1   JENNIFER SHASKY CALVERY
    Chief, Asset Forfeiture and
2   Money Laundering Section (AFMLS)
    LINDA M. SAMUEL
3   Deputy Chief, AFMLS
    DANIEL H. CLAMAN
4   Assistant Chief, AFMLS
    JANET C. HUDSON (Cal. Bar No. 113996)
5   Senior Trial Attorney, AFMLS
    Criminal Division
6   United States Department of Justice
    1400 New York Avenue, N.W., 10th Floor
7   Washington, D.C. 20530
    Telephone:  (202) 514-1263
8   Janet.Hudson2@usdoj.gov

9   ANDRÉ BIROTTE, JR.
    United States Attorney
10  STEVEN R. WELK (Cal. Bar No. 149883)
    Assistant United States Attorney
11  312 North Spring Street, 14th Floor
    Los Angeles, California  90012
12  Telephone:  (213) 894-6166
    Steven.Welk@usdoj.gov

13
    Attorneys for Plaintiff
14  UNITED STATES OF AMERICA



15              UNITED STATES DISTRICT COURT

16          FOR THE CENTRAL DISTRICT OF CALIFORNIA

17  UNITED STATES OF AMERICA,        ) No. CV11-03582GW(SSx)
                                     )
18       Plaintiff,                  ) VERIFIED COMPLAINT FOR
                                     )
19       vs.                         ) FORFEITURE *IN REM*
                                     )
20  ONE WHITE CRYSTAL-COVERED "BAD   )
    TOUR" GLOVE AND OTHER MICHAEL    )
21  JACKSON MEMORABILIA; ONE         )
    GULFSTREAM G-V JET AIRPLANE      )
22  DISPLAYING TAIL NUMBER VPCES;    )
    REAL PROPERTY LOCATED ON         )
23  SWEETWATER MESA ROAD IN MALIBU,  )
    CALIFORNIA; ONE 2007 BENTLEY     )
24  AZURE; ONE 2008 BUGATTI VEYRON;  )
    ONE 2008 LAMBORGHINI             )
25  MURCIELAGO; ONE 2008 ROLLS       )
    ROYCE DROPHEAD COUPE; ONE 2009   )
26  ROLLS ROYCE DROPHEAD COUPE; ONE  )
    2009 ROLLS ROYCE PHANTOM COUPE;  )
27  ONE 2011 FERRARI 599 GTO;        )
                                     )
28       Defendants.                 )
                                     )



1    Plaintiff United States of America, by and through its
2 undersigned attorneys, in a case of forfeiture *in rem*, alleges
3 that:

### NATURE OF THE ACTION

5    1.   This is an action *in rem* to forfeit approximately $75
6 million in real and personal property held for the benefit of
7 Teodoro Nguema Obiang Mangue, the Minister of Agriculture and
8 Forestry of Equatorial Guinea and the son of the President of
9 Equatorial Guinea.  This action is brought against property that
10 was derived from extortion, bribery of a public official, or the
11 misappropriation, embezzlement, or theft of public funds by or
12 for the benefit of a public official, in violation of the law of
13 Equatorial Guinea, and property that was involved in acts of
14 money laundering, in violation of U.S. law.  As property derived
15 from a violation of foreign law, the defendants *in rem* are
16 subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), and
17 as property involved in a money laundering offense in violation
18 of 18 U.S.C. §§ 1956 or 1957, the defendants *in rem* are subject
19 to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).  The
20 defendants *in rem*, obtained through the abuse of public office
21 and illegally laundered through the abuse of financial
22 institutions and businesses in the United States, are believed to
23 be currently located within the Central District of California,
24 with the exception of the defendant aircraft, which has
25 previously been located within the Central District of California
26 and is currently outside the United States, and all but one of
27 the defendant vehicles, which are believed to have been exported
28 from the Los Angeles area to Paris, France.

1

**THE DEFENDANTS IN REM**

2 **One White Crystal-Covered "Bad Tour" Glove and Other Michael
3 Jackson Memorabilia**

4       2.   The defendant White Crystal-Covered "Bad Tour" Glove and

5 miscellaneous other Michael Jackson memorabilia are listed in

6 Attachments A-1 and A-2.   The items in Attachment A-1 are

7 believed to be located at the defendant real property located on

8 Sweetwater Mesa Road, Malibu, California, described below, and

9 the items in Attachment A-2 are believed to be located at Rockin

10 Boxes, 28337 Constellation Road, Santa Clarita, California.

11 **One Gulfstream G-V Jet Airplane Displaying Tail Number VPCES**

12       3.   The defendant Gulfstream jet is a Gulfstream Aerospace

13 model G-V aircraft purchased by Ebony Shine International Ltd.,

14 bearing manufacturer's serial number 669 and International

15 Registration number VPCES (Cayman Islands), previously United

16 States Registration Number N1UB, previously N544KK, its tools and

17 appurtenances.

18 **Real Property Located on Sweetwater Mesa Road, Malibu, California**

19       4.   The defendant real property, as more fully described in

20 Attachment B, is titled in the name of Sweetwater Malibu, LLC, is

21 located on Sweetwater Mesa Road, Malibu, California, and includes

22 all appurtenances, improvements, and attachments thereon, as well

23 as all leases, rents, and profits derived therefrom (hereinafter

24 "Sweetwater property" or "defendant real property").[1]

25 **Seven Luxury Vehicles**

26       5.   The defendant vehicles are described as follows:

27 _____

28       [1]   Pursuant to Local Rule 79-5.4(e), home addresses have
been omitted from this complaint.

a)   One 2007 Bentley Azure, VIN SCBDC47L37CX12482, its tools and appurtenances;

b)   One 2008 Bugatti Veyron, VIN VF9SA25C18M795208, its tools and appurtenances;

c)   One 2008 Lamborghini Murcielago, VIN ZHWBU47S68LA02738, its tools and appurtenances;

d)   One 2008 Rolls Royce Drophead Coupe, VIN SCA2D68578UX16051, its tools and appurtenances;

e)   One 2009 Rolls Royce Drophead Coupe, VIN SCA2D68519UX16242, its tools and appurtenances;

f)   One 2009 Rolls Royce Phantom Coupe, VIN SCA3C67589UX32091, its tools and appurtenances;

g)   One 2011 Ferrari 599 GTO, VIN ZFF70RCA6B0176109, its tools and appurtenances.

6.   Each of the defendant vehicles is titled in the name of Teodoro Nguema Obiang.  The defendant Ferrari is believed to be located at the Sweetwater property, and the remaining defendant vehicles are believed to be located in Paris, France.

7.   The following may have interests in the defendants *in rem*: Teodoro Nguema Obiang Mangue.

<u>**JURISDICTION AND VENUE**</u>

8.   Plaintiff brings this action *in rem* in its own right to forfeit and condemn the defendant property.  This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a).

9.   This Court has *in rem* jurisdiction over the defendant property under 28 U.S.C. § 1355(b).

4

1      10.   Venue is proper in this district pursuant to 28 U.S.C.

2   §1355(b)(1) because the acts or omissions giving rise to the

3   forfeiture occurred in this district, and pursuant to 28 U.S.C.

4   § 1395 because the property is located in this district, with the

5   exception of the defendant vehicles located in Paris, France, and

6   the Gulfstream jet, which was previously located within the

7   Central District of California as recently as February 28, 2011,

8   but is currently believed to be located outside the United

9   States.   Venue as to the defendant assets located outside the

10  United States is under 28 U.S.C. § 1355(b)(2).

11     11.   The defendant real property has not been seized but is

12  located within this district and within the jurisdiction of this

13  Court.   The United States does not request authority from the

14  Court to seize the defendant real property at this time.   The

15  United States will, as provided by 18 U.S.C. §§ 985(b)(1) and

16  (c)(1):

17          •     Post notice of this action and a copy of the

18                Complaint on the defendant real property.

19          •     Serve notice of this action on the defendant real

20                property's owner, and send such a notice to any

21                other person or entity who may claim an interest

22                in the defendant real property, along with a copy

23                of this Complaint.

24          •     If necessary, request and execute a writ of entry

25                for purposes of conducting an inspection and

26                inventory of the defendant real property, and

27          •     Record a *lis pendens* in the county records where

28                the defendant real property is located,

1          identifying the defendant real property as a
2          defendant in this action.
3  The United States will also, as provided in 19 U.S.C. § 1606,
4  appraise the defendant real property.

**BASIS FOR FORFEITURE**

6          12.   The defendant assets are subject to forfeiture pursuant
7  to 18 U.S.C. § 981(a)(1)(C) because they are property
8  constituting or derived from proceeds traceable to an offense
9  constituting "specified unlawful activity."  Specified unlawful
10  activities are defined by 18 U.S.C. § 1956(c)(7) and include
11  foreign offenses involving "extortion," "bribery of a public
12  official, or the misappropriation, theft, or embezzlement of
13  public funds by or for the benefit of a public official."

14          13.   The defendant assets are also subject to forfeiture
15  pursuant to 18 U.S.C. § 981(a)(1)(A) because they constitute
16  property involved in a transaction or an attempted transaction in
17  violation of section 1957 of Title 18, United States Code, or are
18  property traceable to such property.  Section 1957 prohibits the
19  conducting of a financial transaction with property known to be
20  the proceeds of unlawful activity with a value greater than
21  $10,000, *i.e.*, the proceeds of a foreign offense involving
22  extortion, bribery of a public official, or the misappropriation,
23  theft, or embezzlement of public funds by or for the benefit of a
24  public official.  *See* 18 U.S.C. § 1956(c)(7)(B)(ii), (iv).

25          14.   The defendant Gulfstream jet, real property, and
26  memorabilia are also subject to forfeiture pursuant to 18 U.S.C.
27  § 981(a)(1)(A) because they constitute property involved in a
28  transaction or an attempted transaction in violation of section

1  1956 of Title 18, United States Code, or are property traceable

2  to such property.   Section 1956(a)(1)(B) prohibits the conducting

3  of a financial transaction with property known to be the proceeds

4  of unlawful activity with the intent to conceal the nature,

5  location, source, ownership, or control of proceeds of a

6  specified unlawful activity, *i.e.*, a foreign offense involving

7  extortion, bribery of a public official, or the misappropriation,

8  theft, or embezzlement of public funds by or for the benefit of a

9  public official.   *See* 18 U.S.C. § 1956(c)(7)(B)(ii), (iv).

10                                   **FACTS**

11      15.   On information and belief, plaintiff alleges the

12  following facts.

13  **Background**

14      16.   Equatorial Guinea (hereinafter Equatorial Guinea or

15  "EG") is a West African country with slightly less landmass than

16  Maryland.   The population in 2009 was approximately 680,000,

17  according to data compiled by the World Bank.

18      17.   The country was colonized by the Portuguese in the late

19  1600s and ceded to Spain in 1778; it gained independence in 1968.

20  The first President was Macías Nguema.

21      18.   In 1979, Macías Nguema was overthrown in a coup d'état.

22  Teodoro Obiang Nguema Mbasogo ("Obiang Mbasogo"), who was

23  previously the military governor of Bioko and Vice-Minister of

24  the Armed Forces, became President of Equatorial Guinea.

25      19.   More than three decades after seizing control from his

26  uncle Macías Nguema, President Obiang Mbasogo is still in power.

27      20.   As President, Obiang Mbasogo exercises plenary control

28  over the Government of Equatorial Guinea, including naming and

1  dismissing members of the cabinet at will, imposing laws by

2  decree, dissolving the Chamber of Representatives at will,

3  negotiating and ratifying treaties and calling legislative

4  elections.

5      21.  Government Ministers and members of President Obiang

6  Mbasogo's family exercise substantial influence over the economy

7  of Equatorial Guinea.

8      22.  During President Obiang Mbasogo's more than thirty-year

9  rule, government officials and members of the president's family

10 have amassed extraordinary wealth through the misappropriation of

11 Equatorial Guinea's natural resources, their control of

12 government accounts and assets, and their association with

13 President Obiang Mbasogo's power and influence.  One such

14 individual is Teodoro Nguema Obiang Mangue ("Minister Obiang

15 Mangue"), the president's eldest son whom the president appointed

16 Minister of Agriculture and Forestry in or before 2004.  Minister

17 Obiang Mangue is the owner of the defendant properties.

18 **Embezzlement and Misappropriation of Equatorial Guinea's Natural**
**Resources**

19

20     23.  Under Equatoguinean law the nation's mineral resources

21 and hydrocarbons belong to the public, not to individuals.

22 Similarly, Equatoguinean law provides that the National Forestry

23 Reserve is permanent, inalienable, and part of the public domain,

24 and that the National Forests are reserved for exclusive economic

25 extraction and development by the State.

26     24.  Since the commencement of large-scale exploitation of

27 its oil reserves beginning in the mid-1990s, Equatorial Guinea

28 has become a major oil and gas producer, becoming the third-

largest oil and gas producer in Sub-Saharan Africa in 2004.  Over the last several years, oil and gas exports have resulted in billions of dollars in annual revenue.

25.  Equatorial Guinea also derives income from natural resources other than oil, primarily timber, its second major export commodity.

26.  As of 2006, the Equatoguinean economy had grown 20 times larger than it was in the mid-1990s, reflecting the massive revenues derived primarily from oil and gas production.  Despite this extraordinary expansion in the economy of Equatorial Guinea, living standards of the population remain at a subsistence level while the ruling family, including Minister Obiang Mangue, and their associates have gained significant wealth through misappropriation, theft and embezzlement of the nation's natural resources.

27.  An investigation conducted by the Senate Permanent Subcommittee on Investigations (hereinafter "PSI") in 2004 revealed evidence suggesting that oil funds were being misappropriated by government officials.  From at least 1995 to 2004, the Government of Equatorial Guinea directed that payments from oil companies be made into accounts at Riggs National Bank in Washington, D.C.  Aggregate deposits to Equatoguinean government accounts totaled hundreds of millions of dollars at a time and were so large that by 2003, the Government of Equatorial Guinea was the largest client of the bank.

28.  The Obiang family exercised sweeping control over the country's oil revenue, including an account at Riggs in the name of the Republic of Equatorial Guinea General Treasury that

1  received funds mostly from oil companies (the "oil account").  A

2  withdrawal of funds from the oil account required only the

3  signature of President Obiang Mbasogo and a second by either his

4  son Gabriel Obiang Lima (then Deputy Mines and Hydrocarbons

5  Minister) or his nephew Melchor Esono Edjo (Secretary of State

6  for the Treasury).

7       29.  Evidence uncovered in the PSI investigation reveals

8  that any one of those same signatories also could withdraw funds

9  from an EG money market account that was linked to two investment

10 accounts in the name of the Republic of Equatorial Guinea for

11 which the President was the only required signatory.  These EG

12 money market and investment accounts had combined balances of up

13 to $500 million.

14      30.  During the same time period, President Obiang Mbasogo,

15 other EG officials (including several who were relatives of

16 President Obiang Mbasogo), and other family members maintained

17 personal accounts at Riggs Bank in Washington, D.C.

18      31.  Evidence uncovered in the PSI investigation reveals

19 that these and other Riggs Bank accounts were used to receive and

20 transfer the proceeds of misappropriation, embezzlement, and

21 theft of public resources from Equatorial Guinea.  For example,

22 nearly $500,000 was sent from the oil account to the personal

23 bank account of Melchor Edjo, and nearly $35 million was wire

24 transferred from the oil account to two companies that were

25 unknown to the bank and had accounts in jurisdictions with bank

26 secrecy laws.  When Riggs Bank tried to obtain information about

27 the beneficial owners of these two companies, neither the banks

28 holding the accounts nor Equatoguinean officials would provide

information.

32.   The PSI also uncovered other evidence of widespread diversion of official Government funds to personal accounts of President Obiang Mbasogo and members of his family.  In 1999, President Obiang Mbasogo created a Bahamas-registered corporation and opened a money market account at Riggs in the name of that corporation.  From 2000 to 2002, $11.5 million in cash was deposited into this account, often in million-dollar increments and packaged in unopened, plastic-wrapped bundles.

33.   The President's wife also maintained personal accounts at Riggs, into which over $1.4 million in cash was deposited from 2000 to 2002.

34.   Riggs Bank subsequently pleaded guilty to failure to report suspicious monetary transactions by high-risk customers and agreed to a $16 million fine, in addition to a $25 million civil money penalty, for its handling of the Equatoguinean and other accounts.

35.   Following release of the report of the Senate Permanent Subcommittee on Investigations ("Riggs report") in 2004, the EG Government took cosmetic steps to improve its public image, but failed to enact reforms to curb the types of abuses identified in the Riggs report.

**Minister Obiang Mangue's Illicit Acquisition and Misuse of Funds**

36.   Minister Obiang Mangue has used his position and influence to acquire criminal proceeds through corruption, abuse of office and money laundering in violation of Equatoguinean and U.S. law.

37.   As Minister of Agriculture and Forestry, Minister

11

Obiang Mangue exercises control over the ministry that regulates the commercial extraction of forestry products, Equatorial Guinea's second largest export commodity.  Although EG law prohibits public officials from intervening in businesses and associations in their area of responsibility, Minister Obiang Mangue controls companies heavily involved in commercial forestry in Equatorial Guinea, *e.g.*, Grupo Sofona and its affiliate, Somagui Forestal.  Minister Obiang Mangue has used money from accounts in the name of Somagui Forestal for purchases of expensive personal items, including some of the defendant assets.

38.  As a government minister and through his relationship with his father and other family members with direct control over the extraction of oil, natural gas, and other mineral wealth, Minister Obiang Mangue exercises access to and control over public money and resources.  For example, in an attempt to purchase a $40 million luxury aircraft for personal use in 2005, Minister Obiang Mangue advised the manufacturer that he could have a U.S. oil company operating in Equatorial Guinea assume responsibility for making the payments for his personal jet.

39.  Minister Obiang Mangue has held the position of Minister of Agriculture and Forestry since being appointed by his father in or before 2004 and in that capacity currently earns the equivalent of approximately $6,799 per month.

40.  Nevertheless, Minister Obiang Mangue has spent and continues to spend tens of millions of dollars on luxury items in a manner grossly disproportionate to his modest government income.  Minister Obiang Mangue maintains an opulent lifestyle, making extravagant expenditures of many millions of dollars on

costly homes, cars, boats, aircraft, and other items in the
United States and around the world.

41. Some, but not all, of Minister Obiang Mangue's lavish
purchases are set forth below, including his expenditure of more
than $68 million between April and June of 2006 alone in order to
acquire the defendant luxury Gulfstream jet and the defendant
Sweetwater mansion in Malibu.

42. In March 2001, Minister Obiang Mangue purchased a home
located on Antelo Road in Los Angeles, California for $6.5
million dollars. He later sold that property on November 14,
2004 for $7.7 million.

43. In March 2004, before selling the Antelo Road property,
Minister Obiang Mangue purchased two luxury homes in South Africa
for the equivalent of approximately US $7.7 million.

44. Minister Obiang Mangue's extravagant expenditures have
also included millions of dollars in exotic sports cars and
luxury vehicles. These included, among others, 24 cars with a
total declared value of $9,680,000 that he stored at the Petersen
Automotive Museum in Los Angeles until November 2010, when he
shipped them, along with $400,000 worth of motorcycles, to
France. These cars included a $2 million Maserati, a $1.3
million Bugatti sports car, seven Ferraris, four Rolls Royces,
four Bentleys, four Mercedes, a Porsche, a Lamborghini, and an
Aston Martin. All of these are in addition to the Bugatti,
Bentley, Lamborghini, Ferrari, and Rolls Royces listed as
defendants in this Complaint, which cost a total of $5.2 million.

45. In June 2005, Minister Obiang Mangue purchased two
high-performance racing boats in Fort Myers, Florida, for a total

13

of over $2 million.

46.   Between April and June 2006 -- the same period in which he spent $30 million on the defendant Malibu mansion -- Minister Obiang Mangue purchased the defendant Gulfstream G-V private jet for over $38 million.   This aircraft is an ultra-long-range jet that can fly from Los Angeles to Tokyo nonstop, which, according to published reports, costs over $3,000 per hour to operate.   The plane routinely flies all over the world; for example; in December 2010 alone, it flew from Italy to Morocco; from there to Brazil; from there to Equatorial Guinea; and from there to Senegal.

47.   Minister Obiang Mangue has also spent large sums on designer clothing and lavish vacations.   In a single month in 2004, for example, he spent over $80,000 at Gucci and over $50,000 at Dolce and Gabbana in a shopping spree in the United States.   He also spent over $100,000 at the Grand Wailea Resort in Hawaii in August-September 2005.

48.   At auctions in June and October 2010, Minister Obiang Mangue spent a total of over $1.8 million on various items belonging to the late singer and performer Michael Jackson, including $80,000 for a pair of crystal socks, $140,000 for a jacket and shirt, and $245,000 for a ball signed by Michael Jackson and basketball star Michael Jordan.

49.   In June 2008, a broker acting on behalf of Minister Obiang Mangue contacted a German yacht-building company that describes itself on its website as being "famous worldwide for high-end and quality yachts," and as engaging in the design and construction of "mega-yachts."   Minister Obiang Mangue paid the

1   company approximately $290,000 for the pre-design of a mega-
2   yacht; the price of the yacht itself was to be in the
3   neighborhood of $380 million.  When information about the
4   proposed purchase became public in 2011, the Information and
5   Press Bureau of the Government of Equatorial Guinea confirmed
6   that Minister Obiang Mangue had ordered the design, while adding
7   that he "then dismissed the idea of buying it."  The spokesperson
8   claimed that if the order had gone ahead Minister Obiang Mangue
9   "would have bought it with income from his private business
10  activities and he would not in any case have bought it with funds
11  derived from sources of illegal financing or corruption."

12       50.  These additional assets and expenditures, combined with
13  the defendant Malibu mansion, the Gulfstream jet, the luxury
14  vehicles, and the celebrity memorabilia, add up to over $100
15  million (not including the proposed $380 million yacht).

16  **Minister Obiang Mangue's Efforts to Conceal the Source and**
**Ownership of His Funds**

18       51.  Following the issuance of the Riggs report in 2004,
19  Minister Obiang Mangue had difficulty finding U.S. financial
20  institutions willing to deal with him directly because of
21  concerns that his funds were derived from corruption in
22  Equatorial Guinea.  In order to conceal the source and ownership
23  of some of the funds he brought into the United States, Minister
24  Obiang Mangue created shell companies in various names, including
25  "Beautiful Vision, Inc." and "Unlimited Horizon, Inc.," and
26  opened bank accounts in the United States in the names of those
27  shell companies.  He also wire transferred funds to bank accounts
28  controlled by intermediaries, who then used the money to pay his

expenses, or transferred money from those accounts to accounts in the names of the shell companies and then used the shell company accounts to pay his expenses.

52.  The steps Minister Obiang Mangue took after the negative publicity from the Riggs report to continue to make large purchases, and his concomitant efforts to conceal the source of his funds, are illustrated by his efforts to buy a Gulfstream jet, as set forth more fully below at paragraphs 65-74.  In brief, Minister Obiang Mangue's initial effort to buy a Gulfstream jet directly from the manufacturer was terminated by Gulfstream after the Riggs report came out.  The lawyers on both sides of the transaction were so concerned about possible civil or criminal liability as a result of their involvement in handling Minister Obiang Mangue's money that they requested assurances from the U.S. Department of Justice.  Minister Obiang Mangue then tried to buy a used Gulfstream jet from a private party, but that transaction fell through when the escrow company insisted on knowing the source of the funds being used to buy the jet.  Finally, Minister Obiang Mangue was able to complete the transaction by using a different escrow company that did not require such information and an escrow account at a foreign bank.

**Purchase of the Defendants In Rem**

53.  As set forth below, Minister Obiang Mangue followed a pattern of enormous expenditures with no financing and the use of intermediaries and shell companies to acquire the defendants in rem.

**Purchase of the Defendant White Crystal-Covered "Bad Tour" Glove and Other Michael Jackson Memorabilia**

54.  In August 2010, an intermediary registered Minister Obiang Mangue to bid in a live auction of celebrity memorabilia (called the "Legends" auction) taking place on October 9, 2010, in Macau, China (October 8, 2010, in California).  The intermediary advised the auction house by email to "Please make sure that [Minister Obiang Mangue's] name does not appear anywhere, he should be invisible," and to "please make sure that where a name needs to be, my name is there.  This is very important."

55.  At the "Legends" auction, the intermediary bid on various auction items by telephone from Los Angeles, for Minister Obiang Mangue, and was the winning bidder on numerous items of Michael Jackson memorabilia.  The auction house prepared two invoices in the name of the intermediary, using the address of the Sweetwater property.  The total of the two invoices was $1,398,062.50.

56.  When one of Minister Obiang Mangue's assistants received the invoices, she instructed the auction house to revise the invoices to indicate that the purchases were being billed to "Amadeo Oluy, Malabo, Guinea Equatorial."  These items were shipped to France and Equatorial Guinea.

57.  On December 10, 2010, another auction of celebrity memorabilia was held by the same auction house, this time in Beverly Hills, California.  An intermediary came to the auction on Minister Obiang Mangue's behalf and successfully bid on the defendant white crystal-covered "Bad Tour" glove and other

1  defendant items listed in Attachment A-1, attached hereto.   The

2  total cost of these items was $872,125.00.

3       58.   In accordance with the instructions it had previously

4  received, the auction house prepared invoices that did not list

5  the buyer as Minister Obiang Mangue, but instead used the name of

6  a straw purchaser, with the address Sweetwater, Malabo, Guinea

7  Equatorial.

8       59.   On January 31, 2011, Minister Obiang Mangue caused

9  $872,112.00 to be wire transferred from an account in the name of

10  Eloba Construccion, S.A., in Equatorial Guinea to an account at

11  American Business Bank in Los Angeles in the name of the auction

12  house, Julien Entertainment, to pay for the items purchased in

13  the December 10, 2010 auction.   These items were subsequently

14  packed for shipment and delivered to the defendant Sweetwater

15  property.

16       60.   On March 26, 2011, the auction house held another

17  auction, called "Rock Legends."   Again, an intermediary bid on

18  items on Minister Obiang Mangue's behalf.   Through the

19  intermediary, Minister Obiang Mangue purchased the items listed

20  in Attachment A-2, attached, for a total purchase price of

21  $115,000.

22       61.   On March 29, 2011, an employee of the auction house

23  sent her employer an email regarding the invoices for the items

24  purchased on behalf of Minister Obiang Mangue, asking,

25          I assume I need to rewrite the invoices in the same
            fashion as I've done in prior sales? (putting all lots
26          on one page, adding catalog page numbers and changing
            the Buyer's name)
27

28       62.   The invoices were prepared listing the intermediary,

1  rather than Minister Obiang Mangue, as the buyer.

2      63.  On April 15, 2011, Minister Obiang Mangue caused a net

3  total of $119,974.00 to be wire transferred from his account in

4  the name of "Eloba Construccion S.A." in Equatorial Guinea to the

5  bank account of the auction house at American Business Bank in

6  Los Angeles, California, to pay for the items purchased at the

7  March 26, 2011 auction.

8      64.  The items listed in Attachment A-2 are believed to be

9  currently located at a shipping company called Rockin Boxes,

10  28337 Constellation Road, Santa Clarita, California.

11  **Purchase of the Defendant Gulfstream Jet**

12      65.  Initially, Minister Obiang Mangue sought to purchase a

13  $40 million aircraft directly from the manufacturer, Gulfstream

14  Aerospace ("Gulfstream"), in the United States.  Minister Obiang

15  Mangue began negotiating the purchase in late 2003 or early 2004

16  and sent approximately $20 million to an escrow account

17  associated with Gulfstream.  However, after the publication of

18  the Riggs report in July 2004, Gulfstream decided to cancel the

19  transaction and wanted to return the $20 million to a law firm

20  representing Minister Obiang Mangue.

21      66.  Both Gulfstream's lawyers and Minister Obiang Mangue's

22  lawyers were concerned about returning the $20 million, fearing

23  that movement of the funds could trigger a seizure or forfeiture

24  by the U.S. government, or that the parties involved in the

25  transaction could be prosecuted under the federal money

26  laundering statutes.  In approximately January 2005, therefore,

27  the lawyers requested a letter from the U.S. Department of

28  Justice assuring them that no such actions would be taken.

67.   At that time, the Justice Department had not targeted Minister Obiang Mangue or his finances for investigation.   In response to the lawyers' request, the Justice Department sent a letter to Gulfstream's lawyers on March 23, 2005, and a similar letter to the law firm representing Minister Obiang Mangue on April 18, 2005, saying that "at the present time" the Department of Justice had "no basis for either restraining or seizing" the funds and that "at this time" the Department had "no basis for believing" that the funds "would violate the U.S. money laundering laws."

68.   On July 28, 2005, Gulfstream wire transferred the $20 million, plus interest, to the bank account of the law firm representing Minister Obiang Mangue.

69.   Having been rejected by Gulfstream Aerospace, Minister Obiang Mangue sought to purchase a used Gulfstream V jet from a private party in 2006 for $38.5 million.   For purposes of the transaction, Minister Obiang Mangue used a British Virgin Islands shell company, Ebony Shine International Ltd., as the nominal buyer, and a U.S. company, Insured Aircraft Title Services ("IATS") of Oklahoma City, as its escrow agent.

70.   The seller was Blue Sapphire Services, Ltd. (also a British Virgin Islands shell corporation), which used McAfee & Taft, a U.S. company headquartered in Oklahoma City, as its escrow agent.   At the time of the attempted transaction, the aircraft was registered with the Federal Aviation Administration in Oklahoma City, and Wells Fargo Bank Northwest served as the aircraft's U.S. registered owner.

71.   On March 23, 2006, at Minister Obiang Mangue's

20

instruction, IATS wire transferred approximately $4.7 million from an account at UBS London to a McAfee & Taft escrow account at Bank of America in Oklahoma City.  From April 4-7, 2006, Minister Obiang Mangue wired a total of $10,300,000 from his personal account at Société Générale de Banque en Guinée Équatoriale, Malabo, to the McAfee & Taft escrow account at Bank of America in Oklahoma City.

72.  Despite having received a total of $15 million toward the purchase price, McAfee & Taft was not willing to proceed with the transaction because the buyer, Minister Obiang Mangue, had not complied with its requirements, including a requirement that the buyer identify the source of the funds.  McAfee & Taft therefore cancelled the transaction.

73.  On April 12, 2006, McAfee & Taft returned a total of $10,299,950.00 to Minister Obiang Mangue's account in Equatorial Guinea, and $4,723,262.22 to IATS's account at UBS London.

74.  Minister Obiang Mangue was ultimately able to complete the aircraft purchase by using IATS of Oklahoma City as the escrow agent instead of McAfee & Taft, and by depositing the funds into IATS's account at UBS London.  Unlike McAfee & Taft, IATS did not require information as to the source of the $38.5 million used to buy the aircraft.  The funds were provided by Minister Obiang Mangue from his personal account in Equatorial Guinea.  The payments were executed via transactions into and out of correspondent accounts in the United States before arriving at the IATS account at UBS London.

**Purchase of the Defendant Real Property**

75.  The defendant real property is located in an exclusive

21

gated community in Malibu, California and at the time of purchase in 2006 included approximately 12 acres of land overlooking the Pacific Ocean, a 15,000-square foot main house, a 2,500-square foot guest house, two gate houses, a pool overlooking the ocean, a putting green, and a tennis court.

76.  In approximately February 2006, Minister Obiang Mangue reached an agreement to purchase the defendant real property for approximately $30 million, notwithstanding his annual salary of less than $100,000.  Minister Obiang Mangue's purchase of the defendant mansion was one of the ten most expensive home purchases in the United States in 2006.

77.  However, Minister Obiang Mangue did not purchase the defendant real property in his own name.  On or about February 8, 2006, Minister Obiang Mangue caused the formation of a corporation called Sweetwater Malibu, LLC, for the purpose of taking title to the defendant real property.  Minister Obiang Mangue was the sole owner of the corporation at all times, and provided Sweetwater Malibu, LLC with all necessary funds to take title to the defendant real property.

78.  A grant deed was recorded indicating that the seller sold the defendant real property to "Sweetwater Malibu, LLC" on February 27, 2006.  However, escrow did not close, and the deed was not recorded, until April 27, 2006.

79.  Obiang Mangue paid a total of $30,442,000 into escrow account #LGL-226-1234 at First American Title Company, 520 North Central Avenue, Glendale, California 91203, held at First American Trust FSB in Santa Ana, California, for the purchase of the defendant real property.  These payments were made as follows

on or about the following dates:

80. On February 2, 2006, West Coast Escrow, on behalf of Minister Obiang Mangue, wire transferred $900,000 from one of its escrow accounts to First American Title Company's escrow account. These funds had come from Minister Obiang Mangue's unsuccessful attempt to buy a private jet directly from Gulfstream Aerospace Corporation in 2005. When it cancelled the sale, Gulfstream released approximately $20 million plus interest that it had received as partial payment for the plane to Minister Obiang Mangue through a U.S. law firm. Per Minister Obiang Mangue's instructions, the law firm transferred $900,000 of these funds to West Coast Escrow on December 22, 2005, in connection with an earlier attempt by Minister Obiang Mangue to purchase the defendant real property. West Coast Escrow, in turn, executed this transfer into the First American Title Company escrow account in California in February 2006.

81. From April 5, 2006, through April 26, 2006, Minister Obiang Mangue sent five wire transfers, each in the amount of $5,908,400, from Equatorial Guinea to the First American Trust escrow account. The funds originated at Société Générale de Banque en Guinée Équatoriale, where Minister Obiang Mangue held a personal account. The total amount of these five wire transfers was $29,542,000. Added to the $900,000 initial payment into escrow, the total amount paid into escrow was $30,442,000.

82. The total purchase price for the defendant real property was paid from funds provided by Minister Obiang Mangue and no mortgage was used.

**The Defendant Vehicles**

83.  As described below, Minister Obiang Mangue purchased six of the defendant vehicles from O'Gara Coach Company in Beverly Hills, and the defendant Ferrari 599 GTO from Ferrari of Beverly Hills.  The defendant vehicles are titled in the name of Teodoro Nguema Obiang.

**2007 Bentley Azure**

84.  On June 15, 2007, Minister Obiang Mangue signed a contract to purchase the defendant 2007 Bentley Azure for a total purchase price of $424,772.57.  Minister Obiang Mangue paid for the car as follows: On or about May 16, 2007, he wire transferred $424,772.57 from an account in the name of "Somagui" at CCEI Bank, Equatorial Guinea, to the account of O'Gara Coach Co., Beverly Hills, California at Bank of America in Los Angeles, California.  According to shipping records, the defendant 2007 Bentley Azure was exported to Paris, France on November 14, 2010.

**2008 Bugatti Veyron**

85.  On April 10, 2008, Minister Obiang Mangue purchased the defendant 2008 Bugatti Veyron for a total purchase price of $2,038,391.89.  Minister Obiang Mangue paid for the car as follows: On or about April 10, 2008, he paid $1,771,680.00 in cash, leaving a balance due of $266,711.89.  On April 14, 2008, he wire transferred $266,640.22 from an account in his name at CCEI Bank, Equatorial Guinea, to the account of O'Gara Coach Co., Beverly Hills, California at Bank of America in Los Angeles, California.  (Again, the seller apparently accepted this wire transfer as payment in full, although it was $71.67 short.) According to shipping records, the defendant 2008 Bugatti Veyron

24

1  was exported to Paris, France on November 14, 2010.

2  **2008 Lamborghini Murcielago**

3      86.   On July 30, 2005, Minister Obiang Mangue purchased a

4  2005 Lamborghini Murcielago from O'Gara Coach Company in Beverly

5  Hills, California, for a total purchase price of $380,173.96.   He

6  paid for it in full on that date, with $50,000 in cash and a

7  check for $330,173.96 drawn on a bank account in the name of

8  Beautiful Vision, Inc., at Bank of America in Beverly Hills.   The

9  funds drawn from the Beautiful Vision account are traceable as

10 follows:

11     87.   On March 15, 2004, Minister Obiang Mangue sent a wire

12 transfer in the amount of $999,950 from Equatorial Guinea to a

13 client-trust account at City National Bank.   Minister Obiang

14 Mangue later described the source of these funds as "either

15 Somagui Forestal or Sofona," his forestry companies.

16     88.   On June 24, 2005, City National Bank gave two checks

17 totaling $699,691 to Minister Obiang Mangue's attorney after

18 closing the client-trust account.   Minister Obiang Mangue's

19 attorney deposited the two checks into his client-trust account

20 at Bank of America.

21     89.   On July 29, 2005, $669,691 was transferred from the

22 above-referenced client-trust account at Bank of America to

23 Obiang Mangue's account at Bank of America in Beverly Hills,

24 California, in the name of the shell corporation Beautiful

25 Vision.

26     90.   On July 30, 2005, Minister Obiang Mangue wrote a check

27 for $330,173.96 on the Beautiful Vision account at Bank of

28 America in Beverly Hills, California, made payable to O'Gara

Coach Company, for the 2005 Lamborghini Roadster.  This check was deposited into O'Gara Coach Company's account at Bank of America in Los Angeles, California.

91.  On August 31, 2007, Minister Obiang Mangue traded in the 2005 Lamborghini Murcielago for the defendant 2008 Lamborghini Murcielago.  The total price of the new car reflected in the sales contract was $501,073.29, of which $270,000.00 was paid from the trade-in of his 2005 Lamborghini.  Minister Obiang Mangue paid the remaining balance using a wire transfer of $230,976.23 from an account in the name of "Somagui," Bata, Guinee Equatoriale, to the account of O'Gara Coach Company, Beverly Hills at Bank of America in Los Angeles, California on October 12, 2007.  (Although this was $97.06 less than the contract sales price, the seller apparently accepted it as payment in full.)  According to records of U.S. Customs and Border Protection (CBP), the defendant Lamborghini was exported to Paris, France on August 19, 2010.

**2008 Rolls Royce Drophead Coupe**

92.  On March 26, 2008, Minister Obiang Mangue purchased the defendant 2008 Rolls Royce Drophead Coupe for a total purchase price of $609,973.29.  Minister Obiang Mangue paid for the car as follows: On March 18, 2008, he wire transferred $609,898.33 from an account in the name of "Socage" at CCEI Bank, Equatorial Guinea, to the account of O'Gara Coach Co., Beverly Hills at Bank of America in Los Angeles, California.  (Again, the seller apparently accepted this wire transfer as payment in full, although it was $74.96 short.)  According to CBP export records, the defendant 2008 Rolls Royce Drophead Coupe was exported to

1  Paris, France on May 13, 2010.

2  **2009 Rolls Royce Drophead Coupe**

3       93.   On September 22, 2008, Minister Obiang Mangue agreed to

4  purchase the defendant 2009 Rolls Royce Drophead Coupe for a

5  total price of $609,984.29.  He paid for it by wire transferring

6  $609,912.87 on October 6, 2008 from an account in his name at

7  CCEI Bank in Equatorial Guinea to the account of O'Gara Coach

8  Co., Beverly Hills, at Bank of America in Los Angeles,

9  California.   (Again, the seller apparently accepted this wire

10 transfer as payment in full, despite a $71.42 discrepancy.)

11 According to CBP export records, the 2009 Rolls Royce Drophead

12 Coupe was exported to Paris, France on August 19, 2010.

13 **2009 Rolls Royce Phantom Coupe**

14      94.   On January 26, 2009, Minister Obiang Mangue purchased

15 the defendant 2009 Rolls Royce Phantom Coupe for a total purchase

16 price of $499,910.45.  Minister Obiang Mangue paid for the car as

17 follows: On or about January 26, 2009, he wire transferred

18 $499,910.45 from an account in his name at CCEI Bank, Equatorial

19 Guinea, to the account of O'Gara Coach Co., Beverly Hills at Bank

20 of America in Los Angeles, California.   According to CBP export

21 records, the defendant 2009 Rolls Royce Phantom Coupe was

22 exported to Paris, France on August 19, 2010.

23 **2011 Ferrari 599 GTO**

24      95.   On or about November 11, 2010, Minister Obiang Mangue

25 took delivery of the defendant 2011 Ferrari 599 GTO from Ferrari

26 of Beverly Hills.  Minister Obiang Mangue caused his forestry

27 company, Somagui, to make initial down payments on his behalf by

28 executing wire transfers of approximately $25,131, $39,912, and

$14,929.65 to the account of Ferrari of Beverly Hills at Pacific Western Bank in California in November and December of 2009. After a portion of these funds were refunded, Minister Obiang Mangue paid the balance of $493,010.99 via wire transfer to Pacific Western Bank in December 2010. The total recorded purchase price for the vehicle was $532,984.12. The defendant Ferrari is believed to be located at the Sweetwater property.

**Law of Equatorial Guinea**

96. The criminal law of Equatorial Guinea continues to be the law in effect at the time of independence, *i.e.*, the criminal code that was in force in Spain in 1968. That code contains the following provisions, among others, which effectively prohibit extortion, bribery, misappropriation, theft, and embezzlement of public funds by or for the benefit of a public official:

a) A public official may not take advantage of his position to involve himself directly or indirectly with private associations or companies with the intent to profit (article 198);

b) A person without title or legitimate authority may not exercise the actions of an Authority or public official (article 320);

c) A public official may not solicit or receive, directly or indirectly, a gift, offer or promise in exchange for a criminal or unjust act or omission related to his position (article 385, *et seq.*);

d) A public official may not accept gifts presented to him in the normal course of his duties for performing an act that should not be compensated (article 390);

28

1       e) A person may not corrupt or attempt to corrupt a public
2  official with gifts, offers, or promises (article 391);

3       f) A public official may not steal or consent to the theft
4  by another of public funds or property that may be under his
5  control by virtue of his duties (article 394);

6       g) A public official may not use public funds or property
7  placed under his control for personal use (article 396);

8       h) A public official may not directly or indirectly hold an
9  interest in any type of contract or operation in which he must be
10 involved by reason of his position (article 401);

11      i) A government or economic leader may not, during the
12 discharge of his duties, take part directly or indirectly in
13 trading or for-profit transactions, within the limits of his
14 jurisdiction or command, involving objects that are not the
15 product of his own property (article 404);

16      j) A person with intent to enrich may not take property
17 without the consent of the owner (article 514).

18      97.  Under the Spanish criminal code in effect in Equatorial
19 Guinea, accomplices or persons who cover up or impede the
20 discovery of a crime may be held criminally responsible for the
21 offense (article 12, *et seq.*).

22 **Conclusion**

23      98.  As set forth above, despite a modest government salary,
24 Minister Obiang Mangue has acquired vast wealth of tens of
25 millions of dollars during a period in which his family and their
26 associates have been the near exclusive beneficiaries of the sale
27 and exploitation of Equatorial Guinea's natural resources, which
28 by law, are public property.  He exercises cabinet-level

1  authority over a ministry that regulates a sector in which he
2  holds business interests, in violation of the law of Equatorial
3  Guinea.  Through his influence as the president's son, he has
4  directly or indirectly sought to obtain property through the
5  exploitation of the nation's oil and gas resources, over which
6  his family has exercised plenary control for their own benefit.
7  Minister Obiang Mangue also has taken significant steps to
8  conceal the source and ownership of his funds and assets, the
9  value of which is of a magnitude wholly incompatible with his
10 government salary.  In light of these and the other facts set
11 forth above, it is more likely than not that the defendants *in*
12 *rem* constitute assets derived from extortion or bribery,
13 misappropriation, theft, or embezzlement of public funds by or
14 for the benefit of a public official.

15      99.  On information and belief, the approximately $75
16 million used by Minister Obiang Mangue to purchase the defendant
17 assets was derived from funds obtained through extortion or
18 bribery, misappropriation, theft, or embezzlement of public funds
19 by or for the benefit of a public official, in violation of the
20 laws of Equatorial Guinea.

21                    **FIRST CLAIM FOR FORFEITURE**
22                     (18 U.S.C. § 981(a)(1)(C))
23      100.  Paragraphs 1-99 above are incorporated by reference as
24 if fully set forth herein.
25      101.  Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property,
26 real or personal, which constitutes or is derived from proceeds
27 traceable to . . . any offense constituting 'specified unlawful
28 activity'" is subject to forfeiture to the United States.

                                  30

1      102.  "Specified unlawful activity" is defined in 18 U.S.C.

2  § 1956(c)(7)(B)(ii) and (iv) to include, among other things, an

3  offense against a foreign nation involving "extortion" or

4  "bribery of a public official, or the misappropriation, theft, or

5  embezzlement of public funds by or for the benefit of a public

6  official."

7      103.  As set forth above, the funds used to purchase the

8  defendant real property, jet, vehicles, and memorabilia were

9  derived from extortion, or bribery of a public official, or the

10  misappropriation, theft, or embezzlement of public funds by or

11  for the benefit of a public official, in violation of the laws of

12  Equatorial Guinea.

13      104.  Therefore, the defendant assets are subject to

14  forfeiture to the United States pursuant to 18 U.S.C.

15  § 981(a)(1)(C), on the grounds that they constitute or are

16  derived from proceeds traceable to a specified unlawful activity.

17                    **SECOND CLAIM FOR FORFEITURE**

18                     (18 U.S.C. § 981(a)(1)(A))

19      105.  Paragraphs 1-99 above are incorporated by reference as

20  if fully set forth herein.

21      106.  Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property,

22  real or personal, involved in a transaction or attempted

23  transaction in violation of section . . . 1957 . . . of [title

24  18, United States Code], or any property traceable to such

25  property," is subject to forfeiture to the United States.

26      107.  18 U.S.C. § 1957 imposes a criminal penalty on any

27  person who:

28          knowingly engages or attempts to engage in a monetary
             transaction in criminally derived property of a value

1        greater than $10,000 and is derived from specified
2        unlawful activity.

3       108.   For purposes of Section 1957, the term "specified
4 unlawful activity" has the same meaning as set forth in paragraph
5 102 above.

6       109.   As set forth above, the defendants *in rem* were the
7 subject of monetary transactions or attempted transactions
8 involving criminally-derived property of a value greater than
9 $10,000 and derived from specified unlawful activity, that is,
10 extortion or bribery of a public official or the
11 misappropriation, theft, or embezzlement of public funds by or
12 for the benefit of a public official, in violation of the laws of
13 Equatorial Guinea.

14       110.   Therefore, the defendants *in rem* are subject to
15 forfeiture to the United States pursuant to 18 U.S.C.
16 § 981(a)(1)(A), on the grounds that they were involved in
17 transactions or attempted transactions in violation of 18 U.S.C.
18 § 1957, or are traceable to such property.

19                   **THIRD CLAIM FOR FORFEITURE**
20                 (18 U.S.C. § 981(a)(1)(A))

21       111.   Paragraphs 1-99 above are incorporated by reference as
22 if fully set forth herein.

23       112.   Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property,
24 real or personal, involved in a transaction or attempted
25 transaction in violation of section 1956 . . . of [title 18,
26 United States Code], or any property traceable to such property,"
27 is subject to forfeiture to the United States.

28       113.   18 U.S.C. § 1956(a)(1) imposes a criminal penalty on

1 | any person who:

2 |     knowing that the property involved in a financial
3 | transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified
4 | unlawful activity –

. . .

5 |       (B) knowing that the transaction is designed in whole or in part –
6 |         (i) to conceal or disguise the nature, the location, the source,
7 |         the ownership, or the control of the proceeds of specified unlawful
8 |         activity[.]

9 |     114.  For purposes of Section 1956, the term "specified
10 | unlawful activity" has the same meaning as set forth in paragraph
11 | 102 above.

12 |     115.  As set forth above, the defendant real property,
13 | Gulfstream jet, and memorabilia were the subject of financial
14 | transactions and attempted financial transactions and, for the
15 | reasons set forth above, the funds involved in those transactions
16 | were derived from specified unlawful activity, that is, extortion
17 | or bribery of a public official or the misappropriation, theft,
18 | or embezzlement of public funds by or for the benefit of a public
19 | official, in violation of the laws of Equatorial Guinea.  Also,
20 | as set forth above, the transactions were designed in whole or in
21 | part to conceal or disguise the source, ownership, or control of
22 | the proceeds of specified unlawful activity, in that, among other
23 | things, the nominal purchaser of the defendant Gulfstream jet was
24 | Ebony Shine International Ltd., the nominal purchaser of the
25 | defendant real property was Sweetwater Malibu, LLC, and the
26 | invoices for the defendant memorabilia were put in the name of
27 | Minister Obiang Mangue's assistant or a straw purchaser, rather
28 | than the name of the true owner, Teodoro Nguema Obiang Mangue.

116.   Therefore, the defendant real property, the defendant Gulfstream jet, and the defendant memorabilia are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A), on the grounds that they were involved in transactions or attempted transactions in violation of 18 U.S.C. § 1956(a)(1)(B)(i), or are traceable to such property.

34

1

### CLAIM FOR RELIEF

2      WHEREFORE plaintiff, the United States of America, requests

3   that judgment be entered in its favor and against the defendants

4   *in rem*, and that process issue to enforce the forfeiture of the

5   defendants *in rem*, and that all persons having an interest in the

6   defendants *in rem* be cited to appear and show cause why the

7   forfeiture should not be decreed, and that this Court decree

8   forfeiture of the defendants *in rem* to the United States of

9   America for disposition according to law, and that this Court

10  grant the Government such further relief as this Court may deem

11  just and proper, together with the costs and disbursements in

12  this action.

13  DATED: 4-26 , 2011        JENNIFER SHASKY CALVERY, CHIEF
                              ASSET FORFEITURE AND MONEY
14                                 LAUNDERING SECTION
                              LINDA M. SAMUEL
15                            Deputy Chief, AFMLS
                              DANIEL H. CLAMAN
16                            Assistant Chief, AFMLS

17                            _____

18                            JANET C. HUDSON
                              Senior Trial Attorney, AFMLS
19                            Criminal Division
                              United States Department of Justice
20
                              ANDRÉ BIROTTE, JR.
21                            United States Attorney
                              STEVEN WELK
22                            Assistant United States Attorney

23                            Attorneys for Plaintiff
                              UNITED STATES OF AMERICA
24

25

26

27

28

35

### VERIFICATION

I, Robert Manzanares, hereby verify and declare under penalty of perjury that I am a Special Agent with Homeland Security Investigations, that I have read the foregoing Verified Complaint for Forfeiture *In Rem* and know the contents thereof, and that the matters contained in the Verified Complaint are true to the best of my knowledge and belief.

The sources of my knowledge and information and the grounds of my belief are official files and records of the United States, publicly available files and historical information, files and records compiled by the Senate Permanent Subcommittee on Investigations, information supplied to me by other law enforcement officers, experts, and other witnesses, as well as my investigation in this case, together with others, as a Special Agent of Homeland Security Investigations.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this 26 day of April, 2011, at   4:00 pm   .

ROBERT MANZANARES
Special Agent
Homeland Security Investigations

38
34

ATTACHMENT A-1:

## ICONS AND IDOLS

| Lot No. | Description | Price |
|---|---|---|
| 586 | MICHAEL JACKSON BAD TOUR GLOVE | 275,000.00 |
| 573 | "WE ARE THE WORLD" MTV VIDEO MUSIC AWARD | 60,000.00 |
| 585 | MICHAEL JACKSON STAGE WORN FEDORA | 60,000.00 |
| 621 | MICHAEL JACKSON STAGE WORN FEDORA | 60,000.00 |
| 553 | MICHAEL JACKSON SIGNED FEDORA | 42,500.00 |
| 549 | MICHAEL JACKSON SIGNED THRILLER JACKET | 40,000.00 |
| 650B | M.J. STAGE WORN SIGNED GOLD FENCING SHIRT | 30,000.00 |
| 606 | MICHAEL JACKSON WORN FEDORA | 25,000.00 |
| 556 | MICHAEL JACKSON "GOLD" RECORD AWARD | 10,000.00 |
| 576 | "WE ARE THE WORLD" SIGNED DOCUMENT ARCHIVE | 10,000.00 |
| 575 | "WE ARE THE WORLD" SIGNED ALBUM | 8,000.00 |
| 650 | M.J. NEVERLAND RANCH GOLD & COUNTRY BY | 7,000.00 |
| 580 | MICHAEL JACKSON SIGNED SHEET MUSIC | 6,500.00 |
| 617 | MICHAEL JACKSON SIGNED PHOTOGRAPH | 5,250.00 |
| 624 | MICHAEL JACKSON KATHERINE BAUMANN BAG | 5,000.00 |
| 557 | MICHAEL JACKSON "THRILLER" RECORD AWARD | 4,500.00 |
| 589 | MICHAEL JACKSON SIGNED BAD ERA POSTER | 4,000.00 |
| 635a | M. JACKSON AND TROY AIKMAN SIGNED FOOTBALL | 4,000.00 |
| 579 | MICHAEL JACKSON "PLATINUM" RECORD AWARD | 3,500.00 |
| 588 | MICHAEL JACKSON SIGNED PHOTO | 3,250.00 |
| 558 | M. JACKSON SIGNED "THRILLER" 12-INCH SINGLE | 3,000.00 |
| 584 | M.JACKSON AND PAUL MCCARTNEY SIGNED BAG | 3,000.00 |
| 540 | JACKSON 5 "GOLD" SINGLE AWARD | 2,500.00 |
| 614 | MICHAEL JACKSON SIGNED BANNER | 2,400.00 |
| 616 | MICHAEL JACKSON SIGNED POSTER | 2,400.00 |
| 550 | M. JACKSON SIGNED PHOTOGRAPH FROM DISNEYLAND | 2,250.00 |
| 647 | M. JACKSON NEVERLAND RANCH LIFE SIZE FIGURE O | 2,250.00 |
| 645 | M. JACKSON NEVERLAND RANCH LIFE SIZED SEATED | 2,000.00 |
| 646 | M. JACKSON NEVERLAND RANCH LIFE SIZE INDIAN F | 2,000.00 |
| 648 | M. JACKSON NEVERLAND RANCH LIFE SIZE FIGURE Y | 2,000.00 |
| 539 | JACKSON 5 "GOLD" RECORD AWARD | 1,500.00 |
| 650C | M. JACKSON SIGNED "LIVE AND DANGEROUS" BOOK | 1,500.00 |
| 555 | M. JACKSON "THRILLER" COMMEMORATIVE STATUE | 1,400.00 |
| 623 | M. JACKSON KATHARINE BAUMANN FOOTBALL BAG | 1,400.00 |
| 610 | M. JACKSON SIGNED HISTORY MAGAZINE CUTOUT | 1,300.00 |
| 643 | M. JACKSON NEVERLAND RANCH LIFE SIZE FIGURE O | 1,300.00 |
| 642 | M. JACKSON NEVERLAND RANCH LIFE SIZE FIGURE O | 700.00 |
| 644 | M. JACKSON NEVERLAND RANCH LIFE SIZE WESTERN | 700.00 |
| 603 | MICHAEL JACKSON STATUETTE | 600.00 |
| | SUBTOTAL | 697,700.00 |
| | PLUS 25% BUYER'S PREMIUM | 174,425.00 |
| | TOTAL | 872,125.00 |

ATTACHMENT A-2:

## ROCK N ROLL

| Lot No. | Description | Price |
|---|---|---|
| 180 | MICHAEL JACKSON'S PERSONAL MTV MOONMAN | 50,000.00 |
| | PLUS 20% BUYER'S PREMIUM | 10,000.00 |
| | TOTAL | **60,000.00** |
| | | |
| 152 | M. JACKSON "GOLD" RECORD AWARD FOR "BEAT IT" | 10,000.00 |
| 139 | JACKSON 5 "GOLD" RECORD AWARD | 6,500.00 |
| 164 | M. JACKSON ARTIST OF THE DECADE LIMITED EDITION | 6,500.00 |
| 148 | MICHAEL JACKSON SIGNED THRILLER DISPLAY | 6,000.00 |
| 153 | MICHAEL JACKSON THRILLER RECORD AWARD | 4,500.00 |
| 154 | MICHAEL JACKSON THRILLER DISPLAY | 4,500.00 |
| 147 | M. JACKSON THRILLER COMMEMORATIVE AWARD | 3,000.00 |
| 186 | M. JACKSON  CARLITTA COLLECTION FIGURINES | 1,600.00 |
| 185 | M. JACKSON PORCELAIN HISTORY FIGURINE | 600.00 |
| 183 | M. JACKSON CARLITTA COLLECTION FIGURINE | 400.00 |
| 184 | MICHAEL JACKSON WHITE HISTORY FIGURINE | 400.00 |
| | SUBTOTAL | 44,000.00 |
| | PLUS 25% BUYER'S PREMIUM | 11,000.00 |
| | TOTAL | **55,000.00** |
| | | |
| | GRAND TOTAL | **115,000.00** |

**LEGAL DESCRIPTION**

Real property in the City of Malibu, County of Los Angeles, State of California, described as follows:

PARCEL 1:

A PARCEL OF LAND BEING A PORTION OF RANCHO TOPANGA MALIBU SEQUIT, AS CONFIRMED TO MATTHEW KELLER BY PATENT RECORDED IN BOOK 1 PAGE 407, ET SEQ., OF PATENTS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE NORTHERLY LINE OF THE STRIP OF LAND DESCRIBED IN A DEED FROM MARBLEHEAD LAND COMPANY TO THE STATE OF CALIFORNIA, RECORDED IN BOOK 16845 PAGE 253, OFFICIAL RECORDS, SAID POINT OF BEGINNING BEING NORTH 46° 08' 15" WEST 60 FEET FROM ENGINEER'S CENTER LINE STATION 936 PLUS 62.94 AT THE WESTERLY EXTREMITY OF THAT CERTAIN CENTER LINE COURSE DESCRIBED AS NORTH 43° 51' 45" EAST 362.63 FEET IN THE DEED OF THE 80 FOOT STRIP OF LAND FROM T. R. CADWALADER, ET AL., TO THE STATE OF CALIFORNIA, RECORDED IN BOOK 15228 PAGE 342, OFFICIAL RECORDS; THENCE NORTH 43° 51' 45" EAST 189.63 FEET ALONG THE NORTHERLY LINE OF SAID FIRST MENTIONED STRIP; THENCE NORTH 46° 08' 15" WEST 192.92 FEET; THENCE NORTH 31° 32' 55" EAST 214.93 FEET; THENCE NORTH 42° 01' 59" EAST 186.06 FEET; THENCE NORTH 54° 23' 15" EAST 77.65 FEET, MORE OR LESS, TO THE NORTHWESTERLY CORNER OF THE PARCEL OF LAND DESCRIBED IN A DEED FROM MARBLEHEAD LAND COMPANY TO CHESTER A. VOUGHT AND WIFE RECORDED IN BOOK 20254 PAGE 69, OFFICIAL RECORDS; THENCE NORTH 53° 17' 55" EAST 152.26 FEET ALONG THE NORTHERLY LINE OF SAID PARCEL TO THE NORTHEASTERLY CORNER THEREOF; THENCE NORTH 32° 19' 55" WEST 119.27 FEET; THENCE NORTH 46° 58' 55" EAST 28.96 FEET; THENCE 50° 59' 55" WEST 161.73 FEET; THENCE NORTH 62° 09' 00" WEST 123.16 FEET; THENCE SOUTH 60° 48' 00" WEST 21.76 FEET; THENCE SOUTH 29° 12' EAST 75 FEET; THENCE SOUTH 60° 48' WEST 183.01 FEET; THENCE SOUTH 45° 17' 30" WEST 139.76 FEET; THENCE SOUTH 62° 12' 40" WEST 258.81 FEET; THENCE NORTH 44° 07' 06" WEST 158.98 FEET TO THE CENTER LINE DESCRIBED IN THE DEED TO SANGER W. CRUMPACKER ET AL., RECORDED JANUARY 22, 1944 AS INSTRUMENT NO. 973 IN BOOK 20517 PAGE 382, OFFICIAL RECORDS; THENCE ALONG SAID CENTER LINE AS TO THE BEGINNING OF TANGENT CURVE CONCAVE SOUTHEASTERLY WITH A RADIUS OF 183.32 FEET SOUTHWESTERLY ALONG THE ARC OF SAID CURVE 171.24 FEET, TANGENT SOUTH 01° 48' 25" WEST 256.65 FEET TO THE BEGINNING OF TANGENT CURVE CONCAVE EASTERLY WITH A RADIUS OF 253.04 FEET SOUTHERLY ALONG THE ARC OF SAID CURVE 79.24 FEET; TANGENT SOUTH 17° 30' 35"; THENCE EAST 104.43 FEET, SOUTH 27° 05' 15" EAST 386.93 FEET AND SOUTH 20° 53' 35" EAST 25.83 FEET, MORE OR LESS, TO A POINT IN THE NORTHERLY LINE OF THE STRIP OF LAND DESCRIBED IN A DEED FROM MARBLEHEAD LAND COMPANY TO THE STATE OF CALIFORNIA RECORDED IN BOOK 16845 PAGE 253, OFFICIAL RECORDS, SAID LAST MENTIONED POINT BEING ON THE ARC OF A CURVE CONCAVE NORTHWESTERLY WITH A RADIUS OF 1450 FEET AND THE RADIAL BEARING TO SAID POINT BEING SOUTH 22° 47' 36" EAST; THENCE EASTERLY ALONG THE ARC OF SAID CURVE 590.71 FEET; THENCE TANGENT NORTH 43° 51' 45" EAST 12.21 FEET TO THE POINT OF BEGINNING.

EXCEPT ALL RIPARIAN RIGHTS OF SAID LANDS AND ALL MINERALS, OIL, PETROLEUM, ASPHALTUM, GAS, COAL AND OTHER HYDROCARBON SUBSTANCES IN, ON, WITHIN AND UNDER SAID LANDS BUT WITHOUT SURFACE RIGHT TO GO UPON SAID LANDS TO EXTRACT SAID SUBSTANCES AS CONTAINED IN DEED FROM MARBLEHEAD LAND COMPANY, A

06 0927085

Attachment B

CORPORATION RECORDED FEBRUARY 14, 1944 IN BOOK 20657 PAGE 140, OFFICIAL RECORDS.

ALSO EXCEPT THEREFROM THAT PORTION OF SAID LAND CONVEYED TO THE STATE OF CALIFORNIA BY A DEED RECORDED NOVEMBER 16, 1948 AS INSTRUMENT NO. 2085 IN BOOK 28732 PAGE 310, OFFICIAL RECORDS.

PARCEL 2:

A PARCEL OF LAND BEING A RANCHO TOPANGA MALIBU SEQUIT, AS CONFIRMED TO MATTHEW KELLER BY PATENT RECORDED IN BOOK 1 PAGE 407 ET SEQ., OF PATENTS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE NORTHERLY LINE OF THE STRIP OF LAND DESCRIBED IN A DEED FROM MARBLEHEAD LAND COMPANY TO THE STATE OF CALIFORNIA, RECORDED IN BOOK 16845 PAGE 253, OFFICIAL RECORDS AT THE NORTHEASTERLY EXTREMITY OF THE COURSE DESCRIBED AS "NORTH 43° 51' 45" EAST 189.63 FEET" IN THE DEED TO THE MYLES EDWARD CONNOLLY AND WIFE RECORDED IN BOOK 20657 PAGE 146, OFFICIAL RECORDS; THENCE ALONG THE BOUNDARY OF THE LAND DESCRIBED IN SAID DEED TO CONNOLLY AND WIFE; NORTH 46° 00' 15" WEST 192.92 FEET AND NORTH 31° 32' 55" EAST 193.51 FEET; THENCE SOUTH 45° 44' 11" EAST 234.25 FEET TO A POINT IN THE NORTHWESTERLY LINE BEING A CURVE CONCAVE SOUTHEASTERLY HAVING A RADIUS OF 2060 FEET, THE RADIAL BEARING TO SAID POINT BEING NORTH 45° 44' 11" WEST; THENCE ALONG SAID NORTHWESTERLY LINE SOUTHWESTERLY ALONG SAID CURVE 14.42 FEET AND SOUTH 43° 51' 45" WEST 173.00 FEET TO THE POINT OF BEGINNING.

EXCEPT THEREFROM ALL MINERALS, OIL, PETROLEUM, ASPHALTUM, GAS, COAL AND OTHER HYDROCARBON SUBSTANCES IN, ON, WITHIN AND UNDER SAID LANDS AND EVERY PART THEREOF BUT WITHOUT RIGHT OF ENTRY, AS RESERVED BY MARBLEHEAD LAND COMPANY IN DEED RECORDED OCTOBER 17, 1944 IN BOOK 21321 PAGE 347, OFFICIAL RECORDS.

ALSO EXCEPT THEREFROM THAT PORTION OF SAID LAND CONVEYED TO THE STATE OF CALIFORNIA, BY DEED RECORDED NOVEMBER 16, 1948 AS INSTRUMENT NO. 2085 IN BOOK 28732 PAGE 310, OFFICIAL RECORDS.

PARCEL 3:

A. AN EASEMENT FOR ROAD PURPOSES TO BE USED IN COMMON WITH OTHERS OVER A STRIP OF LAND 40 FEET IN WIDTH, THE CENTER LINE OF WHICH IS DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHEASTERLY EXTREMITY OF THE COURSE DESCRIBED AS NORTH 62° 09' 00" WEST 123.16 FEET IN THE DESCRIPTION OF THE PARCEL HEREIN CONVEYED; THENCE NORTH 62° 09' 00" WEST 123.16 FEET TO THE BEGINNING OF TANGENT CURVE CONCAVE NORTHEASTERLY WITH A RADIUS OF 229.33 FEET; THENCE NORTHWESTERLY ALONG THE ARC OF SAID CURVE 262.44 FEET; THENCE TANGENT NORTH 03° 25' 05" EAST 36.35 FEET TO THE BEGINNING OF TANGENT CURVE CONCAVE WESTERLY WITH A RADIUS OF 136.48 FEET; THENCE NORTHWESTERLY ALONG THE ARC OF SAID CURVE 129.36 FEET TO THE BEGINNING OF A COMPOUND CURVE CONCAVE SOUTHERLY WITH A RADIUS OF 91.02 FEET; THENCE WESTERLY ALONG THE ARC OF SAID CURVE 138.63 FEET; THENCE TANGENT SOUTH 41° 50' 55" WEST 114.41 FEET, MORE OR LESS TO A POINT IN THE CENTER LINE OF THE EASEMENT FOR ROAD AND HIGHWAY PURPOSES 50 FEET IN WIDTH DESCRIBED IN A DEED FROM MARBLEHEAD LAND COMPANY TO SANGER W. CRUMPACKER ET AL., RECORDED JANUARY 22, 1944 IN BOOK 20517 PAGE 382, OFFICIAL RECORDS, SAID LAST MENTIONED POINT BEING NORTH 20° 32' 35" EAST 124.79 FEET FROM THE SOUTHWESTERLY EXTREMITY OF THAT

04/27/06

06 0927085

2

40

CERTAIN COURSE DESCRIBED IN SAID DEED AS NORTH 20° 32' 35" EAST 158.00 FEET.

EXCEPT THEREFROM THAT PORTION THEREOF INCLUDED WITHIN THE LINE OF PARCEL 1.

B. AN EASEMENT FOR ROAD PURPOSES TO BE USED IN COMMON WITH OTHERS OVER A STRIP OF LAND 50 FEET IN WIDTH LYING 25 FEET ON EACH SIDE OF A CENTER LINE DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE CENTER LINE DESCRIBED IN THE DEED TO SANGER W. CRUMPACKER ET AL., RECORDED JANUARY 22, 1944 IN BOOK 20517 PAGE 382, OFFICIAL RECORDS DISTANT THEREON NORTH 20° 32' 35" EAST 124.79 FEET FROM THE SOUTHWESTERLY TERMINUS OF THAT COURSE DESCRIBED IN SAID DEED AS NORTH 20° 32' 35" EAST 158.00 FEET; THENCE SOUTH 26° 32' 35" WEST 124.79 FEET TO THE BEGINNING OF TANGENT CURVE CONCAVE EASTERLY HAVING A RADIUS OF 206.84 FEET; THENCE ALONG SAID CURVE AND SAID CENTER LINE SOUTHERLY 130.93 FEET TO THE BEGINNING OF A REVERSE CURVE CONCAVE WESTERLY HAVING A RADIUS OF 178.67 FEET; THENCE SOUTHERLY ALONG SAID CURVE AND CENTER LINE 136.89 FEET TO THE BEGINNING OF A COMPOUND CURVE CONCAVE NORTHWESTERLY HAVING A RADIUS OF 487.46 FEET; THENCE SOUTHWESTERLY ALONG SAID CURVE 221.52 FEET TO THE NORTHWESTERLY TERMINUS OF THE COURSE IN THE BOUNDARY OF THE LAND ABOVE DESCRIBED AS NORTH 44° 07' 06" WEST 158.98 FEET; THENCE ALONG SAID BOUNDARY AS FOLLOWS:

SOUTH 55° 19' 33" WEST 229.74 FEET TO THE BEGINNING OF TANGENT CURVE CONCAVE SOUTHEASTERLY WITH A RADIUS OF 183.32 FEET SOUTHWESTERLY ALONG THE ARC OF SAID CURVE 171.24 FEET TANGENT SOUTH 01° 48' 25" WEST 256.55 FEET TO THE BEGINNING OF TANGENT CURVE CONCAVE SOUTHEASTERLY WITH A RADIUS OF 235.04 FEET SOUTHERLY ALONG THE ARC OF SAID CURVE 79.24 FEET TANGENT SOUTH 17° 30' 35" EAST 104.43 FEET, SOUTH 27° 05' 15" EAST 386.93 FEET AND SOUTH 20° 53' 35" EAST 25.83 FEET, MORE OR LESS, TO A POINT IN THE NORTHERLY LINE OF THE STRIP OF LAND DESCRIBED IN A DEED FROM MARBLEHEAD LAND COMPANY TO THE STATE OF CALIFORNIA, RECORDED IN BOOK 16845 PAGE 253, OFFICIAL RECORDS.

EXCEPT THEREFROM THAT PORTION THEREOF INCLUDED WITHIN THE LINES OF PARCEL 1.

APN:  4452-017-009 and 4452-019-001

06 0927085

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY**

This case has been assigned to District Judge George H. Wu and the assigned discovery Magistrate Judge is Suzanne H. Segal.

The case number on all documents filed with the Court should read as follows:

## CV11- 3582 GW (SSx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] Western Division | [ ] Southern Division | [ ] Eastern Division |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
United States of America

**DEFENDANTS**
One white crystal-covered "Bad Tour" glove and other Michael Jackson memorabilia, et al.

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

Steven R. Welk, Assistant United States Attorney
1400 United States Courthouse, 312 North Spring Street
Los Angeles, California 90012; Telephone: (213)894-6166 Fax: (213) 894-7177

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☒ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☒ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No     ☐ **MONEY DEMANDED IN COMPLAINT: $**_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
18 U.S.C. §§ 981(a)(1)(A) and (C)

**VII. NATURE OF SUIT** (Place an X in one box only.)

OTHER STATUTES
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 890 Other Statutory Actions
☐ 891 Agricultural Act
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Info. Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes

CONTRACT
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise
REAL PROPERTY
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

TORTS
PERSONAL INJURY
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Fed. Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Personal Injury-Med Malpractice
☐ 365 Personal Injury-Product Liability
☐ 368 Asbestos Personal Injury Product Liability
IMMIGRATION
☐ 462 Naturalization Application
☐ 463 Habeas Corpus-Alien Detainee
☐ 465 Other Immigration Actions

TORTS
PERSONAL PROPERTY
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability
BANKRUPTCY
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157
CIVIL RIGHTS
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/Accommodations
☐ 444 Welfare
☐ 445 American with Disabilities - Employment
☐ 446 American with Disabilities - Other
☐ 440 Other Civil Rights

PRISONER PETITIONS
☐ 510 Motions to Vacate Sentence Habeas Corpus
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus/Other
☐ 550 Civil Rights
☐ 555 Prison Condition
FORFEITURE / PENALTY
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety /Health
☒ 690 Other

LABOR
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act
PROPERTY RIGHTS
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark
SOCIAL SECURITY
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))
FEDERAL TAX SUITS
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS-Third Party 26 USC 7609

**CV11-03582**

**FOR OFFICE USE ONLY:** Case Number: _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

CV-71 (05/08)                CIVIL COVER SHEET                Page 1 of 2

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No  ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No  ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or
　　　　　　　　　　　　　　 ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
　　　　　　　　　　　　　　 ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
　　　　　　　　　　　　　　 ☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☑ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
　　**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____  Date April 26 2011

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |