1   QUINN EMANUEL URQUHART & SULLIVAN, LLP
       Duane R. Lyons (Bar No. 125091)
2       duanelyons@quinnemanuel.com
       Brian M. Wheeler (Bar No. 266661)
3       brianwheeler@quinnemanuel.com
     865 South Figueroa Street, 10th Floor
4    Los Angeles, California 90017-2543
     Telephone:   (213) 443-3000
5    Facsimile:   (213) 443-3100

6    FOREMAN DEGEURIN & DEGEURIN              FISHER & KREKORIAN
       Mike DeGeurin (*Admitted Pro Hac Vice*)   Kevin Fisher (Bar No. 131455)
7       mdegeurin@foremandegeurin.com           rkf@fkslaw.net
     300 Main Street, Third Floor             2121 Park Drive
8    Houston, Texas 77002                     Los Angeles, California 90026
     Telephone:   (713) 655-9000             Telephone:   (310) 862-1225
9    Facsimile:   (713) 655-1812             Facsimile:   (310) 388-0805

10   Attorneys for Claimants Vice President
     Teodoro Nguema Obiang Mangue
11   and Sweetwater Malibu, LLC

12                  UNITED STATES DISTRICT COURT

13                  CENTRAL DISTRICT OF CALIFORNIA

14                        WESTERN DIVISION

15   UNITED STATES OF AMERICA,            CASE NO. 2:11-03582-GW-SS

16              Plaintiff,                Hon. George H. Wu

17         vs.                           **DECLARATION OF BRIAN M.
                                         WHEELER IN SUPPORT OF**
18   ONE WHITE CRYSTAL-COVERED           **CLAIMANTS' MOTION FOR**
     "BAD TOUR" GLOVE AND OTHER          **SUMMARY JUDGMENT ON THE**
19   MICHAEL JACKSON                     **LIMITED ISSUE OF PROBABLE**
     MEMORABILIA; REAL PROPERTY          **CAUSE; OR, IN THE**
20   LOCATED ON SWEETWATER               **ALTERNATIVE, ORDER FINDING**
     MESA ROAD IN MALIBU,                **THE GOVERNMENT LACKED**
21   CALIFORNIA; ONE 2011 FERRARI        **PROBABLE CAUSE AT THE TIME**
     599 GTO,                            **IT INSTITUTED THE ACTION**
22                                       **FOR FORFEITURE *IN REM***
                Defendants.
23                                       Hearing Date: June 20, 2013
                                         Time: 8:30 a.m.
24                                       Place: Courtroom No. 10

25

26

27

28

04579.23529/5199471.1

_____
                          WHEELER DECLARATION ISO MOTION RE PROBABLE CAUSE

1

## DECLARATION OF BRIAN M. WHEELER

2   I, Brian M. Wheeler, declare as follows:

3         1.     I am a member of the bar of the State of California and of this

4   Court and an associate at Quinn Emanuel Urquhart & Sullivan, LLP, attorneys for

5   Claimants Vice President Teodoro Nguema Obiang Mangue and Sweetwater

6   Malibu, LLC.  I make this declaration of personal, firsthand knowledge, and if

7   called and sworn as a witness, I could and would testify competently hereto.

8         2.     Attached hereto as Exhibit 1 is a true and correct copy of the

9   document bearing Bates No. DOJ_0000167-173, as produced by the United States.

10        3.     Attached hereto as Exhibit 2 is a true and correct copy of the

11  United States' First Set Of Responses And Objections To Claimants' Vice President

12  Teodoro Nguema Obiang Mangue And Sweetwater Malibu LLC's First Set Of

13  Interrogatories To Plaintiff United States Of America (Set One), dated Nov. 5, 2012,

14  which I received via electronic mail from Woo S. Lee, counsel for the United States,

15  on November 5, 2012.

16        4.     Attached hereto as Exhibit 3 is a true and correct copy of the

17  United States' Supplemental Responses And Objections To Claimants' Vice

18  President Teodoro Nguema Obiang Mangue And Sweetwater Malibu LLC's

19  Interrogatory No. 9, dated Jan. 26, 2013, which I received via electronic mail from

20  Woo S. Lee, counsel for the United States, on January 27, 2013.

21        5.     Attached hereto as Exhibit 4 is a true and correct copy of the

22  document bearing Bates No. DOJ_0000584-589, as produced by the United States.

23        6.     Attached hereto as Exhibit 5 is a true and correct copy of the

24  document bearing Bates No. DOJ_0001049-1080, as produced by the United States.

25        7.     Attached hereto as Exhibit 6 is a true and correct copy of a New

26  York Times article retrieved from LexisNexis titled "A Congressional Conflict of

27  Interest," dated Dec. 16, 2011.  The article is also available on the New York Times

28

1 | Web site, *available at* http://www.nytimes.com/2011/12/16/business/a-

2 | congressional-conflict-of-interest.html.

3 |     8.     Attached hereto as Exhibit 7 is a true and correct copy of the

4 | document bearing Bates No. SENATE-PSI-00093596-603, as produced by the

5 | United States.

6 |     I declare under penalty of perjury under the laws of the United States of

7 | America that the foregoing is true and correct.

8 |     Executed on March 15, 2013, at Los Angeles, California.

9 |

10 |                              _____

11 |                                   Brian M. Wheeler

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

-2-

# EXHIBIT 1

REQUESTED BY:  MORRISEY, DEBORAH
O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | TECS ACCESS CODE 3 |
|---|---|
| R E P O R T   O F   I N V E S T I G A T I O N | PAGE    1 |
| | CASE NUMBER  MI02PR07MI0018 |

TITLE: TEODORO NGUEMA OBIANG

CASE STATUS:     INIT RPT

| REPORT DATE 111606 | DATE ASSIGNED 111506 | PROGRAM CODE 7H0 | REPORT NO. 001 |
|---|---|---|---|

RELATED CASE NUMBERS:

COLLATERAL REQ:

TYPE OF REPORT:
OTHER INFORMATION

TOPIC: EQUITORIAL GUINEA BACKGROUND INFORMATION

SYNOPSIS:
On November 13, 2006, agents assigned to the ICE SAC/Miami Foreign Public Corruption Unit initiated a criminal inquiry regarding the financial activities of Teodoro Nguema OBIANG (DOB: 06/26/1969) a.k.a. "Teodorin". It is alleged that OBIANG is diverting funds allocated to the government of Equatorial Guinea for his own personal use.

This investigation will attempt to identify and track assets and accounts owned by OBAING and/or his family in the United States and will attempt to determine if those assets were acquired as a result of a specified unlawful activity.

| DISTRIBUTION: SACMI CAPJ | SIGNATURE: MORAN         WALTER    A  SENIOR SPEC AGENT |
|---|---|
| | APPROVED: RUTHERFORD     ROBERT    N  OI GRP SUPERVISOR |
| | ORIGIN OFFICE: MI MIAMI, FL - SAC | TELEPHONE: 305 597 6000 |
| | | TYPIST: MORAN |

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

Exhibit 1 Page 3                                    DOJ_0000167

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE    2 |
|---|---|
| | CASE NUMBER MI02PR07MI0018 |
| R E P O R T   O F   I N V E S T I G A T I O N C O N T I N U A T I O N | REPORT NUMBER: 001 |

DETAILS OF INVESTIGATION:

Case Background:

Equatorial Guinea

Equatorial Guinea (E.G.) is a West African country, composed of a mainland and five inhabited islands, with a landmass slightly less than the state of Maryland and a population of about 510,000 people. Malabo, on the island of Bioko, is the capital and largest city of the country. Spanish and French are the official languages, but Bantu languages are also spoken.

Equatorial Guinea was colonized by the Portuguese in the late 1600s, ceded to Spain in 1778, and gained independence in the 1960s. After a referendum and constitutional convention, Francisco Macias NGUEMA was elected President of Equatorial Guinea in 1968. Macias subsequently abolished the constitution, established a single-party dictatorship, and declared himself President for Life. His rule occasioned the death or exile of about one-third of the country's citizens. In 1979, Macias was overthrown and executed by his nephew, Colonel Teodoro OBIANG NGUEMA.

OBIANG declared himself President in his uncle's place. Twenty-five years later, OBIANG still holds that position. While a new E.G. constitution was enacted in 1982, and single-party rule was officially ended in 1991, free and fair elections have not followed. According to a July 2004 hearing by the U.S. Senate Permanent Subcommittee on Investigations Committee on Governmental Affairs, the December 2002 election in Equatorial Guinea, in which President OBIANG claimed victory with 97% of the vote, was described by the U.S. State Department as "marred by extensive fraud and intimidation." President OBIANG is also depicted as dominating the E.G. government. In the words of the U.S. State Department, he "names and dismisses cabinet members and judges, ratifies treaties, leads the armed forces, and appoints the governors." A review of top E.G. officials over the past few years shows that many are members of the President's extended family.

The State Department has also been highly critical of the country's human rights abuses, use of torture, and culture of corruption. The IMF has also issued reports critical of the country's lack of transparency and accountability on fiscal matters. Corruption allegations are also commonplace in articles about Equatorial Guinea. For example, one recent U.S. publication wrote: "In 1998, according to the IMF, [the E.G.] government received $130 million in oil revenue, and Obiang simply pocketed $96 million of it. Although three of every four Equatoguineans suffer malnutrition, between 1997 and 2002,

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

Exhibit 1 Page 4                                           DOJ_0000168

OFFICIAL USE ONLY

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE    3 |
|---|---|
| | CASE NUMBER MI02PR07MI0018 |
| REPORT OF INVESTIGATION CONTINUATION | REPORT NUMBER: 001 |

OBIANG spent just over 1 percent of his country's budget on health, by far the lowest of the nine African countries the IMF surveyed. According to a 2002 State Department report, there is "little evidence that the country's oil wealth is being devoted to the public good".

The Subcommittee also found that "despite its poor record on human rights, civil liberty, and democracy, Equatorial Guinea has experienced rapid economic growth during the last five years due to development of its oil resources. In 1996, the multi-national Mobil Corporation (now ExxonMobil) struck oil in the country, and by 2004, 185,000 barrels per day were being produced for the world oil markets. This discovery had a profound effect upon the country, spurring its economic expansion at the rate of 20% annum. Since 1997, U.S. oil companies, including Amerada Hess, ChevronTexaco, ExxonMobil, and Marathon have made substantial investments in oil fields off the E.G. coast as well as in E.G. methanol and liquified natural gas plants. Equatorial Guinea has also become an important source of oil for the United States.

Diplomatic relations between Equatorial Guinea and the United States have varied over the years. In 1995, the United States closed its embassy in Equatorial Guinea. Eight years later, in 2003, the United States agreed to re-establish this Embassy, reportedly at the urging of U.S. oil companies doing business in Equatorial Guinea.

According to the Wikpidia Encyclopedia, "In March 2004, OBIANG announced that there was a complex plot to overthrow him that allegedly involved the intelligence services of the United States, the United Kingdom and Spain. Shortly after 15 people were arrested in Equatorial Guinea in connection with a possible coup attempt, an airplane landed in Harare, Zimbabwe, and was promptly detained by authorities. This story was used for the 2006 UK film Coup!. The Zimbabwean government claimed that the aircraft was carrying armed white mercenaries who were heading to Equatorial Guinea with the aim of toppling Obiang's government. However, the American-based operator of the plane maintained that the men were en route to the Democratic Republic of the Congo to guard commercial mining interests for JFPI Corporation. President Obiang charges that various Western governments wanted to install the head of Equatorial Guinea's government-in-exile, Severo Moto Ns, as president. A man that Equatoguinean media identified as the leader of the mercenaries, Nick du Toit, said he had not intended to kill Obiang, but had hoped to force him into exile."

Currently, OBIANG is suffering from terminal prostate cancer, amongst other illnesses, and is said to be existing in agony. The issue of succession is dominating the country, with a political struggle within the Equato-Guinean elite. OBIANG wants to hand over control to his son Teodoro Nguema OBIANG (a.k.a. "Teodorin"), to succeed him. This move is primarily opposed by

OFFICIAL USE ONLY

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

Exhibit 1 Page 5

DOJ_0000169

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE   4 |
|---|---|
| | CASE NUMBER MI02PR07MI0018 |
| R E P O R T   O F   I N V E S T I G A T I O N  C O N T I N U A T I O N | REPORT NUMBER: 001 |

OBIANG's younger brother Armengol Ondo NGUEMA, who is the former head of national security for E.G. In November 2005, President OBIANG held an important meeting with the Democratic Party of Equatorial Guinea (PDGE), in which it was believed that he intended to create a position of vice president and fill that position with his son. OBIANG'S worsening medical condition demands he travel abroad twice a month, leaving the country more vulnerable to coups.

RIGGS BANK INVESTIGATION

In July 2004, a hearing conducted by the U.S. Senate Permanent Subcommittee on Investigations Committee on Governmental Affairs determined that the Washington D.C. based Riggs bank, during 1995-2003, managed more than 60 accounts and certificates of deposit for Equatorial Guinea, its officials, and their family members, with little or no attention to the bank's anti-money laundering obligations, turned a blind eye to evidence suggesting the bank was handling the proceeds of foreign corruption, and allowed numerous suspicious transactions to take place without notifying law enforcement.
According to the Subcommittee investigation, "in 1995, Riggs Bank opened its first Embassy accounts for Equatorial Guinea. Over the next eight years, the bank opened nearly 50 additional accounts and a dozen certificates of deposit for not only the government of Equatorial Guinea, but also a host of E.G. senior government officials and their family members. By 2003, the E.G. account had become the bank's largest single relationship, with balances and outstanding loans that together approached $700 million."

The Subcommittee investigation determined that Riggs Bank serviced the E.G. accounts with "little or no attention to the bank's anti-money laundering obligations, turned a blind eye to evidence suggesting the bank was handling the proceeds of foreign corruption, and allowed numerous suspicious transactions to take place without notifying law enforcement." The Subcommittee investigation found that Riggs opened multiple personal accounts for the President of Equatorial Guinea, his wife and other relatives; helped establish offshore shell corporations for the E.G. President and his sons; accepted $13 million in cash deposits into accounts controlled by the E.G. President and his wife with few questions asked; allowed wire transfers withdrawing more than $35 million from the E.G. account containing oil revenues for transfer to two unknown companies with accounts in bank secrecy jurisdictions; and

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

Exhibit 1 Page 6

DOJ_0000170

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE    5 |
|---|---|
| | CASE NUMBER MI02PR07MI0018 |
| R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | REPORT NUMBER: 001 |

exercised such lax oversight over the E.G. account manager that, among other misconduct, he was able to wire transfer more than $1 million in E.G. oil revenues to an account he controlled at another bank. Riggs Bank failed to cooperate initially with the Subcommittee investigation of the E.G accounts, and closed the accounts only after numerous questions raised concerns the bank was unable to resolve. The $700 million dollars was seized but later returned, Riggs Bank Vice President was indicted on a 27 count indictment for his role in the conspiracy and Riggs Bank agreed to pay a $16 million fine for their role in the case.


Identification of Targets:

Teodorin Nguema OBIANG (a.k.a. Teodoro Nguema OBIANG)
OBIANG is the son of Equatorial Guinea President Teodoro Obiang NGUEMA and is currently the Minister of Agriculture and Forestry of Equatorial Guinea. OBIANG is in line to succeed his father as President, who was diagnosed with terminal prostate cancer. OBIANG owns several companies and real estate properties in the United States, despite earning an estimated $5,000 a month from his government job. It was recently reported that OBIANG purchased a home in California for the price of $35 million.

Eve JEFFERS (a.k.a. Eve)

JEFFERS is the girlfriend of OBIANG and a hip-hop musician and actress residing in California. JEFFERS has been linked to OBIANG through bank accounts and social functions. During Christmas 2005, OBIANG threw a party for Eve and spent close to $700,000 to rent Microsoft billionaire Paul Allen's 303-foot yacht, "Tatoosh". JEFFERS additionally owns several businesses that OBIANG has account signing authority for.

Rosalina ROMO

ROMO is believed to be the personal assistant for JEFFERS and has extensive knowledge regarding the business relationship between JEFFERS and OBIANG. At this time it is unknown what degree of association ROMO has with OBIANG.


Case Objectives:

At this time, there is no identified Specified Unlawfully

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

Exhibit 1 Page 7                                    DOJ_0000171

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE    6 |
|---|---|
| R E P O R T   O F   I N V E S T I G A T I O N   C O N T I N U A T I O N | CASE NUMBER MI02PR07MI0018 |
| | REPORT NUMBER: 001 |

Activity directly linked to OBIANG's finances. As a result, this case will begin to identify and track assets in the United States associated with Teodorin Nguema OBIANG. These assets will include but are not limited to, bank accounts, registered businesses and corporations, real-estate and other property. Although no Specified Unlawful Activity has been identified, it is believed that the individuals identified in this report and others yet to be identified are utilizing funds stolen from the government of Equatorial Guinea and may also be accepting bribes from both U.S. and foreign companies for personal gain.
This investigation will attempt to identify foreign public corruption committed by the targets in which U.S. financial institutions were utilized to facilitate the unlawful activity.

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

Exhibit 1 Page 8

DOJ_0000172

REQUESTED BY:  MORRISEY, DEBORAH

OFFICIAL USE ONLY -- TECS II INFORMATION -- OFFICIAL USE ONLY

072111                    TECS II - LIST OF RELATED RECORDS                PAGE    1
                                                                           TN007005

                          1 RECORD IS RELATED TO BASE RECORD
MI02PR07MI0018001    ROI   CMI MORAN              W 111606


MI02PR07MI0018      CASE CMI MANZANARES      R 111506
        TEODORO NGUEMA OBIANG, ET. AL OFFICIALS EQUATORIAL GUINEA

OFFICIAL USE ONLY -- TECS II INFORMATION -- OFFICIAL USE ONLY

Exhibit 1 Page 9                                              DOJ_0000173

# EXHIBIT 2

JAIKUMAR RAMASWAMY, Chief
Asset Forfeiture and Money Laundering Section (AFMLS)
LINDA M. SAMUEL, Deputy Chief
DANIEL H. CLAMAN, Assistant Deputy Chief
WOO S. LEE, Trial Attorney
STEPHEN A. GIBBONS, Trial Attorney
Criminal Division
United States Department of Justice
1400 New York Avenue, N.W., 10th Floor
Washington, D.C. 20530
Telephone:  (202) 514-1263, Woo.Lee@usdoj.gov

ANDRÉ BIROTTE, JR.
United States Attorney
STEVEN R. WELK (Cal. Bar No. 149883)
Assistant United States Attorney
312 North Spring Street, 14th Floor
Los Angeles, California 90012
Telephone:  (213) 894-6166, Steven.welk@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CV 2: 11-3582-GW-SS |
|     Plaintiff, | ) | |
|   vs. | ) | Hon. George H. Wu |
| ONE WHITE CRYSTAL-COVERED "BAD | ) | |
| TOUR" GLOVE AND OTHER MICHAEL | ) | UNITED STATES' FIRST SET OF |
| JACKSON MEMORABILIA; | ) | RESPONSES AND OBJECTIONS TO |
| REAL PROPERTY LOCATED ON | ) | CLAIMANTS' VICE PRESIDENT |
| SWEETWATER MESA ROAD IN MALIBU, | ) | TEODORO NGUEMA OBIANG MANGUE |
| CALIFORNIA; ONE 2011 FERRARI 599 | ) | AND SWEETWATER MALIBU LLC'S |
| GTO, | ) | FIRST SET OF INTERROGATORIES TO |
| | ) | PLAINTIFF UNITED STATES OF |
|    Defendants. | ) | AMERICA (SET ONE) |
| | ) | |
| | ) | |
| | ) | |

Exhibit 2 Page 10

The United States of America submits the following responses and objections to Claimants Second Vice President Teodoro Nguema Obiang Mangue (Nguema) and Sweetwater Malibu, LLC's (Sweetwater Malibu) (collectively Claimants) First Set of Interrogatories to Plaintiff United States of America (Set One) (Interrogatories).

## General Objections

The United States objects to each of the Interrogatories on each and every one of the following grounds, which are incorporated into and made a part of the United States' response to each and every Interrogatory:

1.   The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they purport to require disclosure of information protected from discovery by the attorney-client privilege, the work product doctrine, the deliberative process privilege, the informant's privilege, the investigative file privilege or any other applicable privilege, protection, law, rule, regulation, restriction or order.  Nothing in these responses is intended, or may be construed, as a waiver of the work-product doctrine, or any other privilege, immunity, or doctrine.  Should any such disclosure by the United States occur, it is inadvertent and shall not constitute the waiver of any privilege.

2.   The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they purport to impose obligations on the Government beyond the scope of the Court's order issued on September 6, 2012 (Discovery Order).  On September 6, 2012, the Court authorized Claimants to propound limited discovery on the probable cause the United States had when it filed the instant forfeiture action.  As such, to the extent that this Interrogatory seeks information beyond the scope of the Discovery Order,

1

Exhibit 2 Page 11

the Government objects and will not produce such information, as it is neither relevant nor reasonably calculated to discover evidence that the Government had for purposes of probable cause when it filed the present action.  The United States does, however, expressly reserve the right to supplement, clarify, revise, or correct any or all of the Responses and Objections (General and Specific) herein consistent with Fed. R. Civ. P. 26(e), and to assert additional objections or privileges, in one or more subsequent supplemental response(s).

3.     The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they are vague, ambiguous, or unclear in identifying the information requested.

4.     The United States' investigation and development of all facts and circumstances relating to this action is ongoing.  These Responses and Objections (General and Specific) are made without prejudice to, and are not a waiver of, the United States' right to rely on other facts or documents at trial.

5.     The United States objects to the Requests, the Definitions, and Instructions to the extent that they purport to impose any obligations upon the United States that exceed the scope of permissible discovery under the Federal Rules of Civil Procedure, Local Rules of the United States District Court for the Central District of California, the Discovery Order and/or any other applicable rules.

6.     The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they are compound, phrased disjunctively or conjunctively, and include subparts in such a manner that is unduly burdensome or confusing, or that seeks to circumvent the limitations on discovery set by the Discovery Order.  See, EG, Sattari v. Citi Mortgage, 2010 U.S. Dist. LEXIS 125687, at *3 (D. Nev. Nov. 17, 2010)

(interrogatories "should consist of a brief, simple, direct, and unambiguous question, dealing with one point only.").

7.     The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they are overly broad, unduly burdensome and unnecessary to the extent that they seek information that may be obtained by Claimants from another source that is more convenient, less expensive or less burdensome.  Such information is equally available to Claimants as it is to the Government.

8.     The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they call for or depend upon a legal conclusion.

9.     The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, as unnecessary and unduly burdensome to the extent that they seek information that is already within Claimants' possession, custody or control, or equally or more easily available to Claimants than it is to the United States.

10.     The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, as unnecessary and unduly burdensome to the extent that they are redundant and duplicative.

11.     The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, as overly broad, unnecessary and unduly burdensome to the extent that they are not limited in temporal scope, and seek information obtained by the Government after it filed the Second Amended Complaint (COMPLAINT) on June 11, 2012.

12.     The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, as overly broad, unnecessary

Exhibit 2 Page 13

and unduly burdensome to the extent that they call for the disclosure of information outside the scope of the time, place, subject matter, and circumstances of the occurrences described in the COMPLAINT.

13.    The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they seek information outside the possession, custody or control of the Asset Forfeiture and Money Laundering Section of the Department of Justice (DOJ) or the Homeland Security Investigations Division of Immigration and Customs Enforcement, Department of Homeland Security (ICE).

14.    By making the accompanying Responses and Objections (General and Specific) to the Interrogatories, the United States does not waive, and hereby expressly reserves, its right to assert any and all objections as to the admissibility of such Responses or documents produced pursuant to such Responses into evidence in this action or in any other proceedings, on any and all grounds including, but not limited to, competency, relevancy, materiality, and privilege. Further, the United States makes the Responses and Objections (General and Specific) herein without in any way implying that it considers the Interrogatories to be relevant or material to the probable cause that the United States had when it filed the instant forfeiture action or to the overall subject matter of this case.

15.    The United States objects to Definition No.1 of "YOU," "YOUR," "Plaintiff," "United States," or "the Government" to the extent that Claimants' Interrogatories seek to obtain information not in the possession, custody or control of DOJ or ICE.

16.    The United States objects to Definition No. 8 regarding "DOCUMENT" or "DOCUMENTS" to the extent that it purports to impose obligations on the United States greater than those set forth in the Federal Rules of

4

Exhibit 2 Page 14

Civil Procedure, Local Rules of the United States District Court for the Central District of California, the Discovery Order and any other applicable rules.

17.    The United States expressly reserves the right to object to additional discovery into the subject matter of these Interrogatories.  By producing information responsive to these Interrogatories, the United States does not concede that the information requested or provided is discoverable, relevant, or material to the subject matter of this action or to the issue of probable cause.

## RESPONSES AND OBJECTIONS TO INTERROGATORIES

### INTERROGATORY NO. 1

State all facts that were in YOUR possession on or before April 28, 2011, which YOU contend support probable cause for forfeiture of each of the DEFENDANT ASSETS, and IDENTIFY (a) the date YOU first became aware of such facts; (b) all sources of such facts; (c) all PERSONS with knowledge of such facts; and (d) all DOCUMENTS that REFER OR RELATE TO such facts.

### RESPONSE TO INTERROGATORY NO. 1

The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they purport to impose obligations on the Government beyond the scope of the Discovery Order. On September 6, 2012, the Court authorized Claimants to propound limited discovery on the probable cause the United States had when it filed the instant forfeiture action.  As such, to the extent that this Interrogatory seeks information beyond the scope of the Discovery Order, the Government objects and will not produce such information, as it is neither relevant nor reasonably calculated to discover evidence that the Government had for purposes of probable cause when it filed the present action.  The United States does, however, expressly reserve the right to supplement, clarify, revise, or correct any or all of the Responses and Objections (General and Specific) herein consistent with Fed. R. Civ. P. 26(e), and

Exhibit 2 Page 15

to assert additional objections or privileges, in one or more subsequent supplemental response(s).

The United States further objects to this Interrogatory to the extent it calls for a narrative.  See, e.g., Wilcox v. Changala, 2012 U.S. Dist. LEXIS 5471, at * 6-7 (E. D. Wash. Jan. 18, 2012) (contention interrogatories that "ask the responding party to identify each and every supporting fact about a particular allegation are an abuse of the discovery process").  The United States further objects to this Interrogatory on the grounds that it calls for the disclosure of information subject to the attorney-client privilege, the work product doctrine, or the informant's privilege.  The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they seek information outside the possession, custody or control of DOJ and ICE.  The United States further objects to this Interrogatory as it is overly broad and unduly burdensome, as the definition of "YOUR" includes foreign sovereign governments and entities other than DOJ and ICE.

The United States further objects to this Interrogatory on the ground that it is compound and contains impermissible discrete subparts, which relate to distinct matters and therefore constitutes multiple interrogatories.  To the extent that this request seeks information relating to the recruitment or handling of confidential informants by a federal law enforcement agency, the United States objects to the request and will not produce that information.  See, e.g., Roviaro v. United States, 353 U.S. 53 (1957).

Subject to and without waiving the foregoing general and specific objections, the United States responds as follows:

Brigadier General Teodoro Nguema Obiang Mbasogo (President Obiang) seized power from his uncle, President Francisco Macias Nguema, in a military

coup d'etat in Equatorial Guinea (EG) in 1979.  Since that time, President Obiang and a small number of individuals who hold critical positions of political and economic power (Inner Circle) in EG, including his eldest son Teodoro Nguema Obiang Mangue (Nguema), have exercised plenary control of that country's political and economic infrastructure.  After large-scale oil reserves were discovered in EG during the 1990s, EG has generated billions of dollars in public revenue from its sale of oil extraction rights to foreign oil companies.

# I.

## NGUEMA IS A SENIOR MEMBER OF
## PRESIDENT OBIANG'S INNER CIRCLE

Nguema is a key member of President Obiang's cabinet and an important member of this Inner Circle.  He was appointed Second Vice President of EG by his father in May 2012 and placed in charge of national security issues.  Prior to being appointed Second Vice President, Nguema served as EG's Minister of Forestry and Agriculture and Minister of Infrastructure.  As EG's Forestry Minister, Nguema was in charge of overseeing and regulating EG's timber industry, which is that country's second largest source of foreign exports.   Indeed, since first being appointed to the cabinet asMinister of Forestry and Agriculture in 1998 at the age of 29, Nguema has remained a minister in President Obiang's Government and is now one of the most senior members of President Obiang's administration and senior staff.  Many people believe that Nguema is the presumptive heir to EG's presidency.  Additional information responsive to this Interrogatory relating to Nguema's role within the Inner Circle may be ascertained from the COMPLAINT and documents that have or will be produced by the Government, including DOJ_0000584-592; DOJ_000062-94; DOJ_0000394-398;

7

Exhibit 2 Page 17

DOJ_0000322-326; DOJ_0000359-363; DOJ_0000842-852;  and DOJ_00001049-1080; DOJ_0000946-950.

## II.
## NGUEMA'S MODEST
## LEGITIMATE INCOME

As a public official in EG, Nguema's legitimate salary is approximately $6,799 per month, or less than $100,000 per year, according to official EG sources. Additional information responsive to this Interrogatory relating to Nguema's official salary as a public official may be ascertained from the COMPLAINT and documents that have or will be produced by the Government, including DOJ_0000394-398; DOJ_0000322-326; DOJ_0000872-875; DOJ_0000890-894; DOJ_0001441-1460; DOJ_0001049-1080.

## III.

## NGUEMA'S ACQUISITION OF THE
## $30 MILLION MALIBU MANSION

Despite making less than $100,000 per year as a public official, Nguema reached an agreement in or around February 2006 to purchase a mansion estate (Sweetwater Property) on Sweetwater Mesa Road in Malibu, California for approximately $30 million.  The price of the mansion was the equivalent of more than 300 times Nguema's annual salary as a public official.  From April 5, 2006, through April 26, 2006, Nguema sent five wires from EG to an escrow account at First American Title Co.  Nguema used an account he held at Societe Generale de Banque en Guinee to wire these funds.

In acquiring the Sweetwater Property, Nguema engaged in conduct that demonstrates that he was attempting to conceal the source, ownership and control of the Sweetwater Property.  For instance:

- Rather than acquiring and recording the title to the Sweetwater Property in his name, Nguema used the name of a shell company called Sweetwater Malibu LLC (Sweetwater Malibu).

- In obtaining an Employer Identification Number (EIN) for Sweetwater Malibu, Christine Nguyen, an employee of George Nagler, a California real estate lawyer, falsely identified herself to the Internal Revenue Service (IRS) as Sweetwater Malibu's principal officer, general partner, grantor, owner, or trustor.  Neither the company's articles of incorporation, by-laws or other corporate documents identify Nagler or Nguyen as retaining such authority within the corporation.

- In addition, Nguyen claimed falsely to the IRS that Sweetwater Malibu was a single member LLC and that she—rather than Nguema—was its sole member.

- Sweetwater Malibu's articles of organization, which were filed with the California Secretary of State on February 8, 2006, make no reference to Nguema anywhere in the document.  Instead, Nagler is listed as the company's initial agent for service of process and an unrelated nominee signed the document as the company's purported "organizer."

- Nguema required his realtor Neal Baddin to enter into a confidentiality agreement, whereby Baddin was barred from discussing or disclosing Nguema's identity or details relating to the Sweetwater Property transaction to any third party.

- In or around April 3, 2006, Nagler recommended that Nguema ask that the title company draft the deed so as to hide Nguema's connection with the transaction.  Nagler advised Nguema to instruct the title company to "show [Nagler's] office address so that there is no tie in with [Nguema's current

9

Exhibit 2 Page 19

residential] address." Nagler reminded Nguema that, "The deed is a public document. The other closing documents should [also] go to my address."

- In or around April 4, 2006, Nguema responded to, and explicitly approved, Nagler's recommendation that the Sweetwater Property's deed list Nagler's office address (rather than his own). Nguema signed the letter in his own handwriting and returned a copy to Nagler.

- Although Sweetwater Malibu was required under California law to file a Statement of Information disclosing publicly the name and address of its manager, the type of business it engages in, and the name and address of its chief executive officer, by May 7, 2006, no such statement was filed. Sweetwater Malibu did not disclose such information until September 25, 2006, after the transaction to purchase the Sweetwater Property was completed.

Additional information responsive to this Interrogatory relating to Nguema's acquisition of the Sweetwater Property may be ascertained from the COMPLAINT as well as documents that have or will be produced by the Government, including DOJ_0000209-211; DOJ_0000212-217; DOJ_0000218-226; DOJ_0000269-272; DOJ_0000470-476; DOJ_0000838-841; DOJ_0000842-852; DOJ_0000872-875; DOJ_0000890-893; DOJ_0000922-923; DOJ_0000946-950; DOJ_0001049-1-80; SENATE-PSI-124429-126128; SENATE-PSI-118,645-119,028; SENATE-PSI-73109-100926; SENATE-PSI-107290-110260; SENATE-PSI-120250-120265.

## IV.

### NGUEMA'S ACQUISITION OF THE MICHAEL JACKSON MEMORABILIA

Nguema acquired hundreds of thousands of dollars in Michael Jackson memorabilia. In or around December 2010, Nguema used his personal assistant,

Exhibit 2 Page 20

Wanda Kelly, as an intermediary to attend and bid at an auction of celebrity memorabilia.  At this auction, Kelly successfully bid on several items, including the defendant white crystal-covered "Bad Tour" glove, on Nguema's behalf.  In March 2011, Nguema again used Kelly to bid and purchase various items of Michael Jackson memorabilia for a total purchase price of $115,000.  In June 2011, Nguema again used Kelly to bid on additional items of Michael Jackson memorabilia.  Kelly successfully bid on $379,700 in merchandise.  In 2011 alone, Nguema acquired Michael Jackson memorabilia worth more than 5 times his annual public salary.

In acquiring this merchandise, Nguema engaged in conduct demonstrating that he was seeking to conceal the source, ownership and control of these assets.  For instance:

- In August 2010, Kelly asked that the auction house revise its invoices so that the purchaser of certain items was listed as "Amadeo Oluy" rather than Nguema.  Kelly advised the auction house "Please make sure that [Nguema's] name does not appear anywhere, he should be invisible."

- In December 2010, Kelly bid on and purchased certain items at an auction held in Beverly Hills, California on Nguema's behalf.  Again, the auction house used an alias, instead of Nguema's name, on the billing invoices.  The address of the purchaser was listed as Sweetwater, Malabo, Guinea Equatorial.

- On or about January 31, 2011, Nguema wired $872,112 to the auction house in the name of yet another shell company, Eloba Construccion, S.A., rather than his one name.  The items were subsequently shipped to Nguema's Sweetwater Property.

Additional information responsive to this Interrogatory relating to Nguema's acquisition of Michael Jackson memorabilia may be ascertained from the COMPLAINT as well as documents that have or will be produced by the Government, including DOJ_2435-2480; DOJ_00003516-3852; DOJ_2353-2426.

## V.
## NGUEMA'S ACQUISITION
## OF THE FERRARI

On or about November 11, 2010, Nguema also acquired the defendant 2011 Ferrari 599 GTO from Ferrari of Beverly Hills with funds in the name of a shell company for more than $500,000.  The value of the defendant Ferrari was the equivalent of more than five times Nguema's annual income as a public official.

Nguema wired $492,997.99 from an EG bank account in the name of yet another shell company, Somagui Forestal, in or around December 16, 2010, to Pacific Western Bank in connection with the purchase of the Ferrari.  In addition, Nguema sent three additional wires from EG to Ferrari of Beverly Hills in connection with this purchase, including:  (1) a wire for $25,131.48 on or about November 13, 2009; (2) a wire for $39,912 on or about November 23, 2009; and (3) a wire for $14,929.65 on or about December 9, 2009.  On or about December 9, 2010, $39,912 was refunded to Nguema by Ferrari of Beverly Hills.  These funds were sent to an account held in the name of still another shell company, Mecafis Estate Services LLC, at Wells Fargo Bank.

Additional information responsive to this Interrogatory relating to Nguema's acquisition of the Defendant Ferrari may be ascertained from the COMPLAINT As well as documents that have or will be produced by the Government, including DOJ_00001905-2040.

12

Exhibit 2 Page 22

# VI.
# SUBSTANTIAL ASSET PURCHASES
# THAT ARE INCONSISTENT WITH NGUEMA'S
# LEGITIMATE INCOME

Between 1998 and 2011, Nguema spent more than $100 million acquiring luxury assets and property in the United States, France and South Africa. These expenditure are wholly inconsistent with his annual salary of $100,000 per year. During a period of three months in 2006, for instance, Nguema spent $68 million on two assets in the United States: the $30 million Sweetwater Property and a $38 million Gulfstream G-V jet aircraft. These purchases alone amounted to more than 680 times Nguema's annual income as a public official. As explained below, these asset purchases are entirely inconsistent with Nguema's legitimate income as a public official.

In addition to the Sweetwater Property and the Gulfstream jet, Nguema purchased at least 26 luxury automobiles and motorcycles in the United States, including:

- a 2006 Aston Martin,
- five Bentley automobiles,
- two Bugatti Veyron vehicles,
- seven Ferrari sports cars,
- a Lamborghini,
- a Maserati,
- two Mercedes automobiles,
- a Porsche Carrera GT,
- four Rolls-Royces,
- five Harley-Davidson motorcycles, and

Exhibit 2 Page 23

- two Toiks Choppers.

The value of these automobiles and motorcycles was in or around $12 million (worth more than 120 times Nguema's annual public salary).  Nguema also (i) purchased a $6 million home in Bel Air in 2001 (worth more than 60 times Nguema's annual public salary); (ii) acquired two 50-foot racing boats for over $2 million in 2005 (worth more than 20 times Nguema's annual public salary); (iii) spent $2,270,187.50 on various Michael Jackson memorabilia in 2010 (worth more than 22 times Nguema's annual public salary); and (iv) spent $494,700 on additional Michael Jackson memorabilia in 2011 (worth nearly 5 times Nguema's annual public salary).

After acquiring the Sweetwater Property in 2006, Nguema also continued to wire millions of dollars into the United States to pay for the Sweetwater Property's maintenance and upkeep as well as for other expenses, including expensive vacations and yacht rentals.  For instance between May and September 2009, Nguema wired $609,300 to Yachtzoo, a company in Ft. Lauderdale, Florida, in connection with a luxury yacht rental.  Similarly, during the Christmas holiday in 2005, Nguema spent in or around $600,000 to rent a luxury yacht called the Tatoosh.

In addition to Nguema's asset purchases in the United States, Nguema acquired a luxury residence on Avenue Foch in Paris.  This residence is located in the XVIth Arrondissement of Paris, one of the most expensive neighborhoods in the Western hemisphere.  Nguema also acquired several additional luxury automobiles in France, including:

- a Ferrari Type 51 (acquired in 2000 for in or around approximately $240,000),

- a Ferrari type 550 (acquired in 1998 for in or around $199,675),

14

Exhibit 2 Page 24

- a Bugatti Veyron (acquired in 2006 for in or around $1,547,923),
- a second Bugatti Veyron (acquired in 2006 for in or around $1,294,250),
- a Maserati Coupe F1 (purchased in 2005 for in or around $106,128),
- a Maserati MC12 (acquired in 2005 for in or around $917,623),
- a Maybach 62 (acquired in 2002 for in or around $660,687) and
- a Rolls Royce Phantom Limousine (purchased in 2005 for in or around $493,109).

In South Africa, Nguema purchased two pieces of real estate for approximately $7 million (more than 70 times Nguema's annual public salary). In addition to these two properties, Nguema purchased still more luxury vehicles in South Africa, including two Bentley automobiles for approximately $970,000 and a white 2005 6-litre Lamborghini Murcielago for approximately $440,000.

On or about March 12, 2009, the City of London Police Economic Crimes Division informed the United States that Nguema was attempting to open a bank account in the United Kingdom. The bank account, according to the City of London Police, was to receive and hold $350 million. These funds were expected to be transferred from an account in Spain, that was opened by a third-party nominee of Nguema. The City of London Police also reported that these funds were purportedly obtained through illegal means.

In or around June 2008, Nguema retained Kusch Yacht Projekte GmbH Am Hafen (Kusch) in Germany to design and build a $380 million yacht (worth more than 3,800 times Nguema's annual public income). Nguema paid the company €200,000 in three segments on July 30, 2008; October 2, 2008; and October 31, 2008, for work completed in relation to the pre-design of this yacht.

Additional information responsive to this Interrogatory relating to Nguema's acquisition of assets in the United States and abroad may be ascertained from the

COMPLAINT and documents that have or will be produced by the Government, including DOJ_0000174-0000177; DOJ_0000183-188; DOJ_0000189-192; DOJ_0000193-198; DOJ_0000218-226; DOJ_0000237-240; DOJ_0000265-268; DOJ_0000269-272; DOJ_0000278-280; DOJ_0000281-284; DOJ_0000309-314; DOJ_0000342-345; DOJ_0000364-369; DOJ_0000378-383; DOJ_0000440-442; DOJ_0000447-449; DOJ_0000450-453; DOJ_0000454-456; DOJ_0000457-461; DOJ_0000462-463; DOJ_0000464-469; DOJ_0000470-476; DOJ_0000842-863; DOJ_0001049-1080; DOJ_0001441-1460; DOJ_1652-1904; DOJ_2041-2352; DOJ_00001905-2040; DOJ_2481-2549; DOJ_3005-3117; DOJ_3118-3515; DOJ_2427-2434; DOJ_2353-2426; SENATE-PSI-117457-118644; SENATE-PSI-124429-126128; SENATE-PSI-118,645-119,028; SENATE-PSI-107290-110260; SENATE-PSI-73109-100926; SENATE-PSI-120250-120265.

## VII.
### NGUEMA'S FALSE OR INCONSISTENT STATEMENTS TO EXPLAIN HIS SOURCES OF INCOME AND WEALTH

Between 2004 and 2011, Nguema provided differing and inconsistent explanations as to the source of his personal income and wealth.  In 2007, when asked by Comerica Bank in Los Angeles, Nguema's representative Anne Morse advised the bank that Nguema was unemployed and that his income was derived from trading expensive automobiles and a family inheritance.  Two years later in 2009, Nguema told officials at the United States Embassy (Embassy) in EG that other than his income as a public official, the source of his wealth was commercial logging operations performed by a Malaysian company in EG.  Two years after that in 2011, Nguema changed his explanation yet again, claiming to Ambassador Alberto Fernandez, the United States' then Ambassador to EG, that his personal wealth was derived from government infrastructure contracts.

16

Exhibit 2 Page 26

Yet, on other occasions, Nguema could provide few, if any, specific details as to the source of his income.  For instance, in or about September 2004, City National Bank in California requested Nguema identify the source of the funds that were held in his closed CNB account in California.  Nguema provided no details other than to state that they were from one of two EG companies he owned— Somagui Forestal or Sofona.  Even when CNB refused to provide Nguema with his funds and Nguema sued in California Superior Court, Nguema was still not able to provide any details or any financial data relating to his purported commercial activities and the source of his wealth.

Two years later in 2006, the same year that Nguema acquired the Sweetwater Property, McAfee and Taft, an Oklahoma-based law firm and escrow agent, repeatedly asked Nguema to provide details as to the source of his income in connection with his attempt to purchase a Gulfstream aircraft for $38.5 million.  Despite repeated attempts by McAfee and Taft attorneys to obtain this information from Nguema and his lawyer, Nguema failed to respond.  As a result, McAfee and Taft refused to participate further in the transaction and returned all of Nguema's funds in the escrow account.

Three years later in 2009, the staff of the United States Senate's Permanent Subcommittee on Investigations (PSI) also contacted Nguema to obtain details as to the source of his income and wealth in connection with their 2010 report on foreign corruption.  Despite being promised by Nguema's attorney that this information would be provided, the PSI staff received no such information.  That same year, Nguema also claimed falsely to Anton K. Smith, the United States Embassy's deputy chief of mission, that some of his wealth was due to the fact that the value of the Sweetwater Property had doubled in value since he acquired it in 2006.  But, in the period between 2006 and 2009, there is no evidence that the

Exhibit 2 Page 27

Sweetwater Property was ever valued at anything close to $60 million, as Nguema claimed.

Additional information responsive to this Interrogatory relating to Nguema's inability to explain the source of his income and wealth may be ascertained from the COMPLAINT and documents that have or will be produced by the Government, including DOJ_0000584-592; SENATE-PSI-124429-126128; SENATE-PSI-10216-110308; SENATE-PSI-101514-107289; SENATE-PSI-119217-120245 .

## VIII.
## NGUEMA'S CONTENTION THAT HIS EG COMPANIES EARNED TENS OF MILLIONS OF DOLLARS LACKS CREDIBILITY

Nguema's contention that his forestry companies in EG, Grupo Sofona (Sofona) and Somagui Forestal (Somagui), generated tens of millions of dollars in annual revenue lacks credibility.  Nguema claims that he owns two companies in EG—Sofona and its subsidiary Somagui.  Sofona purportedly generated $26.8 million in revenue from "exporting hard timber" in 1999; $24.92 million in 2000; and $30.3 million in 2001.  The International Monetary Fund's (IMF) macroeconomic data for EG indicates that EG's entire forestry-related gross domestic product (GDP) amounted to in or around $45,022,970 in 1999; $41,134,751 in 2000; and $38,575,268 in 2001.

If Nguema's financial representations are accurate, this would mean that even though seventy-nine other individuals and companies also owned timber concessions in EG, Sofona was singlehandedly responsible for generating 59.5 percent of EG's forestry-related GDP in 1999; 60.5 percent of EG's forestry-related GDP in 2000; and 78.5 percent of EG's forestry-related GDP in 2001.  It would also mean that Sofona was responsible for singlehandedly exporting in or

18

Exhibit 2 Page 28

around 477,190 cubic meters of timber from EG in 1999; 432,575 cubic meters of timber in 2000; and 525,950 cubic meters of timber in 2001.

|  | SOFONA's Purported Annual Revenue | EG Forestry GDP | Percentage of EG Forestry GDP Allegedly Attributable to SOFONA |
|---|---|---|---|
| **1999** | **$26.8 million** | **$45,022.970** | est. 59.5% |
| **2000** | **$24.92 million** | **$41,134,751** | est. 60.5% |
| **2001** | **$30.3 million** | **$38,575,268** | est. 78.5% |

Yet, despite Sofona's purported dominance of EG's forestry sector, and the inevitable commercial footprint that such a company would have in EG's commercial marketplace, international financial institutions and law enforcement authorities have been unable to find evidence of this company's actual operations and/or earnings.  Moreover, despite being asked by business partners, associates, financial institutions, and foreign governments about the source of his income, Nguema has repeatedly failed to provide any specific details as to the source of his wealth, including Sofona's operations, personnel, financial data, profit margins, contracts, and/or business relationships.

Additional information responsive to this Interrogatory relating to Nguema's representations about Sofona and its dominance of the EG forestry sector may be ascertained from the COMPLAINT as well as documents that have or will be produced by the Government, including SENATE-PSI-122837-124428; DOJ_00001536-1651; DOJ_1314-1331.

Exhibit 2 Page 29

# IX.

## NGUEMA'S USE OF SHELL COMPANIES AND NOMINEES TO ACQUIRE ASSETS AND OPEN BANK ACCOUNTS

Between 2000 and 2011, Nguema created and used more than six shell companies to acquire assets, open bank accounts and transfer funds to conceal the source, origin and/or ownership of his assets and funds.  Nguema opened accounts in the names of these shell companies as early as 2000.  None of these shell companies engaged in any legitimate commercial or economic activity. Nguema's representatives frequently opened bank accounts at American financial institutions in the names of these shell companies without disclosing Nguema's association with these companies. Nguema's funds were then funneled through multiple accounts and multi-layered transactions.  Nguema's utilization of these shell corporations, nominees and complex layered transactions served no business or commercial purpose other than to conceal the origin, ownership and/or source of his assets and funds in the United States.

For instance, between 2000 and 2004, Nguema had three accounts at Riggs National Bank (Riggs) in the names of TNO Entertainment LLC (account numbers 76-889-55 and 76-923-450).  One of these accounts had a balance that fluctuated between $17,000 and $11.6 million.  In addition, Nguema also had an account in the name of Awake, Ltd., a Bahamas corporation.

Nguema also formed at least six shell companies in California.  These entities included:

(i)     **Sweet Pink, Inc.**  Nguema formed Sweet Pink, Inc. in 2005 and used it to open a bank account at Union Bank of California (UBOC) in September 2005.  Sweet Pink was incorporated in California and listed George Nagler as its registered agent.  Sweet Pink engaged in

no economic or commercial activity of any kind.  Its only apparent function was to conceal Nguema's association with this account from UBOC.  Nguema wired $29,947.50 into Sweet Pink's account from an EG bank account in the name of Somagui in or around October 19, 2005.

(ii)    **Unlimited Horizon, Inc.**  Nguema used Unlimited Horizon to open Bank Accounts at UBOC, Commercial Capital Bank and Citibank in Los Angeles.  Unlimited Horizon is incorporated in California and lists Michael Berger, another California lawyer, as its registered agent.  Unlimited Horizon did not engaged in any economic or commercial activity.  Its only apparent function was to conceal Nguema's association with this account from American financial institutions.  It also served as a receptacle for Nguema and Michael Berger to funnel money through layered transactions.  Unlimited Horizon's Commercial Capital Bank account received the following three wires from EG:  (i) a wire for $19,946.25 from Somagui on or about February 16, 2006; (ii) a wire for $49,945 from Somagui on or about March 23, 2006; and (iii) a wire for $39,944.81 from SOCAGE on or about June 16, 2006.  Between November 24, 2006 and June 6, 2007, Unlimited Horizon's UBOC account was the ultimate destination of eight wires from Nguema, which were funneled through accounts controlled by Berger at UBOC and Somagui at CCEI Bank in EG, amounting cumulatively to approximately $1,599,419.  Between July 27, 2007, and November 6, 2007, Nguema funneled over a $1 million from EG through Berger's client trust account at Bank of America (BOA) to Unlimited Horizon's account at Citibank.  These funds were

21

Exhibit 2 Page 31

used for the maintenance and upkeep of the defendant Sweetwater Property.

(iii) **Beautiful Vision, Inc.**:  Nguema used Beautiful Vision to open bank accounts at BOA.  Berger was also listed as a signatory on the accounts.  Beautiful Vision did not engage in legitimate economic or commercial activity of any kind.  Its only apparent function was to conceal Nguema's association with this account from BOA.  Beautiful Vision, Inc. was formed in California and listed Berger as its registered agent.  Between November 1, 2004, and November 2005, at least $1 million in funds originating from EG were funneled into Beautiful Vision's accounts at BOA.

(iv) **Sweetwater Malibu, LLC.**  Nguema formed Sweetwater Malibu LLC in 2006 and used it to take title to the defendant Sweetwater Property.  Sweetwater Malibu did not engage in any economic or commercial activity.  Its only apparent function was to conceal Nguema's ownership of the Sweetwater Property    Nguema opened one account in 2006 using Sweetwater Malibu's name at California National Bank.  In or around June 12, 2006, Nguema wired $249,899 to this account from EG.

(v) **Sweetwater Management, Inc.**  Nguema formed Sweetwater Management in 2006 and used it to open three bank accounts at California National Bank in 2006.  Sweetwater Management was incorporated in California and listed George Nagler as its registered agent.  Sweetwater Management did not engage in any economic or commercial activity.  Its only apparent function was to conceal Nguema's association with this account from an American financial

Exhibit 2 Page 32

institution.  This shell company was used to hire personnel to care for the defendant Sweetwater Property's maintenance and upkeep and to open an account, whose funds would be used for the maintenance and upkeep of the defendant Sweetwater Property.

(vi)    **TNO Entertainment, LLC**:  Nguema used TNO Entertainment to open bank accounts at Riggs and City National Bank in or around March 2004.  TNO Entertainment was formed in California and listed Adam Siegler as its registered agent.

(vii)   **Amadeo Oluy**.  Nguema acquired substantial assets and engaged in commercial transactions using the alias—Amadeo Oluy.  As explained above, in acquiring various items of Michael Jackson memorabilia, including the defendant Michael Jackson memorabilia, Nguema, through his personal assistant Wanda Kelly, asked that the auctioneer list Amadeo Oluy, rather than Nguema's actual name, on various invoices and billing sheets.  Similarly, in dealing with Nor-tech, a boating company in N. Fort Myers, Florida, Nguema spent thousands of dollars in 2010 on various services related to his Nor-Tech Hi Performance Boats.  In dealing with Nor-Tech, the invoices list Amadeo Oluy, rather than Nguema, as Nor-Tech's client.

Additional information responsive to this Interrogatory relating to Nguema's formation and use of shell companies may be ascertained from the COMPLAINT and documents that have or will be produced by the Government, including DOJ_0000212-217; DOJ_0000218-226; DOJ_0000252-257; DOJ_0000285-288; DOJ_0000289-296; DOJ_0000470-476; DOJ_3516-3582; DOJ_3853-3913; DOJ_2353-2426; DOJ_00001093-1158; SENATE-PSI-122837-124428; SENATE-PSI-124429-126128; SENATE-PSI-73109-100926; SENATE-PSI-120250-

120265; SENATE-PSI-120250-120265; SENATE-PSI-120374-122836; SENATE-PSI-72041-73108; SENATE-PSI-101000-101513; SENATE-PSI-70636-70717; SENATE-PSI-100927-100999.

## X.

## OTHER SUSPICIOUS CONDUCT IN AQUIRING AND MAINTAINING ASSETS

In addition to using shell companies and nominees to acquire assets and transfer funds, Nguema engaged in other practices that suggest that he was seeking to conceal the source, origin and/or ownership of certain assets and funds. In addition to opening accounts and actively moving funds in the name of shell companies and nominees, Nguema used third-party nominees to layer his transactions and move funds through multiple accounts to conceal the source, origin and/or ownership of his funds.

For instance:

- Nguema funneled money through Berger's attorney client trust account at BOA and UBOC to other accounts he controlled in the names of various California shell companies, including Unlimited Horizon. Specifically, Nguema wired funds from EG to Berger's trust accounts at BOA and UBOC. Berger, then, withdrew these funds, acquired cashier's checks with those funds, and deposited those checks into accounts held in the name of Unlimited Horizon at UBOC and Citibank. These funds were used for the maintenance and upkeep of the defendant Sweetwater Property.

- After Sweet Pink was formed in 2005, Christine Nguyen filed a false application with the IRS to obtain an EIN for the company. In so doing, she identified herself as the company's principal officer, general partner, grantor, owner, or trustor. Neither the company's articles of incorporation,

by-laws or other corporate documents identify Nagler or Nguyen as retaining such authority within the corporation.  Indeed, contrary to the false representations on the IRS application, when faced with a Congressional subpoena, Nagler explained in written responses provided to the PSI staff, that Nguema—not Nguyen— was Sweet Pink's "sole owner."

- On or about May 23, 2006, Melinda DeHaven, Nguema's personal assistant, filed a false EIN application with the IRS for Sweetwater Management, Inc., claiming that she was the company's principal officer, general partner, grantor, owner, or trustor.  Neither the company's articles of incorporation, by-laws or other corporate documents identify DeHaven as retaining such authority within the corporation.  Again, when faced with a Congressional subpoena, Nagler explained in written responses provided to the PSI staff, that Nguema—not DeHaven—served as the corporation's "sole director, President, Secretary and Chief Financial Officer."  The funds wired to this shell company's account at California National Bank were used for the maintenance and upkeep of the defendant Sweetwater Property.

Additional information responsive to this Interrogatory relating to Nguema's formation and use of shell companies may be ascertained from the COMPLAINT and documents that have or will be produced by the Government, including DOJ_0000212-217; DOJ_0000285-288; DOJ_0000289-296; SENATE-PSI-124429-126128; SENATE-PSI-73109-100926; SENATE-PSI-120250-120265; SENATE-PSI-120374-122836; SENATE-PSI-72041-73108.

25

Exhibit 2 Page 35

# XI.

## NGUEMA'S MISAPPROPRIATION, THEFT
## AND EMBEZZLEMENT OF PUBLIC FUNDS

### A. **Nguema's Abuse and Manipulation of Public Infrastructure Contracts to Misappropriate Public Funds**

After oil was discovered in EG during the 1990s, EG invested hundreds of millions of dollars in building public infrastructure projects.  In February 2003, at the age of thirty-three, Nguema was appointed by his father to the newly-created post of EG's Minister of Infrastructure and Forests.  Three years later, Nguema managed to wire more than $68 million out of EG to acquire both the defendant Sweetwater Property and a $38 million Gulfstream GV jet aircraft.

In an affidavit Nguema filed with the Cape Town High Court in South Africa on August 8, 2006, the same year that Nguema acquire the Sweetwater Property, Nguema acknowledged that he, like other EG cabinet ministers, bids on and benefits from obtaining government contracts awarded to them by his father's government.  In that affidavit, Nguema affirmed:

> Cabinet Ministers and public servants in Equatorial Guinea are by law allowed to [own] companies that, in consortium with a foreign company, can bid for government contracts and should the company be successful, then what percentage of the total cost of the contract the company gets, will depend on the terms negotiated between the parties.
> But, in any event, it means that a cabinet minister ends up with a sizeable part of the contract price in his bank account.
>
> \*                                          \*                                          \*
>
> One of the companies that I own is SOCIEDAD DE CARRETERAS DE GUINEA ECUATORIAL ("SOCAGE"), with a bank account at the CCEI BANK GE, in BATA, the commercial capital of [EG].

EG's infrastructure and construction industry, which Nguema was responsible for regulating when he was EG's Infrastructure Minister, is where

26

Exhibit 2 Page 36

corruption is the most pronounced, according to a report drafted by Ambassador Fernandez in 2011.  EG's corruption exists in its "murkier transactions such as sweetheart deals, influence peddling, construction contracts and finder's fees."  On March 21, 2011, Nguema met with Ambassador Fernandez and claimed that his personal wealth was attributable to infrastructure contracts awarded to his private businesses by the EG Government—the very industry that Ambassador Fernandez concluded was where corruption was most prevalent in EG, and the same industry that Nguema was in charge of regulating as Infrastructure Minister.

In 2009, Anton Smith, the United States Embassy's deputy chief of mission, noted that he was also concerned that the awarding of public infrastructure contracts in EG was particularly vulnerable to corruption.  According to Smith, "It is in these downstream, public expenditures that we lose visibility and in which the greatest opportunities for corruption persist.  Rumors abound of influence buying, bid rigging and kickbacks" in EG.  With respect to Nguema specifically, Smith noted that Nguema "lives the life of an international playboy and is widely accused of corruption."

Indeed, by March 2004, two years prior to Nguema's acquisition of the Sweetwater Property, Africa Confidential, a U.K. based publication focusing on Africa, reported that, "[Nguema] control[led] much of the infrastructure portfolio" funded by the EG Government's oil revenues.  Africa Confidential reported that:

> The generals who had previously run lucrative cartels in consumer imports, air and road transport, construction and cement etc. then had to secure approval from [Nguema's Infrastructure] Ministry.  He tried to block merchandise coming in for [other EG officials and businesses].  Compared by some to Iraq's late Uday Hussein, [Nguema] expanded his empire rapidly and started pressuring French, Spanish and other foreign companies.

Additional information responsive to this Interrogatory relating to Nguema's involvement in EG's construction and infrastructure sector may be ascertained from the COMPLAINT as well as documents that have or will be produced by the Government, including DOJ_0000584-592; DOJ_688-718; DOJ_0001049-1080; DOJ_1652-1904; DOJ_0000303-308; DOJ_0000315-321; DOJ_0000413-416; DOJ_0000417-421; DOJ_0000422-425; DOJ_0000426-430; DOJ_0000431-434; DOJ_0000834-837; DOJ_0000864-871; DOJ_00003853-3913; DOJ_0000946-950.

## 1. **Nguema's Corrupt Relationship with General Work.**

General Work is a major construction company in EG specializing in large-scale government infrastructure projects.  Italian law enforcement authorities, including officers of the Guardia di Finanzia (GdF), Italy's financial police, reported that they believed that between 2000 and 2007 Nguema stole EG public funds by funneling government revenue through General Work.  General Work was originally formed by two Italian nationals Giulio Cistaro and Giuseppe Vona in 2001 and managed by Vona, Andrew Mannarino and Igor Celotti.  Because of Celotti's close relationship to President Obiang, General Work was awarded major government infrastructure contracts in EG beginning in the early 2000s.  By 2011, General Work had become one of the largest construction companies in EG.  The GdF believed that 45 percent of the revenue earned by General Work in EG was funneled as kickbacks to Nguema.  During this same time period, Nguema acquired the defendant Sweetwater Property, sent hundreds of thousands of dollars from EG into the United States to fraudulently opened bank accounts for the maintenance and upkeep of this property, and made tens of millions of dollars of lavish expenditures and purchases.

28

Exhibit 2 Page 38

The Judicial Police Squad at the Procure in Udine, Italy identified a network of bank accounts in Italy, Austria, Spain, Monte Carlo and Luxembourg controlled by Nguema and his father. The GdF explained that they believed that these accounts were derived from monies embezzled from the EG Government by Nguema and President Obiang through infrastructure contracts awarded to General Work by President Obiang.

In 2007, Celotti was killed in an airplane crash near Mongomo, a city on EG's mainland. The GdF believed that the circumstances surrounding this crash were suspicious. One month prior to his death, Celotti transferred his corporate holdings, including 45 percent of General Work's equity, to his wife Anna Maria Moro. After Celotti's death, Gimmy Ricci, another Italian businessman, was appointed as General Work's new general manager. In addition to acquiring managerial control of General Work, Ricci worked with Moro to form several additional legal entities and companies to serve as receptacles for General Work's ill-gotten revenue. The remaining equity in General Work was acquired by Nguema's family. According to the GdF, Nguema's family provided no compensation to other shareholders in exchange for their shares.

After Celotti's death in 2007, the GdF conducted an extensive investigation into General Work and Celotti's financial affairs. In connection with this investigation, the GdF interviewed former employees and associates of General Work, including Cistaro and Vona. In addition, they performed a search of Moro's residence in the Friuli region of Italy. Cistaro and Vona informed the GdF that Nguema's family fraudulently assumed control of General Work. Based upon their investigation, including an analysis of Celotti's financial and banking records obtained by the Gdf from Moro, Italian law enforcement authorities concluded that Nguema and his father jointly owned, and controlled with Celotti's assistance a

network of international bank accounts that contained stolen millions of dollars in government monies misappropriated from EG's treasury through General Work's government construction contracts.

When Nguema was negotiating the purchase of the $30 million defendant Sweetwater Property, he sent and received faxes regarding this real estate transaction from Celotti's office at General Work in EG.  For instance, in or around April 2, 2006, Nguema signed and faxed a copy of the Supplemental Escrow Instructions, the Residential Lease After Sale, and the Addendum to the Residential Lease After Sale—all pertaining to the purchase of the defendant Sweetwater Property—to Nagler's office from a fax number in EG (00240) 084096.  This EG fax number belonged to Celotti.  Furthermore, in connection with wiring funds from EG into the United States to support the maintenance and upkeep of the Sweetwater Property, Michael Berger faxed a letter in or around January 20, 2008, to Celotti's fax line in EG, stating, "Here is the information that you need to wire transfer money to Unlimited Horizon, Inc., account at Commercial Capital Bank."  In this same letter, Berger detailed Unlimited Horizon's bank account information, the address of Commercial Capital Bank in Beverly Hills and the bank's telephone number and routing number.

Additional information responsive to this Interrogatory relating to the relationship between Nguema and General Work may be ascertained from the COMPLAINT and documents that have or will be produced by the Government, including DOJ_0000303-308; DOJ_0000315-321; DOJ_0000413-416; DOJ_0000417-421; DOJ_0000422-425; DOJ_0000426-430; DOJ_0000431-434; DOJ_0000809-816; DOJ_00003853-3913; SENATE-PSI-86730; SENATE-PSI-93976; SENATE-PSI-94046; SENATE-PSI-96238-96240.

Exhibit 2 Page 40

**B. Nguema's Attempt to Misappropriate $40 Million in Public Funds to Acquire a Gulfstream Jet**

In 2004, two years before Nguema acquired the defendant Sweetwater Property, Nguema contacted Gulfstream Aerospace Corporation (GAC) and expressed interest in purchasing a $40 million aircraft from GAC. Stephen Arnold Fuller, GAC's regional vice president for Sub-Saharan Africa, recalled that Nguema informed GAC that he intended to finance the purchase of this aircraft by diverting $40 million in public funds from the EG Government through an American oil company.

Nguema told Mr. Fuller that he could and would pay for the $40 million aircraft with public funds by having an "American oil company" initially pay GAC for the aircraft. EG would then, according to Nguema, "repay the American oil company through credits to the company's local account in EG." In a letter dated April 20, 2004, Fuller confirmed that Nguema was proposing to purchase from GAC a Gulfstream 550 with misappropriated public funds. Mr. Fuller stated in that letter:

> [Nguema] is suggesting that [GAC] contact the Chairman of Ocean Energy in Houston, Texas with regard to the Gulfstream 550. There may be an advantage in assigning the Sales Agreement to Ocean Energy and having that company assume the payment obligations for the Gulfstream 550. In return, the Government [of EG] would issue a Credit Memorandum to Ocean Energy for amounts payable in connection with oil production.

Raymond Banoun, managing partner of Cadwalader, Wickersham & Taft, LLP, a New York-based law firm, served as an attorney for GAC in connection with this transaction. Like Mr. Fuller, Mr. Banoun recalled that in 2004, Nguema represented to GAC that he would misappropriate EG public funds by (i) having Ocean Energy, an American oil company, purchase the $40 million aircraft and

31

Exhibit 2 Page 41

"assume the payments on his behalf" and then (ii) "in return" have the "Equatorial Guinea government [] issue a credit memo to Ocean Energy for monies connected with oil production in Equatorial Guinea."

Additional information responsive to this Interrogatory relating to Nguema's relationship and communications with GAC may be ascertained from the COMPLAINT as well as documents that have or will be produced by the Government, including DOJ_0000114-166; DOJ_0000388-393; SENATE-PSI-119217-120245; SENATE-PSI-120318-120347; SENATE-PSI-124429-126128.

## C. Accusations of Direct Diversion of EG Public Funds

In South Africa, George Ehlers, a South African businessman, filed a lawsuit in the Cape Town High Court against the EG Government. In that litigation which was filed in or around July 2005, less than one year prior to Nguema's acquisition of the Sweetwater Property, Ehlers alleged that the EG Government was in breach of a $7.8 million government infrastructure contract with his company, Engineering Design and Construction Company. After the EG Government seized some of his company's assets in EG and refused to pay his company for its services, Ehlers filed a lawsuit seeking to attach two homes valued at $7 million owned by Nguema in South Africa. The two homes were located at Erf 477 Clifton Ridge and Erf 303 Constantia in Cape Town. The funds used to purchase these properties were wired into South Africa in 2004 from an account at CCEI Bank in EG held in the name of Socage, an EG company owned by Nguema.

Ehlers alleged that because Nguema could not have afforded to purchase these assets on his income as an EG public official, Nguema must have used funds misappropriated from the EG Government to acquire and renovate these properties. Indeed, even the contractors hired to renovate the property believed that these assets were owned by the EG Government. In support of his lawsuit, Ehlers filed

Exhibit 2 Page 42

an affidavit executed by Patricia Fuller.  Fuller recalled that she spoke with Peter McNamara, a contractor hired to renovate Nguema's property in Constantia. McNamara, according to Fuller, advised her that he had never heard of Nguema and that he was communicating with the EG Government about how to renovate the property.  Furthermore, McNamara claimed that he was under the impression that the property belonged to the EG Government.  McNamara submitted an invoice for in or around R 3,144,524 (approximately $359,532) to Jacques Levy, an interior decorator in Switzerland, for his services relating to Nguema's house in Constantia.  As McNamara had no knowledge of Nguema, and was receiving his instructions from the EG Government regarding the home's renovations, Ehlers alleged that the funds used to acquire and renovate these properties were misappropriated from the EG Government.  Although Ehlers prevailed against Nguema before the trial court, an appellate court reversed that decision on other grounds.

Additional information responsive to this Interrogatory relating to Mr. Ehlers' lawsuit in South Africa may be ascertained from documents that have or will be produced by the Government, including DOJ_0000281-284; DOJ_0000464-469; DOJ_0001049-1080; DOJ_1652-1904; DOJ_0000890-893.

## XII.

## EXTORTION AND BRIBERY

Beginning in the 1990s, Nguema, as described in the COMPLAINT, received and demanded that companies in E.G provide him with money or property in order to be able to maintain and operate their businesses.  Nguema abused his authority and influence within the EG Government both as a member of the cabinet and President Obiang's eldest son to make these demands and to retaliate against those who refused to acquiesce.

Exhibit 2 Page 43

## A. Extortion and Solicitation of Bribes from Forestry Companies

In 1998, at the age of 29, Nguema was appointed by his father to serve as EG's first-ever Minister of Forestry and Agriculture.  Timber is EG's second largest and most valuable export commodity.  Nguema's Forestry Ministry (Ministry) controls timber harvesting operations in EG.  The Ministry also controls timber exports.  In order to export timber from EG, Nguema requires that timber companies obtain an export authorization document that is personally signed by him.  Timber companies incur expenses of up to $5,000 per day if Nguema delays in signing these requests.

### 1. Extortion Payments and Bribes from Forestry Companies

Foreign timber executives claim that their companies were routinely required to pay bribes to Nguema in order to do business in EG.  Foreign Policy Magazine quoted one timber executive as stating, "[Nguema] would call emergency meetings of all the logging company heads in which he would announce some new tax on logging operations."  According to this executive, Nguema charged timber companies an extra so-called "tax" that they were forced to pay him personally for wood harvested in EG.  Nguema purportedly charged timber companies directly per cubic meter of timber harvested by that company.

A French timber executive, identified as "Jean Michel" in this same Foreign Policy Magazine article, reported that Nguema seized the French logging company he worked for in EG.  It was impossible, according to Jean Michel, for timber companies to do business in EG without paying bribes to Nguema.  Although Jean Michel's company initially paid Nguema the bribes that he demanded, the EG military shut down this company's operations and expelled its personnel from EG after it refused to make any further bribe payments to Nguema.

Exhibit 2 Page 44

Independent NGOs have also reported that Nguema extorts payments and solicits bribes from timber companies in EG.  For instance, a former United States intelligence official, who was familiar with EG, reported to Global Witness, that Nguema solicits and accepts bribes from Malaysian, North Korean and Chinese timber companies.  According to this intelligence official, "There were Malaysian, North Korean, and Chinese logging camps on the mainland [of EG], and [Nguema] collected cash from them . . . for logging operations, much of it involving valuable hardwood."

While Nguema solicits and collects bribes from foreign timber companies, he also permits these same companies to violate EG's forestry laws and regulations.  Indeed, according to representatives of the Environmental Investigation Agency (EIA), an environmental NGO, corruption is pervasive in EG's forestry sector and some foreign timber companies, including Shimmer International of Malaysia (Shimmer), are permitted illegally to harvest timber in EG's protected forests reserves.

Several independent NGOs, including Forest Monitor, Green Peace and the World Rain Forest Movement, confirmed that Nguema does not enforce EG's forestry laws on some foreign timber companies, including Shimmer.  For instance, Shimmer engages in illegal logging in protected national forests in EG, including Monte Alen, even though these forest reserves are protected from industrial logging under EG's Forestry Law. Greenpeace reported that in 2004, "Enforcement of legal requirements is virtually non-existent in commercial logging" in EG.  Similarly, Forests Monitor, a U.K. NGO, concluded in 2001 that, "[i]n practice, enforcement of all the various legal requirements [in EG's forestry sector] is virtually non-existent."

Likewise, while Nguema held the position of Forestry Minister, some timber companies were permitted to overcut EG's forests.  Although EG's Forestry Law places limits on how much timber can be harvested by concessionaires and requires these entities to process 60 percent of their timber in EG, many timber companies, including Shimmer, were operating in violation of these rules. According to a United States Forest Service ranger, who visited EG between July 31, 2004, and August 15, 2004, "[i]t is clear that in some areas that [EG] forests [were] being overcut."  Similarly, EIA representatives confirmed that Shimmer, the dominant timber company in EG, was permitted to illegally export the bulk of its raw timber to China without processing it domestically.

Additional information responsive to this Interrogatory relating to Nguema's control of EG's forestry sector and his solicitation of bribes and extortion payments from timber companies may be ascertained from the COMPLAINT and documents that have or will be produced by the Government, including DOJ_0000408-412; DOJ_0001049-1080; DOJ_0000842-863; DOJ_0000614-615; DOJ_975-1048; DOJ_758-777; DOJ_778-789.

## 2.  **Nguema's Relationship with Shimmer International**

Nguema reportedly maintains a close working relationship with Shimmer that benefits him personally.  While Nguema was its head, EG's Forestry Ministry awarded Shimmer substantial forestry concessions.  Shimmer was the largest and most dominant forestry company in EG.  Indeed, in 2006, the same year that Nguema purchased the Sweetwater Property, Shimmer was responsible for more than 66 percent of the timber harvested in that country.  According to a former U.S. intelligence official who spoke with Global Witness, Nguema solicited and collected bribes from Shimmer in EG.

Exhibit 2 Page 46

Nguema confirmed to U.S. diplomats at the Embassy in 2009 that he permitted a Malaysian company to deploy 40 teams of well-equipped lumberjacks to "clear cut" a "large tract of pristine continental jungle" that was "granted" to him by the EG Government.  Nguema then purportedly earned a "large windfall" by exporting this raw timber to Asia.   It is illegal under EG's Forestry law to permit this type of "clear cutt[ing]."  EG law also requires timber concessionaires, like Nguema, to process domestically a minimum of 60 percent of the raw timber they harvest from their concessions.  Nguema, however, exported his raw timber as "whole logs" to Asia.  Although it was Nguema's responsibility as EG's Forestry Minister to enforce these laws, Nguema explained to U.S. diplomats that this illegal "windfall" was the source of his personal wealth.

Additional information responsive to this Interrogatory relating to Nguema's relationship with timber companies, including Shimmer, may be ascertained from the COMPLAINT as well as documents that have or will be produced by the Government, including DOJ_0000408-412; DOJ_0001049-1080; DOJ_975-1048; DOJ_778-789.

**B. British Hotel Company**

In or around 2003, a British company sought permission to build a Sheraton hotel in Malabo, EG's capital city located on Bioko Island.  According to Simon Kareri, a Riggs Bank vice president, Nguema refused to permit the British company to build the Malabo hotel unless its executives agreed to provide him with 55 percent of the hotel's equity.  When the British company refused, their hotel project was not allowed to go forward. Nguema purportedly accompanied representatives of this British company to Nguema's Los Angeles home to engage in negotiations about this hotel.

37

Exhibit 2 Page 47

Additional information responsive to this Interrogatory relating to this British company may be ascertained from documents that have or will be produced by the Government, including DOJ_000080-87.

## C. **G.E. Petrol**

G. E. Petrol is EG's state-owned oil company.  According to Kareri, when he was employed at Riggs prior to 2005, G.E. Petrol was still "run by the First Family" of EG and Nguema was the company's "*patron*."  In Spanish, which is one of EG's official languages, the word "*patron*" means "master" or "boss."  Even though Nguema "flunked high school and does not know how to do anything," according to Kareri, Nguema controlled G.E. Petrol as its "*patron*".  Kareri stated that "the big money from the [foreign] oil companies is being paid to the First Family through joint venture projects in EG" and that corrupt payments were disbursed by G.E. Petrol to "so-called oil brokers" controlled by Nguema's family.  These brokers, according to Kareri, make further profits for Nguema's family by purchasing oil from G.E. Petrol at discounted rates.

According to Kareri, Nguema's family "may be skimming money from the sale of [EG's] share of oil produced by the oil companies in EG."  Nguema, according to Kareri, often made remarks to him suggesting that he is GE Petrol's "*patron*."  On one occasion, Kareri recalled that G.E. Petrol requested that he divert directly a certain percentage of EG's oil revenue to an account controlled by G.E. Petrol.  Kareri refused.

Similarly, as explained above at Section XI(B), Nguema represented to GAC that he possessed both the ability and the intent to misappropriate public funds from the EG treasury relating to oil production.  Specifically, he claimed that he could provide an American oil money with a $38.5 million "credit memorandum" derived from public funds to acquire a personal asset for himself.

38

Exhibit 2 Page 48

Kareri and Nguema purportedly had a close business and personal relationship.  Nguema consulted Kareri frequently about both financial and personal issues, including "personal problems" Nguema had with his father.  Kareri commented to his wife, that it was unfortunate that Nguema was "blowing" the money from EG.

Additional information responsive to this Interrogatory relating to G.E. Petrol may be ascertained from documents that have or will be produced by the Government, including DOJ_000038-94 and DOJ_0000241-244.

### D. <u>Foreign Oil Companies</u>

Walter International (Walter) was a Houston-based oil company operating in EG.  In 1991, Nguema enrolled at Pepperdine University's English language program in Malibu, California.  According to Ambassador John Bennett, a former United States Ambassador  to EG during the early 1990s, Nguema's Pepperdine tuition and expenses were fully paid for by Walter.  Elisa Wax, a Pepperdine employee, recalled that Pepperdine received a "steady stream of phone calls from the Beverly Wilshire [Hotel] and shops in Beverly Hills trying to track down [Nguema] to settle outstanding bills."  Wax would direct these calls to Walter International.  Ambassador Bennett recalled that Nguema incurred, and Walter paid, $50,000 in expenses while attending Pepperdine in California.

In November 2009, Global Witness reported that Nguema received corrupt payments from Elf-Acquitaine, a French oil and gas company.  In 2004, thirty senior executives of Elf Acquitaine were charged and convicted in France of distributing bribes and kickbacks in Africa over a period of several decades.

A confidential source ("CI 3"), who spoke with federal agents in Miami, Florida, also confirmed that it was his/her belief that Nguema controls the oil industry in EG and that he derives his wealth from illegal activities in EG,

including the distribution of counterfeit cigarettes, diamond smuggling and monetary kickbacks in the form of contracts from United States oil companies operating in EG.

Another confidential source (CI 2), who spoke with federal agents and was a former employee of Nguema in Los Angeles in or around 2006, the same year that Nguema acquired the Sweetwater Property, recalled that Nguema told him/her that the source of his wealth was related to EG's oil resources.  CI 2 was an employee of Nguema who worked at the defendant Sweetwater Property.  Even though Nguema holds no official position within the EG Government related to the oil industry, CI 2 recalls seeing three "oil officials" meet with Nguema at the Sweetwater Property during the second week of November 2006.

Additional information responsive to this Interrogatory relating to Nguema's relationship with the oil and gas industry may be ascertained from documents that have or will be produced by the Government, including DOJ_0000114-0000166; DOJ_0000241-244; DOJ_0000265-268; DOJ_0000388-393; DOJ_0000394-398; DOJ_0000842-863; DOJ_0001049-1080; SENATE-PSI-119217-120245; SENATE-PSI-120318-120347; SENATE-PSI-124429-126128.

**E.  Michael Chevaly**

An individual named Michael Chevaly allegedly smuggles various fraudulently manufactured consumer goods into Cameroon, Nigeria, Benin, Niger, Chad, Sierra Leone, Liberia, Guinea-Conakry and Gabon.  In so doing, Chevaly purportedly uses routes through EG, Niger and Benin to smuggle this merchandise.  CI 3 informed federal agents that Nguema possesses a business relationship with Chevaly relating to this illegal conduct.  Additional information responsive to this Interrogatory relating to the relationship between Nguema and Chevaly may be

40

Exhibit 2 Page 50

ascertained from documents that have or will be produced by the Government, including DOJ_0000246-251.

## XIII.

## NGUEMA'S FRAUD AGAINST U.S. BANKS

Between 2004 and 2008, Nguema, as described in the COMPLAINT, orchestrated, participated in and implemented a scheme fraudulently to open and use bank accounts at six financial institutions in California in order to surreptitiously funnel millions of dollars into the United States from EG, while concealing his association with the accounts, the source of funds, and his status as an EG cabinet minister and son of the President.  During this period, Nguema fraudulently opened at least ten bank accounts at six financial institutions in California, including Bank of America (BOA), Union Bank of California (UBOC), Commercial Capital Bank, California National Bank (CNB), Comerica Bank, and Citibank.

Beginning in 2004, after the PSI published its report on money laundering on July 15, 2004, Nguema was on notice that banks in the United States were uncomfortable opening bank accounts for him.  The PSI's 2004 money laundering report criticized Riggs for its handling of Nguema's family's funds, including those of Nguema.  Further, Riggs was ultimately convicted and ordered to pay a criminal fine of $16 million, as well as $25 million in civil penalties, for its non-compliance with U.S. anti-money laundering controls.

Just two weeks after the PSI's report was published, City National Bank in Los Angeles was contacted by Nguema after the bank had closed his personal bank account.  When he called the bank on July 30, 2004, Nguema told a bank employee that he thought his account had been closed "due to [his] country and the oil."  In addition to closing his accounts, City National Bank refused to return $699,691.02

of Nguema's funds to him and requested that the California Superior Court for the County of Los Angeles allow the bank to release these funds to the court, rather than Nguema, for ultimate resolution.

Beginning in 2004, Nguema, Michael J. Berger and George Nagler opened bank accounts in California in the names of various shell companies, including Sweet Pink, Inc., Unlimited Horizon, Inc., Beautiful Vision, Inc., and Sweetwater Management, LLC, without disclosing Nguema's ownership of the companies or their funds and concealing his status as a Senior Foreign Public Figure (SFP) and a Politically-Exposed Person (PEP). Nguema and his intermediaries, including Berger and Nagler, then transferred funds received from Nguema into these fraudulently opened bank accounts in the United States. In opening numerous California bank accounts and using intermediaries' accounts, Nguema, Berger and Nagler intentionally and deliberately concealed from these financial institutions Nguema's association with these bank accounts as well as his status as a SFP and a PEP.

Nguema used many of the funds in these fraudulently opened accounts for the maintenance and upkeep of the defendant Sweetwater Property, a $30 million mansion he purchased in Malibu in 2006. Funds were used to pay for, among other things, the salaries of Nguema's household staff. These staff persons worked at the Sweetwater Property and aided Nguema, at his direction, in executing this fraudulent scheme. These funds were also used to maintain an office at the Sweetwater Property for Nguema and his employees and associates to perpetuate and oversee this scheme; the professional and administrative services of various lawyers, accountants, and property managers, including Berger and Nagler; costs incurred by Nguema's household staff relating to this scheme; and the costs and fees of the Sweetwater Property, where Nguema and his household staff

maintained their business office for their shell companies and where much of the conduct described at paragraphs 117-209 of the COMPLAINT were planned, coordinated, and occurred.

Nguema repeatedly concealed from banks in California his ownership of the funds in these accounts by using shell companies formed to hide his identity and by using various third-party nominees, including Michael Berger and George Nagler, who both allowed Nguema to use their client trust accounts to pay for personal expenses.  After each of these banks discovered Nguema's association with the accounts, the banks closed each account.

**Bank of America**.  On or about October 12, 2004, Nguema fraudulently opened two accounts in the name of Beautiful Vision, a California company.  No banker looking at the documents and information provided to Bank of America (BOA) by Berger and Nguema could have identified Nguema as being the owner of Beautiful Vision, nor could they have readily identified the account as one affiliated with a SFP and/or a PEP.  BOA closed the Beautiful Vision accounts in or around September 12, 2005, and September 15, 2005, respectively, after discovering that Nguema, a SFP and a PEP, was associated with Beautiful Vision, Inc.

**Union Bank of California.**  On or about September 15, 2005, three days after BOA closed Nguema's Beautiful Vision account, Nagler formed Sweet Pink, Inc. for Nguema.  On or about September 29, 2005, UBOC opened a checking account for Sweet Pink using an EIN obtained by Nagler's assistant.  The signatories on the account were Eve Jeffers, Nguema's then-girlfriend, and four employees of an accounting firm owned by Marvin Freedman that had been retained by Nguema.  On the bank account opening documents, Marvin Freedman's business address is listed as Sweet Pink's address.  No banker looking

at the documents and information provided by Nagler could have identified Nguema, as being the owner of Sweet Pink, nor could they have identified the account as one affiliated with an SFP and a PEP.  Approximately eight days later, on or about October 27, 2005, UBOC discovered that Nguema was using the Sweet Pink account to gain access to the U.S. banking system and closed Sweet Pink's account.  This was the third time in less than fifteen months that a California bank closed an account after learning of Nguema's association with the account.

**Commercial Capital Bank.**   On or about December 7, 2005, less than two months after UBOC closed Nguema's Sweet Pink account, Berger opened an account at Commercial Capital Bank in the name of Unlimited Horizon, Inc.  Berger caused Unlimited Horizon to be incorporated in California on October 21, 2005.  No banker looking at the documents and information provided by Berger and Nguema could have identified Nguema as being the owner of Unlimited Horizon, nor could they have identified the account as one affiliated with an SFP and a PEP.  On or about June 22, 2006, Commercial Capital Bank closed Unlimited Horizon's account.  This was the fifth account in less than two years closed by a California bank after discovering its association with Nguema.

**California National Bank.**  On or about May 16, 2006, after Nguema had acquired the Sweetwater Property in April 2006, Nagler formed another company for Nguema called Sweetwater Management, Inc.  Sweetwater Management was purportedly formed to employ and to pay individuals working to maintain the Sweetwater Property.  In or around May 30, 2006, Edward Mizrahi, Nguema's estate manager, opened an account at this bank in the name of "American Equity Properties, DBA:  American Property MGMT ITF:  Sweet Water Malibu" ("AEP Account").  The estate manager concealed Nguema's involvement with the account as well as Nguema's status as a SFP and a PEP.  He identified the owner of

44

Exhibit 2 Page 54

Sweetwater Malibu, LLC as a "high profile" person who wanted to remain confidential.  The following day, on or about May 31, 2006, Nguema's personal assistant Melinda DeHaven opened three additional business accounts at CNB in the name of Sweetwater Management, Inc.  On or about June 22, 2006, the bank closed all four accounts after learning that these accounts were associated with Nguema.

**Union Bank of California.**  On or about August 28, 2006, two months after Unlimited Horizon's account at Commercial Capital Bank was closed and Nguema's four accounts at CNB were closed, Berger opened two Basic Business Checking Accounts in the name of Unlimited Horizon, Inc. at a UBOC branch in Beverly Hills.  Berger identified himself to UBOC as Unlimited Horizon's president, and was the sole signatory on both UBOC accounts.  Berger again concealed material information from UBOC, including Nguema's association with Unlimited Horizon, as well as Nguema's status as a SFP and a PEP.  No banker looking at the documents and information provided to UBOC by Nguema and Berger, could have identified Nguema as being the owner of these accounts, nor could they have identified the account as one affiliated with an SFP and a PEP.  After opening these accounts, Berger explained to Nguema in an email dated on or about November 1, 2006, that future wires should be sent "to my new client trust account at [UBOC].  I will transfer it from there to the Unlimited Horizon, Inc. General Account.  I will send you a separate e-mail and fax requesting a $200,000 wire transfer and providing wire transfer information for this new account."  Upon receiving these wires in his client trust accounts, Berger withdrew these funds and deposited them into Unlimited Horizon's UBOC accounts in the form of checks and bank drafts.  Between November 29, 2006 and May 11, 2007, Berger

deposited seven checks totaling $1,399,485 into Unlimited Horizon's UBOC accounts, after withdrawing these funds as "cash" from his client trust account. On or about June 12, 2007, after an investigation by UBOC discovered that Berger represented Nguema, an SFP and a PEP, and that Berger was using corporate vehicles to "disguise the identity of" Nguema to pay for the Sweetwater property and Nguema's living expenses, UBOC closed all three accounts.

**Comerica Bank**.  On or about February 6, 2007 -- eight months after CNB closed Nguema's four accounts -- Nguema applied to open a bank account at Comerica Bank on the Avenue of the Stars in Los Angeles.  On this occasion, Nguema directed his representative Anne Morse to open an account in his name and to identify himself as an EG citizen to the bank, but he nonetheless concealed from Comerica the fact that he was a PEP and an SFP.  When asked explicitly whether Nguema "ever performed important public functions for a foreign state (PEP)?" Nguema's representative answered in the negative.  When asked whether Nguema was "closely associated with person(s) who perform public functions for a foreign state (PEP)?" the representative again answered in the negative.  On or about March 22, 2007, Comerica closed this account after the bank's compliance personnel discovered that Nguema, in fact, was a PEP and an SFP.

**Citibank**.  On or about June 25, 2007, approximately thirteen days after UBOC closed Nguema's accounts, Berger opened another account in the name of Unlimited Horizon at a Citibank branch in Beverly Hills.  During the account-opening process, Berger deliberately hid Nguema's ownership of the account by telling a Citibank banker that the true owners of the Citibank account were U.S. citizens, when, in fact, Nguema a non-U.S. citizen PEP and a SFP was the account's true owner.

Over the course of the next five months, Nguema transferred over $1 million directly from EG into Berger's client trust account.  Berger, in turn, transferred these funds into Unlimited Horizon's Citibank account.  In an email dated on or about December 7, 2007, Berger confirmed with Nguema, "I know that all payments [from the Citibank account] must be approved by you . . . I understand the importance of the principle.  This e-mail will reconfirm that I will only pay bills approved by you."  On or about May 20, 2008, after uncovering Nguema's association with Unlimited Horizon and this account, Citibank closed Unlimited Horizon's account.

Additional information responsive to this Interrogatory and the Government's allegations of domestic bank fraud may be ascertained from the COMPLAINT, as well as documents that have or will be produced by the Government, including DOJ_0000212-217; DOJ_0000227-236; DOJ_0000252-257; DOJ_0000258-260; DOJ_0000261-264; DOJ_0000285-288; DOJ_0000289-296; SENATE-PSI-000070636-70717; SENATE-PSI-000072041-73108; SENATE-PSI-73109-100926; SENATE-PSI-0000100927-100999; DOJ_0000101000-101513; SENATE-PSI-0000101514-107289; SENATE-PSI-SENATE-PSI-110261-110308; SENATE-PSI-0000120246-249; SENATE-PSI-000120250-120265; SENATE-PSI-120374-122836; SENATE-PSI-124429-126128.

**Proceeds of Bank Fraud Used for Maintenance and Upkeep of the Sweetwater Property**:  The funds deposited and funneled through Nguema's fraudulently opened bank accounts were used to, among other things, pay for the maintenance and upkeep of the defendant Sweetwater Property.  In disbursing funds from these fraudulently opened bank accounts, Nguema specifically ordered and/or approved the disbursal of funds to various vendors and payees relating to the maintenance

and upkeep of the Sweetwater Property.  Indeed, Berger was not permitted to disburse any funds belonging to Nguema in these accounts unless he first received a check approval form that was signed personally by Nguema.

Nguema used the funds in his Unlimited Horizon account at UBOC to support, maintain and enhance the Sweetwater  Property, including, among other things, paying in or around $54,000 per month for home security services; $10,000 per month in electricity bills; $8,000 per month in phone bills; $73,649.95 in property taxes; $6,875 for the installation of a sauna; more than $10,000 for home theater equipment; more than $4,000 for home insurance; more than $12,000 in landscaping fees; more than $36,000 in tree care-related fees; and more than $30,000 per month in payroll for his household staff, including estate managers, maintenance crews, and housekeepers.

Similarly, Nguema's fraudulently opened Citibank account held in the name of Unlimited Horizon was also used for the maintenance and upkeep of the Sweetwater Property.  Specifically, these funds were used to pay for expenses, including, among other things, approximately $54,000 per month on the home's security detail, over $9,000 per month on the power bill to Southern California Edison, over $5,000 per month on the home's water bill to Los Angeles County Waterworks, $37,000 on landscaping costs, $3,773 on maintenance for the home's fish tank, $24,700 on outdoor landscape lighting, $7,577 for the "Fish Physician" in connection with the home's Koi pond, $9,600 on audio-video equipment, $1,304 for swimming pool maintenance, and thousands of dollars for home furniture and decorations.

Additional information responsive to this Interrogatory may be ascertained from the COMPLAINT, as well as documents that have or will be produced by the Government, including DOJ_0000212-217; DOJ_0000227-236; DOJ_0000252-

257; DOJ_0000258-260; DOJ_0000261-264; DOJ_0000285-288; DOJ_0000289-296; DOJ_0000470-476; SENATE-PSI-000070636-70717; SENATE-PSI-000072041-73108; SENATE-PSI-73109-100926; SENATE-PSI-0000100927-100999; DOJ_0000101000-101513; SENATE-PSI-0000101514-107289; SENATE-PSI-SENATE-PSI-110261-110308; SENATE-PSI-0000120246-249; SENATE-PSI-0000250-120265; SENATE-PSI-120374-122836; SENATE-PSI-124429-126128.

## XIV.
## EVIDENCE OF
## CURRENCY REPORTING VIOLATIONS

Several former employees of Nguema reported that Nguema and/or his employees carried a bag "stuffed with stacks of fresh $100 bills" when he travelled in and out of the United States.  A confidential source (CS 1), who was a former employee of Nguema in California, reported that two EG nationals employed by Nguema—Emmanuel Asamoah and Charles Annan—were responsible for carrying a Louis Vitton briefcase.  This brief case, according to CS 1, is  brought into the United States with Nguema and is filled with approximately $500,000 to pay for Nguema's bills and personal expenses.  Another confidential source (CS 2), who was also a former employee of Nguema in California, recalled that two EG nationals Joseph Otbo and Moses Hilorsi were responsible for carrying a suitcase for Nguema that contained approximately $1 million in cash.  Nguema does not report this currency when he enters the United States, as is required by 31 U.S.C. § 5316.  Additional information relating to Nguema's transportation of bulk cash into and out of the United States is available in documents produced by the Government, including but not limited to DOJ_0000178-182; DOJ_0000183-188; DOJ_0000842-863.

# XV.
# EG GOVERNMENT IS INTERNATIONALLY RECOGNIZED AS A KLEPTOCRACY, BENEFITTING NGUEMA'S FAMILY AND ASSOCIATES

As described in the COMPLAINT, EG's Government, President Obiang's Inner Circle and Nguema in particular have been criticized widely by the United States and foreign governments, multilateral organizations, independent non-governmental organizations (NGOs), and the international media as being among the most corrupt and repressive governments in the world.

### A. United States Government Officials and Reports Identify Nguema as Part of an EG Government Marked by Widespread, Senior-Level Corruption

Between 1998 and 2011, the United States Department of State has published official reports repeatedly identifying senior-level public corruption as pervasive within President Obiang's administration.  In a United States Embassy cable drafted by Anton Smith in 2009, Smith confirmed that most EG cabinet ministers:

> continue to moonlight and conduct businesses that often conflate their public and private interests. . . The custom of simultaneously maintaining both official and private activities that became entrenched in the era of skinny cows has not been altered for the fat ones.  There is public grumbling but little internal pressure to change the rules. Nonetheless, occasionally lines do get crossed.

In that report, Smith specifically identified Nguema and his mother Constancia Obiang as direct beneficiaries of this type of corruption.

U.S. Ambassadors and officials who have lived in and worked in EG also report that corruption within Nguema's father's government benefits senior public officials, like Nguema.  Former United States ambassadors to EG recall that public corruption is widespread within President Obiang's government and that it

50

Exhibit 2 Page 60

frequently utilizes torture and other instruments of political repression to maintain political dominance in EG.  Frank Ruddy, a former United States ambassador to EG during the Reagan administration, told the <u>Los Angeles Times</u> that, "[President] Obiang is a thief and he heads a government of thieves."  In addition to serving as ambassador to EG, Ruddy served formerly as general counsel of the United States Department of Energy and an assistant administrator of the United States Agency for International Development.  Similarly, Ambassador Bennett described Equatorial Guinea as "the world's finest example of a country privatized by a kleptomaniac without a scintilla of social consciousness."  Ambassador Bennett, who served as ambassador to EG between 1991 and 1994, was a career foreign service officer, who served formerly as a senior official at United States diplomatic missions in Mexico, Nigeria, Germany and Spain.

The State Department's annual human rights reports on EG, which are published by the Bureau of Democracy, Human Rights and Labor online at http://www.state.gov/j/drl/rls/hrrpt, has commented repeatedly that public corruption, as well as the use of torture, is widespread within the EG Government. For instance, in 2006, the same year that Nguema acquired the $30 million Sweetwater Property, the State Department concluded that "All branches of government [in EG] are dominated by President [Obiang] and his inner circle" and that "[o]fficial corruption in all branches of the government remained a serious problem."  In 2008, the State Department described how anti-corruption laws were not enforced in EG against public officials and that "[EG] officials frequently engaged in corrupt practices with impunity."  In 2009, the State Department confirmed that "[President Obiang] and members of his inner circle continued to amass huge personal profits from the oil windfall" and that EG public officials continued to "frequently engage[] in corrupt practices with impunity."

51

Exhibit 2 Page 61

## B. <u>Nguema and His Family Are the Subject of Multiple Criminal Investigations for Corruption in Europe</u>

Nguema and his family members were the subject of criminal corruption and money laundering investigations in France, Spain and Italy.  Nguema's conduct and the source of his wealth are directly implicated in the French and Italian investigations.  All three criminal investigations commenced between 2007 and 2008, within one or two years of Nguema's acquisition of the Sweetwater Property, and remained active as of April 28, 2011.

### 1. France

In March 2007, three French NGOs—Sherpa, Serpie, and the Federation of the Congolese Diaspora—filed a complaint with French prosecutors, alleging that Nguema's family acquired substantial assets with stolen public monies.  On July 9, 2008, Transparency International France, a French NGO, filed a complaint with French prosecutors requesting that they investigate whether Nguema's family used stolen public monies from EG to acquire assets in France.

Judges Roger Le Loire and Rene Grouman were then appointed to investigate these allegations.  In 2009, the French media reported that Judges Le Loire and Grouman had identified and were investigating Nguema's acquisition of several assets in France, including his luxury residence on Avenue Foch in Paris and several valuable automobiles worth a total of $6.2 million.  France's anti-money laundering agency, Tracfin, concluded, according to a report by Global Witness, a U.K. NGO, that the funds used by Nguema to acquire these automobiles, including two Bugatti luxury vehicles, were "likely to be the laundered proceeds of misappropriated public funds."  United States law enforcement authorities met with the French Judicial Police in September 2007 to discuss the French investigation.  Since that time, United States law enforcement

Exhibit 2 Page 62

authorities have continued to have communications with French law enforcement authorities regarding their investigation, including on March 19, 2011, when an ICE representative met with the head of the French National Police's money laundering unit.  France's criminal investigation of Nguema remains active.

## 2. Spain

In December 2008, Asociacion Pro Derechos Humanos de Espana (APDHE), a Spanish human rights NGO, filed a complaint with anti-corruption prosecutors in Spain.  The complaint alleges that EG's Inner Circle diverted and misappropriated public funds from the EG Government to acquire personal assets in Spain.  According to this complaint, Nguema's family illegally embezzled approximately $26 million from an EG state agency to acquire and maintain substantial real estate holdings in Spain.  These funds were purportedly laundered through various American and Spanish banks.  Additionally, according to APDHE, Nguema's family abused their political power within EG to (i) obtain direct equity holdings in the enterprises of foreign companies for little or no consideration; (ii) rig public procurement, construction, and licensing contracts tainted by conflicts of interest; (iii) receive off-the-books secret contributions from foreign companies for scholarships and educational purposes; (iv) benefit companies that they own in providing goods and services to companies active in EG's hydrocarbon extraction activities; and (v) divert directly millions of dollars from EG Government accounts into their private accounts through the use of offshore shell corporations.   As a result of this complaint, Spanish prosecutors opened a criminal investigation into APDHE's allegations against Nguema's family.  This criminal investigation of Nguema's family remains active.

Exhibit 2 Page 63

## C. <u>Recognition of Severe Official Corruption in EG Government by Multilateral Public Organizations</u>

Multilateral public organizations, including the World Bank, whose personnel are posted in EG, and the African Development Bank, have also noted that official corruption is a serious problem within the EG Government.  For instance, when the World Bank Institute graded corruption on a scale of 0.0 (being the most severe) to 1.0 (being the least corrupt), the World Bank noted that several organizations ranked EG as being amongst the most corrupt states in the world. The Economist Intelligence Unit, for instance, gave EG zero points on the World Bank's corruption scale for the years 1996, 1998, 2000, and 2002 through 2011. The African Development Bank gave EG 0.2 points for the years 2005 through 2010.  The International Fund for Agricultural Development gave EG 0.2 points for 2004 and 0.4 points for 2010 and 2011.  The World Meteorological Organization gave EG 0.13 points for the years 1996, 1998, 2000, 2002, 2003 and 2005; 0.21 points for 2004; and 0.25 points for the years 2006 through 2011.

Similarly, the United Nations Special Rapporteur on the Right to Freedom of Opinion and Expression reported to the United Nations General Assembly in 2009 that "[t]he scourge of corruption and the overwhelming lack of morality affecting [public] officials" in EG impacted negatively the civil and political liberties of the EG people.

## D. <u>Independent NGOs Have Investigated and Confirmed Senior-Level Corruption in EG Government</u>

Independent NGOs that have investigated public finance in EG have universally concluded that public corruption is widespread within EG's Government.  Transparency International (TI), an international NGO focusing specifically on corruption, ranked EG as the eighth most corrupt country in the

Exhibit 2 Page 64

world.  Several other independent NGOs have also investigated and concluded that public corruption is both widespread and pervasive amongst EG's Inner Circle, including Nguema.

- Human Rights Watch in 2009 explained that, "Perhaps the most brazen and troubling examples of corruption [in EG] are repeated instances involving the president's eldest son, [Nguema], whose globetrotting and extravagant lifestyle is filled with purchases of multimillion-dollar houses and exotic sports cars throughout the world."

- Global Witness reported in 2009 that "When it comes to profligate public consumption by the Obiang clan, [Nguema] . . . is Exhibit A."

- The Open Society Institute in 2010 concluded that, "By controlling [EG's] political, economic, and legal systems—and using that control to enrich themselves—the Nguema/Mongomo group has created a nearly perfect kleptocracy [in EG].  Rarely have so few stolen so much so brazenly."

- The International Bar Association in 2003 noted that "serious concerns were raised to [their delegation to EG] about the levels of corruption which is seemingly endemic in all sectors of [EG] society [] particularly with respect to the money from oil revenues."

- Freedom House confirmed that "Equatorial Guinea is considered one of the most corrupt countries in the world and [President] Obiang and members of his inner circle continue to amass huge personal profits from the country's oil windfall."

Additional information responsive to this Interrogatory relating to EG's international reputation for corruption may be ascertained from the COMPLAINT

55

Exhibit 2 Page 65

as well as documents that have or will be produced by the Government, including DOJ_0000209-211; DOJ_0000273-277; DOJ_0000303-308; DOJ_0000315-321; DOJ_0000394-398; DOJ_0000399-402; DOJ_0000413-416; DOJ_0000417-421; DOJ_0000422-425; DOJ_0000426-430; DOJ_0000431-434; DOJ_0000440-442; DOJ_0000447-449; DOJ_0000450-453; DOJ_490-520; DOJ_521-556; DOJ_000584-592; DOJ_644-650; DOJ_688-718; DOJ_719-729; DOJ_790-808; DOJ_817-828; DOJ_0000838-863; DOJ_0000890-893; DOJ_915-918; DOJ_0000919-925; DOJ_0000946-950; DOJ_952-959; DOJ_0000967-974; DOJ_0001049-1080; DOJ_00001238-1283; DOJ_00001332-1440; DOJ_0001441-1460; DOJ_00001472-1496; DOJ_3853-3913; SENATE-PSI-117457-118644; and United States Department of State Annual Human Rights Reports located online at online at http://www.state.gov/j/drl/rls/hrrpt.

XVI.
**NGUEMA AND HIS FAMILY USE THE
THREAT OF VIOLENCE TO DOMINATE
EG AND ITS GOVERNMENT**

Nguema's father, President Obiang, as described in the COMPLAINT, exercises plenary control of EG's political and economic infrastructure.  The State Department's 2006 human rights report explained that, "All branches of government are dominated by [President Obiang] and his inner circle, mostly of the Fang ethnic group."  Ambassador Bennett recalled that individuals who oppose President Obiang are expelled from EG and that President Obiang's administration routinely uses torture as an instrument of political and economic control.  Criticism of President Obiang or his family is viewed by the EG Government as an "attack[] against the nation."  In an interview with CBS News, Ambassador Bennett graphically described the systemic use of torture by Nguema's family to maintain control of the Government.

56

Exhibit 2 Page 66

In 2006, the EG Government, according to the State Department, reportedly hired assassins in foreign states, including Spain, to intimidate, threaten, and even murder EG citizens in exile.  For instance, the brother of German Pedro Tomo, an exiled EG activist in Spain, was reportedly targeted for assassination.  Instead of killing Tomo, however, the assassins shot Tomo's brother.  These assassins were ultimately arrested and detained by Spanish law enforcement authorities for attempted murder.  Similarly, the EG Government arrested and tortured individuals who opposed President Obiang, including seventy civilian and military officials, who were accused of attempting a coup.  The State Department reported that their military trial was held in "secret" and all but two defendants claimed that they were tortured while in detention.  Some of these defendants even bore "visible marks" of torture; another defendant had to be carried in and out of his trial because he was no longer able to walk; and a female defendant "suffered from vaginal bleeding as a result of torture."

Additional information responsive to this Interrogatory relating to the Inner Circle's political and economic dominance of EG may be ascertained from the COMPLAINT as well as documents that have or will be produced by the Government, including DOJ_000062-94; DOJ_0000297-302; DOJ_0000370-373; DOJ_0000394-398; DOJ_0000399-402; DOJ_651-653; DOJ_0000688-718; DOJ_883-889; DOJ_0000946-950; DOJ_1172-1238; DOJ_1332-1440; DOJ_1530-1535; and United States Department of State Annual Human Rights Reports located online at online at http://www.state.gov/j/drl/rls/hrrpt.

## XVII.
## INNER CIRCLE'S CORRUPT USE OF
## RIGGS NATIONAL BANK IN WASHINGTON, D.C.

Between 1995 and 2004, the EG Government and Nguema's family, including Nguema, maintained personal bank accounts at Riggs National Bank

(Riggs) in Washington, D.C.  The EG Government directed that foreign oil companies make their payments into an account at Riggs.  This account was held in the name of the Republic of Equatorial Guinea General Treasury and was commonly referred to as the "Oil Account."   By 2003, Riggs' EG portfolio had become the largest single customer-relationship for the bank with balances and outstanding loans that together approached $700 million.  The signatories on this account were President Obiang, Gabriel Obiang Lima (Nguema's brother) and Melchor Adjo (Nguema's cousin).

In 2004, the United States Senate's Permanent Subcommittee on Investigations (PSI) published its report on "Money Laundering and Foreign Corruption:  Enforcement and Effectiveness of the Patriot Act."  In that report, the PSI staff concluded that Riggs "turned a blind eye to evidence [,] suggesting the bank was handling the proceeds of foreign corruption."

Riggs Bank records show that President Obiang transferred $35 million from the Oil Account to two companies that appeared to be associated with him—Kalunga and Apexside Trading Ltd.  When Riggs officials sought to obtain more information about these entities from Nguema's father and cousin, they refused to provide additional details.  As a result, Riggs elected to close the EG accounts on February 23, 2004.  (PSI 2004).

In addition to the Oil Account, Nguema's father opened an account at Riggs in the name of Otong, S.A. in 1999.  Between 1999 and 2002, large amounts of bulk cash were deposited into this account.  Specifically:  (1) $1 million in cash was deposited on April 20, 2000; (2) $1 million in cash was deposited on March 8, 2001; (3) $1.5 million in cash was deposited on March 20, 2001; (4) $2 million in cash was deposited on September 5, 2001; (5) $3 million in cash was deposited on September 17, 2001; and (6) $3 million in cash was deposited on April 12, 2002.

Exhibit 2 Page 68

This cash, according to the PSI staff, was wrapped in plastic and transported in suitcases by Simon Kareri, a senior vice president of Riggs' Embassy Banking Division.

Kareri was placed in charge of Riggs' relationship with EG and Nguema's family.  In 2001 or 2002, Kareri recalls that Riggs instructed him to focus his work on developing that bank's relationship with EG.  Kareri provided economic and financial advice to EG public officials; found schools for their children; identified American physicians for their medical care; and accompanied individuals, including Nguema's mother, on shopping trips to Nieman Marcus in the Washington, D.C. area.

Nguema's mother Constancia Obiang also maintained an account at Riggs.  Between 2000 and 2002, $1.4 million in cash was deposited into her account.

Additional information responsive to this Interrogatory relating to the relationship between Riggs and the Inner Circle, including Nguema,  may be ascertained from the COMPLAINT as well as documents that have or will be produced by the Government, including SENATE-PSI-122837-124428; DOJ_00001-113; DOJ_0000167-173.

## XVIII.
## PAYMENTS BY OIL COMPANIES TO PRESIDENT OBIANG'S INNER CIRCLE

American oil companies had frequent contact with members of President Obiang's Inner Circle.  According to Kareri, several payments were made by American oil companies to the Inner Circle, which he considered suspicious, including:

- In approximately 1998 or 1999, Mobil Oil provided a check to Nguema's mother Constancia Obiang for approximately $200,000 or $250,000 with the caption "business development."

- In or around 2003, Marathon Oil paid Teodoro Byogo Nsue, Nguema's uncle and EG's ambassador to the United States, in or around $12,000 per month.  These payments were off-the-book payments not documented in EG's public records and books.

- Marathon Oil also made payments to Nguema's aunt, who served as EG's ambassador to Spain.

- Exxon Mobil provided free shipping services for EG public officials to ship merchandise, including automobiles, from the United States to EG.

- After Exxon and Mobil merged, that company's executives met with President Obiang at the Willard Hotel in Washington, D.C.  The executives provided and left a briefcase full of money with President Obiang.

- On one occasion, Mobil Oil contacted Kareri to distribute cash payments to a visiting delegation of EG officials.  The range of payments made by Kareri to these EG public officials were between $1,500 and $5,500 per member.

- American oil companies paid senior EG officials for "consulting" fees.  Kareri characterized these payments as "suspicious" and felt that these officials may have tried to conceal these payments by depositing the money in banks other than Riggs.

- CMS/Triton, an American oil company, paid Juan Olo Mba Nseng, EG's then Minister of Mining and Hydrocarbons, $5,000 per month.

- American oil companies paid visiting EG delegations a generous per diem.  In Kareri's view, the per diem rates were "excessive" in nature.

60

Exhibit 2 Page 70

- CMS/Triton and Marathon Oil made cash payments to Constancia Obiang's relatives who were students in the United States.  The company also helped these students secure housing in "fancy apartments."

As explained above, Nguema was also a direct beneficiary of payments made by oil companies to Nguema and his family.

Additional information responsive to this Interrogatory relating to the relationship between the Inner Circle and American oil companies may be ascertained from the COMPLAINT as well as documents that have or will be produced by the Government, including DOJ_000038-94.

## INTERROGATORY NO. 2

State all facts that were in YOUR possession on or before April 28, 2011, that support the allegations in Paragraph 102 of YOUR COMPLAINT that "Nguema orchestrated and implemented a scheme to fraudulently open and use bank accounts at financial institutions in California in order to funnel millions of dollars into the United States from EG," and IDENTIFY (a) all sources of such facts; (b) the date YOU first became aware of such facts; (c) all PERSONS with knowledge of such facts; and (d) all DOCUMENTS that REFER OR RELATE TO such facts.

## RESPONSE TO INTERROGATORY NO. 2

The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they purport to impose obligations on the Government beyond the scope of the Discovery Order. On September 6, 2012, the Court authorized Claimants to propound limited discovery on the probable cause the United States had when it filed the instant forfeiture action.  As such, to the extent that this Interrogatory seeks information beyond the scope of the Discovery Order, the Government objects and will not produce such information, as it is neither relevant nor reasonably calculated to

61

Exhibit 2 Page 71

discover evidence that the Government had for purposes of probable cause when it filed the present action.  The United States does, however, expressly reserve the right to supplement, clarify, revise, or correct any or all of the Responses and Objections (General and Specific) herein consistent with Fed. R. Civ. P. 26(e), and to assert additional objections or privileges, in one or more subsequent supplemental response(s).

The United States further objects to this Interrogatory to the extent it calls for a narrative.  See, e.g., Wilcox v. Changala, 2012 U.S. Dist. LEXIS 5471, at *6-7 (E. D. Wash. Jan. 18, 2012) (contention interrogatories that "ask the responding party to identify each and every supporting fact about a particular allegation are an abuse of the discovery process").  The United States further objects to this Interrogatory on the grounds that it calls for the disclosure of information subject to the attorney-client privilege, the work product doctrine or the informant's privilege.  The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they seek information outside the possession, custody or control of DOJ and ICE.  The United States further objects to this Interrogatory as it is overly broad and unduly burdensome, as the definition of "YOUR" includes foreign sovereign governments and entities other than DOJ and ICE.

The United States further objects to this Interrogatory on the ground that it is compound and contains impermissible discrete subparts, which relate to distinct matters and therefore constitutes multiple interrogatories.  The United States further objects to this Interrogatory as it is unnecessary and unduly burdensome, as it is duplicative and redundant of Interrogatory No. 1.  To the extent that that this request seeks information relating to the recruitment or handling of confidential informants by a federal law enforcement agency, the United States objects to the

request and will not produce that information.  See, e.g., <u>Roviaro v. United States</u>, 353 U.S. 53 (1957).

Subject to and without waiving the foregoing general and specific objections, the United States hereby responds as follows:

Between 2004 and 2008, Nguema, as described in the COMPLAINT, orchestrated, participated in and implemented a scheme fraudulently to open and use bank accounts at financial institutions in California in order to surreptitiously funnel millions of dollars into the United States from EG, while concealing his association with the accounts, the source of funds, and his status as an EG cabinet minister and son of the President.  During this period, Nguema fraudulently opened at least ten bank accounts at six financial institutions in California, including Bank of America (BOA), Union Bank of California (UBOC), Commercial Capital Bank, California National Bank (CNB), Comerica Bank, and Citibank.

Between 2004 and 2008, Nguema, as described in the COMPLAINT, orchestrated, participated in and implemented a scheme fraudulently to open and use bank accounts at six financial institutions in California in order to surreptitiously funnel millions of dollars into the United States from EG, while concealing his association with the accounts, the source of funds, and his status as an EG cabinet minister and son of the President.  During this period, Nguema fraudulently opened at least ten bank accounts at six financial institutions in California, including Bank of America (BOA), Union Bank of California (UBOC), Commercial Capital Bank, California National Bank (CNB), Comerica Bank, and Citibank.

Beginning in 2004, after the PSI published its report on money laundering on July 15, 2004, Nguema was on notice that banks in the United States were uncomfortable opening bank accounts for him.  The PSI's 2004 money laundering

report criticized Riggs for its handling of Nguema's family's funds, including those of Nguema.  Further, Riggs was ultimately convicted and ordered to pay a criminal fine of $16 million, as well as $25 million in civil penalties, for its non-compliance with U.S. anti-money laundering controls.

Just two weeks after the PSI's report was published, City National Bank in Los Angeles was contacted by Nguema after the bank had closed his personal bank account.  When he called the bank on July 30, 2004, Nguema told a bank employee that he thought his account had been closed "due to [his] country and the oil."  In addition to closing his accounts, City National Bank refused to return $699,691.02 of Nguema's funds to him and requested that the California Superior Court for the County of Los Angeles allow the bank to release these funds to the court, rather than Nguema, for ultimate resolution.

Beginning in 2004, Nguema, Michael J. Berger and George Nagler opened bank accounts in California in the names of various shell companies, including Sweet Pink, Inc., Unlimited Horizon, Inc., Beautiful Vision, Inc., and Sweetwater Management, LLC, without disclosing Nguema's ownership of the companies or their funds and concealing his status as a Senior Foreign Public Figure (SFP) and a Politically-Exposed Person (PEP).  Nguema and his intermediaries, including Berger and Nagler, then transferred funds received from Nguema into these fraudulently opened bank accounts in the United States.  In opening numerous California bank accounts and using intermediaries' accounts, Nguema, Berger and Nagler intentionally and deliberately concealed from these financial institutions Nguema's association with these bank accounts as well as his status as a SFP and a PEP.

Nguema used many of the funds in these fraudulently opened accounts for the maintenance and upkeep of the defendant Sweetwater Property, a $30 million

Exhibit 2 Page 74

mansion he purchased in Malibu in 2006.  Funds were used to pay for, among other things, the salaries of Nguema's household staff.  These staff persons worked at the Sweetwater Property and aided Nguema, at his direction, in executing this fraudulent scheme.  These funds were also used to maintain an office at the Sweetwater Property for Nguema and his employees and associates to perpetuate and oversee this scheme; the professional and administrative services of various lawyers, accountants, and property managers, including Berger and Nagler; costs incurred by Nguema's household staff relating to this scheme; and the costs and fees of the Sweetwater Property, where Nguema and his household staff maintained their business office for their shell companies and where much of the conduct described at paragraphs 117-209 of the COMPLAINT were planned, coordinated, and occurred.

Nguema repeatedly concealed from banks in California his ownership of the funds in these accounts by using shell companies formed to hide his identity and by using various third-party nominees, including Michael Berger and George Nagler, who both allowed Nguema to use their client trust accounts to pay for personal expenses.  After each of these banks discovered Nguema's association with the accounts, the banks closed each account.

**Bank of America**.  On or about October 12, 2004, Nguema fraudulently opened two accounts in the name of Beautiful Vision, a California company.  No banker looking at the documents and information provided to Bank of America (BOA) by Berger and Nguema could have identified Nguema as being the owner of Beautiful Vision, nor could they have readily identified the account as one affiliated with a SFP and/or a PEP.  BOA closed the Beautiful Vision accounts in or around September 12, 2005, and September 15, 2005, respectively, after

discovering that Nguema, a SFP and a PEP, was associated with Beautiful Vision, Inc.

**Union Bank of California.**  On or about September 15, 2005, three days after BOA closed Nguema's Beautiful Vision account, Nagler formed Sweet Pink, Inc. for Nguema.  On or about September 29, 2005, UBOC opened a checking account for Sweet Pink using an EIN obtained by Nagler's assistant.  The signatories on the account were Eve Jeffers, Nguema's then-girlfriend, and four employees of an accounting firm owned by Marvin Freedman that had been retained by Nguema.  On the bank account opening documents, Marvin Freedman's business address is listed as Sweet Pink's address.  No banker looking at the documents and information provided by Nagler could have identified Nguema, as being the owner of Sweet Pink, nor could they have identified the account as one affiliated with an SFP and a PEP.  Approximately eight days later, on or about October 27, 2005, UBOC discovered that Nguema was using the Sweet Pink account to gain access to the U.S. banking system and closed Sweet Pink's account.  This was the third time in less than fifteen months that a California bank closed an account after learning of Nguema's association with the account.

**Commercial Capital Bank**.   On or about December 7, 2005, less than two months after UBOC closed Nguema's Sweet Pink account, Berger opened an account at Commercial Capital Bank in the name of Unlimited Horizon, Inc.  Berger caused Unlimited Horizon to be incorporated in California on October 21, 2005.  No banker looking at the documents and information provided by Berger and Nguema could have identified Nguema as being the owner of Unlimited Horizon, nor could they have identified the account as one affiliated with an SFP and a PEP.  On or about June 22, 2006, Commercial Capital Bank closed

Exhibit 2 Page 76

Unlimited Horizon's account.  This was the fifth account in less than two years closed by a California bank after discovering its association with Nguema.

**California National Bank.**  On or about May 16, 2006, after Nguema had acquired the Sweetwater Property in April 2006, Nagler formed another company for Nguema called Sweetwater Management, Inc.  Sweetwater Management was purportedly formed to employ and to pay individuals working to maintain the Sweetwater Property.  In or around May 30, 2006, Edward Mizrahi, Nguema's estate manager, opened an account at this bank in the name of "American Equity Properties, DBA:  American Property MGMT ITF:  Sweet Water Malibu" ("AEP Account").  The estate manager concealed Nguema's involvement with the account as well as Nguema's status as a SFP and a PEP.  He identified the owner of Sweetwater Malibu, LLC as a "high profile" person who wanted to remain confidential.  The following day, on or about May 31, 2006, Nguema's personal assistant Melinda DeHaven opened three additional business accounts at CNB in the name of Sweetwater Management, Inc.  On or about June 22, 2006, the bank closed all four accounts after learning that these accounts were associated with Nguema.

**Union Bank of California.**  On or about August 28, 2006, two months after Unlimited Horizon's account at Commercial Capital Bank was closed and Nguema's four accounts at CNB were closed, Berger opened two Basic Business Checking Accounts in the name of Unlimited Horizon, Inc. at a UBOC branch in Beverly Hills.  Berger identified himself to UBOC as Unlimited Horizon's president, and was the sole signatory on both UBOC accounts.  Berger again concealed material information from UBOC, including Nguema's association with Unlimited Horizon, as well as Nguema's status as a SFP and a PEP.  No banker looking at the documents and information provided to UBOC by Nguema and

Berger, could have identified Nguema as being the owner of these accounts, nor could they have identified the account as one affiliated with an SFP and a PEP. After opening these accounts, Berger explained to Nguema in an email dated on or about November 1, 2006, that future wires should be sent "to my new client trust account at [UBOC].  I will transfer it from there to the Unlimited Horizon, Inc. General Account.  I will send you a separate e-mail and fax requesting a $200,000 wire transfer and providing wire transfer information for this new account."  Upon receiving these wires in his client trust accounts, Berger withdrew these funds and deposited them into Unlimited Horizon's UBOC accounts in the form of checks and bank drafts.  Between November 29, 2006 and May 11, 2007, Berger deposited seven checks totaling $1,399,485 into Unlimited Horizon's UBOC accounts, after withdrawing these funds as "cash" from his client trust account. On or about June 12, 2007, after an investigation by UBOC discovered that Berger represented Nguema, an SFP and a PEP, and that Berger was using corporate vehicles to "disguise the identity of" Nguema to pay for the Sweetwater property and Nguema's living expenses, UBOC closed all three accounts.

**Comerica Bank**.  On or about February 6, 2007 -- eight months after CNB closed Nguema's four accounts -- Nguema applied to open a bank account at Comerica Bank on the Avenue of the Stars in Los Angeles.  On this occasion, Nguema directed his representative Anne Morse to open an account in his name and to identify himself as an EG citizen to the bank, but he nonetheless concealed from Comerica the fact that he was a PEP and an SFP.  When asked explicitly whether Nguema "ever performed important public functions for a foreign state (PEP)?" Nguema's representative answered in the negative.  When asked whether Nguema was "closely associated with person(s) who perform public functions for a foreign state (PEP)?" the representative again answered in the negative.  On or

Exhibit 2 Page 78

about March 22, 2007, Comerica closed this account after the bank's compliance personnel discovered that Nguema, in fact, was a PEP and an SFP.

**<u>Citibank</u>**.  On or about June 25, 2007, approximately thirteen days after UBOC closed Nguema's accounts, Berger opened another account in the name of Unlimited Horizon at a Citibank branch in Beverly Hills.  During the account-opening process, Berger deliberately hid Nguema's ownership of the account by telling a Citibank banker that the true owners of the Citibank account were U.S. citizens, when, in fact, Nguema a non-U.S. citizen and a SFP was the account's true owner.

Over the course of the next five months, Nguema transferred over $1 million directly from EG into Berger's client trust account.  Berger, in turn, transferred these funds into Unlimited Horizon's Citibank account.  In an email dated on or about December 7, 2007, Berger confirmed with Nguema, "I know that all payments [from the Citibank account] must be approved by you . . . I understand the importance of the principle.  This e-mail will reconfirm that I will only pay bills approved by you."  On or about May 20, 2008, after uncovering Nguema's association with Unlimited Horizon and this account, Citibank closed Unlimited Horizon's account.

Additional information responsive to this Interrogatory and the Government's allegations of domestic bank fraud may be ascertained from the COMPLAINT, as well as documents that have or will be produced by the Government, including DOJ_0000212-217; DOJ_0000227-236; DOJ_0000252-257; DOJ_0000258-260; DOJ_0000261-264; DOJ_0000285-288; DOJ_0000289-296; SENATE-PSI-000070636-70717; SENATE-PSI-000072041-73108; SENATE-PSI-73109-100926; SENATE-PSI-0000100927-100999; DOJ_0000101000-101513; SENATE-PSI-0000101514-107289; SENATE-PSI-

SENATE-PSI-110261-110308; SENATE-PSI-0000120246-249; SENATE-PSI-000120250-120265; SENATE-PSI-120374-122836; SENATE-PSI-124429-126128.

**Proceeds of Bank Fraud Used for Maintenance and Upkeep of the Sweetwater Property**:  The funds deposited and funneled through Nguema's fraudulently opened bank accounts were used to, among other things, pay for the maintenance and upkeep of the defendant Sweetwater Property.  In disbursing funds from these fraudulently opened bank accounts, Nguema specifically ordered and/or approved the disbursal of funds to various vendors and payees relating to the maintenance and upkeep of the Sweetwater Property.  Indeed, Berger was not permitted to disburse any funds belonging to Nguema in these accounts unless he first received a check approval form that was signed personally by Nguema.

Nguema used the funds in his Unlimited Horizon account at UBOC to support, maintain and enhance the Sweetwater  Property, including, among other things, paying in or around $54,000 per month for home security services; $10,000 per month in electricity bills; $8,000 per month in phone bills; $73,649.95 in property taxes; $6,875 for the installation of a sauna; more than $10,000 for home theater equipment; more than $4,000 for home insurance; more than $12,000 in landscaping fees; more than $36,000 in tree care-related fees; and more than $30,000 per month in payroll for his household staff, including estate managers, maintenance crews, and housekeepers.

Similarly, Nguema's fraudulently opened Citibank account held in the name of Unlimited Horizon was also used for the maintenance and upkeep of the Sweetwater Property.  Specifically, these funds were used to pay for expenses, including, among other things, approximately $54,000 per month on the home's security detail, over $9,000 per month on the power bill to Southern California

Edison, over $5,000 per month on the home's water bill to Los Angeles County Waterworks, $37,000 on landscaping costs, $3,773 on maintenance for the home's fish tank, $24,700 on outdoor landscape lighting, $7,577 for the "Fish Physician" in connection with the home's Koi pond, $9,600 on audio-video equipment, $1,304 for swimming pool maintenance, and thousands of dollars for home furniture and decorations.

Additional information responsive to this Interrogatory may be ascertained from the COMPLAINT, as well as documents that have or will be produced by the Government, including DOJ_0000212-217; DOJ_0000227-236; DOJ_0000252-257; DOJ_0000258-260; DOJ_0000261-264; DOJ_0000285-288; DOJ_0000289-296; DOJ_0000470-476; SENATE-PSI-000070636-70717; SENATE-PSI-000072041-73108; SENATE-PSI-73109-100926; SENATE-PSI-0000100927-100999; DOJ_0000101000-101513; SENATE-PSI-0000101514-107289; SENATE-PSI-SENATE-PSI-110261-110308; SENATE-PSI-0000120246-249; SENATE-PSI-0000250-120265; SENATE-PSI-120374-122836; SENATE-PSI-124429-126128.

**Nguema's Use of Shell Companies to Fraudulently Open Bank Accounts**

Between 2000 and 2011, Nguema created and used more than six shell companies to acquire assets, open bank accounts and transfer funds to conceal the source, origin and/or ownership of his assets and funds.  Nguema opened accounts in the names of these shell companies as early as 2000.  None of these shell companies engaged in any legitimate commercial or economic activity. Nguema's representatives frequently opened bank accounts at American financial institutions in the names of these shell companies without disclosing Nguema's association with these companies. Nguema's funds were then funneled through multiple accounts and multi-layered transactions.  Nguema's utilization of these shell

71

Exhibit 2 Page 81

corporations, nominees and complex layered transactions served no business or commercial purpose other than to conceal the origin, ownership and/or source of his assets and funds in the United States.

Nguema formed at least six shell companies in California to fraudulently open bank accounts at American financial institutions.  These entities included:

- **Sweet Pink, Inc.**  Nguema formed Sweet Pink, Inc. in 2005 and used it to open a bank account at Union Bank of California (UBOC) in September 2005.  Sweet Pink was incorporated in California and listed George Nagler as its registered agent.  Sweet Pink engaged in no economic or commercial activity of any kind.  Its only apparent function was to conceal Nguema's association with this account from UBOC.  Nguema wired $29,947.50 into Sweet Pink's account from an EG bank account in the name of Somagui in or around October 19, 2005.

- **Unlimited Horizon, Inc.**  Nguema used Unlimited Horizon to open Bank Accounts at UBOC, Commercial Capital Bank and Citibank in Los Angeles.  Unlimited Horizon is incorporated in California and lists Michael Berger, another California lawyer, as its registered agent.  Unlimited Horizon did not engaged in any economic or commercial activity.  Its only apparent function was to conceal Nguema's association with this account from American financial institutions.  It also served as a receptacle for Nguema and Michael Berger to funnel money through layered transactions.  Unlimited Horizon's Commercial Capital Bank account received the following three wires from EG:  (i) a wire for $19,946.25 from Somagui on or about February 16, 2006; (ii) a wire for $49,945 from Somagui on or about

72

Exhibit 2 Page 82

March 23, 2006; and (iii) a wire for $39,944.81 from SOCAGE on or about June 16, 2006.  Between November 24, 2006 and June 6, 2007, Unlimited Horizon's UBOC account was the ultimate destination of eight wires from Nguema, which were funneled through accounts controlled by Berger at UBOC and Somagui at CCEI Bank in EG, amounting cumulatively to approximately $1,599,419.  Between July 27, 2007, and November 6, 2007, Nguema funneled over a $1 million from EG through Berger's client trust account at Bank of America (BOA) to Unlimited Horizon's account at Citibank.  These funds were used for the maintenance and upkeep of the defendant Sweetwater Property.

- **Beautiful Vision, Inc.**:  Nguema used Beautiful Vision to open bank accounts at BOA.  Berger was also listed as a signatory on the accounts.  Beautiful Vision did not engage in legitimate economic or commercial activity of any kind.  Its only apparent function was to conceal Nguema's association with this account from BOA.  Beautiful Vision, Inc. was formed in California and listed Berger as its registered agent.  Between November 1, 2004, and November 2005, at least $1 million in funds originating from EG were funneled into Beautiful Vision's accounts at BOA.

- **Sweetwater Malibu, LLC**.  Nguema formed Sweetwater Malibu LLC in 2006 and used it to take title to the defendant Sweetwater Property.  Sweetwater Malibu did not engage in any economic or commercial activity.  Its only apparent function was to conceal Nguema's ownership of the Sweetwater Property    Nguema opened one account in 2006 using Sweetwater Malibu's name at California

73

Exhibit 2 Page 83

National Bank.  In or around June 12, 2006, Nguema wired $249,899 to this account from EG.

- **Sweetwater Management, Inc.**  Nguema formed Sweetwater Management in 2006 and used it to open three bank accounts at California National Bank in 2006.  Sweetwater Management was incorporated in California and listed George Nagler as its registered agent.  Sweetwater Management did not engage in any economic or commercial activity.  Its only apparent function was to conceal Nguema's association with this account from an American financial institution.  This shell company was used to hire personnel to care for the defendant Sweetwater Property's maintenance and upkeep and to open an account, whose funds would be used for the maintenance and upkeep of the defendant Sweetwater Property.

Additional information responsive to this Interrogatory relating to Nguema's formation and use of shell companies to defraud American financial institutions may be ascertained from the COMPLAINT and documents that have or will be produced by the Government, including DOJ_0000212-217; DOJ_0000227-236; DOJ_0000252-257; DOJ_0000258-260; DOJ_0000261-264; DOJ_0000285-288; DOJ_0000289-296; DOJ_0000470-476; SENATE-PSI-000070636-70717; SENATE-PSI-000072041-73108; SENATE-PSI-73109-100926; SENATE-PSI-0000100927-100999; DOJ_0000101000-101513; SENATE-PSI-0000101514-107289; SENATE-PSI-SENATE-PSI-110261-110308; SENATE-PSI-0000120246-120249; SENATE-PSI-000120250-120265; SENATE-PSI-120374-122836; SENATE-PSI-124429-126128.

**INTERROGATORY NO. 3**

State all facts that were in YOUR possession on or before Apri1 28, 2011, that support the allegations in Paragraph 103 of YOUR COMPLAINT that "Nguema continued to spend more than $100,000 per month to pay for the maintenance and upkeep of his newly acquired 12-acre Malibu estate," and IDENTIFY (a) all sources of such facts; (b) the date YOU first became aware of such facts; (c) all PERSONS with knowledge of such facts; and (d) all DOCUMENTS that REFER OR RELATE TO such facts; and state the basis for YOUR contention, if you so contend, that this allegation subjects the DEFENDANT ASSETS to forfeiture.

**RESPONSE TO INTERROGATORY NO. 3**

The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they purport to impose obligations on the Government beyond the scope of the Discovery Order. On September 6, 2012, the Court authorized Claimants to propound limited discovery on the probable cause the United States had when it filed the instant forfeiture action. As such, to the extent that this Interrogatory seeks information beyond the scope of the Discovery Order, the Government objects and will not produce such information, as it is neither relevant nor reasonably calculated to discover evidence that the Government had for purposes of probable cause when it filed the present action. The United States does, however, expressly reserve the right to supplement, clarify, revise, or correct any or all of the Responses and Objections (General and Specific) herein consistent with Fed. R. Civ. P. 26(e), and to assert additional objections or privileges, in one or more subsequent supplemental response(s).

The United States further objects to this Interrogatory to the extent it calls for a narrative. See, e.g., Wilcox v. Changala, 2012 U.S. Dist. LEXIS 5471, at *6-7 (E. D. Wash. Jan. 18, 2012) (contention interrogatories that "ask the responding

party to identify each and every supporting fact about a particular allegation are an abuse of the discovery process").  The United States further objects to this Interrogatory on the grounds that it calls for the disclosure of information subject to the attorney-client privilege, the work product doctrine or the informant's privilege.  The United States further objects to this Interrogatory as it is overly broad and unduly burdensome, as the definition of "YOUR" includes foreign sovereign governments and entities other than DOJ and ICE.

The United States also objects to this Interrogatory on the ground that it is compound and contains impermissible discrete subparts, which relate to distinct matters and therefore constitutes multiple interrogatories.  The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they seek information outside the possession, custody or control of DOJ and ICE.  The United States further objects to this Interrogatory as it is unnecessary and unduly burdensome, as it is duplicative and redundant of Interrogatory Nos. 1 and 2.  To the extent that that this request seeks information relating to the recruitment or handling of confidential informants by a federal law enforcement agency, the United States objects to the request and will not produce that information.  See, e.g., Roviaro v. United States, 353 U.S. 53 (1957).

Subject to and without waiving the foregoing general and specific objections, the United States responds as follows:

Between May 2006 and June 2008, Nguema fraudulently opened bank accounts at several financial institutions in California to, among other things, pay for the maintenance and upkeep of the Sweetwater Property.   For instance, Nguema used the funds in his Unlimited Horizon account at UBOC to support, maintain and enhance the Sweetwater  Property, including, among other things,

paying in or around $54,000 per month for home security services; $10,000 per month in electricity bills; $8,000 per month in phone bills; $73,649.95 in property taxes; $6,875 for the installation of a sauna; more than $10,000 for home theater equipment; more than $4,000 for home insurance; more than $12,000 in landscaping fees; more than $36,000 in tree care-related fees; and more than $30,000 per month in payroll for his household staff, including estate managers, maintenance crews, and housekeepers.

Similarly, Nguema's fraudulently opened Citibank account held in the name of Unlimited Horizon was also used for the maintenance and upkeep of the Sweetwater Property.  Specifically, these funds were used to pay for expenses, including, among other things, approximately $54,000 per month on the home's security detail, over $9,000 per month on the power bill to Southern California Edison, over $5,000 per month on the home's water bill to Los Angeles County Waterworks, $37,000 on landscaping costs, $3,773 on maintenance for the home's fish tank, $24,700 on outdoor landscape lighting, $7,577 for the "Fish Physician" in connection with the home's Koi pond, $9,600 on audio-video equipment, $1,304 for swimming pool maintenance, and thousands of dollars for home furniture and decorations.

Additional information responsive to this Interrogatory may be ascertained from the COMPLAINT, as well as documents that have or will be produced by the Government, including DOJ_0000212-217; DOJ_0000227-236; DOJ_0000252-257; DOJ_0000258-260; DOJ_0000261-264; DOJ_0000285-288; DOJ_0000289-296; DOJ_0000470-476; SENATE-PSI-000070636-70717; SENATE-PSI-000072041-73108; SENATE-PSI-73109-100926; SENATE-PSI-0000100927-100999; DOJ_0000101000-101513; SENATE-PSI-0000101514-107289; SENATE-PSI-SENATE-PSI-110261-110308; SENATE-PSI-0000120246-249;

Exhibit 2 Page 87

SENATE-PSI-0000250-120265; SENATE-PSI-120374-122836; SENATE-PSI-124429-126128.

**INTERROGATORY NO. 4**

State all facts that YOU learned after April 28, 2011, which YOU contend support forfeiture of each of the DEFENDANT ASSETS, and IDENTIFY (a) all sources of such facts; (b) the date YOU first became aware of such facts; (c) all PERSONS with knowledge of such facts; and (d) all DOCUMENTS that REFER OR RELATE TO such facts.

**RESPONSE TO INTERROGATORY NO. 4**

The United States objects to this Interrogatory as it is overly broad and unduly burdensome, as it seeks information obtained by the Government after the filing of the COMPLAINT and is not limited by temporal scope.  The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they purport to impose obligations on the Government beyond the scope of the Discovery Order.  On September 6, 2012, the Court authorized Claimants to propound limited discovery on the probable cause the United States had when it filed the instant forfeiture action.  As such, to the extent that this Interrogatory seeks information beyond the scope of the Discovery Order, the Government objects and will not produce such information, as it is neither relevant nor reasonably calculated to discover evidence that the Government had for purposes of probable cause when it filed the present action.  The United States does, however, expressly reserve the right to supplement, clarify, revise, or correct any or all of the Responses and Objections (General and Specific) herein consistent with Fed. R. Civ. P. 26(e), and to assert additional objections or privileges, in one or more subsequent supplemental response(s).

The United States further objects to this Interrogatory to the extent it calls for a narrative.  See, e.g., Wilcox v. Changala, 2012 U.S. Dist. LEXIS 5471, at *6-7 (E. D. Wash. Jan. 18, 2012) (contention interrogatories that "ask the responding party to identify each and every supporting fact about a particular allegation are an abuse of the discovery process").  The United States further objects to this Interrogatory on the grounds that it calls for the disclosure of information subject to the attorney-client privilege, the work product doctrine or the informant's privilege.  The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they seek information outside the possession, custody or control of DOJ and ICE.  The United States further objects to this Interrogatory as it is overly broad and unduly burdensome, as the definition of "YOUR" includes foreign sovereign governments and entities other than DOJ and ICE.

The United States also objects to this Interrogatory on the ground that it is compound and contains impermissible discrete subparts, which relate to distinct matters and therefore constitutes multiple interrogatories.  To the extent that that this request seeks information relating to the recruitment or handling of confidential informants by a federal law enforcement agency, the United States objects to the request and will not produce that information.  See, EG, Roviaro v. United States, 353 U.S. 53 (1957).

Subject to and without waiving the foregoing general and specific objections, the United States will supplement its response to this Interrogatory consistent with the Joint Stipulation filed by the parties on October 18, 2012, and approved by the Court on October 19, 2012.

Exhibit 2 Page 89

## INTERROGATORY NO. 5

For each DEFENDANT ASSET, state all facts that YOU were aware of on or before April 28, 2011, that support YOUR contention, if YOU so contend, that each of the DEFENDANT ASSETS is either (a) property involved in a MONEY LAUNDERING TRANSACTION or an attempted MONEY LAUNDERING TRANSACTION, or [is] property traceable to such assets; (b) property derived from, or traceable, to proceeds obtained, directly or indirectly from an offense against a foreign nation; or (c) property constituting or derived from proceeds traceable to an offense constituting a specified unlawful activity.

## RESPONSE TO INTERROGATORY NO. 5

The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they purport to impose obligations on the Government beyond the scope of the Discovery Order. On September 6, 2012, the Court authorized Claimants to propound limited discovery on the probable cause the United States had when it filed the instant forfeiture action. As such, to the extent that this Interrogatory seeks information beyond the scope of the Discovery Order, the Government objects and will not produce such information, as it is neither relevant nor reasonably calculated to discover evidence that the Government had for purposes of probable cause when it filed the present action. The United States does, however, expressly reserve the right to supplement, clarify, revise, or correct any or all of the Responses and Objections (General and Specific) herein consistent with Fed. R. Civ. P. 26(e), and to assert additional objections or privileges, in one or more subsequent supplemental response(s).

The United States further objects to this Interrogatory to the extent it calls for a narrative. See, e.g., Wilcox v. Changala, 2012 U.S. Dist. LEXIS 5471, at *6-7 (E. D. Wash. Jan. 18, 2012) (contention interrogatories that "ask the responding

party to identify each and every supporting fact about a particular allegation are an abuse of the discovery process").  The United States further objects to this Interrogatory on the grounds that it calls for the disclosure of information subject to the attorney-client privilege, the work product or the informant's privilege.  The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they seek information outside the possession, custody or control of DOJ and ICE.  The United States further objects to this Interrogatory as it is overly broad and unduly burdensome, as the definition of "YOUR" includes foreign sovereign governments and entities other than DOJ and ICE.

The United States also objects to this Interrogatory on the ground that it is compound and contains impermissible discrete subparts, which relate to distinct matters and therefore constitutes multiple interrogatories.  To the extent that that this request seeks information relating to the recruitment or handling of confidential informants by a federal law enforcement agency, the United States objects to the request and will not produce that information.  See, e.g., Roviaro v. United States, 353 U.S. 53 (1957).  The United States further objects to this Interrogatory as it is unnecessary and unduly burdensome, as it is duplicative and redundant of Interrogatory Nos. 1, 2 and 3.

Subject to and without waiving the foregoing general and specific objections, the United States responds as follows:

Brigadier General Teodoro Nguema Obiang Mbasogo (President Obiang) seized power from his uncle, President Francisco Macias Nguema, in a military coup d'etat in Equatorial Guinea (EG) in 1979.  Since that time, President Obiang and a small number of individuals who hold critical positions of political and economic power (Inner Circle) in EG, including his eldest son Teodoro Nguema

Obiang Mangue (Nguema), have exercised plenary control of that country's political and economic infrastructure.  After large-scale oil reserves were discovered in EG during the 1990s, EG has generated billions of dollars in public revenue from its sale of oil extraction rights to foreign oil companies.

## I.

## NGUEMA IS A SENIOR MEMBER OF PRESIDENT OBIANG'S INNER CIRCLE

Nguema is a key member of President Obiang's cabinet and an important member of this Inner Circle.  He was appointed Second Vice President of EG by his father in May 2012 and placed in charge of national security issues.  Prior to being appointed Second Vice President, Nguema served as EG's Minister of Forestry and Agriculture and Minister of Infrastructure.  As EG's Forestry Minister, Nguema was in charge of overseeing and regulating EG's timber industry, which is that country's second largest source of foreign exports.   Indeed, since first being appointed to the cabinet in 1998 at the age of 29, Nguema has remained a minister in President Obiang's Government and is now one of the most senior members of President Obiang's administration and senior staff.  Many people believe that Nguema is the presumptive heir to EG's presidency. Additional information responsive to this Interrogatory relating to Nguema's role within the Inner Circle may be ascertained from the COMPLAINT and documents that have or will be produced by the Government, including DOJ_0000584-592; DOJ_000062-94; DOJ_0000394-398; DOJ_0000322-326; DOJ_0000359-363; DOJ_0000842-852;  and DOJ_00001049-1080; DOJ_0000946-950.

Exhibit 2 Page 92

## II.
## NGUEMA'S MODEST
## LEGITIMATE INCOME

As a public official in EG, Nguema's legitimate salary is approximately $6,799 per month, or less than $100,000 per year, according to official EG sources. Additional information responsive to this Interrogatory relating to Nguema's official salary as a public official may be ascertained from the COMPLAINT and documents that have or will be produced by the Government, including DOJ_0000394-398; DOJ_0000322-326; DOJ_0000872-875; DOJ_0000890-894; DOJ_0001441-1460; DOJ_0001049-1080.

## III.
## NGUEMA'S ACQUISITION OF THE
## $30 MILLION MALIBU MANSION

Despite making less than $100,000 per year as a public official, Nguema reached an agreement in or around February 2006 to purchase a mansion estate (Sweetwater Property) on Sweetwater Mesa Road in Malibu, California for approximately $30 million. The price of the mansion was the equivalent of more than 300 times Nguema's annual salary as a public official. From April 5, 2006, through April 26, 2006, Nguema sent five wires from EG to an escrow account at First American Title Co. Nguema used an account he held at Societe Generale de Banque en Guinee to wire these funds.

In acquiring the Sweetwater Property, Nguema engaged in conduct that demonstrates that he was attempting to conceal the source, ownership and control of the Sweetwater Property. For instance:

- Rather than acquiring and recording the title to the Sweetwater Property in his name, Nguema used the name of a shell company called Sweetwater Malibu LLC (Sweetwater Malibu).

- In obtaining an Employer Identification Number (EIN) for Sweetwater Malibu, Christine Nguyen, an employee of George Nagler, a California real estate lawyer, falsely identified herself to the Internal Revenue Service (IRS) as Sweetwater Malibu's principal officer, general partner, grantor, owner, or trustor.  Neither the company's articles of incorporation, by-laws or other corporate documents identify Nagler or Nguyen as retaining such authority within the corporation.

- In addition, Nguyen claimed falsely to the IRS that Sweetwater Malibu was a single member LLC and that she—rather than Nguema—was its sole member.

- Sweetwater Malibu's articles of organization, which were filed with the California Secretary of State on February 8, 2006, make no reference to Nguema anywhere in the document.  Instead, Nagler is listed as the company's initial agent for service of process and an unrelated nominee signed the document as the company's purported "organizer."

- Nguema required his realtor Neal Baddin to enter into a confidentiality agreement, whereby Baddin was barred from discussing or disclosing Nguema's identity or details relating to the Sweetwater Property transaction to any third party.

- In or around April 3, 2006, Nagler recommended that Nguema ask that the title company draft the deed so as to hide Nguema's connection with the transaction.  Nagler advised Nguema to instruct the title company to "show [Nagler's] office address so that there is no tie in with [Nguema's current residential] address."  Nagler reminded Nguema that, "The deed is a public document.  The other closing documents should [also] go to my address."

84

Exhibit 2 Page 94

- In or around April 4, 2006, Nguema responded to, and explicitly approved, Nagler's recommendation that the Sweetwater Property's deed list Nagler's office address (rather than his own).  Nguema signed the letter in his own handwriting and returned a copy to Nagler.

- Although Sweetwater Malibu was required under California law to file a Statement of Information disclosing publicly the name and address of its manager, the type of business it engages in, and the name and address of its chief executive officer, by May 7, 2006, no such statement was filed. Sweetwater Malibu did not disclose such information until September 25, 2006, after the transaction to purchase the Sweetwater Property was completed.

Additional information responsive to this Interrogatory relating to Nguema's acquisition of the Sweetwater Property may be ascertained from the COMPLAINT as well as documents that have or will be produced by the Government, including DOJ_0000209-211; DOJ_0000212-217; DOJ_0000218-226; DOJ_0000269-272; DOJ_0000470-476; DOJ_0000838-841; DOJ_0000842-852; DOJ_0000872-875; DOJ_0000890-893; DOJ_0000922-923; DOJ_0000946-950; DOJ_0001049-1-80; SENATE-PSI-124429-126128; SENATE-PSI-118,645-119,028; SENATE-PSI-73109-100926; SENATE-PSI-107290-110260; SENATE-PSI-120250-120265.

## IV.

## NGUEMA'S ACQUISITION OF THE
## MICHAEL JACKSON MEMORABILIA

Nguema acquired hundreds of thousands of dollars in Michael Jackson memorabilia.  In or around December 2010, Nguema used his personal assistant, Wanda Kelly, as an intermediary to attend and bid at an auction of celebrity memorabilia.  At this auction, Kelly successfully bid on several items, including

the defendant white crystal-covered "Bad Tour" glove, on Nguema's behalf.  In March 2011, Nguema again used Kelly to bid and purchase various items of Michael Jackson memorabilia for a total purchase price of $115,000.  In June 2011, Nguema again used Kelly to bid on additional items of Michael Jackson memorabilia.  Kelly successfully bid on $379,700 in merchandise.  In 2011 alone, Nguema acquired Michael Jackson memorabilia worth more than 5 times his annual public salary.

In acquiring this merchandise, Nguema engaged in conduct demonstrating that he was seeking to conceal the source, ownership and control of these assets.  For instance:

- In August 2010, Kelly asked that the auction house revise its invoices so that the purchaser of certain items was listed as "Amadeo Oluy" rather than Nguema.  Kelly advised the auction house "Please make sure that [Nguema's] name does not appear anywhere, he should be invisible."

- In December 2010, Kelly bid on and purchased certain items at an auction held in Beverly Hills, California on Nguema's behalf.  Again, the auction house used an alias, instead of Nguema's name, on the billing invoices.  The address of the purchaser was listed as Sweetwater, Malabo, Guinea Equatorial.

- On or about January 31, 2011, Nguema wired $872,112 to the auction house in the name of yet another shell company, Eloba Construccion, S.A., rather than his one name.  The items were subsequently shipped to Nguema's Sweetwater Property.

Additional information responsive to this Interrogatory relating to Nguema's acquisition of Michael Jackson memorabilia may be ascertained from the

86

Exhibit 2 Page 96

COMPLAINT as well as documents that have or will be produced by the Government, including DOJ_2435-2480; DOJ_00003516-3852; DOJ_2353-2426.

## V.
## NGUEMA'S ACQUISITION
## OF THE FERRARI

On or about November 11, 2010, Nguema also acquired the defendant 2011 Ferrari 599 GTO from Ferrari of Beverly Hills with funds in the name of a shell company for more than $500,000.  The value of the defendant Ferrari was the equivalent of more than five times Nguema's annual income as a public official.

Nguema wired $492,997.99 from an EG bank account in the name of yet another shell company, Somagui Forestal, in or around December 16, 2010, to Pacific Western Bank in connection with the purchase of the Ferrari.  In addition, Nguema sent three additional wires from EG to Ferrari of Beverly Hills in connection with this purchase, including:  (1) a wire for $25,131.48 on or about November 13, 2009; (2) a wire for $39,912 on or about November 23, 2009; and (3) a wire for $14,929.65 on or about December 9, 2009.  On or about December 9, 2010, $39,912 was refunded to Nguema by Ferrari of Beverly Hills.  These funds were sent to an account held in the name of still another shell company, Mecafis Estate Services LLC, at Wells Fargo Bank.

Additional information responsive to this Interrogatory relating to Nguema's acquisition of the Defendant Ferrari may be ascertained from the COMPLAINT As well as documents that have or will be produced by the Government, including DOJ_00001905-2040.

# VI.
# SUBSTANTIAL ASSET PURCHASES
# THAT ARE INCONSISTENT WITH NGUEMA'S
# LEGITIMATE INCOME

Between 1998 and 2011, Nguema spent more than $100 million acquiring luxury assets and property in the United States, France and South Africa. These expenditure are wholly inconsistent with his annual salary of $100,000 per year. During a period of three months in 2006, for instance, Nguema spent $68 million on two assets in the United States: the $30 million Sweetwater Property and a $38 million Gulfstream G-V jet aircraft. These purchases alone amounted to more than 680 times Nguema's annual income as a public official. As explained below, these asset purchases are entirely inconsistent with Nguema's legitimate income as a public official.

In addition to the Sweetwater Property and the Gulfstream jet, Nguema purchased at least 26 luxury automobiles and motorcycles in the United States, including:

- a 2006 Aston Martin,
- five Bentley automobiles,
- two Bugatti Veyron vehicles,
- seven Ferrari sports cars,
- a Lamborghini,
- a Maserati,
- two Mercedes automobiles,
- a Porsche Carrera GT,
- four Rolls-Royces,
- five Harley-Davidson motorcycles, and

Exhibit 2 Page 98

- two Toiks Choppers.

The value of these automobiles and motorcycles was in or around $12 million (worth more than 120 times Nguema's annual public salary).  Nguema also (i) purchased a $6 million home in Bel Air in 2001 (worth more than 60 times Nguema's annual public salary); (ii) acquired two 50-foot racing boats for over $2 million in 2005 (worth more than 20 times Nguema's annual public salary); (iii) spent $2,270,187.50 on various Michael Jackson memorabilia in 2010 (worth more than 22 times Nguema's annual public salary); and (iv) spent $494,700 on additional Michael Jackson memorabilia in 2011 (worth nearly 5 times Nguema's annual public salary).

After acquiring the Sweetwater Property in 2006, Nguema also continued to wire millions of dollars into the United States to pay for the Sweetwater Property's maintenance and upkeep as well as for other expenses, including expensive vacations and yacht rentals.  For instance between May and September 2009, Nguema wired $609,300 to Yachtzoo, a company in Ft. Lauderdale, Florida, in connection with a luxury yacht rental.  Similarly, during the Christmas holiday in 2005, Nguema spent in or around $600,000 to rent a luxury yacht called the Tatoosh.

In addition to Nguema's asset purchases in the United States, Nguema acquired a luxury residence on Avenue Foch in Paris.  This residence is located in the XVIth Arrondissement of Paris, one of the most expensive neighborhoods in the Western hemisphere.  Nguema also acquired several additional luxury automobiles in France, including:

- a Ferrari Type 51 (acquired in 2000 for in or around approximately $240,000),

- a Ferrari type 550 (acquired in 1998 for in or around $199,675),

89

Exhibit 2 Page 99

- a Bugatti Veyron (acquired in 2006 for in or around $1,547,923),
- a second Bugatti Veyron (acquired in 2006 for in or around $1,294,250),
- a Maserati Coupe F1 (purchased in 2005 for in or around $106,128),
- a Maserati MC12 (acquired in 2005 for in or around $917,623),
- a Maybach 62 (acquired in 2002 for in or around $660,687) and
- a Rolls Royce Phantom Limousine (purchased in 2005 for in or around $493,109).

In South Africa, Nguema purchased two pieces of real estate for approximately $7 million (more than 70 times Nguema's annual public salary). In addition to these two properties, Nguema purchased still more luxury vehicles in South Africa, including two Bentley automobiles for approximately $970,000 and a white 2005 6-litre Lamborghini Murcielago for approximately $440,000.

On or about March 12, 2009, the City of London Police Economic Crimes Division informed the United States that Nguema was attempting to open a bank account in the United Kingdom. The bank account, according to the City of London Police, was to receive and hold $350 million. These funds were expected to be transferred from an account in Spain, that was opened by a third-party nominee of Nguema. The City of London Police also reported that these funds were purportedly obtained through illegal means.

In or around June 2008, Nguema retained Kusch Yacht Projekte GmbH Am Hafen (Kusch) in Germany to design and build a $380 million yacht (worth more than 3,800 times Nguema's annual public income). Nguema paid the company €200,000 in three segments on July 30, 2008; October 2, 2008; and October 31, 2008, for work completed in relation to the pre-design of this yacht.

Additional information responsive to this Interrogatory relating to Nguema's acquisition of assets in the United States and abroad may be ascertained from the

COMPLAINT and documents that have or will be produced by the Government, including DOJ_0000174-0000177; DOJ_0000183-188; DOJ_0000189-192; DOJ_0000193-198; DOJ_0000218-226; DOJ_0000237-240; DOJ_0000265-268; DOJ_0000269-272; DOJ_0000278-280; DOJ_0000281-284; DOJ_0000309-314; DOJ_0000342-345; DOJ_0000364-369; DOJ_0000378-383; DOJ_0000440-442; DOJ_0000447-449; DOJ_0000450-453; DOJ_0000454-456; DOJ_0000457-461; DOJ_0000462-463; DOJ_0000464-469; DOJ_0000470-476; DOJ_0000842-863; DOJ_0001049-1080; DOJ_0001441-1460; DOJ_1652-1904; DOJ_2041-2352; DOJ_00001905-2040; DOJ_2481-2549; DOJ_3005-3117; DOJ_3118-3515; DOJ_2427-2434; DOJ_2353-2426; SENATE-PSI-117457-118644; SENATE-PSI-124429-126128; SENATE-PSI-118,645-119,028; SENATE-PSI-107290-110260; SENATE-PSI-73109-100926; SENATE-PSI-120250-120265.

## VII.
### NGUEMA'S FALSE OR INCONSISTENT STATEMENTS TO EXPLAIN HIS SOURCES OF INCOME AND WEALTH

Between 2004 and 2011, Nguema provided differing and inconsistent explanations as to the source of his personal income and wealth.  In 2007, when asked by Comerica Bank in Los Angeles, Nguema's representative Anne Morse advised the bank that Nguema was unemployed and that his income was derived from trading expensive automobiles and a family inheritance.  Two years later in 2009, Nguema told officials at the United States Embassy (Embassy) in EG that other than his income as a public official, the source of his wealth was commercial logging operations performed by a Malaysian company in EG.  Two years after that in 2011, Nguema changed his explanation yet again, claiming to Ambassador Alberto Fernandez, the United States' then Ambassador to EG, that his personal wealth was derived from government infrastructure contracts.

Yet, on other occasions, Nguema could provide few, if any, specific details as to the source of his income. For instance, in or about September 2004, City National Bank in California requested Nguema identify the source of the funds that were held in his closed CNB account in California. Nguema provided no details other than to state that they were from one of two EG companies he owned— Somagui Forestal or Sofona. Even when CNB refused to provide Nguema with his funds and Nguema sued in California Superior Court, Nguema was still not able to provide any details or any financial data relating to his purported commercial activities and the source of his wealth.

Two years later in 2006, the same year that Nguema acquired the Sweetwater Property, McAfee and Taft, an Oklahoma-based law firm and escrow agent, repeatedly asked Nguema to provide details as to the source of his income in connection with his attempt to purchase a Gulfstream aircraft for $38.5 million. Despite repeated attempts by McAfee and Taft attorneys to obtain this information from Nguema and his lawyer, Nguema failed to respond. As a result, McAfee and Taft refused to participate further in the transaction and returned all of Nguema's funds in the escrow account.

Three years later in 2009, the staff of the United States Senate's Permanent Subcommittee on Investigations (PSI) also contacted Nguema to obtain details as to the source of his income and wealth in connection with their 2010 report on foreign corruption. Despite being promised by Nguema's attorney that this information would be provided, the PSI staff received no such information. That same year, Nguema also claimed falsely to Anton K. Smith, the United States Embassy's deputy chief of mission, that some of his wealth was due to the fact that the value of the Sweetwater Property had doubled in value since he acquired it in 2006. But, in the period between 2006 and 2009, there is no evidence that the

Exhibit 2 Page 102

Sweetwater Property was ever valued at anything close to $60 million, as Nguema claimed.

Additional information responsive to this Interrogatory relating to Nguema's inability to explain the source of his income and wealth may be ascertained from the COMPLAINT and documents that have or will be produced by the Government, including DOJ_0000584-592; SENATE-PSI-124429-126128; SENATE-PSI-10216-110308; SENATE-PSI-101514-107289; SENATE-PSI-119217-120245 .

## VIII.
## NGUEMA'S CONTENTION THAT HIS EG COMPANIES EARNED TENS OF MILLIONS OF DOLLARS LACKS CREDIBILITY

Nguema's contention that his forestry companies in EG, Grupo Sofona (Sofona) and Somagui Forestal (Somagui), generated tens of millions of dollars in annual revenue lacks credibility.  Nguema claims that he owns two companies in EG—Sofona and its subsidiary Somagui.  Sofona purportedly generated $26.8 million in revenue from "exporting hard timber" in 1999; $24.92 million in 2000; and $30.3 million in 2001.  The International Monetary Fund's (IMF) macroeconomic data for EG indicates that EG's entire forestry-related gross domestic product (GDP) amounted to in or around $45,022,970 in 1999; $41,134,751 in 2000; and $38,575,268 in 2001.

If Nguema's financial representations are accurate, this would mean that even though seventy-nine other individuals and companies also owned timber concessions in EG, Sofona was singlehandedly responsible for generating 59.5 percent of EG's forestry-related GDP in 1999; 60.5 percent of EG's forestry-related GDP in 2000; and 78.5 percent of EG's forestry-related GDP in 2001.  It would also mean that Sofona was responsible for singlehandedly exporting in or

around 477,190 cubic meters of timber from EG in 1999; 432,575 cubic meters of timber in 2000; and 525,950 cubic meters of timber in 2001.

| | SOFONA's Purported Annual Revenue | EG Forestry GDP | Percentage of EG Forestry GDP Allegedly Attributable to SOFONA |
|---|---|---|---|
| **1999** | **$26.8 million** | **$45,022.970** | est. 59.5% |
| **2000** | **$24.92 million** | **$41,134,751** | est. 60.5% |
| **2001** | **$30.3 million** | **$38,575,268** | est. 78.5% |

Yet, despiteSofona's purported dominance of EG's forestry sector, and the inevitable commercial footprint that such a company would have in EG's commercial marketplace, international financial institutions and law enforcement authorities have been unable to find evidence of this company's actual operations and/or earnings.  Moreover, despite being asked by business partners, associates, financial institutions, and foreign governments about the source of his income, Nguema has repeatedly failed to provide any specific details as to the source of his wealth, including Sofona'a operations, personnel, financial data, profit margins, contracts, and/or business relationships.

Additional information responsive to this Interrogatory relating to Nguema's representations about Sofona and its dominance of the EG forestry sector may be ascertained from the COMPLAINT as well as documents that have or will be produced by the Government, including SENATE-PSI-122837-124428; DOJ_00001536-1651; DOJ_1314-1331.

## IX.

## NGUEMA'S USE OF SHELL COMPANIES AND NOMINEES TO ACQUIRE ASSETS AND OPEN BANK ACCOUNTS

Between 2000 and 2011, Nguema created and used more than six shell companies to acquire assets, open bank accounts and transfer funds to conceal the source, origin and/or ownership of his assets and funds.  Nguema opened accounts in the names of these shell companies as early as 2000.  None of these shell companies engaged in any legitimate commercial or economic activity. Nguema's representatives frequently opened bank accounts at American financial institutions in the names of these shell companies without disclosing Nguema's association with these companies. Nguema's funds were then funneled through multiple accounts and multi-layered transactions.  Nguema's utilization of these shell corporations, nominees and complex layered transactions served no business or commercial purpose other than to conceal the origin, ownership and/or source of his assets and funds in the United States.

For instance, between 2000 and 2004, Nguema had two accounts at Riggs National Bank (Riggs) in the names of TNO Entertainment LLC (account numbers 76-889-55 and 76-923-450).  One of these accounts had a balance that fluctuated between $17,000 and $11.6 million.  In addition, Nguema also had an account in the name of Awake, Ltd., a Bahamas corporation.

Nguema also formed at least six shell companies in California.  These entities included:

(viii)   **Sweet Pink, Inc.**  Nguema formed Sweet Pink, Inc. in 2005 and used it to open a bank account at Union Bank of California (UBOC) in September 2005.  Sweet Pink was incorporated in California and listed George Nagler as its registered agent.  Sweet Pink engaged in

95

Exhibit 2 Page 105

no economic or commercial activity of any kind.  Its only apparent function was to conceal Nguema's association with this account from UBOC.  Nguema wired $29,947.50 into Sweet Pink's account from an EG bank account in the name of Somagui in or around October 19, 2005.

(ix)  **Unlimited Horizon, Inc.**  Nguema used Unlimited Horizon to open Bank Accounts at UBOC, Commercial Capital Bank and Citibank in Los Angeles.  Unlimited Horizon is incorporated in California and lists Michael Berger, another California lawyer, as its registered agent.  Unlimited Horizon did not engaged in any economic or commercial activity.  Its only apparent function was to conceal Nguema's association with this account from American financial institutions.  It also served as a receptacle for Nguema and Michael Berger to funnel money through layered transactions.  Unlimited Horizon's Commercial Capital Bank account received the following three wires from EG:  (i) a wire for $19,946.25 from Somagui on or about February 16, 2006; (ii) a wire for $49,945 from Somagui on or about March 23, 2006; and (iii) a wire for $39,944.81 from SOCAGE on or about June 16, 2006.  Between November 24, 2006 and June 6, 2007, Unlimited Horizon's UBOC account was the ultimate destination of eight wires from Nguema, which were funneled through accounts controlled by Berger at UBOC and Somagui at CCEI Bank in EG, amounting cumulatively to approximately $1,599,419.  Between July 27, 2007, and November 6, 2007, Nguema funneled over a $1 million from EG through Berger's client trust account at Bank of America (BOA) to Unlimited Horizon's account at Citibank.  These funds were

96

Exhibit 2 Page 106

used for the maintenance and upkeep of the defendant Sweetwater
Property.

(x)  **Beautiful Vision, Inc.**:  Nguema used Beautiful Vision to open bank
accounts at BOA.  Berger was also listed as a signatory on the
accounts.  Beautiful Vision did not engage in legitimate economic or
commercial activity of any kind.  Its only apparent function was to
conceal Nguema's association with this account from BOA.  Beautiful
Vision, Inc. was formed in California and listed Berger as its
registered agent.  Between November 1, 2004, and November 2005, at
least $1 million in funds originating from EG were funneled into
Beautiful Vision's accounts at BOA.

(xi)  **Sweetwater Malibu, LLC**.  Nguema formed Sweetwater Malibu
LLC in 2006 and used it to take title to the defendant Sweetwater
Property.  Sweetwater Malibu did not engage in any economic or
commercial activity.  Its only apparent function was to conceal
Nguema's ownership of the Sweetwater Property    Nguema opened
one account in 2006 using Sweetwater Malibu's name at California
National Bank.  In or around June 12, 2006, Nguema wired $249,899
to this account from EG.

(xii)  **Sweetwater Management, Inc.**  Nguema formed Sweetwater
Management in 2006 and used it to open three bank accounts at
California National Bank in 2006.  Sweetwater Management was
incorporated in California and listed George Nagler as its registered
agent.  Sweetwater Management did not engage in any economic or
commercial activity.  Its only apparent function was to conceal
Nguema's association with this account from an American financial

97

Exhibit 2 Page 107

institution.  This shell company was used to hire personnel to care for the defendant Sweetwater Property's maintenance and upkeep and to open an account, whose funds would be used for the maintenance and upkeep of the defendant Sweetwater Property.

(xiii)  **TNO Entertainment, LLC**:  Nguema used TNO Entertainment to open bank accounts at Riggs and City National Bank in or around March 2004.  TNO Entertainment was formed in California and listed Adam Siegler as its registered agent.

(xiv)  **Amadeo Oluy**.  Nguema acquired substantial assets and engaged in commercial transactions using the alias—Amadeo Oluy.  As explained above, in acquiring various items of Michael Jackson memorabilia, including the defendant Michael Jackson memorabilia, Nguema, through his personal assistant Wanda Kelly, asked that the auctioneer list Amadeo Oluy, rather than Nguema's actual name, on various invoices and billing sheets.  Similarly, in dealing with Nor-tech, a boating company in N. Fort Myers, Florida, Nguema spent thousands of dollars in 2010 on various services related to his Nor-Tech Hi Performance Boats.  In dealing with Nor-Tech, the invoices list Amadeo Oluy, rather than Nguema, as Nor-Tech's client.

Additional information responsive to this Interrogatory relating to Nguema's formation and use of shell companies may be ascertained from the COMPLAINT and documents that have or will be produced by the Government, including DOJ_0000212-217; DOJ_0000218-226; DOJ_0000252-257; DOJ_0000285-288; DOJ_0000289-296; DOJ_0000470-476; DOJ_3516-3582; DOJ_3853-3913; DOJ_2353-2426; DOJ_00001093-1158; SENATE-PSI-122837-124428; SENATE-PSI-124429-126128; SENATE-PSI-73109-100926; SENATE-PSI-120250-

120265; SENATE-PSI-120250-120265; SENATE-PSI-120374-122836; SENATE-PSI-72041-73108; SENATE-PSI-101000-101513; SENATE-PSI-70636-70717; SENATE-PSI-100927-100999.

## X.

## OTHER SUSPICIOUS CONDUCT IN AQUIRING AND MAINTAINING ASSETS

In addition to using shell companies and nominees to acquire assets and transfer funds, Nguema engaged in other practices that suggest that he was seeking to conceal the source, origin and/or ownership of certain assets and funds.  In addition to opening accounts and actively moving funds in the name of shell companies and nominees, Nguema used third-party nominees to layer his transactions and move funds through multiple accounts to conceal the source, origin and/or ownership of his funds.

For instance:

- Nguema funneled money through Berger's attorney client trust account at BOA and UBOC to other accounts he controlled in the names of various California shell companies, including Unlimited Horizon.  Specifically, Nguema wired funds from EG to Berger's trust accounts at BOA and UBOC.  Berger, then, withdrew these funds, acquired cashier's checks with those funds, and deposited those checks into accounts held in the name of Unlimited Horizon at UBOC and Citibank.  These funds were used for the maintenance and upkeep of the defendant Sweetwater Property.

- After Sweet Pink was formed in 2005, Christine Nguyen filed a false application with the IRS to obtain an EIN for the company.  In so doing, she identified herself as the company's principal officer, general partner, grantor, owner, or trustor.  Neither the company's articles of incorporation,

99

Exhibit 2 Page 109

by-laws or other corporate documents identify Nagler or Nguyen as retaining such authority within the corporation.  Indeed, contrary to the false representations on the IRS application, when faced with a Congressional subpoena, Nagler explained in written responses provided to the PSI staff, that Nguema—not Nguyen— was Sweet Pink's "sole owner."

- On or about May 23, 2006, Melinda DeHaven, Nguema's personal assistant, filed a false EIN application with the IRS for Sweetwater Management, Inc., claiming that she was the company's principal officer, general partner, grantor, owner, or trustor.  Neither the company's articles of incorporation, by-laws or other corporate documents identify DeHaven as retaining such authority within the corporation.  Again, when faced with a Congressional subpoena, Nagler explained in written responses provided to the PSI staff, that Nguema—not DeHaven—served as the corporation's "sole director, President, Secretary and Chief Financial Officer."  The funds wired to this shell company's account at California National Bank were used for the maintenance and upkeep of the defendant Sweetwater Property.

Additional information responsive to this Interrogatory relating to Nguema's formation and use of shell companies may be ascertained from the COMPLAINT and documents that have or will be produced by the Government, including DOJ_0000212-217; DOJ_0000285-288; DOJ_0000289-296; SENATE-PSI-124429-126128; SENATE-PSI-73109-100926; SENATE-PSI-120250-120265; SENATE-PSI-120374-122836; SENATE-PSI-72041-73108.

# XI.

## NGUEMA'S MISAPPROPRIATION, THEFT
## AND EMBEZZLEMENT OF PUBLIC FUNDS

### Nguema's Abuse and Manipulation of Public Infrastructure Contracts to Misappropriate Public Funds

After oil was discovered in EG during the 1990s, EG invested hundreds of millions of dollars in building public infrastructure projects.  In February 2003, at the age of thirty-three, Nguema was appointed by his father to the newly-created post of EG's Minister of Infrastructure and Forests.  Three years later, Nguema managed to wire more than $68 million out of EG to acquire both the defendant Sweetwater Property and a $38 million Gulfstream GV jet aircraft.

In an affidavit Nguema filed with the Cape Town High Court in South Africa on August 8, 2006, the same year that Nguema acquire the Sweetwater Property, Nguema acknowledged that he, like other EG cabinet ministers, bids on and benefits from obtaining government contracts awarded to them by his father's government.  In that affidavit, Nguema affirmed:

> Cabinet Ministers and public servants in Equatorial Guinea are by law allowed to [own] companies that, in consortium with a foreign company, can bid for government contracts and should the company be successful, then what percentage of the total cost of the contract the company gets, will depend on the terms negotiated between the parties.
> But, in any event, it means that a cabinet minister ends up with a sizeable part of the contract price in his bank account.
>
>          *                   *
>
> One of the companies that I own is SOCIEDAD DE CARRETERAS DE GUINEA ECUATORIAL ("SOCAGE"), with a bank account at the CCEI BANK GE, in BATA, the commercial capital of [EG].

EG's infrastructure and construction industry, which Nguema was responsible for regulating when he was EG's Infrastructure Minister, is where

corruption is the most pronounced, according to a report drafted by Ambassador Fernandez in 2011.  EG's corruption exists in its "murkier transactions such as sweetheart deals, influence peddling, construction contracts and finder's fees."  On March 21, 2011, Nguema met with Ambassador Fernandez and claimed that his personal wealth was attributable to infrastructure contracts awarded to his private businesses by the EG Government—the very industry that Ambassador Fernandez concluded was where corruption was most prevalent in EG, and the same industry that Nguema was in charge of regulating as Infrastructure Minister.

In 2009, Anton Smith, the United States Embassy's deputy chief of mission, noted that he was also concerned that the awarding of public infrastructure contracts in EG was particularly vulnerable to corruption.  According to Smith, "It is in these downstream, public expenditures that we lose visibility and in which the greatest opportunities for corruption persist.  Rumors abound of influence buying, bid rigging and kickbacks" in EG.  With respect to Nguema specifically, Smith noted that Nguema "lives the life of an international playboy and is widely accused of corruption."

Indeed, by March 2004, two years prior to Nguema's acquisition of the Sweetwater Property, Africa Confidential, a U.K. based publication focusing on Africa, reported that, "[Nguema] control[led] much of the infrastructure portfolio" funded by the EG Government's oil revenues.  Africa Confidential reported that:

> The generals who had previously run lucrative cartels in consumer imports, air and road transport, construction and cement etc. then had to secure approval from [Nguema's Infrastructure] Ministry.  He tried to block merchandise coming in for [other EG officials and businesses].  Compared by some to Iraq's late Uday Hussein, [Nguema] expanded his empire rapidly and started pressuring French, Spanish and other foreign companies.

Additional information responsive to this Interrogatory relating to Nguema's involvement in EG's construction and infrastructure sector may be ascertained from the COMPLAINT as well as documents that have or will be produced by the Government, including DOJ_0000584-592; DOJ_688-718; DOJ_0001049-1080; DOJ_1652-1904; DOJ_0000303-308; DOJ_0000315-321; DOJ_0000413-416; DOJ_0000417-421; DOJ_0000422-425; DOJ_0000426-430; DOJ_0000431-434; DOJ_0000834-837; DOJ_0000864-871; DOJ_00003853-3913; DOJ_0000946-950.

**Nguema's Corrupt Relationship with General Work.**

General Work is a major construction company in EG specializing in large-scale government infrastructure projects.  Italian law enforcement authorities, including officers of the Guardia di Finanzia (GdF), Italy's financial police, reported that they believed that between 2000 and 2007 Nguema stole EG public funds by funneling government revenue through General Work.  General Work was originally formed by two Italian nationals Giulio Cistaro and Giuseppe Vona in 2001 and managed by Vona, Andrew Mannarino and Igor Celotti.  Because of Celotti's close relationship to President Obiang, General Work was awarded major government infrastructure contracts in EG beginning in the early 2000s.  By 2011, General Work had become one of the largest construction companies in EG.  The GdF believed that 45 percent of the revenue earned by General Work in EG was funneled as kickbacks to Nguema.  During this same time period, Nguema acquired the defendant Sweetwater Property, sent hundreds of thousands of dollars from EG into the United States to fraudulently opened bank accounts for the maintenance and upkeep of this property, and made tens of millions of dollars of lavish expenditures and purchases.

The Judicial Police Squad at the Procure in Udine, Italy identified a network of bank accounts in Italy, Austria, Spain, Monte Carlo and Luxembourg controlled by Nguema and his father.  The GdF explained that they believed that these accounts were derived from monies embezzled from the EG Government by Nguema and President Obiang through infrastructure contracts awarded to General Work by President Obiang.

In 2007, Celotti was killed in an airplane crash near Mongomo, a city on EG's mainland.  The GdF believed that the circumstances surrounding this crash were suspicious.  One month prior to his death, Celotti transferred his corporate holdings, including 45 percent of General Work's equity, to his wife Anna Maria Moro.  After Celotti's death, Gimmy Ricci, another Italian businessman, was appointed as General Work's new general manager.  In addition to acquiring managerial control of General Work, Ricci worked with Moro to form several additional legal entities and companies to serve as receptacles for General Work's ill-gotten revenue.  The remaining equity in General Work was acquired by Nguema's family.  According to the GdF, Nguema's family provided no compensation to other shareholders in exchange for their shares.

After Celotti's death in 2007, the GdF conducted an extensive investigation into General Work and Celotti's financial affairs.  In connection with this investigation, the GdF interviewed former employees and associates of General Work, including Cistaro and Vona.  In addition, they performed a search of Moro's residence in the Friuli region of Italy.  Cistaro and Vona informed the GdF that Nguema's family fraudulently assumed control of General Work.  Based upon their investigation, including an analysis of financial and banking records obtained by the Gdf from Moro, Italian law enforcement authorities concluded that Nguema and his father jointly owned and controlled a network of international bank

accounts that contained stolen government monies misappropriated from EG's treasury through General Work's government construction contracts.

When Nguema was negotiating the purchase of the $30 million defendant Sweetwater Property, he sent and received faxes regarding this real estate transaction from Celotti's office at General Work in EG.  For instance, in or around April 2, 2006, Nguema signed and faxed a copy of the Supplemental Escrow Instructions, the Residential Lease After Sale, and the Addendum to the Residental Lease After Sale—all pertaining to the purchase of the defendant Sweetwater Property—to Nagler's office from a fax number in EG (00240) 084096.  This EG fax number belonged to Celotti.  Furthermore, in connection with wiring funds from EG into the United States to support the maintenance and upkeep of the Sweetwater Property, Michael Berger faxed a letter in or around January 20, 2008, to Celotti's fax line in EG, stating, "Here is the information that you need to wire transfer money to Unlimited Horizon, Inc., account at Commercial Capital Bank."  In this same letter, Berger detailed Unlimited Horizon's bank account information, the address of Commercial Capital Bank in Beverly Hills and the bank's telephone number and routing number.

Additional information responsive to this Interrogatory relating to the relationship between Nguema and General Work may be ascertained from the COMPLAINT and documents that have or will be produced by the Government, including DOJ_0000303-308; DOJ_0000315-321; DOJ_0000413-416; DOJ_0000417-421; DOJ_0000422-425; DOJ_0000426-430; DOJ_0000431-434; DOJ_0000809-816; DOJ_00003853-3913; SENATE-PSI-86730; SENATE-PSI-93976; SENATE-PSI-94046; SENATE-PSI-96238-96240.

## **Nguema's Attempt to Misappropriate $40 Million in Public Funds to Acquire a Gulfstream Jet**

In 2004, two years before Nguema acquired the defendant Sweetwater Property, Nguema contacted Gulfstream Aerospace Corporation (GAC) and expressed interest in purchasing a $40 million aircraft from GAC.  Stephen Arnold Fuller, GAC's regional vice president for Sub-Saharan Africa, recalled that Nguema informed GAC that he intended to finance the purchase of this aircraft by diverting $40 million in public funds from the EG Government through an American oil company.

Nguema told Mr. Fuller that he could and would pay for the $40 million aircraft with public funds by having an "American oil company" initially pay GAC for the aircraft.  EG would then, according to Nguema, "repay the American oil company through credits to the company's local account in EG."  In a letter dated April 20, 2004, Fuller confirmed that Nguema was proposing to purchase from GAC a Gulfstream 550 with misappropriated public funds.  Mr. Fuller stated in that letter:

> [Nguema] is suggesting that [GAC] contact the Chairman of Ocean Energy in Houston, Texas with regard to the Gulfstream 550.  There may be an advantage in assigning the Sales Agreement to Ocean Energy and having that company assume the payment obligations for the Gulfstream 550.  In return, the Government [of EG] would issue a Credit Memorandum to Ocean Energy for amounts payable in connection with oil production.

Raymond Banoun, managing partner of Cadwalader, Wickersham & Taft, LLP, a New York-based law firm, served as an attorney for GAC in connection with this transaction.  Like Mr. Fuller, Mr. Banoun recalled that in 2004, Nguema represented to GAC that he would misappropriate EG public funds by (i) having Ocean Energy, an American oil company, purchase the $40 million aircraft and

"assume the payments on his behalf" and then (ii) "in return" have the "Equatorial Guinea government [] issue a credit memo to Ocean Energy for monies connected with oil production in Equatorial Guinea."

Additional information responsive to this Interrogatory relating to Nguema's relationship and communications with GAC may be ascertained from the COMPLAINT as well as documents that have or will be produced by the Government, including DOJ_0000114-166; DOJ_0000388-393; SENATE-PSI-119217-120245; SENATE-PSI-120318-120347; SENATE-PSI-124429-126128.

**Accusations of Direct Diversion of EG Public Funds**

In South Africa, George Ehlers, a South African businessman, filed a lawsuit in the Cape Town High Court against the EG Government.  In that litigation which was filed in or around July 2005, less than one year prior to Nguema's acquisition of the Sweetwater Property, Ehlers alleged that the EG Government was in breach of a $7.8 million government infrastructure contract with his company, Engineering Design and Construction Company.  After the EG Government seized some of his company's assets in EG and refused to pay his company for its services, Ehlers filed a lawsuit seeking to attach two homes valued at $7 million owned by Nguema in South Africa.  The two homes were located at Erf 477 Clifton Ridge and Erf 303 Constantia in Cape Town.  The funds used to purchase these properties were wired into South Africa in 2004 from an account at CCEI Bank in EG held in the name of Socage, an EG company owned by Nguema.

Ehlers alleged that because Nguema could not have afforded to purchase these assets on his income as an EG public official, Nguema must have used funds misappropriated from the EG Government to acquire and renovate these properties. Indeed, even the contractors hired to renovate the property believed that these assets were owned by the EG Government.  In support of his lawsuit, Ehlers filed

an affidavit executed by Patricia Fuller.  Fuller recalled that she spoke with Peter McNamara, a contractor hired to renovate Nguema's property in Constantia. McNamara, according to Fuller, advised her that he had never heard of Nguema and that he was communicating with the EG Government about how to renovate the property.  Furthermore, McNamara claimed that he was under the impression that the property belonged to the EG Government.  McNamara submitted an invoice for in or around R 3,144,524 (approximately $359,532) to Jacques Levy, an interior decorator in Switzerland, for his services relating to Nguema's house in Constantia.  As McNamara had no knowledge of Nguema, and was receiving his instructions from the EG Government regarding the home's renovations, Ehlers alleged that the funds used to acquire and renovate these properties were misappropriated from the EG Government.  Although Ehlers prevailed against Nguema before the trial court, an appellate court reversed that decision on other grounds.

Additional information responsive to this Interrogatory relating to Mr. Ehlers' lawsuit in South Africa may be ascertained from documents that have or will be produced by the Government, including DOJ_0000281-284; DOJ_0000464-469; DOJ_0001049-1080; DOJ_1652-1904; DOJ_0000890-893.

## XII.

## EXTORTION AND BRIBERY

Beginning in the 1990s, Nguema, as described in the COMPLAINT, received and demanded that companies in E.G provide him with money or property in order to be able to maintain and operate their businesses.  Nguema abused his authority and influence within the EG Government both as a member of the cabinet and President Obiang's eldest son to make these demands and to retaliate against those who refused to acquiesce.

Exhibit 2 Page 118

**Extortion and Solicitation of Bribes from Forestry Companies**

In 1998, at the age of 29, Nguema was appointed by his father to serve as EG's first-ever Minister of Forestry and Agriculture.  Timber is EG's second largest and most valuable export commodity.  Nguema's Forestry Ministry (Ministry) controls timber harvesting operations in EG.  The Ministry also controls timber exports.  In order to export timber from EG, Nguema requires that timber companies obtain an export authorization document that is personally signed by him.  Timber companies incur expenses of up to $5,000 per day if Nguema delays in signing these requests.

**Extortion Payments and Bribes from Forestry Companies**

Foreign timber executives claim that their companies were routinely required to pay bribes to Nguema in order to do business in EG.  Foreign Policy Magazine quoted one timber executive as stating, "[Nguema] would call emergency meetings of all the logging company heads in which he would announce some new tax on logging operations."  According to this executive, Nguema charged timber companies an extra so-called "tax" that they were forced to pay him personally for wood harvested in EG.  Nguema purportedly charged timber companies directly per cubic meter of timber harvested by that company.

A French timber executive, identified as "Jean Michel" in this same Foreign Policy Magazine article, reported that Nguema seized the French logging company he worked for in EG.  It was impossible, according to Jean Michel, for timber companies to do business in EG without paying bribes to Nguema.  Although Jean Michel's company initially paid Nguema the bribes that he demanded, the EG military shut down this company's operations and expelled its personnel from EG after it refused to make any further bribe payments to Nguema.

Independent NGOs have also reported that Nguema extorts payments and solicits bribes from timber companies in EG.  For instance, a former United States intelligence official, who was familiar with EG, reported to Global Witness, that Nguema solicits and accepts bribes from Malaysian, North Korean and Chinese timber companies.  According to this intelligence official, "There were Malaysian, North Korean, and Chinese logging camps on the mainland [of EG], and [Nguema] collected cash from them . . . for logging operations, much of it involving valuable hardwood."

While Nguema solicits and collects bribes from foreign timber companies, he also permits these same companies to violate EG's forestry laws and regulations.  Indeed, according to representatives of the Environmental Investigation Agency (EIA), an environmental NGO, corruption is pervasive in EG's forestry sector and some foreign timber companies, including Shimmer International of Malaysia (Shimmer), are permitted illegally to harvest timber in EG's protected forests reserves.

Several independent NGOs, including Forest Monitor, Green Peace and the World Rain Forest Movement, confirmed that Nguema does not enforce EG's forestry laws on some foreign timber companies, including Shimmer.  For instance, Shimmer engages in illegal logging in protected national forests in EG, including Monte Alen, even though these forest reserves are protected from industrial logging under EG's Forestry Law. Greenpeace reported that in 2004, "Enforcement of legal requirements is virtually non-existent in commercial logging" in EG.  Similarly, Forests Monitor, a U.K. NGO, concluded in 2001 that, "[i]n practice, enforcement of all the various legal requirements [in EG's forestry sector] is virtually non-existent."

Exhibit 2 Page 120

Likewise, while Nguema held the position of Forestry Minister, some timber companies were permitted to overcut EG's forests.  Although EG's Forestry Law places limits on how much timber can be harvested by concessionaires and requires these entities to process 60 percent of their timber in EG, many timber companies, including Shimmer, were operating in violation of these rules. According to a United States Forest Service ranger, who visited EG between July 31, 2004, and August 15, 2004,"[i]t is clear that in some areas that [EG] forests [were] being overcut."  Similarly, EIA representatives confirmed that Shimmer, the dominant timber company in EG, was permitted to illegally export the bulk of its raw timber to China without processing it domestically.

Additional information responsive to this Interrogatory relating to Nguema's control of EG's forestry sector and his solicitation of bribes and extortion payments from timber companies may be ascertained from the COMPLAINT and documents that have or will be produced by the Government, including DOJ_0000408-412; DOJ_0001049-1080; DOJ_0000842-863; DOJ_0000614-615; DOJ_975-1048; DOJ_758-777; DOJ_778-789.

**Nguema's Relationship with Shimmer International**

Nguema reportedly maintains a close working relationship with Shimmer that benefits him personally.  While Nguema was its head, EG's Forestry Ministry awarded Shimmer substantial forestry concessions.  Shimmer was the largest and most dominant forestry company in EG.  Indeed, in 2006, the same year that Nguema purchased the Sweetwater Property, Shimmer was responsible for more than 66 percent of the timber harvested in that country.  According to a former U.S. intelligence official who spoke with Global Witness, Nguema solicited and collected bribes from Shimmer in EG.

111

Exhibit 2 Page 121

Nguema confirmed to U.S. diplomats at the Embassy in 2009 that he permitted a Malaysian company to deploy 40 teams of well-equipped lumberjacks to "clear cut" a "large tract of pristine continental jungle" that was "granted" to him by the EG Government.  Nguema then purportedly earned a "large windfall" by exporting this raw timber to Asia.   It is illegal under EG's Forestry law to permit this type of "clear cutt[ing]."  EG law also requires timber concessionaires, like Nguema, to process domestically a minimum of 60 percent of the raw timber they harvest from their concessions.  Nguema, however, exported his raw timber as "whole logs" to Asia.  Although it was Nguema's responsibility as EG's Forestry Minister to enforce these laws, Nguema explained to U.S. diplomats that this illegal "windfall" was the source of his personal wealth.

Additional information responsive to this Interrogatory relating to Nguema's relationship with timber companies, including Shimmer, may be ascertained from the COMPLAINT as well as documents that have or will be produced by the Government, including DOJ_0000408-412; DOJ_0001049-1080; DOJ_975-1048; DOJ_778-789.

**British Hotel Company**

In or around 2003, a British company sought permission to build a Sheraton hotel in Malabo, EG's capital city located on Bioko Island.  According to Simon Kareri, a Riggs Bank vice president, Nguema refused to permit the British company to build the Malabo hotel unless its executives agreed to provide him with 55 percent of the hotel's equity.  When the British company refused, their hotel project was not allowed to go forward. Nguema purportedly accompanied representatives of this British company to Nguema's Los Angeles home to engage in negotiations about this hotel.

112

Exhibit 2 Page 122

Additional information responsive to this Interrogatory relating to this British company may be ascertained from documents that have or will be produced by the Government, including DOJ_000080-87.

**<u>G.E. Petrol</u>**

G. E. Petrol is EG's state-owned oil company.  According to Kareri, when he was employed at Riggs prior to 2005, G.E. Petrol was still "run by the First Family" of EG and Nguema was the company's "*patron*."  In Spanish, which is one of EG's official languages, the word "*patron*" means "master" or "boss." Even though Nguema "flunked high school and does not know how to do anything," according to Kareri, Nguema controlled G.E. Petrol as its "*patron*". Kareri stated that "the big money from the [foreign] oil companies is being paid to the First Family through joint venture projects in EG" and that corrupt payments were disbursed by G.E. Petrol to "so-called oil brokers" controlled by Nguema's family.  These brokers, according to Kareri, make further profits for Nguema's family by purchasing oil from G.E. Petrol at discounted rates.

According to Kareri, Nguema's family "may be skimming money from the sale of [EG's] share of oil produced by the oil companies in EG."  Nguema, according to Kareri, often made remarks to him suggesting that he is GE Petrol's "*patron*."  On one occasion, Kareri recalled that G.E. Petrol requested that he divert directly a certain percentage of EG's oil revenue to an account controlled by G.E. Petrol.  Kareri refused.

Similarly, as explained above at Section XI(B), Nguema represented to GAC that he possessed both the ability and the intent to misappropriate public funds from the EG treasury relating to oil production.  Specifically, he claimed that he could provide an American oil money with a $38.5 million "credit memorandum" derived from public funds to acquire a personal asset for himself.

Kareri and Nguema purportedly had a close business and personal relationship.  Nguema consulted Kareri frequently about both financial and personal issues, including "personal problems" Nguema had with his father. Kareri commented to his wife, that it was unfortunate that Nguema was "blowing" the money from EG.

Additional information responsive to this Interrogatory relating to G.E. Petrol may be ascertained from documents that have or will be produced by the Government, including DOJ_000038-94 and DOJ_0000241-244.

**Foreign Oil Companies**

Walter International (Walter) was a Houston-based oil company operating in EG.  In 1991, Nguema enrolled at Pepperdine University's English language program in Malibu, California.  According to Ambassador John Bennett, a former United States Ambassador  to EG during the early 1990s, Nguema's Pepperdine tuition and expenses were fully paid for by Walter.  Elisa Wax, a Pepperdine employee, recalled that Pepperdine received a "steady stream of phone calls from the Beverly Wilshire [Hotel] and shops in Beverly Hills trying to track down [Nguema] to settle outstanding bills."  Wax would direct these calls to Walter International.  Ambassador Bennett recalled that Nguema incurred, and Walter paid, $50,000 in expenses while attending Pepperdine in California.

In November 2009, Global Witness reported that Nguema received corrupt payments from Elf-Acquitaine, a French oil and gas company.  In 2004, thirty senior executives of Elf Acquitaine were charged and convicted in France of distributing bribes and kickbacks in Africa over a period of several decades.

A confidential source ("CI 3"), who spoke with federal agents in Miami, Florida, also confirmed that it was his/her belief that Nguema controls the oil industry in EG and that he derives his wealth from illegal activities in EG,

including the distribution of counterfeit cigarettes, diamond smuggling and monetary kickbacks in the form of contracts from United States oil companies operating in EG.

Another confidential source (CI 2), who spoke with federal agents and was a former employee of Nguema in Los Angeles in or around 2006, the same year that Nguema acquired the Sweetwater Property, recalled that Nguema told him/her that the source of his wealth was related to EG's oil resources.  CI 2 was an employee of Nguema who worked at the defendant Sweetwater Property.  Even though Nguema holds no official position within the EG Government related to the oil industry, CI 2 recalls seeing three "oil officials" meet with Nguema at the Sweetwater Property during the second week of November 2006.

Additional information responsive to this Interrogatory relating to Nguema's relationship with the oil and gas industry may be ascertained from documents that have or will be produced by the Government, including DOJ_0000114-0000166; DOJ_0000241-244; DOJ_0000265-268; DOJ_0000388-393; DOJ_0000394-398; DOJ_0000842-863; DOJ_0001049-1080; SENATE-PSI-119217-120245; SENATE-PSI-120318-120347; SENATE-PSI-124429-126128.

**Michael Chevaly**

An individual named Michael Chevaly allegedly smuggles various fraudulently manufactured consumer goods into Cameroon, Nigeria, Benin, Niger, Chad, Sierra Leone, Liberia, Guinea-Conakry and Gabon.  In so doing, Chevaly purportedly uses routes through EG, Niger and Benin to smuggle this merchandise.  CI 3 informed federal agents that Nguema possesses a business relationship with Chevaly relating to this illegal conduct.  Additional information responsive to this Interrogatory relating to the relationship between Nguema and Chevaly may be

ascertained from documents that have or will be produced by the Government, including DOJ_0000246-251.

## XIII.

## NGUEMA'S FRAUD AGAINST U.S. BANKS

Between 2004 and 2008, Nguema, as described in the COMPLAINT, orchestrated, participated in and implemented a scheme fraudulently to open and use bank accounts at six financial institutions in California in order to surreptitiously funnel millions of dollars into the United States from EG, while concealing his association with the accounts, the source of funds, and his status as an EG cabinet minister and son of the President.  During this period, Nguema fraudulently opened at least ten bank accounts at six financial institutions in California, including Bank of America (BOA), Union Bank of California (UBOC), Commercial Capital Bank, California National Bank (CNB), Comerica Bank, and Citibank.

Beginning in 2004, after the PSI published its report on money laundering on July 15, 2004, Nguema was on notice that banks in the United States were uncomfortable opening bank accounts for him.  The PSI's 2004 money laundering report criticized Riggs for its handling of Nguema's family's funds, including those of Nguema.  Further, Riggs was ultimately convicted and ordered to pay a criminal fine of $16 million, as well as $25 million in civil penalties, for its non-compliance with U.S. anti-money laundering controls.

Just two weeks after the PSI's report was published, City National Bank in Los Angeles was contacted by Nguema after the bank had closed his personal bank account.  When he called the bank on July 30, 2004, Nguema told a bank employee that he thought his account had been closed "due to [his] country and the oil."  In addition to closing his accounts, City National Bank refused to return $699,691.02

116

Exhibit 2 Page 126

of Nguema's funds to him and requested that the California Superior Court for the County of Los Angeles allow the bank to release these funds to the court, rather than Nguema, for ultimate resolution.

Beginning in 2004, Nguema, Michael J. Berger and George Nagler opened bank accounts in California in the names of various shell companies, including Sweet Pink, Inc., Unlimited Horizon, Inc., Beautiful Vision, Inc., and Sweetwater Management, LLC, without disclosing Nguema's ownership of the companies or their funds and concealing his status as a Senior Foreign Public Figure (SFP) and a Politically-Exposed Person (PEP).  Nguema and his intermediaries, including Berger and Nagler, then transferred funds received from Nguema into these fraudulently opened bank accounts in the United States.  In opening numerous California bank accounts and using intermediaries' accounts, Nguema, Berger and Nagler intentionally and deliberately concealed from these financial institutions Nguema's association with these bank accounts as well as his status as a SFP and a PEP.

Nguema used many of the funds in these fraudulently opened accounts for the maintenance and upkeep of the defendant Sweetwater Property, a $30 million mansion he purchased in Malibu in 2006.  Funds were used to pay for, among other things, the salaries of Nguema's household staff.  These staff persons worked at the Sweetwater Property and aided Nguema, at his direction, in executing this fraudulent scheme.  These funds were also used to maintain an office at the Sweetwater Property for Nguema and his employees and associates to perpetuate and oversee this scheme; the professional and administrative services of various lawyers, accountants, and property managers, including Berger and Nagler; costs incurred by Nguema's household staff relating to this scheme; and the costs and fees of the Sweetwater Property, where Nguema and his household staff

maintained their business office for their shell companies and where much of the conduct described at paragraphs 117-209 of the COMPLAINT were planned, coordinated, and occurred.

Nguema repeatedly concealed from banks in California his ownership of the funds in these accounts by using shell companies formed to hide his identity and by using various third-party nominees, including Michael Berger and George Nagler, who both allowed Nguema to use their client trust accounts to pay for personal expenses.  After each of these banks discovered Nguema's association with the accounts, the banks closed each account.

**Bank of America**.  On or about October 12, 2004, Nguema fraudulently opened two accounts in the name of Beautiful Vision, a California company.  No banker looking at the documents and information provided to Bank of America (BOA) by Berger and Nguema could have identified Nguema as being the owner of Beautiful Vision, nor could they have readily identified the account as one affiliated with a SFP and/or a PEP.  BOA closed the Beautiful Vision accounts in or around September 12, 2005, and September 15, 2005, respectively, after discovering that Nguema, a SFP and a PEP, was associated with Beautiful Vision, Inc.

**Union Bank of California.**  On or about September 15, 2005, three days after BOA closed Nguema's Beautiful Vision account, Nagler formed Sweet Pink, Inc. for Nguema.  On or about September 29, 2005, UBOC opened a checking account for Sweet Pink using an EIN obtained by Nagler's assistant.  The signatories on the account were Eve Jeffers, Nguema's then-girlfriend, and four employees of an accounting firm owned by Marvin Freedman that had been retained by Nguema.  On the bank account opening documents, Marvin Freedman's business address is listed as Sweet Pink's address.  No banker looking

at the documents and information provided by Nagler could have identified Nguema, as being the owner of Sweet Pink, nor could they have identified the account as one affiliated with an SFP and a PEP.  Approximately eight days later, on or about October 27, 2005, UBOC discovered that Nguema was using the Sweet Pink account to gain access to the U.S. banking system and closed Sweet Pink's account.  This was the third time in less than fifteen months that a California bank closed an account after learning of Nguema's association with the account.

**Commercial Capital Bank.**    On or about December 7, 2005, less than two months after UBOC closed Nguema's Sweet Pink account, Berger opened an account at Commercial Capital Bank in the name of Unlimited Horizon, Inc. Berger caused Unlimited Horizon to be incorporated in California on October 21, 2005.  No banker looking at the documents and information provided by Berger and Nguema could have identified Nguema as being the owner of Unlimited Horizon, nor could they have identified the account as one affiliated with an SFP and a PEP.  On or about June 22, 2006, Commercial Capital Bank closed Unlimited Horizon's account.  This was the fifth account in less than two years closed by a California bank after discovering its association with Nguema.

**California National Bank.**  On or about May 16, 2006, after Nguema had acquired the Sweetwater Property in April 2006, Nagler formed another company for Nguema called Sweetwater Management, Inc.  Sweetwater Management was purportedly formed to employ and to pay individuals working to maintain the Sweetwater Property.  In or around May 30, 2006, Edward Mizrahi, Nguema's estate manager, opened an account at this bank in the name of "American Equity Properties, DBA:  American Property MGMT ITF:  Sweet Water Malibu" ("AEP Account").  The estate manager concealed Nguema's involvement with the account as well as Nguema's status as a SFP and a PEP.  He identified the owner of

Sweetwater Malibu, LLC as a "high profile" person who wanted to remain confidential.  The following day, on or about May 31, 2006, Nguema's personal assistant Melinda DeHaven opened three additional business accounts at CNB in the name of Sweetwater Management, Inc.  On or about June 22, 2006, the bank closed all four accounts after learning that these accounts were associated with Nguema.

**Union Bank of California.**  On or about August 28, 2006, two months after Unlimited Horizon's account at Commercial Capital Bank was closed and Nguema's four accounts at CNB were closed, Berger opened two Basic Business Checking Accounts in the name of Unlimited Horizon, Inc. at a UBOC branch in Beverly Hills.  Berger identified himself to UBOC as Unlimited Horizon's president, and was the sole signatory on both UBOC accounts.  Berger again concealed material information from UBOC, including Nguema's association with Unlimited Horizon, as well as Nguema's status as a SFP and a PEP.  No banker looking at the documents and information provided to UBOC by Nguema and Berger, could have identified Nguema as being the owner of these accounts, nor could they have identified the account as one affiliated with an SFP and a PEP. After opening these accounts, Berger explained to Nguema in an email dated on or about November 1, 2006, that future wires should be sent "to my new client trust account at [UBOC].  I will transfer it from there to the Unlimited Horizon, Inc. General Account.  I will send you a separate e-mail and fax requesting a $200,000 wire transfer and providing wire transfer information for this new account."  Upon receiving these wires in his client trust accounts, Berger withdrew these funds and deposited them into Unlimited Horizon's UBOC accounts in the form of checks and bank drafts.  Between November 29, 2006 and May 11, 2007, Berger

deposited seven checks totaling $1,399,485 into Unlimited Horizon's UBOC accounts, after withdrawing these funds as "cash" from his client trust account. On or about June 12, 2007, after an investigation by UBOC discovered that Berger represented Nguema, an SFP and a PEP, and that Berger was using corporate vehicles to "disguise the identity of" Nguema to pay for the Sweetwater property and Nguema's living expenses, UBOC closed all three accounts.

**Comerica Bank**.  On or about February 6, 2007 -- eight months after CNB closed Nguema's four accounts -- Nguema applied to open a bank account at Comerica Bank on the Avenue of the Stars in Los Angeles.  On this occasion, Nguema directed his representative Anne Morse to open an account in his name and to identify himself as an EG citizen to the bank, but he nonetheless concealed from Comerica the fact that he was a PEP and an SFP.  When asked explicitly whether Nguema "ever performed important public functions for a foreign state (PEP)?" Nguema's representative answered in the negative.  When asked whether Nguema was "closely associated with person(s) who perform public functions for a foreign state (PEP)?" the representative again answered in the negative.  On or about March 22, 2007, Comerica closed this account after the bank's compliance personnel discovered that Nguema, in fact, was a PEP and an SFP.

**Citibank**.  On or about June 25, 2007, approximately thirteen days after UBOC closed Nguema's accounts, Berger opened another account in the name of Unlimited Horizon at a Citibank branch in Beverly Hills.  During the account-opening process, Berger deliberately hid Nguema's ownership of the account by telling a Citibank banker that the true owners of the Citibank account were U.S. citizens, when, in fact, Nguema a non-U.S. citizen and a SFP was the account's true owner.

Over the course of the next five months, Nguema transferred over $1 million directly from EG into Berger's client trust account.  Berger, in turn, transferred these funds into Unlimited Horizon's Citibank account.  In an email dated on or about December 7, 2007, Berger confirmed with Nguema, "I know that all payments [from the Citibank account] must be approved by you . . . I understand the importance of the principle.  This e-mail will reconfirm that I will only pay bills approved by you."  On or about May 20, 2008, after uncovering Nguema's association with Unlimited Horizon and this account, Citibank closed Unlimited Horizon's account.

Additional information responsive to this Interrogatory and the Government's allegations of domestic bank fraud may be ascertained from the COMPLAINT, as well as documents that have or will be produced by the Government, including DOJ_0000212-217; DOJ_0000227-236; DOJ_0000252-257; DOJ_0000258-260; DOJ_0000261-264; DOJ_0000285-288; DOJ_0000289-296; SENATE-PSI-000070636-70717; SENATE-PSI-000072041-73108; SENATE-PSI-73109-100926; SENATE-PSI-0000100927-100999; DOJ_0000101000-101513; SENATE-PSI-0000101514-107289; SENATE-PSI-SENATE-PSI-110261-110308; SENATE-PSI-0000120246-249; SENATE-PSI-000120250-120265; SENATE-PSI-120374-122836; SENATE-PSI-124429-126128.

**Proceeds of Bank Fraud Used for Maintenance and Upkeep of the Sweetwater Property**:  The funds deposited and funneled through Nguema's fraudulently opened bank accounts were used to, among other things, pay for the maintenance and upkeep of the defendant Sweetwater Property.  In disbursing funds from these fraudulently opened bank accounts, Nguema specifically ordered and/or approved the disbursal of funds to various vendors and payees relating to the maintenance

and upkeep of the Sweetwater Property.  Indeed, Berger was not permitted to disburse any funds belonging to Nguema in these accounts unless he first received a check approval form that was signed personally by Nguema.

Nguema used the funds in his Unlimited Horizon account at UBOC to support, maintain and enhance the Sweetwater  Property, including, among other things, paying in or around $54,000 per month for home security services; $10,000 per month in electricity bills; $8,000 per month in phone bills; $73,649.95 in property taxes; $6,875 for the installation of a sauna; more than $10,000 for home theater equipment; more than $4,000 for home insurance; more than $12,000 in landscaping fees; more than $36,000 in tree care-related fees; and more than $30,000 per month in payroll for his household staff, including estate managers, maintenance crews, and housekeepers.

Similarly, Nguema's fraudulently opened Citibank account held in the name of Unlimited Horizon was also used for the maintenance and upkeep of the Sweetwater Property.  Specifically, these funds were used to pay for expenses, including, among other things, approximately $54,000 per month on the home's security detail, over $9,000 per month on the power bill to Southern California Edison, over $5,000 per month on the home's water bill to Los Angeles County Waterworks, $37,000 on landscaping costs, $3,773 on maintenance for the home's fish tank, $24,700 on outdoor landscape lighting, $7,577 for the "Fish Physician" in connection with the home's Koi pond, $9,600 on audio-video equipment, $1,304 for swimming pool maintenance, and thousands of dollars for home furniture and decorations.

Additional information responsive to this Interrogatory may be ascertained from the COMPLAINT, as well as documents that have or will be produced by the Government, including DOJ_0000212-217; DOJ_0000227-236; DOJ_0000252-

257; DOJ_0000258-260; DOJ_0000261-264; DOJ_0000285-288; DOJ_0000289-296; DOJ_0000470-476; SENATE-PSI-000070636-70717; SENATE-PSI-000072041-73108; SENATE-PSI-73109-100926; SENATE-PSI-0000100927-100999; DOJ_0000101000-101513; SENATE-PSI-0000101514-107289; SENATE-PSI-SENATE-PSI-110261-110308; SENATE-PSI-0000120246-249; SENATE-PSI-0000250-120265; SENATE-PSI-120374-122836; SENATE-PSI-124429-126128.

## XIV.
## EVIDENCE OF
## CURRENCY REPORTING VIOLATIONS

Several former employees of Nguema reported that Nguema and/or his employees carried a bag "stuffed with stacks of fresh $100 bills" when he travelled in and out of the United States.  A confidential source (CS 1), who was a former employee of Nguema in California, reported that two EG nationals employed by Nguema—Emmanuel Asamoah and Charles Annan—were responsible for carrying a Louis Vitton briefcase.  This brief case, according to CS 1, is  brought into the United States with Nguema and is filled with approximately $500,000 to pay for Nguema's bills and personal expenses.  Another confidential source (CS 2), who was also a former employee of Nguema in California, recalled that two EG nationals Joseph Otbo and Moses Hilorsi were responsible for carrying a suitcase for Nguema that contained approximately $1 million in cash.  Nguema does not report this currency when he enters the United States, as is required by 31 U.S.C. § 5316.  Additional information relating to Nguema's transportation of bulk cash into and out of the United States is available in documents produced by the Government, including but not limited to DOJ_0000178-182; DOJ_0000183-188; DOJ_0000842-863.

Exhibit 2 Page 134

## XV.
## EG GOVERNMENT IS INTERNATIONALLY RECOGNIZED AS A KLEPTOCRACY, BENEFITTING NGUEMA'S FAMILY AND ASSOCIATES

As described in the COMPLAINT, EG's Government, President Obiang's Inner Circle and Nguema in particular have been criticized widely by the United States and foreign governments, multilateral organizations, independent non-governmental organizations (NGOs), and the international media as being among the most corrupt and repressive governments in the world.

**United States Government Officials and Reports Identify Nguema as Part of an EG Government Marked by Widespread, Senior-Level Corruption**

Between 1998 and 2011, the United States Department of State has published official reports repeatedly identifying senior-level public corruption as pervasive within President Obiang's administration.  In a United States Embassy cable drafted by Anton Smith in 2009, Smith confirmed that most EG cabinet ministers:

> continue to moonlight and conduct businesses that often conflate their public and private interests. . . The custom of simultaneously maintaining both official and private activities that became entrenched in the era of skinny cows has not been altered for the fat ones.  There is public grumbling but little internal pressure to change the rules. Nonetheless, occasionally lines do get crossed.

In that report, Smith specifically identified Nguema and his mother Constancia Obiang as direct beneficiaries of this type of corruption.

U.S. Ambassadors and officials who have lived in and worked in EG also report that corruption within Nguema's father's government benefits senior public officials, like Nguema.  Former United States ambassadors to EG recall that public corruption is widespread within President Obiang's government and that it

125

Exhibit 2 Page 135

frequently utilizes torture and other instruments of political repression to maintain political dominance in EG.  Frank Ruddy, a former United States ambassador to EG during the Reagan administration, told the <u>Los Angeles Times</u> that, "[President] Obiang is a thief and he heads a government of thieves."  In addition to serving as ambassador to EG, Ruddy served formerly as general counsel of the United States Department of Energy and an assistant administrator of the United States Agency for International Development.  Similarly, Ambassador Bennett described Equatorial Guinea as "the world's finest example of a country privatized by a kleptomaniac without a scintilla of social consciousness."  Ambassador Bennett, who served as ambassador to EG between 1991 and 1994, was a career foreign service officer, who served formerly as a senior official at United States diplomatic missions in Mexico, Nigeria, Germany and Spain.

The State Department's annual human rights reports on EG, which are published by the Bureau of Democracy, Human Rights and Labor online at http://www.state.gov/j/drl/rls/hrrpt, has commented repeatedly that public corruption, as well as the use of torture, is widespread within the EG Government. For instance, in 2006, the same year that Nguema acquired the $30 million Sweetwater Property, the State Department concluded that "All branches of government [in EG] are dominated by President [Obiang] and his inner circle" and that "[o]fficial corruption in all branches of the government remained a serious problem."  In 2008, the State Department described how anti-corruption laws were not enforced in EG against public officials and that "[EG] officials frequently engaged in corrupt practices with impunity."  In 2009, the State Department confirmed that "[President Obiang] and members of his inner circle continued to amass huge personal profits from the oil windfall" and that EG public officials continued to "frequently engage[] in corrupt practices with impunity."

**Nguema and His Family Are the Subject of Multiple Criminal Investigations for Corruption in Europe**

Nguema and his family members were the subject of criminal corruption and money laundering investigations in France, Spain and Italy.  Nguema's conduct and the source of his wealth are directly implicated in the French and Italian investigations.  All three criminal investigations commenced between 2007 and 2008, within one or two years of Nguema's acquisition of the Sweetwater Property.  All three investigations remained open as of April 28, 2011.

**France**

In March 2007, three French NGOs—Sherpa, Serpie, and the Federation of the Congolese Diaspora—filed a complaint with French prosecutors, alleging that Nguema's family acquired substantial assets with stolen public monies.  On July 9, 2008, Transparency International France, a French NGO, filed a complaint with French prosecutors requesting that they investigate whether Nguema's family used stolen public monies from EG to acquire assets in France.

Judges Roger Le Loire and Rene Grouman were then appointed to investigate these allegations.  In 2009, the French media reported that Judges Le Loire and Grouman had identified and were investigating Nguema's acquisition of several assets in France, including his luxury residence on Avenue Foch in Paris and several valuable automobiles worth a total of $6.2 million.  France's anti-money laundering agency, Tracfin, concluded, according to a report by Global Witness, a U.K. NGO, that the funds used by Nguema to acquire these automobiles, including two Bugatti luxury vehicles, were "likely to be the laundered proceeds of misappropriated public funds."  United States law enforcement authorities met with the French Judicial Police in September 2007 to discuss the French investigation.  Since that time, United States law enforcement

127

Exhibit 2 Page 137

authorities have continued to have communications with French law enforcement authorities regarding their investigation, including on March 19, 2011, when an ICE representative met with the head of the French National Police's money laundering unit.  France's criminal investigation of Nguema remains active.

### Spain

In December 2008, Asociacion Pro Derechos Humanos de Espana (APDHE), a Spanish human rights NGO, filed a complaint with anti-corruption prosecutors in Spain.  The complaint alleges that EG's Inner Circle diverted and misappropriated public funds from the EG Government to acquire personal assets in Spain.  According to this complaint, Nguema's family illegally embezzled approximately $26 million from an EG state agency to acquire and maintain substantial real estate holdings in Spain.  These funds were purportedly laundered through various American and Spanish banks.  Additionally, according to APDHE, Nguema's family abused their political power within EG to (i) obtain direct equity holdings in the enterprises of foreign companies for little or no consideration; (ii) rig public procurement, construction, and licensing contracts tainted by conflicts of interest; (iii) receive off-the-books secret contributions from foreign companies for scholarships and educational purposes; (iv) benefit companies that they own in providing goods and services to companies active in EG's hydrocarbon extraction activities; and (v) divert directly millions of dollars from EG Government accounts into their private accounts through the use of offshore shell corporations.   As a result of this complaint, Spanish prosecutors opened a criminal investigation into APDHE's allegations against Nguema's family.  This criminal investigation of Nguema's family remains active.

128

Exhibit 2 Page 138

## Recognition of Severe Official Corruption in EG Government by Multilateral Public Organizations

Multilateral public organizations, including the World Bank, whose personnel are posted in EG, and the African Development Bank, have also noted that official corruption is a serious problem within the EG Government. For instance, when the World Bank Institute graded corruption on a scale of 0.0 (being the most severe) to 1.0 (being the least corrupt), the World Bank noted that several organizations ranked EG as being amongst the most corrupt states in the world. The Economist Intelligence Unit, for instance, gave EG zero points on the World Bank's corruption scale for the years 1996, 1998, 2000, and 2002 through 2011. The African Development Bank gave EG 0.2 points for the years 2005 through 2010. The International Fund for Agricultural Development gave EG 0.2 points for 2004 and 0.4 points for 2010 and 2011. The World Meteorological Organization gave EG 0.13 points for the years 1996, 1998, 2000, 2002, 2003 and 2005; 0.21 points for 2004; and 0.25 points for the years 2006 through 2011.

Similarly, the United Nations Special Rapporteur on the Right to Freedom of Opinion and Expression reported to the General Assembly in 2009 that "[t]he scourge of corruption and the overwhelming lack of morality affecting [public] officials" in EG impacted negatively the civil and political liberties of the EG people.

## Independent NGOs Have Investigated and Confirmed Senior-Level Corruption in EG Government

Independent NGOs that have investigated public finance in EG have universally concluded that public corruption is widespread within EG's Government. Transparency International (TI), an international NGO focusing specifically on corruption, ranked EG as the eighth most corrupt country in the

129

Exhibit 2 Page 139

world.  Several other independent NGOs have also investigated and concluded that public corruption is both widespread and pervasive amongst EG's Inner Circle, including Nguema.

- Human Rights Watch in 2009 explained that, "Perhaps the most brazen and troubling examples of corruption [in EG] are repeated instances involving the president's eldest son, [Nguema], whose globetrotting and extravagant lifestyle is filled with purchases of multimillion-dollar houses and exotic sports cars throughout the world."

- Global Witness reported in 2009 that "When it comes to profligate public consumption by the Obiang clan, [Nguema] . . . is Exhibit A."

- The Open Society Institute in 2010 concluded that, "By controlling [EG's] political, economic, and legal systems—and using that control to enrich themselves—the Nguema/Mongomo group has created a nearly perfect kleptocracy [in EG].  Rarely have so few stolen so much so brazenly."

- The International Bar Association in 2003 noted that "serious concerns were raised to [their delegation to EG] about the levels of corruption which is seemingly endemic in all sectors of [EG] society [] particularly with respect to the money from oil revenues."

- Freedom House confirmed that "Equatorial Guinea is considered one of the most corrupt countries in the world and [President] Obiang and members of his inner circle continue to amass huge personal profits from the country's oil windfall."

Additional information responsive to this Interrogatory relating to EG's international reputation for corruption may be ascertained from the COMPLAINT

130

Exhibit 2 Page 140

as well as documents that have or will be produced by the Government, including DOJ_0000209-211; DOJ_0000273-277; DOJ_0000303-308; DOJ_0000315-321; DOJ_0000394-398; DOJ_0000399-402; DOJ_0000413-416; DOJ_0000417-421; DOJ_0000422-425; DOJ_0000426-430; DOJ_0000431-434; DOJ_0000440-442; DOJ_0000447-449; DOJ_0000450-453; DOJ_490-520; DOJ_521-556; DOJ_000584-592; DOJ_644-650; DOJ_688-718; DOJ_719-729; DOJ_790-808; DOJ_817-828; DOJ_0000838-863; DOJ_0000890-893; DOJ_915-918; DOJ_0000919-925; DOJ_0000946-950; DOJ_952-959; DOJ_0000967-974; DOJ_0001049-1080; DOJ_00001238-1283; DOJ_00001332-1440; DOJ_0001441-1460; DOJ_00001472-1496; DOJ_3853-3913; SENATE-PSI-117457-118644; and United States Department of State Annual Human Rights Reports located online at online at http://www.state.gov/j/drl/rls/hrrpt.

XVI.

**NGUEMA AND HIS FAMILY USE THE
THREAT OF VIOLENCE TO DOMINATE
EG AND ITS GOVERNMENT**

Nguema's father, President Obiang, as described in the COMPLAINT, exercises plenary control of EG's political and economic infrastructure.  The State Department's 2006 human rights report explained that, "All branches of government are dominated by [President Obiang] and his inner circle, mostly of the Fang ethnic group."  Ambassador Bennett recalled that individuals who oppose President Obiang are expelled from EG and that President Obiang's administration routinely uses torture as an instrument of political and economic control.  Criticism of President Obiang or his family is viewed by the EG Government as an "attack[] against the nation."  In an interview with CBS News, Ambassador Bennett graphically described the systemic use of torture by Nguema's family to maintain control of the Government.

Exhibit 2 Page 141

In 2006, the EG Government, according to the State Department, reportedly hired assassins in foreign states, including Spain, to intimidate, threaten, and even murder EG citizens in exile.  For instance, the brother of German Pedro Tomo, an exiled EG activist in Spain, was reportedly targeted for assassination.  Instead of killing Tomo, however, the assassins shot Tomo's brother.  These assassins were ultimately arrested and detained by Spanish law enforcement authorities for attempted murder.  Similarly, the EG Government arrested and tortured individuals who opposed President Obiang, including seventy civilian and military officials, who were accused of attempting a coup.  The State Department reported that their military trial was held in "secret" and all but two defendants claimed that they were tortured while in detention.  Some of these defendants even bore "visible marks" of torture; another defendant had to be carried in and out of his trial because he was no longer able to walk; and a female defendant "suffered from vaginal bleeding as a result of torture."

Additional information responsive to this Interrogatory relating to the Inner Circle's political and economic dominance of EG may be ascertained from the COMPLAINT as well as documents that have or will be produced by the Government, including DOJ_000062-94; DOJ_0000297-302; DOJ_0000370-373; DOJ_0000394-398; DOJ_0000399-402; DOJ_651-653; DOJ_0000688-718; DOJ_883-889; DOJ_0000946-950; DOJ_1172-1238; DOJ_1332-1440; DOJ_1530-1535; and United States Department of State Annual Human Rights Reports located online at online at http://www.state.gov/j/drl/rls/hrrpt.

## XVII.
## INNER CIRCLE'S CORRUPT USE OF
## RIGGS NATIONAL BANK IN WASHINGTON, D.C.

Between 1995 and 2004, the EG Government and Nguema's family, including Nguema, maintained personal bank accounts at Riggs National Bank

(Riggs) in Washington, D.C.  The EG Government directed that foreign oil companies make their payments into an account at Riggs.  This account was held in the name of the Republic of Equatorial Guinea General Treasury and was commonly referred to as the "Oil Account."   By 2003, Riggs' EG portfolio had become the largest single customer-relationship for the bank with balances and outstanding loans that together approached $700 million.  The signatories on this account were President Obiang, Gabriel Obiang Lima (Nguema's brother) and Melchor Adjo (Nguema's cousin).

In 2004, the United States Senate's Permanent Subcommittee on Investigations (PSI) published its report on "Money Laundering and Foreign Corruption:  Enforcement and Effectiveness of the Patriot Act."  In that report, the PSI staff concluded that Riggs "turned a blind eye to evidence [,] suggesting the bank was handling the proceeds of foreign corruption."

Riggs Bank records show that President Obiang transferred $35 million from the Oil Account to two companies that appeared to be associated with him— Kalunga and Apexside Trading Ltd.  When Riggs officials sought to obtain more information about these entities from Nguema's father and cousin, they refused to provide additional details.  As a result, Riggs elected to close the EG accounts on February 23, 2004.  (PSI 2004).

In addition to the Oil Account, Nguema's father opened an account at Riggs in the name of Otong, S.A. in 1999.  Between 1999 and 2002, large amounts of bulk cash were deposited into this account.  Specifically:  (1) $1 million in cash was deposited on April 20, 2000; (2) $1 million in cash was deposited on March 8, 2001; (3) $1.5 million in cash was deposited on March 20, 2001; (4) $2 million in cash was deposited on September 5, 2001; (5) $3 million in cash was deposited on September 17, 2001; and (6) $3 million in cash was deposited on April 12, 2002.

This cash, according to the PSI staff, was wrapped in plastic and transported in suitcases by Simon Kareri, a senior vice president of Riggs' Embassy Banking Division.

Kareri was placed in charge of Riggs' relationship with EG and Nguema's family.  In 2001 or 2002, Kareri recalls that Riggs instructed him to focus his work on developing that bank's relationship with EG.  Kareri provided economic and financial advice to EG public officials; found schools for their children; identified American physicians for their medical care; and accompanied individuals, including Nguema's mother, on shopping trips to Nieman Marcus in the Washington, D.C. area.

Nguema's mother Constancia Obiang also maintained an account at Riggs. Between 2000 and 2002, $1.4 million in cash was deposited into her account.

Additional information responsive to this Interrogatory relating to the relationship between Riggs and the Inner Circle, including Nguema,  may be ascertained from the COMPLAINT as well as documents that have or will be produced by the Government, including SENATE-PSI-122837-124428; DOJ_00001-113; DOJ_0000167-173.

## XVIII.
## PAYMENTS BY OIL COMPANIES TO PRESIDENT OBIANG'S INNER CIRCLE

American oil companies had frequent contact with members of President Obiang's Inner Circle.  According to Kareri, several payments were made by American oil companies to the Inner Circle, which he considered suspicious, including:

- In approximately 1998 or 1999, Mobil Oil provided a check to Nguema's mother Constancia Obiang for approximately $200,000 or $250,000 with the caption "business development."

- In or around 2003, Marathon Oil paid Teodoro Byogo Nsue, Nguema's uncle and EG's ambassador to the United States, in or around $12,000 per month.  These payments were off-the-book payments not documented in EG's public records and books.

- Marathon Oil also made payments to Nguema's aunt, who served as EG's ambassador to Spain.

- Exxon Mobil provided free shipping services for EG public officials to ship merchandise, including automobiles, from the United States to EG.

- After Exxon and Mobil merged, that company's executives met with President Obiang at the Willard Hotel in Washington, D.C.  The executives provided and left a briefcase full of money with President Obiang.

- On one occasion, Mobil Oil contacted Kareri to distribute cash payments to a visiting delegation of EG officials.  The range of payments made by Kareri to these EG public officials were between $1,500 and $5,500 per member.

- American oil companies paid senior EG officials for "consulting" fees.  Kareri characterized these payments as "suspicious" and felt that these officials may have tried to conceal these payments by depositing the money in banks other than Riggs.

- CMS/Triton, an American oil company, paid Juan Olo Mba Nseng, EG's then Minister of Mining and Hydrocarbons, $5,000 per month.

- American oil companies paid visiting EG delegations a generous per diem.  In Kareri's view, the per diem rates were "excessive" in nature.

135

Exhibit 2 Page 145

- CMS/Triton and Marathon Oil made cash payments to Constancia Obiang's relatives who were students in the United States. The company also helped these students secure housing in "fancy apartments."

As explained above, Nguema was also a direct beneficiary of payments made by oil companies to Nguema and his family.

Additional information responsive to this Interrogatory relating to the relationship between the Inner Circle and American oil companies may be ascertained from the COMPLAINT as well as documents that have or will be produced by the Government, including DOJ_000038-94.

## INTERROGATORY NO. 6

For each DEFENDANT ASSET, state all facts that YOU became aware of after April 28, 2011, that support YOUR contention, if YOU so contend, that each of the DEFENDANT ASSETS is either (a) property involved in a MONEY LAUNDERING TRANSACTION or an attempted MONEY LAUNDERING TRANSACTION, or [is] property traceable to such assets; (b) property derived from, or traceable, to proceeds obtained, directly or indirectly from an offense against a foreign nation; or (c) property constituting or derived from proceeds traceable to an offense constituting a specified unlawful activity.

## RESPONSE TO INTERROGATORY NO. 6

The United States objects to this Interrogatory as it is overly broad and unduly burdensome, as it seeks information obtained by the Government after the filing of the COMPLAINT and is not limited by temporal scope. The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they purport to impose obligations on the Government beyond the scope of the Discovery Order. On September 6, 2012, the Court authorized Claimants to propound limited discovery on the probable cause the United States had when it filed the instant forfeiture

action.  As such, to the extent that this Interrogatory seeks information beyond the scope of the Discovery Order, the Government objects and will not produce such information, as it is neither relevant nor reasonably calculated to discover evidence that the Government had for purposes of probable cause when it filed the present action.  The United States does, however, expressly reserve the right to supplement, clarify, revise, or correct any or all of the Responses and Objections (General and Specific) herein consistent with Fed. R. Civ. P. 26(e), and to assert additional objections or privileges, in one or more subsequent supplemental response(s).

The United States further objects to this Interrogatory to the extent it calls for a narrative.   See, e.g., Wilcox v. Changala, 2012 U.S. Dist. LEXIS 5471, at *6-7 (E. D. Wash. Jan. 18, 2012) (contention interrogatories that "ask the responding party to identify each and every supporting fact about a particular allegation are an abuse of the discovery process").  The United States further objects to this Interrogatory on the grounds that it calls for the disclosure of information subject to the attorney-client privilege, the work product doctrine or the informant's privilege.  The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they seek information outside the possession, custody or control of DOJ and ICE.   The United States further objects to this Interrogatory as it is overly broad and unduly burdensome, as the definition of "YOUR" includes foreign sovereign governments and entities other than DOJ and ICE.

The United States also objects to this Interrogatory on the ground that it is compound and contains impermissible discrete subparts, which relate to distinct matters and therefore constitutes multiple interrogatories.  To the extent that that this request seeks information relating to the recruitment or handling of

Exhibit 2 Page 147

confidential informants by a federal law enforcement agency, the United States objects to the request and will not produce that information.  See, e.g., Roviaro v. United States, 353 U.S. 53 (1957).

Subject to and without waiving the foregoing general and specific objections, the United States will respond to this Interrogatory consistent with the Joint Stipulation filed by the parties on October 18, 2012, and granted by the Court on October 19, 2012.

## INTERROGATORY NO. 7

If YOU have obtained information from a foreign government or representative, agency or component thereof concerning (a) the allegations in the COMPLAINT, (b) the DEFENDANT ASSETS YOU seek to forfeit, or (c) any other facts that support YOUR forfeiture action, state the specific information obtained and when such information was received.

## RESPONSE TO INTERROGATORY NO. 7

The United States objects to this Interrogatory as it is overly broad and unduly burdensome, as it seeks information obtained by the Government after the filing of the COMPLAINT and is not limited by temporal scope.  The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they purport to impose obligations on the Government beyond the scope of the Discovery Order.  On September 6, 2012, the Court authorized Claimants to propound limited discovery on the probable cause the United States had when it filed the instant forfeiture action.  As such, to the extent that this Interrogatory seeks information beyond the scope of the Discovery Order, the Government objects and will not produce such information, as it is neither relevant nor reasonably calculated to discover evidence

that the Government had for purposes of probable cause when it filed the present action.  The United States does, however, expressly reserve the right to supplement, clarify, revise, or correct any or all of the Responses and Objections (General and Specific) herein consistent with Fed. R. Civ. P. 26(e), and to assert additional objections or privileges, in one or more subsequent supplemental response(s).

    The United States further objects to this Interrogatory on the grounds that it calls for the disclosure of information subject to the attorney-client privilege, the work product doctrine or the informant's privilege.  The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they seek information outside the possession, custody or control of DOJ and ICE.  The United States further objects to this Interrogatory as it is overly broad and unduly burdensome, as the definition of "YOUR" includes foreign sovereign governments and entities other than DOJ and ICE.  The United States further objects to this Interrogatory as vague and ambiguous, especially with respect to its use of the words "concerning" and "component."

    The United States also objects to this Interrogatory on the ground that it is compound and contains impermissible discrete subparts, which relate to distinct matters and therefore constitutes multiple interrogatories.  To the extent that that this request seeks information relating to the recruitment or handling of confidential informants by a federal law enforcement agency, the United States objects to the request and will not produce that information.  See, e.g., Roviaro v. United States, 353 U.S. 53 (1957).

    Subject to and without waiving the foregoing general and specific objections, the United States responds as follows:

The United States received information from foreign governments, including France, Italy, South Africa and the United Kingdom, relating to Nguema prior to April 28, 2011.

**France**

In March 2007, three French NGOs—Sherpa, Serpie, and the Federation of the Congolese Diaspora—filed a complaint with French prosecutors, alleging that Nguema's family acquired substantial assets with stolen public monies.  On July 9, 2008, Transparency International France, a French NGO, filed a complaint with French prosecutors requesting that they investigate whether Nguema's family used stolen public monies from EG to acquire assets in France.

Judges Roger Le Loire and Rene Grouman were then appointed to investigate these allegations.  In 2009, the French media reported that Judges Le Loire and Grouman had identified and were investigating Nguema's acquisition of several assets in France, including his luxury residence on Avenue Foch in Paris and several valuable automobiles worth a total of $6.2 million.  France's anti-money laundering agency, Tracfin, concluded, according to a report by Global Witness, a U.K. NGO, that the funds used by Nguema to acquire these automobiles, including two Bugatti luxury vehicles, were "likely to be the laundered proceeds of misappropriated public funds."  United States law enforcement authorities met with the French Judicial Police in September 2007 to discuss the French investigation.  Since that time, United States law enforcement authorities have continued to have communications with French law enforcement authorities regarding their investigation, including on March 19, 2011, when an ICE representative met with the head of the French National Police's money laundering unit.  France's criminal investigation of Nguema remains active.

Exhibit 2 Page 150

## **Italy**

General Work is a major construction company in EG specializing in large-scale government infrastructure projects.  Italian law enforcement authorities, including officers of the Guardia di Finanzia (GdF), Italy's financial police, reported that they believed that between 2000 and 2007 Nguema stole EG public funds by funneling government revenue through General Work.  General Work was originally formed by two Italian nationals Giulio Cistaro and Giuseppe Vona in 2001 and managed by Vona, Andrew Mannarino and Igor Celotti.  Because of Celotti's close relationship to President Obiang, General Work was awarded major government infrastructure contracts in EG beginning in the early 2000s.  By 2011, General Work had become one of the largest construction companies in EG.  The GdF believed that 45 percent of the revenue earned by General Work in EG was funneled as kickbacks to Nguema.  During this same time period, Nguema acquired the defendant Sweetwater Property, sent hundreds of thousands of dollars from EG into the United States to fraudulently opened bank accounts for the maintenance and upkeep of this property, and made tens of millions of dollars of lavish expenditures and purchases.

The Judicial Police Squad at the Procure in Udine, Italy identified a network of bank accounts in Italy, Austria, Spain, Monte Carlo and Luxembourg controlled by Nguema and his father.  The GdF explained that they believed that these accounts were derived from monies embezzled from the EG Government by Nguema and President Obiang through infrastructure contracts awarded to General Work by President Obiang.

In 2007, Celotti was killed in an airplane crash near Mongomo, a city on EG's mainland.  The GdF believed that the circumstances surrounding this crash were suspicious.  One month prior to his death, Celotti transferred his corporate

holdings, including 45 percent of General Work's equity, to his wife Anna Maria Moro.  After Celotti's death, Gimmy Ricci, another Italian businessman, was appointed as General Work's new general manager.  In addition to acquiring managerial control of General Work, Ricci worked with Moro to form several additional legal entities and companies to serve as receptacles for General Work's ill-gotten revenue.  The remaining equity in General Work was acquired by Nguema's family.  According to the GdF, Nguema's family provided no compensation to other shareholders in exchange for their shares.

After Celotti's death in 2007, the GdF conducted an extensive investigation into General Work and Celotti's financial affairs.  In connection with this investigation, the GdF interviewed former employees and associates of General Work, including Cistaro and Vona.  In addition, they performed a search of Moro's residence in the Friuli region of Italy.  Cistaro and Vona informed the GdF that Nguema's family fraudulently assumed control of General Work.  Based upon their investigation, including an analysis of financial and banking records obtained by the Gdf from Moro, Italian law enforcement authorities concluded that Nguema and his father jointly owned and controlled a network of international bank accounts that contained stolen government monies misappropriated from EG's treasury through General Work's government construction contracts.

**United Kingdom**

On or about March 12, 2009, the City of London Police Economic Crimes Division informed the United States that Nguema was attempting to open a bank account in the United Kingdom.  The bank account, according to the City of London Police, was to receive and hold $350 million.  These funds were expected to be transferred from an account in Spain, that was opened by a third-party

nominee of Nguema.  The City of London Police also reported that these funds were purportedly obtained through illegal means.

### South Africa

In South Africa, George Ehlers, a South African businessman, filed a lawsuit in the Cape Town High Court against the EG Government.  In that litigation which was filed in or around July 2005, less than one year prior to Nguema's acquisition of the Sweetwater Property, Ehlers alleged that the EG Government was in breach of a $7.8 million government infrastructure contract with his company, Engineering Design and Construction Company.  After the EG Government seized some of his company's assets in EG and refused to pay his company for its services, Ehlers filed a lawsuit seeking to attach two homes valued at $7 million owned by Nguema in South Africa.  The two homes were located at Erf 477 Clifton Ridge and Erf 303 Constantia in Cape Town.  The funds used to purchase these properties were wired into South Africa in 2004 from an account at CCEI Bank in EG held in the name of Socage, an EG company owned by Nguema.

Ehlers alleged that because Nguema could not have afforded to purchase these assets on his income as an EG public official, Nguema must have used funds misappropriated from the EG Government to acquire and renovate these properties.  Indeed, even the contractors hired to renovate the property believed that these assets were owned by the EG Government.  In support of his lawsuit, Ehlers filed an affidavit executed by Patricia Fuller.  Fuller recalled that she spoke with Peter McNamara, a contractor hired to renovate Nguema's property in Constantia.  McNamara, according to Fuller, advised her that he had never heard of Nguema and that he was communicating with the EG Government about how to renovate the property.  Furthermore, McNamara claimed that he was under the impression that the property belonged to the EG Government.  McNamara submitted an

invoice for in or around R 3,144,524 (approximately $359,532) to Jacques Levy, an interior decorator in Switzerland, for his services relating to Nguema's house in Constantia.  As McNamara had no knowledge of Nguema, and was receiving his instructions from the EG Government regarding the home's renovations, Ehlers alleged that the funds used to acquire and renovate these properties were misappropriated from the EG Government.  Although Ehlers prevailed against Nguema before the trial court, an appellate court reversed that decision on other grounds.

Additional information responsive to this Interrogatory may be ascertained from DOJ_0000303-314; DOJ_0000315-321; DOJ_0000413-416; DOJ_0000417-421; DOJ_0000422-425; DOJ_0000426-430; DOJ_0000431-434; DOJ_0000454-456; DOJ_0000457-461; DOJ_0000462-463; DOJ_0000440-442; DOJ_0000443-446; DOJ_0000447-449; DOJ_0000450-53; DOJ_0000454-0000463; DOJ_0000464-469; DOJ_00001652-00001904; DOJ_3853-3913.

**INTERROGATORY NO. 8**

IDENTIFY each and every witness, informant, and other PERSON whom YOU have interviewed or whose statements YOU have relied on that REFER OR RELATE TO YOUR contention that the DEFENDANT ASSETS are subject to forfeiture, or that CLAIMANT has engaged in conduct that constitutes a specified unlawful activity, and state when YOU first interviewed or obtained the statement of such PERSON and by whom.

**RESPONSE TO INTERROGATORY NO. 8**

The United States objects to this Interrogatory as it is overly broad and unduly burdensome, as it seeks information obtained by the Government after the filing of the COMPLAINT and is not limited by temporal scope.  The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they purport to impose

obligations on the Government beyond the scope of the Discovery Order.  On September 6, 2012, the Court authorized Claimants to propound limited discovery on the probable cause the United States had when it filed the instant forfeiture action.  As such, to the extent that this Interrogatory seeks information beyond the scope of the Discovery Order, the Government objects and will not produce such information, as it is neither relevant nor reasonably calculated to discover evidence that the Government had for purposes of probable cause when it filed the present action.  The United States does, however, expressly reserve the right to supplement, clarify, revise, or correct any or all of the Responses and Objections (General and Specific) herein consistent with Fed. R. Civ. P. 26(e), and to assert additional objections or privileges, in one or more subsequent supplemental response(s).

The United States further objects to this Interrogatory on the grounds that it calls for the disclosure of information subject to the attorney-client privilege, the work product doctrine or the informant's privilege.  The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they seek information outside the possession, custody or control of DOJ and ICE.  The United States further objects to this Interrogatory as it is overly broad and unduly burdensome, as the definition of "YOUR" includes foreign sovereign governments and entities other than DOJ and ICE.

The United States also objects to this Interrogatory on the ground that it is compound and contains impermissible discrete subparts, which relate to distinct matters and therefore constitutes multiple interrogatories.  The United States further objects to this Interrogatory on the ground that, when combined with the preceding Interrogatories, this Interrogatory violates the 25 interrogatory limit set

forth in Fed. R. Civ. P. 33(a)(1).  Because the Government has already responded to 25 interrogatories, it is not required to respond to this Interrogatory.  See Capaccione v. Charlotte-Mecklenburg Schools, 182 F.R.D. 486, 496, n. 4 (W.D.N.C. 1998).

To the extent that that this request seeks information relating to the recruitment or handling of confidential informants by a federal law enforcement agency, the United States objects to the request and will not produce that information.  See, e.g., Roviaro v. United States, 353 U.S. 53 (1957).

Subject to and without waiving the foregoing general and specific objections, the United States hereby refers Claimants pursuant to Fed. R. Civ. Proc. 33(d) to documents that the United States has and will produce, including but not limited to DOJ_00001-0000489.

**INTERROGATORY NO. 9**

For each and every witness, informant, and other PERSON YOU have identified in response to Interrogatory No. 8, IDENTIFY any and all efforts YOU have made to corroborate the statements of such witness, informant or PERSON or confirmed their reliability and when and how such corroboration or confirmation, if any, was secured, if at all.

**RESPONSE TO INTERROGATORY NO. 9**

The United States objects to this Interrogatory as it is overly broad and unduly burdensome, as it seeks information obtained by the Government after the filing of the COMPLAINT and is not limited by temporal scope.  The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they purport to impose obligations on the Government beyond the scope of the Discovery Order.  On September 6, 2012, the Court authorized Claimants to propound limited discovery

146

Exhibit 2 Page 156

on the probable cause the United States had when it filed the instant forfeiture action.  As such, to the extent that this Interrogatory seeks information beyond the scope of the Discovery Order, the Government objects and will not produce such information, as it is neither relevant nor reasonably calculated to discover evidence that the Government had for purposes of probable cause when it filed the present action.  The United States does, however, expressly reserve the right to supplement, clarify, revise, or correct any or all of the Responses and Objections (General and Specific) herein consistent with Fed. R. Civ. P. 26(e), and to assert additional objections or privileges, in one or more subsequent supplemental response(s).

The United States further objects to this Interrogatory on the grounds that it calls for the disclosure of information subject to the attorney-client privilege, the investigative files privilege, the work product doctrine or the informant's privilege. The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they seek information outside the possession, custody or control of DOJ and ICE.  The United States further objects to this Interrogatory as it is overly broad and unduly burdensome, as the definition of "YOUR" includes foreign sovereign governments and entities other than DOJ and ICE.

The United States also objects to this Interrogatory on the ground that it is compound and contains impermissible discrete subparts, which relate to distinct matters and therefore constitutes multiple interrogatories.  The United States further objects to this Interrogatory on the ground that, when combined with the preceding Interrogatories, this Interrogatory violates the 25 interrogatory limit set forth in Fed. R. Civ. P. 33(a)(1).  Because the Government has already responded to 25 interrogatories, it is not required to respond to this Interrogatory.  <u>See</u>

Exhibit 2 Page 157

Capaccione v. Charlotte-Mecklenburg Schools, 182 F.R.D. 486, 496, n. 4 (W.D.N.C. 1998).

To the extent that that this request seeks information relating to the recruitment or handling of confidential informants by a federal law enforcement agency, the United States objects to the request and will not produce that information.  See, e.g., Roviaro v. United States, 353 U.S. 53 (1957).

Subject to and without waiving the foregoing general and specific objections, the United States hereby refers Claimants pursuant to Fed. R. Civ. Proc. 33(d) to documents that the United States has and will produce, including but not limited to DOJ_00001-0000489.

**INTERROGATORY NO. 10**

IDENTIFY each and every act YOU contend constitutes or forms the basis for each and every alleged specified unlawful activity in the COMPLAINT, and IDENTIFY (a) the date of the alleged conduct; (b) the alleged victim of the conduct; (c) the alleged role of CLAIMANT in the conduct; and (d) the proceeds of the conduct allegedly received by CLAIMANT.

**RESPONSE TO INTERROGATORY NO. 10**

The United States objects to this Interrogatory as it is overly broad and unduly burdensome, as it seeks information obtained by the Government after the filing of the COMPLAINT and is not limited by temporal scope.  The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they purport to impose obligations on the Government beyond the scope of the Discovery Order.  On September 6, 2012, the Court authorized Claimants to propound limited discovery on the probable cause the United States had when it filed the instant forfeiture action.  As such, to the extent that this Interrogatory seeks information beyond the

scope of the Discovery Order, the Government objects and will not produce such information, as it is neither relevant nor reasonably calculated to discover evidence that the Government had for purposes of probable cause when it filed the present action. The United States does, however, expressly reserve the right to supplement, clarify, revise, or correct any or all of the Responses and Objections (General and Specific) herein consistent with Fed. R. Civ. P. 26(e), and to assert additional objections or privileges, in one or more subsequent supplemental response(s).

The United States further objects to this Interrogatory to the extent it calls for a narrative.  See, e.g., Wilcox v. Changala, 2012 U.S. Dist. LEXIS 5471, at *6-7 (E. D. Wash. Jan. 18, 2012) (contention interrogatories that "ask the responding party to identify each and every supporting fact about a particular allegation are an abuse of the discovery process").  The United States further objects to this Interrogatory on the grounds that it calls for the disclosure of information subject to the attorney-client privilege, the work product doctrine or the informant's privilege.  The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they seek information outside the possession, custody or control of DOJ and ICE.  The United States further objects to this Interrogatory as it is overly broad and unduly burdensome, as the definition of "YOUR" includes foreign sovereign governments and entities other than DOJ and ICE.

The United States also objects to this Interrogatory on the ground that it is compound and contains impermissible discrete subparts, which relate to distinct matters and therefore constitutes multiple interrogatories.  See, e.g., Sattari v. Citi Mortgage, 2010 U.S. Dist. LEXIS 125687, at *3 (D. Nev. Nov. 17, 2010) (interrogatories "should consist of a brief, simple, direct, and unambiguous

question, dealing with one point only."). The United States further objects to this Interrogatory on the ground that, when combined with the preceding Interrogatories, this Interrogatory violates the 25 interrogatory limit set forth in Fed. R. Civ. P. 33(a)(1). Because the Government has already responded to 25 interrogatories, it is not required to respond to this Interrogatory. See Capaccione v. Charlotte-Mecklenburg Schools, 182 F.R.D. 486, 496, n. 4 (W.D.N.C. 1998).

To the extent that that this request seeks information relating to the recruitment or handling of confidential informants by a federal law enforcement agency, the United States objects to the request and will not produce that information. See, e.g., Roviaro v. United States, 353 U.S. 53 (1957). The United States further objects to this Interrogatory as it is unnecessary and unduly burdensome, as it is duplicative and redundant of Interrogatory Nos. 1, 2 and 3.

Subject to and without waiving the foregoing general and specific objections, the United States responds as follows:

## I.

### NGUEMA'S MISAPPROPRIATION, THEFT AND EMBEZZLEMENT OF PUBLIC FUNDS

**Nguema's Abuse and Manipulation of Public Infrastructure Contracts to Misappropriate Public Funds**

After oil was discovered in EG during the 1990s, EG invested hundreds of millions of dollars in building public infrastructure projects. In February 2003, at the age of thirty-three, Nguema was appointed by his father to the newly-created post of EG's Minister of Infrastructure and Forests. Three years later, Nguema managed to wire more than $68 million out of EG to acquire both the defendant Sweetwater Property and a $38 million Gulfstream GV jet aircraft.

In an affidavit Nguema filed with the Cape Town High Court in South Africa on August 8, 2006, the same year that Nguema acquire the Sweetwater Property, Nguema acknowledged that he, like other EG cabinet ministers, bids on and benefits from obtaining government contracts awarded to them by his father's government.  In that affidavit, Nguema affirmed:

> Cabinet Ministers and public servants in Equatorial Guinea are by law allowed to [own] companies that, in consortium with a foreign company, can bid for government contracts and should the company be successful, then what percentage of the total cost of the contract the company gets, will depend on the terms negotiated between the parties.
> But, in any event, it means that a cabinet minister ends up with a sizeable part of the contract price in his bank account.
>     *    *    *
> One of the companies that I own is SOCIEDAD DE CARRETERAS DE GUINEA ECUATORIAL ("SOCAGE"), with a bank account at the CCEI BANK GE, in BATA, the commercial capital of [EG].

EG's infrastructure and construction industry, which Nguema was responsible for regulating when he was EG's Infrastructure Minister, is where corruption is the most pronounced, according to a report drafted by Ambassador Fernandez in 2011.  EG's corruption exists in its "murkier transactions such as sweetheart deals, influence peddling, construction contracts and finder's fees."  On March 21, 2011, Nguema met with Ambassador Fernandez and claimed that his personal wealth was attributable to infrastructure contracts awarded to his private businesses by the EG Government—the very industry that Ambassador Fernandez concluded was where corruption was most prevalent in EG, and the same industry that Nguema was in charge of regulating as Infrastructure Minister.

In 2009, Anton Smith, the United States Embassy's deputy chief of mission, noted that he was also concerned that the awarding of public infrastructure contracts in EG was particularly vulnerable to corruption.  According to Smith, "It

Exhibit 2 Page 161

is in these downstream, public expenditures that we lose visibility and in which the greatest opportunities for corruption persist.  Rumors abound of influence buying, bid rigging and kickbacks" in EG.  With respect to Nguema specifically, Smith noted that Nguema "lives the life of an international playboy and is widely accused of corruption."

Indeed, by March 2004, two years prior to Nguema's acquisition of the Sweetwater Property, Africa Confidential, a U.K. based publication focusing on Africa, reported that, "[Nguema] control[led] much of the infrastructure portfolio" funded by the EG Government's oil revenues.  Africa Confidential reported that:

> The generals who had previously run lucrative cartels in consumer imports, air and road transport, construction and cement etc. then had to secure approval from [Nguema's Infrastructure] Ministry.  He tried to block merchandise coming in for [other EG officials and businesses].  Compared by some to Iraq's late Uday Hussein, [Nguema] expanded his empire rapidly and started pressuring French, Spanish and other foreign companies.

Additional information responsive to this Interrogatory relating to Nguema's involvement in EG's construction and infrastructure sector may be ascertained from the COMPLAINT as well as documents that have or will be produced by the Government, including DOJ_0000584-592; DOJ_688-718; DOJ_0001049-1080; DOJ_1652-1904; DOJ_0000303-308; DOJ_0000315-321; DOJ_0000413-416; DOJ_0000417-421; DOJ_0000422-425; DOJ_0000426-430; DOJ_0000431-434; DOJ_0000834-837; DOJ_0000864-871; DOJ_00003853-3913; DOJ_0000946-950.

**Nguema's Corrupt Relationship with General Work.**

General Work is a major construction company in EG specializing in large-scale government infrastructure projects.  Italian law enforcement authorities, including officers of the Guardia di Finanzia (GdF), Italy's financial police,

152

Exhibit 2 Page 162

reported that they believed that between 2000 and 2007 Nguema stole EG public funds by funneling government revenue through General Work.  General Work was originally formed by two Italian nationals Giulio Cistaro and Giuseppe Vona in 2001 and managed by Vona, Andrew Mannarino and Igor Celotti.  Because of Celotti's close relationship to President Obiang, General Work was awarded major government infrastructure contracts in EG beginning in the early 2000s.  By 2011, General Work had become one of the largest construction companies in EG.  The GdF believed that 45 percent of the revenue earned by General Work in EG was funneled as kickbacks to Nguema.  During this same time period, Nguema acquired the defendant Sweetwater Property, sent hundreds of thousands of dollars from EG into the United States to fraudulently opened bank accounts for the maintenance and upkeep of this property, and made tens of millions of dollars of lavish expenditures and purchases.

The Judicial Police Squad at the Procure in Udine, Italy identified a network of bank accounts in Italy, Austria, Spain, Monte Carlo and Luxembourg controlled by Nguema and his father.  The GdF explained that they believed that these accounts were derived from monies embezzled from the EG Government by Nguema and President Obiang through infrastructure contracts awarded to General Work by President Obiang.

In 2007, Celotti was killed in an airplane crash near Mongomo, a city on EG's mainland.  The GdF believed that the circumstances surrounding this crash were suspicious.  One month prior to his death, Celotti transferred his corporate holdings, including 45 percent of General Work's equity, to his wife Anna Maria Moro.  After Celotti's death, Gimmy Ricci, another Italian businessman, was appointed as General Work's new general manager.  In addition to acquiring managerial control of General Work, Ricci worked with Moro to form several

additional legal entities and companies to serve as receptacles for General Work's ill-gotten revenue. The remaining equity in General Work was acquired by Nguema's family. According to the GdF, Nguema's family provided no compensation to other shareholders in exchange for their shares.

After Celotti's death in 2007, the GdF conducted an extensive investigation into General Work and Celotti's financial affairs. In connection with this investigation, the GdF interviewed former employees and associates of General Work, including Cistaro and Vona. In addition, they performed a search of Moro's residence in the Friuli region of Italy. Cistaro and Vona informed the GdF that Nguema's family fraudulently assumed control of General Work. Based upon their investigation, including an analysis of financial and banking records obtained by the Gdf from Moro, Italian law enforcement authorities concluded that Nguema and his father jointly owned and controlled a network of international bank accounts that contained stolen government monies misappropriated from EG's treasury through General Work's government construction contracts.

Additional information responsive to this Interrogatory relating to the relationship between Nguema and General Work may be ascertained from the COMPLAINT and documents that have or will be produced by the Government, including DOJ_0000303-308; DOJ_0000315-321; DOJ_0000413-416; DOJ_0000417-421; DOJ_0000422-425; DOJ_0000426-430; DOJ_0000431-434; DOJ_0000809-816; DOJ_00003853-3913; SENATE-PSI-86730; SENATE-PSI-93976; SENATE-PSI-94046; SENATE-PSI-96238-96240.

**Nguema's Attempt to Misappropriate $40 Million in Public Funds to Acquire a Gulfstream Jet**

In 2004, two years before Nguema acquired the defendant Sweetwater Property, Nguema contacted Gulfstream Aerospace Corporation (GAC) and

154

Exhibit 2 Page 164

expressed interest in purchasing a $40 million aircraft from GAC.  Stephen Arnold Fuller, GAC's regional vice president for Sub-Saharan Africa, recalled that Nguema informed GAC that he intended to finance the purchase of this aircraft by diverting $40 million in public funds from the EG Government through an American oil company.

Nguema told Mr. Fuller that he could and would pay for the $40 million aircraft with public funds by having an "American oil company" initially pay GAC for the aircraft.  EG would then, according to Nguema, "repay the American oil company through credits to the company's local account in EG."  In a letter dated April 20, 2004, Fuller confirmed that Nguema was proposing to purchase from GAC a Gulfstream 550 with misappropriated public funds.  Mr. Fuller stated in that letter:

> [Nguema] is suggesting that [GAC] contact the Chairman of Ocean Energy in Houston, Texas with regard to the Gulfstream 550.  There may be an advantage in assigning the Sales Agreement to Ocean Energy and having that company assume the payment obligations for the Gulfstream 550.  In return, the Government [of EG] would issue a Credit Memorandum to Ocean Energy for amounts payable in connection with oil production.

Raymond Banoun, managing partner of Cadwalader, Wickersham & Taft, LLP, a New York-based law firm, served as an attorney for GAC in connection with this transaction.  Like Mr. Fuller, Mr. Banoun recalled that in 2004, Nguema represented to GAC that he would misappropriate EG public funds by (i) having Ocean Energy, an American oil company, purchase the $40 million aircraft and "assume the payments on his behalf" and then (ii) "in return" have the "Equatorial Guinea government [] issue a credit memo to Ocean Energy for monies connected with oil production in Equatorial Guinea."

155

Exhibit 2 Page 165

Additional information responsive to this Interrogatory relating to Nguema's relationship and communications with GAC may be ascertained from the COMPLAINT as well as documents that have or will be produced by the Government, including DOJ_0000114-166; DOJ_0000388-393; SENATE-PSI-119217-120245; SENATE-PSI-120318-120347; SENATE-PSI-124429-126128.

**Accusations of Direct Diversion of EG Public Funds**

In South Africa, George Ehlers, a South African businessman, filed a lawsuit in the Cape Town High Court against the EG Government.  In that litigation which was filed in or around July 2005, less than one year prior to Nguema's acquisition of the Sweetwater Property, Ehlers alleged that the EG Government was in breach of a $7.8 million government infrastructure contract with his company, Engineering Design and Construction Company.  After the EG Government seized some of his company's assets in EG and refused to pay his company for its services, Ehlers filed a lawsuit seeking to attach two homes valued at $7 million owned by Nguema in South Africa.  The two homes were located at Erf 477 Clifton Ridge and Erf 303 Constantia in Cape Town.  The funds used to purchase these properties were wired into South Africa in 2004 from an account at CCEI Bank in EG held in the name of Socage, an EG company owned by Nguema.

Ehlers alleged that because Nguema could not have afforded to purchase these assets on his income as an EG public official, Nguema must have used funds misappropriated from the EG Government to acquire and renovate these properties. Indeed, even the contractors hired to renovate the property believed that these assets were owned by the EG Government.  In support of his lawsuit, Ehlers filed an affidavit executed by Patricia Fuller.  Fuller recalled that she spoke with Peter McNamara, a contractor hired to renovate Nguema's property in Constantia. McNamara, according to Fuller, advised her that he had never heard of Nguema

156

Exhibit 2 Page 166

and that he was communicating with the EG Government about how to renovate the property.  Furthermore, McNamara claimed that he was under the impression that the property belonged to the EG Government.  McNamara submitted an invoice for in or around R 3,144,524 (approximately $359,532) to Jacques Levy, an interior decorator in Switzerland, for his services relating to Nguema's house in Constantia.  As McNamara had no knowledge of Nguema, and was receiving his instructions from the EG Government regarding the home's renovations, Ehlers alleged that the funds used to acquire and renovate these properties were misappropriated from the EG Government.  Although Ehlers prevailed against Nguema before the trial court, an appellate court reversed that decision on other grounds.

Additional information responsive to this Interrogatory relating to Mr. Ehlers' lawsuit in South Africa may be ascertained from documents that have or will be produced by the Government, including DOJ_0000281-284; DOJ_0000464-469; DOJ_0001049-1080; DOJ_1652-1904; DOJ_0000890-893.

## II.

## EXTORTION AND BRIBERY

Beginning in the 1990s, Nguema, as described in the COMPLAINT, received and demanded that companies in E.G provide him with money or property in order to be able to maintain and operate their businesses.  Nguema abused his authority and influence within the EG Government both as a member of the cabinet and President Obiang's eldest son to make these demands and to retaliate against those who refused to acquiesce.

### Extortion and Solicitation of Bribes from Forestry Companies

In 1998, at the age of 29, Nguema was appointed by his father to serve as EG's first-ever Minister of Forestry and Agriculture.  Timber is EG's second

largest and most valuable export commodity.  Nguema's Forestry Ministry (Ministry) controls timber harvesting operations in EG.  The Ministry also controls timber exports.  In order to export timber from EG, Nguema requires that timber companies obtain an export authorization document that is personally signed by him.  Timber companies incur expenses of up to $5,000 per day if Nguema delays in signing these requests.

**Extortion Payments and Bribes from Forestry Companies**

Foreign timber executives claim that their companies were routinely required to pay bribes to Nguema in order to do business in EG.  Foreign Policy Magazine quoted one timber executive as stating, "[Nguema] would call emergency meetings of all the logging company heads in which he would announce some new tax on logging operations."  According to this executive, Nguema charged timber companies an extra so-called "tax" that they were forced to pay him personally for wood harvested in EG.  Nguema purportedly charged timber companies directly per cubic meter of timber harvested by that company.

A French timber executive, identified as "Jean Michel" in this same Foreign Policy Magazine article, reported that Nguema seized the French logging company he worked for in EG.  It was impossible, according to Jean Michel, for timber companies to do business in EG without paying bribes to Nguema.  Although Jean Michel's company initially paid Nguema the bribes that he demanded, the EG military shut down this company's operations and expelled its personnel from EG after it refused to make any further bribe payments to Nguema.

Independent NGOs have also reported that Nguema extorts payments and solicits bribes from timber companies in EG.  For instance, a former United States intelligence official, who was familiar with EG, reported to Global Witness, that Nguema solicits and accepts bribes from Malaysian, North Korean and Chinese

Exhibit 2 Page 168

timber companies.  According to this intelligence official, "There were Malaysian, North Korean, and Chinese logging camps on the mainland [of EG], and [Nguema] collected cash from them . . . for logging operations, much of it involving valuable hardwood."

While Nguema solicits and collects bribes from foreign timber companies, he also permits these same companies to violate EG's forestry laws and regulations.  Indeed, according to representatives of the Environmental Investigation Agency (EIA), an environmental NGO, corruption is pervasive in EG's forestry sector and some foreign timber companies, including Shimmer International of Malaysia (Shimmer), are permitted illegally to harvest timber in EG's protected forests reserves.

Several independent NGOs, including Forest Monitor, Green Peace and the World Rain Forest Movement, confirmed that Nguema does not enforce EG's forestry laws on some foreign timber companies, including Shimmer.  For instance, Shimmer engages in illegal logging in protected national forests in EG, including Monte Alen, even though these forest reserves are protected from industrial logging under EG's Forestry Law. Greenpeace reported that in 2004, "Enforcement of legal requirements is virtually non-existent in commercial logging" in EG.  Similarly, Forests Monitor, a U.K. NGO, concluded in 2001 that, "[i]n practice, enforcement of all the various legal requirements [in EG's forestry sector] is virtually non-existent."

Likewise, while Nguema served as Forestry Minister, some timber companies were permitted to overcut EG's forests.  Although EG's Forestry Law places limits on how much timber can be harvested by concessionaires and requires these entities to process 60 percent of their timber in EG, many timber companies, including Shimmer, were operating in violation of these rules.

According to a United States Forest Service ranger, who visited EG between July 31, 2004, and August 15, 2004, "[i]t is clear that in some areas that [EG] forests [were] being overcut." Similarly, EIA representatives confirmed that Shimmer, the dominant timber company in EG, was permitted to illegally export the bulk of its raw timber to China without processing it domestically.

Additional information responsive to this Interrogatory relating to Nguema's control of EG's forestry sector and his solicitation of bribes and extortion payments from timber companies may be ascertained from the COMPLAINT and documents that have or will be produced by the Government, including DOJ_0000408-412; DOJ_0001049-1080; DOJ_0000842-863; DOJ_0000614-615; DOJ_975-1048; DOJ_758-777; DOJ_778-789.

**Nguema's Relationship with Shimmer International**

Nguema reportedly maintains a close working relationship with Shimmer that benefits him personally. While Nguema was its head, EG's Forestry Ministry awarded Shimmer substantial forestry concessions. Shimmer was the largest and most dominant forestry company in EG. Indeed, in 2006, the same year that Nguema purchased the Sweetwater Property, Shimmer was responsible for more than 66 percent of the timber harvested in that country. According to a former U.S. intelligence official who spoke with Global Witness, Nguema solicited and collected bribes from Shimmer in EG.

Nguema confirmed to U.S. diplomats at the Embassy in 2009 that he permitted a Malaysian company to deploy 40 teams of well-equipped lumberjacks to "clear cut" a "large tract of pristine continental jungle" that was "granted" to him by the EG Government. Nguema then purportedly earned a "large windfall" by exporting this raw timber to Asia. It is illegal under EG's Forestry law to permit this type of "clear cutt[ing]." EG law also requires timber concessionaires,

like Nguema, to process domestically a minimum of 60 percent of the raw timber they harvest from their concessions.  Nguema, however, exported his raw timber as "whole logs" to Asia.  Although it was Nguema's responsibility as EG's Forestry Minister to enforce these laws, Nguema explained to U.S. diplomats that this illegal "windfall" was the source of his personal wealth.

Additional information responsive to this Interrogatory relating to Nguema's relationship with timber companies, including Shimmer, may be ascertained from the COMPLAINT as well as documents that have or will be produced by the Government, including DOJ_0000408-412; DOJ_0001049-1080; DOJ_975-1048; DOJ_778-789.

**British Hotel Company**

In or around 2003, a British company sought permission to build a Sheraton hotel in Malabo, EG's capital city located on Bioko Island.  According to Simon Kareri, a Riggs Bank vice president, Nguema refused to permit the British company to build the Malabo hotel unless its executives agreed to provide him with 55 percent of the hotel's equity.  When the British company refused, their hotel project was not allowed to go forward. Nguema purportedly accompanied representatives of this British company to Nguema's Los Angeles home to engage in negotiations about this hotel.

Additional information responsive to this Interrogatory relating to this British company may be ascertained from documents that have or will be produced by the Government, including DOJ_000080-87.

**G.E. Petrol**

G. E. Petrol is EG's state-owned oil company.  According to Kareri, when he was employed at Riggs prior to 2005, G.E. Petrol was still "run by the First Family" of EG and Nguema was the company's "*patron*."  In Spanish, which is

one of EG's official languages, the word "*patron*" means "master" or "boss." Even though Nguema "flunked high school and does not know how to do anything," according to Kareri, Nguema controlled G.E. Petrol as its "*patron*". Kareri stated that "the big money from the [foreign] oil companies is being paid to the First Family through joint venture projects in EG" and that corrupt payments were disbursed by G.E. Petrol to "so-called oil brokers" controlled by Nguema's family.  These brokers, according to Kareri, make further profits for Nguema's family by purchasing oil from G.E. Petrol at discounted rates.

According to Kareri, Nguema's family "may be skimming money from the sale of [EG's] share of oil produced by the oil companies in EG."  Nguema, according to Kareri, often made remarks to him suggesting that he is GE Petrol's "*patron*."  On one occasion, Kareri recalled that G.E. Petrol requested that he divert directly a certain percentage of EG's oil revenue to an account controlled by G.E. Petrol.  Kareri refused.

Similarly, as explained above, Nguema represented to GAC that he possessed both the ability and the intent to misappropriate public funds from the EG treasury relating to oil production.  Specifically, he claimed that he could provide an American oil money with a $38.5 million "credit memorandum" derived from public funds to acquire a personal asset for himself.

Kareri and Nguema purportedly had a close business and personal relationship.  Nguema consulted Kareri frequently about both financial and personal issues, including "personal problems" Nguema had with his father. Kareri commented to his wife, that it was unfortunate that Nguema was "blowing" the money from EG.

162

Exhibit 2 Page 172

Additional information responsive to this Interrogatory relating to G.E. Petrol may be ascertained from documents that have or will be produced by the Government, including DOJ_000038-94 and DOJ_0000241-244.

**Foreign Oil Companies**

Walter International (Walter) was a Houston-based oil company operating in EG. In 1991, Nguema enrolled at Pepperdine University's English language program in Malibu, California. According to Ambassador John Bennett, a former United States Ambassador to EG during the early 1990s, Nguema's Pepperdine tuition and expenses were fully paid for by Walter. Elisa Wax, a Pepperdine employee, recalled that Pepperdine received a "steady stream of phone calls from the Beverly Wilshire [Hotel] and shops in Beverly Hills trying to track down [Nguema] to settle outstanding bills." Wax would direct these calls to Walter International. Ambassador Bennett recalled that Nguema incurred, and Walter paid, $50,000 in expenses while attending Pepperdine in California.

In November 2009, Global Witness reported that Nguema received corrupt payments from Elf-Acquitaine, a French oil and gas company. In 2004, thirty senior executives of Elf Acquitaine were charged and convicted in France of distributing bribes and kickbacks in Africa over a period of several decades.

A confidential source ("CI 3"), who spoke with federal agents in Miami, Florida, also confirmed that it was his/her belief that Nguema controls the oil industry in EG and that he derives his wealth from illegal activities in EG, including the distribution of counterfeit cigarettes, diamond smuggling and monetary kickbacks in the form of contracts from United States oil companies operating in EG.

Another confidential source (CI 2), who spoke with federal agents and was a former employee of Nguema in Los Angeles in or around 2006, the same year that

Nguema acquired the Sweetwater Property, recalled that Nguema told him/her that the source of his wealth was related to EG's oil resources.  CI 2 was an employee of Nguema who worked at the defendant Sweetwater Property.  Even though Nguema holds no official position within the EG Government related to the oil industry, CI 2 recalls seeing three "oil officials" meet with Nguema at the Sweetwater Property during the second week of November 2006.

Additional information responsive to this Interrogatory relating to Nguema's relationship with the oil and gas industry may be ascertained from documents that have or will be produced by the Government, including DOJ_0000114-0000166; DOJ_0000241-244; DOJ_0000265-268; DOJ_0000388-393; DOJ_0000394-398; DOJ_0000842-863; DOJ_0001049-1080; SENATE-PSI-119217-120245; SENATE-PSI-120318-120347; SENATE-PSI-124429-126128.

**Michael Chevaly**

An individual named Michael Chevaly allegedly smuggles various fraudulently manufactured consumer goods into Cameroon, Nigeria, Benin, Niger, Chad, Sierra Leone, Liberia, Guinea-Conakry and Gabon.  In so doing, Chevaly purportedly uses routes through EG, Niger and Benin to smuggle this merchandise. CI 3 informed federal agents that Nguema possesses a business relationship with Chevaly relating to this illegal conduct.  Additional information responsive to this Interrogatory relating to the relationship between Nguema and Chevaly may be ascertained from documents that have or will be produced by the Government, including DOJ_0000246-251.

### III.

### NGUEMA'S FRAUD AGAINST U.S. BANKS

Between 2004 and 2008, Nguema, as described in the COMPLAINT, orchestrated, participated in and implemented a scheme fraudulently to open and

use bank accounts at six financial institutions in California in order to surreptitiously funnel millions of dollars into the United States from EG, while concealing his association with the accounts, the source of funds, and his status as an EG cabinet minister and son of the President.  During this period, Nguema fraudulently opened at least ten bank accounts at six financial institutions in California, including Bank of America (BOA), Union Bank of California (UBOC), Commercial Capital Bank, California National Bank (CNB), Comerica Bank, and Citibank.

Beginning in 2004, after the PSI published its report on money laundering on July 15, 2004, Nguema was on notice that banks in the United States were uncomfortable opening bank accounts for him.  The PSI's 2004 money laundering report criticized Riggs for its handling of Nguema's family's funds, including those of Nguema.  Further, Riggs was ultimately convicted and ordered to pay a criminal fine of $16 million, as well as $25 million in civil penalties, for its non-compliance with U.S. anti-money laundering controls.

Just two weeks after the PSI's report was published, City National Bank in Los Angeles was contacted by Nguema after the bank had closed his personal bank account.  When he called the bank on July 30, 2004, Nguema told a bank employee that he thought his account had been closed "due to [his] country and the oil."  In addition to closing his accounts, City National Bank refused to return $699,691.02 of Nguema's funds to him and requested that the California Superior Court for the County of Los Angeles allow the bank to release these funds to the court, rather than Nguema, for ultimate resolution.

Beginning in 2004, Nguema, Michael J. Berger and George Nagler opened bank accounts in California in the names of various shell companies, including Sweet Pink, Inc., Unlimited Horizon, Inc., Beautiful Vision, Inc., and Sweetwater

Management, LLC, without disclosing Nguema's ownership of the companies or their funds and concealing his status as a Senior Foreign Public Figure (SFP) and a Politically-Exposed Person (PEP).  Nguema and his intermediaries, including Berger and Nagler, then transferred funds received from Nguema into these fraudulently opened bank accounts in the United States.  In opening numerous California bank accounts and using intermediaries' accounts, Nguema, Berger and Nagler intentionally and deliberately concealed from these financial institutions Nguema's association with these bank accounts as well as his status as a SFP and a PEP.

Nguema used many of the funds in these fraudulently opened accounts for the maintenance and upkeep of the defendant Sweetwater Property, a $30 million mansion he purchased in Malibu in 2006.  Funds were used to pay for, among other things, the salaries of Nguema's household staff.  These staff persons worked at the Sweetwater Property and aided Nguema, at his direction, in executing this fraudulent scheme.  These funds were also used to maintain an office at the Sweetwater Property for Nguema and his employees and associates to perpetuate and oversee this scheme; the professional and administrative services of various lawyers, accountants, and property managers, including Berger and Nagler; costs incurred by Nguema's household staff relating to this scheme; and the costs and fees of the Sweetwater Property, where Nguema and his household staff maintained their business office for their shell companies and where much of the conduct described at paragraphs 117-209 of the COMPLAINT were planned, coordinated, and occurred.

Nguema repeatedly concealed from banks in California his ownership of the funds in these accounts by using shell companies formed to hide his identity and by using various third-party nominees, including Michael Berger and George

Nagler, who both allowed Nguema to use their client trust accounts to pay for personal expenses.  After each of these banks discovered Nguema's association with the accounts, the banks closed each account.

**Bank of America**.  On or about October 12, 2004, Nguema fraudulently opened two accounts in the name of Beautiful Vision, a California company.  No banker looking at the documents and information provided to Bank of America (BOA) by Berger and Nguema could have identified Nguema as being the owner of Beautiful Vision, nor could they have readily identified the account as one affiliated with a SFP and/or a PEP.  BOA closed the Beautiful Vision accounts in or around September 12, 2005, and September 15, 2005, respectively, after discovering that Nguema, a SFP and a PEP, was associated with Beautiful Vision, Inc.

**Union Bank of California.**  On or about September 15, 2005, three days after BOA closed Nguema's Beautiful Vision account, Nagler formed Sweet Pink, Inc. for Nguema.  On or about September 29, 2005, UBOC opened a checking account for Sweet Pink using an EIN obtained by Nagler's assistant.  The signatories on the account were Eve Jeffers, Nguema's then-girlfriend, and four employees of an accounting firm owned by Marvin Freedman that had been retained by Nguema.  On the bank account opening documents, Marvin Freedman's business address is listed as Sweet Pink's address.  No banker looking at the documents and information provided by Nagler could have identified Nguema, as being the owner of Sweet Pink, nor could they have identified the account as one affiliated with an SFP and a PEP.  Approximately eight days later, on or about October 27, 2005, UBOC discovered that Nguema was using the Sweet Pink account to gain access to the U.S. banking system and closed Sweet Pink's

Exhibit 2 Page 177

account.  This was the third time in less than fifteen months that a California bank closed an account after learning of Nguema's association with the account.

**Commercial Capital Bank.**    On or about December 7, 2005, less than two months after UBOC closed Nguema's Sweet Pink account, Berger opened an account at Commercial Capital Bank in the name of Unlimited Horizon, Inc. Berger caused Unlimited Horizon to be incorporated in California on October 21, 2005.  No banker looking at the documents and information provided by Berger and Nguema could have identified Nguema as being the owner of Unlimited Horizon, nor could they have identified the account as one affiliated with an SFP and a PEP.  On or about June 22, 2006, Commercial Capital Bank closed Unlimited Horizon's account.  This was the fifth account in less than two years closed by a California bank after discovering its association with Nguema.

**California National Bank.**  On or about May 16, 2006, after Nguema had acquired the Sweetwater Property in April 2006, Nagler formed another company for Nguema called Sweetwater Management, Inc.  Sweetwater Management was purportedly formed to employ and to pay individuals working to maintain the Sweetwater Property.  In or around May 30, 2006, Edward Mizrahi, Nguema's estate manager, opened an account at this bank in the name of "American Equity Properties, DBA:  American Property MGMT ITF:  Sweet Water Malibu" ("AEP Account").  The estate manager concealed Nguema's involvement with the account as well as Nguema's status as a SFP and a PEP.  He identified the owner of Sweetwater Malibu, LLC as a "high profile" person who wanted to remain confidential.  The following day, on or about May 31, 2006, Nguema's personal assistant Melinda DeHaven opened three additional business accounts at CNB in the name of Sweetwater Management, Inc.  On or about June 22, 2006, the bank

closed all four accounts after learning that these accounts were associated with Nguema.

**Union Bank of California.**  On or about August 28, 2006, two months after Unlimited Horizon's account at Commercial Capital Bank was closed and Nguema's four accounts at CNB were closed, Berger opened two Basic Business Checking Accounts in the name of Unlimited Horizon, Inc. at a UBOC branch in Beverly Hills.  Berger identified himself to UBOC as Unlimited Horizon's president, and was the sole signatory on both UBOC accounts.  Berger again concealed material information from UBOC, including Nguema's association with Unlimited Horizon, as well as Nguema's status as a SFP and a PEP.  No banker looking at the documents and information provided to UBOC by Nguema and Berger, could have identified Nguema as being the owner of these accounts, nor could they have identified the account as one affiliated with an SFP and a PEP. After opening these accounts, Berger explained to Nguema in an email dated on or about November 1, 2006, that future wires should be sent "to my new client trust account at [UBOC].  I will transfer it from there to the Unlimited Horizon, Inc. General Account.  I will send you a separate e-mail and fax requesting a $200,000 wire transfer and providing wire transfer information for this new account."  Upon receiving these wires in his client trust accounts, Berger withdrew these funds and deposited them into Unlimited Horizon's UBOC accounts in the form of checks and bank drafts.  Between November 29, 2006 and May 11, 2007, Berger deposited seven checks totaling $1,399,485 into Unlimited Horizon's UBOC accounts, after withdrawing these funds as "cash" from his client trust account. On or about June 12, 2007, after an investigation by UBOC discovered that Berger represented Nguema, an SFP and a PEP, and that Berger was using corporate

vehicles to "disguise the identity of" Nguema to pay for the Sweetwater property and Nguema's living expenses, UBOC closed all three accounts.

**Comerica Bank**.  On or about February 6, 2007 -- eight months after CNB closed Nguema's four accounts -- Nguema applied to open a bank account at Comerica Bank on the Avenue of the Stars in Los Angeles.  On this occasion, Nguema directed his representative Anne Morse to open an account in his name and to identify himself as an EG citizen to the bank, but he nonetheless concealed from Comerica the fact that he was a PEP and an SFP.  When asked explicitly whether Nguema "ever performed important public functions for a foreign state (PEP)?" Nguema's representative answered in the negative.  When asked whether Nguema was "closely associated with person(s) who perform public functions for a foreign state (PEP)?" the representative again answered in the negative.  On or about March 22, 2007, Comerica closed this account after the bank's compliance personnel discovered that Nguema, in fact, was a PEP and an SFP.

**Citibank**.  On or about June 25, 2007, approximately thirteen days after UBOC closed Nguema's accounts, Berger opened another account in the name of Unlimited Horizon at a Citibank branch in Beverly Hills.  During the account-opening process, Berger deliberately hid Nguema's ownership of the account by telling a Citibank banker that the true owners of the Citibank account were U.S. citizens, when, in fact, Nguema a non-U.S. citizen and a SFP was the account's true owner.

Over the course of the next five months, Nguema transferred over $1 million directly from EG into Berger's client trust account.  Berger, in turn, transferred these funds into Unlimited Horizon's Citibank account.  In an email dated on or about December 7, 2007, Berger confirmed with Nguema, "I know that all payments [from the Citibank account] must be approved by you . . . I understand

the importance of the principle.  This e-mail will reconfirm that I will only pay bills approved by you."  On or about May 20, 2008, after uncovering Nguema's association with Unlimited Horizon and this account, Citibank closed Unlimited Horizon's account.

Additional information responsive to this Interrogatory and the Government's allegations of domestic bank fraud may be ascertained from the COMPLAINT, as well as documents that have or will be produced by the Government, including DOJ_0000212-217; DOJ_0000227-236; DOJ_0000252-257; DOJ_0000258-260; DOJ_0000261-264; DOJ_0000285-288; DOJ_0000289-296; SENATE-PSI-000070636-70717; SENATE-PSI-000072041-73108; SENATE-PSI-73109-100926; SENATE-PSI-0000100927-100999; DOJ_0000101000-101513; SENATE-PSI-0000101514-107289; SENATE-PSI-SENATE-PSI-110261-110308; SENATE-PSI-0000120246-249; SENATE-PSI-000120250-120265; SENATE-PSI-120374-122836; SENATE-PSI-124429-126128.

**Proceeds of Bank Fraud Used for Maintenance and Upkeep of the Sweetwater Property**:  The funds deposited and funneled through Nguema's fraudulently opened bank accounts were used to, among other things, pay for the maintenance and upkeep of the defendant Sweetwater Property.  In disbursing funds from these fraudulently opened bank accounts, Nguema specifically ordered and/or approved the disbursal of funds to various vendors and payees relating to the maintenance and upkeep of the Sweetwater Property.  Indeed, Berger was not permitted to disburse any funds belonging to Nguema in these accounts unless he first received a check approval form that was signed personally by Nguema.

Nguema used the funds in his Unlimited Horizon account at UBOC to support, maintain and enhance the Sweetwater  Property, including, among other

things, paying in or around $54,000 per month for home security services; $10,000 per month in electricity bills; $8,000 per month in phone bills; $73,649.95 in property taxes; $6,875 for the installation of a sauna; more than $10,000 for home theater equipment; more than $4,000 for home insurance; more than $12,000 in landscaping fees; more than $36,000 in tree care-related fees; and more than $30,000 per month in payroll for his household staff, including estate managers, maintenance crews, and housekeepers.

Similarly, Nguema's fraudulently opened Citibank account held in the name of Unlimited Horizon was also used for the maintenance and upkeep of the Sweetwater Property.  Specifically, these funds were used to pay for expenses, including, among other things, approximately $54,000 per month on the home's security detail, over $9,000 per month on the power bill to Southern California Edison, over $5,000 per month on the home's water bill to Los Angeles County Waterworks, $37,000 on landscaping costs, $3,773 on maintenance for the home's fish tank, $24,700 on outdoor landscape lighting, $7,577 for the "Fish Physician" in connection with the home's Koi pond, $9,600 on audio-video equipment, $1,304 for swimming pool maintenance, and thousands of dollars for home furniture and decorations.

Additional information responsive to this Interrogatory may be ascertained from the COMPLAINT, as well as documents that have or will be produced by the Government, including DOJ_0000212-217; DOJ_0000227-236; DOJ_0000252-257; DOJ_0000258-260; DOJ_0000261-264; DOJ_0000285-288; DOJ_0000289-296; DOJ_0000470-476; SENATE-PSI-000070636-70717; SENATE-PSI-000072041-73108; SENATE-PSI-73109-100926; SENATE-PSI-0000100927-100999; DOJ_0000101000-101513; SENATE-PSI-0000101514-107289; SENATE-PSI-SENATE-PSI-110261-110308; SENATE-PSI-0000120246-249;

SENATE-PSI-0000250-120265; SENATE-PSI-120374-122836; SENATE-PSI-124429-126128.

## INTERROGATORY NO. 11

For each and every act YOU contend constitutes or forms the basis for each and every alleged specified unlawful activity in the COMPLAINT, IDENTIFY when YOU first became aware of (a) the date of the alleged conduct; (b) the alleged victim of the conduct; (c) the alleged role of CLAIMANT in the conduct; and (d) the proceeds of the conduct allegedly received by CLAIMANT.

## RESPONSE TO INTERROGATORY NO. 11

The United States objects to this Interrogatory as it is overly broad and unduly burdensome, as it seeks information obtained by the Government after the filing of the COMPLAINT and is not limited by temporal scope.  The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they purport to impose obligations on the Government beyond the scope of the Discovery Order.  On September 6, 2012, the Court authorized Claimants to propound limited discovery on the probable cause the United States had when it filed the instant forfeiture action.  As such, to the extent that this Interrogatory seeks information beyond the scope of the Discovery Order, the Government objects and will not produce such information, as it is neither relevant nor reasonably calculated to discover evidence that the Government had for purposes of probable cause when it filed the present action.  The United States does, however, expressly reserve the right to supplement, clarify, revise, or correct any or all of the Responses and Objections (General and Specific) herein consistent with Fed. R. Civ. P. 26(e), and to assert additional objections or privileges, in one or more subsequent supplemental response(s).

The United States further objects to this Interrogatory on the grounds that it calls for the disclosure of information subject to the attorney-client privilege, the work product doctrine or the informant's privilege. The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they seek information outside the possession, custody or control of DOJ and ICE. The United States further objects to this Interrogatory as it is overly broad and unduly burdensome, as the definition of "YOUR" includes foreign sovereign governments and entities other than DOJ and ICE.

The United States also objects to this Interrogatory on the ground that it is compound and contains impermissible discrete subparts, which relate to distinct matters and therefore constitutes multiple interrogatories. See, e.g., Sattari v. Citi Mortgage, 2010 U.S. Dist. LEXIS 125687, at *3 (D. Nev. Nov. 17, 2010) (interrogatories "should consist of a brief, simple, direct, and unambiguous question, dealing with one point only."). The United States further objects to this Interrogatory on the ground that, when combined with the preceding Interrogatories, this Interrogatory violates the 25 interrogatory limit set forth in Fed. R. Civ. P. 33(a)(1). Because the Government has already responded to 25 interrogatories, it is not required to respond to this Interrogatory. See Capaccione v. Charlotte-Mecklenburg Schools, 182 F.R.D. 486, 496, n. 4 (W.D.N.C. 1998).

To the extent that that this request seeks information relating to the recruitment or handling of confidential informants by a federal law enforcement agency, the United States objects to the request and will not produce that information. See, e.g., Roviaro v. United States, 353 U.S. 53 (1957).

Subject to and without waiving the foregoing general and specific objections, the United States responds as follows:

174

Exhibit 2 Page 184

All of the facts stated herein were within the possession of DOJ and/or ICE on or before April 28, 2011.  Additional information responsive to this Interrogatory may be ascertained from documents that have or will be produced by the Government.

## INTERROGATORY NO.  12

For each and every PERSON referred to or referenced in the COMPLAINT as an alleged victim, witness, informant, or other non-perpetrator of allegedly unlawful conduct or transactions, IDENTIFY (a) the paragraph they are referenced in the COMPLAINT; (b) the true full name of such PERSON; (c) any current or last known business title and affiliation; and (d) current or last known address.

## RESPONSE TO INTERROGATORY NO. 12

The United States objects to this Interrogatory as it is overly broad and unduly burdensome, as it seeks information obtained by the Government after the filing of the COMPLAINT and is not limited by temporal scope.  The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they purport to impose obligations on the Government beyond the scope of the Discovery Order.  On September 6, 2012, the Court authorized Claimants to propound limited discovery on the probable cause the United States had when it filed the instant forfeiture action.  As such, to the extent that this Interrogatory seeks information beyond the scope of the Discovery Order, the Government objects and will not produce such information, as it is neither relevant nor reasonably calculated to discover evidence that the Government had for purposes of probable cause when it filed the present action.  The United States does, however, expressly reserve the right to supplement, clarify, revise, or correct any or all of the Responses and Objections (General and Specific) herein consistent with Fed. R. Civ. P. 26(e), and to assert

175

Exhibit 2 Page 185

additional objections or privileges, in one or more subsequent supplemental response(s).

The United States further objects to this Interrogatory on the grounds that it calls for the disclosure of information subject to the attorney-client privilege, the work product doctrine or the informant's privilege.  The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they seek information outside the possession, custody or control of DOJ and ICE.  The United States further objects to this Interrogatory as it is overly broad and unduly burdensome, as the definition of "YOUR" includes foreign sovereign governments and entities other than DOJ and ICE.  The United States further objects to this Interrogatory as vague and ambiguous, especially with respect its use of the words "victim," and "non-perpetrator."

The United States also objects to this Interrogatory on the ground that it is compound and contains impermissible discrete subparts, which relate to distinct matters and therefore constitutes multiple interrogatories.  The United States further objects to this Interrogatory on the ground that, when combined with the preceding Interrogatories, this Interrogatory violates the 25 interrogatory limit set forth in Fed. R. Civ. P. 33(a)(1).  Because the Government has already responded to 25 interrogatories, it is not required to respond to this Interrogatory.  See Capaccione v. Charlotte-Mecklenburg Schools, 182 F.R.D. 486, 496, n. 4 (W.D.N.C. 1998).

To the extent that that this request seeks information relating to the recruitment or handling of confidential informants by a federal law enforcement agency, the United States objects to the request and will not produce that information.  See, e.g., Roviaro v. United States, 353 U.S. 53 (1957).

**INTERROGATORY NO.  13**

For each PERSON identified in response to Interrogatory No. 12, IDENTIFY when and how YOU first became aware of each such PERSON.

**RESPONSE TO INTERROGATORY NO. 13**

The United States objects to this Interrogatory as it is overly broad and unduly burdensome, as it seeks information obtained by the Government after the filing of the COMPLAINT and is not limited by temporal scope.  The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they purport to impose obligations on the Government beyond the scope of the Discovery Order.  On September 6, 2012, the Court authorized Claimants to propound limited discovery on the probable cause the United States had when it filed the instant forfeiture action.  As such, to the extent that this Interrogatory seeks information beyond the scope of the Discovery Order, the Government objects and will not produce such information, as it is neither relevant nor reasonably calculated to discover evidence that the Government had for purposes of probable cause when it filed the present action.  The United States does, however, expressly reserve the right to supplement, clarify, revise, or correct any or all of the Responses and Objections (General and Specific) herein consistent with Fed. R. Civ. P. 26(e), and to assert additional objections or privileges, in one or more subsequent supplemental response(s).

The United States further objects to this Interrogatory to the extent it calls for a narrative.   See, EG, Wilcox v. Changala, 2012 U.S. Dist. LEXIS 5471, at *6-7 (E. D. Wash. Jan. 18, 2012) (contention interrogatories that "ask the

responding party to identify each and every supporting fact about a particular

allegation are an abuse of the discovery process").  The United States further

objects to this Interrogatory on the grounds that it calls for the disclosure of

information subject to the attorney-client privilege, the work product doctrine or

the informant.  The United States objects to Claimants' Interrogatories, including

but not limited to all Instructions and Definitions therein, to the extent that they

seek information outside the possession, custody or control of DOJ and ICE.  The

United States further objects to this Interrogatory as it is overly broad and unduly

burdensome, as the definition of "YOUR" includes foreign sovereign governments

and entities other than DOJ and ICE.  The United States further objects to this

Interrogatory as vague and ambiguous, especially with respect its use of the word

"aware."

     The United States also objects to this Interrogatory on the ground that it is

compound and contains impermissible discrete subparts, which relate to distinct

matters and therefore constitutes multiple interrogatories.  <u>See</u>, e.g., <u>Sattari v. Citi

Mortgage</u>, 2010 U.S. Dist. LEXIS 125687, at *3 (D. Nev. Nov. 17, 2010)

(interrogatories "should consist of a brief, simple, direct, and unambiguous

question, dealing with one point only.").  The United States further objects to this

Interrogatory on the ground that, when combined with the preceding

Interrogatories, this Interrogatory violates the 25 interrogatory limit set forth in

Fed. R. Civ. P. 33(a)(1).  Because the Government has already responded to 25

interrogatories, it is not required to respond to this Interrogatory.  <u>See</u> <u>Capaccione

v. Charlotte-Mecklenburg Schools</u>, 182 F.R.D. 486, 496, n. 4 (W.D.N.C. 1998).

     To the extent that that this request seeks information relating to the

recruitment or handling of confidential informants by a federal law enforcement

Exhibit 2 Page 188

agency, the United States objects to the request and will not produce that information.  See, e.g., Roviaro v. United States, 353 U.S. 53 (1957).

## INTERROGATORY NO.  14

IDENTIFY, with particularity, all COMMUNICATIONS between YOU and each and every informant, alleged victim, and other source of information that YOU rely on or which REFER OR RELATE TO the allegations in YOUR COMPLAINT or which YOU otherwise contend support the forfeiture of the DEFENDANT ASSETS, including the dates of such COMMUNICATIONS.

## RESPONSE TO INTERROGATORY NO. 14

The United States objects to this Interrogatory as it is overly broad and unduly burdensome, as it seeks information obtained by the Government after the filing of the COMPLAINT and is not limited by temporal scope.  The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they purport to impose obligations on the Government beyond the scope of the Discovery Order.  On September 6, 2012, the Court authorized Claimants to propound limited discovery on the probable cause the United States had when it filed the instant forfeiture action.  As such, to the extent that this Interrogatory seeks information beyond the scope of the Discovery Order, the Government objects and will not produce such information, as it is neither relevant nor reasonably calculated to discover evidence that the Government had for purposes of probable cause when it filed the present action.  The United States does, however, expressly reserve the right to supplement, clarify, revise, or correct any or all of the Responses and Objections (General and Specific) herein consistent with Fed. R. Civ. P. 26(e), and to assert additional objections or privileges, in one or more subsequent supplemental response(s).

Exhibit 2 Page 189

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The United States further objects to this Interrogatory to the extent it calls for a narrative.   See, e.g., Wilcox v. Changala, 2012 U.S. Dist. LEXIS 5471, at *6-7 (E. D. Wash. Jan. 18, 2012) (contention interrogatories that "ask the responding party to identify each and every supporting fact about a particular allegation are an abuse of the discovery process").  The United States further objects to this Interrogatory on the grounds that it calls for the disclosure of information subject to the attorney-client privilege, the work product doctrine or the informant's privilege.  The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they seek information outside the possession, custody or control of DOJ and ICE.  The United States further objects to this Interrogatory as it is overly broad and unduly burdensome, as the definition of "YOUR" includes foreign sovereign governments and entities other than DOJ and ICE.  The United States further objects to this Interrogatory as vague and ambiguous, especially with respect its use of the words "victim" and "particularity."

The United States also objects to this Interrogatory on the ground that it is compound and contains impermissible discrete subparts, which relate to distinct matters and therefore constitutes multiple interrogatories.  See, e.g., Sattari v. Citi Mortgage, 2010 U.S. Dist. LEXIS 125687, at *3 (D. Nev. Nov. 17, 2010) (interrogatories "should consist of a brief, simple, direct, and unambiguous question, dealing with one point only.").  The United States further objects to this Interrogatory on the ground that, when combined with the preceding Interrogatories, this Interrogatory violates the 25 interrogatory limit set forth in Fed. R. Civ. P. 33(a)(1).  Because the Government has already responded to 25 interrogatories, it is not required to respond to this Interrogatory.  See Capaccione v. Charlotte-Mecklenburg Schools, 182 F.R.D. 486, 496, n. 4 (W.D.N.C. 1998).

To the extent that that this request seeks information relating to the recruitment or handling of confidential informants by a federal law enforcement agency, the United States objects to the request and will not produce that information.  See, e.g., Roviaro v. United States, 353 U.S. 53 (1957).

Subject to and without waiving the foregoing general and specific objections, the United States hereby refers Claimants pursuant to Fed. R. Civ. Proc. 33(d) to documents that the United States has and will produce, including but not limited to DOJ_00001-0000489.

**INTERROGATORY NO.  15**

IDENTIFY all DOCUMENTS that YOU rely on or which REFER OR RELATE TO the allegations in YOUR COMPLAINT or which YOU otherwise contend support the forfeiture of the DEFENDANT ASSETS, and IDENTIFY all PERSONS with knowledge of such DOCUMENTS and the date when YOU first became aware of each DOCUMENT.

**RESPONSE TO INTERROGATORY NO. 15**

The United States objects to this Interrogatory as it is overly broad and unduly burdensome, as it seeks information obtained by the Government after the filing of the COMPLAINT and is not limited by temporal scope.  The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they purport to impose obligations on the Government beyond the scope of the Discovery Order.  On September 6, 2012, the Court authorized Claimants to propound limited discovery on the probable cause the United States had when it filed the instant forfeiture action.  As such, to the extent that this Interrogatory seeks information beyond the scope of the Discovery Order, the Government objects and will not produce such information, as it is neither relevant nor reasonably calculated to discover evidence that the Government had for purposes of probable cause when it filed the present

181

Exhibit 2 Page 191

action.  The United States does, however, expressly reserve the right to supplement, clarify, revise, or correct any or all of the Responses and Objections (General and Specific) herein consistent with Fed. R. Civ. P. 26(e), and to assert additional objections or privileges, in one or more subsequent supplemental response(s).

The United States further objects to this Interrogatory on the grounds that it calls for the disclosure of information subject to the attorney-client privilege, the work product doctrine or the informant's privilege.  The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they seek information outside the possession, custody or control of DOJ and ICE.  The United States further objects to this Interrogatory as it is overly broad and unduly burdensome, as the definition of "YOUR" includes foreign sovereign governments and entities other than DOJ and ICE.

The United States also objects to this Interrogatory on the ground that it is compound and contains impermissible discrete subparts, which relate to distinct matters and therefore constitutes multiple interrogatories.  See, e.g., Sattari v. Citi Mortgage, 2010 U.S. Dist. LEXIS 125687, at *3 (D. Nev. Nov. 17, 2010) (interrogatories "should consist of a brief, simple, direct, and unambiguous question, dealing with one point only.").  The United States further objects to this Interrogatory on the ground that, when combined with the preceding Interrogatories, this Interrogatory violates the 25 interrogatory limit set forth in Fed. R. Civ. P. 33(a)(1).  Because the Government has already responded to 25 interrogatories, it is not required to respond to this Interrogatory.  See Capaccione v. Charlotte-Mecklenburg Schools, 182 F.R.D. 486, 496, n. 4 (W.D.N.C. 1998).

To the extent that that this request seeks information relating to the recruitment or handling of confidential informants by a federal law enforcement agency, the United States objects to the request and will not produce that information.  <u>See</u>, e.g., <u>Roviaro v. United States</u>, 353 U.S. 53 (1957).  The United States further objects to this Interrogatory as it is unnecessary and unduly burdensome, as it is duplicative and redundant of Interrogatory Nos. 1, 2 and 3.

Subject to and without waiving the foregoing general and specific objections, the United States responds as follows:

All of the facts stated and documents cited herein were within the possession of DOJ and/or ICE on or before April 28, 2011.  Additional information responsive to this Interrogatory may be ascertained from documents that have or will be produced by the Government pursuant to the Court's Discovery Order and the parties' Joint Stipulation approved by the Court on October 19, 2012.

## INTERROGATORY NO.  16

State all facts that support the allegations in Paragraph 49 of YOUR COMPLAINT that "Nguema demanded that businesses in EG pay him personal fees to be able to operate," and IDENTIFY (a) all sources of such facts; (b) the date YOU first became aware of such facts; (c) all PERSONS with knowledge of such facts; and (d) all DOCUMENTS that REFER OR RELATE TO such facts.

## RESPONSE TO INTERROGATORY NO. 16

The United States objects to this Interrogatory as it is overly broad and unduly burdensome, as it seeks information obtained by the Government after the filing of the COMPLAINT and is not limited by temporal scope.  The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they purport to impose

Exhibit 2 Page 193

obligations on the Government beyond the scope of the Discovery Order.  On September 6, 2012, the Court authorized Claimants to propound limited discovery on the probable cause the United States had when it filed the instant forfeiture action.  As such, to the extent that this Interrogatory seeks information beyond the scope of the Discovery Order, the Government objects and will not produce such information, as it is neither relevant nor reasonably calculated to discover evidence that the Government had for purposes of probable cause when it filed the present action.  The United States does, however, expressly reserve the right to supplement, clarify, revise, or correct any or all of the Responses and Objections (General and Specific) herein consistent with Fed. R. Civ. P. 26(e), and to assert additional objections or privileges, in one or more subsequent supplemental response(s).

The United States further objects to this Interrogatory to the extent it calls for a narrative.   See, e.g., Wilcox v. Changala, 2012 U.S. Dist. LEXIS 5471, at *6-7 (E. D. Wash. Jan. 18, 2012) (contention interrogatories that "ask the responding party to identify each and every supporting fact about a particular allegation are an abuse of the discovery process").  The United States further objects to this Interrogatory on the grounds that it calls for the disclosure of information subject to the attorney-client privilege, the work product doctrine or the informant's privilege.  The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they seek information outside the possession, custody or control of DOJ and ICE.  The United States further objects to this Interrogatory as it is overly broad and unduly burdensome, as the definition of "YOUR" includes foreign sovereign governments and entities other than DOJ and ICE.  The United States further

Exhibit 2 Page 194

objects to this Interrogatory as vague and ambiguous, especially with respect its use of the words "corroborate," "confirmed," "reliability," and "confirmed."

The United States also objects to this Interrogatory on the ground that it is compound and contains impermissible discrete subparts, which relate to distinct matters and therefore constitutes multiple interrogatories.  See, e.g., Sattari v. Citi Mortgage, 2010 U.S. Dist. LEXIS 125687, at *3 (D. Nev. Nov. 17, 2010) (interrogatories "should consist of a brief, simple, direct, and unambiguous question, dealing with one point only.").  The United States further objects to this Interrogatory on the ground that, when combined with the preceding Interrogatories, this Interrogatory violates the 25 interrogatory limit set forth in Fed. R. Civ. P. 33(a)(1).  Because the Government has already responded to 25 interrogatories, it is not required to respond to this Interrogatory.  See Capaccione v. Charlotte-Mecklenburg Schools, 182 F.R.D. 486, 496, n. 4 (W.D.N.C. 1998).

To the extent that that this request seeks information relating to the recruitment or handling of confidential informants by a federal law enforcement agency, the United States objects to the request and will not produce that information.  See, e.g., Roviaro v. United States, 353 U.S. 53 (1957).  The United States further objects to this Interrogatory as it is unnecessary and unduly burdensome, as it is duplicative and redundant of Interrogatory No. 1.

Subject to and without waiving the foregoing general and specific objections, the United States responds as follows:

185

Exhibit 2 Page 195

# I.
## NGUEMA'S MISAPPROPRIATION, THEFT
## AND EMBEZZLEMENT OF PUBLIC FUNDS

**Nguema's Abuse and Manipulation of Public Infrastructure Contracts to
Misappropriate Public Funds**

After oil was discovered in EG during the 1990s, EG invested hundreds of
millions of dollars in building public infrastructure projects.  In February 2003, at
the age of thirty-three, Nguema was appointed by his father to the newly-created
post of EG's Minister of Infrastructure and Forests.  Three years later, Nguema
managed to wire more than $68 million out of EG to acquire both the defendant
Sweetwater Property and a $38 million Gulfstream GV jet aircraft.

In an affidavit Nguema filed with the Cape Town High Court in South
Africa on August 8, 2006, the same year that Nguema acquire the Sweetwater
Property, Nguema acknowledged that he, like other EG cabinet ministers, bids on
and benefits from obtaining government contracts awarded to them by his father's
government.  In that affidavit, Nguema affirmed:

> Cabinet Ministers and public servants in Equatorial Guinea are by law
> allowed to [own] companies that, in consortium with a foreign company, can
> bid for government contracts and should the company be successful, then
> what percentage of the total cost of the contract the company gets, will
> depend on the terms negotiated between the parties.
> But, in any event, it means that a cabinet minister ends up with a sizeable
> part of the contract price in his bank account.
>
> &ast;    &ast;    &ast;
>
> One of the companies that I own is SOCIEDAD DE CARRETERAS DE
> GUINEA ECUATORIAL ("SOCAGE"), with a bank account at the CCEI
> BANK GE, in BATA, the commercial capital of [EG].

EG's infrastructure and construction industry, which Nguema was
responsible for regulating when he was EG's Infrastructure Minister, is where
corruption is the most pronounced, according to a report drafted by Ambassador

186

Exhibit 2 Page 196

Fernandez in 2011.  EG's corruption exists in its "murkier transactions such as sweetheart deals, influence peddling, construction contracts and finder's fees."  On March 21, 2011, Nguema met with Ambassador Fernandez and claimed that his personal wealth was attributable to infrastructure contracts awarded to his private businesses by the EG Government—the very industry that Ambassador Fernandez concluded was where corruption was most prevalent in EG, and the same industry that Nguema was in charge of regulating as Infrastructure Minister.

In 2009, Anton Smith, the United States Embassy's deputy chief of mission, noted that he was also concerned that the awarding of public infrastructure contracts in EG was particularly vulnerable to corruption.  According to Smith, "It is in these downstream, public expenditures that we lose visibility and in which the greatest opportunities for corruption persist.  Rumors abound of influence buying, bid rigging and kickbacks" in EG.  With respect to Nguema specifically, Smith noted that Nguema "lives the life of an international playboy and is widely accused of corruption."

Indeed, by March 2004, two years prior to Nguema's acquisition of the Sweetwater Property, Africa Confidential, a U.K. based publication focusing on Africa, reported that, "[Nguema] control[led] much of the infrastructure portfolio" funded by the EG Government's oil revenues.  Africa Confidential reported that:

> The generals who had previously run lucrative cartels in consumer imports, air and road transport, construction and cement etc. then had to secure approval from [Nguema's Infrastructure] Ministry.  He tried to block merchandise coming in for [other EG officials and businesses].  Compared by some to Iraq's late Uday Hussein, [Nguema] expanded his empire rapidly and started pressuring French, Spanish and other foreign companies.

Additional information responsive to this Interrogatory relating to Nguema's involvement in EG's construction and infrastructure sector may be ascertained

187

Exhibit 2 Page 197

from the COMPLAINT as well as documents that have or will be produced by the Government, including DOJ_0000584-592; DOJ_688-718; DOJ_0001049-1080; DOJ_1652-1904; DOJ_0000303-308; DOJ_0000315-321; DOJ_0000413-416; DOJ_0000417-421; DOJ_0000422-425; DOJ_0000426-430; DOJ_0000431-434; DOJ_0000834-837; DOJ_0000864-871; DOJ_00003853-3913; DOJ_0000946-950.

**Nguema's Corrupt Relationship with General Work.**

General Work is a major construction company in EG specializing in large-scale government infrastructure projects.  Italian law enforcement authorities, including officers of the Guardia di Finanzia (GdF), Italy's financial police, reported that they believed that between 2000 and 2007 Nguema stole EG public funds by funneling government revenue through General Work.  General Work was originally formed by two Italian nationals Giulio Cistaro and Giuseppe Vona in 2001 and managed by Vona, Andrew Mannarino and Igor Celotti.  Because of Celotti's close relationship to President Obiang, General Work was awarded major government infrastructure contracts in EG beginning in the early 2000s.  By 2011, General Work had become one of the largest construction companies in EG.  The GdF believed that 45 percent of the revenue earned by General Work in EG was funneled as kickbacks to Nguema.  During this same time period, Nguema acquired the defendant Sweetwater Property, sent hundreds of thousands of dollars from EG into the United States to fraudulently opened bank accounts for the maintenance and upkeep of this property, and made tens of millions of dollars of lavish expenditures and purchases.

The Judicial Police Squad at the Procure in Udine, Italy identified a network of bank accounts in Italy, Austria, Spain, Monte Carlo and Luxembourg controlled

by Nguema and his father.  The GdF explained that they believed that these accounts were derived from monies embezzled from the EG Government by Nguema and President Obiang through infrastructure contracts awarded to General Work by President Obiang.

In 2007, Celotti was killed in an airplane crash near Mongomo, a city on EG's mainland.  The GdF believed that the circumstances surrounding this crash were suspicious.  One month prior to his death, Celotti transferred his corporate holdings, including 45 percent of General Work's equity, to his wife Anna Maria Moro.  After Celotti's death, Gimmy Ricci, another Italian businessman, was appointed as General Work's new general manager.  In addition to acquiring managerial control of General Work, Ricci worked with Moro to form several additional legal entities and companies to serve as receptacles for General Work's ill-gotten revenue.  The remaining equity in General Work was acquired by Nguema's family.  According to the GdF, Nguema's family provided no compensation to other shareholders in exchange for their shares.

After Celotti's death in 2007, the GdF conducted an extensive investigation into General Work and Celotti's financial affairs.  In connection with this investigation, the GdF interviewed former employees and associates of General Work, including Cistaro and Vona.  In addition, they performed a search of Moro's residence in the Friuli region of Italy.  Cistaro and Vona informed the GdF that Nguema's family fraudulently assumed control of General Work.  Based upon their investigation, including an analysis of financial and banking records obtained by the Gdf from Moro, Italian law enforcement authorities concluded that Nguema and his father jointly owned and controlled a network of international bank accounts that contained stolen government monies misappropriated from EG's treasury through General Work's government construction contracts.

When Nguema was negotiating the purchase of the $30 million defendant Sweetwater Property, he sent and received faxes regarding this real estate transaction from Celotti's office at General Work in EG.  For instance, in or around April 2, 2006, Nguema signed and faxed a copy of the Supplemental Escrow Instructions, the Residential Lease After Sale, and the Addendum to the Residental Lease After Sale—all pertaining to the purchase of the defendant Sweetwater Property—to Nagler's office from a fax number in EG (00240) 084096.  This EG fax number belonged to Celotti.  Furthermore, in connection with wiring funds from EG into the United States to support the maintenance and upkeep of the Sweetwater Property, Michael Berger faxed a letter in or around January 20, 2008, to Celotti's fax line in EG, stating, "Here is the information that you need to wire transfer money to Unlimited Horizon, Inc., account at Commercial Capital Bank."  In this same letter, Berger detailed Unlimited Horizon's bank account information, the address of Commercial Capital Bank in Beverly Hills and the bank's telephone number and routing number.

Additional information responsive to this Interrogatory relating to the relationship between Nguema and General Work may be ascertained from the COMPLAINT and documents that have or will be produced by the Government, including DOJ_0000303-308; DOJ_0000315-321; DOJ_0000413-416; DOJ_0000417-421; DOJ_0000422-425; DOJ_0000426-430; DOJ_0000431-434; DOJ_0000809-816; DOJ_00003853-3913; SENATE-PSI-86730; SENATE-PSI-93976; SENATE-PSI-94046; SENATE-PSI-96238-96240.

**Nguema's Attempt to Misappropriate $40 Million in Public Funds to Acquire a Gulfstream Jet**

In 2004, two years before Nguema acquired the defendant Sweetwater Property, Nguema contacted Gulfstream Aerospace Corporation (GAC) and

expressed interest in purchasing a $40 million aircraft from GAC.  Stephen Arnold Fuller, GAC's regional vice president for Sub-Saharan Africa, recalled that Nguema informed GAC that he intended to finance the purchase of this aircraft by diverting $40 million in public funds from the EG Government through an American oil company.

Nguema told Mr. Fuller that he could and would pay for the $40 million aircraft with public funds by having an "American oil company" initially pay GAC for the aircraft.  EG would then, according to Nguema, "repay the American oil company through credits to the company's local account in EG."  In a letter dated April 20, 2004, Fuller confirmed that Nguema was proposing to purchase from GAC a Gulfstream 550 with misappropriated public funds.  Mr. Fuller stated in that letter:

> [Nguema] is suggesting that [GAC] contact the Chairman of Ocean Energy in Houston, Texas with regard to the Gulfstream 550.  There may be an advantage in assigning the Sales Agreement to Ocean Energy and having that company assume the payment obligations for the Gulfstream 550.  In return, the Government [of EG] would issue a Credit Memorandum to Ocean Energy for amounts payable in connection with oil production.

Raymond Banoun, managing partner of Cadwalader, Wickersham & Taft, LLP, a New York-based law firm, served as an attorney for GAC in connection with this transaction.  Like Mr. Fuller, Mr. Banoun recalled that in 2004, Nguema represented to GAC that he would misappropriate EG public funds by (i) having Ocean Energy, an American oil company, purchase the $40 million aircraft and "assume the payments on his behalf" and then (ii) "in return" have the "Equatorial Guinea government [] issue a credit memo to Ocean Energy for monies connected with oil production in Equatorial Guinea."

Exhibit 2 Page 201

Additional information responsive to this Interrogatory relating to Nguema's relationship and communications with GAC may be ascertained from the COMPLAINT as well as documents that have or will be produced by the Government, including DOJ_0000114-166; DOJ_0000388-393; SENATE-PSI-119217-120245; SENATE-PSI-120318-120347; SENATE-PSI-124429-126128.

**Accusations of Direct Diversion of EG Public Funds**

In South Africa, George Ehlers, a South African businessman, filed a lawsuit in the Cape Town High Court against the EG Government.  In that litigation which was filed in or around July 2005, less than one year prior to Nguema's acquisition of the Sweetwater Property, Ehlers alleged that the EG Government was in breach of a $7.8 million government infrastructure contract with his company, Engineering Design and Construction Company.  After the EG Government seized some of his company's assets in EG and refused to pay his company for its services, Ehlers filed a lawsuit seeking to attach two homes valued at $7 million owned by Nguema in South Africa.  The two homes were located at Erf 477 Clifton Ridge and Erf 303 Constantia in Cape Town.  The funds used to purchase these properties were wired in 2004 into South Africa from an account at CCEI Bank in EG held in the name of Socage, an EG company owned by Nguema.

Ehlers alleged that because Nguema could not have afforded to purchase these assets on his income as an EG public official, Nguema must have used funds misappropriated from the EG Government to acquire and renovate these properties.  Indeed, even the contractors hired to renovate the property believed that these assets were owned by the EG Government.  In support of his lawsuit, Ehlers filed an affidavit executed by Patricia Fuller.  Fuller recalled that she spoke with Peter McNamara, a contractor hired to renovate Nguema's property in Constantia.  McNamara, according to Fuller, advised her that he had never heard of Nguema

Exhibit 2 Page 202

and that he was communicating with the EG Government about how to renovate the property.  Furthermore, McNamara claimed that he was under the impression that the property belonged to the EG Government.  McNamara submitted an invoice for in or around R 3,144,524 (approximately $359,532) to Jacques Levy, an interior decorator in Switzerland, for his services relating to Nguema's house in Constantia.  As McNamara had no knowledge of Nguema, and was receiving his instructions from the EG Government regarding the home's renovations, Ehlers alleged that the funds used to acquire and renovate these properties were misappropriated from the EG Government.  Although Ehlers prevailed against Nguema before the trial court, an appellate court reversed that decision on other grounds.

Additional information responsive to this Interrogatory relating to Mr. Ehlers' lawsuit in South Africa may be ascertained from documents that have or will be produced by the Government, including DOJ_0000281-284; DOJ_0000464-469; DOJ_0001049-1080; DOJ_1652-1904; DOJ_0000890-893.

## II.

## EXTORTION AND BRIBERY

Beginning in the 1990s, Nguema, as described in the COMPLAINT, received and demanded that companies in E.G provide him with money or property in order to be able to maintain and operate their businesses.  Nguema abused his authority and influence within the EG Government both as a member of the cabinet and President Obiang's eldest son to make these demands and to retaliate against those who refused to acquiesce.

**<u>Extortion and Solicitation of Bribes from Forestry Companies</u>**

In 1998, at the age of 29, Nguema was appointed by his father to serve as EG's first-ever Minister of Forestry and Agriculture.  Timber is EG's second

Exhibit 2 Page 203

largest and most valuable export commodity.  Nguema's Forestry Ministry (Ministry) controls timber harvesting operations in EG.  The Ministry also controls timber exports.  In order to export timber from EG, Nguema requires that timber companies obtain an export authorization document that is personally signed by him.  Timber companies incur expenses of up to $5,000 per day if Nguema delays in signing these requests.


**Extortion Payments and Bribes from Forestry Companies**

Foreign timber executives claim that their companies were routinely required to pay bribes to Nguema in order to do business in EG.  Foreign Policy Magazine quoted one timber executive as stating, "[Nguema] would call emergency meetings of all the logging company heads in which he would announce some new tax on logging operations."  According to this executive, Nguema charged timber companies an extra so-called "tax" that they were forced to pay him personally for wood harvested in EG.  Nguema purportedly charged timber companies directly per cubic meter of timber harvested by that company.

A French timber executive, identified as "Jean Michel" in this same Foreign Policy Magazine article, reported that Nguema seized the French logging company he worked for in EG.  It was impossible, according to Jean Michel, for timber companies to do business in EG without paying bribes to Nguema.  Although Jean Michel's company initially paid Nguema the bribes that he demanded, the EG military shut down this company's operations and expelled its personnel from EG after it refused to make any further bribe payments to Nguema.

Independent NGOs have also reported that Nguema extorts payments and solicits bribes from timber companies in EG.  For instance, a former United States

intelligence official, who was familiar with EG, reported to Global Witness, that Nguema solicits and accepts bribes from Malaysian, North Korean and Chinese timber companies.  According to this intelligence official, "There were Malaysian, North Korean, and Chinese logging camps on the mainland [of EG], and [Nguema] collected cash from them . . . for logging operations, much of it involving valuable hardwood."

While Nguema solicits and collects bribes from foreign timber companies, he also permits these same companies to violate EG's forestry laws and regulations.  Indeed, according to representatives of the Environmental Investigation Agency (EIA), an environmental NGO, corruption is pervasive in EG's forestry sector and some foreign timber companies, including Shimmer International of Malaysia (Shimmer), are permitted illegally to harvest timber in EG's protected forests reserves.

Several independent NGOs, including Forest Monitor, Green Peace and the World Rain Forest Movement, confirmed that Nguema does not enforce EG's forestry laws on some foreign timber companies, including Shimmer.  For instance, Shimmer engages in illegal logging in protected national forests in EG, including Monte Alen, even though these forest reserves are protected from industrial logging under EG's Forestry Law. Greenpeace reported that in 2004, "Enforcement of legal requirements is virtually non-existent in commercial logging" in EG.  Similarly, Forests Monitor, a U.K. NGO, concluded in 2001 that, "[i]n practice, enforcement of all the various legal requirements [in EG's forestry sector] is virtually non-existent."

Likewise, while Nguema held the position of Forestry Minister, some timber companies were permitted to overcut EG's forests.  Although EG's Forestry Law places limits on how much timber can be harvested by concessionaires and

requires these entities to process 60 percent of their timber in EG, many timber companies, including Shimmer, were operating in violation of these rules. According to a United States Forest Service ranger, who visited EG between July 31, 2004, and August 15, 2004, "[i]t is clear that in some areas that [EG] forests [were] being overcut."  Similarly, EIA representatives confirmed that Shimmer, the dominant timber company in EG, was permitted to illegally export the bulk of its raw timber to China without processing it domestically.

Additional information responsive to this Interrogatory relating to Nguema's control of EG's forestry sector and his solicitation of bribes and extortion payments from timber companies may be ascertained from the COMPLAINT and documents that have or will be produced by the Government, including DOJ_0000408-412; DOJ_0001049-1080; DOJ_0000842-863; DOJ_0000614-615; DOJ_975-1048; DOJ_758-777; DOJ_778-789.

**Nguema's Relationship with Shimmer International**

Nguema reportedly maintains a close working relationship with Shimmer that benefitted him personally.  While Nguema was its head, EG's Forestry Ministry awarded Shimmer substantial forestry concessions.  Shimmer was the largest and most dominant forestry company in EG.  Indeed, in 2006, the same year that Nguema purchased the Sweetwater Property, Shimmer was responsible for more than 66 percent of the timber harvested in that country.  According to a former U.S. intelligence official who spoke with Global Witness, Nguema solicited and collected bribes from Shimmer in EG.

Nguema confirmed to U.S. diplomats at the Embassy in 2009 that he permitted a Malaysian company to deploy 40 teams of well-equipped lumberjacks to "clear cut" a "large tract of pristine continental jungle" that was "granted" to him by the EG Government.  Nguema then purportedly earned a "large windfall"

by exporting this raw timber to Asia.   It is illegal under EG's Forestry law to permit this type of "clear cutt[ing]."  EG law also requires timber concessionaires, like Nguema, to process domestically a minimum of 60 percent of the raw timber they harvest from their concessions.  Nguema, however, exported his raw timber as "whole logs" to Asia.  Although it was Nguema's responsibility as EG's Forestry Minister to enforce these laws, Nguema explained to U.S. diplomats that this illegal "windfall" was the source of his personal wealth.

Additional information responsive to this Interrogatory relating to Nguema's relationship with timber companies, including Shimmer, may be ascertained from the COMPLAINT as well as documents that have or will be produced by the Government, including DOJ_0000408-412; DOJ_0001049-1080; DOJ_975-1048; DOJ_778-789.

## British Hotel Company

In or around 2003, a British company sought permission to build a Sheraton hotel in Malabo, EG's capital city located on Bioko Island.  According to Simon Kareri, a Riggs Bank vice president, Nguema refused to permit the British company to build the Malabo hotel unless its executives agreed to provide him with 55 percent of the hotel's equity.  When the British company refused, their hotel project was not allowed to go forward. Nguema purportedly accompanied representatives of this British company to Nguema's Los Angeles home to engage in negotiations about this hotel.

Additional information responsive to this Interrogatory relating to this British company may be ascertained from documents that have or will be produced by the Government, including DOJ_000080-87.

**G.E. Petrol**

G. E. Petrol is EG's state-owned oil company.  According to Kareri, when he was employed at Riggs prior to 2005, G.E. Petrol was still "run by the First Family" of EG and Nguema was the company's "*patron*."  In Spanish, which is one of EG's official languages, the word "*patron*" means "master" or "boss."  Even though Nguema "flunked high school and does not know how to do anything," according to Kareri, Nguema controlled G.E. Petrol as its "*patron*".  Kareri stated that "the big money from the [foreign] oil companies is being paid to the First Family through joint venture projects in EG" and that corrupt payments were disbursed by G.E. Petrol to "so-called oil brokers" controlled by Nguema's family.  These brokers, according to Kareri, make further profits for Nguema's family by purchasing oil from G.E. Petrol at discounted rates.

According to Kareri, Nguema's family "may be skimming money from the sale of [EG's] share of oil produced by the oil companies in EG."  Nguema, according to Kareri, often made remarks to him suggesting that he is GE Petrol's "*patron*."  On one occasion, Kareri recalled that G.E. Petrol requested that he divert directly a certain percentage of EG's oil revenue to an account controlled by G.E. Petrol.  Kareri refused.

Similarly, as explained above at Section XI(B), Nguema represented to GAC that he possessed both the ability and the intent to misappropriate public funds from the EG treasury relating to oil production.  Specifically, he claimed that he could provide an American oil money with a $38.5 million "credit memorandum" derived from public funds to acquire a personal asset for himself.

Kareri and Nguema purportedly had a close business and personal relationship.  Nguema consulted Kareri frequently about both financial and personal issues, including "personal problems" Nguema had with his father.

Kareri commented to his wife, that it was unfortunate that Nguema was "blowing" the money from EG.

Additional information responsive to this Interrogatory relating to G.E. Petrol may be ascertained from documents that have or will be produced by the Government, including DOJ_000038-94 and DOJ_0000241-244.

**Foreign Oil Companies**

Walter International (Walter) was a Houston-based oil company operating in EG.  In 1991, Nguema enrolled at Pepperdine University's English language program in Malibu, California.  According to Ambassador John Bennett, a former United States Ambassador  to EG during the early 1990s, Nguema's Pepperdine tuition and expenses were fully paid for by Walter.  Elisa Wax, a Pepperdine employee, recalled that Pepperdine received a "steady stream of phone calls from the Beverly Wilshire [Hotel] and shops in Beverly Hills trying to track down [Nguema] to settle outstanding bills."  Wax would direct these calls to Walter International.  Ambassador Bennett recalled that Nguema incurred, and Walter paid, $50,000 in expenses while attending Pepperdine in California.

In November 2009, Global Witness reported that Nguema received corrupt payments from Elf-Acquitaine, a French oil and gas company.  In 2004, thirty senior executives of Elf Acquitaine were charged and convicted in France of distributing bribes and kickbacks in Africa over a period of several decades.

A confidential source ("CI 3"), who spoke with federal agents in Miami, Florida, also confirmed that it was his/her belief that Nguema controls the oil industry in EG and that he derives his wealth from illegal activities in EG, including the distribution of counterfeit cigarettes, diamond smuggling and monetary kickbacks in the form of contracts from United States oil companies operating in EG.

Another confidential source (CI 2), who spoke with federal agents and was a former employee of Nguema in Los Angeles in or around 2006, the same year that Nguema acquired the Sweetwater Property, recalled that Nguema told him/her that the source of his wealth was related to EG's oil resources.  CI 2 was an employee of Nguema who worked at the defendant Sweetwater Property.  Even though Nguema holds no official position within the EG Government related to the oil industry, CI 2 recalls seeing three "oil officials" meet with Nguema at the Sweetwater Property during the second week of November 2006.

Additional information responsive to this Interrogatory relating to Nguema's relationship with the oil and gas industry may be ascertained from documents that have or will be produced by the Government, including DOJ_0000114-0000166; DOJ_0000241-244; DOJ_0000265-268; DOJ_0000388-393; DOJ_0000394-398; DOJ_0000842-863; DOJ_0001049-1080; SENATE-PSI-119217-120245; SENATE-PSI-120318-120347; SENATE-PSI-124429-126128.

**Michael Chevaly**

An individual named Michael Chevaly allegedly smuggles various fraudulently manufactured consumer goods into Cameroon, Nigeria, Benin, Niger, Chad, Sierra Leone, Liberia, Guinea-Conakry and Gabon.  In so doing, Chevaly purportedly uses routes through EG, Niger and Benin to smuggle this merchandise. CI 3 informed federal agents that Nguema possesses a business relationship with Chevaly relating to this illegal conduct.  Additional information responsive to this Interrogatory relating to the relationship between Nguema and Chevaly may be ascertained from documents that have or will be produced by the Government, including DOJ_0000246-251.

## INTERROGATORY NO.  17

State all facts that support the allegations in Paragraph 76 of YOUR COMPLAINT that "Nguema has misappropriated, embezzled and stolen government funds and resources in violation of EG law," and IDENTIFY (a) all sources of such facts; (b) the date YOU first became aware of such facts; (c) all PERSONS with knowledge of such facts; and (d) all DOCUMENTS that REFER OR RELATE TO such facts.

## RESPONSE TO INTERROGATORY NO. 17

The United States objects to this Interrogatory as it is overly broad and unduly burdensome, as it seeks information obtained by the Government after the filing of the COMPLAINT and is not limited by temporal scope.  The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they purport to impose obligations on the Government beyond the scope of the Discovery Order.  On September 6, 2012, the Court authorized Claimants to propound limited discovery on the probable cause the United States had when it filed the instant forfeiture action.  As such, to the extent that this Interrogatory seeks information beyond the scope of the Discovery Order, the Government objects and will not produce such information, as it is neither relevant nor reasonably calculated to discover evidence that the Government had for purposes of probable cause when it filed the present action.  The United States does, however, expressly reserve the right to supplement, clarify, revise, or correct any or all of the Responses and Objections (General and Specific) herein consistent with Fed. R. Civ. P. 26(e), and to assert additional objections or privileges, in one or more subsequent supplemental response(s).

The United States further objects to this Interrogatory to the extent it calls for a narrative.   See, e.g., Wilcox v. Changala, 2012 U.S. Dist. LEXIS 5471, at

*6-7 (E. D. Wash. Jan. 18, 2012) (contention interrogatories that "ask the responding party to identify each and every supporting fact about a particular allegation are an abuse of the discovery process").  The United States further objects to this Interrogatory on the grounds that it calls for the disclosure of information subject to the attorney-client privilege, the work product doctrine or the informant's privilege.  The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they seek information outside the possession, custody or control of DOJ and ICE.  The United States further objects to this Interrogatory as it is overly broad and unduly burdensome, as the definition of "YOUR" includes foreign sovereign governments and entities other than DOJ and ICE.

The United States also objects to this Interrogatory on the ground that it is compound and contains impermissible discrete subparts, which relate to distinct matters and therefore constitutes multiple interrogatories.  See, e.g., Sattari v. Citi Mortgage, 2010 U.S. Dist. LEXIS 125687, at *3 (D. Nev. Nov. 17, 2010) (interrogatories "should consist of a brief, simple, direct, and unambiguous question, dealing with one point only.").  The United States further objects to this Interrogatory on the ground that, when combined with the preceding Interrogatories, this Interrogatory violates the 25 interrogatory limit set forth in Fed. R. Civ. P. 33(a)(1).  Because the Government has already responded to 25 interrogatories, it is not required to respond to this Interrogatory.  See Capaccione v. Charlotte-Mecklenburg Schools, 182 F.R.D. 486, 496, n. 4 (W.D.N.C. 1998).

To the extent that that this request seeks information relating to the recruitment or handling of confidential informants by a federal law enforcement agency, the United States objects to the request and will not produce that information.  See, e.g., Roviaro v. United States, 353 U.S. 53 (1957).  The United

States further objects to this Interrogatory as it is unnecessary and unduly burdensome, as it is duplicative and redundant of Interrogatory No. 1.

Subject to and without waiving the foregoing general and specific objections, the United States responds as follows:

# I.
## NGUEMA'S MISAPPROPRIATION, THEFT AND EMBEZZLEMENT OF PUBLIC FUNDS

**Nguema's Abuse and Manipulation of Public Infrastructure Contracts to Misappropriate Public Funds**

After oil was discovered in EG during the 1990s, EG invested hundreds of millions of dollars in building public infrastructure projects.  In February 2003, at the age of thirty-three, Nguema was appointed by his father to the newly-created post of EG's Minister of Infrastructure and Forests.  Three years later, Nguema managed to wire more than $68 million out of EG to acquire both the defendant Sweetwater Property and a $38 million Gulfstream GV jet aircraft.

In an affidavit Nguema filed with the Cape Town High Court in South Africa on August 8, 2006, the same year that Nguema acquire the Sweetwater Property, Nguema acknowledged that he, like other EG cabinet ministers, bids on and benefits from obtaining government contracts awarded to them by his father's government.  In that affidavit, Nguema affirmed:

Cabinet Ministers and public servants in Equatorial Guinea are by law allowed to [own] companies that, in consortium with a foreign company, can bid for government contracts and should the company be successful, then what percentage of the total cost of the contract the company gets, will depend on the terms negotiated between the parties.
But, in any event, it means that a cabinet minister ends up with a sizeable part of the contract price in his bank account.

*          *          *

One of the companies that I own is SOCIEDAD DE CARRETERAS DE GUINEA ECUATORIAL ("SOCAGE"), with a bank account at the CCEI BANK GE, in BATA, the commercial capital of [EG].

EG's infrastructure and construction industry, which Nguema was responsible for regulating when he was EG's Infrastructure Minister, is where corruption is the most pronounced, according to a report drafted by Ambassador Fernandez in 2011.  EG's corruption exists in its "murkier transactions such as sweetheart deals, influence peddling, construction contracts and finder's fees."  On March 21, 2011, Nguema met with Ambassador Fernandez and claimed that his personal wealth was attributable to infrastructure contracts awarded to his private businesses by the EG Government—the very industry that Ambassador Fernandez concluded was where corruption was most prevalent in EG, and the same industry that Nguema was in charge of regulating as Infrastructure Minister.

In 2009, Anton Smith, the United States Embassy's deputy chief of mission, noted that he was also concerned that the awarding of public infrastructure contracts in EG was particularly vulnerable to corruption.  According to Smith, "It is in these downstream, public expenditures that we lose visibility and in which the greatest opportunities for corruption persist.  Rumors abound of influence buying, bid rigging and kickbacks" in EG.  With respect to Nguema specifically, Smith noted that Nguema "lives the life of an international playboy and is widely accused of corruption."

Indeed, by March 2004, two years prior to Nguema's acquisition of the Sweetwater Property, Africa Confidential, a U.K. based publication focusing on Africa, reported that, "[Nguema] control[led] much of the infrastructure portfolio" funded by the EG Government's oil revenues.  Africa Confidential reported that:

The generals who had previously run lucrative cartels in consumer imports, air and road transport, construction and cement etc. then had

204

Exhibit 2 Page 214

to secure approval from [Nguema's Infrastructure] Ministry.  He tried to block merchandise coming in for [other EG officials and businesses].  Compared by some to Iraq's late Uday Hussein, [Nguema] expanded his empire rapidly and started pressuring French, Spanish and other foreign companies.

Additional information responsive to this Interrogatory relating to Nguema's involvement in EG's construction and infrastructure sector may be ascertained from the COMPLAINT as well as documents that have or will be produced by the Government, including DOJ_0000584-592; DOJ_688-718; DOJ_0001049-1080; DOJ_1652-1904; DOJ_0000303-308; DOJ_0000315-321; DOJ_0000413-416; DOJ_0000417-421; DOJ_0000422-425; DOJ_0000426-430; DOJ_0000431-434; DOJ_0000834-837; DOJ_0000864-871; DOJ_00003853-3913; DOJ_0000946-950.

**Nguema's Corrupt Relationship with General Work.**

General Work is a major construction company in EG specializing in large-scale government infrastructure projects.  Italian law enforcement authorities, including officers of the Guardia di Finanzia (GdF), Italy's financial police, reported that they believed that between 2000 and 2007 Nguema stole EG public funds by funneling government revenue through General Work.  General Work was originally formed by two Italian nationals Giulio Cistaro and Giuseppe Vona in 2001 and managed by Vona, Andrew Mannarino and Igor Celotti.  Because of Celotti's close relationship to President Obiang, General Work was awarded major government infrastructure contracts in EG beginning in the early 2000s.  By 2011, General Work had become one of the largest construction companies in EG.  The GdF believed that 45 percent of the revenue earned by General Work in EG was funneled as kickbacks to Nguema.  During this same time period, Nguema acquired the defendant Sweetwater Property, sent hundreds of thousands of dollars

from EG into the United States to fraudulently opened bank accounts for the maintenance and upkeep of this property, and made tens of millions of dollars of lavish expenditures and purchases.

The Judicial Police Squad at the Procure in Udine, Italy identified a network of bank accounts in Italy, Austria, Spain, Monte Carlo and Luxembourg controlled by Nguema and his father.  The GdF explained that they believed that these accounts were derived from monies embezzled from the EG Government by Nguema and President Obiang through infrastructure contracts awarded to General Work by President Obiang.

In 2007, Celotti was killed in an airplane crash near Mongomo, a city on EG's mainland.  The GdF believed that the circumstances surrounding this crash were suspicious.  One month prior to his death, Celotti transferred his corporate holdings, including 45 percent of General Work's equity, to his wife Anna Maria Moro.  After Celotti's death, Gimmy Ricci, another Italian businessman, was appointed as General Work's new general manager.  In addition to acquiring managerial control of General Work, Ricci worked with Moro to form several additional legal entities and companies to serve as receptacles for General Work's ill-gotten revenue.  The remaining equity in General Work was acquired by Nguema's family.  According to the GdF, Nguema's family provided no compensation to other shareholders in exchange for their shares.

After Celotti's death in 2007, the GdF conducted an extensive investigation into General Work and Celotti's financial affairs.  In connection with this investigation, the GdF interviewed former employees and associates of General Work, including Cistaro and Vona.  In addition, they performed a search of Moro's residence in the Friuli region of Italy.  Cistaro and Vona informed the GdF that Nguema's family fraudulently assumed control of General Work.  Based upon

their investigation, including an analysis of financial and banking records obtained by the Gdf from Moro, Italian law enforcement authorities concluded that Nguema and his father jointly owned and controlled a network of international bank accounts that contained stolen government monies misappropriated from EG's treasury through General Work's government construction contracts.

When Nguema was negotiating the purchase of the $30 million defendant Sweetwater Property, he sent and received faxes regarding this real estate transaction from Celotti's office at General Work in EG.  For instance, in or around April 2, 2006, Nguema signed and faxed a copy of the Supplemental Escrow Instructions, the Residential Lease After Sale, and the Addendum to the Residental Lease After Sale—all pertaining to the purchase of the defendant Sweetwater Property—to Nagler's office from a fax number in EG (00240) 084096.  This EG fax number belonged to Celotti.  Furthermore, in connection with wiring funds from EG into the United States to support the maintenance and upkeep of the Sweetwater Property, Michael Berger faxed a letter in or around January 20, 2008, to Celotti's fax line in EG, stating, "Here is the information that you need to wire transfer money to Unlimited Horizon, Inc., account at Commercial Capital Bank."  In this same letter, Berger detailed Unlimited Horizon's bank account information, the address of Commercial Capital Bank in Beverly Hills and the bank's telephone number and routing number.

Additional information responsive to this Interrogatory relating to the relationship between Nguema and General Work may be ascertained from the COMPLAINT and documents that have or will be produced by the Government, including DOJ_0000303-308; DOJ_0000315-321; DOJ_0000413-416; DOJ_0000417-421; DOJ_0000422-425; DOJ_0000426-430; DOJ_0000431-434;

DOJ_0000809-816; DOJ_00003853-3913; SENATE-PSI-86730; SENATE-PSI-93976; SENATE-PSI-94046; SENATE-PSI-96238-96240.

**Nguema's Attempt to Misappropriate $40 Million in Public Funds to Acquire a Gulfstream Jet**

In 2004, two years before Nguema acquired the defendant Sweetwater Property, Nguema contacted Gulfstream Aerospace Corporation (GAC) and expressed interest in purchasing a $40 million aircraft from GAC.  Stephen Arnold Fuller, GAC's regional vice president for Sub-Saharan Africa, recalled that Nguema informed GAC that he intended to finance the purchase of this aircraft by diverting $40 million in public funds from the EG Government through an American oil company.

Nguema told Mr. Fuller that he could and would pay for the $40 million aircraft with public funds by having an "American oil company" initially pay GAC for the aircraft.  EG would then, according to Nguema, "repay the American oil company through credits to the company's local account in EG."  In a letter dated April 20, 2004, Fuller confirmed that Nguema was proposing to purchase from GAC a Gulfstream 550 with misappropriated public funds.  Mr. Fuller stated in that letter:

> [Nguema] is suggesting that [GAC] contact the Chairman of Ocean Energy in Houston, Texas with regard to the Gulfstream 550.  There may be an advantage in assigning the Sales Agreement to Ocean Energy and having that company assume the payment obligations for the Gulfstream 550.  In return, the Government [of EG] would issue a Credit Memorandum to Ocean Energy for amounts payable in connection with oil production.

Raymond Banoun, managing partner of Cadwalader, Wickersham & Taft, LLP, a New York-based law firm, served as an attorney for GAC in connection with this transaction.  Like Mr. Fuller, Mr. Banoun recalled that in 2004, Nguema

represented to GAC that he would misappropriate EG public funds by (i) having Ocean Energy, an American oil company, purchase the $40 million aircraft and "assume the payments on his behalf" and then (ii) "in return" have the "Equatorial Guinea government [] issue a credit memo to Ocean Energy for monies connected with oil production in Equatorial Guinea."

Additional information responsive to this Interrogatory relating to Nguema's relationship and communications with GAC may be ascertained from the COMPLAINT as well as documents that have or will be produced by the Government, including DOJ_0000114-166; DOJ_0000388-393; SENATE-PSI-119217-120245; SENATE-PSI-120318-120347; SENATE-PSI-124429-126128.

**Accusations of Direct Diversion of EG Public Funds**

In South Africa, George Ehlers, a South African businessman, filed a lawsuit in the Cape Town High Court against the EG Government.  In that litigation which was filed in or around July 2005, less than one year prior to Nguema's acquisition of the Sweetwater Property, Ehlers alleged that the EG Government was in breach of a $7.8 million government infrastructure contract with his company, Engineering Design and Construction Company.  After the EG Government seized some of his company's assets in EG and refused to pay his company for its services, Ehlers filed a lawsuit seeking to attach two homes valued at $7 million owned by Nguema in South Africa.  The two homes were located at Erf 477 Clifton Ridge and Erf 303 Constantia in Cape Town.  The funds used to purchase these properties were wired in 2004 into South Africa from an account at CCEI Bank in EG held in the name of Socage, an EG company owned by Nguema.

Ehlers alleged that because Nguema could not have afforded to purchase these assets on his income as an EG public official, Nguema must have used funds misappropriated from the EG Government to acquire and renovate these properties.

Indeed, even the contractors hired to renovate the property believed that these assets were owned by the EG Government.  In support of his lawsuit, Ehlers filed an affidavit executed by Patricia Fuller.  Fuller recalled that she spoke with Peter McNamara, a contractor hired to renovate Nguema's property in Constantia.  McNamara, according to Fuller, advised her that he had never heard of Nguema and that he was communicating with the EG Government about how to renovate the property.  Furthermore, McNamara claimed that he was under the impression that the property belonged to the EG Government.  McNamara submitted an invoice for in or around R 3,144,524 (approximately $359,532) to Jacques Levy, an interior decorator in Switzerland, for his services relating to Nguema's house in Constantia.  As McNamara had no knowledge of Nguema, and was receiving his instructions from the EG Government regarding the home's renovations, Ehlers alleged that the funds used to acquire and renovate these properties were misappropriated from the EG Government.  Although Ehlers prevailed against Nguema before the trial court, an appellate court reversed that decision on other grounds.

Additional information responsive to this Interrogatory relating to Mr. Ehlers' lawsuit in South Africa may be ascertained from documents that have or will be produced by the Government, including DOJ_0000281-284; DOJ_0000464-469; DOJ_0001049-1080; DOJ_1652-1904; DOJ_0000890-893.

## II.

## EXTORTION AND BRIBERY

Beginning in the 1990s, Nguema, as described in the COMPLAINT, received and demanded that companies in E.G provide him with money or property in order to be able to maintain and operate their businesses.  Nguema abused his authority and influence within the EG Government both as a member of the cabinet

and President Obiang's eldest son to make these demands and to retaliate against those who refused to acquiesce.

**Extortion and Solicitation of Bribes from Forestry Companies**

In 1998, at the age of 29, Nguema was appointed by his father to serve as EG's first-ever Minister of Forestry and Agriculture. Timber is EG's second largest and most valuable export commodity. Nguema's Forestry Ministry (Ministry) controls timber harvesting operations in EG. The Ministry also controls timber exports. In order to export timber from EG, Nguema requires that timber companies obtain an export authorization document that is personally signed by him. Timber companies incur expenses of up to $5,000 per day if Nguema delays in signing these requests.

**Extortion Payments and Bribes from Forestry Companies**

Foreign timber executives claim that their companies were routinely required to pay bribes to Nguema in order to do business in EG. Foreign Policy Magazine quoted one timber executive as stating, "[Nguema] would call emergency meetings of all the logging company heads in which he would announce some new tax on logging operations." According to this executive, Nguema charged timber companies an extra so-called "tax" that they were forced to pay him personally for wood harvested in EG. Nguema purportedly charged timber companies directly per cubic meter of timber harvested by that company.

A French timber executive, identified as "Jean Michel" in this same Foreign Policy Magazine article, reported that Nguema seized the French logging company he worked for in EG. It was impossible, according to Jean Michel, for timber companies to do business in EG without paying bribes to Nguema. Although Jean Michel's company initially paid Nguema the bribes that he demanded, the EG

military shut down this company's operations and expelled its personnel from EG after it refused to make any further bribe payments to Nguema.

Independent NGOs have also reported that Nguema extorts payments and solicits bribes from timber companies in EG.  For instance, a former United States intelligence official, who was familiar with EG, reported to Global Witness, that Nguema solicits and accepts bribes from Malaysian, North Korean and Chinese timber companies.  According to this intelligence official, "There were Malaysian, North Korean, and Chinese logging camps on the mainland [of EG], and [Nguema] collected cash from them . . . for logging operations, much of it involving valuable hardwood."

While Nguema solicits and collects bribes from foreign timber companies, he also permits these same companies to violate EG's forestry laws and regulations.  Indeed, according to representatives of the Environmental Investigation Agency (EIA), an environmental NGO, corruption is pervasive in EG's forestry sector and some foreign timber companies, including Shimmer International of Malaysia (Shimmer), are permitted illegally to harvest timber in EG's protected forests reserves.

Several independent NGOs, including Forest Monitor, Green Peace and the World Rain Forest Movement, confirmed that Nguema does not enforce EG's forestry laws on some foreign timber companies, including Shimmer.  For instance, Shimmer engages in illegal logging in protected national forests in EG, including Monte Alen, even though these forest reserves are protected from industrial logging under EG's Forestry Law. Greenpeace reported that in 2004, "Enforcement of legal requirements is virtually non-existent in commercial logging" in EG.  Similarly, Forests Monitor, a U.K. NGO, concluded in 2001 that,

212

Exhibit 2 Page 222

"[i]n practice, enforcement of all the various legal requirements [in EG's forestry sector] is virtually non-existent."

Likewise, while Nguema held the position of Forestry Minister, some timber companies were permitted to overcut EG's forests.  Although EG's Forestry Law places limits on how much timber can be harvested by concessionaires and requires these entities to process 60 percent of their timber in EG, many timber companies, including Shimmer, were operating in violation of these rules. According to a United States Forest Service ranger, who visited EG between July 31, 2004, and August 15, 2004, "[i]t is clear that in some areas that [EG] forests [were] being overcut."  Similarly, EIA representatives confirmed that Shimmer, the dominant timber company in EG, was permitted to illegally export the bulk of its raw timber to China without processing it domestically.

Additional information responsive to this Interrogatory relating to Nguema's control of EG's forestry sector and his solicitation of bribes and extortion payments from timber companies may be ascertained from the COMPLAINT and documents that have or will be produced by the Government, including DOJ_0000408-412; DOJ_0001049-1080; DOJ_0000842-863; DOJ_0000614-615; DOJ_975-1048; DOJ_758-777; DOJ_778-789.

**Nguema's Relationship with Shimmer International**

Nguema reportedly maintains a close working relationship with Shimmer that benefits him personally.  While Nguema was its head, EG's Forestry Ministry awarded Shimmer substantial forestry concessions.  Shimmer was the largest and most dominant forestry company in EG.  Indeed, in 2006, the same year that Nguema purchased the Sweetwater Property, Shimmer was responsible for more than 66 percent of the timber harvested in that country.  According to a former

Exhibit 2 Page 223

U.S. intelligence official who spoke with Global Witness, Nguema solicited and collected bribes from Shimmer in EG.

Nguema confirmed to U.S. diplomats at the Embassy in 2009 that he permitted a Malaysian company to deploy 40 teams of well-equipped lumberjacks to "clear cut" a "large tract of pristine continental jungle" that was "granted" to him by the EG Government.  Nguema then purportedly earned a "large windfall" by exporting this raw timber to Asia.   It is illegal under EG's Forestry law to permit this type of "clear cutt[ing]."  EG law also requires timber concessionaires, like Nguema, to process domestically a minimum of 60 percent of the raw timber they harvest from their concessions.  Nguema, however, exported his raw timber as "whole logs" to Asia.  Although it was Nguema's responsibility as EG's Forestry Minister to enforce these laws, Nguema explained to U.S. diplomats that this illegal "windfall" was the source of his personal wealth.

Additional information responsive to this Interrogatory relating to Nguema's relationship with timber companies, including Shimmer, may be ascertained from the COMPLAINT as well as documents that have or will be produced by the Government, including DOJ_0000408-412; DOJ_0001049-1080; DOJ_975-1048; DOJ_778-789.

**British Hotel Company**

In or around 2003, a British company sought permission to build a Sheraton hotel in Malabo, EG's capital city located on Bioko Island.  According to Simon Kareri, a Riggs Bank vice president, Nguema refused to permit the British company to build the Malabo hotel unless its executives agreed to provide him with 55 percent of the hotel's equity.  When the British company refused, their hotel project was not allowed to go forward. Nguema purportedly accompanied

representatives of this British company to Nguema's Los Angeles home to engage in negotiations about this hotel.

Additional information responsive to this Interrogatory relating to this British company may be ascertained from documents that have or will be produced by the Government, including DOJ_000080-87.

**G.E. Petrol**

G. E. Petrol is EG's state-owned oil company. According to Kareri, when he was employed at Riggs prior to 2005, G.E. Petrol was still "run by the First Family" of EG and Nguema was the company's "*patron*." In Spanish, which is one of EG's official languages, the word "*patron*" means "master" or "boss." Even though Nguema "flunked high school and does not know how to do anything," according to Kareri, Nguema controlled G.E. Petrol as its "*patron*". Kareri stated that "the big money from the [foreign] oil companies is being paid to the First Family through joint venture projects in EG" and that corrupt payments were disbursed by G.E. Petrol to "so-called oil brokers" controlled by Nguema's family. These brokers, according to Kareri, make further profits for Nguema's family by purchasing oil from G.E. Petrol at discounted rates.

According to Kareri, Nguema's family "may be skimming money from the sale of [EG's] share of oil produced by the oil companies in EG." Nguema, according to Kareri, often made remarks to him suggesting that he is GE Petrol's "*patron*." On one occasion, Kareri recalled that G.E. Petrol requested that he divert directly a certain percentage of EG's oil revenue to an account controlled by G.E. Petrol. Kareri refused.

Similarly, as explained above at Section XI(B), Nguema represented to GAC that he possessed both the ability and the intent to misappropriate public funds from the EG treasury relating to oil production. Specifically, he claimed that he

could provide an American oil money with a $38.5 million "credit memorandum" derived from public funds to acquire a personal asset for himself.

Kareri and Nguema purportedly had a close business and personal relationship.  Nguema consulted Kareri frequently about both financial and personal issues, including "personal problems" Nguema had with his father.  Kareri commented to his wife, that it was unfortunate that Nguema was "blowing" the money from EG.

Additional information responsive to this Interrogatory relating to G.E. Petrol may be ascertained from documents that have or will be produced by the Government, including DOJ_000038-94 and DOJ_0000241-244.

**Foreign Oil Companies**

Walter International (Walter) was a Houston-based oil company operating in EG.  In 1991, Nguema enrolled at Pepperdine University's English language program in Malibu, California.  According to Ambassador John Bennett, a former United States Ambassador  to EG during the early 1990s, Nguema's Pepperdine tuition and expenses were fully paid for by Walter.  Elisa Wax, a Pepperdine employee, recalled that Pepperdine received a "steady stream of phone calls from the Beverly Wilshire [Hotel] and shops in Beverly Hills trying to track down [Nguema] to settle outstanding bills."  Wax would direct these calls to Walter International.  Ambassador Bennett recalled that Nguema incurred, and Walter paid, $50,000 in expenses while attending Pepperdine in California.

In November 2009, Global Witness reported that Nguema received corrupt payments from Elf-Acquitaine, a French oil and gas company.  In 2004, thirty senior executives of Elf Acquitaine were charged and convicted in France of distributing bribes and kickbacks in Africa over a period of several decades.

A confidential source ("CI 3"), who spoke with federal agents in Miami, Florida, also confirmed that it was his/her belief that Nguema controls the oil industry in EG and that he derives his wealth from illegal activities in EG, including the distribution of counterfeit cigarettes, diamond smuggling and monetary kickbacks in the form of contracts from United States oil companies operating in EG.

Another confidential source (CI 2), who spoke with federal agents and was a former employee of Nguema in Los Angeles in or around 2006, the same year that Nguema acquired the Sweetwater Property, recalled that Nguema told him/her that the source of his wealth was related to EG's oil resources.  CI 2 was an employee of Nguema who worked at the defendant Sweetwater Property.  Even though Nguema holds no official position within the EG Government related to the oil industry, CI 2 recalls seeing three "oil officials" meet with Nguema at the Sweetwater Property during the second week of November 2006.

Additional information responsive to this Interrogatory relating to Nguema's relationship with the oil and gas industry may be ascertained from documents that have or will be produced by the Government, including DOJ_0000114-0000166; DOJ_0000241-244; DOJ_0000265-268; DOJ_0000388-393; DOJ_0000394-398; DOJ_0000842-863; DOJ_0001049-1080; SENATE-PSI-119217-120245; SENATE-PSI-120318-120347; SENATE-PSI-124429-126128.

**Michael Chevaly**

An individual named Michael Chevaly allegedly smuggles various fraudulently manufactured consumer goods into Cameroon, Nigeria, Benin, Niger, Chad, Sierra Leone, Liberia, Guinea-Conakry and Gabon.  In so doing, Chevaly purportedly uses routes through EG, Niger and Benin to smuggle this merchandise.  CI 3 informed federal agents that Nguema possesses a business relationship with

Exhibit 2 Page 227

Chevaly relating to this illegal conduct.  Additional information responsive to this Interrogatory relating to the relationship between Nguema and Chevaly may be ascertained from documents that have or will be produced by the Government, including DOJ_0000246-251.

**INTERROGATORY NO.  18**

State all facts that support the allegations in Paragraph 87 of YOUR COMPLAINT that "Nguema diverted EG public resources and monies for his personal use," and IDENTIFY (a) all sources of such facts; (b) the date YOU first became aware of such facts; (c) all PERSONS with knowledge of such facts; and (d) all DOCUMENTS that REFER OR RELATE TO such facts.

**RESPONSE TO INTERROGATORY NO. 18**

The United States objects to this Interrogatory as it is overly broad and unduly burdensome, as it seeks information obtained by the Government after the filing of the COMPLAINT and is not limited by temporal scope.  The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they purport to impose obligations on the Government beyond the scope of the Discovery Order.  On September 6, 2012, the Court authorized Claimants to propound limited discovery on the probable cause the United States had when it filed the instant forfeiture action.  As such, to the extent that this Interrogatory seeks information beyond the scope of the Discovery Order, the Government objects and will not produce such information, as it is neither relevant nor reasonably calculated to discover evidence that the Government had for purposes of probable cause when it filed the present action.  The United States does, however, expressly reserve the right to supplement, clarify, revise, or correct any or all of the Responses and Objections (General and Specific) herein consistent with Fed. R. Civ. P. 26(e), and to assert

additional objections or privileges, in one or more subsequent supplemental response(s).

The United States further objects to this Interrogatory to the extent it calls for a narrative.   See, e.g., Wilcox v. Changala, 2012 U.S. Dist. LEXIS 5471, at *6-7 (E. D. Wash. Jan. 18, 2012) (contention interrogatories that "ask the responding party to identify each and every supporting fact about a particular allegation are an abuse of the discovery process").  The United States further objects to this Interrogatory on the grounds that it calls for the disclosure of information subject to the attorney-client privilege, the work product doctrine or the informant's privilege.  The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they seek information outside the possession, custody or control of DOJ and ICE.  The United States further objects to this Interrogatory as it is overly broad and unduly burdensome, as the definition of "YOUR" includes foreign sovereign governments and entities other than DOJ and ICE.  The United States further objects to this Interrogatory as vague and ambiguous, especially with respect its use of the word "component."

The United States also objects to this Interrogatory on the ground that it is compound and contains impermissible discrete subparts, which relate to distinct matters and therefore constitutes multiple interrogatories.  See, e.g., Sattari v. Citi Mortgage, 2010 U.S. Dist. LEXIS 125687, at *3 (D. Nev. Nov. 17, 2010) (interrogatories "should consist of a brief, simple, direct, and unambiguous question, dealing with one point only.").  The United States further objects to this Interrogatory on the ground that, when combined with the preceding Interrogatories, this Interrogatory violates the 25 interrogatory limit set forth in Fed. R. Civ. P. 33(a)(1).  Because the Government has already responded to 25

Exhibit 2 Page 229

interrogatories, it is not required to respond to this Interrogatory.  See Capaccione v. Charlotte-Mecklenburg Schools, 182 F.R.D. 486, 496, n. 4 (W.D.N.C. 1998).

To the extent that that this request seeks information relating to the recruitment or handling of confidential informants by a federal law enforcement agency, the United States objects to the request and will not produce that information.  See, e.g., Roviaro v. United States, 353 U.S. 53 (1957).  The United States further objects to this Interrogatory as it is unnecessary and unduly burdensome, as it is duplicative and redundant of Interrogatory No. 1.

Subject to and without waiving the foregoing general and specific objections, the United States responds as follows:

# I.
## NGUEMA'S MISAPPROPRIATION, THEFT
## AND EMBEZZLEMENT OF PUBLIC FUNDS

### Nguema's Abuse and Manipulation of Public Infrastructure Contracts to Misappropriate Public Funds

After oil was discovered in EG during the 1990s, EG invested hundreds of millions of dollars in building public infrastructure projects.  In February 2003, at the age of thirty-three, Nguema was appointed by his father to the newly-created post of EG's Minister of Infrastructure and Forests.  Three years later, Nguema managed to wire more than $68 million out of EG to acquire both the defendant Sweetwater Property and a $38 million Gulfstream GV jet aircraft.

In an affidavit Nguema filed with the Cape Town High Court in South Africa on August 8, 2006, the same year that Nguema acquire the Sweetwater Property, Nguema acknowledged that he, like other EG cabinet ministers, bids on and benefits from obtaining government contracts awarded to them by his father's government.  In that affidavit, Nguema affirmed:

> Cabinet Ministers and public servants in Equatorial Guinea are by law allowed to [own] companies that, in consortium with a foreign company, can bid for government contracts and should the company be successful, then what percentage of the total cost of the contract the company gets, will depend on the terms negotiated between the parties.
> But, in any event, it means that a cabinet minister ends up with a sizeable part of the contract price in his bank account.
>
>         *                    *                   *
>
> One of the companies that I own is SOCIEDAD DE CARRETERAS DE GUINEA ECUATORIAL ("SOCAGE"), with a bank account at the CCEI BANK GE, in BATA, the commercial capital of [EG].

EG's infrastructure and construction industry, which Nguema was responsible for regulating when he was EG's Infrastructure Minister, is where corruption is the most pronounced, according to a report drafted by Ambassador Fernandez in 2011.  EG's corruption exists in its "murkier transactions such as sweetheart deals, influence peddling, construction contracts and finder's fees."  On March 21, 2011, Nguema met with Ambassador Fernandez and claimed that his personal wealth was attributable to infrastructure contracts awarded to his private businesses by the EG Government—the very industry that Ambassador Fernandez concluded was where corruption was most prevalent in EG, and the same industry that Nguema was in charge of regulating as Infrastructure Minister.

In 2009, Anton Smith, the United States Embassy's deputy chief of mission, noted that he was also concerned that the awarding of public infrastructure contracts in EG was particularly vulnerable to corruption.  According to Smith, "It is in these downstream, public expenditures that we lose visibility and in which the greatest opportunities for corruption persist.  Rumors abound of influence buying, bid rigging and kickbacks" in EG.  With respect to Nguema specifically, Smith noted that Nguema "lives the life of an international playboy and is widely accused of corruption."

Indeed, by March 2004, two years prior to Nguema's acquisition of the Sweetwater Property, <u>Africa Confidential</u>, a U.K. based publication focusing on Africa, reported that, "[Nguema] control[led] much of the infrastructure portfolio" funded by the EG Government's oil revenues. <u>Africa Confidential</u> reported that:

> The generals who had previously run lucrative cartels in consumer imports, air and road transport, construction and cement etc. then had to secure approval from [Nguema's Infrastructure] Ministry.  He tried to block merchandise coming in for [other EG officials and businesses].  Compared by some to Iraq's late Uday Hussein, [Nguema] expanded his empire rapidly and started pressuring French, Spanish and other foreign companies.

Additional information responsive to this Interrogatory relating to Nguema's involvement in EG's construction and infrastructure sector may be ascertained from the COMPLAINT as well as documents that have or will be produced by the Government, including DOJ_0000584-592; DOJ_688-718; DOJ_0001049-1080; DOJ_1652-1904; DOJ_0000303-308; DOJ_0000315-321; DOJ_0000413-416; DOJ_0000417-421; DOJ_0000422-425; DOJ_0000426-430; DOJ_0000431-434; DOJ_0000834-837; DOJ_0000864-871; DOJ_00003853-3913; DOJ_0000946-950.

**<u>Nguema's Corrupt Relationship with General Work.</u>**

General Work is a major construction company in EG specializing in large-scale government infrastructure projects.  Italian law enforcement authorities, including officers of the Guardia di Finanzia (GdF), Italy's financial police, reported that they believed that between 2000 and 2007 Nguema stole EG public funds by funneling government revenue through General Work.  General Work was originally formed by two Italian nationals Giulio Cistaro and Giuseppe Vona in 2001 and managed by Vona, Andrew Mannarino and Igor Celotti.  Because of Celotti's close relationship to President Obiang, General Work was awarded major

government infrastructure contracts in EG beginning in the early 2000s.  By 2011, General Work had become one of the largest construction companies in EG.  The GdF believed that 45 percent of the revenue earned by General Work in EG was funneled as kickbacks to Nguema.  During this same time period, Nguema acquired the defendant Sweetwater Property, sent hundreds of thousands of dollars from EG into the United States to fraudulently opened bank accounts for the maintenance and upkeep of this property, and made tens of millions of dollars of lavish expenditures and purchases.

The Judicial Police Squad at the Procure in Udine, Italy identified a network of bank accounts in Italy, Austria, Spain, Monte Carlo and Luxembourg controlled by Nguema and his father.  The GdF explained that they believed that these accounts were derived from monies embezzled from the EG Government by Nguema and President Obiang through infrastructure contracts awarded to General Work by President Obiang.

In 2007, Celotti was killed in an airplane crash near Mongomo, a city on EG's mainland.  The GdF believed that the circumstances surrounding this crash were suspicious.  One month prior to his death, Celotti transferred his corporate holdings, including 45 percent of General Work's equity, to his wife Anna Maria Moro.  After Celotti's death, Gimmy Ricci, another Italian businessman, was appointed as General Work's new general manager.  In addition to acquiring managerial control of General Work, Ricci worked with Moro to form several additional legal entities and companies to serve as receptacles for General Work's ill-gotten revenue.  The remaining equity in General Work was acquired by Nguema's family.  According to the GdF, Nguema's family provided no compensation to other shareholders in exchange for their shares.

Exhibit 2 Page 233

After Celotti's death in 2007, the GdF conducted an extensive investigation into General Work and Celotti's financial affairs. In connection with this investigation, the GdF interviewed former employees and associates of General Work, including Cistaro and Vona. In addition, they performed a search of Moro's residence in the Friuli region of Italy. Cistaro and Vona informed the GdF that Nguema's family fraudulently assumed control of General Work. Based upon their investigation, including an analysis of financial and banking records obtained by the Gdf from Moro, Italian law enforcement authorities concluded that Nguema and his father jointly owned and controlled a network of international bank accounts that contained stolen government monies misappropriated from EG's treasury through General Work's government construction contracts.

When Nguema was negotiating the purchase of the $30 million defendant Sweetwater Property, he sent and received faxes regarding this real estate transaction from Celotti's office at General Work in EG. For instance, in or around April 2, 2006, Nguema signed and faxed a copy of the Supplemental Escrow Instructions, the Residential Lease After Sale, and the Addendum to the Residental Lease After Sale—all pertaining to the purchase of the defendant Sweetwater Property—to Nagler's office from a fax number in EG (00240) 084096. This EG fax number belonged to Celotti. Furthermore, in connection with wiring funds from EG into the United States to support the maintenance and upkeep of the Sweetwater Property, Michael Berger faxed a letter in or around January 20, 2008, to Celotti's fax line in EG, stating, "Here is the information that you need to wire transfer money to Unlimited Horizon, Inc., account at Commercial Capital Bank." In this same letter, Berger detailed Unlimited Horizon's bank account information, the address of Commercial Capital Bank in Beverly Hills and the bank's telephone number and routing number.

Additional information responsive to this Interrogatory relating to the relationship between Nguema and General Work may be ascertained from the COMPLAINT and documents that have or will be produced by the Government, including DOJ_0000303-308; DOJ_0000315-321; DOJ_0000413-416; DOJ_0000417-421; DOJ_0000422-425; DOJ_0000426-430; DOJ_0000431-434; DOJ_0000809-816; DOJ_00003853-3913; SENATE-PSI-86730; SENATE-PSI-93976; SENATE-PSI-94046; SENATE-PSI-96238-96240.

**Nguema's Attempt to Misappropriate $40 Million in Public Funds to Acquire a Gulfstream Jet**

In 2004, two years before Nguema acquired the defendant Sweetwater Property, Nguema contacted Gulfstream Aerospace Corporation (GAC) and expressed interest in purchasing a $40 million aircraft from GAC.  Stephen Arnold Fuller, GAC's regional vice president for Sub-Saharan Africa, recalled that Nguema informed GAC that he intended to finance the purchase of this aircraft by diverting $40 million in public funds from the EG Government through an American oil company.

Nguema told Mr. Fuller that he could and would pay for the $40 million aircraft with public funds by having an "American oil company" initially pay GAC for the aircraft.  EG would then, according to Nguema, "repay the American oil company through credits to the company's local account in EG."  In a letter dated April 20, 2004, Fuller confirmed that Nguema was proposing to purchase from GAC a Gulfstream 550 with misappropriated public funds.  Mr. Fuller stated in that letter:

> [Nguema] is suggesting that [GAC] contact the Chairman of Ocean Energy in Houston, Texas with regard to the Gulfstream 550.  There may be an advantage in assigning the Sales Agreement to Ocean Energy and having that company assume the payment obligations for the Gulfstream 550.  In return, the Government [of EG] would issue a

225

Exhibit 2 Page 235

Credit Memorandum to Ocean Energy for amounts payable in connection with oil production.

Raymond Banoun, managing partner of Cadwalader, Wickersham & Taft, LLP, a New York-based law firm, served as an attorney for GAC in connection with this transaction.  Like Mr. Fuller, Mr. Banoun recalled that in 2004, Nguema represented to GAC that he would misappropriate EG public funds by (i) having Ocean Energy, an American oil company, purchase the $40 million aircraft and "assume the payments on his behalf" and then (ii) "in return" have the "Equatorial Guinea government [] issue a credit memo to Ocean Energy for monies connected with oil production in Equatorial Guinea."

Additional information responsive to this Interrogatory relating to Nguema's relationship and communications with GAC may be ascertained from the COMPLAINT as well as documents that have or will be produced by the Government, including DOJ_0000114-166; DOJ_0000388-393; SENATE-PSI-119217-120245; SENATE-PSI-120318-120347; SENATE-PSI-124429-126128.

## Accusations of Direct Diversion of EG Public Funds

In South Africa, George Ehlers, a South African businessman, filed a lawsuit in the Cape Town High Court against the EG Government.  In that litigation which was filed in or around July 2005, less than one year prior to Nguema's acquisition of the Sweetwater Property, Ehlers alleged that the EG Government was in breach of a $7.8 million government infrastructure contract with his company, Engineering Design and Construction Company.  After the EG Government seized some of his company's assets in EG and refused to pay his company for its services, Ehlers filed a lawsuit seeking to attach two homes valued at $7 million owned by Nguema in South Africa.  The two homes were located at Erf 477 Clifton Ridge and Erf 303 Constantia in Cape Town.  The funds used to purchase

these properties were wired in 2004 into South Africa from an account at CCEI Bank in EG held in the name of Socage, an EG company owned by Nguema.

Ehlers alleged that because Nguema could not have afforded to purchase these assets on his income as an EG public official, Nguema must have used funds misappropriated from the EG Government to acquire and renovate these properties. Indeed, even the contractors hired to renovate the property believed that these assets were owned by the EG Government.  In support of his lawsuit, Ehlers filed an affidavit executed by Patricia Fuller.  Fuller recalled that she spoke with Peter McNamara, a contractor hired to renovate Nguema's property in Constantia. McNamara, according to Fuller, advised her that he had never heard of Nguema and that he was communicating with the EG Government about how to renovate the property.  Furthermore, McNamara claimed that he was under the impression that the property belonged to the EG Government.  McNamara submitted an invoice for in or around R 3,144,524 (approximately $359,532) to Jacques Levy, an interior decorator in Switzerland, for his services relating to Nguema's house in Constantia.  As McNamara had no knowledge of Nguema, and was receiving his instructions from the EG Government regarding the home's renovations, Ehlers alleged that the funds used to acquire and renovate these properties were misappropriated from the EG Government.  Although Ehlers prevailed against Nguema before the trial court, an appellate court reversed that decision on other grounds.

Additional information responsive to this Interrogatory relating to Mr. Ehlers' lawsuit in South Africa may be ascertained from documents that have or will be produced by the Government, including DOJ_0000281-284; DOJ_0000464-469; DOJ_0001049-1080; DOJ_1652-1904; DOJ_0000890-893.

**II.**

Exhibit 2 Page 237

# EXTORTION AND BRIBERY

Beginning in the 1990s, Nguema, as described in the COMPLAINT, received and demanded that companies in E.G provide him with money or property in order to be able to maintain and operate their businesses.  Nguema abused his authority and influence within the EG Government both as a member of the cabinet and President Obiang's eldest son to make these demands and to retaliate against those who refused to acquiesce.

## Extortion and Solicitation of Bribes from Forestry Companies

In 1998, at the age of 29, Nguema was appointed by his father to serve as EG's first-ever Minister of Forestry and Agriculture.  Timber is EG's second largest and most valuable export commodity.  Nguema's Forestry Ministry (Ministry) controls timber harvesting operations in EG.  The Ministry also controls timber exports.  In order to export timber from EG, Nguema requires that timber companies obtain an export authorization document that is personally signed by him.  Timber companies incur expenses of up to $5,000 per day if Nguema delays in signing these requests.

## Extortion Payments and Bribes from Forestry Companies

Foreign timber executives claim that their companies were routinely required to pay bribes to Nguema in order to do business in EG.  Foreign Policy Magazine quoted one timber executive as stating, "[Nguema] would call emergency meetings of all the logging company heads in which he would announce some new tax on logging operations."  According to this executive, Nguema charged timber companies an extra so-called "tax" that they were forced to pay him personally for wood harvested in EG.  Nguema purportedly charged timber companies directly per cubic meter of timber harvested by that company.

Exhibit 2 Page 238

A French timber executive, identified as "Jean Michel" in this same <u>Foreign Policy Magazine</u> article, reported that Nguema seized the French logging company he worked for in EG.  It was impossible, according to Jean Michel, for timber companies to do business in EG without paying bribes to Nguema.  Although Jean Michel's company initially paid Nguema the bribes that he demanded, the EG military shut down this company's operations and expelled its personnel from EG after it refused to make any further bribe payments to Nguema.

Independent NGOs have also reported that Nguema extorts payments and solicits bribes from timber companies in EG.  For instance, a former United States intelligence official, who was familiar with EG, reported to Global Witness, that Nguema solicits and accepts bribes from Malaysian, North Korean and Chinese timber companies.  According to this intelligence official, "There were Malaysian, North Korean, and Chinese logging camps on the mainland [of EG], and [Nguema] collected cash from them . . . for logging operations, much of it involving valuable hardwood."

While Nguema solicits and collects bribes from foreign timber companies, he also permits these same companies to violate EG's forestry laws and regulations.  Indeed, according to representatives of the Environmental Investigation Agency (EIA), an environmental NGO, corruption is pervasive in EG's forestry sector and some foreign timber companies, including Shimmer International of Malaysia (Shimmer), are permitted illegally to harvest timber in EG's protected forests reserves.

Several independent NGOs, including Forest Monitor, Green Peace and the World Rain Forest Movement, confirmed that Nguema does not enforce EG's forestry laws on some foreign timber companies, including Shimmer.  For instance, Shimmer engages in illegal logging in protected national forests in EG,

including Monte Alen, even though these forest reserves are protected from industrial logging under EG's Forestry Law. Greenpeace reported that in 2004, "Enforcement of legal requirements is virtually non-existent in commercial logging" in EG.  Similarly, Forests Monitor, a U.K. NGO, concluded in 2001 that, "[i]n practice, enforcement of all the various legal requirements [in EG's forestry sector] is virtually non-existent."

Likewise, while Nguema held the position of Forestry Minister, some timber companies were permitted to overcut EG's forests.  Although EG's Forestry Law places limits on how much timber can be harvested by concessionaires and requires these entities to process 60 percent of their timber in EG, many timber companies, including Shimmer, were operating in violation of these rules. According to a United States Forest Service ranger, who visited EG between July 31, 2004, and August 15, 2004, "[i]t is clear that in some areas that [EG] forests [were] being overcut."  Similarly, EIA representatives confirmed that Shimmer, the dominant timber company in EG, was permitted to illegally export the bulk of its raw timber to China without processing it domestically.

Additional information responsive to this Interrogatory relating to Nguema's control of EG's forestry sector and his solicitation of bribes and extortion payments from timber companies may be ascertained from the COMPLAINT and documents that have or will be produced by the Government, including DOJ_0000408-412; DOJ_0001049-1080; DOJ_0000842-863; DOJ_0000614-615; DOJ_975-1048; DOJ_758-777; DOJ_778-789.

**Nguema's Relationship with Shimmer International**

Nguema reportedly maintains a close working relationship with Shimmer that benefits him personally.  While Nguema was its head, EG's Forestry Ministry awarded Shimmer substantial forestry concessions.  Shimmer was the largest and

most dominant forestry company in EG.  Indeed, in 2006, the same year that Nguema purchased the Sweetwater Property, Shimmer was responsible for more than 66 percent of the timber harvested in that country.  According to a former U.S. intelligence official who spoke with Global Witness, Nguema solicited and collected bribes from Shimmer in EG.

Nguema confirmed to U.S. diplomats at the Embassy in 2009 that he permitted a Malaysian company to deploy 40 teams of well-equipped lumberjacks to "clear cut" a "large tract of pristine continental jungle" that was "granted" to him by the EG Government.  Nguema then purportedly earned a "large windfall" by exporting this raw timber to Asia.   It is illegal under EG's Forestry law to permit this type of "clear cutt[ing]."  EG law also requires timber concessionaires, like Nguema, to process domestically a minimum of 60 percent of the raw timber they harvest from their concessions.  Nguema, however, exported his raw timber as "whole logs" to Asia.  Although it was Nguema's responsibility as EG's Forestry Minister to enforce these laws, Nguema explained to U.S. diplomats that this illegal "windfall" was the source of his personal wealth.

Additional information responsive to this Interrogatory relating to Nguema's relationship with timber companies, including Shimmer, may be ascertained from the COMPLAINT as well as documents that have or will be produced by the Government, including DOJ_0000408-412; DOJ_0001049-1080; DOJ_975-1048; DOJ_778-789.

**British Hotel Company**

In or around 2003, a British company sought permission to build a Sheraton hotel in Malabo, EG's capital city located on Bioko Island.  According to Simon Kareri, a Riggs Bank vice president, Nguema refused to permit the British company to build the Malabo hotel unless its executives agreed to provide him

with 55 percent of the hotel's equity.  When the British company refused, their hotel project was not allowed to go forward. Nguema purportedly accompanied representatives of this British company to Nguema's Los Angeles home to engage in negotiations about this hotel.

Additional information responsive to this Interrogatory relating to this British company may be ascertained from documents that have or will be produced by the Government, including DOJ_000080-87.

**G.E. Petrol**

G. E. Petrol is EG's state-owned oil company.  According to Kareri, when he was employed at Riggs prior to 2005, G.E. Petrol was still "run by the First Family" of EG and Nguema was the company's "*patron*."  In Spanish, which is one of EG's official languages, the word "*patron*" means "master" or "boss." Even though Nguema "flunked high school and does not know how to do anything," according to Kareri, Nguema controlled G.E. Petrol as its "*patron*". Kareri stated that "the big money from the [foreign] oil companies is being paid to the First Family through joint venture projects in EG" and that corrupt payments were disbursed by G.E. Petrol to "so-called oil brokers" controlled by Nguema's family.  These brokers, according to Kareri, make further profits for Nguema's family by purchasing oil from G.E. Petrol at discounted rates.

According to Kareri, Nguema's family "may be skimming money from the sale of [EG's] share of oil produced by the oil companies in EG."  Nguema, according to Kareri, often made remarks to him suggesting that he is GE Petrol's "*patron*."  On one occasion, Kareri recalled that G.E. Petrol requested that he divert directly a certain percentage of EG's oil revenue to an account controlled by G.E. Petrol.  Kareri refused.

Similarly, as explained above at Section XI(B), Nguema represented to GAC that he possessed both the ability and the intent to misappropriate public funds from the EG treasury relating to oil production.  Specifically, he claimed that he could provide an American oil money with a $38.5 million "credit memorandum" derived from public funds to acquire a personal asset for himself.

Kareri and Nguema purportedly had a close business and personal relationship.  Nguema consulted Kareri frequently about both financial and personal issues, including "personal problems" Nguema had with his father.  Kareri commented to his wife, that it was unfortunate that Nguema was "blowing" the money from EG.

Additional information responsive to this Interrogatory relating to G.E. Petrol may be ascertained from documents that have or will be produced by the Government, including DOJ_000038-94 and DOJ_0000241-244.

**Foreign Oil Companies**

Walter International (Walter) was a Houston-based oil company operating in EG.  In 1991, Nguema enrolled at Pepperdine University's English language program in Malibu, California.  According to Ambassador John Bennett, a former United States Ambassador  to EG during the early 1990s, Nguema's Pepperdine tuition and expenses were fully paid for by Walter.  Elisa Wax, a Pepperdine employee, recalled that Pepperdine received a "steady stream of phone calls from the Beverly Wilshire [Hotel] and shops in Beverly Hills trying to track down [Nguema] to settle outstanding bills."  Wax would direct these calls to Walter International.  Ambassador Bennett recalled that Nguema incurred, and Walter paid, $50,000 in expenses while attending Pepperdine in California.

In November 2009, Global Witness reported that Nguema received corrupt payments from Elf-Acquitaine, a French oil and gas company.  In 2004, thirty

senior executives of Elf Acquitaine were charged and convicted in France of distributing bribes and kickbacks in Africa over a period of several decades.

A confidential source ("CI 3"), who spoke with federal agents in Miami, Florida, also confirmed that it was his/her belief that Nguema controls the oil industry in EG and that he derives his wealth from illegal activities in EG, including the distribution of counterfeit cigarettes, diamond smuggling and monetary kickbacks in the form of contracts from United States oil companies operating in EG.

Another confidential source (CI 2), who spoke with federal agents and was a former employee of Nguema in Los Angeles in or around 2006, the same year that Nguema acquired the Sweetwater Property, recalled that Nguema told him/her that the source of his wealth was related to EG's oil resources.  CI 2 was an employee of Nguema who worked at the defendant Sweetwater Property.  Even though Nguema holds no official position within the EG Government related to the oil industry, CI 2 recalls seeing three "oil officials" meet with Nguema at the Sweetwater Property during the second week of November 2006.

Additional information responsive to this Interrogatory relating to Nguema's relationship with the oil and gas industry may be ascertained from documents that have or will be produced by the Government, including DOJ_0000114-0000166; DOJ_0000241-244; DOJ_0000265-268; DOJ_0000388-393; DOJ_0000394-398; DOJ_0000842-863; DOJ_0001049-1080; SENATE-PSI-119217-120245; SENATE-PSI-120318-120347; SENATE-PSI-124429-126128.

**Michael Chevaly**

An individual named Michael Chevaly allegedly smuggles various fraudulently manufactured consumer goods into Cameroon, Nigeria, Benin, Niger, Chad, Sierra Leone, Liberia, Guinea-Conakry and Gabon.  In so doing, Chevaly

purportedly uses routes through EG, Niger and Benin to smuggle this merchandise. CI 3 informed federal agents that Nguema possesses a business relationship with Chevaly relating to this illegal conduct.  Additional information responsive to this Interrogatory relating to the relationship between Nguema and Chevaly may be ascertained from documents that have or will be produced by the Government, including DOJ_0000246-251.


DATED: November 5, 2012

/S/

WOO S. LEE
Trial Attorney
United States Department of Justice


Attorney for Plaintiff
UNITED STATES OF AMERICA

235

Exhibit 2 Page 245

## **VERIFICATION**

I, Robert Manzanares, hereby verify and declare under penalty of perjury that I am a Special Agent with Homeland Security Investigations, that I have read the foregoing United States' First Set of Responses and Objections to Claimants' First Set of Interrogatories to Plaintiff United States of America, and know its contents. Everything contained in the response is true and correct, to the best of my knowledge and belief.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this __5__ day of __November__, 2012, at __9:47 AM__, Florida.

ROBERT MANZANARES
Special Agent
Homeland Security Investigations
U.S. Department of Homeland Security

1

Exhibit 2 Page 246

# EXHIBIT 3

JAIKUMAR RAMASWAMY, Chief
Asset Forfeiture and Money Laundering Section (AFMLS)
LINDA M. SAMUEL, Deputy Chief
DANIEL H. CLAMAN, Assistant Deputy Chief
WOO S. LEE, Trial Attorney
STEPHEN A. GIBBONS, Trial Attorney
Criminal Division
United States Department of Justice
1400 New York Avenue, N.W., 10th Floor
Washington, D.C. 20530
Telephone:  (202) 514-1263, Woo.Lee@usdoj.gov

ANDRÉ BIROTTE, JR.
United States Attorney
STEVEN R. WELK (Cal. Bar No. 149883)
Assistant United States Attorney
312 North Spring Street, 14th Floor
Los Angeles, California 90012
Telephone:  (213) 894-6166, Steven.welk@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | No. CV 2: 11-3582-GW-SS |
| Plaintiff, ) | |
| ) | |
| vs. ) | Hon. George H. Wu |
| ONE WHITE CRYSTAL-COVERED "BAD ) | |
| TOUR" GLOVE AND OTHER MICHAEL ) | UNITED STATES' SUPPLEMENTAL |
| JACKSON MEMORABILIA; ) | RESPONSES AND OBJECTIONS TO |
| REAL PROPERTY LOCATED ON ) | CLAIMANTS' VICE PRESIDENT |
| SWEETWATER MESA ROAD IN MALIBU, ) | TEODORO NGUEMA OBIANG MANGUE |
| CALIFORNIA; ONE 2011 FERRARI 599 ) | AND SWEETWATER MALIBU LLC'S |
| GTO, ) | INTERROGATORY NO. 9 |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |
| ) | |

Exhibit 3 Page 247

The United States of America submits the following responses and objections to Claimants Second Vice President Teodoro Nguema Obiang Mangue (Nguema) and Sweetwater Malibu, LLC's (Sweetwater Malibu) (collectively Claimants) Interrogatory No. 9.

## INTERROGATORY NO. 9

For each and every witness, informant, and other PERSON YOU have identified in response to Interrogatory No. 8, IDENTIFY any and all efforts YOU have made to corroborate the statements of such witness, informant or PERSON or confirmed their reliability and when and how such corroboration or confirmation, if any, was secured, if at all.

## RESPONSE TO INTERROGATORY NO. 9

The United States objects to this Interrogatory as it is overly broad and unduly burdensome, as it seeks information obtained by the Government after the filing of the COMPLAINT and is not limited by temporal scope.  The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they purport to impose obligations on the Government beyond the scope of the Discovery Order.  On September 6, 2012, the Court authorized Claimants to propound limited discovery on the probable cause the United States had when it filed the instant forfeiture action.  As such, to the extent that this Interrogatory seeks information beyond the scope of the Discovery Order, including information obtained by DOJ and/or ICE after June 11, 2012, the Government objects and will not produce such information, as it is neither relevant nor reasonably calculated to discover evidence that the Government had for purposes of probable cause when it filed the present action.  The United States does, however, expressly reserve the right to supplement, clarify, revise, or correct any or all of the Responses and Objections

(General and Specific) herein consistent with Fed. R. Civ. P. 26(e), and to assert additional objections or privileges, in one or more subsequent supplemental response(s).

The United States further objects to this Interrogatory on the grounds that it calls for the disclosure of information subject to the attorney-client privilege, the investigative files privilege, the work product doctrine or the informant's privilege. The United States objects to Claimants' Interrogatories, including but not limited to all Instructions and Definitions therein, to the extent that they seek information outside the possession, custody or control of DOJ and ICE.  The United States further objects to this Interrogatory as it is overly broad and unduly burdensome, as the definition of "YOUR" includes foreign sovereign governments and entities other than DOJ and ICE.

The United States also objects to this Interrogatory on the ground that it is compound and contains impermissible discrete subparts, which relate to distinct matters and therefore constitutes multiple interrogatories.  The United States further objects to this Interrogatory on the ground that, when combined with the preceding Interrogatories, this Interrogatory violates the 25 interrogatory limit set forth in Fed. R. Civ. P. 33(a)(1).  Because the Government has already responded to 25 interrogatories, it is not required to respond to this Interrogatory.  See Capaccione v. Charlotte-Mecklenburg Schools, 182 F.R.D. 486, 496, n. 4 (W.D.N.C. 1998).

To the extent that that this request seeks information relating to the recruitment or handling of confidential informants by a federal law enforcement agency, the United States objects to the request and will not produce that information.  See, e.g., Roviaro v. United States, 353 U.S. 53 (1957).

2

Exhibit 3 Page 249

Subject to and without waiving the foregoing general and specific objections set forth in the United States' Second Set of Responses and Objections to Claimants' First Set of Interrogatories to Plaintiff United States of America (Set One), the United States hereby refers Claimants pursuant to Fed. R. Civ. Proc. 33(d) to documents that the United States has and will produce, including but not limited to DOJ_00001-0000489.  With respect to witness interviews that took place on or after April 29, 2011, but prior to June 12, 2012, the United States hereby refers Claimants pursuant to Fed. R. Civ. Proc. 33(d) to documents that the United States has and will produce, including but not limited to DOJ_0009050-9230; DOJ_0012458-12623.

Additionally, the United States responds as follows:

The United States corroborated and confirmed information provided to the Government by confidential informants through a variety of sources, including documents obtained in connection with the Government's investigation, statements provided to the Government by other witnesses, open source materials and Government law enforcement databases.

Information provided by **CS 1**, a former employee of Nguema, was corroborated and confirmed by the Government, as it was consistent with other information obtained in connection with the Government's investigation, including but not limited to open source materials, documents obtained by the Government from other witnesses and Government agencies and actors, Government law enforcement databases, and other individuals interviewed by the Government, including **CS 2** (a former employee of Nguema), three other confidential informants, who were also employed by Nguema, and another confidential informant who was involved in a personal relationship with Nguema.  Nguema's former employees, who were interviewed by the Government, worked directly with Nguema in managing his affairs and assets, including the Sweetwater

3

Exhibit 3 Page 250

Property, in the United States.  The witness interview reports for these witnesses are available at DOJ_00183-188; DOJ_00199-202; DOJ_00265-268; DOJ_009167-9170; DOJ_009179-9188; DOJ_009215-9219; DOJ_0012543-12549; DOJ_0012469-12474.   This witness' information was further corroborated and confirmed, as it was consistent with documents in the Government's investigatory files, which were also produced to Claimants, including SENATE-PSI-00069602-00122836.  Additional information responsive to this Interrogatory may be ascertained from DOJ_00178-182.

Information provided by **CS 2,** another former employee of Nguema, was corroborated and confirmed by the Government, as it was consistent with other information obtained in connection with the Government's investigation, including but not limited to open source materials, documents obtained by the Government from other witnesses and Government agencies and actors, Government law enforcement databases, and other individuals interviewed by the Government, including **CS 1**, three other confidential informants, who were also employed by Nguema, and another confidential informant who was involved in a personal relationship with Nguema.  Nguema's former employees, who were interviewed by the Government, worked directly with Nguema in managing his affairs and assets, including the Sweetwater Property, in the United States.  The witness interview reports for these witnesses are available at DOJ_00178-182; DOJ_009167-9170; DOJ_009179-9188; DOJ_009215-9219; DOJ_0012543-12549; DOJ_0012469-12474.   This witness' information was further corroborated and confirmed, as it was consistent with documents in the Government's investigatory files, which were also produced to Claimants, including SENATE-PSI-00069602-00122836. Additional information responsive to this Interrogatory may be ascertained from DOJ_00183-188; DOJ_00199-202; DOJ_00265-268.

Information provided by **IMF Economist A**, a senior official of the International Monetary Fund (IMF),a United Nations financial agency, who visited

4

Exhibit 3 Page 251

EG in 2007, was corroborated and confirmed by the Government, as it was consistent with other information obtained in connection with the Government's investigation, including but not limited to open source materials, documents obtained by the Government from other witnesses and Government agencies and actors, Government law enforcement databases, and other individuals interviewed by the Government, including **IMF Economist B** (a senior IMF official who visited EG in 2010), **EG Fiscal Advisor A** (a former fiscal advisor to EG's finance minister), **EG Fiscal Advisor B** (a former fiscal advisor to EG's finance minister), **Construction Executive A** (a construction executive who worked in EG), **Construction Executive B** (a construction executive who worked in EG), **Construction Executive C** (a construction executive who worked in EG), **Dr. John Stewart** (a US AID contractor in EG), **Stephen Fuller** (a former Gulfstream executive), **Ian Cooling** (a former Ocean Energy Executive), **Simon Kareri** (a former Riggs National Bank vice president), **Raymond Banoun** (outside counsel for Gulfstream) and another senior IMF official who visited EG. Additional information pertaining to these witnesses are available at DOJ_0012596-12597; DOJ_0012518-12524; DOJ_009207-9214; DOJ_0012492-12497; DOJ_009067-9071; DOJ_0012458-468; DOJ_0012475-12482; DOJ_0012578-12583; DOJ_0012617-12619; DOJ_0062-94; DOJ_12614-12616; DOJ_120-128; DOJ_9141-9146; DOJ_114-119.  This witness' information was further corroborated and confirmed, as it was consistent with documents in the Government's investigatory files, which were also produced to Claimants, including DOJ_0000303-308; DOJ_0000315-321; DOJ_0000413-416; DOJ_0000417-421; DOJ_0000422-425; DOJ_0000426-430; DOJ_0000431-434;DOJ_0000584-592; DOJ_688-718; DOJ_0000834-837; DOJ_0000864-871; DOJ_00003853-3913; DOJ_0000946-950; DOJ_0001049-1080; DOJ_1652-1904; DOJ_000009067-9071; DOJ_009134-9140; DOJ_009147-9151; DOJ_009152-9157; DOJ_0009207-9214; DOJ_12458-12468; DOJ_0012492-12497;

DOJ_0012518-12524; DOJ_0012564-0012566; DOJ_0012567-12572;
DOJ_0012573-12577; DOJ_0012578-12583; DOJ_0012596-12597;
DOJ_0012518-12524; DOJ_0012492-12497; DOJ_0012617-12623;
DOJ_0012564-12566.  Additional information responsive to this Interrogatory may
be ascertained from DOJ_0012573-12577.

Information provided by **IMF Economist B**, a senior IMF official who
visited EG in 2010, was corroborated and confirmed by the Government, as it was
consistent with other information obtained in connection with the Government's
investigation, including but not limited to open source materials, documents
obtained by the Government from other witnesses and Government agencies and
actors, Government law enforcement databases, and other individuals interviewed
by the Government, including **IMF Economist A** (a senior IMF official who
visited EG in 2007), **EG Fiscal Advisor A** (a former fiscal advisor to EG's finance
minister), **EG Fiscal Advisor B** (a former fiscal advisor to EG's finance minister),
**Construction Executive A** (a construction executive who worked in EG),
**Construction Executive B** (a construction executive who worked in EG),
**Construction Executive C** (a construction executive who worked in EG),
**Dr. John Stewart** (a US AID contractor in EG), **Stephen Fuller** (a former
Gulfstream executive), **Ian Cooling** (a former Ocean Energy Executive), **Simon
Kareri** (a former Riggs National Bank vice president), **Raymond Banoun** (outside
counsel for Gulfstream) and another senior IMF official who visited EG.
Additional information pertaining to these witnesses are available at
DOJ_0012573-12577; DOJ_0012518-12524; DOJ_009207-9214; DOJ_0012492-
12497; DOJ_009067-9071; DOJ_0012458-468; DOJ_0012475-12482;
DOJ_0012578-12583; DOJ_0012617-12619; DOJ_0062-94; DOJ_12614-12616;
DOJ_120-128; DOJ_9141-9146; DOJ_114-119.   This witness' information was
further corroborated and confirmed, as it was consistent with documents in the
Government's investigatory files, which were also produced to Claimants,

including DOJ_0000303-308; DOJ_0000315-321; DOJ_0000413-416; DOJ_0000417-421; DOJ_0000422-425; DOJ_0000426-430; DOJ_0000431-434;DOJ_0000584-592; DOJ_688-718; DOJ_0000834-837; DOJ_0000864-871; DOJ_0000946-950; DOJ_0001049-1080; DOJ_1652-1904; DOJ_00003853-3913; DOJ_003914-5725;  DOJ_000009067-9071; DOJ_009134-9140; DOJ_009147-9151; DOJ_009152-9157; DOJ_0009207-9214; DOJ_12458-12468; DOJ_0012492-12497; DOJ_0012518-12524; DOJ_0012564-0012566; DOJ_0012567-12572; DOJ_0012573-12577; DOJ_0012578-12583; DOJ_0012596-12597; DOJ_0012518-12524; DOJ_0012492-12497; DOJ_0012617-12623; DOJ_0012564-12566.  Additional information responsive to this Interrogatory may be ascertained from DOJ_0012596-12597.

Information provided by **EG Fiscal Advisor A**, who worked as a fiscal advisor to the EG Finance Minister in or around the time period in which Nguema acquired the Sweetwater Property, was corroborated and confirmed by the Government, as it was consistent with other information obtained in connection with the Government's investigation, including but not limited to open source materials, documents obtained by the Government from other witnesses and Government agencies and actors, Government law enforcement databases, and other individuals interviewed by the Government, including **IMF Economist A**, **IMF Economist B** (a senior IMF official who visited EG), **EG Fiscal Advisor B** (a former fiscal advisor to EG's finance minister), **Construction Executive A** (a construction executive who worked in EG),  **Construction Executive B** (a construction executive who worked in EG), **Construction Executive C** (a construction executive who worked in EG), **Dr. John Stewart** (a US AID contractor in EG), **EG CS 3** (an EG lawyer and former civil servant), **Stephen Fuller** (a former Gulfstream executive), **Ian Cooling** (a former Ocean Energy Executive), **Simon Kareri** (a former Riggs National Bank vice president), **Raymond Banoun** (outside counsel for Gulfstream)  and another senior IMF

7

Exhibit 3 Page 254

official who visited EG.  Additional information pertaining to these witnesses are available at DOJ_0012573-12577; DOJ_009207-9214; DOJ_0012492-12497; DOJ_009067-9071; DOJ_0012458-468; DOJ_0012475-12482; DOJ_0012567-12572; DOJ_0012578-12583; DOJ_0012596-12597; DOJ_0012617-12619; DOJ_0062-94; DOJ_12614-12616; DOJ_120-128; DOJ_9141-9146; DOJ_114-119.  This witness' information was further corroborated and confirmed, as it was consistent with documents in the Government's investigatory files, which were also produced to Claimants, including DOJ_0000303-308; DOJ_0000315-321; DOJ_0000413-416; DOJ_0000417-421; DOJ_0000422-425; DOJ_0000426-430; DOJ_0000431-434;DOJ_0000584-592; DOJ_688-718; DOJ_0000834-837; DOJ_0000864-871; DOJ_0000946-950; DOJ_0001049-1080; DOJ_1652-1904; DOJ_00003853-3913; DOJ_003914-5725;  DOJ_000009067-9071; DOJ_009134-9140; DOJ_009147-9151; DOJ_009152-9157; DOJ_0009207-9214; DOJ_12458-12468; DOJ_0012492-12497; DOJ_0012518-12524; DOJ_0012564-0012566; DOJ_0012567-12572; DOJ_0012573-12577; DOJ_0012578-12583; DOJ_0012596-12597; DOJ_0012518-12524; DOJ_0012492-12497; DOJ_0012617-12623; DOJ_0012564-12566.  **EG Fiscal Advisor A's** information was also corroborated and further confirmed by his daily journal, which he maintained while in EG and showed to the Government.  This handwritten journal contained detailed notes of individuals he spoke with and met in EG, as well as information he learned from various sources within EG.  Additional information responsive to this Interrogatory may be ascertained from DOJ_009067-9071; DOJ_0012518-12468.

Information provided by **EG Fiscal Advisor B**, who worked as a fiscal advisor to the EG Finance Minister between 2007 and 2011, was corroborated and confirmed by the Government, as it was consistent with other information obtained in connection with the Government's investigation, including but not limited to open source materials, documents obtained by the Government from other

8

Exhibit 3 Page 255

witnesses and Government agencies and actors, Government law enforcement databases, and other individuals interviewed by the Government, including **IMF Economist A**, **IMF Economist B** (a senior IMF official who visited EG), **EG Fiscal Advisor A** (a former fiscal advisor to EG's finance minister), **Construction Executive A** (a construction executive who worked in EG),  **Construction Executive B** (a construction executive who worked in EG), **Construction Executive C** (a construction executive who worked in EG), **Dr. John Stewart** (a US AID contractor in EG), and another senior IMF official who visited EG. Additional information pertaining to these witnesses are available at DOJ_0012573-12577; DOJ_009207-9214; DOJ_0012518-12524; DOJ_009067-9071; DOJ_0012458-468; DOJ_0012475-12482; DOJ_0012567-12572; DOJ_0012578-12583; DOJ_0012596-12597; DOJ_0012617-12619.   This witness' information was further corroborated and confirmed, as it was consistent with documents in the Government's investigatory files, which were also produced to Claimants, including DOJ_0000303-308; DOJ_0000315-321; DOJ_0000413-416; DOJ_0000417-421; DOJ_0000422-425; DOJ_0000426-430; DOJ_0000431-434;DOJ_0000584-592; DOJ_688-718; DOJ_0000834-837; DOJ_0000864-871; DOJ_0000946-950; DOJ_0001049-1080; DOJ_1652-1904; DOJ_00003853-3913; DOJ_003914-5725;  DOJ_000009067-9071; DOJ_009134-9140; DOJ_009147-9151; DOJ_009152-9157; DOJ_0009207-9214; DOJ_12458-12468; DOJ_0012492-12497; DOJ_0012518-12524; DOJ_0012564-0012566; DOJ_0012567-12572; DOJ_0012573-12577; DOJ_0012578-12583; DOJ_0012596-12597; DOJ_0012518-12524; DOJ_0012492-12497; DOJ_0012617-12623; DOJ_0012564-12566.  Additional information responsive to this Interrogatory may be ascertained from DOJ_0012492-12497.

Information provided by **Construction Executive A**, who worked with General Work, S.A., an EG construction company, was corroborated and confirmed by the Government, as it was consistent with other information obtained

in connection with the Government's investigation, including but not limited to open source materials, documents obtained by the Government from other witnesses and Government agencies and actors, Government law enforcement databases, and other individuals interviewed by the Government, including **Construction Executive B**, **Construction Executive C**, **IMF Economist A**, **IMF Economist B**, **EG Fiscal Advisor A**, **EG Fiscal Advisor B**, **Dr. John Stewart** (a US AID contractor in EG), **Stephen Fuller** (a former Gulfstream executive), **Ian Cooling** (a former Ocean Energy Executive), **Simon Kareri** (a former Riggs National Bank vice president), **Raymond Banoun** (outside counsel for Gulfstream) and another senior IMF official who visited EG.  Additional information pertaining to these witnesses are available at DOJ_009067-9071; DOJ_0012458-12468; DOJ_0012475-12482; DOJ_0012573-12583; DOJ_9207-9214; DOJ_0012518-12524; DOJ_0012492-12497; DOJ_0012596-12597; DOJ_12617-12619; DOJ_0062-94; DOJ_12614-12616; DOJ_120-128; DOJ_9141-9146; DOJ_114-119.   This witness' information was further corroborated and confirmed, as it was consistent with documents in the Government's investigatory files, which were also produced to Claimants, including DOJ_0000303-308; DOJ_0000315-321; DOJ_0000413-416; DOJ_0000417-421; DOJ_0000422-425; DOJ_0000426-430; DOJ_0000431-434; DOJ_0000809-816; DOJ_00003853-3913; DOJ_9067-9071; DOJ_009134-9140; DOJ_009147-9151; DOJ_009152-9157; DOJ_009207-9214; DOJ_0012458-12468; DOJ_0012475-12482; DOJ_0012492-12497; DOJ_0012518-12524; DOJ_0012564-12566; DOJ_0012567-12572; DOJ_0012573-12577; DOJ_0012617-12623; SENATE-PSI-86730; SENATE-PSI-93976; SENATE-PSI-94046; SENATE-PSI-96238-96240.  Information provided by this witness was also further confirmed and corroborated by information provided to the United States by Italian law enforcement authorities, including the Guardia di Finanzia

(GdF).  Additional information responsive to this Interrogatory may be ascertained from DOJ_009067-9071; DOJ_12458-12468; DOJ_12475-12482.

Information provided by **Construction Executive B**, was corroborated and confirmed by the Government, as it was consistent with other information obtained in connection with the Government's investigation, including but not limited to open source materials, documents obtained by the Government from other witnesses and Government agencies and actors, Government law enforcement databases, and other individuals interviewed by the Government, including **IMF Economist A**, **IMF Economist B**, **EG Fiscal Advisor A**, **EG Fiscal Advisor B**, **Construction Executive A**, **Construction Executive C**, **Dr. John Stewart** (US AID contractor in EG), **Bruno Beretta** (former EG construction executive and timber company executive), **EG Accountant A** (Big Four accountant in EG), **GSF Executive** (former GSF executive in EG), **John Bennett** (former United States Ambassador to EG) and another senior IMF official, whose interview report was also produced to Claimants.  Additional information pertaining to these witnesses are available at DOJ_0012573-12583; DOJ_9207-9214; DOJ_0012518-12524; DOJ_0012492-12497; DOJ_0012596-12597; DOJ_12617-12619; DOJ_009120-9126; DOJ_0012584-12586; DOJ_0012589-12591; DOJ_00394-398.  This witness' information was further corroborated and confirmed, as it was consistent with documents in the Government's investigatory files, which were also produced to Claimants, including DOJ_0000303-308; DOJ_0000315-321; DOJ_0000413-416; DOJ_0000417-421; DOJ_0000422-425; DOJ_0000426-430; DOJ_0000431-434; DOJ_0000809-816; DOJ_00003853-3913; DOJ_9067-9071; DOJ_009134-9140; DOJ_009147-9151; DOJ_009152-9157; DOJ_009207-9214; DOJ_0012458-12468; DOJ_0012475-12482; DOJ_0012492-12497; DOJ_0012518-12524; DOJ_0012564-12566; DOJ_0012567-12572; DOJ_0012573-12577; DOJ_0012617-12623; SENATE-PSI-86730; SENATE-PSI-93976; SENATE-PSI-94046; SENATE-PSI-96238-96240.  Information provided by this witness was

also further confirmed and corroborated by information provided to the United States by Italian law enforcement authorities, including the GdF.  Additional information responsive to this Interrogatory may be ascertained from DOJ_009067-9071; DOJ_12458-12468; DOJ_12475-12482.

Information provided by **Construction Executive C**, who worked with General Work, was corroborated and confirmed by the Government, as it was consistent with other information obtained in connection with the Government's investigation, including but not limited to open source materials, documents obtained by the Government from other witnesses and Government agencies and actors, Government law enforcement databases, and other individuals interviewed by the Government, including **Construction Executive A**, **Construction Executive B**, **IMF Economist A**, **IMF Economist B**, **EG Fiscal Advisor A**, **EG Fiscal Advisor B**, **Dr. John Stewart** (US AID contractor in EG), **Bruno Beretta** (former EG construction executive and timber company executive), **EG Accountant A** (Big Four accountant in EG), **GSF Executive** (former GSF executive in EG), **John Bennett** (former United States Ambassador to EG), **EG CS 3** (EG lawyer and former civil servant**), EG CS 4** (EG architect) **, EG CS 5** (EG legal and public administration scholar**), Stephen Fuller** (a former Gulfstream executive), **Ian Cooling** (a former Ocean Energy Executive), **Simon Kareri** (a former Riggs National Bank vice president), **Raymond Banoun** (outside counsel for Gulfstream) and another senior IMF official, whose interview report was also produced to Claimants.  Additional information pertaining to these witnesses are available at DOJ_009067-9071; DOJ_0012458-12468; DOJ_0012475-12482; DOJ_0012573-12583; DOJ_9207-9214; DOJ_0012518-12524; DOJ_0012492-12497; DOJ_0012596-12597; DOJ_12617-12619; DOJ_009120-9126; DOJ_0012584-12586; DOJ_0012589-12591; DOJ_00394-398; DOJ_0012567-12572; DOJ_0012564-566; DOJ_009147-9151; DOJ_0062-94; DOJ_12614-12616; DOJ_120-128; DOJ_9141-9146; DOJ_114-119.   This witness' information

12

Exhibit 3 Page 259

was further corroborated and confirmed, as it was consistent with documents in the Government's investigatory files, which were also produced to Claimants, including DOJ_0000303-308; DOJ_0000315-321; DOJ_0000413-416; DOJ_0000417-421; DOJ_0000422-425; DOJ_0000426-430; DOJ_0000431-434; DOJ_0000809-816; DOJ_00003853-3913; DOJ_9067-9071; DOJ_009134-9140; DOJ_009147-9151; DOJ_009152-9157; DOJ_009207-9214; DOJ_0012458-12468; DOJ_0012475-12482; DOJ_0012492-12497; DOJ_0012518-12524; DOJ_0012564-12566; DOJ_0012567-12572; DOJ_0012573-12577; DOJ_0012617-12623; SENATE-PSI-86730; SENATE-PSI-93976; SENATE-PSI-94046; SENATE-PSI-96238-96240.  Information provided by this witness was also further confirmed and corroborated by information provided to the United States by Italian law enforcement authorities, including the GdF.   Additional information responsive to this Interrogatory may be ascertained from DOJ_009067-9071; DOJ_12458-12468; DOJ_12475-12482.

Information provided by **EG CS 3**, an EG lawyer and former civil servant who worked directly on the staff of a former EG cabinet member, was corroborated and confirmed by the Government, as it was consistent with other information obtained in connection with the Government's investigation, including but not limited to open source materials, documents obtained by the Government from other witnesses and Government agencies and actors, Government law enforcement databases, and other individuals interviewed by the Government, including **Construction Executive A**, **Construction Executive B**, **Construction Executive C**, **IMF Economist A**, **IMF Economist B**, **EG Fiscal Advisor A**, **EG Fiscal Advisor B**, **Dr. John Stewart** (US AID contractor in EG), **EG CS 4** (an EG architect familiar with the EG construction sector), **EG CS 5** (EG law and public administration academic), **Bruno Beretta** (former EG construction executive and timber company executive), **EG Accountant A** (Big Four accountant in EG), **GSF Executive** (former GSF executive in EG), **John Bennett** (former United States

13

Exhibit 3 Page 260

Ambassador to EG) and another senior IMF official who visited EG.  Additional information pertaining to these witnesses are available at DOJ_009067-9071; DOJ_0012458-12468; DOJ_0012475-12482; DOJ_0012573-12583; DOJ_009147-9151; DOJ_9207-9214; DOJ_0012518-12524; DOJ_0012492-12497; DOJ_0012564-12566; DOJ_0012596-12597; DOJ_12617-12619; DOJ_009120-9126; DOJ_0012584-12586; DOJ_0012589-12591; DOJ_00394-398.  This witness' information was further corroborated and confirmed, as it was consistent with documents in the Government's investigatory files, which were also produced to Claimants, including DOJ_006706-6773; DOJ_006865-6925; DOJ_008561-8578; DOJ_009134-9140; DOJ_009147-9151; DOJ_009152-9157; DOJ_009207-9214; DOJ_012518-12524; DOJ_009247-9249; DOJ_009781-9782; DOJ_009786-9952; DOJ_0012492-12497; DOJ_0012498-12504; DOJ_0012511-12517; DOJ_0012559-12563; DOJ_0012564-12566; DOJ_0012567-12572; DOJ_0012573-12577; DOJ_0012584-12586; DOJ_0012587-12588; DOJ_0012589-12591; DOJ_0012596-12597; DOJ_0012617-12623.  Additional information responsive to this Interrogatory may be ascertained from DOJ_0012567-12572.

Information provided by **EG CS 4**, an EG architect who has worked in the construction sector in EG for the past two decades, was corroborated and confirmed by the Government, as it was consistent with other information obtained in connection with the Government's investigation, including but not limited to open source materials, documents obtained by the Government from other witnesses and Government agencies and actors, Government law enforcement databases, and other individuals interviewed by the Government, **Construction Executive A**, **Construction Executive B**, **Construction Executive C**, **IMF Economist A**, **IMF Economist B**, **EG Fiscal Advisor A**, **EG Fiscal Advisor B**, **Dr. John Stewart** (US AID contractor in EG), **EG CS 3** (an EG lawyer and former civil servant), **EG CS 5** (EG law and public administration academic),

**Bruno Beretta** (former EG construction executive and timber company executive), **EG Accountant A** (Big Four accountant in EG), **GSF Executive** (former GSF executive in EG), **John Bennett** (former United States Ambassador to EG), **Stephen Fuller** (a former Gulfstream executive), **Ian Cooling** (a former Ocean Energy Executive), **Simon Kareri** (a former Riggs National Bank vice president), **Raymond Banoun** (outside counsel for Gulfstream)  and another senior IMF official who visited EG.  Additional information pertaining to these witnesses are available at DOJ_009067-9071; DOJ_0012458-12468; DOJ_0012475-12482; DOJ_0012573-12583; DOJ_009147-9151; DOJ_9207-9214; DOJ_0012518-12524; DOJ_0012492-12497; DOJ_12567-12572; DOJ_0012596-12597; DOJ_12617-12619; DOJ_009120-9126; DOJ_0012584-12586; DOJ_0012589-12591; DOJ_00394-398; DOJ_0062-94; DOJ_12614-12616; DOJ_120-128; DOJ_9141-9146; DOJ_114-119.   This witness' information was further corroborated and confirmed, as it was consistent with documents in the Government's investigatory files, which were also produced to Claimants, including DOJ_006706-6773; DOJ_006865-6925; DOJ_008561-8578; DOJ_009134-9140; DOJ_009147-9151; DOJ_009152-9157; DOJ_009207-9214; DOJ_012518-12524; DOJ_009247-9249; DOJ_009781-9782; DOJ_009786-9952; DOJ_0012492-12497; DOJ_0012498-12504; DOJ_0012511-12517; DOJ_0012559-12563; DOJ_0012564-12566; DOJ_0012567-12572; DOJ_0012573-12577; DOJ_0012584-12586; DOJ_0012587-12588; DOJ_0012589-12591; DOJ_0012596-12597; DOJ_0012617-12623.  Additional information responsive to this Interrogatory may be ascertained from DOJ_12564-12566.

Information provided by **EG CS 5**, an EG academic who focuses on issues of law and public administration, was corroborated and confirmed by the Government, as it was consistent with other information obtained in connection with the Government's investigation, including but not limited to open source

materials, documents obtained by the Government from other witnesses and Government agencies and actors, Government law enforcement databases, and other individuals interviewed by the Government, **Construction Executive A**, **Construction Executive B**, **Construction Executive C**, **IMF Economist A**, **IMF Economist B**, **EG Fiscal Advisor A**, **EG Fiscal Advisor B**, **Dr. John Stewart** (US AID contractor in EG), **EG CS 3** (an EG lawyer and former civil servant), **EG CS 4** (EG architect familiar with the construction sector), **Stephen Fuller** (a former Gulfstream executive), **Ian Cooling** (a former Ocean Energy Executive), **Simon Kareri** (a former Riggs National Bank vice president), **Raymond Banoun** (outside counsel for Gulfstream), **Bruno Beretta** (former EG construction executive and timber company executive), **EG Accountant A** (Big Four accountant in EG), **GSF Executive** (former GSF executive in EG), **John Bennett** (former United States Ambassador to EG) and another senior IMF official who visited EG.  Additional information pertaining to these witnesses are available at DOJ_009067-9071; DOJ_0012458-12468; DOJ_0012475-12482; DOJ_0012573-12583; DOJ_0012564-12566; DOJ_9207-9214; DOJ_0012518-12524; DOJ_0012492-12497; DOJ_12567-12572; DOJ_0012596-12597; DOJ_12617-12619; DOJ_0062-94; DOJ_12614-12616; DOJ_120-128; DOJ_9141-9146; DOJ_114-119; DOJ_009120-9126; DOJ_0012584-12586; DOJ_0012589-12591; DOJ_00394-398.   This witness' information was further corroborated and confirmed, as it was consistent with documents in the Government's investigatory files, which were also produced to Claimants, including DOJ_006706-6773; DOJ_006865-6925; DOJ_008561-8578; DOJ_009134-9140; DOJ_009147-9151; DOJ_009152-9157; DOJ_009207-9214; DOJ_012518-12524; DOJ_009247-9249; DOJ_009781-9782; DOJ_009786-9952; DOJ_0012492-12497; DOJ_0012498-12504; DOJ_0012511-12517; DOJ_0012559-12563; DOJ_0012564-12566; DOJ_0012567-12572; DOJ_0012573-12577; DOJ_0012584-12586; DOJ_0012587-12588; DOJ_0012589-12591; DOJ_0012596-12597;

DOJ_0012617-12623.  Additional information responsive to this Interrogatory may be ascertained from DOJ_009147-9151.

Information provided by **EG CS 6**, an EG scientist and senior opposition party official in EG,  was corroborated and confirmed by the Government, as it was consistent with other information obtained in connection with the Government's investigation, including but not limited to open source materials, documents obtained by the Government from other witnesses and Government agencies and actors, Government law enforcement databases, and other individuals interviewed by the Government, **Construction Executive A**, **Construction Executive B**, **Construction Executive C**, **IMF Economist A**, **IMF Economist B**, **EG Fiscal Advisor A**, **EG Fiscal Advisor B**, **Dr. John Stewart** (US AID contractor in EG), **EG CS 3** (an EG lawyer and former civil servant), **EG CS 4** (EG architect familiar with the construction sector), **Bruno Beretta** (former EG construction executive and timber company executive), **EG Accountant A** (Big Four accountant in EG), **GSF Executive** (former GSF executive in EG), **John Bennett** (former United States Ambassador to EG) and another senior IMF official who visited EG.  Additional information pertaining to these witnesses are available at DOJ_009067-9071; DOJ_009147-9151; DOJ_0012458-12468; DOJ_0012475-12482; DOJ_0012573-12583; DOJ_0012564-12566; DOJ_9207-9214; DOJ_0012518-12524; DOJ_0012492-12497; DOJ_12567-12572; DOJ_0012596-12597; DOJ_12617-12619; DOJ_009120-9126; DOJ_0012584-12586; DOJ_0012589-12591; DOJ_00394-398.  This witness' information was further corroborated and confirmed, as it was consistent with documents in the Government's investigatory files, which were also produced to Claimants, including DOJ_006706-6773; DOJ_006865-6925; DOJ_008561-8578; DOJ_009134-9140; DOJ_009147-9151; DOJ_009152-9157; DOJ_009207-9214; DOJ_012518-12524; DOJ_009247-9249; DOJ_009781-9782; DOJ_009786-9952; DOJ_0012492-12497; DOJ_0012498-12504; DOJ_0012511-12517;

Exhibit 3 Page 264

DOJ_0012559-12563; DOJ_0012564-12566; DOJ_0012567-12572; DOJ_0012573-12577; DOJ_0012584-12586; DOJ_0012587-12588; DOJ_0012589-12591; DOJ_0012596-12597; DOJ_0012617-12623.  Additional information responsive to this Interrogatory may be ascertained from DOJ_9134-9140.

Information provided by **EG CS 8**, an EG opposition party official and agricultural engineer, was corroborated and confirmed by the Government, as it was consistent with other information obtained in connection with the Government's investigation, including but not limited to open source materials, documents obtained by the Government from other witnesses and Government agencies and actors, Government law enforcement databases, and other individuals interviewed by the Government, including but not limited to **Construction Executive C**, **Construction Executive B**, **German Pedro Tomo** (former EG timber company owner), **Bruno Beretta** (former EG timber executive), **EG CS 7** (former foreign timber executive), **Christopher Kernan** (former EG country director for Conservation International), **John Palmer** (retired United States Forest Service officer who visited EG), **Bruno Beretta** (former EG construction executive and timber company executive), **EG Accountant A** (Big Four accountant in EG), **GSF Executive** (former GSF executive in EG), **John Bennett** (former United States Ambassador to EG) and **EG Fiscal Advisor A**.  Additional information pertaining to these witnesses are available at DOJ_9067-9071; DOJ_009120-9126; DOJ_9207-9214; DOJ_0012458-12468; DOJ_0012475-12482; DOJ_0012483-12491; DOJ_0012511-12517; DOJ_0012518-12524; DOJ_0012559-12563; DOJ_0012587-12588; DOJ_009120-9126; DOJ_0012584-12586; DOJ_0012589-12591; DOJ_00394-398.  This witness' information was further corroborated and confirmed, as it was consistent with documents in the Government's investigatory files, which were also produced to Claimants, including DOJ_006298-6332; DOJ_006386-6387; DOJ_0012458-12468;

18

Exhibit 3 Page 265

DOJ_009120-9126; DOJ_009207-9214; DOJ_0012518-12524;  DOJ_009271-9665; DOJ_009247-9249; DOJ_0012483-12491; DOJ_0012598-12613; DOJ_0012511-12517; DOJ_0012559-12563; DOJ_0012587-12588; DOJ_006386-6387; DOJ_009067-9071; DOJ_0012458-12468; DOJ_0012475-12482; DOJ_009107-9114; DOJ_009120-9126; DOJ_009134-9140; DOJ_009271-9665; DOJ_009134-9140; DOJ_009147-9151; DOJ_009152-9157; DOJ_009189-9193; DOJ_009194-9198; DOJ_009207-9214; DOJ_0012518-12524; DOJ_009247-9249; DOJ_0012483-12491; DOJ_0012598-12613; DOJ_0012492-12497; DOJ_0012498-12504; DOJ_0012511-12517; DOJ_0012559-12563; DOJ_0012564-12566; DOJ_0012567-12572; DOJ_0012584-12586; DOJ_0012587-12588; DOJ_0012589-12591; DOJ_0012483-12491; DOJ_0012598-12613.  Additional information responsive to this Interrogatory may be ascertained from DOJ_009152-9156.

Information provided by **EG CS 7**, a European timber executive who worked in EG, was corroborated and confirmed by the Government, as it was consistent with other information obtained in connection with the Government's investigation, including but not limited to open source materials, documents obtained by the Government from other witnesses and Government agencies and actors, Government law enforcement databases, and other individuals interviewed by the Government, including but not limited to **Construction Executive C**, **Construction Executive B**, **German Pedro Tomo** (former EG timber company owner), **Bruno Beretta** (former EG timber executive), **EG CS 8** (EG agricultural engineer and opposition party official ), **Christopher Kernan** (former EG country director for Conservation International), **John Palmer** (retired United States Forest Service officer who visited EG), **Bruno Beretta** (former EG construction executive and timber company executive), **EG Accountant A** (Big Four accountant in EG), **GSF Executive** (former GSF executive in EG), **John Bennett** (former United States Ambassador to EG), and **EG Fiscal Advisor A**.  Additional

information pertaining to these witnesses are available at DOJ_9067-9071; DOJ_009120-9126; DOJ_009152-9156; DOJ_9207-9214; DOJ_0012458-12468; DOJ_0012475-12482; DOJ_0012483-12491; DOJ_0012511-12517; DOJ_0012518-12524; DOJ_0012559-12563; DOJ_0012587-12588; DOJ_009120-9126; DOJ_0012584-12586; DOJ_0012589-12591; DOJ_00394-398.  This witness' information was further corroborated and confirmed, as it was consistent with documents in the Government's investigatory files, which were also produced to Claimants, including DOJ_006298-6332; DOJ_006386-6387; DOJ_0012458-12468; DOJ_009120-9126; DOJ_009207-9214; DOJ_0012518-12524; DOJ_009271-9665; DOJ_009247-9249; DOJ_0012483-12491; DOJ_0012598-12613; DOJ_0012511-12517; DOJ_0012559-12563; DOJ_0012587-12588; DOJ_006386-6387; DOJ_009067-9071; DOJ_0012458-12468; DOJ_0012475-12482; DOJ_009107-9114; DOJ_009120-9126; DOJ_009134-9140; DOJ_009271-9665; DOJ_009134-9140; DOJ_009147-9151; DOJ_009152-9157; DOJ_009189-9193; DOJ_009194-9198; DOJ_009207-9214; DOJ_0012518-12524; DOJ_009247-9249; DOJ_0012483-12491; DOJ_0012598-12613; DOJ_0012492-12497; DOJ_0012498-12504; DOJ_0012511-12517; DOJ_0012559-12563; DOJ_0012564-12566; DOJ_0012567-12572; DOJ_0012584-12586; DOJ_0012587-12588; DOJ_0012589-12591; DOJ_0012483-12491; DOJ_0012598-12613.  Additional information responsive to this Interrogatory may be ascertained from DOJ_12483-12491.

Information provided by **GSF Executive**, who worked as a finance manager at Global Santa Fe in EG, was corroborated and confirmed by the Government, as it was consistent with other information obtained in connection with the Government's investigation, including but not limited to open source materials, documents obtained by the Government from other witnesses and Government agencies and actors, Government law enforcement databases, and other individuals interviewed by the Government, including but not limited to **Construction**

Exhibit 3 Page 267

**Executive C**, **Construction Executive B, German Pedro Tomo** (former EG timber company owner), **Bruno Beretta** (former EG timber executive), **John Bennett** (former United States Ambassador to EG), **EG CS 3** (an EG lawyer and former civil servant), **EG CS 4** (EG architect familiar with the construction sector), **EG CS 5** (EG law and public administration academic),  **EG CS 7** (former foreign timber executive), **Christopher Kernan** (former EG country director for Conservation International), **John Palmer** (retired United States Forest Service officer who visited EG), **Simon Kareri** (a former vice president at Riggs National Bank) and **EG Fiscal Advisor A**.  Additional information pertaining to these witnesses are available at DOJ_00062-94; DOJ_9067-9071; DOJ_009120-9126; DOJ_009152-9156; DOJ_9207-9214; DOJ_0012458-12468; DOJ_0012475-12482; DOJ_0012483-12491; DOJ_0012511-12517; DOJ_0012518-12524; DOJ_0012559-12563; DOJ_0012587-12588; DOJ_00394-398; DOJ_0012567-12572; DOJ_0012564-12566; DOJ_009147-9151; DOJ_0012567-12572; DOJ_0012584-12586; DOJ_0012587-12588; DOJ_0012589-12591.  This witness' information was further corroborated and confirmed, as it was consistent with documents in the Government's investigatory files, which were also produced to Claimants, including DOJ_0000408-412; DOJ_0001049-1080; DOJ_0000842-863; DOJ_0000614-615; DOJ_975-1048; DOJ_758-777; DOJ_778-789; DOJ_0000408-412; DOJ_0001049-1080; DOJ_975-1048; DOJ_778-789; DOJ_0003914-5725; DOJ_006298-6332; DOJ_006386-6387; DOJ_0012458-12468; DOJ_009120-9126; DOJ_009207-9214; DOJ_0012518-12524; DOJ_009271-9665; DOJ_009247-9249; DOJ_0012483-12491; DOJ_0012598-12613; DOJ_0012511-12517; DOJ_0012559-12563; DOJ_0012587-12588; DOJ_000080-87; DOJ_006386-6387; DOJ_009067-9071; DOJ_0012458-12468; DOJ_0012475-12482; DOJ_009107-9114; DOJ_009120-9126; DOJ_009134-9140; DOJ_009271-9665; DOJ_009134-9140; DOJ_009147-9151; DOJ_009152-9157; DOJ_009189-9193; DOJ_009194-9198; DOJ_009207-9214; DOJ_0012518-

12524; DOJ_009247-9249; DOJ_0012483-12491; DOJ_0012598-12613; DOJ_0012492-12497; DOJ_0012498-12504; DOJ_0012511-12517; DOJ_0012559-12563; DOJ_0012564-12566; DOJ_0012567-12572; DOJ_0012584-12586; DOJ_0012587-12588; DOJ_0012589-12591.  Additional information responsive to this Interrogatory may be ascertained from DOJ_0012589-12591.

Information provided by **EG Accountant A**, an accountant at a Big Four accounting firm in EG, was corroborated and confirmed by the Government, as it was consistent with other information obtained in connection with the Government's investigation, including but not limited to open source materials, documents obtained by the Government from other witnesses and Government agencies and actors, and other individuals interviewed by the Government, including **Construction Executive B**, **Construction Executive C, German Pedro Tomo** (former EG timber company owner), **Bruno Beretta** (former EG timber executive), **EG CS 7** (former foreign timber executive), **Christopher Kernan** (former EG country director for Conservation International), **John Palmer** (retired United States Forest Service officer who visited EG), **Simon Kareri**, **John Bennett** (former United States Ambassador to EG), **EG CS 3** (an EG lawyer and former civil servant), **EG CS 4** (EG architect familiar with the construction sector), **EG CS 5** (EG law and public administration academic),  **EG CS 7** (former foreign timber executive), and **EG Fiscal Advisor A**.  Additional information pertaining to these witnesses are available at DOJ_00062-94; DOJ_9067-9071; DOJ_009120-9126; DOJ_009152-9156; DOJ_9207-9214; DOJ_0012458-12468; DOJ_0012475-12482; DOJ_0012483-12491; DOJ_0012511-12517; DOJ_0012518-12524; DOJ_0012559-12563; DOJ_0012587-12588; DOJ_0012567-12572; DOJ_0012584-12586; DOJ_0012587-12588; DOJ_0012589-12591; DOJ_00394-398.  This witness' information was further corroborated and confirmed, as it was consistent with documents in the Government's investigatory files, which were

22

Exhibit 3 Page 269

also produced to Claimants, including DOJ_0000408-412; DOJ_0001049-1080; DOJ_0000842-863; DOJ_0000614-615; DOJ_975-1048; DOJ_758-777; DOJ_778-789; DOJ_0000408-412; DOJ_0001049-1080; DOJ_975-1048; DOJ_778-789; DOJ_0003914-5725; DOJ_006298-6332; DOJ_006386-6387; DOJ_0012458-12468; DOJ_009120-9126; DOJ_009207-9214; DOJ_0012518-12524;  DOJ_009271-9665; DOJ_009247-9249; DOJ_0012483-12491; DOJ_0012598-12613; DOJ_0012511-12517; DOJ_0012559-12563; DOJ_0012587-12588; DOJ_000080-87; DOJ_006386-6387; DOJ_009067-9071; DOJ_0012458-12468; DOJ_0012475-12482; DOJ_009107-9114; DOJ_009120-9126; DOJ_009134-9140; DOJ_009271-9665; DOJ_009134-9140; DOJ_009147-9151; DOJ_009152-9157; DOJ_009189-9193; DOJ_009194-9198; DOJ_009207-9214; DOJ_0012518-12524; DOJ_009247-9249; DOJ_0012483-12491; DOJ_0012598-12613; DOJ_0012492-12497; DOJ_0012498-12504; DOJ_0012511-12517; DOJ_0012559-12563; DOJ_0012564-12566; DOJ_0012567-12572; DOJ_0012584-12586; DOJ_0012587-12588; DOJ_0012589-12591 .  Additional information responsive to this Interrogatory may be ascertained from DOJ_0012498-12504; DOJ_0012584-12586.

Information provided by **EG CS 9**, who was involved in an intimate relationship with Nguema, was corroborated and confirmed by the Government, as it was consistent with other information obtained in connection with the Government's investigation, including but not limited to open source materials, documents obtained by the Government from other witnesses and Government agencies and actors, and other individuals interviewed by the Government, including, **CS 1**, **CS 2**, and two other confidential informants who were employed by Nguema in the United States.  Additional information pertaining to these witnesses are available at DOJ_00178-182; DOJ_00183-188; DOJ-00199-202; DOJ_00265-268; DOJ_9167-9170; DOJ_9179-9188; DOJ_9215-9219; DOJ_12543-12549.  This witness' information was further corroborated and

confirmed, as it was consistent with documents in the Government's investigatory files, which were also produced to Claimants, including DOJ_0000178-182; DOJ_0000183-188; DOJ_0000842-863; DOJ_009179-9188; DOJ_0012469-12474; SENATE-PSI-00069602-00122836.   Additional information responsive to this Interrogatory may be ascertained from DOJ_0012469-12474.

Information provided by **CS 3**, who was familiar with Nguema's activities in EG, was corroborated and confirmed by the Government, as it was consistent with other information obtained in connection with the Government's investigation, including but not limited to open source materials, documents obtained by the Government from other witnesses and Government agencies and actors, and other individuals interviewed by the Government.  This witness' information was further corroborated and confirmed, as it was consistent with documents in the Government's investigatory files, which were also produced to Claimants, including DOJ_0000209-211; DOJ_0000273-277; DOJ_0000303-308; DOJ_0000315-321; DOJ_0000394-398; DOJ_0000399-402; DOJ_0000413-416; DOJ_0000417-421; DOJ_0000422-425; DOJ_0000426-430; DOJ_0000431-434; DOJ_0000440-442; DOJ_0000447-449; DOJ_0000450-453; DOJ_490-520; DOJ_521-556; DOJ_000584-592; DOJ_644-650; DOJ_688-718; DOJ_719-729; DOJ_790-808; DOJ_817-828; DOJ_0000838-863; DOJ_0000890-893; DOJ_915-918; DOJ_0000919-925; DOJ_0000946-950; DOJ_952-959; DOJ_0000967-974; DOJ_0001049-1080; DOJ_00001238-1283; DOJ_00001332-1440; DOJ_0001441-1460; DOJ_00001472-1496; DOJ_3853-3913; SENATE-PSI-117457-118644; and United States Department of State Annual Human Rights Reports located online at online at http://www.state.gov/j/drl/rls/hrrpt.  Additional information responsive to this Interrogatory may be ascertained from DOJ_00241-251.

DATED: January 26, 2013

/S/

WOO S. LEE
Trial Attorney
United States Department of Justice

Attorney for Plaintiff
UNITED STATES OF AMERICA

25

Exhibit 3 Page 272

**VERIFICATION**

I, Robert Manzanares, hereby verify and declare under penalty of perjury that I am a Special Agent with Homeland Security Investigations, that I have read the foregoing United States' Supplemental Responses and Objections to Claimants' Interrogatory No. 9, and know its contents. Everything contained in the response is true and correct, to the best of my knowledge and belief.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this _27_ day of _JANUARY_ , 2013, at _Ft. LAUDERONE_ Florida.

ROBERT MANZANARES
Special Agent
Homeland Security Investigations
U.S. Department of Homeland Security

1

Exhibit 3 Page 273

# EXHIBIT 4

PRINT | CLOSE

**(UNCLASSIFIED//FOR OFFICIAL USE ONLY)**

## 09MALABO27 EQUATORIAL GUINEA RAW, PAPER 4: THE BUSINESS OF CORRUPTION

(U//FOUO)

**09MALABO27 (Embassy Malabo)**                                          03-12-2009 06:40 AM EDT
UNCLAS SECTION 01 OF 05 MALABO 000027

SENSITIVE
SIPDIS

KHARTOUM FOR FERNANDEZ; HARARE FOR CHISHOLM; YAOUNDE FOR DATT

E.O. 12958: N/A
TAGS: PREL, ECIN, ECON, EFIN, PGOV, EPET, ENRG, KCOR, PINR,
SOCI, EK
SUBJECT: EQUATORIAL GUINEA RAW, PAPER 4: THE BUSINESS OF CORRUPTION

REF: MALABO 26 AND PREVIOUS

1. (U) Triggered by changes underway in Washington D.C.,
upcoming personnel rotations in Embassy Malabo and animated by
the recent attack on the capital, this is the fourth in a series
of cables intended to update our perspective on Equatorial
Guinea, and to provide a ground-level view of one of the world's
most-isolated and least-understood countries to interested
readers.

2. (SBU) SUMMARY: The low level of institutional development
and peculiar financial management mechanisms may inflate
perceptions of corruption in Equatorial Guinea (EG). Suddenly
rich, the country's over-reliance on now-defunct Riggs bank, a
lack of conflict-of-interest rules and a legacy of moonlighting
further complicate EG's record. While significant concerns over
the level of corruption remain, and as growing oil revenues fuel
the local commercial boom, there are signs EG is moving toward
improving public finance management -- and U.S. engagement is
helping achieve results. End SUMMARY

3. (SBU) As in many other areas, Equatorial Guinea (EG) has a
bad reputation when it comes to transparency and corruption.
Numerous IOs/NGOs rate the country as one of the world's worst
performers. However, these organizations may be working from a
position of bias and with poor information. To our knowledge,
none of them have undertaken recent on-the-ground surveys here.
On the contrary, there are signs the perspective of the problem
in EG may not be in complete alignment with reality. Moreover,
assessments rarely take into full account the country's level of
societal and institutional development.

4. (SBU) Legacy Issues: Part of the problem is the peculiar
nature of the EG social environment. According to the former EG
treasurer, who retired in 1993 just before the oil revenues
started to flow, lack of resources in its early days often led
the government to compensate officials with in-kind transfers.
Land, operating licenses and import concessions were common
forms of "payment" to ministers and other ranking officials
during a period when "there was often no money to pay salaries."
The practice began with EG government seizure of "abandoned"
Spanish colonial holdings -- and their subsequent redistribution
to officials as a means of compensation. As testament to the
then-prevailing level of abject poverty, former U.S. Ambassador
to EG Chester Norris (1989-1992) relates having to personally

loan money to President Obiang himself so he could "buy gasoline to go to local political events." During the period of the "skinny cows," officials were only expected to be in the office three days a week. The remainder of the time they worked their farms or businesses in order to feed their families. During that period -- when local markets sold onions by the quarter, tomato paste by the spoonful, and the handful of taxis in circulation in Malabo required advance booking for use -- many Equato-Guineans energetically sought to avoid poorly-compensated government jobs. Some could not; especially those close to the president. Having himself come to power in a coup (one likely supported by outside forces) and constantly under threat of overthrow, he purchased loyalty by any means available.

5. (SBU) Those private entrepreneurs who mocked their poor public officials now see the tables turned. Once oil money started to flow in the mid '90s, many officials found themselves in improved positions. Money and power accumulated within the government. In addition, the once-major returns from the earlier in-kind compensation for officials mushroomed as the economy expanded at one of the world's fastest rates. For one example, the single license to import cement into country has become extremely lucrative (NOTE: this license belongs to ABAYAK, a company partially owned by the president and first lady). In another, the only person authorized to provide notary services in Malabo is now one of the country's wealthiest men. These legacy privileges have been closely guarded by those receiving them, but demands from the younger generation and growing appreciation for competition is leading to gradual opening. The outgoing, but-still-powerful Minister of National Security once had the only modern hotel in Malabo. He built it on land that was part of his "skinny cow" compensation package, situated along the 4-lane airport highway that was until 2000 a single, muddy track. His now-aging hotel faces stiff

MALABO 00000027 002 OF 005

competition from newer, more upscale arrivals: a French-owned "5-star" Sofitel, a Lebanese-run EG government complex, and (soon) a 300-bed Lebanese-owned Hilton Hotel near the Malabo airport. Forced to innovate, the former minister has just opened Malabo's first European-style bakery and associated ice-cream shop on his premises. Competition works.

6. (SBU) Legal Corruption: Representatives of a foreign, internationally-recognized law firm working closely with U.S. oil companies in EG for years tell us they are aware of rumors, have seen fully exploited "grey areas" but have never encountered a "smoking gun of outright corruption." They describe EG's anti-corruption statutes as "even more stringent than the (U.S.) Foreign Corrupt Practices Act." In practice, officials caught in the act are more often quietly removed from office and/or banished to some hinterlands task as penance than they are prosecuted. We know of not a single court case.

7. (SBU) Moreover, one major flaw remains: EG has no law limiting or even defining conflict of interest. Most ministers continue to moonlight and conduct businesses that often conflate their public and private interests. The Minister of Justice has his own private law firm, in which he maintains an active hand and open interest -- and which is not illegal under current EG law. In similar fashion, the Minister of Transportation and Communications is director of the board and owns shares in the parastatal airline, not to mention the national telephone company. The custom of simultaneously maintaining both official and private activities that became entrenched in the era of

- Department of State                                                   Page 3 of 6

skinny cows has not been altered for the fat ones. There is
public grumbling but little internal pressure to change the
rules. Nonetheless, occasionally lines do get crossed. We
understand the former Minister of Fishing and Environment lost
his job when it was discovered he was occasionally going to
Spain to sign over fishing licenses out of view of the rest of
the government. There were also rumors that corruption led to
the former Prime Minister's ouster (i.e., Ricardo Mangue). High
officials appear to be insulated from prosecution, but
apparently can't expect impunity.

8. (SBU) Family Matters: EG has an extremely tight, intricately
interconnected society (REFTEL). There are no arms-length
transactions here. The traditions of the predominant Fang tribe
prevail, and the bonds of family are as strong as they are in
any other culture. By American standards, these bonds are
exceedingly powerful. Ministers themselves fall victim to these
traditions and appear unable to avoid pressures to intercede in
mundane matters on behalf of even lower-class family members.
Failure to do so can result in loss of influence and
ostracization within the family and clan. During a meeting with
the powerful Minister of Interior in which he was interrupted by
a telephone call, we were surprised to hear him engage in
translation and explanation of a routine administrative document
for an elderly aunt. "She doesn't read well and she speaks poor
Spanish," he apologized. "These family matters must be attended
to here." The tug of family and the opportunity for abuse of
power are clear.

9. (SBU) Among those close to the president, two individuals
are singled out for criticism both here and abroad -- the first
lady, and her son, the "primogeniture" of President Obiang.
"Teodorin" (or "little Theodor") as the son is known, lives the
life of an international playboy and is widely accused of
corruption. His purchase of a $34 million mansion in Malibu,
California once made Forbes magazine and attracted a great deal
of attention. Yet when we probe him on the issue of corruption,
he explains that during the time of the "skinny cows," the
government "granted" him a concession to lumber a large tract of
pristine continental jungle. The company he formed (and which
he still owns, even though he is currently Minister of
Agriculture and Forestry), brought in a Malaysian contractor
with 40 teams of well-equipped lumberjacks who clear-cut,
transported and shipped a wealth of whole logs to Asian markets
-- leaving Teodorin with a large windfall. It also ruffled
enough feathers that a new law was introduced that prohibited
the exportation of whole logs and limiting clear-cutting. In
the meantime, Teodorin continued entrepreneurial activities that
often included purchase of foreign real estate. "I've been very

MALABO 00000027 003 OF 005


lucky in business," he told us, "and I like to live well. My
house in Malibu is now worth twice what I paid for it."

10. (SBU) The origins of his mother's initial grubstake were
based in real estate, and by any measure she has since become a
formidable local real estate baron. As the oil business took
off, anyone with residential properties that supplied the basics
(i.e., running water, electricity) saw demand for their
properties soar. Earlier than most, the first lady identified
and built into EG's sizzling real estate boom, where 100% return
on investments in western-style construction can come within a
single year of completion. Of course, it doesn't hurt with
marketing if you are the first lady, and land for construction
may be easier to come by than for some others. The president

Exhibit 4 Page 276
DOJ_0000586

himself acknowledges his "private interests in Equatorial
Guinea," which include support for his wife's real estate
ventures. Once, in a new, stately presidential palace suite,
waving a hand, he told us, "This doesn't belong to me. It
belongs to the people. But I have to take care of my family, so
I maintain private interests on the side."

11. (SBU) Anecdotal Indicators: Given the poor level of
institutional development, the absence of appropriate law and
the whiplash EG has experienced in going from poverty to riches
in such a short period (a decade ago EG was among the very
poorest countries in the world -- it now has one of the highest
per capita incomes of any population), it is appropriate to
focus on the issue of corruption. Yet apart from the obvious
conflicts of interest, the rumors and accusations, there are
some positive signs. Most EG government revenue is generated by
exploitation of the country's growing oil and gas reserves. All
production is currently led by U.S. oil companies extremely
sensitive to the requirements of the U.S. Foreign Corrupt
Practices Act. Thus we have a reasonable level of confidence
regarding the accounting up to the point that royalty payments
enter EG accounts.

12. (SBU) In this area too, there are positive signs. EG is a
member of the 6-nation Central African Franc monetary union. In
the past decade, and in competition with much larger countries
such as Cameroon, Gabon, and Congo, EG's reserves in the
associated Central African Bank went from a rounding error to
over 60% of the sum total. While leaks are likely, a system
hemorrhaging money to corruption is unlikely to have amassed
reserves at such a rapid rate. A recent visitor from the
secretariat of the Extractive Industries Transparency Initiative
(EITI -- for which EG is voluntarily a candidate country) was
"pleasantly surprised" to find EG's accounts to be in such good
order.

13. (SBU) Riggs Rigged: The 2005 collapse of venerable Riggs
Bank in Washington D.C. continues to hang over EG like a cloud.
At the time of the Senate/OCC investigations, EG was discovered
to have the largest cumulative balance in the bank. Yet study
of the record shows the bank itself to have been at fault with
regard to its reporting responsibilities, while the accounts
associated with EG can be reasonably explained. Based on our
conversations here, Equatoguineans readily accepted Riggs'
advice regarding accounts and accounting -- assuming the bank
was "acting properly." As the increasing flow of
dollar-denominated oil revenues built up, and attractive
interest income streams ensued (which was not always the case
with EG funds held in the BEAC -- the Central African central
bank), individuals associated with the EG government began to
open private accounts. Both the amounts in the government
accounts and those in individual accounts are easily in line
with amounts generated respectively by oil revenues and private
activities of those concerned. Recognizing the crippling human
capacity challenges in the country and the need for western
(particularly U.S.) education, the EG government even worked
with the bank to set up accounts for two separate scholarship
funds, which the bank (poorly) administered. EG leaders were
"surprised" to learn U.S. government investigators took a dim
view of this arrangement.

14. (SBU) As a country, EG has poor level of appreciation for
international best practices in accounting. From the EG
perspective, the country relied on Riggs for good advice, which

MALABO 00000027 004 OF 005

Exhibit 4 Page 277

it did not receive. EG continues to struggle with very meager institutional development in the area of public finance and financial management. One element scrutinized by U.S. investigators of the Riggs affair was the peculiar signatory authority utilized on EG accounts. Long after closure of its Riggs accounts, President Obiang is still proud to say he is paymaster for the EG government. He continues to personally maintain control of the checkbook, "because I've learned I can't trust anyone else." Countersigned checks are his way of ensuring money goes where intended. He has been attacked by some for exerting this level of control, but given what we know about the current low level of institutional development and lack of capacity, it may be more prudent than immediately apparent. There are very large numbers of public projects underway and the president is famous for making surprise personal appearances to spot-check for progress, conformity and quality. The tactic is reported to keep contractors on their toes. Nevertheless, it is in these downstream, public expenditures that we lose visibility and in which the greatest opportunities for corruption persist. Rumors abound of influence buying, bid rigging and kickbacks. Without developed institutional oversight and internal controls, one person can't supervise everything, but woes betide those who are caught in the act.

15. (SBU) Progress: There are two bright spots and a promising glimmer regarding improvement in EG's management of public finances, all of which have significant USG angles. One is the unique "Social Development Fund" (SDF) whereby EG ministries are learning to manage project development, planning and execution in ways that are consistent with international best practices. SDF is fully funded by the EG government, and involves direct payment to USAID for 3 years and about $15 million worth of technical assistance to establish mechanisms and procedures for social projects that range from health to education. An overarching goal is to set in motion institutional development leading to a government-wide system that meets international standards. After fits and starts, the Fund has moved into the execution phase of initial round of projects, with dozens more in development and new ministries coming onboard.

16. (SBU) Another promising sign is EG's determination to become a member of the Extractive Industries Transparency Initiative (EITI), an international effort supported by former British PM Tony Blair and Transparency International's Peter Eigen. Encouraged by the embassy, EG has mounted a serious, voluntary effort to obtain candidate status and move toward full membership. In another demonstration of the capacity challenges confronting the country, the key stumbling block is not accounting and transparency so much as a very low level of development of the country's nascent civil society -- a key "watch-dog" component of the EITI process. With a 200 million euro project underway, the EU is engaged in helping civil society grow to fill this gap.

17. (SBU) Finally, we have been told by the Minister of Finance that EG will pursue a request for USG assistance (specifically Treasury Department official technical assistance) in professionalizing his ministry, and which the government of EG will partially or fully fund. His letter making this request has been drafted and is "awaiting the council of ministers approval," expected soon.

18. (SBU) Conclusion: While we make no claim of having undertaken an exhaustive study of corruption in EG, we find local nuance and "ground truth" to be at odds with

often-exaggerated claims made by the international press and
even by NGO's that focus on this issue set. Flush with oil
money, the value of corrupt actions is probably growing.
However, anecdotal evidence suggests the incidence of corruption
is declining. Businessmen describe EG as a "good place to work,
but a hard place to do business." I.e., while it is relatively
safe and secure, many of the actors who populate the country are
working the angles for their own personal and family benefit.
The FCPA and resulting performance of U.S. oil companies has
helped secure a reputation for Americans of being honest and
straight, which helps keep the worst of the crooks at bay.
Other international players may have less integrity. The good

MALABO 00000027 005 OF 005

reputation we enjoy attracts EG leaders who want to see the
business and legal environment improve. Here too, additional
U.S. assistance can help, as the results above show.
SMITH

http://ncd.state.sgov.gov:80/message/reference/09MALABO27

UNCLASSIFIED//FOR OFFICIAL USE ONLY

PRINT | CLOSE

# EXHIBIT 5



global witness

# The Secret Life of a SHOPAHOLIC



## HOW AN AFRICAN DICTATOR'S PLAYBOY SON WENT ON A MULTI-MILLION DOLLAR SHOPPING SPREE IN THE U.S.

A report by Global Witness, November 2009

Exhibit 5 Page 286

DOJ_0001049

This report by natural resources, conflict and corruption watchdog Global Witness was written with the help of Ken Silverstein, the investigative journalist who first broke the Riggs Bank scandal story at the *LA Times* and who now writes for *Harper's*.

Riggs Bank billed itself as 'bank of presidents', a venerable Washington institution which banked for Abraham Lincoln himself. It fell apart in 2004 after a U.S. Senate committee investigation and federal criminal investigators found it had been holding accounts and facilitating money laundering for corrupt President Obiang of Equatorial Guinea and his family members. This report carries on that story. In the first of a series of collaborations, we combine our investigative powers to reveal secret U.S. government documents that allege a crime spree by President Obiang's son Teodorin. The documents relate to a preliminary investigation; charges have not been made. He continues to live a fantastic and profligate lifestyle in the U.S. while ordinary citizens of Equatorial Guinea live in poverty and oppression.

With its oil income, paid for by American companies, Equatorial Guinea should be one of the richest countries in the world. Instead its people are among the poorest. Despite an official salary of $4,000 – $5,000 a month as a minister in his dad's government, Teodorin has acquired a fleet of fast cars, a $35 million mansion in Malibu, a private jet and he is reported to be building a 200-foot custom luxury yacht, complete with shark tank.

Laws already in place in the United States would prevent Teodorin from enjoying the proceeds of corruption on U.S. territory, and provide the basis both for revocation of his visa and potential seizure of his U.S. assets. They have not been used, despite knowledge on the part of U.S. enforcement agencies, set forth in confidential U.S. Department of Justice documents, that Teodorin was involved in grand corruption and using illicit proceeds to fund his U.S. lifestyle.

The U.S. government continues to allow him into the country, despite the fact that the State Department is legally obligated to maintain a list of foreign officials against whom there is credible evidence of corruption, who are denied visas. That an individual like Teodorin is able to move and spend his money relatively easily in the U.S. is a scandal. We are publishing the contents of these confidential memos now because law enforcement efforts against him appear to have stalled.

Teodorin is able to spend lavishly in the U.S. because banks, despite the devastating lesson of what happened to Riggs, have continued to process and accept Teodorin's money as it comes into the U.S. These banks, this report will show on pages 13-14, are Bank of America, Wachovia, UBS, Union Bank of California, and First American Trust. This is a spectacular moral failing on the part of these banks, and reveals a disturbing chain of gaps in the design and implementation of the anti-money laundering laws.

The U.S. has generally taken a far more effective and robust approach to tackling foreign corruption and bribery than many of its international peers. Nonetheless, dangerous regulatory holes in the fence remain that frustrate efforts to tackle the flows of corrupt money into the U.S., further complicated by the difficulty in gathering evidence against venal ruling elites when they are able to use the sovereignty of their captured and corrupted state as a shield.

At the end of this report are a series of policy recommendations for the U.S. government. The ongoing banking regulatory reform process in Congress offers a significant opportunity to tackle many of them.

Exhibit 5 Page 284

DOJ_0001050



President's son Teodoro Nguema Obiang (TNO) went on a shopping spree in the United States

Javier Espinosa/El Mundo

**N**estled high in the hills overlooking the ocean off Malibu Beach sits the exclusive, gated community of Serra Retreat, which according to a local realtor's website offers some of the area's "most stunning and distinctive homes."

Serra Retreat has less than 100 properties, whose owners have included Hollywood stars such as Mel Gibson and Britney Spears. Perhaps the most lavish property in Serra Retreat is an estate at 3620 Sweetwater Mesa Road, which sits on sixteen acres of land and boasts a swimming pool, tennis courts and a four-hole golf course. Teodoro Nguema Obiang Mangue, or TNO, son of the dictator of Equatorial Guinea, a tiny nation on the coast of West Africa, paid $35 million for the property three years ago.[1]

The majority of Equatorial Guinea's people survive on less than $1 a day, but 41-year-old Obiang Mangue belongs to a tiny sliver that have grown rich since American oil firms discovered oil there 15 years ago: the family of Lieut. Gen. Teodoro Obiang Nguema Mbasogo, his father, who runs a corrupt dictatorship.

TNO is considered a likely successor to his father. He holds the title of Minister of Forestry, Fisheries & the Environment – more popularly known as the Minister of Chopping Down Trees – which offers a salary of about $4,000 – $5,000 per month. At that rate, as Global Witness mentioned in a prior report[2], it would have taken TNO somewhere between 580 and 730 years to squirrel away enough money to buy his Malibu property, assuming he had no other expenses and paid no taxes on his income.

Why TNO is allowed to set foot into the United States, let alone to own tens of millions of dollars worth of assets there, is not immediately evident. In 2004, George W. Bush issued Presidential Proclamation 7750, which bars corrupt foreign officials

Exhibit 5 Page 282

DOJ_0001051

Despite earning a salary of a few thousand dollars a month. TNO bought this $35 million Malibu mansion



*'Pictometry International Corp'*

from entering the United States; in 2006 he launched a cross-departmental Anti-Kleptocracy Initiative. A measure passed by Congress in 2008 and renewed in 2009 also flatly states that the U.S. government should deny visas to foreign officials where there is "credible evidence" they are involved in corruption.[3] Under President Obama, the State Department issued a report last July, saying "Anti-corruption is a tenet of U.S. foreign policy because corrupt practices sabotage development efforts, lead to misuse of public resources, erode confidence in democratic institutions, and ease the way for transnational criminals and terrorists." The United States would continue "to deny or revoke visas to payers of bribes and corrupt officials, with increased scrutiny of those involved in corruption in the extraction of natural resources," the department said.[4]

That TNO should be barred on such grounds is well known to U.S. authorities. Previously undisclosed documents from a joint Justice Department/Immigration and Customs Enforcement (ICE) investigation, obtained by Global Witness, inventory TNO's American-held assets. In addition to his Malibu mansion, they include a $33 million private jet, millions of dollars worth of sports cars, and at least two luxury boats. The documents detail a host of his alleged criminal activities, ranging from "drug binges" to money laundering.[5]

"[I]t is suspected that a large portion of Teodoro Nguema OBIANG's assets have originated from extortion, theft of public funds, or other corrupt conduct," says a Justice Department document, dated 4 September 2007, which sought assistance for the investigation from the French government. Owing to "the sensitive nature of this investigation involving senior foreign public officials and because criminal charges have not yet been filed, we ask that the subject of this request and the existence of a U.S. investigation on this subject be kept strictly confidential," it said.[6]

TNO funneled roughly $75 million from overseas into the United States between 2005 and 2007, says the Justice Department memo. The documents relate to a preliminary investigation; charges have not been made. The confidential documents identify the shell corporations and bank accounts through which he moved the money, which TNO used to buy the Malibu estate and the luxury jet. The documents also show that some of the major American banks involved filed suspicious activity reports to the authorities about TNO's financial transactions and eventually blacklisted him as a customer – but not until after they had helped him move tens of millions of dollars. As this report will show, any meaningful due diligence would have

Exhibit 5 Page 283

DOJ_0001052

raised big questions about whether a bank should have proceeded with these transfers.

A second document, prepared by ICE's lead investigator on the case, identified the inquiry's goals as being to "identify, trace, freeze, and recover assets within the United States illicitly acquired through kleptocracy by Teodoro Obiang and his associates," and to "deny safe haven in the United States to kleptocrats, in accordance with presidential proclamation 7750." Yet despite the overwhelming evidence already compiled by investigators as of two years ago, the inquiry is effectively stalled, according to sources that spoke about the case.

The list of foreign officials barred under Proclamation 7750 has only about 3 dozen names on it, sources have told Global Witness. While these names are kept strictly secret by the State Department, a spokesman at Equatorial Guinea's embassy in Washington told Global Witness that TNO is not on it. The spokesman, who asked to remain unidentified, said that TNO had in fact traveled unhindered to the United States as recently as late-September, when he was in Houston to help inaugurate officially his country's consulate there.[7]

(Many of those in attendance at the ceremony were American energy company officials.[8])

"Natural resources are the only significant source of wealth in many developing nations, and we have seen how easily the proceeds can be exploited by government officials for their own self interest," said Senator Patrick Leahy, who played a key role in passing the congressional amendment barring corrupt officials from entering the United States. "Some of these despots have used this ill gotten wealth to live in luxury in the United States. We should not facilitate their crimes against their own people, and we have every right and obligation to deny them entry."[9]

Jack Blum, a former congressional investigator into the BCCI bank scandal and now a private attorney specializing in cases involving money laundering and foreign corruption, suggests that the lack of action against TNO may be tied to Equatorial Guinea's energy wealth and close relationship with U.S. oil companies. "The least they could do is cut off his shopping privileges by denying him entry into the United States," he said. "Where the hell is the U.S. government?"[10]



Revenues from natural resources, such as oil, should be improving the lives of the world's poorest people. But Equatorial Guinea's oil wealth is squandered by a small corrupt elite

Ed Kashi/Corbis

Exhibit 5 Page 284

DOJ_0001053

TNO's father,
Teodoro Obiang,
is a brutal dictator
who has crushed
opposition



AP Photo/KEYSTONE/Andree-Noelle Pot

**R**oughly the size of Maryland, Equatorial Guinea gained independence in 1968 and is the only former Spanish colony in sub-Saharan Africa.

The country's first ruler was Francisco Macias Nguema, the self-declared "Implacable Apostle of Freedom" and "Sole Miracle of Equatorial Guinea." As many as 50,000 people, roughly 10 percent of the population, were murdered during the Macias era, which came to a close in 1979 when the Sole Miracle was overthrown and executed by Obiang.[11]

The latter was no reformer. As head of the National Guard and later commander of the armed forces, he played a major role in carrying out the terrible repression of the Macias years. John Bennett, the former American ambassador to the country, describes him as the "chief executioner [who] carried out most of the killing and torturing that took place under Macias."[12]

Since taking the reins of power, Obiang has squashed political opposition and crushed almost all dissent. He has been "elected" three times in balloting marred by fraud

and violence (in 1989 with 99 percent of the vote, in 1996 with 97.8 percent, and in 2002 with 97.1 percent).[13] The ruling party currently controls 99 of the 100 seats in parliament and Obiang has staffed top government ministries, the security forces and the judiciary with his relatives and members of his own ethnic clan.[14] His second son, Gabriel Obiang Lima, controls oil revenues through his position as vice-minister of mines, industry and energy. Teodoro Biyogo Nsue, Obiang's brother-in-law, served as ambassador to the United States before gaining his current post as ambassador to Brazil.

The State Department's most recent annual global human rights survey, released in February 2009, said abuses in Equatorial Guinea included "unlawful killings by security forces; government-sanctioned kidnappings; systematic torture of prisoners and detainees by security forces; life threatening conditions in prisons and detention facilities; impunity; arbitrary arrest, detention, and incommunicado detention...restrictions on freedom of speech and of the press; restrictions on the rights of assembly, association, and movement; government corruption; violence and discrimination against women; suspected trafficking in persons; discrimination against ethnic minorities; and restrictions on labor rights."[15]

Equatorial Guinea was one of the most isolated countries on the planet up until the mid-1990s, a destitute pariah state with few international allies. Then, American energy firms, led by ExxonMobil, ChevronTexaco, Marathon and Amerada Hess, discovered vast reserves of oil and gas in the offshore waters of Equatorial Guinea, and billions of dollars in American corporate investment poured in. Since then, the country has become the third-largest producer of oil in sub-Saharan Africa.[16] Between 1993 and 2007, annual government oil revenues shot from $2.1 million to $3.9 billion.[17]

Equatorial Guinea now enjoys a per capita income of about $37,200, one of the highest in the world.[18] Yet 77 percent of the population lives in poverty, 35 percent die before the age of 40, and 57 percent lack access to safe water. Between 1990 and 2007 the infant mortality rate actually rose from 10 to 12 percent.[19]

Exhibit 5 Page 285

DOJ_0001054



This family made a living from fishing, but are now blocked from the beach by an oil company's secure zone. Despite the country's huge wealth, most of the population of Equatorial Guinea lives in dire poverty

Concealed within the technical jargon of an October 2008 report by the International Monetary Fund (IMF) on Equatorial Guinea is a bleak portrait of a regime awash with oil money but deeply reluctant to spend more than a small fraction on the welfare of its own people. Poverty is "strikingly high" and there is no social safety net, though the government has promised to pay some "modest" food subsidies to households. More than a third of public investment goes towards highways and other public infrastructure, with only a small percentage going towards health, water and education. Equatorial Guinea is investing four times more money in its Presidency (3.2 % of public investment) than in the country's water and sewage (a tiny 0.7 %). It is also spending substantial amounts "on hotel and related infrastructure is necessary to meet upcoming international obligations (the summit of the African Union, in 2011, and the Africa Cup of Nations, in 2012)."[20]

In other words, Obiang's regime appears willing to spend more on prestige projects to impress other African countries than on clean water for its own people.[21]

Meanwhile, Equatorial Guinea has gained strategic value to the United States as Africa emerges as an important energy ally – other major producers in the continent include Nigeria, Angola, Cameroon and Gabon – and all the more so given political turmoil and instability in the Middle East. Africa now provides 21 percent of America's oil imports, more than the Persian Gulf.[22]

prompting the Pentagon to inaugurate the U.S.-Africa Command in October 2008. In June of this year, President Obama visited the West African nation of Ghana, his first trip to the continent as president. His visit "held a special resonance for Big Oil and American businessmen," said a UPI story. "Ghana...is on the cusp of oil wealth – and the United States wants it."[23]

"No country is going to create wealth if its leaders exploit the economy to enrich themselves," Obama said when he addressed parliament in Ghana. "No person wants to live in a society where the rule of law gives way to the rule of brutality and bribery. That is not democracy, that



A new stadium in Malabo. The Obiang regime appears more willing to spend money on prestige projects than on clean water

Exhibit 5 Page 286

DOJ_0001055

is tyranny, and now is the time for it to end."[24] It is important that the new Obama administration is able to match its rhetoric on good governance and revenue transparency with concrete actions, including in strategically important energy-rich countries such as Equatorial Guinea.

In August of this year, Secretary of State Hillary Clinton traveled to Angola, where she offered only the faintest criticism of the government's legendary track record of corruption or its failure to hold a presidential election that was originally scheduled to take place in 1997. While Secretary Clinton stressed the importance of good governance and anti-corruption efforts throughout her trip to Africa, it was disappointing that she did not make stronger public statements on the need to promote greater transparency in the management of oil revenues during her visit to Angola. She publicly said that the focus of her trip was "to deepen and strengthen our energy partnership" and "to explore ways to advance energy security."[25]

Historically, the United States has exerted little pressure on the Obiang regime to improve its record on human rights and corruption. In 2003, following an intense lobbying campaign by the oil industry, President Bush decided to reopen the American embassy in the country, which had been shut down eight years earlier

for budgetary reasons and human rights violations. (The decision to close the embassy was made easier by the fact that in addition to repressing its own citizens, the Obiang regime had threatened to kill then-Ambassador Bennett.)[26]

In 2006, Obiang met with then secretary of state Condoleezza Rice, who called him "a good friend" to the United States.[27] Last year Senator John Isakson from Georgia, a member of the Senate Foreign Relations Committee, visited Equatorial Guinea and met with government officials to discuss "issues of common concern." He also visited a natural gas plant, which ships gas to the port of Savannah in his home state.[28]

The Obiang family has not been terribly discreet about its plundering of the national treasury. In late 1999, President Obiang paid $2.6 million for a mansion in the Maryland suburbs that has 10 bathrooms, seven fireplaces and an indoor pool. The following year he bought a second Maryland property for $1.15 million.[29] In 2008, a Spanish civil rights group filed a complaint charging that Obiang and 11 relatives had used laundered funds to buy chalets and real estate in the country;[30] an investigation is now under way and court details are being reported in Spain about the alleged transfers. A lawyer for the government of Equatorial Guinea wrote to *El País* earlier this year rejecting the allegations made in the complaint.[31]

President Obiang met Condoleezza Rice in 2006. She called him a "good friend" to the U.S.



*US Department of State*

Exhibit 5 Page 287

DOJ_0001056



Bosses of disgraced Riggs Bank testifying before Congress. Riggs collapsed because it banked for the Obiang family, yet U.S. banks continue to process payments for TNO

A 2004 report by the Senate Permanent Subcommittee on Investigations found that President Obiang had control over some $700 million in state funds, deposited by American oil companies active in Equatorial Guinea, at Riggs Bank in Washington, D.C. (Subsequent to the investigation, Riggs Bank paid $41 million in civil and criminal fines for violations of banking regulations, a senior vice president pled guilty to fourteen counts of fraud and money laundering, and it was eventually bought at great loss to shareholder value by PNC Bank.)[32] According to the report, Chevron, Marathon, Amerada Hess Corporation, ExxonMobil and other American oil companies "may have contributed to corrupt practices by making substantial payments to, or entering into business ventures with," government officials in Equatorial Guinea, their family members, and businesses they controlled.[33]

"Before oil money came in there was not a lot of money to steal, and when the oil money did start coming in there were no safeguards in place," said Antony Goldman, head of PM Consulting, a London based energy consulting firm. "There was no culture of government oversight, no media, let alone an independent media, no independent judiciary and no outside scrutiny, because the country had been largely forgotten by the outside world. That all allowed corruption to flourish in ways it did in very few other countries."[34]

When it comes to profligate public consumption by the Obiang clan, TNO – who had three accounts at Riggs, including one opened for a Bahamian offshore corporation named Awake Ltd. – is Exhibit A. For high school, he was sent abroad to be educated at an exclusive French boarding school. TNO attended university in France as well, though little in the way of education appears to have taken place there. A former U.S. intelligence officer, who after joining the private sector was hired to track TNO's activities because he was viewed as a potential successor to his father, said his academic career in France was marked by extensive partying and general revelry.[35]

In late 1991, TNO enrolled in a non-degree English as a Second Language course at Pepperdine University in Malibu. Elisa Wax, director of the course during that time, recalled TNO arriving to campus in sports cars or limousines. "He had, literally, an entourage," she said. "He was there to party. He rarely came to class."[36]

Other than paying $3,400 per session, there were no admissions requirements to the program. Though TNO's tuition included boarding at Pepperdine, he shuttled between the Beverly Wilshire Hotel and

Exhibit 5 Page 288

DOJ_0001057

The Beverly
Wilshire, one of the
hotels TNO stayed
at while a student
in the U.S.



Flickr / Robert Karol

a house he rented in Malibu, which he destroyed. "There was a fire," Wax said. "He literally trashed it."[37] TNO has not responded to this allegation.

Meanwhile, Wax received a steady stream of phone calls from the Beverly Wilshire and shops in Beverly Hills trying to track down Teodorin to settle outstanding bills. She would direct these calls to a representative at Walter International, a Houston-based firm, later bought up by CMS Energy, that then had a stake in Equatorial Guinea's offshore fields and that financed TNO's "studies" at Pepperdine. The woman assigned by Walter to handle these complaints was "pulling out her hair," Wax said. "There were people trying to locate him from all directions."

Bennett, who was ambassador at the time and was informed of TNO's behaviour at Pepperdine – he dropped out of the program after five months – said TNO racked up $50,000 in expenses that Walter International had to cover.[38]

Following his time at Pepperdine, TNO returned to France, where he briefly worked at a logistics firm called Saga, which had extensive interests in Africa and was looking to expand into Equatorial Guinea. Saga appears to have hired TNO merely as a means of currying favor with President Obiang. "Teodorin didn't do any work and rarely turned up," said a person familiar with his tenure at Saga. "He just took up desk space."[39]

TNO traveled back and forth to Equatorial Guinea on a regular basis in the 1990s. When he was there, his father sought to promote his political profile, which proved to be a challenging task, given that he spoke his native language like a foreigner when he appeared on local TV, according to the former U.S. intelligence official.[40] This source said that Obiang's efforts to promote TNO also encountered resistance from tribal elders, who were disgusted by his "profligate behavior."

By the late-1990s, TNO had been appointed by his father as minister of forestry, fisheries & the environment. As TNO simultaneously owned a major forestry company, this arrangement is roughly equivalent to allowing the U.S. Secretary of Defense to own Lockheed Martin.

At the time, oil and gas generated little money and forestry was the major source of state revenue. "There were Malaysian, North Korean, and Chinese logging camps on the mainland, and he collected cash from them for ... logging operations, much of it involving valuable hardwood," said the former U.S. intelligence source. His account was corroborated in part by the Justice Department/ICE documents, which state that as minister of forestry, TNO had "instituted a large 'revolutionary tax' on timber, but insisted that the payments be made directly to him, either in cash or through checks to Somagui Forestal, a forestry company owned by Teodoro Nguema OBIANG."

Exhibit 5 Page 289

DOJ_0001058

Despite his reputation, the French government courted and developed TNO to be its man-in-charge after his father died. French authorities also protected him when he lived in Paris, once covering up the circumstances of an accident in which he totalled a luxury car, according to the former intelligence official. He said that French agents out of Gabon paid money to TNO, as did Elf-Aquitaine. The French state oil company, later bought by Total, became famous for bribing foreign leaders, although TNO was not among those identified by the 2003 Elf investigation and trial in France.[41] "The French had troops stationed on Pico Bazille, which overlooks Malabo and was the major telecommunications node for the country," he said. "They had a plan in place to control the airport, the ports, and telecommunications in the event of instability."

TNO often visited French Legionnaires stationed on Pico Bazille, but he also sought ties to the United States, especially as French influence in West Africa was waning and the U.S. was seeking to expand its influence in the area. "The Pentagon had Special Forces in the country and they worked closely with Teodorin," this person said.[42] "He wanted U.S.-trained Equatoguinean troops to be



TNO is known as the Minister of Chopping Down Trees. He allegedly imposed a "revolutionary tax", payable directly to him, on timber companies

loyal to him and available to him when his father died."

As to American willingness to push Equatorial Guinea towards democracy, the former intelligence official remarked: "We will go through the motions, we will push democracy, but we'll live with what's put together there because we do not have any good options. We need their oil. The political leadership is illiterate and brutal in its crude way, but they know how to stay in power. If the elder son takes power, you live with it."



The U.S. 3rd Special Forces group, pictured here in Mali, trained troops in Equatorial Guinea. Special Forces allegedly worked closely with TNO

Exhibit 5 Page 290

DOJ_0001059

The Plaza Athénée Hotel, Paris, where TNO stayed. TNO leads a life of luxury while the people of Equatorial Guinea suffer



**A**n itemized list of TNO's assets would be impossible to produce, but in Equatorial Guinea they have included a number of logging firms and an airline.

He also runs Equatorial Guinea's only private radio station and a government TV station, both named Asonga. (In 2003, the radio station declared that President Obiang was a God "in permanent contact with the Almighty" who can "kill anyone without going to hell").[43]

In Los Angeles, TNO owned and operated a hip-hop label called TNO Entertainment, which produced two albums before going out of business. In an effort to woo the rapper Eve, he rented a 300-foot yacht from Microsoft founder Paul Allen for $680,000;[44] Eve dated TNO for a time.[45] A request for comment sent to Eve's publicist was not responded to.

A source intimately familiar with Teodorin's spending habits from his Riggs Bank accounts said that he would frequently call his personal banker with imperious and extravagant demands. One day he'd want arrangements made to fly his friends to Rio de Janeiro for Carnival; on another day he'd need to have a Bentley air-freighted from Scotland to Los Angeles; and on another still he'd demand that a helicopter be immediately dispatched to offload a female companion from a cruise ship because she had fallen out of his favor. According to this source, TNO also was offering a six-figure reward for an introduction to Halle Berry.[46]

TNO has been a defendant in several civil cases in California, being accused of stiffing contractors[47] and taking wrongful possession of a Mercedes Benz CL600c. In the latter case a Mercedes leasing company alleged that another defendant had leased the car for $125,000 over four years and then, despite not being the legal owner, sold it to a fraudulent car dealership. TNO then bought the Mercedes from the dealership. According to the Mercedes company, TNO's purchase of the car was 'wilful, intentional and malicious'. Neither TNO nor the other defendant responded to summons in the case, which was settled out of court in 2003.[48] The Mercedes leasing company declined to comment on the case.

In France, one of his favorite playgrounds, a TV crew once filmed TNO driving down the Champs-Élysées in a Bentley and on a shopping spree during which he bought 30 designer suits in a single afternoon. He was also filmed at the luxury hotel where he lived and sampling expensive wines "Très bien, très bien," he says while sipping from a glass of red.[49]

Exhibit 5 Page 291

DOJ_0001060

A Western businessman who had dealings with TNO in the late-1990s, recalled meeting him in Paris, where he was staying at the Plaza Athénée, which is located between the Champs Élysées and the Eiffel Tower, and is one of the city's most luxurious hotels. TNO had commandeered three suites there – the current rate for suites starts at $1,400 a day and goes up to $29,000 – and booked a number of other rooms for his entourage, including bodyguards and girlfriends. "He had the EG ambassador to France running around like his personal servant," the businessman said.[60]

TNO also invited this person to a large dinner at La Maison du Caviar. "He had a private room and he ordered a lot of champagne and so much caviar you could have scooped it with a shovel," the source said. "All he knows is how to spend money, that's how he measures success."

In 2007, three French non-governmental organizations – Sherpa, Survie and Fédération des Congolais de la Diaspora – filed a legal complaint alleging that the ruling families of Equatorial Guinea and several other African countries had acquired vast assets in France that could not be the fruits of their official salaries. A police investigation in response to the case uncovered tens of millions of dollars worth of luxury properties and cars, and dozens of bank accounts belonging to the rulers and family members of Republic of Congo, Gabon and Equatorial Guinea. TNO's car purchases alone came to $6.3 million over the last decade.

A 200-page French police dossier showed that TNO controlled multiple accounts at blue chip banks such as Barclays, BNP Paribas and HSBC, which he used to buy a Ferrari 550 Maranello and a Ferrari 512M. Other cars he had bought in France included two Maseratis, a Rolls Royce, and several Bugattis worth a million and a half dollars each. A subsequent investigation by Tracfin, the French anti-money laundering service, concluded that the financial flows that facilitated TNO's Bugatti purchases were "likely to be the laundered proceeds of misappropriated public funds." The case





Cheques paid out of TNO's accounts at Barclays and BNP in Paris, used to pay for a Ferrari

Exhibit 5 Page 292                    DOJ_0001061

Padlocked gates to one of TNO's houses in South Africa, which is now occupied by squatters



was quickly dropped for what appeared to be political reasons when the Public Prosecutor ruled that the offences were insufficiently substantiated. However, Transparency International France submitted a further complaint. In May 2009 it was ruled by the French authorities to be admissible, but on 29 October 2009 the French courts stopped the case again, this time arguing that a civil society organisation could not bring a case against heads of state.[51]

In South Africa, TNO bought two estates in Cape Town in 2004 for $7 million. The houses "were not fit for the son of the president of one of Africa's most prolific oil-producing countries," reported South Africa's *Sunday Times*, which said TNO spent millions more on renovations and refurbishments, including a home-theatre sound system, plasma-screen televisions, and bathrooms replete with spa baths, chrome fittings and marble surfaces.[52] The newspaper also quoted an unnamed security guard who had worked for Teodorin as saying that his employer "always had a briefcase filled with cash on hand," and that he spent thousands of dollars on champagne and wining and dining female companions.[53]

In 2006, the South African firm Engineering Design and Construction Company (EDC) sued the government of Equatorial Guinea for breach of a $7.8 million contract to build an airport in the country.[54] After becoming embroiled in a dispute with a government official, EDC's owner, George Ehlers, had to abandon the project and surreptitiously evacuate his staff, which at one point had been jailed. Ehlers was paid for part of his

work, but was forced to leave behind millions of dollars in equipment in Equatorial Guinea. He sued in Cape Town High Court and attached two homes belonging to TNO on the basis that while the homes were registered in Teodorin's name, they were purchased with state money and hence in effect, owned by the Obiang government, with which he had signed the airport deal. Given that Teodorin could not possibly have afforded the houses on his minister's salary, Ehlers said, he must have used funds diverted from the government.

In his defense, TNO offered an explanation which effectively acknowledged that government "service" in his country offered rich rewards: "Cabinet Ministers and public servants in Equatorial Guinea are by law allowed to own companies that, in consortium with a foreign company, can bid for government contracts and should the company be successful, then what percentage of the total cost of the contract the company gets will depend on the terms negotiated between the parties. But, in any event, it means that a cabinet minister ends up with a sizable part of the contract price in his bank account."[55]

Ehlers won a first round judgment and was awarded the homes but an appeals court reversed the decision. It ruled that whatever the source of his money, the properties were registered in TNO's name and hence he, not the government, was the legal owner.[56] One of TNO's houses has now been stripped bare by squatters, the other has squatters living on the terrace. Both houses appear to have been abandoned.[57]

Exhibit 5 Page 293                    DOJ_0001062

**O**n September 4, 2007, Stewart C. Robinson, deputy director of the criminal division at the Justice Department's Office of International Affairs, sent to French investigators an urgent "Request for Assistance in the Investigation of Teodoro Nguema OBIANG and his associates."

The Fraud Section and Asset Forfeiture and Money Laundering Section of the Justice Department and ICE were "investigating suspected criminal conduct of Teodoro Nguema OBIANG and his associates," the document said. "The prosecutors suspect that most, if not all, of Teodoro Nguema OBIANG's assets are derived from extortion, bribery or the misappropriation of public funds."[58]

The "targets of the investigation" were identified as TNO; Michael Jay Berger, his Los Angeles based "personal attorney [who] serves as an intermediary for funds wired from Equatorial Guinea;" and Somagui Forestal, "a forestry company beneficially owned by [TNO] from which large money transfers to the United States have originated."

The document said that TNO's home in Malibu was purchased in the name of a U.S.-registered shell corporation, Sweetwater Malibu, LLC of which he is the president, and that his jet was purchased by another of TNO's shell corporations, Ebony Shine International, Ltd., which is registered in the British Virgin Islands."

The request for assistance cited as evidence of TNO's corruption "Equatorial Guinea's



TNO's wire transfers to the U.S.

Exhibit 5 Page 294

DOJ_0001063

reputation in the international community, the enormous natural resource wealth of the country, and the dominance of the OBIANG MBASOGO family over the government and economy in Equatorial Guinea." It further noted payments from timber companies to his firm, Somagui Forestal, and the South African court testimony in which he admitted that cabinet ministers in Equatorial Guinea get a cut of government contracts. Although TNO "claimed that this practice was legal, the assertion also suggests that he may be receiving bribes or extortion payments in the form of a percentage of contract revenue," Robinson wrote.

But that was not the only evidence cited by Robinson. The U.S. investigation of TNO and his associates had "identified numerous suspicious transactions originating from or transiting the French financial system" and then entering U.S. banks:

- In April 2005, TNO "was the originator on at least five separate wire transfers," each for $5.9 million "from Société Générale de Banque en Guinée Équatoriale to Banque de France, account # 2000193528235, to a correspondent account at Wachovia Corporation Atlantic to account # 2000055333 at First American Trust FSB in the name of First American Title." Investigators believe he used some of those funds to purchase the mansion in Malibu, which was bought in the name of his U.S. shell company, Sweetwater.

- In April 2006, Teodoro Nguema OBIANG "was the originator on three wire transfers" that moved from an account at Société Générale de Banque in Equatorial Guinea through Banque de France (accounts #2000193528235 and 0000061000012), and then on through a correspondent account at Wachovia Atlantic to the final destination at a Bank of America account in the name of McAfee & Taft, account #071601562059. Those transfers allowed TNO to move $10.3 million to the United States.[59]

- From May to June 2006, TNO and his associates executed six wire transfers from Banque de France account 0000061000012 to a correspondent

bank Wachovia Atlantic and on to a UBS account in New York, #322998, in the name of Insured Aircraft Title Service Correspondent. Total funds transferred came to $33.8 million; investigators believe the money was used by TNO to purchase his luxury jet, using his British Virgin Islands shell company, Ebony Shine International Ltd.

- Between November 2006 and June 2007, the "suspected money laundering continued …through the use of an intermediary." That person was identified as TNO's attorney, Michael Jay Berger, who was the recipient of at least four wire transfers totaling about $800,000. The evidence suggested that the wires originated from an account for Somagui Forestal, TNO's timber company, at CCEI Bank in Equatorial Guinea. Two of the transfers were sent through Fortis Banque and two through Natixis. Those banks in France then sent the money on to Berger's attorney/client trust account #0720-115581 at Union Bank of California.[60]

The investigation had also obtained evidence that TNO owned several real estate properties in Paris and that in 2006 he had transferred money from the United States to France to purchase a Bugatti sports car valued at more than $1 million. "Based upon the wire transfer information available to the U.S. investigation, if these transfers represent illegal activity in the United States, there is a strong possibility that related conduct may also have violated French criminal law," Robinson wrote.

In support of the request for assistance, U.S. officials sent to the French a PowerPoint presentation prepared by the Special Agent in Charge of the ICE's Miami bureau. It said that TNO's Malibu mansion was "undergoing multi-million dollar renovation," and that he had "numerous luxury vehicles stored at the Peterson Automobile Museum in Los Angeles," including two Rolls Royce Phantoms worth $350,000 each; two Maybachs worth $350,000 each; four Ferraris worth $250,000 each; and one Rolls Royce Park Ward. It identified other American assets of TNO's, including the $33 million Gulf Stream V (currently undergoing "renovation/

Exhibit 5 Page 295

DOJ_0001064

THE SECRET LIFE OF A SHOPAHOLIC | 15



# TO BUY

*need to customize*

## IN US AND FRANCE

- ☑ Gulf Stream Jet $33,000,000
- ☑ Bugatti Veyron (×3) $1,300,000
  1 for Paris, 1 for California, deposit on 3rd
- ☑ Rolls Royce Phantom (×2) $350,000
- ☑ Rolls Royce Park Ward
- ☑ Maybach $350,000 (×2)
  ※ minibar
- ☑ Ferrari $250,000 (×4)
- ☑ Bentley Arnage $240,000
- ☐ 200ft yacht $TBC
  shark tank ?
- ☑ speed boat (×2)

West Coast
East Coast

Gulfstream Flickr, Tokyo Grand Sale. Bugatti Flickr, Jorge L. Molls. Royce Phantom Flickr, dennis bratli.
Rolls Royce Park Ward Flickr, Photo Emjel. Maybach, Ferrari 550 Maranello, Bentley Flickr.
Yacht, Speedboat Flickr, Jens Paulsen.

Exhibit 5 Page 296                    DOJ_0001065

While the U.S. is a global leader on tackling money laundering, its wire transfer regulations contain loopholes



customization") and two speedboats of unknown value. Investigators also had information from two independent sources that TNO was building a 200-foot custom luxury yacht, complete with shark tank. He had also recently sought to purchase an apartment at the Ritz Carlton in New York for $20 million in cash (it was unclear if the deal had gone through) and was looking to purchase residential property in Miami.[61]

The PowerPoint said further that TNO:

- was a "Recreational drug user (3 to 4 day binges with friends)."

- frequently traveled to the United States as an A-1 diplomat, "although he is seldom on official business."

- was "suspected of using oil revenues from his country to pay for 'lavish' lifestyle."

- "routinely travels to the United States with over $1 million in cash and failed to declare," a criminal violation that can carry up to a 5-year prison term.

- "allegedly received large wire transfers weekly through a 'fictitious' corporate account at Union Bank in California."

- was the "target of multiple Suspicious Activity Reports for suspected money laundering from financial institutions including Bank of America and Wachovia. As a result of his activities, both banks have closed all accounts associated with Obiang and his associates," the document said.

This information about the role of the banks raises a number of disturbing questions which should be tackled by the U.S. authorities.

## Ethical problem

The first problem is the moral one. While laudable that these two banks ultimately cut off TNO, on an ethical level it is stunning that they, and other financial institutions cited in the documents, would have done business with him at all during the period in question. Banks are under no obligation to accept business from any individual. In this case, basic checks would have revealed either that it was not clear who these huge transfers were coming from (that were, in the cases of UBS and First American Trust, being paid into the accounts of companies that handled title to aeroplanes and property), or, if it was, that they were coming from the super-rich son of a brutal dictator whose people live in desperate poverty. SARs may have been filed by some of the banks, but still the transfers were made.

To be completely clear: a U.S. bank, Riggs, had been fined and sold off at a dramatic loss of shareholder value after banking for the Obiangs, and is now used as a case study to scare bank compliance officers about the consequences of getting it wrong; after this happened no U.S. bank (or indeed, French bank) in its right mind should have wanted to have anything to do with Teodorin Obiang. The money laundering alleged in the government documents began three years after initial media accounts detailed Riggs Banks's relationship with government officials in Equatorial Guinea; two years after the Senate issued its report on the matter and Riggs was fined $25 million for violating the Bank Secrecy Act in regard to that relationship; and one year after Riggs, in the aftermath of the scandal, collapsed and was sold to PNC.

## Regulatory problem #1:
### suspicious activity reports

On the legal front, the requirement on U.S. banks is to do due diligence to identify their customer and his or her source of funds, and to file a suspicious activity report (SAR) to the authorities if they suspect that money

Exhibit 5 Page 297

laundering is taking place. But unlike in the UK, where a bank filing a SAR has to apply for official consent to proceed before continuing with the transaction, (offering the authorities a chance to monitor further transactions and potentially gather evidence) U.S. banks can file the SAR, and get on with the business. It is up to law enforcement to act on the SAR, and to follow the trail after the money has gone. But if the authorities are overworked or asleep and do not follow up the information in the SAR, the bank can effectively do business with a corrupt dictator's son with impunity as long as it continues to file a SAR for each suspect transaction. So, while technically a bank is not allowed to process or accept crooked funds, the money may have long since moved on before the authorities might get around to looking into it. This is the worst of both worlds: a bank can fulfil its legal obligations through the SAR filing process, yet the dirty money still enters the U.S.

## Regulatory problem #2:
### beneficial ownership of corporate accounts

The majority of the U.S. banks involved in these transactions were processing wire transfers, or holding accounts for companies whose services Teodorin was paying for. The question of wire transfers is a particular one, and will be returned to shortly. But as seen above, the documents also allege that Union Bank of California held a 'fictitious'

corporate account through which Teodorin was receiving large weekly transfers. Accounts for privately-held companies represent a heightened money laundering risk for banks, since corrupt or otherwise criminal individuals can hide behind them. So did Union Bank of California identify Teodorin as a beneficiary of payments from this account? Did it identify the beneficial owner of the company that set up the account? Did it identify the source of funds being paid into the account? The bank did not respond to Global Witness' questions.

The international anti money laundering standard, as set by the Financial Action Task Force (FATF), the intergovernmental body that sets the standards and measures countries' compliance with them, is that banks must identify the beneficial owner of any company seeking to open an account as part of the account-opening due diligence. The problem with the U.S. regulation is that this requirement to find a beneficial owner is only made explicit for a specific scenario: non-U.S. persons opening private bank accounts, which is defined as those accounts containing more than a million dollars. The Patriot Act which introduced this requirement in 2001 was right to recognise these accounts as a money laundering risk, but the Act and its subsequent rulemaking have failed to make it explicit that banks in the U.S. must find the beneficial owner of *all* corporate vehicles as a condition of them opening an account (except where it is a company that is publicly listed on a stock exchange). This is a significant oversight that must be corrected.



The lessons of Riggs do not seem to have been learnt: as late as June 2007 U.S. banks were still allowing TNO to transfer funds to the U.S.

Flickr / Stefn Gdines

Exhibit 5 Page 298

Wachovia was one of the banks in the U.S. that processed multi-million dollar wire transfers for TNO



Photo: Derek Gale

## Regulatory problem #3:
### due diligence on wire transfers

The other vital issue is what due diligence banks can do to identify the originators of wire transfers. FATF has a Special Recommendation on wire transfers, introduced in October 2001 when the standards were tightened up in the wake of 9/11 and the realization of the ease with which terrorists had been able to move money into the U.S. This international standard says that countries should require their banks 'to include accurate and meaningful originator information (name, address and account number) on funds transfers and related messages that are sent, and the information should remain with the transfer or related message through the payment chain.' Banks should also be required to 'conduct enhanced scrutiny of and monitor for suspicious activity funds transfers which do not contain complete originator information.'[62] However, if a transfer arrives without originator information, a bank can still pass it on.

The U.S., which was the final destination for Teodorin's wire transfers, is largely compliant with this standard. Its 'travel rule' says that banks have to pass on originator information that arrives with a transfer; if no information comes with it they can pass it on regardless. While they must file SARS if they suspect

suspicious activity or do not know where a large transfer is coming from, they are not prevented from accepting or forwarding the transfer.[63] Teodorin's transfers were coming from outside of the U.S., so did they arrive with any originator information?

France was the next step back along the wire transfer chain: here, Banque de France, Natixis and Fortis forwarded transfers which arrived from Equatorial Guinea on to the U.S. A 2005 IMF evaluation of the French anti-money laundering laws said there were 'currently no legislative requirements for financial entities to include complete originator information in message or payment forms accompanying wire transfers.' Instead it was required only by guidance rules issued by industry bodies.[64] In January 2007 a new European Union Resolution came into force with an implementation deadline at the end of that year, requiring all wire transfers to include originator information; crucially, if the payee's bank becomes aware that the payer's information is missing or incomplete, it must reject the transfer or ask for complete information.[65]

This new European standard is stronger than FATF's or the U.S.'s, since a bank is not supposed to forward a transfer that doesn't have originator information. But it wasn't mandatory in France until nearly all of Teodorin's transfers, which ran from April 2005 to June 2007, had already taken place. For most of this period, French banks would effectively have been permitted to forward wire transfers that arrived without originator information.

Teodorin's wire transfers originated in Equatorial Guinea, where it is not clear exactly what the law is pertaining to information included on wire transfers. It is safe to assume that even if this is a requirement on paper, implementation and enforcement are not a priority. Perhaps also of relevance is the fact that Société Générale de Banques en Guinea Ecuatorial, out of which the transfers were made through Wachovia to First American Trust, Bank of America and UBS, is 7% owned by "Obiang Nguema", who is presumably the President, but could also be TNO, and 32% by the government; and CCEI Bank Guinea Ecuatorial, out of which the Somagui transfers were made through Fortis and Natixis to Union Bank of California, is 10% owned by Abayak SA, a company named in

Exhibit 5 Page 299

the Senate Riggs report as being controlled by the president, and 10% owned by the government.[66]

What this means is that from the perspective of the banks in the U.S.: Wachovia, Bank of America, UBS, First American Trust and Union Bank of California, there are two possibilities.

One is that if the wire transfers came with originator information identifying Teodorin and/or his company Somagui Forestal, (which was publicly named as owned by TNO in the Senate report into Riggs), the banks went ahead and processed the transactions anyway, despite knowing who they were dealing with. According to the documents, Wachovia and Bank of America filed SARs and ultimately closed all accounts associated with Obiang and his associates. The documents did not mention if the other banks did so (if they didn't, this would be very concerning, suggesting that either they knew there was a problem and did nothing, or failed to spot the problem).

The other possibility is that the wire transfers arrived without originator information, in which case U.S. banks are accepting funds without knowing where they come from. The filing of SARs in such a case, as required by the FATF standard and the U.S. regulations, does not prevent the money being transferred into the U.S.

Neither of these possibilities is a pleasing prospect. Either way, the result is that the lessons of Riggs have not yet been learnt: banks in the U.S. have funneled millions of dollars of money through shell corporations for TNO, allowing him to purchase a luxury home and private jet while the people of Equatorial Guinea continue to live in poverty.

Global Witness has contacted all of the banks mentioned in the documents, in the U.S., France and Equatorial Guinea, to ask them what due diligence, if any, they did on these transfers and whether they knew that the originator was Teodorin Obiang. Fortis, Banque de France, Wachovia and UBS have replied.

Fortis said that bank secrecy prevented it commenting on specific clients, and that it complies with regulations on money laundering and terrorist financing. Bank of America said it could not comment, and complies with the 'the letter and the spirit' of regulations in countries where it operates.[67] Banque de France said it could not comment, and listed the French laws and regulations on money laundering. On wire transfers it said it required that its correspondent banks comply with FATF anti-money laundering standards.[68] A representative of Wachovia stated that TNO did not hold an account with Wachovia. However, she said that it would be possible to transfer money semi-anonymously, through Wachovia's correspondent bank accounts by for example using a third-party bank as middleman.[69]

UBS said it could not comment on this specific case, but explained its policies for due diligence on correspondent banks and monitoring of wire transfers. Its 'pre execution monitoring' screens names of 'terrorists, drug kingpins, weapons of mass destruction proliferators' and can freeze and reject payments if necessary; however politically exposed persons on not on these lists, unless 'designated' by one or more jurisdictions, as this would create too many false positives. 'Post-execution monitoring', it said, takes place after transfers have moved, identifying 'red flags' such as unusually large payments, round amounts and suddenly active amounts, and then manually reviewing such transactions to determine if a SAR needs to be filed. 'In a case such as the one to which you refer, UBS would expect its post-execution monitoring tools to flag large transactions with a client if these were unusual,' it said.[70]

Banks are not allowed by regulation to comment on whether they have filed a suspicious activity report. Union Bank of America, First American Trust FSB, Natixis, and the banks in Equatorial Guinea did not comment.

A representative of the law firm McAfee and Taft, which according to the documents received payments of $10.3 million into an escrow account, denied that Teodorin was a customer of the firm and said the firm did not have direct knowledge of the transactions, which must have been on behalf of another client.[71]

Michael Jay Berger, TNO's lawyer, who according to the documents had received $800,000 in wire transfers, failed to respond to multiple requests for comment.

Exhibit 5 Page 300                    DOJ_0001069

**B**arring a coup d'état, it is likely that President Obiang, age 67, will rule until his death and then hand off power to a chosen successor.

Teodorin is widely considered to be the leading candidate to inherit power. "The guy knows how to play politics," says Bennett, the former American ambassador. "He's seen as the junior Big Man."[72]

These documents show that the Justice Department and ICE were collecting evidence to prosecute Teodorin for money laundering, and seek forfeiture of his assets in the U.S.. According to documents seen by Global Witness, a U.S. delegation met French investigators in September 2007, a meeting at which this evidence was discussed. The outcome was that the U.S. would submit to the French authorities a 'commission rogatoire internationale', or a formal request for cross-border legal assistance. Could the lack of legal action against TNO stem from political pressure to ignore the crimes of a possible future president of an oil-friendly ally? Or are there insurmountable legal obstacles to prosecuting TNO, who has diplomatic status from his government? It is impossible to say with certainty, and neither the Justice Department, State Department, nor ICE would comment for this article.

After being informed of the contents of the government documents, Lawrence Barcella, a former federal prosecutor, offered this comment:

"To build a case like this you have to prove that his money comes from the proceeds of corruption. That would generally require the cooperation of the foreign government in order to gather sufficient evidence, and in this case Equatorial Guinea is obviously not going to cooperate. It looks like they [prosecutors] have grounds for probable cause, which would be enough to get a warrant and an indictment, but they have to get over the hump of probable cause to beyond a reasonable doubt and that's a lot tougher. Justice Department guidelines say you should not seek an indictment unless you believe you can meet the reasonable doubt standard."[73]

However, Barcella said that even if Justice could not prosecute TNO, the State Department could bar him from entering the country. "Traveling into the United States is not a right, it's a gift. He could very easily be declared PNG and denied entry. For years, John Lennon couldn't enter the United States because he smoked marijuana. You can deny a visa for any reason." He said it would be more difficult, but not impossible, to seize TNO's assets. "That's where his diplomatic passport comes in handy," he said. "That doesn't grant him total immunity, but it makes it damn harder, and it would cause a big blow-up."



An oil refinery in Equatorial Guinea. Is the U.S.'s failure to take action against TNO motivated by oil?

Rex Features / Ims Hager

Exhibit 5 Page 301

DOJ_0001070

THE SECRET LIFE OF A SHOPAHOLIC | 21



Malibu, where TNO has a house. The U.S. government needs to use its powers to deny visas to politicians where there is credible evidence they are involved in corruption

Jack Blum shared much of Barcella's assessment. "Would I like to see him prosecuted," he asked. "Of course. But gathering the evidentiary material to prove the illegal origins of [TNO's] money would not be easy and [bringing a case] would turn the U.S. relationship with Equatorial Guinea on its head, and that's of some interest given all the oil." He agreed that barring TNO from the country would be a simple matter, adding, "That is a sensible step that would have real impact, as it would put off limits to him of all his assets in the United States."

Blum believed the failure to take action against Obiang could be politically motivated. He noted that several other Justice Department cases involving oil kleptocracies – including the so-called "Kazakhgate" scandal, in which the president of Kazakhstan allegedly received tens of millions of dollars in payoffs from an American businessman representing U.S. oil companies – have been mysteriously bogged down for years. "It's quite possible that there is high-level political interference" he said, "As U.S. citizens, we have the right to know what's going on here. If they are going to drop the cases, they need to lay out the facts and explain why."

"The U.S. Presidential Proclamation 7750...[has] a 'reason to believe' standard, meaning that the proclamation can be applied absent conviction for a crime of corruption," Kathleen Hamman, now a trial attorney in the Justice Department's fraud section, explained in a speech about the Kleptocracy Initiative in 2005.[74] When it called for corrupt foreign officials to be barred from the country, Congress set a threshold of "credible evidence" for the State Department to make that determination.

There is every reason to believe that TNO has been massively enriched by corruption and a vast amount of credible evidence that supports that conclusion. One can argue about the legal and political issues involved in prosecuting him or seizing his assets. There is no doubt at all, though, that he is ineligible to enter the United States under 7750. If the Kleptocracy Initiative has any meaning at all, he should be banned now.

Global Witness sought an interview with Teodorin Obiang to offer him an opportunity to respond to these allegations. Approaches were made through the Equatorial Guinea embassy in the U.S., and through the country's Washington PR firm, Qorvis. An embassy spokesperson offered only the following statement: "We have not been contacted by any Government Agencies and are not aware of any ongoing investigation into the Government of Equatorial Guinea or any of its representatives."[75]

A Justice Department spokesperson said it could not confirm or deny the existence of any investigation; the State Department and ICE said they could not comment.[76]

Exhibit 5 Page 302                                                    DOJ_0001071

## POLICY RECOMMENDATIONS

**As well as a clear public explanation as to why the case has stalled and what can be done about it, the U.S. government also needs to develop a comprehensive policy approach to implement meaningfully the 2006 anti-Kleptocracy Initiative, the aspirations and intent of which Global Witness fully supports.**

Since it passed the landmark Foreign Corrupt Practices Act in 1975, the U.S. has generally taken a far more effective and robust approach to tackling foreign corruption and bribery than many of its peers (indeed, Global Witness would argue that it remains the only credible global enforcer of anti-corruption norms). Nonetheless, this story shows that dangerous 'holes in the fence' remain and that well-intentioned efforts to tackle the flows of corrupt money into the U.S. often fail because it is difficult to gather evidence against venial ruling elites when they are able to use the sovereignty of their captured and corrupted state as a shield.

The recommendations below cover some of the immediately practical policy approaches that could be taken to further the anti-Kleptocracy Initiative and as part of a wider strategy to tackle the U.S.'s facilitation of foreign corruption which leaves so many millions of ordinary citizens around the world in destitution and under brutal and oppressive governments.

### 1) Visa denial

A U.S. visa is a highly prized possession in many countries around the world; its denial is an effective discretionary sanction. Unlike a prosecution, it can be imposed immediately and does not require proof of guilt. Visa denial is particularly effective as it can also target the family members of a corrupt official. Language in the 2008 and 2009 Consolidated Appropriations Acts requires that "the Secretary of State shall compile and maintain a list of officials of foreign governments and their immediate family members who the Secretary has credible evidence have been involved in corruption relating to the extraction of



President Obama in Ghana, June 2009: "No country is going to create wealth if its leaders exploit the economy to enrich themselves"

SHAUN THEW/epa/Corbis

Exhibit 5 Page 303

DOJ_0001072

natural resources in their countries" and that "any individual on the list compiled under subsection (a) shall be ineligible for admission to the United States".[77] Teodoro Obiang Nguema is clearly such an individual, so why is he still allowed to travel to and through the U.S.?

There is a clause in the Appropriations Acts suggesting that somebody might be allowed into the U.S. despite evidence against them so that law enforcement can continue to gather information. But clearly in this case the action has stalled, so logic would dictate that he ought to be denied a visa from now on.

## 2) Make banks do their customer due diligence properly

Global Witness' report *Undue Diligence: How banks do business with corrupt regimes*, published earlier this year, highlighted numerous examples of banks doing business with some of the most corrupt dictators and their kin in the world. The banks either did not know who their customer was, or they knew and they did not care, or they told their regulators and their regulators did not care. This story now raises similar concerns.

The regulators must examine the steps taken by the banks that feature in this report and ascertain if they fulfilled their regulatory requirements, and punish them if they did not. The question of whether banks are taking sufficient steps, from an ethical perspective, to avoid facilitating corruption must also be examined.

As described above, it may be possible for a bank to be in compliance with the letter of the law while still able to do business with a corrupt customer. While the U.S. must be acknowledged as having led the global move towards improved anti-money laundering laws, there are some crucial gaps in its own regulatory framework that must be addressed as a matter of urgency. The ongoing regulatory reform process in Congress offers an opportunity to do so.

- The U.S. must make it explicit, either through primary legislation or rulemaking, that as part of their customer due diligence, banks must



Rep. Barney Frank's (D-Mass) House Committee on Financial Services is currently working on reforms to financial regulation

*Source: Dennis Van Tine/Retna Ltd./Corbis*

find the beneficial owner of all corporate vehicles as a condition of them opening an account. This will help to bring the U.S. into compliance with FATF's Recommendation 5, which by requiring banks to know who they are dealing with is the cornerstone of any anti-money laundering framework.

- The U.S. must change its regulations on wire transfers to match the European standard so that if there is no or incomplete originator information, the bank must either obtain it from the paying bank, or not accept the transfer. This must apply to transfers coming from within or without the U.S.. The U.S. should also push for this standard to be adopted by FATF as the required level for compliance with Special Recommendation VII.

- The U.S. must strengthen its anti-money laundering regulations to require banks only to accept funds from senior political figures, their family members and known associates,[78] if the bank has strong evidence that the source of funds is not corrupt. As well as implementing this measure itself, the U.S. should push for this recommendation to be adopted by FATF so that it becomes an international standard.[79]

- The U.S. should follow the model adopted by the UK, where after filing

Exhibit 5 Page 304

24 | GLOBAL WITNESS NOVEMBER 2009

An oil company compound in Equatorial Guinea. Oil companies need to publish what they pay to governments



Fisle/Melofie and John Kotropoulos

a SAR banks are required to wait for consent to proceed from the authorities, within a given time span, before continuing the transaction.

- Company formation agents can facilitate corruption by setting up shell companies used by corrupt politicians or other money launderers. Currently they are not regulated for money laundering purposes in the U.S., which means they do not have to undertake due diligence on their clients or file suspicious activity reports; this represents a significant weakness in America's fight against dirty money. Therefore, the U.S. must apply anti-money laundering obligations to company formation agents.

- The U.S. should use its influence within the Financial Action Task Force to ensure that FATF fulfils the recent G20 requirement to 'help detect and deter the proceeds of corruption by prioritizing work to strengthen standards on customer due diligence, beneficial ownership and transparency.'[80]

## 3) More transparency over the beneficial ownership of corporate vehicles

Teodorin Obiang was able to buy his property in the name of a U.S.-registered shell company, Sweetwater Management Inc. and his jet in the name of another, Ebony Shine International, incorporated in the British Virgin Islands.

Lack of transparency over the ownership of corporate vehicles such as these, behind which the corrupt, or indeed U.S. tax evaders, can hide, is a significant impediment to the working of the anti-money laundering laws and the tracking down of illicit funds by law enforcement after they have been moved.

The U.S. Congress should pass without delay the provisions of Senator Levin's proposed S.569 Incorporation Transparency and Law Enforcement Assistance Act Bill, which would require incorporators of companies in the U.S. to provide beneficial ownership details to their state.

Internationally, the U.S. should use its influence in FATF to push for a standard of national registries to be adopted internationally as a mandatory criterion for compliance with FATF's recommendations 33 and 34. (These recommendations require countries to prevent misuse of corporate vehicles or legal arrangements such as trusts for money laundering purposes, and suggest that they do so by making beneficial ownership information available; the problem is that they allow compliance at a standard of relying on law enforcement to access the information: this standard is too low.)

Exhibit 5 Page 305

DOJ_0001074

## 4) Help prevent the money from being stolen in the first place by requiring more transparency over oil income

Equatorial Guinea's money comes from oil, mostly from revenues paid by U.S. oil companies.

Its income remains a state secret. In 2008, the Equatorial Guinean government signed up to the Extractive Industries Transparency Initiative[61] to improve disclosure of its oil income and allow the country's ordinary citizens to track that money into the national exchequer, but progress has been moribund and no figures have been released. Oil companies meanwhile claim they support transparency but that they cannot publish any financial information without permission or they will violate the swingeing confidentiality clauses in the production contracts that they signed with the Equatorial Guinea government.

Fortunately, there is a get-out of these confidentiality provisions for information required by an applicable accounting law or stock exchange rule. Recent legislation in front of the Congress is intended to do just

that and could put the amount of oil money provided to the EG government into the public domain for the first time and thereby help prevent its gross diversion and theft into private pockets.

In May 2008, Chairman Barney Frank of the House Committee on Financial Services introduced the Extractive Industries Transparency Disclosure (EITD) Act, which requires companies to report their country-by-country payments for oil, gas and minerals to the U.S. Securities and Exchange Commission.[82] In September 2009, the renamed "Energy Security through Transparency Act of 2009" was introduced by a bipartisan coalition of Senators Lugar, Cardin, Schumer, Wicker and Feingold.[83] The bill would require energy and mining companies to reveal how much they pay to foreign countries and also to the U.S. government for oil, gas, and other minerals. The international Publish What You Pay coalition of over 400 civil society organisations in over 70 countries, of which Global Witness is a founding member, is cheerleading for this legislation as are some major U.S. investors (such as Calvert) and at least one major multinational company (Newmont Mining).

The U.S. Congress should ensure that this bill is passed as soon as possible.



Citizens would see the benefits from oil if the Energy Security Through Transparency Act was passed

Ed Kash/Corbis

Exhibit 5 Page 306

DOJ_0001075

# ENDNOTES

1   Global Witness press release, 'African Minister buys multi million dollar California mansion', 8 November 2006

2   Global Witness, *Undue Diligence: How banks do business with corrupt regimes*, March 2009, p41

3   Federal Register, Vol. 69, No. 9, 14 January 2004, http://edocket.access.gpo.gov/2004/pdf/04-957.pdf; White House Fact Sheet and President's Statement: National Strategy to Internationalize Efforts Against Kleptocracy, 10 August 2006, http://georgewbushwhitehouse.archives.gov/news/releases/2006/08/20060810-1.html; Public Law 110-181, the "Consolidated Appropriations Act, 2008", Sec 6991 (a) and (b) respectively, p580; Public Law 111-8, the "Omnibus Appropriations Act, 2009", Sec 7086 (a) and (b) respectively, p389,

4   U.S. Bureau of International Narcotics and Law Enforcement Affairs, 'G8 2009 Accountability Report on Implementation of Anticorruption Commitments: U.S. Submission', 10 July 2009, http://www.state.gov/p/inl/rls/125905.htm

5   Walter Moran, 'U.S. Immigration and Customs Enforcement: Teodoro Nguema Obiang, et al'. Undated powerpoint presentation made by Walter Moran, special agent in charge Immigration and Customs Enforcement, Miami, Florida to French investigators

6   Letter from Stewart C. Robinson, deputy director of criminal division at the Justice Department's Office of International Affairs, to French investigators, 4 September 2007

7   Phone interview with Equatorial Guinea's embassy in Washington, 30 September 2009

8   Jenalia Moreno, 'Equatorial Guinea seeks investment via consulate here,' Houston Chronicle, 25 September 2009

9   Statement by Senator Leahy, 16 October 2009

10  Phone interview with Jack Blum, 17 September, 2009,

11  Ken Silverstein, 'U.S. Oil Politics in the "Kuwait of Africa", The Nation, 4 April 2002. http://www.thenation.com/doc/20020422/silverstein

12  Phone interview with John Bennett, 28 August, 2009

13  African Elections Database: Equatorial Guinea, http://africanelections.tripod.com/gq.html

14  Human Rights Watch, Well Oiled: Oil and Human Rights in Equatorial Guinea, 9 July 2009, http://www.hrw.org/node/84253, p14

15  U.S. Department of State 2008 *Human Rights Report: Equatorial Guinea*, http://www.state.gov/g/drl/rls/hrrpt/2008/af/118999.htm

16  U.S. Energy Information Administration, 'International Energy Data and Analysis for Equatorial Guinea', updated September 2009

17  IMF, *Equatorial Guinea: Statistical Appendix*, April 1998, IMF Country Report No. 98/33, p23, http://www.imf.org/external/pubs/ft/scr/1998/cr9833.pdf; IMF, *Republic of Equatorial Guinea: 2008 Article IV Consultation*, March 2009, IMF Country Report No. 09/102, p25, http://www.imf.org/external/pubs/ft/scr/2009/cr09102.pdf

18  CIA, *The World Factbook*, 2009

19  IMF, *Republic of Equatorial Guinea: 2008 Article IV Consultation*, March 2009, IMF Country Report No. 09/102, p5; UNDP Human Development Report 2009: Equatorial Guinea, http://hdrstats.undp.org/en/countries/country_fact_sheets/cty_fs_GNQ.html; UNICEF infant mortality data, September 2009, http://www.childinfo.org/mortality_imrcountrydata.php

20  IMF, *Republic of Equatorial Guinea: 2008 Article IV Consultation*, March 2009, IMF Country Report No. 09/102, http://www.imf.org/external/pubs/ft/scr/2009/cr09102.pdf

21  The U.S. State Department championing of a Social Development Fund for Equatorial Guinea in the wake of the Riggs scandal also appears to have come to nought in theory, President Obiang agreed to earmark a small percentage of oil revenues for development projects for his people. The IMF report said that "about 12 projects were agreed on, to be implemented with assistance from the U.S. Agency for International Development (USAID) ... Funds were allocated in the 2008 budget but the government has yet to approve their disbursement so work can begin." The report adds that "continued delay would raise questions about whether the government's commitment is genuine." IMF, *Republic of Equatorial Guinea: 2008 Article IV Consultation*, March 2009, IMF Country Report No. 09/102, http://www.imf.org/external/pubs/ft/scr/2009/cr09102.pdf

22  Energy Information Administration: Official Energy Statistics from the U.S. government, updated 23 April 2009, http://tonto.eia.doe.gov/energy_in_brief/foreign_oil_dependence.cfm

23  'Obama's Ghana trip underlines oil reserve,' UPI, 15 July 2009, http://www.upi.com/Energy_Resources/2009/07/15/Obamas-Ghana-trip-underlines-oil-reserve/UPI-47731247681902/

24  'Key Excerpts: Obama's Ghana speech', BBC, 11 July 2009, http://news.bbc.co.uk/1/hi/8145999.stm

25  U.S. Department of State, 'Remarks With Angolan Foreign Minister Assuncao Afonso dos Anjos', 9 August 2009, http://www.state.gov/secretary/rm/2009a/08/127029.htm

26  Peter Maass, 'A touch of crude,' Mother Jones, January 2005, http://www.motherjones.com/politics/2005/01/touch-crude

27  Ken Silverstein, 'Our friend Teodoro,' Harpers, 18 April 2006; Global Witness press release, 'New U.S. Envoy to Equatorial Guinea Must Hold Government Accountable for Corruption and Human Rights Abuses,' 3 August 2006. In 2007, no less an authority than Donald Trump said he would fire Rice as secretary of state because she was a totally ineffective in her dealings with despots. "She goes to some country to meet a dictator or whatever, who is a ruthless killer, a vicious murderer who is a lot smarter than she is ... She goes over to the dictator's office and sits down for a photo op with him" he said. "Then she leaves, waves good-bye, get back on the airplane, and nothing ever happens - nothing ever happens." D Trump and W Zanker, *Think Big and Kick Ass. in Business and Life*, 2007, p152.

28  Embassy News, U.S. Embassy, Malabo, Equatorial Guinea, 'Georgia State Senator John Isakson Visits Equatorial Guinea,' http://malabo.usembassy.gov/senator_isakson_visit.html

29  Ken Silverstein, 'Our new favourite despot,' salon.com, 29 April 2002 http://dir.salon.com/story/politics/feature/2002/04/29/obiang/print.html

30  Complaint filed to the Pre-Trial Investigations Court, 21 October 2008, See http://www.soros.com/initiatives/justice/litigation/obiangfamily

Exhibit 5 Page 307                    DOJ_0001076

31   For example, José María Irujo, 'La familia de Obiang ingresó dinero de una cuenta investigada en España,' *El País*, 25 October 2009. For Equatorial Guinea lawyer's statement in response to the claim, see Jorge Trillo Señaler, 'Aclaración sobre Guinea,' El País, 28 May 2009

32   See Chapter 3 of Global Witness, *Undue Diligence, How banks do business with corrupt regimes*, March 2009

33   Minority staff of the Permanent Subcommittee on Investigations of the U.S. Senate, Money Laundering and Foreign Corruption: Enforcement and Effectiveness of the Patriot Act Case Study involving Riggs Bank, 15 July 2004, p96, http://hsgac.senate.gov/public/_files/ACF5F8.pdf

34   Phone interview with Antony Goldman, 14 September 2009

35   Personal interview with a former U.S. intelligence officer, 5 June 2009

36   Phone interview with Elisa Wax, 31 August 2009

37   Phone interview with Elisa Wax, 31 August 2009

38   Phone interview with John Bennett, 28 August 2009

39   Phone interview with a person familiar with TNO's tenure at Saga, 3 September 2009

40   Personal interview with a former senior U.S. official, 5 June 2009

41   Global Witness's 2004 report *Time for Transparency* describes how the trial of 37 former senior executives of Elf, which resulted in convictions for 30 of them, revealed an extensive system of bribes and kickbacks to African presidents and other politicians over decades in order to maintain its powerful market position.

42   The Washington Post also reported in 1998 that the 3rd Special Forces Group based at Fort Bragg, N.C. continued to "train scores of local troops in Equatorial Guinea in light infantry skills, including operations planning, small unit tactics, land navigation, reconnaissance and medicine". Dana Priest, 'U.S. Military Trains Foreign Troops', *Washington Post*, 12 July 1998

43   'Equatorial Guinea's 'God',' BBC News Online, 26 July 2003, http://news.bbc.co.uk/1/hi/world/africa/3098007.stm

44   Email correspondence with Chris Shoeman, an advocate for George Ehlers, 26 October 2009; see footnotes 56 and 57.

45   George Rush and Joanna Rush Molloy, 'Rapper Gives Her African Hotshot the Eve-Ho, Sez Pal,' *New York Daily News*, 16 August 2006, http://www.nydailynews.com/archives/gossip/2006/08/16/2006-08-16_rapper_gives_her_african_hot.html

46   Personal interview with an individual familiar with Teodorin's spending habits from his Riggs bank accounts, 10 June 2009

47   A number of cases against Teodorin feature in the California court records with listings under 'case type' for 'contractual fraud', 'other breach contract', 'small claims'. In phone interviews with a number of contractors who had sued TNO, the contractors confirmed that they had managed to recover at least some of the funds owed to them by TNO. Phone interviews, 19 October 2009

48   Case No. BC 302418, Superior Court of California, County of Los Angeles, Central District. A court clerk confirmed the settlement was sealed, phone interview, 28 September 2009

49   *60 Minutes*, 18 July 2004

50   Personal interview with a Western businessman, 9 September 2009

51   See chapter 4 of Global Witness, *Undue Diligence: How banks do business with corrupt regimes*, March 2009 for more information on these bank accounts and cars; BBC News Online, France halts African leaders case, 25 October 2009

52   Nashira Davids, 'How African president's son blew millions,' *Sunday Times (South Africa)*, 20 August 2006, http://www.frontlineafrica.org/content.php?x=How%20African%20president%02s%20con%20blew%20millions. Phone conversation with the journalist, 20 October 2009

53   Ibid

54   Case No. 1407/2006, in the matter between Maseve Investments 7 (PTY), Ltd., and The Government of the Republic of Equatorial Guinea (First Respondent), Teodoro Nguema Obiang (Second Respondent). See John Reed, 'Taking a cut acceptable, says African minister,' *Financial Times*, 25 October 2006

55   Affidavit by Teodoro Nguema Obiang in the Case No. 1407/2006, in the matter between Maseve Investments 7 (PTY), Ltd., and The Government of the Republic of Equatorial Guinea (First Respondent), Teodoro Nguema Obiang (Second Respondent).

56   Telephone interview with Chris Shoeman, an advocate for Mr Ehlers, 12 October 2009

57   Telephone interview with Chris Shoeman, 26 October 2009

58   Letter from Stewart C. Robinson, deputy director of criminal division at the Justice Department's Office of International Affairs, to French investigators, 4 September 2007

59   A representative of the law firm McAfee and Taft denied that Teodorin was a customer of the firm and said they did not have direct knowledge of the transactions, which must have been on behalf of another client. Telephone interview with McAfee and Taft representative, 19 October 2009

60   Michael Jay Berger failed to respond to multiple requests for comment

61   Walter Moran, 'U.S. Immigration and Customs Enforcement: Teodoro Nguema Obiang, et al'. Undated powerpoint presentation made by Walter Moran, special agent in charge Immigration and Customs Enforcement, Miami, Florida to French investigators

62   FATF Special Recommendation VII, http://www.fatf-gafi.org/document/9/0,3343,en_32250379_32236920_3403207 3_1_1_1,00.html

63   U.S. Code, 31 CFR 103.33(g)

64   IMF, France: Financial Sector Assessment Program – Detailed Assessments of Observance of Standards and Codes including Banking Supervision, Insurance Regulation, Securities Legislation, Monetary and Financial Policy Transparency, Payments Systems, Securities Settlement, and Anti-Money Laundering and Combating the Financing of Terrorism, IMF Country Report No. 05/186, June 2005, p327 http://www.imf.org/external/pubs/ft/scr/2005/cr05186.pdf

65   EU Regulation 1781/2006

66   Rapport de la Commission Bancaire de l'Afrique Centrale pour l'année 2007, p90 http://www.beac.int/cobac/Publications/rapcobac2007.pdf

Exhibit 5 Page 308                                                     DOJ_0001077

67  Letter from Fortis to Global Witness, 12 October 2009;
    letter from Bank of America to Global Witness, 9 November
    2009

68  Letter from Banque de France to Global Witness, 14
    October 2009

69  Phone interview with a representative of Wachovia, 28
    September 2009

70  Letter from UBS to Global Witness, 20 October 2009

71  Telephone interview with McAtee and firm representative,
    15 October 2009

72  Phone interview with John Bennett, 28 August 2009

73  Phone interview with Lawrence Barcella, 2 September 2009

74  Kathleen M Hamann, 'Difficulties and Challenges in
    Strengthening Cooperation in the Denial of Safe Haven to
    Corrupt Officials and Those Who Corrupt Them', remarks to
    the Meeting of Experts on Cooperation with Respect to the
    Denial of Safe Haven to Corrupt Officials and Those Who
    Corrupt Them, their Extradition, and the Denial of Entry and
    Recovery of the Proceeds of Corruption and Their Return to
    Their Legitimate Owners, 28-29 March 2005 www.oas.org/
    juridico/spanish/rexcor_hamann.pdf

75  Email correspondence with Qorvis, 28 October 2009

76  Telephone call with Justice Department, 4 November 2009;
    emails from State Department and ICE, 6 November 2009

77  Public Law 110-161, the "Consolidated Appropriations Act,
    2008", Sec 699L (a) and (b) respectively, p530; Public Law
    111-8, the "Omnibus Appropriations Act, 2009", Sec 7086
    (a) and (b) respectively, p389

78  In the anti-money laundering jargon these individuals are
    known as Politically Exposed Persons (PEPs)

79  The language in 31CFR103.178(c) could be amended
    to read: "enhanced scrutiny of such [an] account that is
    designed to verify, on the preponderance of the evidence,
    that the source of income is not the proceeds of foreign
    corruption. Further rulemaking or guidance could then
    outline the specific measures that banks should take such
    as requesting information about official salaries, or copies
    of asset declarations.

80  Global Witness press release, 'Summit communiqué calls
    for stronger anti-money laundering standards to help curb
    illicit flows of looted state funds,' 28 September 2009

81  http://eiti.org/EquatorialGuinea

82  HR 6066. Full text of the legislation is available at: http://
    www.pwypusa.org/clientimages/39924/frank_144_xml.pdf

83  Full text of the legislation is available at: http://www.
    publishwhatyoupay.org/en/resources/energy-security-
    through-transparency-act-2009

## MAP OF EQUATORIAL GUINEA



Exhibit 5 Page 309

DOJ_0001078



**global witness**

Global Witness exposes and breaks the links
between the exploitation of natural resources
and the funding of conflict, corruption and
human rights abuses. Global Witness carries
out investigations in countries devastated
by conflict, corruption and poverty and our
findings from these investigations are used
to brief governments, intergovernmental
organisations, civil society and the media.

Global Witness
Buchanan House
30 Holborn
London, EC1N 2HS
Email: mail@globalwitness.org

ISBN 978-0-9562028-7-1
© Global Witness Ltd. 2009

Exhibit 5 Page 310                    DOJ_0001079



Exhibit 5 Page 311
DOJ-0001080

# EXHIBIT 6



1 of 1 DOCUMENT

Copyright 2011 The New York Times Company
The New York Times

December 16, 2011 Friday
Late Edition - Final

**SECTION:** Section B; Column 0; Business/Financial Desk; REUTERS BREAKINGVIEWS; Pg. 2

**LENGTH:** 744 words

**HEADLINE:** A Congressional Conflict of Interest

**BYLINE:** By DANIEL INDIVIGLIO and JEFFREY GOLDFARB

**BODY:**

Imagine buying stock in a company and then being in position to help change the law to enhance its value. Welcome to the United States Congress. A fuel subsidy proposal, if passed, would enrich Representative Nancy Pelosi of California because of her stake in a "green" firm that stands to benefit. It's the latest sign that Congressional trading rules are in desperate need of an overhaul.

Among the flurry of legislation Congress is rushing to complete by year's end is the New Alternative Transportation to Give Americans Solutions Act of 2011, or Natgas Act. The proposal would, among other things, provide subsidies for driving vehicles powered by natural gas.

Clean Energy Fuels is one company that needs the government's helping hand. It operates natural gas fueling stations for trucks. Clean Energy even said in its most recent quarterly earnings report that the success of its business plan depended in part on federal tax credits on natural gas. When a Senate version of the bill was introduced last month, Clean Energy shares jumped 15 percent.

The oil tycoon T. Boone Pickens owns a big stake in the company and has been on a campaign advocating for the legislation. Mr. Pickens is oddly aligned with Ms. Pelosi, though her stake is smaller. Her asset disclosure indicates she owns as much as $100,000 of Clean Energy stock. Earlier this year, she listed the Natgas Act as one of the priorities for her "Make It in America" agenda.

By no means would Ms. Pelosi be the first lawmaker on either side of the aisle to gain financially from her legislative post. The sticky problem of Congressional stock trading and ownership has been getting more attention on the back of studies showing that stock portfolios modeled on the trading of legislators regularly beat the market.

But the problem goes even deeper, as evidenced by the bill. Ms. Pelosi wouldn't be guilty of insider trading. Her influence as a lawmaker would merely help her profit. Getting rid of such undue perks is the kind of agenda item that

Exhibit 6 Page 312

A Congressional Conflict of Interest The New York Times December 16, 2011 Friday

ought to unite far-reaching constituencies, including members of the Tea Party and those who are part of Occupy Wall Street.

Procter's Sloppy Work

Procter & Gamble doesn't appear to have adequately worked through the details on the company that is buying its Pringles brand. Troubles escalated for Diamond Foods, the agreed-upon buyer, on Thursday as the Securities and Exchange Commission began an investigation into its accounting on the heels of the snack food company's own internal inquiry.

Everything looked fine back in April when the $2.4 billion transaction was announced. Diamond shares soared as the company appeared to fulfill ambitions to grow from a walnut co-operative to a global player in salty treats. For Procter & Gamble, a craftily structured deal allowed it to finally leave the food business.

Things began crumbling in September amid growing questions, from Breakingviews and others, about the accounting treatment of payments to growers now under the microscope, and other oddities involving the company's finances and disclosures. Investors bet against Diamond shares. In November, the deal was put off.

It's hard to blame Procter and its advisers -- Morgan Stanley and Blackstone -- for not seeing six months in advance that Diamond Foods would make payments to walnut suppliers that raised concerns. And Diamond also may ultimately be vindicated of any wrongdoing. But accounting sloppiness is often a symptom of larger governance and control problems. In any event, Procter's responsibility to its shareholders, who will own stock in the newly merged Diamond-Pringles, didn't end in April.

Procter & Gamble, a $180 billion consumer products group, had less incentive than, say, short sellers, to invest extra time and money into a forensic scrubbing of Diamond after the deal was signed. Moreover, gathering nonpublic information about Diamond could have created a messy conflict with any related confidentially agreements it signed.

This leaves an impression that Procter's concern with tax efficiency outweighed a desire to more thoroughly understand Diamond. The complex structure being used to unload Pringles erases Procter's tax obligation, which is nice for shareholders. And Procter is a master of the format, having used it twice before. The Diamond deal offers a simple merger lesson for corporations everywhere: better know thy partner.

For more independent financial commentary and analysis, visit www.breakingviews.com.

**URL:** http://www.nytimes.com

**GRAPHIC:** PHOTO: Nancy Pelosi owns shares in a firm that could benefit from a House bill. (PHOTOGRAPH BY JIM LO SCALZO/EUROPEAN PRESSPHOTO AGENCY)

**LOAD-DATE:** December 16, 2011

Exhibit 6 Page 313

# EXHIBIT 7



**CALIFORNIA**
**RESIDENTIAL PURCHASE AGREEMENT**
**AND JOINT ESCROW INSTRUCTIONS**
For Use With Single Family Residential Property — Attached or Detached
(C.A.R. Form RPA-CA, Revised 10/02)

RESIDENTIAL BROKERAGE



CALIFORNIA
ASSOCIATION
OF REALTORS®

Date **9/18/05**, at **Los Angeles**, California.

1. **OFFER:**
   A. THIS IS AN OFFER FROM **Teodoro Nguema Obiang** ("Buyer").
   B. THE REAL PROPERTY TO BE ACQUIRED is described as **3620 Sweetwater Mesa Rd**, situated in
      _____, Assessor's Parcel No. _____, County of **Los Angeles**, California, ("Property").
   C. THE PURCHASE PRICE offered is **Twenty eight million five hundred thousand and 00** Dollars $ **28,500,000**.
   D. CLOSE OF ESCROW shall occur on _____ (date)(or ☒ **45** Days After Acceptance).

2. **FINANCE TERMS:** Obtaining the loans below **is a contingency** of this Agreement unless: (i) either 2K or 2L is checked below; or (ii) otherwise agreed in writing. Buyer shall act diligently and in good faith to obtain the designated loans. Obtaining deposit, down payment and closing costs **is not a contingency.** Buyer represents that funds will be good when deposited with Escrow Holder.
   A. **INITIAL DEPOSIT:** Buyer has given a deposit in the amount of ........................................$ **855,000**
      to the agent submitting the offer (or to _____), by personal check
      (or _____), made payable to _____
      which shall be held uncashed until Acceptance and then deposited within 3 business days after
      Acceptance (or ☐ _____), with
      Escrow Holder, (or ☐ into Broker's trust account).
   B. **INCREASED DEPOSIT:** Buyer shall deposit with Escrow Holder an increased deposit in the amount of ...$ _____
      within _____ Days After Acceptance, or ☐ _____
   C. **FIRST LOAN IN THE AMOUNT OF** ...............................................................$ _____
      (1) NEW First Deed of Trust in favor of lender, encumbering the Property, securing a note payable at
          maximum interest of _____% fixed rate, or _____% initial adjustable rate with a maximum
          interest rate of _____%, balance due in _____ years, amortized over _____ years. Buyer
          shall pay loan fees/points not to exceed _____. (These terms apply whether the designated loan
          is conventional, FHA or VA.)
      (2) ☐ FHA ☐ VA: (The following terms only apply to the FHA or VA loan that is checked.)
          Seller shall pay _____% discount points. Seller shall pay other fees not allowed to be paid by
          Buyer, ☐ not to exceed $_____. Seller shall pay the cost of lender required Repairs
          (including those for wood destroying pest) not otherwise provided for in this Agreement, ☐ not to
          exceed $_____. (Actual loan amount may increase if mortgage insurance premiums,
          funding fees or closing costs are financed.)
   D. **ADDITIONAL FINANCING TERMS:** ☐ Seller financing, (C.A.R. Form SFA); ☐ secondary financing, ....$ _____
      (C.A.R. Form PAA, paragraph 4A); ☐ assumed financing (C.A.R. Form PAA, paragraph 4B)

   E. **BALANCE OF PURCHASE PRICE** (not including costs of obtaining loans and other closing costs) in the amount of ... $ **27,645,000**
      to be deposited with Escrow Holder within sufficient time to close escrow.
   F. **PURCHASE PRICE (TOTAL):** ...............................................................$ **28,500,000**
   G. **LOAN APPLICATIONS:** Within 7 (or _____) Days After Acceptance, Buyer shall provide Seller a letter from lender or
      mortgage loan broker stating that, based on a review of Buyer's written application and credit report, Buyer is prequalified or
      preapproved for the NEW loan specified in 2C above.
   H. **VERIFICATION OF DOWN PAYMENT AND CLOSING COSTS:** Buyer (or Buyer's lender or loan broker pursuant to 2G) shall, within
      7 (or _____) Days After Acceptance, provide Seller written verification of Buyer's down payment and closing costs.
   I. **LOAN CONTINGENCY REMOVAL:** (i) Within 17 (or ☐ _____) Days After Acceptance, Buyer shall, as specified in paragraph
      14, remove the loan contingency or cancel this Agreement; OR (ii) (if checked) ☐ the loan contingency shall remain in effect
      until the designated loans are funded.
   J. **APPRAISAL CONTINGENCY AND REMOVAL:** This Agreement is (OR, if checked, ☐ is NOT) contingent upon the Property
      appraising at no less than the specified purchase price. If there is a loan contingency, at the time the loan contingency is
      removed (or, if checked, ☐ within 17 (or _____) Days After Acceptance), Buyer shall, as specified in paragraph 14B(3), remove
      the appraisal contingency or cancel this Agreement. If there is no loan contingency, Buyer shall, as specified in paragraph
      14B(3), remove the appraisal contingency within 17 (or _____) Days After Acceptance.
   K. ☒ **NO LOAN CONTINGENCY** (If checked): Obtaining any loan in paragraphs 2C, 2D or elsewhere in this Agreement is NOT
      a contingency of this Agreement. If Buyer does not obtain the loan and as a result Buyer does not purchase the Property, Seller
      may be entitled to Buyer's deposit or other legal remedies.
   L. ☐ **ALL CASH OFFER** (If checked): No loan is needed to purchase the Property. Buyer shall, within 7 (or _____) Days After Acceptance,
      provide Seller written verification of sufficient funds to close this transaction.

3. **CLOSING AND OCCUPANCY:**
   A. Buyer intends (or ☐ does not intend) to occupy the Property as Buyer's primary residence.
   B. **Seller-occupied or vacant property:** Occupancy shall be delivered to Buyer at _____ AM/PM, ☒ on the date of Close Of
      Escrow; ☐ on _____, or ☐ no later than _____ Days After Close Of Escrow. (C.A.R. Form PAA, paragraph 2.) If
      transfer of title and occupancy do not occur at the same time, Buyer and Seller are advised to: (i) enter into a written occupancy
      agreement; and (ii) consult with their insurance and legal advisors.

The copyright laws of the United States (Title 17 U.S. Code) forbid the unauthorized reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. Copyright © 1991-2004, CALIFORNIA ASSOCIATION OF REALTORS®, INC. ALL RIGHTS RESERVED.

Buyer's Initials ( **TNO** )( )
Seller's Initials ( )( )

Reviewed by _____ Date _____

**RPA-CA REVISED 10/02 (PAGE 1 OF 8)** Print Date BDC Nov 04

BUYER'S COPY

**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT  (RPA-CA PAGE 1 OF 8)**

Confidential Treatment Requested

SEN009692

Property Address: _3.20 Sweetwater_ Date: _9/18/05_

**C. Tenant-occupied property: (i)** Property shall be vacant at least 5 (or ☐ _____) Days Prior to Close Of Escrow, unless otherwise agreed in writing. **Note to Seller: If you are unable to deliver Property vacant in accordance with rent control and other applicable Law, you may be in breach of this Agreement.**

**OR (ii)** (if checked) ☐ **Tenant to remain in possession.** The attached addendum is incorporated into this Agreement (C.A.R. Form PAA, paragraph 3.);

**OR (iii)** (if checked) ☐ **This Agreement is contingent** upon Buyer and Seller entering into a written agreement regarding occupancy of the Property within the time specified in paragraph 14B(1). If no written agreement is reached within this time, either Buyer or Seller may cancel this Agreement in writing.

**D.** At Close Of Escrow, Seller assigns to Buyer any assignable warranty rights for items included in the sale and shall provide any available Copies of such warranties. Brokers cannot and will not determine the assignability of any warranties.

**E.** At Close Of Escrow, unless otherwise agreed in writing, Seller shall provide keys and/or means to operate all locks, mailboxes, security systems, alarms and garage door openers. If Property is a condominium or located in a common interest subdivision, Buyer may be required to pay a deposit to the Homeowners' Association ("HOA") to obtain keys to accessible HOA facilities.

**4. ALLOCATION OF COSTS (If checked):** Unless otherwise specified here, this paragraph only determines who is to pay for the report, inspection, test or service mentioned. If not specified here or elsewhere in this Agreement, the determination of who is to pay for any work recommended or identified by any such report, inspection, test or service shall be by the method specified in paragraph 14B(2).

**A. WOOD DESTROYING PEST INSPECTION:**

(1) ☐ Buyer ☒ Seller shall pay for an inspection and report for wood destroying pests and organisms ("Report") which shall be prepared by _Seller's choice_, a registered structural pest control company. The Report shall cover the accessible areas of the main building and attached structures and, if checked: ☐ detached garages and carports, ☐ detached decks, ☐ the following other structures or areas _____. The Report shall not include roof coverings. If Property is a condominium or located in a common interest subdivision, the Report shall include only the separate interest and any exclusive-use areas being transferred and shall not include common areas, unless otherwise agreed. Water tests of shower pans on upper level units may not be performed without consent of the owners of property below the shower.

**OR (2)** ☒ **(If checked)** The attached addendum (C.A.R. Form WPA) regarding wood destroying pest inspection and allocation of cost is incorporated into this Agreement.

**B. OTHER INSPECTIONS AND REPORTS:**

(1) ☐ Buyer ☒ Seller shall pay to have septic or private sewage disposal systems inspected _____
(2) ☐ Buyer ☒ Seller shall pay to have domestic wells tested for water potability and productivity _____
(3) ☐ Buyer ☒ Seller shall pay for a natural hazard zone disclosure report prepared by _prop ID_
(4) ☐ Buyer ☐ Seller shall pay for the following inspection or report _____
(5) ☐ Buyer ☐ Seller shall pay for the following inspection or report _____

**C. GOVERNMENT REQUIREMENTS AND RETROFIT:**

(1) ☐ Buyer ☒ Seller shall pay for smoke detector installation and/or water heater bracing, if required by Law. Prior to Close Of Escrow, Seller shall provide Buyer a written statement of compliance in accordance with state and local Law, unless exempt.
(2) ☐ Buyer ☒ Seller shall pay the cost of compliance with any other minimum mandatory government retrofit standards, inspections and reports if required as a condition of closing escrow under any Law.

**D. ESCROW AND TITLE:**

(1) ☒ Buyer ☒ Seller shall pay escrow fee _Each pay their own_ Escrow Holder shall be _West coast Estrow / Anthony Leonard_
(2) ☐ Buyer ☐ Seller shall pay for owner's title insurance policy specified in paragraph 12E _____ Owner's title policy to be issued by _Equity_ (Buyer shall pay for any title insurance policy insuring Buyer's lender, unless otherwise agreed in writing.)

**E. OTHER COSTS:**

(1) ☐ Buyer ☒ Seller shall pay County transfer tax or transfer fee _____
(2) ☐ Buyer ☒ Seller shall pay City transfer tax or transfer fee _____
(3) ☐ Buyer ☒ Seller shall pay HOA transfer fee _____
(4) ☐ Buyer ☒ Seller shall pay HOA document preparation fees _____
(5) ☐ Buyer ☒ Seller shall pay the cost, not to exceed $ _2,000_, of a one-year home warranty plan, issued by _Buyer's choice_ with the following optional coverage: _To be done in escrow_
(6) ☐ Buyer ☐ Seller shall pay for _____
(7) ☐ Buyer ☐ Seller shall pay for _____

**5. STATUTORY DISCLOSURES (INCLUDING LEAD-BASED PAINT HAZARD DISCLOSURES) AND CANCELLATION RIGHTS:**

**A.** (1) Seller shall, within the time specified in paragraph 14A, deliver to Buyer, if required by Law: **(i)** Federal Lead-Based Paint Disclosures and pamphlet ("Lead Disclosures"); and **(ii)** disclosures or notices required by sections 1102 et. seq. and 1103 et. seq. of the California Civil Code ("Statutory Disclosures"). Statutory Disclosures include, but are not limited to, a Real Estate Transfer Disclosure Statement ("TDS"), Natural Hazard Disclosure Statement ("NHD"), notice or actual knowledge of release of illegal controlled substance, notice of special tax and/or assessments (or, if allowed, substantially equivalent notice regarding the Mello-Roos Community Facilities Act and Improvement Bond Act of 1915) and, if Seller has actual knowledge, an industrial use and military ordnance location disclosure (C.A.R. Form SSD).

(2) Seller, within the time specified in paragraph 14B(1), return Signed Copies of the Statutory and Lead Disclosures to Seller.

(3) In the event Seller, prior to Close Of Escrow, becomes aware of adverse conditions materially affecting the Property, or any material inaccuracy in disclosures, information or representations previously provided to Buyer of which Buyer is otherwise unaware, Seller shall promptly provide a subsequent or amended disclosure or notice, in writing, covering those items. **However, a subsequent or amended disclosure shall not be required for conditions and material inaccuracies disclosed in reports ordered and paid for by Buyer.**

Buyer's Initials ( _TNU_ )(_____)
Seller's Initials (_____)(_____)

| Reviewed by _____ | Date _____ |



Copyright © 1991-2004, CALIFORNIA ASSOCIATION OF REALTORS®, INC.
**RPA-CA REVISED 10/02 (PAGE 2 OF 8)**

**BUYER'S COPY**

**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT (RPA-CA PAGE 2 OF 8)**

**Confidential Treatment Requested**

SEN009693

Exhibit 7 Page 315

Property Address: 3620 Sweetwater Mesa Rd                    Date: _____

(4) If any disclosure or notice specified in 5A(1), or subsequent or amended disclosure or notice is delivered to Buyer after the offer is Signed, Buyer shall have the right to cancel this Agreement within **3 Days** After delivery in person, or **5 Days** After delivery by deposit in the mail, by giving written notice of cancellation to Seller or Seller's agent. (Lead Disclosures sent by mail must be sent certified mail or better.)

(5) Note to Buyer and Seller: Waiver of Statutory and Lead Disclosures is prohibited by Law.

  **B.** **NATURAL AND ENVIRONMENTAL HAZARDS:** Within the time specified in paragraph 14A, Seller shall, if required by Law: (i) deliver to Buyer earthquake guides (and questionnaire) and environmental hazards booklet; (ii) even if exempt from the obligation to provide a NHD, disclose if the Property is located in a Special Flood Hazard Area; Potential Flooding (Inundation) Area; Very High Fire Hazard Zone; State Fire Responsibility Area; Earthquake Fault Zone; Seismic Hazard Zone; and (iii) disclose any other zone as required by Law and provide any other information required for those zones.

  **C.** **DATA BASE DISCLOSURE:** NOTICE: The California Department of Justice, sheriff's departments, police departments serving jurisdictions of 200,000 or more and many other local law enforcement authorities maintain for public access a data base of the locations of persons required to register pursuant to paragraph (1) of subdivision (a) of Section 290.4 of the Penal Code. The data base is updated on a quarterly basis and a source of information about the presence of these individuals in any neighborhood. The Department of Justice also maintains a Sex Offender Identification Line through which inquiries about individuals may be made. This is a "900" telephone service. Callers must have specific information about individuals they are checking. Information regarding neighborhoods is not available through the "900" telephone service.

**6.** **CONDOMINIUM/PLANNED UNIT DEVELOPMENT DISCLOSURES:**

  **A.** **SELLER HAS: 7 (or ☐ _____ ) Days** After Acceptance to disclose to Buyer whether the Property is a condominium, or is located in a planned unit development or other common interest subdivision (C.A.R. Form SSD).

  **B.** If the Property is a condominium or is located in a planned unit development or other common interest subdivision, Seller has **3 (or ☐ _____ ) Days** After Acceptance to request from the HOA (C.A.R. Form HOA): (i) Copies of any documents required by Law; (ii) disclosure of any pending or anticipated claim or litigation by or against the HOA; (iii) a statement containing the location and number of designated parking and storage spaces; (iv) Copies of the most recent 12 months of HOA minutes for regular and special meetings; and (v) the names and contact information of all HOAs governing the Property (collectively, "CI Disclosures"). Seller shall itemize and deliver to Buyer all CI Disclosures received from the HOA and any CI Disclosures in Seller's possession. Buyer's approval of CI Disclosures is a contingency of this Agreement as specified in paragraph 14B(3).

**7.** **CONDITIONS AFFECTING PROPERTY:**

  **A.** Unless otherwise agreed: (i) the Property is sold (a) in its **PRESENT physical condition as of the date of Acceptance** and **(b) subject to Buyer's Investigation rights;** (ii) the Property, including pool, spa, landscaping and grounds, is to be maintained in substantially the same condition as on the date of Acceptance; and (iii) all debris and personal property not included in the sale shall be removed by Close Of Escrow.

  **B.** **SELLER SHALL,** within the time specified in paragraph 14A, **DISCLOSE KNOWN MATERIAL FACTS AND DEFECTS** affecting the Property, including known insurance claims within the past five years, **AND MAKE OTHER DISCLOSURES REQUIRED BY LAW (C.A.R. Form SSD).**

  **C.** **NOTE TO BUYER:** You are strongly advised to conduct investigations of the entire Property in order to determine its present condition since Seller may not be aware of all defects affecting the Property or other factors that you consider important. Property improvements may not be built according to code, in compliance with current Law, or have had permits issued.

  **D.** **NOTE TO SELLER:** Buyer has the right to inspect the Property and, as specified in paragraph 14B, based upon information discovered in those inspections: (i) cancel this Agreement; or (ii) request that you make Repairs or take other action.

**8.** **ITEMS INCLUDED AND EXCLUDED:**

  **A.** **NOTE TO BUYER AND SELLER:** Items listed as included or excluded in the MLS, flyers or marketing materials are **not** included in the purchase price or excluded from the sale unless specified in 8B or C.

  **B.** **ITEMS INCLUDED IN SALE:**

    (1) All EXISTING fixtures and fittings that are attached to the Property;

    (2) Existing electrical, mechanical, lighting, plumbing and heating fixtures, ceiling fans, fireplace inserts, gas logs and grates, solar systems, built-in appliances, window and door screens, awnings, shutters, window coverings, attached floor coverings, television antennas, satellite dishes, private integrated telephone systems, air coolers/conditioners, pool/spa equipment, garage door openers/remote controls, mailbox, in-ground landscaping, trees/shrubs, water softeners, water purifiers, security systems/alarms; and

    (3) The following items: _____

    (4) Seller represents that all items included in the purchase price, unless otherwise specified, are owned by Seller.

    (5) All items included shall be transferred free of liens and without Seller warranty.

  **C.** **ITEMS EXCLUDED FROM SALE:** _____

**9.** **BUYER'S INVESTIGATION OF PROPERTY AND MATTERS AFFECTING PROPERTY:**

  **A.** Buyer's acceptance of the condition of, and any other matter affecting the Property, is a contingency of this Agreement as specified in this paragraph and paragraph 14B. Within the time specified in paragraph 14B(1), Buyer shall have the right, at Buyer's expense unless otherwise agreed, to conduct inspections, investigations, tests, surveys and other studies ("Buyer Investigations"), including, but not limited to, the right to: (i) inspect for lead-based paint and other lead-based paint hazards; (ii) inspect for wood destroying pests and organisms; (iii) review the registered sex offender database; (iv) confirm the insurability of Buyer and the Property; and (v) satisfy Buyer as to any matter specified in the attached Buyer's Inspection Advisory (C.A.R. Form BIA). Without Seller's prior written consent, Buyer shall neither make nor cause to be made: (i) invasive or destructive Buyer Investigations; or (ii) inspections by any governmental building or zoning inspector or government employee, unless required by Law.

  **B.** Buyer shall complete Buyer Investigations and, as specified in paragraph 14B, remove the contingency or cancel this Agreement. Buyer shall give Seller, at no cost, complete Copies of all Buyer Investigation reports obtained by Buyer. Seller shall make the Property available for all Buyer Investigations. Seller shall have water, gas, electricity and all operable pilot lights on for Buyer's Investigations and through the date possession is made available to Buyer.

Copyright © 1991-2004, CALIFORNIA ASSOCIATION OF REALTORS®, INC.
RPA-CA REVISED 10/02 (PAGE 3 OF 8)

Buyer's Initials  TND  (_____)(_____)
Seller's Initials (_____)(_____)

Reviewed by _____ Date _____

**BUYER'S COPY**

**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT (RPA-CA PAGE 3 OF 8)**

Confidential Treatment Requested

SEN009694

Property Address: 3420 Sweetwater Mesa (L)                    Date: _____

10. **REPAIRS:** Repairs shall be completed prior to final verification of condition unless otherwise agreed in writing. Repairs to be performed at Seller's expense may be performed by Seller or through others, provided that the work complies with applicable Law, including governmental permit, inspection and approval requirements. Repairs shall be performed in a good, skillful manner with materials of quality and appearance comparable to existing materials. It is understood that exact restoration of appearance or cosmetic items following all Repairs may not be possible. Seller shall: (i) obtain receipts for Repairs performed by others; (ii) prepare a written statement indicating the Repairs performed by Seller and the date of such Repairs; and (iii) provide Copies of receipts and statements to Buyer prior to final verification of condition.

11. **BUYER INDEMNITY AND SELLER PROTECTION FOR ENTRY UPON PROPERTY:** Buyer shall: (i) keep the Property free and clear of liens; (ii) Repair all damage arising from Buyer Investigations; and (iii) indemnify and hold Seller harmless from all resulting liability, claims, demands, damages and costs. Buyer shall carry, or Buyer shall require anyone acting on Buyer's behalf to carry, policies of liability, workers' compensation and other applicable insurance, defending and protecting Seller from liability for any injuries to persons or property occurring during any Buyer Investigations or work done on the Property at Buyer's direction prior to Close Of Escrow. Seller is advised that certain protections may be afforded Seller by recording a "Notice of Non-responsibility" (C.A.R. Form NNR) for Buyer Investigations and work done on the Property at Buyer's direction. Buyer's obligations under this paragraph shall survive the termination of this Agreement.

12. **TITLE AND VESTING:**
    A. Within the time specified in paragraph 14, Buyer shall be provided a current preliminary (title) report, which is only an offer by the title insurer to issue a policy of title insurance and may not contain every item affecting title. Buyer's review of the preliminary report and any other matters which may affect title are a contingency of this Agreement as specified in paragraph 14B.
    B. Title is taken in its present condition subject to all encumbrances, easements, covenants, conditions, restrictions, rights and other matters, whether of record or not, as of the date of Acceptance except: (i) monetary liens of record unless Buyer is assuming those obligations or taking the Property subject to those obligations; and (ii) those matters which Seller has agreed to remove in writing.
    C. Within the time specified in paragraph 14A, Seller has a duty to disclose to Buyer all matters known to Seller affecting title, whether of record or not.
    D. At Close Of Escrow, Buyer shall receive a grant deed conveying title (or, for stock cooperative or long-term lease, an assignment of stock certificate or of Seller's leasehold interest), including oil, mineral and water rights if currently owned by Seller. Title shall vest as designated in Buyer's supplemental escrow instructions. THE MANNER OF TAKING TITLE MAY HAVE SIGNIFICANT LEGAL AND TAX CONSEQUENCES. CONSULT AN APPROPRIATE PROFESSIONAL.
    E. Buyer shall receive a CLTA/ALTA Homeowner's Policy of Title Insurance. A title company, at Buyer's request, can provide information about the availability, desirability, coverage, and cost of various title insurance coverages and endorsements. If Buyer desires title coverage other than that required by this paragraph, Buyer shall instruct Escrow Holder in writing and pay any increase in cost.

13. **SALE OF BUYER'S PROPERTY:**
    A. This Agreement is NOT contingent upon the sale of any property owned by Buyer.
    OR B. ☐ (If checked): The attached addendum (C.A.R. Form COP) regarding the contingency for the sale of property owned by Buyer is incorporated into this Agreement.

14. **TIME PERIODS; REMOVAL OF CONTINGENCIES; CANCELLATION RIGHTS: The following time periods may only be extended, altered, modified or changed by mutual written agreement. Any removal of contingencies or cancellation under this paragraph must be in writing (C.A.R. Form CR).**
    A. **SELLER HAS: 7 (or ☐ _____) Days** After Acceptance to deliver to Buyer all reports, disclosures and information for which Seller is responsible under paragraphs 4, 5A and B, 6A, 7B and 12.
    B. (1) **BUYER HAS: 17 (or ☒ 30 ) Days** After Acceptance, unless otherwise agreed in writing, to:
        (i) complete all Buyer Investigations; approve all disclosures, reports and other applicable information, which Buyer receives from Seller; and approve all matters affecting the Property (including lead-based paint and lead-based paint hazards as well as other information specified in paragraph 5 and insurability of Buyer and the Property); and
        (ii) return to Seller Signed Copies of Statutory and Lead Disclosures delivered by Seller in accordance with paragraph 5A.
        (2) Within the time specified in 14B(1), Buyer may request that Seller make repairs or take any other action regarding the Property (C.A.R. Form RR). Seller has no obligation to agree to or respond to Buyer's requests.
        (3) By the end of the time specified in 14B(1) (or 2I for loan contingency or 2J for appraisal contingency), Buyer shall, in writing, remove the applicable contingency (C.A.R. Form CR) or cancel this Agreement. However, if (i) government-mandated inspections/ reports required as a condition of closing; or (ii) Common Interest Disclosures pursuant to paragraph 6B are not made within the time specified in 14A, then Buyer has 5 (or ☐ _____) Days After receipt of any such items, or the time specified in 14B(1), whichever is later, to remove the applicable contingency or cancel this Agreement in writing.
    C. **CONTINUATION OF CONTINGENCY OR CONTRACTUAL OBLIGATION; SELLER RIGHT TO CANCEL:**
        (1) **Seller right to Cancel; Buyer Contingencies:** Seller, after first giving Buyer a Notice to Buyer to Perform (as specified below), may cancel this Agreement in writing and authorize return of Buyer's deposit if, by the time specified in this Agreement, Buyer does not remove in writing the applicable contingency or cancel this Agreement. Once all contingencies have been removed, failure of either Buyer or Seller to close escrow on time may be a breach of this Agreement.
        (2) **Continuation of Contingency:** Even after the expiration of the time specified in 14B, Buyer retains the right to make requests to Seller, remove in writing the applicable contingency or cancel this Agreement until Seller cancels pursuant to 14C(1). Once Seller receives Buyer's written removal of all contingencies, Seller may not cancel this Agreement pursuant to 14C(1).
        (3) **Seller right to Cancel; Buyer Contract Obligations:** Seller, after first giving Buyer a Notice to Buyer to Perform (as specified below), may cancel this Agreement in writing and authorize return of Buyer's deposit for any of the following reasons: (i) if Buyer fails to deposit funds as required by 2A or 2B; (ii) if the funds deposited pursuant to 2A or 2B are not good when deposited; (iii) if Buyer fails to provide a letter as required by 2G; (iv) if Buyer fails to provide verification as required by 2H or 2L; (v) if Seller reasonably disapproves of the verification provided by 2H or 2L; (vi) if Buyer fails to return Statutory and Lead Disclosures as required by paragraph 5A(2); or (vii) if Buyer fails to sign or initial a separate liquidated damage form for an increased deposit as required by paragraph 16. **Seller is not required to give Buyer a Notice to Perform regarding Close of Escrow.**
        (4) **Notice To Buyer To Perform:** The Notice to Buyer to Perform (C.A.R. Form NBP) shall: (i) be in writing; (ii) be signed by Seller; and (iii) give Buyer at least 24 (or ☒ 48 ) hours (or until the time specified in the applicable paragraph, whichever occurs last) to take the applicable action. A Notice to Buyer to Perform may not be given any earlier than 2 Days Prior to the expiration of the applicable time for Buyer to remove a contingency or cancel this Agreement or meet a 14C(3) obligation.

Buyer's Initials ( FL )(_____)
Seller's Initials (_____)(_____)

Reviewed by _____ Date _____

Copyright © 1991-2004, CALIFORNIA ASSOCIATION OF REALTORS®, INC.
RPA-CA REVISED 10/02 (PAGE 4 OF 8)

**BUYER'S COPY**

**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT (RPA-CA PAGE 4 OF 8)**

**Confidential Treatment Requested**                                    **SEN009695**

Property Address: _3620 Sweetwater Mesa Rd._    Date: _____

**D. EFFECT OF BUYER'S REMOVAL OF CONTINGENCIES :** If Buyer removes, in writing, any contingency or cancellation rights, unless otherwise specified in a separate written agreement between Buyer and Seller, Buyer shall conclusively be deemed to have: **(i)** completed all Buyer Investigations, and review of reports and other applicable information and disclosures pertaining to that contingency or cancellation right; **(ii)** elected to proceed with the transaction; and **(iii)** assumed all liability, responsibility and expense for Repairs or corrections pertaining to that contingency or cancellation right, or for inability to obtain financing.

**E. EFFECT OF CANCELLATION ON DEPOSITS:** If Buyer or Seller gives written notice of cancellation pursuant to rights duly exercised under the terms of this Agreement, Buyer and Seller agree to Sign mutual instructions to cancel the sale and escrow and release deposits to the party entitled to the funds, less fees and costs incurred by that party. Fees and costs may be payable to service providers and vendors for services and products provided during escrow. **Release of funds will require mutual Signed release instructions from Buyer and Seller, judicial decision or arbitration award. A party may be subject to a civil penalty of up to $1,000 for refusal to sign such instructions if no good faith dispute exists as to who is entitled to the deposited funds (Civil Code §1057.3).**

**15. FINAL VERIFICATION OF CONDITION:** Buyer shall have the right to make a final inspection of the Property within **5 (or _____)** Days Prior to Close Of Escrow, NOT AS A CONTINGENCY OF THE SALE, but solely to confirm: **(i)** the Property is maintained pursuant to paragraph 7A; **(ii)** Repairs have been completed as agreed; and **(iii)** Seller has complied with Seller's other obligations under this Agreement.

**16. LIQUIDATED DAMAGES: If Buyer fails to complete this purchase because of Buyer's default, Seller shall retain, as liquidated damages, the deposit actually paid. If the Property is a dwelling with no more than four units, one of which Buyer intends to occupy, then the amount retained shall be no more than 3% of the purchase price. Any excess shall be returned to Buyer. Release of funds will require mutual, Signed release instructions from both Buyer and Seller, judicial decision or arbitration award.**
**BUYER AND SELLER SHALL SIGN A SEPARATE LIQUIDATED DAMAGES PROVISION FOR ANY INCREASED DEPOSIT. (C.A.R. FORM RID)**

| Buyer's Initials _ƒ⟋__ | Seller's Initials ____⟋____ |
|---|---|

**17. DISPUTE RESOLUTION:**

**A. MEDIATION:** Buyer and Seller agree to mediate any dispute or claim arising between them out of this Agreement, or any resulting transaction, before resorting to arbitration or court action.  Paragraphs 17B(2) and (3) below apply whether or not the Arbitration provision is initialed. Mediation fees, if any, shall be divided equally among the parties involved. If, for any dispute or claim to which this paragraph applies, any party commences an action without first attempting to resolve the matter through mediation, or refuses to mediate after a request has been made, then that party shall not be entitled to recover attorney fees, even if they would otherwise be available to that party in any such action. THIS MEDIATION PROVISION APPLIES WHETHER OR NOT THE ARBITRATION PROVISION IS INITIALED.

**B. ARBITRATION OF DISPUTES: (1) Buyer and Seller agree that any dispute or claim in Law or equity arising between them out of this Agreement or any resulting transaction, which is not settled through mediation, shall be decided by neutral, binding arbitration, including and subject to paragraphs 17B(2) and (3) below. The arbitrator shall be a retired judge or justice, or an attorney with at least 5 years of residential real estate Law experience, unless the parties mutually agree to a different arbitrator, who shall render an award in accordance with substantive California Law. The parties shall have the right to discovery in accordance with California Code of Civil Procedure §1283.05. In all other respects, the arbitration shall be conducted in accordance with Title 9 of Part III of the California Code of Civil Procedure. Judgment upon the award of the arbitrator(s) may be entered into any court having jurisdiction. Interpretation of this agreement to arbitrate shall be governed by the Federal Arbitration Act.**

**(2) EXCLUSIONS FROM MEDIATION AND ARBITRATION:** The following matters are excluded from mediation and arbitration: **(i)** a judicial or non-judicial foreclosure or other action or proceeding to enforce a deed of trust, mortgage or installment land sale contract as defined in California Civil Code §2985; **(ii)** an unlawful detainer action; **(iii)** the filing or enforcement of a mechanic's lien; and **(iv)** any matter that is within the jurisdiction of a probate, small claims or bankruptcy court. The filing of a court action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies, shall not constitute a waiver of the mediation and arbitration provisions.

**(3) BROKERS:** Buyer and Seller agree to mediate and arbitrate disputes or claims involving either or both Brokers, consistent with 17A and B, provided either or both Brokers shall have agreed to such mediation or arbitration prior to, or within a reasonable time after, the dispute or claim is presented to Brokers. Any election by either or both Brokers to participate in mediation or arbitration shall not result in Brokers being deemed parties to the Agreement.

"**NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY.**"

"**WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION TO NEUTRAL ARBITRATION.**"

| Buyer's Initials _⟋ ⌄ ⟋_ | Seller's Initials ____⟋____ |
|---|---|

Copyright © 1991-2004, CALIFORNIA ASSOCIATION OF REALTORS®, INC.
**RPA-CA REVISED 10/02 (PAGE 5 OF 8)**

| Buyer's Initials ( ƒⁿ⟍ )( ) |
|---|
| Seller's Initials ( 𝑭 )( ) |

| Reviewed by __ⱻ__ Date ___ |
|---|

BUYER'S COPY
**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT  (RPA-CA PAGE 5 OF 8)**

**Confidential Treatment Requested**

SEN009696

Property Address: _3620 Sweetwater Mesa Rd_   Date: _____

18. **PRORATIONS OF PROPERTY TAXES AND OTHER ITEMS:** Unless otherwise agreed in writing, the following items shall be PAID CURRENT and prorated between Buyer and Seller as of Close Of Escrow: real property taxes and assessments, interest, rents, HOA regular, special, and emergency dues and assessments imposed prior to Close Of Escrow, premiums on insurance assumed by Buyer, payments on bonds and assessments assumed by Buyer, and payments on Mello-Roos and other Special Assessment District bonds and assessments that are now a lien. The following items shall be assumed by Buyer WITHOUT CREDIT toward the purchase price: prorated payments on Mello-Roos and other Special Assessment District bonds and assessments and HOA special assessments that are now a lien but not yet due. Property will be reassessed upon change of ownership. Any supplemental tax bills shall be paid as follows: **(I)** for periods after Close Of Escrow, by Buyer; and **(ii)** for periods prior to Close Of Escrow, by Seller. TAX BILLS ISSUED AFTER CLOSE OF ESCROW SHALL BE HANDLED DIRECTLY BETWEEN BUYER AND SELLER. Prorations shall be made based on a 30-day month.
19. **WITHHOLDING TAXES:** Seller and Buyer agree to execute any instrument, affidavit, statement or instruction reasonably necessary to comply with federal (FIRPTA) and California withholding Law, if required (C.A.R. Forms AS and AB).
20. **MULTIPLE LISTING SERVICE ("MLS"):** Brokers are authorized to report to the MLS a pending sale and, upon Close Of Escrow, the terms of this transaction to be published and disseminated to persons and entities authorized to use the information on terms approved by the MLS.
21. **EQUAL HOUSING OPPORTUNITY:** The Property is sold in compliance with federal, state and local anti-discrimination Laws.
22. **ATTORNEY FEES:** In any action, proceeding, or arbitration between Buyer and Seller arising out of this Agreement, the prevailing Buyer or Seller shall be entitled to reasonable attorney fees and costs from the non-prevailing Buyer or Seller, except as provided in paragraph 17A.
23. **SELECTION OF SERVICE PROVIDERS:** If Brokers refer Buyer or Seller to persons, vendors, or service or product providers ("Providers"), Brokers do not guarantee the performance of any Providers. Buyer and Seller may select ANY Providers of their own choosing.
24. **TIME OF ESSENCE; ENTIRE CONTRACT; CHANGES:** Time is of the essence. All understandings between the parties are incorporated in this Agreement. Its terms are intended by the parties as a final, complete and exclusive expression of their Agreement with respect to its subject matter, and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. If any provision of this Agreement is held to be ineffective or invalid, the remaining provisions will nevertheless be given full force and effect. **Neither this Agreement nor any provision in it may be extended, amended, modified, altered or changed, except in writing Signed by Buyer and Seller.**
25. **OTHER TERMS AND CONDITIONS,** including attached supplements:
    A. ☑ Buyer's Inspection Advisory (C.A.R. Form BIA)
    B. ☐ Purchase Agreement Addendum (C.A.R. Form PAA paragraph numbers: _____ )
    C. ☐ Statewide Buyer and Statewide Advisory (C.A.R. Form SBSA)
    D. _✓ Malibu Topanga Disclosure Addendum_
       _✓ Confidentiality agreement by all parties engaged in this offer._
26. **DEFINITIONS:** As used in this Agreement:
    A. **"Acceptance"** means the time the offer or final counter offer is accepted in writing by a party and is delivered to and personally received by the other party or that party's authorized agent in accordance with the terms of this offer or a final counter offer.
    B. **"Agreement"** means the terms and conditions of this accepted California Residential Purchase Agreement and any accepted counter offers and addenda.
    C. **"C.A.R. Form"** means the specific form referenced or another comparable form agreed to by the parties.
    D. **"Close Of Escrow"** means the date the grant deed, or other evidence of transfer of title, is recorded. If the scheduled close of escrow falls on a Saturday, Sunday or legal holiday, then close of escrow shall be the next business day after the scheduled close of escrow date.
    E. **"Copy"** means copy by any means including photocopy, NCR, facsimile and electronic.
    F. **"Days"** means calendar days, unless otherwise required by Law.
    G. **"Days After"** means the specified number of calendar days after the occurrence of the event specified, not counting the calendar date on which the specified event occurs, and ending at 11:59PM on the final day.
    H. **"Days Prior"** means the specified number of calendar days before the occurrence of the event specified, not counting the calendar date on which the specified event is scheduled to occur.
    I. **"Electronic Copy" or "Electronic Signature"** means, as applicable, an electronic copy or signature complying with California Law. Buyer and Seller agree that electronic means will not be used by either party to modify or alter the content or integrity of this Agreement without the knowledge and consent of the other.
    J. **"Law"** means any law, code, statute, ordinance, regulation, rule or order, which is adopted by a controlling city, county, state or federal legislative, judicial or executive body or agency.
    K. **"Notice to Buyer to Perform"** means a document (C.A.R. Form NBP), which shall be in writing and Signed by Seller and shall give Buyer at least 24 hours **(or as otherwise specified in paragraph 14C(4))** to remove a contingency or perform as applicable.
    L. **"Repairs"** means any repairs (including pest control), alterations, replacements, modifications or retrofitting of the Property provided for under this Agreement.
    M. **"Signed"** means either a handwritten or electronic signature on an original document, Copy or any counterpart.
    N. **Singular and Plural** terms each include the other, when appropriate.

Buyer's Initials ( _Jw_ )( _____ )
Seller's Initials ( _____ )( _____ )

Copyright © 1991-2004, CALIFORNIA ASSOCIATION OF REALTORS®, INC.
**RPA-CA REVISED 10/02 (PAGE 6 OF 8)**

| Reviewed by _____ Date _____ |

**BUYER'S COPY**

**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT (RPA-CA PAGE 6 OF 8)**

**Confidential Treatment Requested**

SEN009697

Property Address: _3620 (Sweetwater Mesa Rd.)_     Date: _9/18/05_

**27. AGENCY:**

  **A. DISCLOSURE:** Buyer and Seller each acknowledge prior receipt of C.A.R. Form AD "Disclosure Regarding Real Estate Agency Relationships."

  **B. POTENTIALLY COMPETING BUYERS AND SELLERS:** Buyer and Seller each acknowledge receipt of a disclosure of the possibility of multiple representation by the Broker representing that principal. This disclosure may be part of a listing agreement, buyer-broker agreement or separate document (C.A.R. Form DA). Buyer understands that Broker representing Buyer may also represent other potential buyers, who may consider, make offers on or ultimately acquire the Property. Seller understands that Broker representing Seller may also represent other sellers with competing properties of interest to this Buyer.

  **C. CONFIRMATION:** The following agency relationships are hereby confirmed for this transaction:
Listing Agent _Hilton and Hyland_ (Print Firm Name) is the agent of (check one):☒ the Seller exclusively; or ☐ both the Buyer and Seller.
Selling Agent _Coldwell Banker_ (Print Firm Name) (if not same as Listing Agent) is the agent of (check one):☒ the Buyer exclusively; or ☐ the Seller exclusively; or ☐ both the Buyer and Seller. Real Estate Brokers are not parties to the Agreement between Buyer and Seller.

**28. JOINT ESCROW INSTRUCTIONS TO ESCROW HOLDER:**

  **A. The following paragraphs, or applicable portions thereof, of this Agreement constitute the joint escrow instructions of Buyer and Seller to Escrow Holder,** which Escrow Holder is to use along with any related counter offers and addenda, and any additional mutual instructions to close the escrow: 1, 2, 4, 12, 13B, 14E, 18, 19, 24, 25B and C, 26, 28, 29, 32A, 33 and paragraph D of the section titled Real Estate Brokers on page 8. If a Copy of the separate compensation agreement(s) provided for in paragraph 29 or 32A, or paragraph D of the section titled Real Estate Brokers on page 8 is deposited with Escrow Holder by Broker, Escrow Holder shall accept such agreement(s) and pay out from Buyer's or Seller's funds, or both, as applicable, the Broker's compensation provided for in such agreement(s). The terms and conditions of this Agreement not set forth in the specified paragraphs are additional matters for the information of Escrow Holder, but about which Escrow Holder need not be concerned. Buyer and Seller will receive Escrow Holder's general provisions directly from Escrow Holder and will execute such provisions upon Escrow Holder's request. To the extent the general provisions are inconsistent or conflict with this Agreement, the general provisions will control as to the duties and obligations of Escrow Holder only. Buyer and Seller will execute additional instructions, documents and forms provided by Escrow Holder that are reasonably necessary to close the escrow.

  **B.** A Copy of this Agreement shall be delivered to Escrow Holder within **3** business days after Acceptance (or ☐ _____ ). Buyer and Seller authorize Escrow Holder to accept and rely on Copies and Signatures as defined in this Agreement as originals, to open escrow and for other purposes of escrow. The validity of this Agreement as between Buyer and Seller is not affected by whether or when Escrow Holder Signs this Agreement.

  **C.** Brokers are a party to the escrow for the sole purpose of compensation pursuant to paragraphs 29, 32A and paragraph D of the section titled Real Estate Brokers on page 8. Buyer and Seller irrevocably assign to Brokers compensation specified in paragraphs 29 and 32A, respectively, and irrevocably instruct Escrow Holder to disburse those funds to Brokers at Close Of Escrow or pursuant to any other mutually executed cancellation agreement. Compensation instructions can be amended or revoked only with the written consent of Brokers. Escrow Holder shall immediately notify Brokers: **(i)** if Buyer's initial or any additional deposit is not made pursuant to this Agreement, or is not good at time of deposit with Escrow Holder; or **(ii)** if Buyer and Seller instruct Escrow Holder to cancel escrow.

  **D.** A Copy of any amendment that affects any paragraph of this Agreement for which Escrow Holder is responsible shall be delivered to Escrow Holder within 2 business days after mutual execution of the amendment.

**29. BROKER COMPENSATION FROM BUYER:** If applicable, upon Close Of Escrow, **Buyer** agrees to pay compensation to Broker as specified in a separate written agreement between Buyer and Broker.

**30. TERMS AND CONDITIONS OF OFFER:**
This is an offer to purchase the Property on the above terms and conditions. All paragraphs with spaces for initials by Buyer and Seller are incorporated in this Agreement only if initialed by all parties. If at least one but not all parties initial, a counter offer is required until agreement is reached. Seller has the right to continue to offer the Property for sale and to accept any other offer at any time prior to notification of Acceptance. Buyer has read and acknowledges receipt of a Copy of the offer and agrees to the above confirmation of agency relationships. If this offer is accepted and Buyer subsequently defaults, Buyer may be responsible for payment of Brokers' compensation. This Agreement and any supplement, addendum or modification, including any Copy, may be Signed in two or more counterparts, all of which shall constitute one and the same writing.

Buyer's Initials ( _TW_ )( _____ )
Seller's Initials ( _____ )( _____ )

Copyright © 1991-2004, CALIFORNIA ASSOCIATION OF REALTORS®, INC.
**RPA-CA REVISED 10/02 (PAGE 7 OF 8)**

Reviewed by _____ Date _____

**BUYER'S COPY**

**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT (RPA-CA PAGE 7 OF 8)**

**Confidential Treatment Requested**

SEN009698

Property Address: _3620 Sweetwater Mesa Rd_____ Date: _9/18/05_

**31. EXPIRATION OF OFFER:** This offer shall be deemed revoked and the deposit shall be returned unless the offer is Signed by Seller and a Copy of the Signed offer is personally received by Buyer, or by ___Neal Baden___, who is authorized to receive it by 5:00 PM on the third calendar day after this offer is signed by Buyer (or, if checked, ☐ by _____ (date), at _____ AM/PM).

Date ___9/18/05___                          Date _____

BUYER _____            BUYER _____

**(Print name)**                            **(Print name)**

_____                   _____

**(Address)**

**32. BROKER COMPENSATION FROM SELLER:**
   **A.** Upon Close Of Escrow, **Seller** agrees to pay compensation to Broker as specified in a separate written agreement between Seller and Broker.
   **B.** If escrow does not close, compensation is payable as specified in that separate written agreement.

**33. ACCEPTANCE OF OFFER:** Seller warrants that Seller is the owner of the Property, or has the authority to execute this Agreement. Seller accepts the above offer, agrees to sell the Property on the above terms and conditions, and agrees to the above confirmation of agency relationships. Seller has read and acknowledges receipt of a Copy of this Agreement, and authorizes Broker to deliver a Signed Copy to Buyer.
   ☐ (If checked) **SUBJECT TO ATTACHED COUNTER OFFER, DATED** _____

Date _____              Date _____

SELLER _____            SELLER _____

**(Print name)**                            **(Print name)**

_____                   _____

**(Address)**

**CONFIRMATION OF ACCEPTANCE:** A Copy of Signed Acceptance was personally received by Buyer or Buyer's authorized
( ___/___ ) agent on (date) _____ at _____ AM/PM. **A binding Agreement is created when**
**(Initials)** **a Copy of Signed Acceptance is personally received by Buyer or Buyer's authorized agent whether or not confirmed in this document. Completion of this confirmation is not legally required in order to create a binding Agreement; it is solely intended to evidence the date that Confirmation of Acceptance has occurred.**

**REAL ESTATE BROKERS:**
**A. Real Estate Brokers are not parties to the Agreement between Buyer and Seller.**
**B. Agency relationships are confirmed as stated in paragraph 27.**
**C.** If specified in paragraph 2A, Agent who submitted the offer for Buyer acknowledges receipt of deposit.
**D. COOPERATING BROKER COMPENSATION:** Listing Broker agrees to pay Cooperating Broker **(Selling Firm)** and Cooperating Broker agrees to accept, out of Listing Broker's proceeds in escrow: **(i)** the amount specified in the MLS, provided Cooperating Broker is a Participant of the MLS in which the Property is offered for sale or a reciprocal MLS; or **(ii)** ☐ (if checked) the amount specified in a separate written agreement (O.A.R. Form CBC) between Listing Broker and Cooperating Broker.

Real Estate Broker (Selling Firm) _Coldwell Banker_
By _Mark Badd_                                              Date _____
Address _9000 Sunset_        City _L.A._    State _Ca_ Zip _90069_
Telephone _310-887-6205_   Fax _323-850-7561_    E-mail _____

Real Estate Broker (Listing Firm) _____
By _____                                Date _____
Address _____ City _____ State _____ Zip _____
Telephone _____ Fax _____    E-mail _____

**ESCROW HOLDER ACKNOWLEDGMENT:**
Escrow Holder acknowledges receipt of a Copy of this Agreement, (if checked, ☐ a deposit in the amount of $ _____ ),
counter offer numbers _____ and _____
_____, and agrees to act as Escrow Holder subject to paragraph 28 of this Agreement, any supplemental escrow instructions and the terms of Escrow Holder's general provisions.

Escrow Holder is advised that the date of Confirmation of Acceptance of the Agreement as between Buyer and Seller is _____

Escrow Holder _____         Escrow # _____
By _____                      Date _____
Address _____
Phone/Fax/E-mail _____
Escrow Holder is licensed by the California Department of ☐ Corporations, ☐ Insurance, ☐ Real Estate.  License # _____

**REJECTION OF OFFER:** No counter offer is being made. This offer was reviewed and rejected by Seller on
( ___/___ ) _____ (Date)
(Seller's Initials)

THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ADEQUACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is available for use by the entire real estate industry. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
a subsidiary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

Reviewed by _____ Date _____

RPA-CA REVISED 10/02 (PAGE 8 OF 8)                **BUYER'S COPY**

_Neil Baden_   **CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT  (RPA-CA PAGE 8 OF 8)**

**Confidential Treatment Requested**

SEN009699