# Exhibit

# 6

REQUESTED BY: MANZANARES, ROBERTO

OFFICIAL USE ONLY

| DEPARTMENT OF HOMELAND SECURITY ICE | TECS ACCESS CODE 3 |
|---|---|
| REPORT OF INVESTIGATION | PAGE 1 |
| | CASE NUMBER MI02PR07MI0018 |

TITLE: TEODORO NGUEMA OBIANG, ET. AL OFFICIALS EQUATORIAL GUINEA

CASE STATUS: INTERIM RPT

| REPORT DATE | DATE ASSIGNED | PROGRAM CODE | REPORT NO. |
|---|---|---|---|
| 041812 | 111506 | YA1 | 079 |

RELATED CASE NUMBERS:

COLLATERAL REQ:

TYPE OF REPORT:
INITIAL SOURCE DOCUMENT/ INVESTIGATIVE FINDINGS

TOPIC: INTERVIEW OF CS# 8

SYNOPSIS:
On November 13, 2006, Agents assigned to the Homeland Security Investigation (HSI) Foreign Corruption Investigations Group initiated a criminal inquiry regarding the financial activities of Minister Teodoro Nguema OBIANG (Minister OBIANG). It is alleged that Minister OBIANG is diverting government funds Equatorial Guinea (EG) for his own personal use. Minister OBIANG is currently the Minister of Agriculture and Forestry in EG.

HSI is investigating Minister OBIANG for violation of money laundering statutes. Minister OBIANG purchased a mansion valued at $30 million dollars despite having a reported salary of $60,000 annually. He also purchased a Gulfstream aircraft for $38 million dollars. Minister OBIANG asserts his wealth is the result of his private businesses which are involved in lumber and road construction. In EG officials are permitted to engage in private businesses so long as the official involved isn't actively involved in the "day to day" operations of the business.

| DISTRIBUTION: SACMI | SIGNATURE: MANZANARES ROBERTO SPECIAL AGENT |
|---|---|
| | APPROVED: RUTHERFORD ROBERT N OI GRP SUPERVISOR |
| | ORIGIN OFFICE: MI MIAMI, FL - SAC | TELEPHONE: 305 597 6000 |
| | | TYPIST: MANZANARES |

OFFICIAL USE ONLY
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

OFFICIAL USE ONLY

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br>REPORT OF INVESTIGATION<br>CONTINUATION | PAGE 2 |
|---|---|
| | CASE NUMBER MI02PR07MI0018 |
| | REPORT NUMBER: 079 |

CASE PROGRAM CODES:

YA1 Financial Other/Corr    7H0 FOREIGN CORRUPTION    2FJ SHELL CORPORATIONS

OFFICIAL USE ONLY
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

OFFICIAL USE ONLY

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE 3 |
|---|---|
| REPORT OF INVESTIGATION CONTINUATION | CASE NUMBER MI02PR07MI0018 |
| | REPORT NUMBER: 079 |

DETAILS OF INVESTIGATION:

On November 13, 2006, Agents assigned to the Homeland Security Investigation (HSI) Foreign Corruption Investigations Group initiated a criminal inquiry regarding the financial activities of Minister Teodoro Nguema OBIANG (Minister OBIANG). It is alleged that Minister OBIANG is diverting funds allocated to the government of Equatorial Guinea (EG) for his own personal use. Minister OBIANG is currently the Minister of Agriculture and Forestry in EG and is the son of the dictator.

HSI is investigating Minister OBIANG for violation of money laundering statutes. OBIANG purchased a Beverly Hills mansion valued at $32 million dollars despite having a reported government salary of $60,000 annually. Additionally, he purchased a Gulfstream aircraft for $35 million dollars. Minister OBIANG asserts his wealth is the result of his private businesses which are involved in lumber and road construction. In EG officials are permitted to engage in private businesses and authorized to have government contracts as long as the official involved isn't actively involved in the ?day to day? operations or management of the business.

On November 19, 2011, CS # 8 was interviewed at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ by HSI special agents, Robert Manzanares and Carlos Figueroa. Also present was U.S. Department of Justice, (DOJ) Criminal Division Asset Forfeiture & Money Laundering attorney, Woo Lee.

After being apprised of the nature of the investigation, CS # 8 agreed be interviewed on a voluntary basis. CS# 8 requested that his/her name and contact information remain confidential but if necessary, would testify in any court proceedings. CS # 8 claims that she/he is in fear of his/her safety given the enormous amount of wealth that OBIANG and his family has overseas.

It was explained to the CS # 8 that the U.S. government has filed two separate civil forfeiture actions insisting that the assets owned by OBIANG were obtained by money which he obtained illegally.

OFFICIAL USE ONLY
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

OFFICIAL USE ONLY

| DEPARTMENT OF HOMELAND SECURITY<br>ICE | PAGE    4 |
|---|---|
| REPORT OF INVESTIGATION<br>CONTINUATION | CASE NUMBER MI02PR07MI0018 |
| | REPORT NUMBER: 079 |

CS # 8 claimed that he/she is a ▮▮▮▮▮▮▮▮▮ and traveled to Africa in the past for the exploration for a particular type of ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Prior to traveling to EG, CS # 8 worked for a company who was harvesting timer in EG. There were few forestry professionals in Africa who had the knowledge of the scope of work and type of timer that was in this region. Only five companies in France had experience with this type of timber. He was hired by one of them. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

In ▮▮▮▮, 1996, CS # 8 arrived in EG and resided in a hotel in the city of Bata for approximately one month. Thereafter, he rented a house ▮▮▮▮ ▮▮▮▮ in Bome which was south of Bata. CS #8 claims that all forms of harvesting by ▮▮▮ were at a standstill when he/she arrived in EG. CS # 8 began working in EG for ▮▮▮ and was responsible for locating ▮▮▮ wood to be harvested. At the time CS # 8 arrived in EG, operations were under the control of a ▮▮▮▮▮▮▮ called ▮▮▮. The manager of this ▮▮▮▮▮▮ was ▮▮▮▮▮▮, a French national, and according to CS # 8, ▮▮▮ had to pay personal fees directly to Minister OBIANG to engage in forestry exploration and harvesting in EG. When ▮▮▮ refused to pay him any further fees, it was no longer allowed to harvest timer in EG.

CS # 8 claims that ▮▮▮▮ told him/her that his company ▮▮▮, whose parent company was a French company ▮▮▮▮▮▮▮, was paying these fees to Minister OBIANG for at least 3 to 4 years prior to his arrival in ▮▮ 1996. The fees that were paid to harvest the timber to Minister OBIANG were based on weight. Once ▮▮▮ failed to pay the fees, Minister OBIANG had this company cease it operation and removed them from the country.

▮▮▮▮ told CS #8 that ▮▮▮ decided in May 1996 that it decided to take a "new direction" in terms of dealing with Minister Obiang. In other words, ▮▮▮ no longer wanted to make personal payments to him in exchange for being able to operate in EG. Because ▮▮▮ was refusing to make further payments to Minister OBIANG, he was no longer permitted to enter EG. CS #8 was going to replace him/her.

OFFICIAL USE ONLY
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE 5 |
|---|---|
| REPORT OF INVESTIGATION CONTINUATION | CASE NUMBER MI02PR07MI0018 |
| | REPORT NUMBER: 079 |

CS # 8 claimed that 10 days after ▓ arrived in EG, Minister OBIANG announced that a new tax would be imposed on all timber companies operating in EG. This tax would be paid to him personally. The amount of the tax was 6400 CFAs (approx. 10 euros) per cubic of wood that any company had ever harvested from EG. This was a new and retroactive tax calculated based upon the total volume of wood that a company had ever harvested from EG.

▓▓▓ then hired CS # 8 and sent him/her to EG under the company name of ▓▓▓. CS # 8 claims that the standard fees that companies pay in Africa are taxes, excise taxes and concession fees which include a specified area where the timer is located. However, in EG the only way a company can harvest timber is to have direct contact with Minister OBIANG and to pay him a fee of 80,000 euros everyone to 2 months. CS# 8 claims that he/she learned this from a man named ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ between ▓▓▓ and Minister OBIANG. After learning about these payments to OBIANG, CS # 8 contacted ▓▓▓ and asked him why the company had been previously making these payments to Minister OBIANG. ▓▓▓ responded by assuring CS # 8 that the company was not going to pay OBIANG anymore.

Once the timber was harvested, the company was required to pay a further fee to OBIANG for exporting the timber. This fee was calculated based upon cubic meters per log. CS # 8 described that once the timer/logs were harvested from the forests, the logs were place on a truck and transported to the port in Bata. There a government employee, a customs officer who works for Minister OBIANG, calculates the amount of timber harvested.

Based upon this calculation, the company would, then, pay certain personal fees to OBIANG to be permitted to export the timber. CS # 8 was not aware of how these fees were specifically paid or who received the payments but believes that the payments were made to Minister OBIANG's agents and representatives. These facts are based upon what CS # 8 said was his/her investigation of the company's past practices, as well as what ▓▓▓ and other company personnel told him/her about conducting business in EG.

Another ▓▓▓▓▓▓▓ called ▓▓▓▓▓▓ handled all of the logistical operations and support for ▓▓ company's EG operations. Personnel at ▓▓▓ ▓▓▓ also confirmed to CS # 8 that ▓▓▓ had been making such payments to

OFFICIAL USE ONLY
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE 6 |
|---|---|
| REPORT OF INVESTIGATION CONTINUATION | CASE NUMBER MI02PR07MI0018 |
| | REPORT NUMBER: 079 |

Minister OBIANG.

---

CS # 8 recalled that upon arriving to EG there were several companies who were involved in harvesting timber in EG. The first was an American company named AFRIAM who was also harvesting timber. The company was run by 3 Americans and 1 Cuban. The second company was an Italian company named AGROFORESTAL, the third company was a Spanish company named ABM who was harvesting timber since 1970 and lastly, a Philippine company who were from Valencia, Spain, who operated in EG for approximately 5 years.

CS # 8 began to travel within EG with a person by the name of ▓▓▓▓ ▓▓▓▓ to begin ▓▓ exploration of ▓▓▓▓ timber in the forest. CS # 8 described the timber in EG as being beautiful rich wood. CS #8 recalled seeing two bull dozers that were abandoned and no harvesting being done by ▓▓▓▓ After surveying the land and returning back to ▓▓ residence, ▓ was stopped by the police and arrested as a result of not having the proper documents to travel within EG. CS # 8 claimed he/she spent 1 day in jail until the ▓▓▓▓ authorities were successful in having ▓▓ released. A person by the name of ▓▓▓▓▓▓, who was CS #8's ▓▓▓▓▓▓▓▓▓▓ in EG, told CS #.8 not to re-enter the forest until they were able to provide him with the proper documents.

After 15 days of not being able to engage in the exploitation, CS # 8 sent a fax to ▓▓▓▓ who was in ▓▓▓▓ requesting what action the company want to undertake given his predicament. CS # 8 suggested to ▓▓▓▓ that ▓ would negotiate with ABM to work with them. ▓▓▓▓ denied this request from CS # 8. EG was not allowing CS # 8 to work until ▓▓ company paid 50 million CFAs (87,000 euros) in back taxes that was purportedly owed for customs duties and another 28 million CFAs for other purportedly official fees and dues that were owed. All of these fees were paid by ▓▓▓▓

But, CS # 8 claims even after paying all the back taxes and complying with all of the EG rules, several weeks passed and no exploration work was done or permitted to be done. Since CS #8's visa was scheduled to expire ▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.
The day after CS # 8 submitted the Visa application, CS # 8 was arrested for the second time and spent a day in jail.

OFFICIAL USE ONLY
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE 7 |
|---|---|
| REPORT OF INVESTIGATION CONTINUATION | CASE NUMBER MI02PR07MI0018 |
| | REPORT NUMBER: 079 |

After being released ▉ returned back to where he was living. Five days later, CS # 8 was approached by ▉▉▉▉▉▉▉▉▉▉ who told CS #8 that if CS # 8 does not leave EG now, CS # 8's ▉ daughters will become orphans. CS# 8 claims that he/she never met Minister OBIANG, but did run into Minister OBIANG at a nightclub in EG in 1996. CS# 8 insist that he/she was of the belief that Minister OBIANG was drunk and high on drugs and confronted CS # 8 and stated "?you are the new person for ▉▉▉, you are going to suffer here."

CS # 8 claims that the reason CS #8 was being threatened was because Minister OBIANG was not receiving the money which Minister OBIANG was demanding. Therefore, by having CS # 8 leave the country, Minister OBIANG would be able to misappropriate all of the equipment of the companies ▉▉▉▉▉▉▉▉ who had chosen not to pay Minister OBIANG. CS # 8 claimed that everyone who was working in the timber harvesting industry in EG knew that this was what Minister OBIANG was trying to accomplish. CS # 8 claims the local citizens, even the cooks at ▉ residence, were telling CS #8 that if they did not pay Minister OBIANG, he was going to take their forestry equipment and have his/her employees removed from the country. These EG nationals reiterated to CS # 8 that Teodorin was the law in Bata.

CS # 8 cited a specific example of a government employee who worked in the traffic division who informed CS # 8 that Minister OBIANG was going to take ▉▉ company's forestry equipment if Minister OBIANG was not paid. CS # 8 claimed that he/she never paid Minister OBIANG. Any and all demands for money were done by Minister OBIANG's agent, Vicente OBAMA. CS # 8 claimed that ▉▉ company had sent a mercenary to protect CS # 8 until all of the financial matters could be resolved because they were concerned for ▉▉ personal safety. CS # 8 claimed that the name of this person, who was from ▉▉▉▉▉▉▉▉▉▉. OBAMA never demanded any further money from CS # 8 directly, but told ▉▉ that CS # 8's company owed Minister OBIANG a significant amount of money.

Since CS # 8 was unable to resolve the financial issues between his/her company and Minister OBIANG, CS # 8 sent messages via facsimile to his/her employer. The employer responded by requesting CS # 8 to have ▉▉▉▉ contact the company. However, CS # 8 did not know what transpired between his/her company and ▉▉▉▉. CS # 8 claimed that he/she was solely in EG for exploration purposes.

OFFICIAL USE ONLY

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE 8 |
|---|---|
| REPORT OF INVESTIGATION CONTINUATION | CASE NUMBER MI02PR07MI0018 |
| | REPORT NUMBER: 079 |

ABM and the Filipino company were authorized at some point to work because they began paying Minister OBIANG the money he demanded. The only reason any company was authorized to harvest timber was due to the fact that they agreed to and paid Minister OBAING the money which he demanded. The general consensus of all the employees of timber companies in EG was if you did not pay Minister OBIANG, your company would not be able to work in EG. CS # 8 insists that no one would be able to work unless they paid Minister OBIANG, period.

But, even ABM was eventually forcibly removed from EG. Minister OBIANG ultimately demanded that ABM pay him 1.2 million Euros within 4 days or be ordered to leave the country. This personal tax was calculated based upon all of the timber ABM had ever extracted from EG. In other words, it was a retroactive tax. When AMB did not pay Minister OBIANG, armed police officials stormed into the business office and removed all of the company's employees from EG. Thereafter, ABM was no longer allowed to conduct further business in EG. After forcibly removing ABM from the country, Minister OBIANG seized all their equipment without any compensation.

Similarly, CS# 8 claims that when his/her company was forcibly removed from EG, all of their equipment was seized by Minister OBIANG. After being removed from the country, CS # 8 company had to pay a fee in order to get their equipment out of EG. CS # 8 learned about this from the mercenary named ████ who presently resides in ████. CS # 8 recalls that the ransom that was charged by Minister OBIANG was percent of the value of these hard assets. ████ negotiated with Minister OBIANG's representative to arrive at this figure.

However, the Filipino Company and a Lebanese company elected to pay these new taxes which were imposed and therefore, were authorized to continue harvesting timber. In fact, CS # 8 learned that the Lebanese company took over many of these harvesting concessions sometime in 2004.

CS # 8 is certain that Minister OBIANG was involved in every aspect of the of

OFFICIAL USE ONLY
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

OFFICIAL USE ONLY

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE 9 |
|---|---|
| REPORT OF INVESTIGATION CONTINUATION | CASE NUMBER MI02PR07MI0018 |
| | REPORT NUMBER: 079 |

the timber arena and after speaking with numerous other persons who worked in EG. There was no doubt that Minister OBIANG was making money within the timber industry but that Minister OBIANG did not directly earn this money.

CS # 8 claims that in his opinion, there are 3 persons who were aware of what had been transpiring in EG relating to the harvesting of timber, ▓▓▓▓, OBAMA, and ▓▓▓▓▓▓▓.

▓▓▓▓ was another mercenary who was responsible for protecting CS # 8.

CS # 8 recalled that on ▓▓▓▓ 1996, the following persons: ▓▓▓▓, OBAMA, ▓▓▓▓▓▓ and ▓▓▓▓▓▓▓ had a meeting with Minister OBIANG in Bata. The purpose of this meeting was to try to resolve the disputes with Minister OBIANG. CS # 8 was not invited to this meeting. ▓▓▓▓ and ▓▓▓▓ were from Gabon and worked in the timber industry in EG.

CS #8 characterized his former employer ▓▓▓▓ as a "thief" who lied to CS # 8 about all the problems that the company was facing with Minister OBIANG especially the undisclosed financial arrangements that they had with Minister OBIANG.

CS # 8 provided a copy of a letter that he wrote to his former employer, protesting his experiences in EG.

CS # 8 also provided letters that he had sent to his former employer expressing his disappointment for what he had to go through in EG and how ▓▓▓▓ was less than forthright about the true problems that were transpiring in EG.

The Investigation continues.

OFFICIAL USE ONLY
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.