# Exhibit

# 7

REQUESTED BY: MANZANARES, ROBERTO

OFFICIAL USE ONLY

| DEPARTMENT OF HOMELAND SECURITY ICE | TECS ACCESS CODE 3 |
|---|---|
| REPORT OF INVESTIGATION | PAGE 1 |
| | CASE NUMBER MI02PR07MI0018 |

TITLE: TEODORO NGUEMA OBIANG, ET. AL OFFICIALS EQUATORIAL GUINEA

CASE STATUS: INTERIM RPT

| REPORT DATE | DATE ASSIGNED | PROGRAM CODE | REPORT NO. |
|---|---|---|---|
| 081712 | 111506 | YA1 | 083 |

RELATED CASE NUMBERS:

COLLATERAL REQ:

TYPE OF REPORT:
INITIAL SOURCE DOCUMENT/ INVESTIGATIVE FINDINGS

TOPIC: INTERVIEW OF CHRISTOPHER KERNAN

SYNOPSIS:
On November 13, 2006, Agents assigned to the Homeland Security Investigation (HSI) Foreign Corruption Investigations Group initiated a criminal inquiry into the financial activities of Minister Teodoro Nguema OBIANG (Minister OBIANG). It is alleged that Minister OBIANG is diverting funds allocated to the government of Equatorial Guinea (EG) for his own personal use. Minister OBIANG is currently the Minister of Agriculture and Forestry in EG.

HSI is investigating Minister OBIANG for money laundering statutes. OBIANG purchased a mansion valued at $32 million dollars despite having a reported government salary of $60,000 annually. Additionally, he purchased an aircraft for $38 million dollars. Minister OBIANG asserts his wealth is the result of his private businesses which are involved in lumber and road construction. EG officials are purportedly permitted to engage in private businesses and authorized to have government contracts as long as the official isn't involved in the "day to day" operations or management of the business.

| DISTRIBUTION: SACMI | SIGNATURE: MANZANARES ROBERTO SPECIAL AGENT |
|---|---|
| | APPROVED: RUTHERFORD ROBERT N QI GRP SUPERVISOR |
| | ORIGIN OFFICE: MI MIAMI, FL - SAC | TELEPHONE: 305 597 6000 |
| | | TYPIST: MANZANARES |

OFFICIAL USE ONLY

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

DOJ_0012511

OFFICIAL USE ONLY

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br>REPORT OF INVESTIGATION<br>CONTINUATION | PAGE   2 |
|---|---|
| | CASE NUMBER MI02PR07MI0018 |
| | REPORT NUMBER: 083 |

CASE PROGRAM CODES:

YA1 Financial Other/Corn    7H0 FOREIGN CORRUPTION    2FJ SHELL CORPORATIONS

OFFICIAL USE ONLY

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

OFFICIAL USE ONLY

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE 3 |
|---|---|
| REPORT OF INVESTIGATION CONTINUATION | CASE NUMBER MI02PR07MI0018 |
| | REPORT NUMBER: 083 |

DETAILS OF INVESTIGATION:

On November 13, 2006, Agents assigned to the Homeland Security Investigations (HSI) Foreign Corruption Investigations Group initiated a criminal inquiry regarding the financial activities of Minister Teodoro Nguema OBIANG (Minister OBIANG). It is alleged that Minister OBIANG is diverting funds allocated to the government of Equatorial Guinea (EG) for his own personal use. Minister OBIANG is currently the Minister of Agriculture and Forestry in EG and is the son of the President.

On September 20, 2011, Christopher KERNAN, Conservation International was interviewed telephonically by U.S. Department of Justice, Criminal Division Asset Forfeiture & Money Laundering (AFMLS) attorney, Woo Lee and Edward E. Bishop, Jr., Senior Contract Investigator, AFMLS, DOJ Criminal Division.

KERNAN was asked about his knowledge of the Government of Equatorial Guinea ("Government") in conducting its affairs and allegations of corruption. Lee advised Kernan of our identities and roles as members of the DOJ Kleptocracy Initiative. KERNAN agreed to speak to us and provided the following information:

1. He was employed by Conservational International ("CI").
2. He was the Country Program Director for CI covering Equatorial Guinea ("EG") and Gabon for five years from 2004 through 2009. From 2006 through 2009 he resided in and was based in Bata.
3. CI is a worldwide organization that assists countries in global hot spots of diversified issues. CI was a contractor to USAID under CAPRE its project focused on:
a. Management of natural resources,
b. Endangered species of rare primates on the Bioka Island,
c. Endangered species impacted by the forestry deforestation on the mainland,
d. Technical support to the EG government,
e. Preparation of a report on a study of a European Union ("EU") funded project involving the implementation of a forest reserve in EG.
4. The study of the EU project revealed a good plan on paper; however, functionally the plan was not run well at all. Under the plan a national forest reserve was negotiated and created, allowing controlled timber concessions. The plan was to be administered by the government in coordination with the Department of Environmental Studies of the university in EG, and it addressed forestry and environmental concerns. The plan really never was implemented due to issues of who had authority under the plan, was improperly funded, and was understaffed.
5. The deforestation issues in EG became so much of a concern that the

OFFICIAL USE ONLY

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

DOJ_0012513

OFFICIAL USE ONLY

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br>REPORT OF INVESTIGATION<br>CONTINUATION | PAGE 4 |
|---|---|
| | CASE NUMBER MI02PR07MI0018 |
| | REPORT NUMBER: 083 |

government issued a ban on the export of timber in log form in 2008. Kernan observed huge stacks of logs on the dock of the port of Bata prior to the ban being issued, and he saw little to nothing of logs on the dock after the ban was issued.

6. Kernan visited the forests in the rural area of EG and saw few ministry staff in the field, meaning he saw few government officials in the forest enforcing the laws. This was due to a lack of transportation and resources for these officials. While in the forests, Kernan observed a tremendous amount of waste and abuse by loggers.

7. Kernan and John Palmer, retired U. S. Forestry Service, met with individuals who owned private lands in EG and who had been logging their land for approximately twenty years. One individual told them he "owned" his land, and they could look at the land records to identify his name.

8. Kernan looked at a number of timber concessions and saw no indications of ministry oversight and governance.

9. There were as many logging roads as the logging companies wanted to build and use, and there was no consideration for the impact on deforestation, the environment, and the people of EG. Foresstry law was not followed or enforced.

10. Kernan was provided the following information by technicians of the Ministry of Agriculture, Forestry and Environment:

a. The land on which forests grew is owned by the Government of EG, individuals, or communities. Timber rights allow for ownership of the timber. Concessions granted by Teodoro Nguema Obiang ("TNO"), the Ministry of Agriculture, Forestry and Environment, provided the right of harvesting the timber in an area covered by the concession. Before companies received a concession, they paid Obiang a fee.

b. Most concessions were given by TNO when he needed cash, and these were given either to Shimmer International ("Shimmer") or to local logging companies as contractors for Shimmer. Shimmer worked through contractors and never used their own equipment or their own employees.

c. Many of the communities in the rural area of EG had timber rights or extraction rights on community forests. Logging companies bought the timber rights from the local council communities that owned the land.

d. There were suppose to be logging restrictions on concessions under the laws of Equatorial Guinea; however, no one paid any attention to them.

e. A tax was placed on harvested wood and was only paid when the logs arrived on the docks of the port in Bata. Ministry technicians who worked in the port of Bata overseeing the logging export operations told Kernan that logging companies paid bribes to TNO at the rate of 15,000 CFAs per log in order for their logs to be exported. TNO had to personally sign export licenses.

f. Representatives of logging companies became very upset with TNO for the delay in logging exports from the Bata port because either:

i. They would not make the bribe payments to TNO resulting in the logs

OFFICIAL USE ONLY
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

DOJ_0012514

OFFICIAL USE ONLY

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br>REPORT OF INVESTIGATION<br>CONTINUATION | PAGE     5 |
|---|---|
| | CASE NUMBER MI02PR07MI0018 |
| | REPORT NUMBER: 083 |

sitting on the dock until payment was made, or
ii. TNO not being available to sign the logging export documents.  TNO required that he sign all documents relating to exports.  He was usually unavailable and out of the country in Paris, California, or elsewhere.  He was only available for a month or two at a time.  Kernan observed stacks of logs on the docks of the Bata port awaiting shipment.
11. The value of each log depended upon the species and grade of the timber.  Pricing was set by the Ministry of Agriculture, Forestry, and Environment, and the ministry assisted communities in the direct sales of logs.  The ministry also provided a price list which was normally $.50 per log lower than the price of logs at the Bata port.
12. Kernan advised that it was difficult to have a business in EG if a company did not have an Obiang family connection.  Therefore, companies recruited a member of the family to be on their board of directors and companies entered into joint ventures with EG owned companies.  As an example of this, Kernan recalled asking the operator of a primary plywood mill who owned the mill, and he was told Obiang was the owner.  Kernan could not recall which Obiang the operator referred to.
13. Kernan recalled that right before the logging ban became law in 2008 there were a lot of logs from the mainland stacked on the docks of the Bata port for export.  These logs came from the forest area just outside and southeast of the Monte Alen National Park.
14. Kernan has never heard of companies called Sofona or Socage.  He recalled seeing the name Somagui and will look in his records to see if he has any information on this company.
15. "TNO Enterprises" is on a 14 story office building where the Bank of Equatorial Guinea is located, and Kernan advised the building is owned by TNO.  TNO also owns other buildings along the waterfront.  TNO has a personal compound in Bata.  Kernan has observed TNO driving his luxury vehicles in EG.
16. TNO funds an annual music festival in Bata where African bands perform.  These bands are usually ones that TNO has seen in the travel throughout Africa.
17. Kernan has met TNO on occasions.  He described TNO as a poorly educated person who has difficulty expressing himself.  TNO has a violent temper and has struck other ministers in meetings.  TNO is not a businessman and never showed up for any meetings.  The professional employees, individuals who care about their job and would like to see an improvement to their government, do not like TNO because he does not treat them well and he makes arbitrary appointments within the ministry of his friends and those loyal to him.
18. TNO uses funds from concessions of EG's timber resources he awards as his personal money.
19. Corruption is throughout the EG government.  An individual named "Cleito", a representative of the Permanent Secretary Office in Bata, is open about taking payoffs.  Cleito was responsible for issuing various permits, including travel permits.  Travel permits are required for travel outside of

OFFICIAL USE ONLY

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.


OFFICIAL USE ONLY

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE 6 |
|---|---|
| REPORT OF INVESTIGATION CONTINUATION | CASE NUMBER MI02PR07MI0018 |
| | REPORT NUMBER: 083 |

Bata if one is not from EG. Kernan needed to obtain a travel permit to visit the forests and went to Cleito to obtain the permit. Cleito told Kernan he was "hungry and needed to be feed", meaning he wanted to be paid before he issued the permit. Cleito asked Kernan for 10,000 (USD or CFAs), and Kernan told him he has USAID money and, "No."
20. The society of EG is structured around tribes and clans.
21. While Kernan was living in EG, he saw the impact of timber revenue on the EG economy go from four percent to being dwarfed by oil and infrastructure. He saw a significant increase in the construction of roads and buildings in Bata and Malabo, and roads throughout EG were constructed or newly paved. When he first arrived, a drive from Bata to the Gabon border took 14 hours. When he left, the drive took four to four-half hours.
22. Construction companies were primarily Chinese, Spanish and French with the most being Chinese.
23. A road construction company in EG is owned by Constancia Nsue, TNO?s mother, and Obiang.
24. Kernan advised EG had significant deforestation issues and observed them through his travel throughout EG. He saw what were once vibrant communities and villages that were boarded up and the people were no longer in the rural area. Urbanization had become the focus of the government. Forests laid in waste from the random methods used to extract the logs. Environmental and wildlife problems existed. Kernan cautioned that deforestation reports that were based on satellite imaging were unreliable. To really understand the issues, one had to go into the forests and see them.
25. Francisca Eme, director of the forest protective agency, INDEFOR, was as corrupt as Obiang. When Kernan's USAID vehicle arrived at the Bata dock, she stole it and used it. Kernan had to make other travel arrangements to get around EG.

Investigation continues.

OFFICIAL USE ONLY
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.