# Exhibit

# 8

REQUESTED BY: MANZANARES, ROBERTO

OFFICIAL USE ONLY

| DEPARTMENT OF HOMELAND SECURITY ICE<br>REPORT OF INVESTIGATION | TECS ACCESS CODE 3<br>PAGE 1<br>CASE NUMBER MI02PR07MI0018 | | |
|---|---|---|---|
| TITLE: TEODORO NGUEMA OBIANG, ET. AL OFFICIALS EQUATORIAL GUINEA | | | |
| CASE STATUS: INTERIM RPT | | | |
| REPORT DATE<br>032612 | DATE ASSIGNED<br>111506 | PROGRAM CODE<br>YA1 | REPORT NO.<br>076 |
| RELATED CASE NUMBERS: | | | |
| COLLATERAL REQ: | | | |
| TYPE OF REPORT:<br>INITIAL SOURCE DOCUMENT/ INVESTIGATIVE FINDINGS | | | |
| TOPIC: INTERVIEW OF CS#6 | | | |

SYNOPSIS:

On November 13, 2006, Agents assigned to the Homeland Security Investigation (HSI) Foreign Corruption Investigations Group initiated a criminal inquiry into the financial activities of Minister Teodoro Nguema OBIANG (Minister OBIANG). It is alleged that Minister OBIANG is diverting funds allocated to the government of Equatorial Guinea (EG) for his own personal use. Minister OBIANG is currently the Minister of Agriculture and Forestry in EG.

HSI is investigating Minister OBIANG for money laundering statutes. OBIANG purchased a mansion valued at $32 million dollars despite having a reported government salary of $60,000 annually. Additionally, he purchased a an aircraft for $38 million dollars. Minister OBIANG asserts his wealth is the result of his private businesses which are involved in lumber and road construction. EG officials are purportedly permitted to engage in private businesses and authorized to have government contracts as long as the official isn't involved in the operations or management of the business.

| DISTRIBUTION: | SIGNATURE: | | |
|---|---|---|---|
| SACMI | MANZANARES ROBERTO SPECIAL AGENT | | |
| | APPROVED:<br>RUTHERFORD ROBERT N OI GRP SUPERVISOR | | |
| | ORIGIN OFFICE: MI<br>MIAMI, FL - SAC | TELEPHONE: 305 597 6000<br>TYPIST: MANZANARES | |

OFFICIAL USE ONLY

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

OFFICIAL USE ONLY

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>REPORT OF INVESTIGATION<br>CONTINUATION | PAGE 2<br><br>CASE NUMBER MI02PR07MI0018<br><br>REPORT NUMBER: 076 |
|---|---|

CASE PROGRAM CODES:

YA1 Financial Other/Corn 7H0 FOREIGN CORRUPTION 2FJ SHELL CORPORATIONS

OFFICIAL USE ONLY

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>REPORT OF INVESTIGATION<br>CONTINUATION | PAGE 3<br>CASE NUMBER MI02PR07MI0018<br>REPORT NUMBER: 076 |
|---|---|

DETAILS OF INVESTIGATION:

On November 13, 2006, Agents assigned to the Homeland Security Investigations (HSI) Foreign Corruption Investigations Group initiated a criminal inquiry regarding the financial activities of Minister Teodoro Nguema OBIANG (Minister OBIANG). It is alleged that Minister OBIANG is diverting funds allocated to the government of Equatorial Guinea (EG) for his own personal use. Minister OBIANG is currently the Minister of Agriculture and Forestry in EG and is the son of the President.

On November 17 and 18, 2011, CS # 6 was interviewed at the U.S. Embassy, [redacted] by HSI Special Agents, Robert Manzanares and Carlos Figueroa. Additionally, U.S. Department of Justice, Criminal Division Asset Forfeiture & Money Laundering attorney, Woo Lee and Foreign Service National Investigator, Dario D'Andrea served as a translator from English to [redacted].

After being apprised of the nature of the investigation, CS # 6 agreed to be interviewed. CS # 6 was educated in [redacted]

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

OFFICIAL USE ONLY

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE 4 |
|---|---|
| REPORT OF INVESTIGATION CONTINUATION | CASE NUMBER MI02PR07MI0018 |
| | REPORT NUMBER: 076 |

███████████████████████████████, Igor approached CS # 6 again and informed him the he had started working for a new construction company named GERNERAL WORKS ITALIA (GW). This business was in Equatorial Guinea (EG). Igor claimed he was making a lot of money. GW also had some operations in Italy south of Rome. Igor sought to recruit CS # 6 on behalf of GW.

On or about ███████████, Igor returned to CS # 6 and offered him a job ███ ████████████████████████ of GW in EG. CS # 6 agreed to listen to the offer but wanted to view the scope of the work and travelled to EG. CS # 6 described his first visit to EG, specifically ██████████, as a poorly developed country that did not have an airport. There was nothing on Annabon Island except for dirt. GW was building everything, including an air field. Igor held the position of CEO and he had approximately 40 to 50 local workers working for the company. CS # 6 recalled that he was introduced to E.G. Minister Marcelino ATUUNO who had a good relationship with Igor. While at dinner one night, ATUUNO told CS # 6 that after the country discovered oil, the country was in a position to develop its infrastructure and that GW stood to make a lot of money. After CS # 6's initial meeting he returned back to ████ and spoke with his family about the employment opportunity that was presented to him in EG.

On ████████████, CS # 6 moved to EG and began to ████████████ ██████████████ while Igor was responsible for supervising the laborers. CS # 6 served as the ██████████ of the company. Aside from some local natives, GW's staff was comprised of mostly Lebanese and Egyptians. As the business began to flourish, additional staff was added.

CS # 6 insisted that the President of EG runs everything in the country and his son, Minister OBIANG was uneducated and lived in the presidential palace and was a frequent user of cocaine. GW assisted in the construction of Minister OBIANG's home in EG. No one was ever allowed entry inside the home. Minister OBIANG was extremely protective of his residence. The residence was a brick building which CS # 6 described as having 3 floors, a pool with several automobiles consisting of Hummers and Ferraris.

CS # 6 recalled that Minister OBIANG would frequently approach CS # 6 to ███ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████. This was also how CS # 6 first came to know Minister OBIANG. ████████████████████████████ documents that were ███████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████

OFFICIAL USE ONLY
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

[redacted]).

CS # 6 insists that although the family of the president may not be educated, they are not "stupid." There is always a middle man involved when working with this family. For example, CS # 6 claims that Minister OBIANG and/or his middle-men, [redacted]) would approach CS # 6 and insist that a paved road was needed to be constructed to Minister Obiang's home or for the timber companies that needed to harvest the trees that Minister OBIANG controlled.

Minister OBIANG's timber companies, which, according to CS # 6, only existed on paper and had no real personnel or operations, did not have the ability to pave roads and therefore, GW had to complete projects for them. These work projects were a means for Minister OBIANG to steal money from the E.G. treasury. GW provided kickbacks to Minister OBIANG for various contracts, which were highly inflated at Minister OBIANG's direction. These inflated contracts were the principal vehicle through which Minister OBIANG stole money from the E.G. government's treasury.

For instance, CS # 6 explained that if the real cost of a construction project was 2 million dollars, Minister OBIANG would instruct GW to prepare and submit a project invoice to the E.G. Government for 10 million dollars so that he (Minister OBIANG) could receive a "kick back" of 8 million dollars. Therefore, once GW was paid by the EG treasury for this inflated amount, GW prepared a blank check or bearer check that was deposited into CCEI bank in EG in an account controlled by Minister OBIANG or one of his "paper" companies. If GW did not comply with these requests from Minister OBIANG, CS # 6 claims GW would have been kicked out of the country. At first, Minister OBIANG's requests for kickbacks and money was modest. Over time, his demands became more and more outrageous in terms of how much he wanted to steal from the E.G. government.

CS # 6 described how contracts awarded in E.G. were done so on a highly inflated and fraudulent basis. For instance, a hospital was built by GW for 200 million CFAs because the President wanted GW to build it and the other competitors knew that the President wanted GW to do the job. As the construction began, GW would get an advance for 1.2 million CFAs and a second advance for 2.3 million CFAs from the government. The initial advances were nominal but eventually the cost of the project would explode to well over 40% above what was originally contemplated in the contract.

GW received payments from the EG Government by way of a wire transaction. CS # 6 claims that he was in possession of many of the invoices for GW and is willing share these documents to U.S. investigators.

GW was the largest construction company in EG. There was another company

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

OFFICIAL USE ONLY

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>REPORT OF INVESTIGATION<br>CONTINUATION | PAGE 6<br>CASE NUMBER MI02PR07MI0018<br>REPORT NUMBER: 076 |
|---|---|

which was operated with the President's wife name ECOSA and was managed by Serbians. Minister OBIANG was protected by his mother as the President is well aware of the embarrassment that Minister OBIANG has created for him and his family.
The reason why the GW received most of the contacts in E.G. was because Igor had been traveling to EG prior to 1994 when oil was discovered. Prior to the discovery of oil, sometime between 1995 and 1996 which was prior to Minister OBIANG's appointment Forestry Minister in E.G., President Obiang gave Igor the opportunity to run the timber companies in E.G.

Thereafter, the President gave Igor a contract to build a road from the airport to the port in Malabo. When this was offered to GW, this was when Igor sought [redacted].

Aside from earning money from granting timber concessions to foreign loggers and the harvesting of timber by foreign logging companies, Minister OBIANG controlled the exports of all timber from EG. The companies that were harvesting these logs were usually from China or Malaysia. These companies had to pay Minister OBIANG to work in E.G. and to export their logs.

CS # 6 claims that Minister OBIANG also had a beer and brick-making factory that he generates some money from but he is not familiar with these companies. In contrast with Somagui and Socage, which are not real companies, the beer and brick companies actually had real operations. However, CS # 6 was not sure if these entities were profitable. CS # 6 claims that these companies do in fact make beer and manufacture brinks. The beer company was formulated sometime in 2004 while the brick company was in 1999.

Minister OBIANG not only made money from the timber that was being harvested but he also made money from the timber which was exported. Minister OBIANG charged people to export their logs out of E.G. CS # 6 claims that this money went directly and personally to Minister OBIANG and not to EG.

CS # 6 claims that Minister Obiang also made money from collecting personal import dues from companies importing goods into E.G. CS # 6 knows this because [redacted] was aware that GW was responsible for paying fees personally to Minister OBIANG (and his associates) for any and all imports GW brought into E.G. through the Port of Bata. For example, if GW needed vehicles for their projects, there were two types of fees that had to be paid by G.W. The first was an official import tax paid to the general revenue service of the government. The second, however, was a personal fee paid to Minister OBIANG. These fees were given by GW to a person names [redacted] who was directly working for Minister OBIANG. [redacted] was paid approximately 200 thousand CFAs per week by GW for his work with Minister OBIANG. [redacted] was

OFFICIAL USE ONLY
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

DOJ_0012463

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE 7 |
|---|---|
| REPORT OF INVESTIGATION CONTINUATION | CASE NUMBER MI02PR07MI0018 |
| | REPORT NUMBER: 076 |

paid by GW approximately 2000 euros per month. CS # 6 explained that because Minister OBIANG did not want to pay [redacted] and [redacted] wages; GW was forced to do so.

There were two primary ports of entry in E.G., Malabo and Bata. The Port of Bata, which was under Minister OBIANG's personal and direct control, was monitored by an E.G. soldier. This soldier would keep track of shipments entering Bata and would assess what import fees were owed by each company on a monthly basis. Eventually, someone would contact GW and inform them that they owed a certain amount of money for imports/exports. A bearer check would be written and given to Minister OBIANG or his associates by GW.

CS # 6 claims that Igor, at one point in time, was approached by [redacted] and asked to prepare fraudulent balance sheets for one of Minister OBIANG's business. These statements may have been sent for certification in [redacted] to make it appear that these paper companies, owned by Minister Obiang, were legitimate businesses. CS # 6 claims that the financial data on these documents were fabricated, as was the certification of the company?s balance sheets. CS # 6 reiterated that Minister OBIANG's companies were paper companies that had no employees and no real operations. SOMGUI or SOCAGE did not have any employees and someone else did the work relating to timber and construction.

In or around [redacted] Igor approached CS # 6 about a proposal that was initiated by President OBIANG to purchase all the shares of GW. Igor wanted to use the proceeds to purchase an oil well station. Igor tried to persuade CS # 6 that this was a viable venture because of documents that Igor received from a French Company which showed that the President's son, Gabrielle Obiang could not be trusted.

President OBIANG described a Lebanese man who held a special counselor role within the President's administration wherein he controlled all levels of his administration and would offer political and financial advice to the President by the name of HASSAN who was Lebanese. [redacted]

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>REPORT OF INVESTIGATION<br>CONTINUATION | PAGE 8 |
|---|---|
| | CASE NUMBER MI02PR07MI0018 |
| | REPORT NUMBER: 076 |

[redacted]

OFFICIAL USE ONLY
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>R E P O R T  O F  I N V E S T I G A T I O N<br>C O N T I N U A T I O N | PAGE 9<br>CASE NUMBER MI02PR07MI0018<br>REPORT NUMBER: 076 |
|---|---|

CS # 6's impression of President OBIANG was that he was a brilliant man who studied in Spain, who was a politician and was in the military and was responsible for killing many people at the direction of his uncle. The country was very poor when he overthrew h is uncle and after the discovery of oil he became greedy.

CS # 6 insists that the President was behind the death of Igor [redacted] and was a dangerous person. The reason why he was talking to the U.S. government was because he has been working with law enforcement over the last several years and has developed a sound relationship. Law enforcement has asked that he cooperate with U.S. authorities in our investigation. Additionally, he lost over 250 million CFAs since working in EG.

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

OFFICIAL USE ONLY

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>REPORT OF INVESTIGATION<br>CONTINUATION | PAGE 10<br>CASE NUMBER MI02PR07MI0018<br>REPORT NUMBER: 076 |
|---|---|

CS # 6 claims on one occasion, he personally contacted the head of Ferrari about a vehicle that Minister OBIANG wanted to purchase in the United States which was yellow in color with black interior and CS # 6 claims that GW made a payment of $100,000 on behalf of Minister OBIANG. Although the car was titled under Minister OBIANG, the payment came from GW. This is one of the types of requests made by Minister OBIANG. Minister OBIANG made these demands frequently.

CS # 6 insisted that he would meet with U.S. investigators again within one month after reviewing look his records and he stated he was willing to share these documents with investigators.

Investigation continues.

OFFICIAL USE ONLY
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.