# Exhibit

# 9

REQUESTED BY:  MANZANARES, ROBERTO
O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | TECS ACCESS CODE 3 |
|---|---|
| R E P O R T   O F   I N V E S T I G A T I O N | PAGE     1 |
| | CASE NUMBER MI02PR07MI0018 |

| TITLE: TEODORO NGUEMA OBIANG, ET. AL OFFICIALS EQUATORIAL GUINEA |
|---|

| CASE STATUS:     INTERIM RPT |
|---|

| REPORT DATE 032812 | DATE ASSIGNED 111506 | PROGRAM CODE YA1 | REPORT NO. 078 |
|---|---|---|---|

RELATED CASE NUMBERS:

COLLATERAL REQ:

TYPE OF REPORT:
INITIAL SOURCE DOCUMENT/   INVESTIGATIVE FINDINGS

TOPIC: INTERVIEW OF CS # 7 IN ███████, ███████

SYNOPSIS:
On November 13, 2006, Agents assigned to the Homeland Security Investigation (HSI) Foreign Corruption Investigations Group initiated a criminal inquiry regarding the financial activities of Minister Teodoro Nguema OBIANG (Minister OBIANG). It is alleged that Minister OBIANG is diverting government funds Equatorial Guinea (EG) for his own personal use. Minister OBIANG is currently the Minister of Agriculture and Forestry in EG.

HSI is investigating Minister OBIANG for violation of money laundering statutes. Minister OBIANG purchased a mansion valued at $30 million dollars despite having a reported salary of $60,000 annually. He also purchased a Gulfstream aircraft for $38 million dollars. Minister OBIANG asserts his wealth is the result of his private businesses which are involved in lumber and road construction. In EG officials are permitted to engage in private businesses so long as the official involved isn't actively involved in the "day to day" operations of the business.

| DISTRIBUTION: SACMI | SIGNATURE: MANZANARES     ROBERTO          SPECIAL AGENT |
|---|---|
| | APPROVED: FLORES          DANIEL          SPECIAL AGENT |
| | ORIGIN OFFICE: MI MIAMI, FL - SAC | TELEPHONE: 305 597 6000 |
| | | TYPIST: MANZANARES |

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE    2 |
|---|---|
| R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | CASE NUMBER MI02PR07MI0018 |
| | REPORT NUMBER: 078 |

CASE PROGRAM CODES:

YA1 Financial Other/Corn   7H0 FOREIGN CORRUPTION    2FJ SHELL CORPORATIONS

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

DOJ_0012476

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE    3 |
|---|---|
| | CASE NUMBER MI02PR07MI0018 |
| R E P O R T   O F   I N V E S T I G A T I O N C O N T I N U A T I O N | REPORT NUMBER: 078 |

DETAILS OF INVESTIGATION:

On November 13, 2006, Agents assigned to the Homeland Security Investigation (HSI) Foreign Corruption Investigations Group initiated a criminal inquiry regarding the financial activities of Minister Teodoro Nguema OBIANG (Minister OBIANG). It is alleged that Minister OBIANG is diverting funds allocated to the government of Equatorial Guinea (EG) for his own personal use. Minister OBIANG is currently the Minister of Agriculture and Forestry in EG and is the son of the dictator.

HSI is investigating Minister OBIANG for violation of money laundering statutes. OBIANG purchased a Beverly Hills mansion valued at $30 million dollars despite having a reported government salary of $60,000 annually. Additionally, he purchased a Gulfstream aircraft for $38 million dollars. Minister OBIANG asserts his wealth is the result of his private businesses which are involved in lumber and road construction. In EG officials are permitted to engage in private businesses and authorized to have government contracts as long as the official involved isn't actively involved in the "day to day" operations of the business.

On February 29 and March 1, 2012, CS # 7 was interviewed at the U.S. Embassy, ████, ████ by HSI special agents, Robert Manzanares and Steven Ussher. Also present was U.S. Department of Justice, (DOJ) Criminal Division Asset Forfeiture & Money Laundering attorney, Woo Lee, Foreign Service Officer Dario D'Andrea who served as a translator from English to ████. Additionally, CS # 7 was represented by his attorney ████ ████ who was also present.

CS # 7 was previously interviewed by agents in November 2011 in London, England and he was aware of the nature of the investigation, CS # 7 and his attorney agreed to be interviewed.

CS # 7 was presented with a proffer letter, (Agents notes: letter is attached to ROI 78), and upon examination, Ms. ████ requested that paragraph numbers 4 and 9 be deleted prior to executing. DOJ attorney Lee explained and reviewed the proffer letter paragraph by paragraph with ████. Lee explained that he was not authorized to remove paragraphs 4 and 9 unless it was authorized by upper management of DOJ in Washington, DC. Lee explained that the choice of signing the Proffer letter was completely voluntary. ████ agreed to go forward with the interview without signing the letter. Both Lee and the HSI agents emphasized that it was imperative that CS # 7 answer questions truthfully and the U.S. government was most interested in learning the unvarnished truth of what CS # 7 saw, heard and experienced

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

OFFICIAL USE ONLY

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE    4 |
|---|---|
| | CASE NUMBER MI02PR07MI0018 |
| R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | REPORT NUMBER: 078 |

during his/her time in EG.  CS # 7 agreed that the information provided would be the truth.

Ms. ▮▮▮▮▮▮ requested that her client's name not be disclosed prior to trial and should there be a public trial, she wanted some level of protection for CS # 7 to include a United States lawful permanent card and some type of U.S. affiliation because President OBIANG respects the U.S. and would not harm anyone who had this form of distinction.   Lee advised CS # 7 that these were requests that the United States may not be able to accommodate but that he would make inquiries.  Furthermore, Lee advised CS # 7 that his/her identity could likely come out prior to trial because of U.S. discovery rules.  While his/her identity may be protected if there was a risk to his/her security, this decision was ultimately going to be in the hands of the court.  ▮▮▮▮▮▮ acknowledged that she understood these issues and agreed to proceed with the interview.

Since our last meeting in London, England, CS # 7 claims that ▮ has had the opportunity to review documents that he has in his possession relating to government contract fraud by Minister OBIANG relating to the submission of fraudulent contracts and inflated invoices to the EG government by Obiang through General Works.

CS # 7 recalled, for instance, that he/she was asked to ▮▮▮▮▮▮



y.  More importantly, CS # 7 is in possession of bank statements of two of OBIANG's companies named SOCAGE and SOMGUI.

These bank statements were provided to CS # 7 by a CCEI bank director for the purpose of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ CS # 7 claims that after he/she prepared the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, he/she was told it was later certified by a company in ▮▮▮▮▮▮▮▮▮▮▮▮.  CS # 7 insists that he/she believes that the ▮▮▮ may have been involved in requesting these documents but he/she was not sure.  CS # 7 claims he/she has not seen but would like to see the final version of the ▮▮▮▮▮▮▮▮▮▮ which he/she helped prepare.

Additionally, CS # 7 showed original check stub banking records that show hundreds of payments to "TEO" and "▮▮▮▮," who was a middleman for Minister OBIANG, by General Works.  These check stubs were from General Works' business records.  The check stubs showed check numbers, who the checks were

OFFICIAL USE ONLY

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

OFFICIAL USE ONLY

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | PAGE    5 |
|---|---|
| | CASE NUMBER MI02PR07MI0018 |
| | REPORT NUMBER: 078 |

made out to, the amount of the checks, and a handwritten signature by the person at General Works who authorized the payment at issue. These check stubs constitute all of the checks written by General Works for a period of several years, ▓▓▓▓▓▓. CS #7 identified the signatures on the check stubs as those of either CELOTTI or CS # &. CS # 7 claims he/she has ▓▓▓▓▓▓ bank statements of General Works to support his/her claim that these checks were actually disbursed and cashed but does not have these statements available at the time of this meeting. He/She also said that he/she does not have access to the actual cancelled checks, as they would be in the possession of the relevant financial institu
tions.

CS # 7 claims that all of the employees who were employed by General Works were paid in cash and therefore any checks that were written by General Works for "▓▓▓▓," who was on General Work's payroll, were in reality for Minister OBIANG. Even though ▓▓▓ performed no services or work for General Works, and was in actuality an agent of Minister OBIANG, General Works was required to pay ▓▓▓ a regular salary in cash, as if he were an employee. Any checks that were written to Minister OBIANG himself were written to the bearer and were bearer checks that could be cashed by anyone who was in possession of them. The amounts of these bearer checks were often so large the bearer could not possibly retrieve that amount of cash/currency from the bank. CS # 7 said that this money had to be transferred to one of Minister OBIANG's accounts.



CS # 7 also described how he/she ▓▓▓▓▓▓ contracts between General Works and one of OBIANG's companies named SOCAGE. For example, CS # 7 showed one such contract issued by the EG government. This particular contract was executed on behalf of SOCAGE by another middle-man of Minister OBIANG named ▓▓▓▓▓▓.' CS #7 described that even though 'Minister Obiang's companies, like Socage, would be listed as a purported subcontractor of General Works in performing various government construction projects, these companies did not actually exist (except on paper). These entities were vehicles through which Minister OBIANG could steal and receive payment from the EG government (through General Works) pursuant to some kind of inflated and fraudulent public contract. The actual work described in these contracts, and which were suppose to be performed by Minister OBIANG's companies, were in actuality performed by General Works' construction crews. In describing the flow of money, CS #7 said that GE Projects, a state agency in charge of overseeing government contracts, would issue a government civil engineering

OFFICIAL USE ONLY

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

| | |
|---|---|
| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | PAGE      6<br><br>CASE NUMBER MI02PR07MI0018<br><br>REPORT NUMBER: 078 |

or construction contract to General Works.

General Works would then receive payment from BEAC, EG's central bank, pursuant to an instruction from GE Projects authorizing such a payment. General Works would then pay a portion of those fees to Minister OBIANG's fictional companies pursuant to some kind of sham subcontract drawn up between these fictional companies and the EG government or General Works. CS # 7 has ▓▓▓▓▓ documents to both of Minister OBIANG's middle-men which corroborate his/her version of what transpired between ▓▓▓▓▓▓▓ and OBIANG.

CS # 7 recalled an incident with the bank director of CCEI who oversaw Minister OBIANG's money. One day, OBIANG called the bank director and ordered the bank director to transfer a large sum of money to an account in OBIANG's name or control. But Minister OBIANG did not have sufficient funds in his accounts to perform the transaction. The bank director was so fearful that he went to General Works' offices and told CS # 7 what had transpired. As a result of this, the bank director spent the night there in fear for his life. The next day, CS # 7 transferred money from General Works into Minister OBIANG's account so that the money could be transferred, as instructed by Minister OBIANG. CS # 7 claims that he/she has copies of the wire transfers to corroborate this claim.

CS # 7 claims that minister OBIANG would routinely contact him/her and order him/her to give money to ▓▓▓ or ▓▓▓▓▓, who was another middle-men for Minister OBIANG.

CS # 7 proposed that if the US government would pay him $500,000 as a down payment he/she would be capable of securing several other witnesses who would also corroborate similar experiences with Minister OBIANG. This proposal was immediately withdrawn by Ms. ▓▓▓▓ and she admonished her client for his proposal. Thereafter, Ms. ▓▓▓▓ inquired about the amount of money that the U.S. government was willing to give her client if he/she were to provide these documents as evidence. Since the documents were not readily available, no such agreement or offer of any kind was presented by any of the United States government agents and employees in the meeting.

The representatives of the U.S. government told ▓▓▓▓ that it was impossible to even consider that type of request at this time. Furthermore, the U.S. government agents and employees told ▓▓▓▓ that it was important that the U.S. government be able to review and verify the existence and relevance of documents that CS # 7 claims are in his/her possession.

The U.S. government agreed to provide CS # 7 with a list of all the documents

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE      7 |
| REPORT OF INVESTIGATION CONTINUATION | CASE NUMBER MIO2PR07MI0018 |
| | REPORT NUMBER: 078 |

that we are seeking from CS # 7 and would return after April 2012 to ▪▪▪▪ for further debriefing.  The list would be compiled based upon documents that CS # 7 claimed were in his/her possession.  It was again reiterated to CS # 7 that the most important issue was for him/her to provide information that was accurate and truthful.  CS # 7 acknowledged that ▪▪ understood.

Investigation continues.

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.