Exhibit

8

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription  08/16/2005

  NDEYE NENE FALL, female, date of birth ███████, place of birth Dakar, Senegal, Social Security Account Number ███████, was contacted via prior arrangement at the United States District Court, Washington, D.C. FALL, who is incarcerated in the District of Columbia jail, was brought by the U.S. Marshals Service to the United States District Court for the interview. NINA GINSBERG, who identified herself as FALL's counsel, was present throughout the interview. The interview was conducted under a proffer agreement. FALL was advised of the identity of the interviewing Agent and that of Assistant United States Attorney (AUSA) STEVE DURHAM and Special Agent NICOLE BROWN, Internal Revenue Service. After being advised of the purpose of the interview, FALL provided the following information:

  FALL's childhood was spent in Senegal. She graduated from high school in Senegal in approximately 1983. From approximately 1986 through 1987, she attended the University of Dakar, and received a Literature and Journalism degree, with an emphasis on English. FALL's first language is French.

  FALL has three brothers and one sister, all who live abroad. FALL's mother, RENEE SARR BA, worked until retirement as a librarian. BA began working in France, but after Senegal gained independence, she and her husband moved back to Senegal. In Senegal, BA continued to work as a librarian with the ECONOMIC'S BUREAU and a technical organization.

  FALL's father, BASSIROU FALL, was a doctor who received his training from the School of Medicine in Dakar. At the time, Senegal had not gained its independence and was known as French Western Africa, a French colony, which eventually gained its independence in 1960. BASSIROU FALL then continued his education at the University of Bordeaux (France) School of Medicine. After graduation he worked at the INSTITUTE OF CANCER in Paris, and then at another cancer institute in Villejuif, France. FALL's parents moved back to Senegal in 1963. FALL's father worked at a military hospital with French doctors.

  BASSIROU FALL subsequently worked at the CENTER FOR BLOOD TRANSFUSION, where he was employed as the Director. BASSIROU FALL worked for the CENTER FOR BLOOD TRANSFUSION while FALL was in

Investigation on  7/26/2005   at  Washington, D.C.

File #  29B-WF-228673           Date dictated  7/28/2005

by  SA MARK RICHARD STANLEY:cr

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

DOJ_0000050

FD-302a (Rev. 10-6-95)

29B-WF-228673

Continuation of FD-302 of   NDEYE NENE FALL   , On 7/26/2005   , Page   2

    elementary school, until approximately her first year of high school. After which, her father opened private medical clinics. BASSIROU FALL operated two general practice clinics, MON MEDECIN and another clinic which did not have a particular name. BASSIROU FALL worked in his home office and at the clinic. BASSIROU FALL traveled all hours of the night for his medical practice. BASSIROU FALL passed away in 1987. FALL's mother still lives in Dakar, Senegal, at ▓▓▓▓▓▓▓▓▓▓▓▓▓▓, Dakar, Senegal.

    While at college, FALL worked at a newspaper. After college she worked at three newspapers. She was a reporter for approximately three years. In the beginning, she reported on cultural assignments, to include concert reviews, writers, and literature conventions. She also covered a school crisis at the university. She eventually began covering political events, to include opposition meetings and interviews of opposition leaders.

    In August 1989, FALL came to the United States. She continued to write after coming to the United States. She would send the articles back to Senegal. The articles included her reviews of concerts and interviews of famous people.

    FALL came to the United States to attend school. She became involved in a type of exchange program with Mount Holyoke University in Massachusetts. In exchange for teaching French language classes, she received a General Studies Certificate from Mount Holyoke in 1990. After which, she spent a few months in New York with relatives. At the time, FALL was in the United States on a student visa.

    FALL subsequently moved to Washington, D.C., where she planned to attend the University of Maryland. However, there were some contract problems with her visa, and she was never able to enroll at the University of Maryland. FALL had planned on enrolling in communications and journalism classes at the University of Maryland.

    While hoping to resolve the issues and attend the University of Maryland, FALL began to tutor individuals in French, baby-sit and write articles for various Senegalese newspapers. FALL would travel to New York and write articles about her discussions with the immigrant community in New York. The two Senegalese papers for which FALL would write articles were SUD and HEBDO, which eventually became SUD QUOTIDIEN, and the opposition newspaper known as SOPI. FALL would sometimes write articles under

DOJ_0000051

FD-302a (Rev. 10-6-95)

29B-WF-228673

Continuation of FD-302 of __NDEYE NENE FALL__ , On 7/26/2005 , Page 3

the pen name of KANI. FALL continued to write articles up until approximately 1994, at which time she was still on her student visa. FALL would also conduct interviews for AFRICAN TIME, a radio program in New York for Senegalese immigrants.

FALL also worked at a pizzeria in Washington, D.C. At the time, she was living in Silver Spring, Maryland, in a home she shared with her friend, BINCA. BINCA was also from Senegal and had come with FALL to the United States. At the time, FALL was also writing articles for two magazines, THE AFRICAN MIRROR and THE AFRICAN EPIC, both Washington, D.C. based magazines.

FALL then began to work as a translator for the INTER-PRESS SERVICE, which had an office in Washington, D.C. FALL would translate documents from the INTERNATIONAL MONETARY FUND (IMF) and WORLD BANK, from English to French. In 1995, when FALL's daughter was born, FALL was working from home.

In late 2002, approximately two weeks before Christmas, FALL began working for the AFRICA CENTER FOR STRATEGIC STUDIES (ACSS), in Crystal City, Virginia. The office eventually moved to Fort McNair. ACSS is one of the five centers of the Pentagon. FALL worked approximately three days a week, translating, drafting letters, researching terrorism in Africa, and providing support for seminars put on by her agency. When she first began at ACSS, she worked in External Affairs as a translator, but then moved to the Office of the Director as an administrative assistant. As such, she was a researcher/translator/support person. FALL held the title of Participant Affairs Coordinator, which dealt with the seminar participants. She received a salary of approximately $800.00 every two weeks. FALL was employed at ACSS until approximately October, 2004, after which she began working for ACSS as a consultant. As a consultant, she conducted media reviews of French newspapers and English media for news on terrorism, health, and security in Africa. FALL's salary was approximately $230.00 per week.

In 1994, FALL met SIMON KARERI at a party in Washington, D.C. A Namibian diplomat hosted the party for a Kenyan diplomat who was leaving the United States. FALL was at the party with her girlfriends and one of her girlfriends introduced her to KARERI. At the time, KARERI worked with RIGGS BANK.

In approximately July, 1995, FALL and KARERI were married in Silver Spring, Maryland. The ceremony was held at the

FD-302a (Rev. 10-6-95)

29B-WF-228673

Continuation of FD-302 of    NDEYE NENE FALL   , On 7/26/2005 , Page 4

    courthouse. FALL and KARERI lived at a home on Ingram Terrace, in Silver Spring, Maryland. KARERI owned the home prior to their marriage.

    After their marriage, KARERI and FALL very seldom had parties at their home. FALL is a very low-key person. She and her husband would have personal friends over for dinner, but she had no time to entertain clients from RIGGS BANK. FALL would not often go to events with KARERI for the bank.

    FALL and KARERI had a daughter on November 16, 1995, and a son was born on February 22, 1999. Approximately two years ago, FALL and KARERI adopted a daughter, who was approximately 17 years old. Their adopted daughter is KARERI's niece. The adopted daughter had been involved in a bad school bus accident in Kenya, and her natural mother was ill and her natural father was absent.

    KARERI was a Vice President for Embassy Banking at RIGGS BANK. He managed the African and Caribbean Branch, which initially had a staff of four employees, but grew as time went on. At the time that KARERI was fired from RIGGS BANK, his staff was much larger.

    KARERI would go to work early every morning and return in the evening. KARERI was a workaholic and often went into work very early, as he needed to make oversea telephone calls and had to account for the five to eight hour time difference. Most African Embassies held their accounts at RIGGS BANK. KARERI dealt with the Ambassadors of the various Embassies in Washington, D.C. Mr. PARRIS was KARERI's right-hand man in the African and Caribbean Branch.

    KARERI was involved in managing the accounts of the Embassies and the Ambassadors, to include such work as paying the salaries of Embassy personnel from the RIGGS accounts. KARERI left early for work and came back late. The topic of his work at RIGGS BANK really did not interest FALL.

    FALL had not wanted to be a stay-at-home mother. After her children were born, she felt stuck at home, while her friends were working. It bothered FALL that she could not have a career. As a result, she did not want to hear about KARERI's involvement with his clients. FALL stayed at home for approximately five to six years.

FD-302a (Rev. 10-6-95)

29B-WF-228673

Continuation of FD-302 of __NDEYE NENE FALL__ , On _7/26/2005_ , Page __5__

      FALL's urge to work stemmed from her father's advice that she (and her sister) should never depend on the husband for their living. KARERI was understanding of FALL's situation, as he would try to help with the children and household duties when he arrived home from work. KARERI knew FALL was exhausted from staying at home with the children, and that FALL really wanted to work. However, KARERI may not have seen that FALL really desired to work outside the home, and KARERI may have thought he was providing for his wife and family.

      Although FALL and KARERI discussed her going back to work outside the home, FALL realized that most of her salary would go to a nanny. In addition, FALL was worried about who would watch her children. FALL "fussed and whined" about her situation. Even though FALL was under a lot of stress from this situation, she and KARERI never separated. The situation did, however, make her ill and she required medical care. FALL's doctor tried to give her depression medication, but she would not take it. FALL had a medical problem, known as IC, which is a problem with her bladder. She is currently on medication to control the pain related to this medical condition.

      In FALL's opinion, KARERI was doing too much for his bank clients. As an example, an Ambassador, who was a former general from Senegal, used to have KARERI sort through his junk mail. In another example, KARERI wired the computer system for the Cameroon Embassy. KARERI never thought of this work as being taken advantage of, as he thought he was just helping a friend. KARERI was a good friend of the Cameroon Ambassador. KARERI would often say to FALL that "they are my clients and I have to have a good relationship with the clients." However, FALL did not think the Ambassadors and the secretaries should take advantage of KARERI. She believed that KARERI often did too much work for the Ambassadors and their Embassies because of his good heart and his naivety. FALL believed that KARERI probably was most involved with the accounts related to Equatorial Guinea.

      One such relationship with Equatorial Guinea was the account maintained by TEODORO NGUEMA, the son of the Equatorial Guinea President. Approximately two to three years before KARERI was fired, NGUEMA began to have an account relationship at RIGGS BANK. FALL believes that NGUEMA initially lived in France, but then came to the United States. When NGUEMA would come to the Unites States, NGUEMA would call KARERI and ask questions related to his accounts. In addition to asking questions about his bank

FD-302a (Rev. 10-6-95)

29B-WF-228673

Continuation of FD-302 of __NDEYE NENE FALL__ , On _7/26/2005_ , Page __6__

accounts, NGUEMA would also come to KARERI for personal problems, most often with his father, the Equatorial Guinea President. On one occasion, NGUEMA made negative comments about his father on a radio program. KARERI offered advice to NGUEMA on settling the matter with his father. FALL believed that NGUEMA was not mentally stable, which is an allegation often discussed in the French media and on news programs such as 60 Minutes. NGUEMA would often call the KARERI home, sometimes late at night (approximately 1:00 a.m.), over issues about his spending limits on credit cards and his house in California. FALL would sometimes answer the telephone calls from NGUEMA, with whom she would speak in French, before passing the telephone to KARERI.

KARERI often commented to FALL that it was unfortunate that NGUEMA was immature and "blowing" the money from Equatorial Guinea. KARERI mentioned that NGUEMA's mother wanted him to become the President of Equatorial Guinea.

FALL believes that NGUEMA was high on some of the occasions that he telephoned the KARERI house. FALL believes NGUEMA was high as he sounded desperate and agitated. In addition, what NGUEMA was saying would not make sense. FALL advised that everybody knows NGUEMA uses drugs, as evidenced by the reports of his drug use by the French media. Even though FALL had concerns about KARERI dealing with NGUEMA, KARERI said NGUEMA was a main client and that Equatorial Guinea was a main client, and that he would try and help NGUEMA. NGUEMA would say that KARERI did a lot for him and that he was grateful, and that he appreciated KARERI because KARERI was helping him a great deal. KARERI always helped NGUEMA. When NGUEMA was in trouble, it seemed NGUEMA always called KARERI. The calls would happen at any time, to include the weekends. NGUEMA would call until he reached KARERI.

FALL advised that JADINI HOLDINGS was formed as a result of her wanting to have employment outside the home. As background, after the birth of her children, FALL was stressed out and depressed. She and KARERI discussed this situation and eventually planned that FALL would take her children to Dakar and get the help that her mother had from relatives for child care. In addition, it would help FALL care for her mother, who was a senior citizen living alone. FALL raised the issue of going back to Dakar with KARERI, and after some subsequent arguments and complaints, KARERI finally gave in and decided they would form a company which would be involved in import/export business.

FD-302a (Rev. 10-6-95)

29B-WF-228673

Continuation of FD-302 of     NDEYE NENE FALL                                    , On 7/26/2005   , Page   7

    KARERI started to give FALL advice on establishing such a business, to include how to open a company and how to gather the capital left to FALL after her father passed away.  The capital was being managed by FALL's uncle.  FALL's uncle had invested her capital in businesses such as a tailoring business.

    However, at the time that she and KARERI were discussing the formation of a company, her illness was still a concern.  This was at the time following the birth of her children.  FALL eventually decided the best medical care was in the United States and decided that moving back to Dakar was not an option.  The decision not to move back to Dakar was made just prior to her son being born.

    When BASSIROU FALL passed away in 1987, he owned the medical clinics, medical equipment, and a family house in Mali.  BASSIROU FALL's assets were shared between FALL and her siblings.  In Senegal, there was a tradition that when a man dies, the deceased man's brother takes control of the deceased's assets.  BASSIROU FALL had battled cancer for approximately two years before passing away.  BASSIROU FALL would fly to France every couple of months for chemotherapy.  FALL was approximately 20 or 21 years old when her father died.

    After FALL's father passed away, her uncle, with the help of a cousin who was also a doctor, sold her father's assets, to include the clinics, medical equipment, such as X-ray machines and beds.  The property in Mali had already been sold.  Approximately six months after BASSIROU FALL died, FALL's uncle, who was a lawyer, began splitting the proceeds between FALL's siblings.  Because she was so young and immature at the time, FALL's proceeds were held by her uncle.

    While FALL was still working in Senegal, the money from her inheritance was available for her living expenses.  At the time, FALL's uncle decided to go after four companies who owed money to BASSIROU FALL and to collect the monies owed.  The four companies had purchased insurance and owed the money to FALL's father.  FALL wrote to the companies, and even though she was not even 24 years old, she and her uncle were able to collect money from the four companies.  FALL was able to get the monies as she called each company, asked for their Director, and introduced herself as working for SOPI.  In order to avoid the potential news articles, the companies quickly settled and provided FALL and her uncle with the monies owed to BASSIROU FALL.

FD-302a (Rev. 10-6-95)

29B-WF-228673

Continuation of FD-302 of  **NDEYE NENE FALL**  , On  7/26/2005  , Page  8

      The four companies included SIDEC, a movie theater; ORTS, an office of radio-television of Senegal; a company whose name FALL does not recall, but that was involved in restaurants and the business section of the Dakar Airport, and a fourth unrecalled company. FALL's father had been a doctor for these companies. The eventual settlement paid to FALL and her uncle was made in CFA, a local currency. FALL does not know the entire amount of monies received, but knows the payment from one company was over one million CFA. FALL believed that approximately 500 to 700 CFA equaled one United States dollar. Of the monies received from the four companies, FALL gave a portion to her mother, kept a portion for herself, and provided the remainder to her uncle. FALL's uncle may have spent some of the money, but he also invested in local businesses, such as a tailor of African dresses and companies involved in the production of African drums and art. FALL's uncle was MALICK FALL, who passed away in 2003.

      FALL paid for her ticket to the United States with monies from her inheritance. She also brought some of the money with her to spend in the United States. FALL also knows that her uncle invested money in Tontine, an investment method for the local people in Senegal to make money.

      KARERI never liked the fact that FALL's uncle controlled FALL's inheritance money. KARERI knew that FALL was not good at financing and budgeting, and wanted to maintain and manage FALL's inheritance money. Eventually, FALL spoke with her uncle about collecting the money so that it could be managed by KARERI. FALL's uncle collected the money.

      KARERI decided the inheritance money should be changed into United States dollars. In order to effect the change, KARERI directed FALL's uncle to hand the money to a gentleman in Malabo, Equatorial Guinea, who was doing some type of project in the country. FALL was not aware how the money would eventually be replaced (from the gentleman and the Equatorial Guinean project) back into an account that was established for her. To FALL's knowledge, her uncle informed her that he went to Malabo and gave the money to a gentleman. KARERI also told FALL that it had been done and the gentleman had received the money. FALL knows that her uncle had receipts for the transfer of funds to the gentleman, although her uncle did not say that he got a receipt. As background, Senegal is a cash society, but people do obtain receipts. FALL trusted KARERI's judgement in transferring the money from her uncle to this gentleman in Malabo. KARERI mentioned

DOJ_0000057

FD-302a (Rev. 10-6-95)

29B-WF-228673

Continuation of FD-302 of __NDEYE NENE FALL__ , On _7/26/2005_ , Page _9_

there would have been fees placed on the funds if it had been transferred through a bank.

FALL believes her uncle drove to Equatorial Guinea to transfer the funds to the gentleman in Malabo. The gentleman was not from Equatorial Guinea, but had some contract to build some type of business in Equatorial Guinea. The gentleman was from a Spanish speaking country, possibly Guatemala or Bolivia. FALL had talked to the gentleman when the gentleman would call the KARERI home to speak with KARERI. She does not remember the gentleman's name. KARERI may have been giving advice to Equatorial Guinea on the construction project being performed by the gentleman.

FALL believes the amount of money in her inheritance transferred to the gentleman was approximately $300,000.00 (USD). To FALL's knowledge, it was supposed to be all the money from her inheritance.

At this point in the interview, Special Agent BROWN left the interview for a prior commitment.

FALL advised that she did not know if her inheritance funds had been kept in a bank. Senegal only had a banking system since approximately 2000. FALL does not know how the funds (from her inheritance) made their way back to JADINI HOLDINGS.

Although FALL formed JADINI HOLDINGS, the company never really took off. At some point, KARERI instructed FALL that they needed to go to SUN TRUST BANK to set up an account for JADINI HOLDINGS. FALL does not remember where the name JADINI HOLDINGS came from.

The accounts at SUN TRUST BANK were established in FALL's maiden name. The accounts were established at a SUN TRUST BANK, located on Randolph Road in Glenmont, Maryland, an approximate five to ten minute drive from the KARERI's house. One morning, FALL and KARERI went to the SUN TRUST BANK, where she filled out and signed some account forms. KARERI explained to the bank manager what was to be done and what he wanted. KARERI advised that the account may possibly be a money market or a Certificate of Deposit. KARERI did the talking at the bank, as FALL has a numbers phobia, and did not even balance her own checkbook. KARERI mentioned the monies may have eventually been used for real estate investment, as he said the market for homes was good and that he planned to buy a home.

FD-302a (Rev. 10-6-95)

29B-WF-228673

Continuation of FD-302 of __NDEYE NENE FALL__ , On _7/26/2005_ , Page _10_

FALL remembered that KARERI mentioned real estate, but she does not remember the details.

JADINI HOLDINGS was not formed in the United States. FALL thought the company may have been established in the British Virgin Islands. FALL did not create the name JADINI HOLDINGS.

The interviewing Agent showed FALL a three page document related to JADINI HOLDINGS, further identified as the Certificate of Incorporation, Memorandum of Association, and Appointment of First Director. FALL advised that she is not sure if she ever saw the document. FALL does remember that mail would come to their house from TRIDENT TRUST COMPANY or JADINI HOLDINGS. However, FALL would not open the mail as KARERI was the financial advisor. FALL would give the mail to KARERI. It was not out of the ordinary for FALL not to open the TRIDENT TRUST or JADINI HOLDINGS' mail, as she normally does not open her banking account statements.

The interviewing Agent then showed FALL pages two through five of a facsimile, dated 05/09/01, further identified as a TRIDENT TRUST International Business Companies Incorporation Questionnaire . FALL advised the handwriting on page three was probably KARERI's. KARERI's signature was found on page five of the document. Only KARERI and FALL know about JADINI HOLDINGS.

KARERI had mentioned that JADINI HOLDINGS would be a business that, if it took off, KARERI would help FALL with financial advice and provide sources for computer products to be imported/exported. FALL does not know why JADINI HOLDINGS was formed in the British Virgin Islands. It was KARERI's idea to put the company in the British Virgin Islands. FALL was never suspicious of KARERI that JADINI HOLDINGS was not being used for its intended purpose. When it was realized that FALL's business idea was not going to work out, she and KARERI planned to buy a property with the money.

In addition to FALL's inheritance, KARERI also had money from his father's businesses in Nairobi, which included a couple of butcheries in Nairobi, and also a couple of similar businesses in the rural area. KARERI's father died in approximately November, 2001.

The money contained in JADINI HOLDINGS was strictly the money that FALL's uncle had provided to the gentleman and also some of KARERI's money.

FD-302a (Rev. 10-6-95)

29B-WF-228673

Continuation of FD-302 of __NDEYE NENE FALL__ , On _7/26/2005_ , Page _11_

  FALL's uncle gave United States dollars to the gentleman in Malabo. People have the ability to change CFA to United States dollars on the street. At the time, KARERI told FALL that her uncle had given the money to the businessman and that the money would eventually end up in the JADINI HOLDINGS' account. FALL was not specifically aware that the money placed into the JADINI HOLDINGS' account would be from an Equatorial Guinea account. KARERI just mentioned that the money would be replaced. In reading recent newspaper articles, FALL has learned that the money placed into the JADINI HOLDINGS' account may have come from an Equatorial Guinea account.

  The interviewing Agent showed FALL a one page letter, dated July 5, 2001, written on the letterhead of NDEYE N. FALL to TRIDENT TRUST COMPANY (B.V.I.) LIMITED, which referenced that all further correspondence from TRIDENT TRUST to JADINI HOLDINGS should "not" be sent to the bank. After reviewing the document, FALL advised the signature on the document was her own. However, the body of the document are KARERI's words and she did not write the letter. KARERI had explained to FALL the mail should be coming to their house. KARERI and FALL never discussed concealing the JADINI HOLDINGS matter from RIGGS BANK.

  The interviewing Agent showed FALL a four page document related to the JADINI HOLDINGS' accounts at SUN TRUST BANK, further identified as a Non-Personal Account Deposit Agreement, Specimen Signatures, Universal banking Resolution, and Certificate of Foreign Status of Beneficial Owner. After reviewing the document, FALL advised that NORMAL GOYAL was of Indian decent and she was the SUN TRUST BANK employee that dealt with the KARERIs to open the account. Although KARERI was an employee of RIGGS BANK, and knew the banking system very well, he did not take any action to show that he was working at RIGGS BANK. FALL advised the signature in the President field and the signature and date in the Secretary's Signature field on page one of the document were her own. On page two, the Signature 1 field is FALL's signature. On page three of the document, the signature was her handwriting. On page four of the document, the signature, date, and acting capacity fields were her own handwriting. KARERI filled out page four at the bank. She does not know where the Certificate of Foreign Status document came from, but believes the bank provided it. FALL provided her mother's address in Senegal as the address for JADINI HOLDINGS, as she had planned to move back to Senegal with her children. If FALL would have moved back to Senegal, she planned to use a couple of rooms at her family house in Senegal to operate her business.

DOJ_0000060

FD-302a (Rev. 10-6-95)

29B-WF-228673

Continuation of FD-302 of ___NDEYE NENE FALL_____, On _7/26/2005_, Page __12_

    After accounts at SUN TRUST BANK were opened, FALL did not look at the account statements for JADINI HOLDINGS. KARERI told her that the money was in the accounts, although she does not remember when this happened. Sometime later, KARERI told her that the amount of funds in the JADINI HOLDINGS' account was $700,000.00. Although she does not remember the exact time, it was less than one year after opening the account that she learned that $700,000.00 was in the account.

    KARERI recommended that the JADINI HOLDINGS' accounts be established at SUN TRUST BANK. The account was opened in FALL's maiden name, as it is a tradition that women in Senegal use their maiden name. Also, she and KARERI discussed that it would make her feel good if it was her company. KARERI asked FALL if she wanted the accounts and the business to be in the name KARERI or FALL.

    KARERI was conducting research on information related to computers that would be bought or sold in her import/export business. FALL researched various African art businesses which would supply African clothes and art. Once such company was MARCHE SANDANGA in Dakar. There are also companies in similar related African art businesses located in Soumbedioune, a tourist market near the ocean in Dakar. However, JADINI HOLDINGS never got off the ground as FALL's health concerns were the issues that prevented her from starting the business. On FALL's part, she conducted no transactions of import/export activity related to JADINI HOLDINGS.

    FALL was not aware of any additional monies being placed into the JADINI HOLDINGS' account.

DOJ_0000061