QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Duane R. Lyons (Bar No. 125091)
  duanelyons@quinnemanuel.com
  Brian M. Wheeler (Bar No. 266661)
  brianwheeler@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:  (213) 443-3000
Facsimile:   (213) 443-3100

FOREMAN DEGEURIN & DEGEURIN
  Mike DeGeurin (*Admitted Pro Hac Vice*)
  mdegeurin@foremandegeurin.com
300 Main Street, Third Floor
Houston, Texas 77002
Telephone:  (713) 655-9000
Facsimile:   (713) 655-1812

FISHER & KREKORIAN
  Kevin Fisher (Bar No. 131455)
  rkf@fkslaw.net
2121 Park Drive
Los Angeles, California 90026
Telephone:  (310) 862-1225
Facsimile:   (310) 388-0805

Attorneys for Claimants Vice President
Teodoro Nguema Obiang Mangue
and Sweetwater Malibu, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>        vs.<br><br>ONE WHITE CRYSTAL-COVERED "BAD TOUR" GLOVE AND OTHER MICHAEL JACKSON MEMORABILIA; REAL PROPERTY LOCATED ON SWEETWATER MESA ROAD IN MALIBU, CALIFORNIA; ONE 2011 FERRARI 599 GTO,<br><br>             Defendants. | CASE NO. 2:11-03582-GW-SS<br><br>Hon. George H. Wu<br><br>CLAIMANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON THE LIMITED ISSUE OF PROBABLE CAUSE; OR, IN THE ALTERNATIVE, ORDER FINDING THE GOVERNMENT LACKED PROBABLE CAUSE AT THE TIME IT INSTITUTED THE ACTION FOR FORFEITURE *IN REM*;<br><br>[Consolidated Separate Statement, Evidentiary Objections, and Supplemental Declaration of Brian M. Wheeler filed concurrently herewith]<br><br>Hearing Date: June 20, 2013<br>Time: 8:30 a.m.<br>Place: Courtroom No. 10 |

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................... 1

ARGUMENT ................................................................................................. 3

I. PROBABLE CAUSE TO *INSTITUTE* FORFEITURE
PROCEEDINGS IS DETERMINED AS OF THE DATE THE
GOVERNMENT INSTITUTED THE ACTION ...................................... 3

    A. This Court Has Already Ruled, And The Government Has
Previously Admitted, That Probable Cause Is Measured As of the
Time The Government Filed The Initial Complaint ............................ 4

    B. The Government Is Estopped From Changing Its Position ................. 5

    C. The Government's Contention That Probable Cause is Measured
as of the SAC Is Illogical and Contrary to Law ................................ 6

    D. The Date The Government Filed Its Initial Complaint Instituting
The Forfeiture Complaint Is Not Non-Existent ................................. 9

II. THE GOVERNMENT'S PRE-COMPLAINT EVIDENCE FAILS TO
SUPPORT PROBABLE CAUSE TO FORFEIT EACH OF THE
DEFENDANT *RES* AT THE TIME IT INSTITUTED THE ACTION ........ 10

    A. The Government's Exhibits Do Not Show Probable Cause That
Claimant Violated E.G. Law ............................................................ 11

        1. The Government Attempted To Conceal Exculpatory
Evidence From The State Department ..................................... 11

        2. The Government's Omission Of Evidence That Conduct
Was Legal Is An Old Trick, Condemned By The Ninth
Circuit In A Similar Situation ................................................ 11

        3. Uncorroborated and Unreliable Magazine Articles Do Not
Provide Probable Cause .......................................................... 12

        4. Uncorroborated Information From Italian Officials Do Not
Establish Probable Cause ....................................................... 13

        5. None of the Government's Other Alleged Evidence
Supports Probable Cause To Institute The Forfeiture
Proceeding .............................................................................. 17

    B. The Government Continues to Fail To Link Each Specific
Defendant *Res* To Proceeds of Specified Unlawful Activity .............. 19

    C. The Government's Net Worth Theory Does Not Provide
Probable Cause ................................................................................ 20

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1.     The Net Worth Theory Requires Proof That Claimant Lacked Sufficient Income From Legitimate Sources .................21

2.     The Net Worth Doctrine Requires a Link Between The *Res* and The Specified Unlawful Activity ...................................22

D.    The Government's Belated Bank Fraud Theory Is Irrelevant To The Issue Of Probable Cause When The Action Was Instituted ..........23

CONCLUSION.......................................................................................................25

1

## TABLE OF AUTHORITIES

2

**Page**

3

## Cases

4

Franks v. Delaware,
   438 U.S. 154 (1978) ........................................................................ 12

5

6

Hamilton v. State Farm Fire & Cas. Co.,
   270 F.3d 778 (9th Cir. 2001) ......................................................... 5

7

Rhodes v. Robinson,
   621 F.3d 1002 (9th Cir. 2010) ..................................................... 7, 8

8

9

In Re Sindona,
   450 F. Supp. 672 (S.D.N.Y. 1978) ............................................. 15

10

11

United States v. $6,190.00 in U.S. Currency,
   581 F.3d 881 (9th Cir. 2009) ...................................................... 8, 9

12

United States v. $13,391.00,
   2010 WL 1507980 (D. Haw. Apr. 14, 2010) ............................ 9

13

14

United States v. $20,280.00 In U.S. Currency,
   2011 WL 4448735 (C.D. Cal. Sept. 13, 2011) .......................... 20, 22

15

16

United States v. $186,416.00 in U.S. Currency,
   527 F. Supp. 2d 1103 (C.D. Cal. 2007), rev'd and remanded
   on other grounds, 590 F.3d 942 (9th Cir. 2010) .................... 6, 7, 11, 12

17

18

United States v. $186,416.00 in U.S. Currency,
   590 F.3d 942 (9th Cir. 2010) ...................................................... 4, 6, 7

19

20

United States v. $191,910.00 in U.S. Currency,
   16 F.3d 1051 (9th Cir. 1994) .................................. 3, 4, 6, 7, 8, 9, 10, 24, 25

21

United States v. $223,178.00 In Bank Account Funds,
   2008 WL 4735884 (C.D. Cal. Apr. 30, 2008) ......................... 20, 22

22

23

United States v. $405,089.23 U.S. Currency,
   122 F.3d 1285 (9th Cir. 1997) .................................................... 20

24

25

United States v. $493,850,
   518 F.3d 1159 (9th Cir. 2008) .................................................... 4, 5, 6

26

United States v. 3714 Cancun Loop,
   2002 WL 1035457 (May 17, 2002) ........................................... 23

27

28

-iii-

<u>United States v. Anderson,</u>
   453 F.2d 174 (9th Cir. 1971) ...................................................................... 25

<u>United States v. Delgadillo-Velasquez,</u>
   856 F.2d 1292 (9th Cir. 1988) .................................................................... 13

<u>United States v. Grant,</u>
   682 F.3d 827 (9th Cir. 2012) ...................................................................... 17

<u>United States v. One 56-Foot Yacht Named Tahuna,</u>
   702 F.2d 1276 (9th Cir. 1983) .................................................................... 12

<u>United States v. Padilla,</u>
   888 F.2d 642 (9th Cir. 1989) ...................................................................... 18

<u>United States v. Thomas,</u>
   913 F.2d 1111 (4th Cir. 1990) .................................................................... 22

<u>United States v. U.S. Currency, $30,060.00,</u>
   39 F.3d 1039 (9th Cir. 1994) ...................................................................... 20

<u>Various Items of Personal Property v. United States,</u>
   282 U.S. 577 (1931) .................................................................................... 23

<u>Williams v. Boeing Co.,</u>
   517 F.3d 1120 (9th Cir. 2008) ...................................................................... 9

## <u>Statutes</u>

18 U.S.C. § 983(c)(1) ........................................................................................ 21

19 U.S.C. § 1615 ................................................................................................. 3

F.R.C.P. Rule 15(d) ............................................................................................ 8

Fed. R. Crim. P. 4(a) ........................................................................................ 23

## MEMORANDUM OF POINTS AND AUTHORITIES

### Preliminary Statement

The government argues that the straightforward issue of whether it had probable cause to *institute* the forfeiture proceedings is determined at the time it filed the Second Amended Complaint (the "SAC"), rather than when it in fact instituted the forfeiture action.  The government's argument contradicts it previous admission and this Court's prior ruling.

When Claimants moved to dismiss the SAC, this Court ruled that the government must have probable cause "at the time it filed the initial complaint," and that "after-acquired evidence may not be used" to support "probable cause to institute the action."  See ECF Doc. No. 68-1 at 12.  The government conceded that the Court's analysis was correct, but argued that the question of probable cause should be decided on summary judgment, not by a motion to dismiss:

> **THE COURT**:  If at some point in time in the future it's determined conclusively that they did not have that evidence at the time the matter was initially filed, then I think they will concede that deficiency might tank some or all of their case.
>
> . . . Does the government disagree that if it did not have the evidence at the time that the forfeiture matter was filed, that they cannot argue it later on?
>
> **MR. LEE**: No, Your Honor. *There's no dispute as to the 1615 probable cause requirement.* But the case Mr. Lyons has cited is a motion for summary judgment, which is exactly what Your Honor pointed out in the tentative.  This should be raised -- in that case it was raised at the close of discovery by claimant on a motion for summary judgment.  The claimants are free to do that, Your Honor.  It's not a pleading stage issue. We're in agreement with the Court.
> Sept. 6, 2012, Hr'g Tr. at 6:10-13, 7:3-13 (emphasis added).

Having succeeded in convincing the Court to deny Claimant's Motion to Dismiss the SAC on the ground that the probable cause issue should be left for summary judgment, the government now argues that that summary judgment motion is inappropriate because the government had already amended its complaint.  The government's attempted "Catch-22" is pure gamesmanship.

04579.23529/5325161

CLAIMANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT RE PROBABLE CAUSE

1    The government's insistence that probable cause is measured on the filing

2  date of the SAC is little more than a transparent attempt to conceal the absence of

3  reliable evidence in the government's possession when it instituted this action.

4  Instead, it needed 13 additional months to gather evidence it believed was sufficient

5  to establish probable cause.  This is impermissible.

6    When this Court denied Claimant's Motion to Dismiss the SAC, the Court

7  permitted Claimant to conduct discovery in order to identify the evidence the

8  government relied on "when it filed the action":

9    **THE COURT:** It may be that the quickest thing to happen would be
   for your client to ask the government certain interrogatories, or a

10   30(b)(6) or whatever, to get the information as to what the government
   is relying on, *what is the evidence that it relied upon when it filed the*

11   *action.* The government will give you a response; and whatever it is,
   you can decide whether or not that is sufficient or insufficient. If it is

12   insufficient in your opinion, you can make the motion [Re: Probable
   Cause].

13   Sept. 6, 2012, Hr'g Tr. at 29:10-18 (emphasis added).

14    After receiving the government's discovery responses, Claimant announced

15  that he would make the instant motion.  The Court then stated:

16   **THE COURT:**  And what I will require from the government in its
   opposition is as to each of the items that the government seeks to

17   forfeit, I want you to list for me the bases of the probable cause. In
   other words, almost like a statement of undisputed facts so that we have

18   a document which will make it clear as to what are  the grounds for the
   government's belief that the item was forfeitable.

19   Jan. 28, 2013, Hr'g Tr. at 22:13-20.

20    Instead of filing a straightforward separate statement that identified the

21  specific evidence it possessed when it commenced this action, the government filed

22  a 107-page separate statement, which primarily relies on evidence that the

23  government acquired **after** it initiated this action.  Other facts relate to new legal

24  theories that were not pleaded in the original complaint and thus not relied on by the

25  government as a basis for forfeiture at the time the government commenced this

26  action.

27    The few "facts" that the government identifies it was aware of before it

28  initiated this action are simply general rumors of unspecified corruption juxtaposed

1   with details of Claimant's spending habits that do not establish probable cause that
2   the defendant assets were acquired with SUA proceeds.

3       Finally, the government does not identify the basis for probable cause as to
4   *each* defendant asset the government seeks to forfeit, as this Court specifically
5   directed the government to do.  The Court should not condone flagrant disregard of
6   its rulings.  Because the government has not shown that it had probable cause for
7   forfeiture of the specific defendant assets named when it instituted the proceeding
8   against *those* assets, the Court should grant the instant motion and end this
9   unprecedented and ill-conceived action.

10                                    **Argument**
11  **I.    PROBABLE CAUSE TO *INSTITUTE* FORFEITURE PROCEEDINGS**
12  **IS    DETERMINED    AS    OF    THE    DATE    THE    GOVERNMENT**
13  **INSTITUTED THE ACTION**

14      In its first 18 pages, the government sets forth an argument that the Ninth
15  Circuit has already rejected as a "tortured construction" of 19 U.S.C. § 1615 – i.e.,
16  the government's dead-on-arrival argument that probable cause is measured by a
17  date other than when it *instituted* the forfeiture action.  United States v.
18  $191,910.00 in U.S. Currency, 16 F.3d 1051, 1066 (9th Cir. 1994) (holding the
19  government must have probable cause "at the time it institutes forfeiture
20  proceedings.").  The strained definition of the verb "institute" the government
21  urges the Court to adopt not only runs afoul of the plain meaning of the word, it
22  also flies in the face of the unambiguous language of the statute and, most
23  importantly, is contrary to Ninth Circuit law and this Court's prior ruling.  Indeed,
24  the government's "argument would make the words 'institution of such' in the
25  statute meaningless." Id.  Like the statutory language in Section 1615, there is
26  nothing ambiguous about the Ninth Circuit's rule:

27          The plain language of the statute makes clear that the government must
            have probable cause at the time it institutes the forfeiture proceedings.
28          There is nothing ambiguous about the provision at all. The statute is not

                                        -3-
CLAIMANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT RE PROBABLE CAUSE

cast in abstract or general terms. It requires probable cause "for *the* institution" of "*such* suit or action." Moreover, the statute does not say that the government must have probable cause for the maintenance of the action, or probable cause for the continuation of the action, or even probable cause for the re-institution of the action. Even more critical, the statute does not simply say that the government must have "probable cause for its action." It says the government must have probable cause for the *institution* of *such* action. The clear import of this language is that the government must show that it had probable cause to institute—that is, probable cause at the time it instituted—the suit or action in which it seeks to forfeit the claimant's property. Id. (emphasis in original).

The government argues that this rationale is inapplicable because it has amended the complaint twice, and therefore it is as if the original complaint "never existed." (Gov. Opp. at 8). The Ninth Circuit has previously addressed and rejected that exact argument:

Whether probable cause exists to institute proceedings is solely a question of what information is in the government's possession***; even if the government were to amend its pleadings to include new evidence, the amendment could not change the historical fact that the government did not have probable cause at the time it brought the case. While a subsequent amendment might cure a violation of the pleading-with-particularity requirement in Supplemental Rule E(2)(a), it would stretch the concept of "relation back" too far to say that an amendment of pleadings can turn back time and make probable cause exist on a date when it did not.*** Civil forfeiture proceedings are already rooted in one legal fiction; there is no justification for adding another more tenuous legal fiction to the mix. Id. at 1068 (emphasis added).

In addition, the Ninth Circuit has twice held that this requirement survived the enactment of the Civil Asset Forfeiture Reform Act of 2000. See United States v. $493,850, 518 F.3d 1159, 1169 (9th Cir. 2008); United States v. $186,416.00 in U.S. Currency, 590 F.3d 942, 949 (9th Cir. 2010).

### A.   **This Court Has Already Ruled, And The Government Has Previously Admitted, That Probable Cause Is Measured As of the Time The Government Filed The Initial Complaint**

This Court has already ruled that "the Government must show that **at the time it filed the *initial* complaint**, it had probable cause to 'believe that the property is involved in the activity subject to the specific forfeiture statute it

-4-

1   invokes.' . . . Claimant is correct that any after-acquired evidence may not be used

2   at trial to show that the Government had probable cause to institute the action."

3   ECF Doc. No. 68-1 at 12 (emphasis added) (quoting $493,850.00, 518 F.3d at

4   1169).

5          In opposing Claimants' Motion to Dismiss the SAC, the government

6   acknowledged that probable cause is determined at the time it instituted the action,

7   but argued that probable cause was not a pleading issue, and urged the Court to deny

8   the motion and have Claimants' raise the issue through a motion for summary

9   judgment.  Sept. 6, 2012, Hr'g Tr. at 7:6-13, 24:16-28:13.  The Court then denied

10  Claimant's motion, but permitted discovery regarding the issue of probable cause.

11  That ruling set the stage for this motion for summary judgment.  The government

12  now attempts to "flip the script," arguing that the existence of the SAC renders the

13  original complaint non-existent, and, that probable cause must be measured as of the

14  filing of the SAC.  (Gov. Opp. at 10).  The government is judicially estopped from

15  making this argument.

16          **B.**     **The Government Is Estopped From Changing Its Position**

17          Here, the government successfully advocated a position that resulted in the

18  denial of Claimant's motion to dismiss.  But now, the government reverses itself in

19  an attempt to defeat summary judgment.  It argues that its prior position (which the

20  Court adopted) was wrong.  In short, the government is "playing fast and loose

21  with the court[]" and, in the interest of the "orderly administration of justice and

22  regard for the dignity of judicial proceedings," should be estopped.  Hamilton v.

23  State Farm Fire & Cas. Co., 270 F.3d 778, 782 (9th Cir. 2001) ("Judicial estoppel

24  is an equitable doctrine that precludes a party from gaining an advantage by

25  asserting one position, and then later seeking an advantage by taking a clearly

26  inconsistent position.").

27

28

04579.23529/5325161

1
2

**C.**   **The Government's Contention That Probable Cause is Measured as of the SAC Is Illogical and Contrary to Law**

3
4
5
6
7
8
9
10
11
12

Even if the Court were to entertain the government's newly minted position, the law in the Ninth Circuit is unequivocal:  probable cause must be had when the government institutes the forfeiture proceeding and only the evidence it relied on at the time it instituted the action can be used to prove probable cause.  $191,910.00, 16 F.3d at 1067; $493,850.00, 518 F.3d at 1169; United States v. $186,416.00 in U.S. Currency, 527 F. Supp. 2d 1103, 1115 (C.D. Cal. 2007) (government "could not make up for its lack of probable cause after the lawsuit began through the use of discovery, or other independent investigation"), *rev'd and remanded on other grounds*, 590 F.3d 942 (9th Cir. 2010) (probable cause "may be based only upon information gathered before the forfeiture action was instituted").[1]

13
14
15
16
17
18
19
20
21
22
23

The district court and Ninth Circuit decisions in $186,416.00 in U.S. Currency are instructive.  There, the government commenced forfeiture proceedings against the defendant currency after the execution of a search warrant at UMCC, a medical marijuana dispensary.  The district court granted UMCC's motion to suppress the currency on the grounds that there was no probable cause for the search warrant that led to the seizure.  UMCC then filed a motion for judgment on the pleadings which the district court converted into a motion for summary judgment on the narrow question of whether the government had sufficient evidence to initiate the lawsuit against the defendant currency.  Relying on $191,910 in U.S. Currency, the district court compared the rules of pleading, as evaluated on a motion to dismiss, against the evidentiary showings, required on a

24
25
26
27
28

---

[1]   Claimants do not concede the government has shown sufficient evidence at the time of the SAC to support probable cause.  Claimants did not address probable cause as of the filing of the SAC because the inquiry under unequivocal Ninth Circuit law for when the government must *have* probable cause is at the time it instituted the forfeiture proceeding—i.e., when it filed its original complaint.

04579.23529/5325161

CLAIMANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT RE PROBABLE CAUSE

1    motion for summary judgment, and determined "[t]he Government's pleading of
2    probable cause is not relevant to whether, on a motion for summary judgment, it
3    actually *had* probable cause to file the forfeiture action."  527 F. Supp. 2d at 1121.
4    The court then concluded that a declaration by Scott Feil, the CEO of UMCC,
5    which was filed in support of a motion for return of property before the forfeiture
6    complaint was filed, could be used to support probable cause.  In that declaration,
7    Feil acknowledged that the defendant currency was used in the course of marijuana
8    sales.  The district court concluded that this declaration was not tainted by the prior
9    illegal search and by itself gave the government probable cause to begin the action.
10    Accordingly, the court denied claimant's motion for summary judgment.

11         The Ninth Circuit reversed and remanded.  The circuit held that the Feil
12    declaration was tainted by the illegal search and could not be used to support
13    probable cause.  Nevertheless, the Ninth Circuit, like the district court, concluded
14    that probable cause may be based only upon information gathered before the
15    forfeiture action is instituted.  <u>$186,416.00 in U.S. Currency</u>, 590 F.3d at 949.

16         To hold otherwise would be to endorse the very conduct the court in <u>$191,910</u>
17    <u>in U.S. Currency</u> warned against:  permitting the government "to bring proceedings
18    (and thereby seize property) on the basis of mere suspicion or even enmity and then
19    engage in a fishing expedition to discover whether probable cause exists."  <u>Id.</u> at
20    1067-68.

21         The government acknowledges the Ninth Circuit's holding in  <u>$191,910 in</u>
22    <u>U.S. Currency</u>, but argues that the filing of an amended complaint renders the
23    original complaint non-existent and its filing date irrelevant.  (Opp. at 9).  The
24    government cites <u>Rhodes v. Robinson</u>, 621 F.3d 1002, 1005 (9th Cir. 2010), for the
25    general rule of pleading that "when a plaintiff files an amended complaint, the
26    amended complaint supersedes the original, the latter being treated thereafter as
27    non-existent."  <u>Id.</u>  The government's reliance on <u>Rhodes</u> is misplaced.

28

1    Rhodes is not a forfeiture case, but rather concerned the procedural
2    requirements of the Prison Litigation Reform Act of 1995 ("PLRA").  The PLRA
3    requires that a prisoner exhaust his administrative remedies before filing a complaint
4    which challenges his conditions.  After filing his original complaint, Rhodes filed a
5    supplemental amended complaint under F.R.C.P. Rule 15(d) which alleged new acts
6    of retaliation that occurred after the filing of his original complaint.  There was no
7    dispute that Rhodes had exhausted his administrative remedies as to these new
8    claims by the time he filed the amended complaint.  However, because those claims
9    had newly arisen, he had not exhausted his administrative remedies as to those
10   claims when he filed his original complaint.  As a result, the district court dismissed
11   the newly alleged claims because it believed that the PLRA's exhaustion
12   requirement barred amended complaints from asserting new claims based on
13   conduct that occurred after the initial complaint was brought.  The Ninth Circuit
14   reversed, noting that Rhodes' assertion of claims based on events which occurred
15   after the filing of the original complaint was a supplemental pleading under Rule
16   15(d).  The court added that the district court's interpretation of the PLRA's
17   exhaustion requirement necessarily implied that a supplemental complaint alleging
18   new, and newly-exhausted, claims could never be filed in a PLRA action.  The court
19   concluded that Congress had not indicated that it intended to do away with Rule
20   15(d) and supplemental pleadings in PLRA actions.  Accordingly, the court found
21   its decision necessary to harmonize the PLRA with the F.R.C.P.  Id. at 1007.

22       Rhodes is inapposite and does not alter the Ninth Circuit's holding in
23   $191,910.00, that probable cause must exist at the time the government initiates the
24   forfeiture action and that the government cannot avoid that result by gamesmanship
25   and technical amendments.  Id. at 1068.  None of the other authority cited by the
26   government compel a different result.

27       In United States v. $6,190.00 in U.S. Currency, the government amended its
28   complaint to add additional defendant assets.  581 F.3d 881, 883 (9th Cir. 2009).

1  However, the court in $6,190.00 does *not* hold that the date of the amended

2  complaint is the measuring stick for probable cause to institute forfeiture

3  proceedings against the previously-named, existing defendant *res*.  Therefore,

4  nothing in the court's opinion in $6,190.00 runs afoul of its rule in $191,900.00.

5      The government's other authority fare no better.  For example, in United

6  States v. $13,391.00, the court declined to consider evidence acquired after the

7  government filed its original and amended complaints, which were filed one month

8  apart.  2010 WL 1507980, at *5 (D. Haw. Apr. 14, 2010).  The remainder of the

9  government's cases, including pre-CAFRA and out-of-circuit district court

10 opinions, consider motions to dismiss based on pleading inquiries.  None of these

11 cases, however, contradict the Ninth Circuit's rule that the government must *have*

12 probable cause to institute the forfeiture proceeding, not merely plead probable

13 cause.

14     **D.**     **The Date The Government Filed Its Initial Complaint Instituting**

15             **The Forfeiture Complaint Is Not Non-Existent**

16     The government argues that with filing of the SAC, the original complaint

17 was rendered "non-existent" – "no more than a mere scrap of paper" – and should

18 be treated "as if it never existed."  (Opp. at 7-8.)  The government  completely

19 ignores the existence of the relation-back doctrine.  That doctrine is the perfect

20 example of a well-established rule that demonstrates the original complaint is not

21 dead for all purposes, even if superseded by a subsequent amendment.  The

22 doctrine provides that an amendment to a pleading relates back to the date of the

23 original pleading for purposes of the statute of limitations when the amendment

24 asserts a claim or defense that arose out of the conduct, transaction, or occurrence

25 set out-or attempted to be set out-in the original pleading.  Williams v. Boeing Co.,

26 517 F.3d 1120, 1133 (9th Cir. 2008).

27

28

1   The government argues that the SAC should be treated as a new suit, thus

2   conceding that the relation back doctrine is inapplicable in this instance.  The

3   government states:

> Moreover, because the SAC contains new claims and new allegations
> that were not alleged in the original complaint—specifically, the SAC's
> bank fraud claim and its fourth claim for forfeiture—it should for this
> reason, too, be deemed "in effect the commencement of a new suit."
> (Opp. at 8).

7   Although the relation back doctrine may not be applicable to all amended pleadings,

8   the existence of the doctrine belies any suggestion that an original complaint is

9   automatically treated as if it never existed whenever an amended pleading is filed.

10  More importantly, however, the government's admission that the SAC should be

11  treated as a new suit is a tacit admission that the government needed to try to secure

12  additional evidence because the government's original complaint (as well as its

13  FAC) did not satisfy the probable cause requirement.  This is the very conduct the

14  Ninth Circuit's rule sought to prevent.  See $191,910 in U.S. Currency, 16 F.3d at

15  1067 (if the government were not required to *have* probable cause at the time it

16  instituted the action, the government could "bring proceedings (and thereby seize

17  property) on the basis of mere suspicion or even enmity and then engage in a fishing

18  expedition to discover whether probable cause exists.").

## II.   THE GOVERNMENT'S PRE-COMPLAINT EVIDENCE FAILS TO SUPPORT PROBABLE CAUSE TO FORFEIT EACH OF THE DEFENDANT *RES* AT THE TIME IT INSTITUTED THE ACTION

22  Of the 102 exhibits filed in support of the government's opposition to the

23  instant motion, 53 were acquired or otherwise reflect facts obtained after the

24  government instituted this action and are therefore irrelevant for purposes of this

25  motion.  The remaining exhibits are devoid of any reliable evidence which support

26  the government's claims that Claimant engaged in any violation of E.G. law.  As

27  set forth below, the evidence in the government's possession was little more than a

28

04579.23529/5325161

CLAIMANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT RE PROBABLE CAUSE

collection of rumors of corruption from a variety of uncorroborated sources, including organizations that the U.S. State Department deemed unreliable.

**A.** **The Government's Exhibits Do Not Show Probable Cause That Claimant Violated E.G. Law**

**1.** **The Government Attempted To Conceal Exculpatory Evidence From The State Department**

The government claims that "corruption is endemic in E.G.'s infrastructure sector. . . ." (Gov't Sep. Statement at 16)  In support of this conclusion, the government selectively quotes from a March 2011 State Department cable (Graf Ex. 14), that corruption supposedly exists in its "murkier transactions such as sweetheart deals, influence peddling, construction contracts and finder's fees." (Gov't Fact No. 74.)  The government is not accurately quoting from the document.  The government deliberately omitted the final clause of this same sentence: "***all* of which are *legal* in Equatorial Guinea**."  (Graf Decl. Exh. 14).  Moreover, the State Department has also written, two years earlier, that "E.G. has no law limiting or even defining conflict of interest."  (Graf Decl. Exh 15 at 585).

**2.** **The Government's Omission Of Evidence That Conduct Was Legal Is An Old Trick, Condemned By The Ninth Circuit In A Similar Situation**

The government claims it had probable cause based on generalized claims of "corruption."  The government cannot sincerely contend that it had probable cause to believe that Claimant's assets were traceable to violations of E.G. law when it had uncontroverted evidence that the alleged conduct and business relationships it claimed were illegal, were in fact lawful.  Indeed, the government's failure to even utilize ellipses to signal its willful omission of this exculpatory clause is telling. The Ninth Circuit's analogous analysis in $186,416.00 is instructive.  There, local law enforcement authorities obtained a search warrant for UMCC.  Even though they were aware of evidence suggesting the clinic "may have been operating in

compliance with California law," they omitted this evidence in their application for a search warrant based on violations of California state law.  Both the district court and the Ninth Circuit concluded that the search was illegal.  Indeed, the Ninth Circuit held that in omitting facts that suggested the clinic's conduct "was probably legal under California law," the agency "misled" the court into "perceiving [the clinic's] conduct as criminal."  Id. at 952.

Similarly, here, the government seeks forfeiture of the defendant *res* based on violations of *E.G. law*, while simultaneously omitting facts that it was aware of that demonstrate that the accused conduct, even if true, is legal under E.G. law.  Just as in $186,416.00, this Court should reject the government's misleading suggestion that the claimed conflicts of interest are illegal in E.G.

### 3.   Uncorroborated and Unreliable Magazine Articles Do Not Provide Probable Cause

Another large chunk of the government's pre-filing "evidence" consists of magazine articles written by NGOs that claim that corruption is widespread throughout E.G.  (See, e.g., Graf Decl. Exhibits 13, 16 and 19).  The government does not identify what effort, if any, it made to confirm that the sources of these articles are reliable or to otherwise corroborate their allegations.  Rather, the government points out merely that it can rely on inadmissible hearsay for purposes of establishing probable cause.  (Opp. at 6.)  Once again, the government is not being candid.  The cases it relies upon hold that hearsay may only form the basis for probable cause if that hearsay is *corroborated or otherwise shown to be reliable*.  See Franks v. Delaware, 438 U.S. 154, 165 (1978) (hearsay evidence supporting probable cause must be shown to be "truthful" by reciting circumstances evidencing the reliability of the information and the credibility of the informant); United States v. One 56-Foot Yacht Named Tahuna, 702 F.2d 1276, 1283-84 (9th Cir. 1983) (probable cause depends "upon the legal sufficiency

1  and reliability of the evidence").  Conversely, unreliable or uncorroborated hearsay

2  cannot be used to support probable cause.  See Mot. at 10-11.

3       Not only did the government fail to corroborate the sources of these articles,

4  but the evidence in the government's possession at the time it initiated this action

5  actually cautioned against relying on these questionable sources.  A State

6  Department cable dated March 21, 2011, admitted that the allegations against E.G.

7  in the international media and by NGOs "is extremely tendentious."  (Graf Decl.

8  Ex. 14, ECF No. 91-18, at DOJ_0000591).  In another document, the State

9  Department admits that NGOs and other organizations:

10          may be working from a position of bias and with poor information.  To
             our knowledge, none of them have undertaken recent on-the-ground
11          surveys here.  On the contrary, there are signs the perspective of the
             problem in EG may not be in complete alignment with reality.
12          Moreover, assessments rarely take into account the country's level of
             societal and institutional development. . . .  [W]e find local nuances and
13          'ground truth' to be at odds with often-exaggerated claims made by the
             international press and even by NGO's."
14          (Graf Decl. Ex. 15, ECF No. 91-19, at DOJ_0000584, -588-589).

15       The government does not dispute the State Department's findings.  Given,

16  the existence of these pre-filing concerns and the government's complete failure to

17  show that anything in these articles were based on reliable sources, the government

18  cannot rely on these NGO articles to support probable cause.  See, e.g., United

19  States v. Delgadillo-Velasquez, 856 F. 2d 1292, 1297-1298 (9th Cir. 1988) (no

20  probable cause where the government relied on an untested informant's tip, which

21  it had not shown to be reliable and failed to adequately corroborate).

            **4.    Uncorroborated Information From Italian Officials Do Not
22
                    Establish Probable Cause**
23

24       The government relies on information from Italian officials to allege that

25  Claimant had a corrupt relationship with General Work, an Italian contractor.

26  (Manzanares Decl. ¶¶ 28-32).  Yet, the Italian authorities did little more than

27  provide speculation and conjecture based on their own review of newspaper

28

1   articles and conversations with unidentified and uncorroborated sources.  As

2   discussed above, uncorroborated sources cannot establish probable cause.

3        For example, Ex. 26 is an ROI which simply notes that in April 2009, the

4   government received a report from Italian authorities (the "GDF") regarding a

5   network of bank accounts.  Exhibit 26 states:

> They[Italian authorities] believe these accounts are all owned or
> controlled by the current ruler of the country and his son and are
> allegedly funded with government revenues stolen by the dictator and
> his son. The accounts appear to have markers of money laundering.

9   Other than stating that the Italian authorities were willing to share their information

10  with the government, the report contains no other information.  Indeed, it does not

11  even identify the basis for the GDF's concerns.  Especially in the political arena,

12  those unhappy with the status quo may be motivated to publish strong, baseless

13  opinions.  The government cannot use statements that may be nothing more than

14  opinion when facts are required.  The government fails to state what, if any,

15  evidence the authorities had for this belief.  Nor do they explain what "markers"

16  give an "appearance" of money laundering.

17       Exhibits 24 and 27 report meetings between the U.S. government and the

18  GDF on June 12, 2009.  The government's opposition describes this meeting as a

19  lengthy briefing which allegedly revealed  that "Italy's analysis of that evidence

20  concluded that 45% of GW's construction revenue was diverted as kickback's to

21  Nguema's bank accounts in Switzerland, Luxembourg and Monaco."  (Opp. at 21).

22  Yet again, the government has misstated the evidence.  The report of investigation

23  in fact reads: "GDF *speculates* that OBIANG received forty-five percent of all

24  general contracting projects which were preformed [*sic*] by GW.  <u>See</u> Manzanares

25  Decl., Ex. 24 at DOJ_000317 (emphasis added).

26       The government does not identify the basis of the GDF's speculation.  This

27  too is another example of the government's efforts to deceive.  The power point

28

presentation provided to the government by the GDF reveals that the statement came

from an Italian newspaper article:

> a former agent of the secret services of that African State, friend of Celotti (who asked to be called "Santiago Ndong") stated: "Celotti gave a lot of money from the proceeds of public contracts to members of the government, but he was also giving money to the opposition. The president and his administration started to have suspicions about him. Why is it that today the president's family controls 45% of Guinea General Works?"

(Manzanares Decl., Ex. 25A at DOJ_003857).

Rather than receiving information from "reliable law enforcement partners," the

government is simply relying on the "speculation" of foreign law enforcement.

Worse still, that speculation was based on those officers' review of foreign

newspaper articles which quoted a rhetorical question from an unknown and

uncorroborated witnesses.  This is a far cry from the evidence the court found

reliable in In Re Sindona,  450 F. Supp. 672, 688 (S.D.N.Y. 1978).  There, the court

upheld an extradition warrant from Italy after it concluded that the Italian

government's evidence was based on "careful and thorough investigations" and

"amply corroborated" by deposition testimony.  Id.

In contrast, here, the government concedes that it made no effort to

corroborate the GDF's speculation regarding Claimant's relationship with General

Work (or the newspaper article for that matter).  Nevertheless, the government

claims that GDF's claims are reliable based on allegations that Nguema

misappropriated funds on other occasions.  (Opp. at 21).  Even if allegations of

different conduct were sufficient to corroborate the GDF's speculation, the

government does not provide evidence of any actual misappropriation.  Rather, the

government refers only to its purported evidence that Claimant allegedly *attempted*

to misappropriate funds to acquire a Gulfstream aircraft.  "[T]he problem remains

that the alleged misappropriation *did not in fact occur*."  Order, ECF No. 47 at 5

(emphasis in original).  The government admits Claimant did not misappropriate any

public funds in this transaction and cites no authority demonstrating alleged

-15-

1  attempted conduct is adequate corroboration.   Nor can this allegation even be fairly
2  considered an attempted misappropriation.
3          Contrary to the government's characterization, its witness did not tell the
4  government that Claimant attempted to misappropriate public funds to acquire the
5  aircraft.  Instead, the ROI states that Gulfstream "was pressuring [Claimant] for
6  payment" of the first installment and that Claimant invited the witness to E.G. to
7  avoid further payment delay in Europe.  After meeting with Claimant at a bank in
8  E.G., an authorization for the wire transfer was signed and the money successfully
9  transferred to Gulfstream without any alleged involvement of any American oil
10  company or any evidence of misappropriation of public funds.  In fact, the report
11  states that the witness "concluded the transfer was a legitimate transaction and
12  nothing in the transaction [gave] him any cause for alarm."  (Graf Ex. 5 at
13  DOJ_0000125).  The witness reportedly told the investigator that before the
14  successful wire transfer, when he "was pressuring [Claimant] for the payment" (id.),
15  Claimant allegedly suggested a "back-up" proposal wherein "he could pay [one of
16  the American oil company that have a CFA account] and they in turn could pay
17  [Gulfstream]."  (Graf Decl. Ex. 6B at  DOJ_0000131).  The witness stated that he
18  believed Claimant was merely "reacting to Gulfstream's pressure and was grasping
19  for a solution on the payment."  No efforts were made to misappropriate funds, the
20  oil company was never contacted, and the payment proceeded through a
21  "transparent and legitimate process."[2]  (Graf. Decl. Ex. 5 at  DOJ_0000125-126).
22          In short, at the time the government initiated this action, it lacked any reliable
23  evidence that even a single company had been extorted by Claimant.

24  _____

25      [2]   The government's other witness reported on what Claimant "apparently
26  mentioned" to this first witness and does not offer any first-hand account of the
27  proposal or any alleged attempt to misappropriate public funds.  See ECF Doc. No.
   91-6 at DOJ_0000116.
28

**5.**     <u>None of the Government's Other Alleged Evidence Supports</u>
<u>Probable Cause To Institute The Forfeiture Proceeding</u>

The remaining "evidence" relied on by the government is either after-acquired, impermissibly stale, or otherwise insufficient to establish probable cause. **Removal of Assets:** The government argues that the alleged removal of assets from the district *after the institution of the forfeiture proceeding* somehow supported probable cause *for the institution* of the same action. This is nonsensical. Because the government must have probable cause at the time it institutes the action, it cannot rely on alleged acts consummated after that time to retrospectively support probable cause.

**French Money Laundering Investigation:** The government argues that the existence of an investigation by French authorities and the resulting seizure of different properties somehow supports probable cause that the defendants *in rem* are subject to forfeiture under U.S. law. Not so. The seizure by French authorities occurred in September 2011 and in 2012 – **after the filing of the original complaint**. Thus, the evidence is irrelevant. Further, the government does not identify any of the evidence underlying the French investigation. The mere existence of the investigation without more does not support probable cause. This Court has already ruled that "[t]he burden is different in French court." <u>See</u> Sept. 6, 2012, Hr'g Tr. at 13:19-24.

**Tuition Payments:** The government alleges that in 1991, an American oil company paid Claimant's tuition and expenses to attend school at Pepperdine. Even if this allegation bore some relationship to the defendant assets, the 20 years that elapsed before the government instituted the action renders this allegation stale. Information becomes stale when enough time has elapsed such that there is no longer a sufficient temporal basis to support probable cause. <u>United States v. Grant</u>, 682 F.3d 827, 835 (9th Cir. 2012) (no probable cause on staleness grounds where nine-month gap between offense and warrant application failed to show "the property to be seized

1  was known to be at the place to be searched so recently as to justify the belief that

2  the property is still there at the time of the issuance of the search warrant.").

3  **Alleged Inconsistent Explanations of Wealth:** The government contends that

4  Claimant has refused to describe the sources of his wealth and at other times has

5  provided inconsistent explanations as to the source of his wealth support.  (Opp. at

6  24).  The government again misstates the facts.  Rather, on separate occasions,

7  Claimant denied that he engaged in corruption and that his business interests were

8  legitimate.  A 2009 State Department cable reported that when probed about

9  corruption, Claimant explained that during the era of the "skinny cows," he received

10 a timber concession.  Similarly in 2011, Claimant complained to the U.S.

11 Ambassador that he was a victim of false accusations of kleptocracy by the media.

12 Claimant stated that he had never taken money from the oil companies and that the

13 government could confirm that fact.  Claimant added that "his companies had

14 profited handsomely from winning government contracts in road building and

15 construction in the booming infrastructure business, but that no one wanted to hear

16 the truth.  In neither instance was Claimant asked for an exhaustive list as to the

17 sources of his wealth.

18 **Possession of Cash:**  The government cites no authority for the proposition that

19 Claimant's alleged possession of large quantities of cash supports probable cause to

20 believe that he violated E.G. law.   Instead, it cites cases which stand for the

21 proposition that large amounts of cash bundled in a manner consistent with *drug*

22 *trafficking* and accompanied by supporting evidence connecting the currency to

23 *drug trafficking* can support probable cause to seize that currency as involved in

24 *drug trafficking*.  See, e.g, United States v. Padilla, 888 F.2d 642, 644 (9th Cir.

25 1989) ("We have said that in assessing probable cause an 'extremely large amount

26 of money found in the household itself is strong evidence that the money was

27 furnished or intended to be furnished in return for drugs.'  The test requires more

28 than the mere existence of a large amount of cash to establish a connection between

-18-

CLAIMANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT RE PROBABLE CAUSE

1    that cash and illegal drug transactions; the money must be 'in combination with
2    other persuasive circumstantial evidence.'").  Given that the drug trade is a cash
3    business, that inference, when combined with other evidence, is appropriate.  On the
4    other hand, the government has not identified a single act of foreign corruption that
5    would suggest that any cash in Claimant's possession was the proceeds of
6    corruption.

7    **Real Estate Held in Name of LLC**:  That Claimants took title to the defendant real
8    property in the name of an LLC does not support probable cause that the real
9    property constitutes the proceeds of foreign corruption.  That presumption is
10   defeated by the government's admission that Claimant made offers on the property
11   in his own name.  <u>See</u> Sep. Statement at Claimant Fact A.15.  The Court has already
12   ruled that the fact he took title in the name of an LLC as part of the transaction is a
13   "commonplace financial arrangement."  <u>See</u> ECF Doc. No. 47 at 6.  The
14   government also does not dispute that Claimant holds title to the defendant Ferrari
15   in his own name as an individual.  <u>See</u> Sep. Statement at Claimant Fact  A.14.

## B.   <u>The Government Continues to Fail To Link Each Specific Defendant *Res* To Proceeds of Specified Unlawful Activity</u>

18   The Court instructed the government that "*as to each of the items* that the
19   government seeks to forfeit," the government must "list for [the Court] the bases of
20   the probable cause, . . . which will make it clear as to what are the grounds for the
21   government's belief that the *item* was forfeitable."  Jan. 28, 2013, Hr'g Tr., at 22:13-
22   20 (emphasis added).  The government has refused to do this.

23   Indeed, this was not the first time the Court has asked the government to
24   explain its basis to proceed against *these* specific assets as opposed to some other
25   asset, but tellingly, the government has been unable to do so.  And the reason is
26   clear, the government has no basis to connect the specific *res* to any SUA.
27   However, "the government is supposed to have that information as a basis for filing
28   the forfeiture." Sept. 6, 2012, Hr'g Tr. at 12:17-13:13.  As the Court has explained,

-19-

CLAIMANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT RE PROBABLE CAUSE

eventually, if this case is going to go forward, there has to be that tracing. And even though you have come up with some theories which appear to be sufficient on their face for certain things, unless there is that tracing where under one of the four theories that the government is proceeding under, that you can trace the proceeds from one of these bases to the *specific* items that you're seeking to forfeit the glove, the Ferrari, the house. . . . If the government doesn't meet the burden, then we stop the case at this point in time, but we've litigated the case fully. Sept. 6, 2012, Hr'g Tr. at 12:20-13:13 (emphasis added).

Accordingly, because the government has failed to present evidence connecting, either directly or indirectly, unlawful SUA activity and the specific defendant *res* it seeks to forfeit, summary judgment is appropriate.  See, e.g., United States v. U.S. Currency, $30,060.00, 39 F.3d 1039, 1045 (9th Cir. 1994) (affirming summary judgment against the government); United States v. $405,089.23 U.S. Currency, 122 F.3d 1285, 1292 (9th Cir. 1997) (reversing and holding the government "failed to demonstrate the requisite probable cause for the institution of its forfeiture proceeding because there is a gap in the evidence between the targeted assets and the illegal narcotics activity").

## C.   The Government's Net Worth Theory Does Not Provide Probable Cause

In the absence of reliable evidence regarding specific acts of corruption, the government relies heavily on the so-called "net worth theory."  The government argues it could essentially forfeit any single item of Claimant's property based on its belief that Claimant's expenditures exceeded his government salary.

As a preliminary matter, this theory requires that Claimant's "net worth" derive from illegitimate sources.  See, e.g., United States v. $223,178.00 In Bank Account Funds, 2008 WL 4735884 (C.D. Cal. Apr. 30, 2008) (claimant unemployed with no significant income for the past six years based on pre-filing tax returns presented by the government); United States v. $20,280.00 In U.S. Currency, 2011 WL 4448735 (C.D. Cal. Sept. 13, 2011) (claimant was unemployed at the time and had never filed tax returns because his earnings were too low).  Second, even if the

government can establish this element, it must still show some nexus between the *res* and specified unlawful activity.  See infra Section II.C.2.

1.  **The Net Worth Theory Requires Proof That Claimant Lacked Sufficient Income From Legitimate Sources**

The government argues that Claimant's wealth is derived in large part from "corruption" stemming from improper government contracts and commodity concessions. Yet, the government does not identify a single victim of corruption and its claim that those relationships are illegal is contradicted by two separate statements by the State Department.  Accordingly, the government cannot establish this prong of the net worth inquiry.

In a parallel forfeiture proceeding that the government is pursuing against Claimant's aircraft in the District Court for the District of Columbia, the court recently dismissed the government's complaint, observing that the government's admission that "Nguema owns or controls a number of companies" defeated the inference the government urges here.  The court held that the government could not support this inference because it did not know

> what income Nguema derives from [his companies].  Thus without knowing what Nguema's means are, the court is hard-pressed to infer that he lives beyond them.  Absent other details, the court cannot infer how Nguema's wealth may have been derived, nor from what sources, nor the legality of those sources.  Although the government alleges that Nguema lives far beyond his means, the court cannot leap to the conclusion that his largesse is evidence of criminal activity.

One Gulfstream G-V Jet Aircraft, D.D.C. ECF No. 22 at 22.

The government has not presented any pre-filing evidence that supports probable cause to believe that Claimant did not have substantial legitimate income beyond his official salary.  Instead, the government miscites the burden, arguing that Claimant "presents no evidence" of his non-government salary income.  (Opp. at 15.)  That is not the law.  Post-CAFRA, the government bears the burden to establish each of the elements of its claims.  18 U.S.C. § 983(c)(1).  Indeed, each of the cases cited by the government where the court considered claimant's failure to

1  rebut the net worth evidence with counter evidence of legitimate source income, was

2  either decided pre-CAFRA, or in the context of a government motion for summary

3  judgment and claimant's failure to raise a genuine dispute of material fact following

4  the government's proof of illegality by a preponderance of the evidence.

5      As a result, the court in the parallel D.C. proceeding recognized that it is the

6  government's burden to prove the defendant assets are derived from or proceeds of

7  the alleged specified unlawful activity; a burden the government did not meet to

8  support probable cause for forfeiture:  "Absent some specific indication that the Jet

9  is derived from or traceable to illicit activity, the complaint must be dismissed."

10  Id. at 23.

11          **2.      The Net Worth Doctrine Requires a Link Between The *Res***

12                  **and The Specified Unlawful Activity**

13      Even if the government had some evidence which suggested that Claimant

14  had significant illegitimate income, that fact standing alone would not support

15  application of the net worth theory.  In each instance where this theory supported

16  probable cause for the government's case, the court also relied on evidence

17  connecting the *res* with the alleged conduct constituting specified unlawful activity

18  giving rise to forfeiture.  See, e.g., United States v. $223,178.00 In Bank Account

19  Funds, 2008 WL 4735884 (C.D. Cal. Apr. 30, 2008) (claimant  admitted

20  participation in the scheme for payment, and the government presented independent

21  evidence of participation in the scheme and receipt of illegal funds in excess of

22  amount seized); United States v. $20,280.00 In U.S. Currency, 2011 WL 4448735

23  (C.D. Cal. Sept. 13, 2011) (for connection to drug trafficking, the court also

24  considered a positive alert by a narcotics canine, the packaging and location of the

25  property consistent with drug activity, and claimant's criminal record); United

26  States v. Thomas, 913 F.2d 1111 (4th Cir. 1990) (claimant thrice convicted on drug

27  charges, testimony of an undercover agent who bought drugs at claimant's place of

28  business implicating claimant in the transactions, discovery of drug-packaging

1  materials, and corroborated informants who bought drugs from the claimant);

2  United States v. 3714 Cancun Loop, 2002 WL 1035457 (May 17, 2002) (claimant

3  admitted he was a drug dealer and used drug proceeds to purchase materials used to

4  build the house on the defendant real property).

5          This requirement is well-founded and demonstrably necessary in light of the

6  nature of an *in rem* proceeding.  In an *in rem* proceeding, "[i]t is the property

7  which is proceeded against, and, by resort to a legal fiction, held guilty and

8  condemned as though it were conscious instead of inanimate and insentient."

9  Various Items of Personal Property v. United States, 282 U.S. 577, 581 (1931).

10 The government's supposed basis would disregard any alleged guilt of the item

11 and focus *exclusively* on the alleged disparity between the level of the claimant's

12 spending and what it contends is his only legitimate income (although in reality

13 merely a subset of it) without any demonstration that the defendant – the thing – is

14 guilty.  Essentially, the government wants to rely on *in personam* forfeiture against

15 Claimant irrespective of the guilt of the thing it has filed against.  This is not a

16 criminal forfeiture case, however, and Claimants have not been convicted of a

17 crime giving rise to forfeiture.  Accordingly, the government must make its case

18 that the defendant *res* is guilty, not the person.  Various Items of Personal Property

19 v. United States, 282 U.S. 577, 581 (1931); c.f. Fed. R. Crim. P. 4(a) (arrest

20 warrant requires "probable cause to believe that an offense has been committed

21 and that the defendant committed it").

22      **D.    The Government's Belated Bank Fraud Theory Is Irrelevant To**

23              **The Issue Of Probable Cause When The Action Was Instituted**

24          Contrary to the government's contention, Claimant moved for summary

25 judgment and challenged the government's bank fraud allegations as a basis for

26 probable cause to institute the forfeiture proceeding in its moving papers (Mot at 1

27 and 12 n.9.), and separate statement (Sep. St. at Fact Nos. A.20, B.6, C.6.).

28

1    The government contends it had probable cause to institute forfeiture

2  proceedings because of the Claimant's alleged bank fraud.  The fatal flaw in that

3  argument is that the government did not plead bank fraud when it instituted this

4  action.  The government must have probable cause to believe that the property is

5  involved in the activity subject to the specific forfeiture statute it invokes.

6  $191,910.00, 16 F.3d at 1071.  The government did not plead bank fraud as a basis

7  for forfeiture of any of the defendant assets in the original complaint.  Rather, the

8  sole basis for the government's forfeiture claims was that the defendant assets were

9  the proceeds of specified unlawful activity of "foreign offenses."  Complaint, ECF

10  Doc. No. 1, at 6-7; Opp., ECF Doc. No. 44, at 1-2, 8-9, 11, 14.

11    Logically, when the government did not plead any bank fraud related theory,

12  the government could not have been relying on a bank fraud theory when it

13  instituted this action.  Furthermore, even the FAC did not allege a bank fraud theory.

14  If there could be any doubt as to the government's basis in seeking forfeiture, it was

15  eliminated when, in opposing Claimant's Motion to Dismiss the FAC, the

16  government conceded that it relied on "three distinct claims for forfeiture," and that

17  each of these bases depended on the specified unlawful activity of "offenses against

18  a foreign nation."  Opp., ECF Doc. No. 44, at 1-2, 8-9, 11, 14.  Even as to the basis

19  that defendant *res* were "involved in" a money laundering transaction involving

20  proceeds of a SUA, the only SUA it relied on were likewise offenses against a

21  foreign nation constituting extortion and the misappropriation, theft or

22  embezzlement of public funds.  Id. at 2, 8.  Indeed, the Court too recognized that "in

23  order for the Government to prevail on any of their three stated bases for forfeiture

24  of the Defendant Assets, it must show that Nguema amassed a wealth in a manner

25  illegal under E.G. law. . . ."  Order Dismissing FAC, ECF No. 47, at 3.[3]

---

[3]   Claimant maintain the government's bank fraud theory fails as a matter of law.

1    The government's assertion that the SAC should be treated as a new suit is a

2    tacit concession that the government had not relied on a bank fraud theory as a

3    basis for forfeiture.  If probable cause to institute an action is to have any meaning,

4    it must mean just that; probable cause for the claims instituted.  The proposition

5    advanced by the government renders the statute meaningless.

6    The Supplemental Rule's requirement that the government verify its

7    forfeiture complaint, which allows it to immediately obtain a warrant, further

8    assures that the government must support probable cause as of the time it files this

9    verified, instituting complaint.  <u>See</u> <u>$191,910.00</u>, 16 F.3d at 1068 ("Because the

10   government must swear that probable cause exists at the time it institutes the

11   action, and that specific facts exist to support probable cause, it is entirely

12   reasonable to conclude that probable cause must actually exist when the

13   government brings forfeiture proceedings."); <u>cf.</u> <u>United States v. Anderson</u>, 453

14   F.2d 174, 175-176 (9th Cir. 1971) (holding bases for probable cause "must be

15   contained within the four corners of a written affidavit given under oath;" other

16   information, even which the government knew prior in time, was "irrelevant to a

17   determination of probable cause" where it was omitted from the sworn affidavit).

18   The government was required to swear it had probable cause under the crime

19   it specified.  On that basis alone, it instituted suit.  It turns out, it did not have

20   probable cause at all.  But according to the government, that does not matter.  It

21   had, the government argues, undisclosed evidence of an undisclosed crime, and

22   those secrets substituted for compliance with the statute.  The government's

23   argument reduces to the modern legal equivalent of "shoot first, ask questions

24   later" – "sue first, provide probable cause later."

25   **<u>Conclusion</u>**

26   For the foregoing reasons, the Court should grant Claimants' motion, enter

27   judgment in favor of Claimants and order the immediate return of the defendant

28   assets.

1  DATED:  June 7, 2013              QUINN EMANUEL URQUHART &
2                                    SULLIVAN, LLP

3
4                                    By  /s/ Duane R. Lyons
5                                         Duane R. Lyons
                                          Brian M. Wheeler
6                                         Attorneys for Claimants Vice President
                                          Teodoro Nguema Obiang Mangue and
7                                         Sweetwater Malibu, LLC

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28