QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Duane R. Lyons (Bar No. 125091)
  duanelyons@quinnemanuel.com
  Brian M. Wheeler (Bar No. 266661)
  brianwheeler@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:  (213) 443-3000
Facsimile:   (213) 443-3100

FOREMAN DEGEURIN & DEGEURIN
  Mike DeGeurin (*Admitted Pro Hac Vice*)
  mdegeurin@foremandegeurin.com
300 Main Street, Third Floor
Houston, Texas 77002
Telephone:  (713) 655-9000
Facsimile:   (713) 655-1812

FISHER & KREKORIAN
  Kevin Fisher (Bar No. 131455)
  rkf@fkslaw.net
2121 Park Drive
Los Angeles, California 90026
Telephone:  (310) 862-1225
Facsimile:   (310) 388-0805

Attorneys for Claimants Vice President
Teodoro Nguema Obiang Mangue
and Sweetwater Malibu, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 2:11-03582-GW-SS |
| Plaintiff, | Hon. George H. Wu |
| vs. | CLAIMANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON THE LIMITED ISSUE OF PROBABLE CAUSE; OR, IN THE ALTERNATIVE, ORDER FINDING THE GOVERNMENT LACKED PROBABLE CAUSE AT THE TIME IT INSTITUTED THE ACTION FOR FORFEITURE *IN REM*; |
| ONE WHITE CRYSTAL-COVERED "BAD TOUR" GLOVE AND OTHER MICHAEL JACKSON MEMORABILIA; REAL PROPERTY LOCATED ON SWEETWATER MESA ROAD IN MALIBU, CALIFORNIA; ONE 2011 FERRARI 599 GTO, | |
| Defendants. | [Claimants' Response to Government's Statement of Alleged Facts and Declaration of Duane R. Lyons filed concurrently herewith] |
| | Hearing Date: August 19, 2013 Time: 8:30 a.m. Place: Courtroom No. 10 |

04579.23529/5442456.6

CLAIMANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ........................................................................................................... 1

I.    THE GOVERNMENT LACKED PROBABLE CAUSE TO
INSTITUTE THE FORFEITURE ACTION AGAINST THE
DEFENDANT ASSETS ................................................................................. 1

    A.    The Government's General Allegations Of Unspecified
Corruption And Alleged Attempted Conduct Are Insufficient To
Support Probable Cause To Forfeit These Defendant Assets ................. 3

II.    BECAUSE THE GOVERNMENT DID NOT INVOKE BANK
FRAUD AS A BASIS FOR FORFEITURE WHEN IT FILED THE
ACTION, IT CANNOT SUPPORT PROBABLE CAUSE TO
INSTITUTE ................................................................................................. 14

III.    CLAIMANTS MOVED FOR AND ARE ENTITLED TO
JUDGMENT, WHICH WOULD HAVE A PRECLUSIONARY
EFFECT ON FUTURE ACTIONS FOR FORFEITURE ON THE
SAME BASES ............................................................................................. 17

CONCLUSION ..................................................................................................... 20

CLAIMANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## <u>Cases</u>

<u>Anderson v. Liberty Lobby, Inc.</u>,
477 U.S. 242 (1986) ........................................................................ 2

<u>Celotex Corp. v. Catrett</u>,
477 U.S. 317 (1986) ........................................................................ 2

<u>Costello v. United States</u>,
365 U.S. 265 (1951) ................................................................. 19, 20

<u>Kennedy v. Applause, Inc.</u>,
90 F.3d 1477 (9th Cir. 1996) .......................................................... 2

<u>Thornhill Publ'g Co. v. GTE Corp.</u>,
594 F.2d 730 (9th Cir. 1979) .......................................................... 2

<u>U.S. v. $31,999.00 in U.S. Currency</u>,
1992 WL 209542 (N.D.N.Y. June 1, 1992) ................................. 18

<u>U.S. v. $32,000 in U.S. Currency</u>,
2007 WL 1297098 (D. Ariz. Apr. 30, 2007) ................................ 18

<u>U.S. v. $38,000</u>,
816 F.2d 1538 (11th Cir. 1987) .................................................... 19

<u>U.S. v. $49,576.00 U.S. Currency</u>,
116 F.3d 425 (9th Cir. 1997) ........................................................ 13

<u>U.S. v. $186,416 in U.S. Currency</u>, ............................................. 18
590 F.3d 942 (9th Cir. 2010)

<u>U.S. v. $405,089.23 U.S. Currency</u>,
122 F.3d 1285 (9th Cir. 1997) ............................................ 3, 15, 19

<u>U.S. v. $506,231 in U.S. Currency</u>,
125 F.3d 442 (7th Cir. 1997) .......................................................... 3

<u>U.S. v. 191,910.00 in U.S. Currency</u>,
16 F.3d 1051 (9th Cir. 1994) ......................... 1, 2, 14, 15, 17, 19

<u>U.S. v. $191,910 in U.S. Currency</u>,
788 F. Supp. 1090 (N.D. Cal. 1992) .............................................. 1

<u>U.S. v. $493,850.00 in U.S. Currency</u>,
518 F.3d 1159 (9th Cir. 2008); <u>S</u> ....................................... 2, 12, 13, 15

<u>U.S. v. 1982 Yukon Delta Houseboat</u>,
774 F.2d 1432 (9th Cir. 1985) ........................................................ 2

-ii-

CLAIMANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

U.S. v. One Parcel,
  705 Supp. 710 (D.R.I. 1989) ................................................................. 19

U.S. v. One Partially Assembled Drag Racer,
  899 F. Supp. 1334 (D.N.J. 1995)........................................................... 19

U.S. v. Real Prop. Known As 22249 Dolorosa St.,
  167 F.3d 509 (9th Cir. 1999) ................................................................... 3

U.S. v. U.S. Currency, $30,060.00,
  39 F.3d 1039 (9th Cir. 1994) ................................................................. 13

United States v. 9,800,
  952 F. Supp. 1254 (N.D. Ill. 1996)........................................................ 19

Villarimo v. Aloha Island Air, Inc.,
  281 F.3d 1054 (9th Cir. 2002) ................................................................. 2

**Miscellaneous**

9th Cir. Model Crim. Jury Instr. § 5.3 ................................................... 7, 8

CLAIMANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## MEMORANDUM OF POINTS AND AUTHORITIES

### Preliminary Statement

Instead of addressing the issues raised by the Court's tentative ruling, the government's supplemental brief simply re-argues the evidence this Court has previously rejected. The government still has not identified a single victim of extortion or bribery, or a specific instance of bid rigging. Nor can it show that it attempted to corroborate any of the reports of illegal activity that were referenced in the newspaper or magazine articles that it heavily relies on. In short, *all that the government has is evidence that Claimant spent money.* Where the money came from is a matter of pure speculation. Accordingly, at the time it commenced this action, the government lacked probable cause to believe that the Defendant Assets were the proceeds of foreign corruption.

Nor can the government rely on its last-minute bank fraud claim to save this action. As set forth below, "probable cause to believe that the property is involved in some illegal activity is not enough—the government must have probable cause to believe that the property is involved in the activity subject to the specific forfeiture statute it invokes." U.S. v. 191,910.00 in U.S. Currency, 16 F.3d 1051, 1071 (9th Cir. 1994). Although the government may now subjectively believe it had evidence to support a bank fraud claim, there is no dispute that it did not identify bank fraud as a basis for the forfeiture theories it invoked. Accordingly, summary judgment is appropriate. Because Claimants are entitled to summary judgment, a Fed R. Civ. P. 41.1 hearing on E.G. law is not necessary.

### Argument

### I.   THE GOVERNMENT LACKED PROBABLE CAUSE TO INSTITUTE THE FORFEITURE ACTION AGAINST THE DEFENDANT ASSETS

"Whether the government has shown probable cause is a question of law for the trial court." U.S. v. $191,910 in U.S. Currency, 788 F. Supp. 1090, 1094 (N.D. Cal. 1992) (granting claimant's motion for summary judgment) aff'd sub nom.,

1  $191,910.00, 16 F.3d 1051; see also U.S. v. 1982 Yukon Delta Houseboat, 774 F.2d

2  1432, 1434 (9th Cir. 1985) (probable cause determination in a forfeiture proceeding

3  is a question of law).   Moreover, the Supreme Court has specifically held that

4  summary judgment is proper against a party who "fails to make a showing sufficient

5  to establish the existence of an element essential to that party's case, and on which

6  that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S.

7  317, 322 (1986).   Here, the government bears the burden of proving that it had

8  probable cause to institute this action.   Accordingly, in order to defeat this motion,

9  the government must "set forth specific facts showing that there is some genuine

10  issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

11       The government argues that its evidence is sufficient for a reasonable jury to

12  find the existence of probable cause and therefore the instant motion must be denied.

13  (Supp. Br. at 5.)   However, the government cannot simply proffer unreliable

14  evidence to avoid summary judgment.   The government's basis for probable cause

15  "can be less than prima facie proof," but it "requires more than a mere suspicion."

16  U.S. v. $493,850.00 in U.S. Currency, 518 F.3d 1159, 1168 (9th Cir. 2008);

17  $191,910.00, 16 F.3d at 1071.   The Court should "refuse[ ]to find a 'genuine issue'"

18  where the only evidence presented is "uncorroborated and self-serving testimony."

19  Villarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting

20  Kennedy v. Applause, Inc., 90 F.3d 1477, 1481 (9th Cir. 1996)).   Likewise,

21  conclusory or speculative testimony in affidavits and moving papers is not sufficient

22  to defeat summary judgment.   See Thornhill Publ'g Co. v. GTE Corp., 594 F.2d

23  730, 738 (9th Cir. 1979).   The mere existence of a "scintilla" of evidence in support

24  of the nonmoving party's position is not sufficient.   Liberty Lobby, Inc., 477 U.S. at

25  249-50.   Further, "[i]f the evidence is merely colorable, or is not significantly

26  probative, summary judgment may be granted."   Id.

27       More importantly, in order to establish probable cause, the government must

28  also demonstrate a nexus between the actual named Defendant Assets it seeks to

forfeit and the specified unlawful activity it alleges gives rise to forfeiture under the statutory scheme it invokes.  See, e.g., U.S. v. $405,089.23 U.S. Currency, 122 F.3d 1285, 1291 (9th Cir. 1997) (without the requisite nexus between the defendant property and the criminal conduct, "the Government cannot establish probable cause for its forfeiture proceeding"); U.S. v. $506,231 in U.S. Currency, 125 F.3d 442, 451 (7th Cir. 1997) (to meet its probable cause burden, the government must demonstrate "a nexus between the money and narcotics-related activities.").

A. **The Government's General Allegations Of Unspecified Corruption And Alleged Attempted Conduct Are Insufficient To Support Probable Cause To Forfeit These Defendant Assets**

The government rehashes the same allegations that it previously claimed supported probable cause.  However, none of this evidence establishes the specified unlawful activity of "extortion, bribery of a public official, or the misappropriation, embezzlement, or theft of public funds by or for the benefit of a public official, in violation of the law of Equatorial Guinea. . . ."  Complaint, ECF No. 1, at 2.  As a result, the government has failed to present evidence of any illegal proceeds.

Moreover, even if, *arguendo*, the government could show that this conduct generated some proceeds– which it cannot – it still has failed to cite evidence sufficient to show probable cause that the named Defendant Assets are forfeitable as proceeds of such specified unlawful activity.  See $405,089.23, 122 F.3d at 1290-92 (holding despite evidence of underlying criminal conduct, the government lacked sufficient probable cause to forfeit because it failed to connect that conduct to the defendant property).  See, e.g., U.S. v. Real Prop. Known As 22249 Dolorosa St., 167 F.3d 509, 514 (9th Cir. 1999) (evidence insufficient to establish the requisite connection between claimant's drug activity and the property to be forfeited.).  Common sense dictates that the government could not show probable cause that the Defendant Assets were proceeds of specified unlawful activity when it has no evidence that any proceeds were ever generated in the first place.

**The Italian law enforcement officials did not provide the government with reliable evidence to support probable cause that claimant violated the laws of E.G.**  The government contends that Claimant used General Works ("GW") to launder "stolen" public infrastructure funds and kickbacks, stating "[I]ndeed, according to Italy, Celotti paid Nguema an amount equivalent to 45% of GW's revenue." (Supp. Br. at 6 (citing Manz. Decl. Exs. 24, 25A).)  This mischaracterizes the actual documents.  Exhibit 24 states "GDF *speculates* that OBIANG received forty-five percent of all general contracting projects which were preformed [*sic*] by GW." (Manz. Ex. 24 at -317 (emphasis added).)  Although the government identifies a newspaper article (Manz. Ex. 25A.) as the source of the 45% figure, that percentage did not refer to "kickbacks" from construction projects, but rather referred to a separate claim that the President's family acquired a 45% interest in GW after Celotti's death.  Indeed, none of the evidence the government received from Italian law enforcement states that Claimant received kickbacks from GW or any other source.  Further, as the Court noted in its tentative ruling ("TR"), the government did not identify any efforts it made to corroborate the newspaper's actual allegations. See TR at 11 n.9.  The government has still failed to do so.  Accordingly, it cannot support probable cause to believe the Defendant Assets were purchased with proceeds of foreign corruption.

The government claims that during a meeting on June 12, 2009, the GdF reported that two individuals claimed to be co-owners of GW, along with Igor Celotti (who owned 45%).  The GdF stated that Celotti died in 2007, allegedly as the result of a mysterious airplane crash, and these two individuals claimed that their business had been fraudulently taken over by members of the ruling family in Equatorial Guinea.  (Manz. Ex. 27 at -419.)  The government does not state what information, if any, the GdF provided to support this claim.  However, the government cites to a statement from an undated excerpt from an Italian newspaper

CLAIMANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

article questioning the death of Celotti.  The article hypothesized that Celotti was the victim of foul play, stating "Celotti managed a business many wanted:"

> Celotti gave a lot of money from the proceeds of public contracts to members of the government, but he was also giving money to the opposition. The president and his administration started to have suspicions about him. Why is it that today the president's family controls 45% of Guinea General Works? (Manz. Ex. 25A at -3857.)

At best, the article raised two separate concerns.  First, that Celotti gave money to government officials.  Second, after Celotti's death, the president's family controlled 45% of GW.  However, neither claim provides reliable support for the government's contention that Celotti paid Claimant 45% of all general contracting projects performed by GW.  To begin with, the article doed not identify any illegal kickback to Claimant.  The article simply references payments to unidentified members of the government and the opposition.  Moreover, the 45% figure comes from Celotti's ownership of GW, which the "ruling family" allegedly assumed control of after his death in 2007.  Exhibit 25A provides no evidence that Celotti paid Claimant anything, let alone 45% of GW's receipts.  (See Manz. Ex. 25A.)  Not surprisingly, the government does not identify any effort that it made to corroborate this article and candidly admits "[T]he GdF reported that they have been unable to validate the press reports with police reports from relevant Authorities in Equatorial Guinea."  (Manz. Ex. 27 at DOJ 419.)

The government claims, however, that the Italian authorities did not rely solely on the press release to support its speculations, but relied on other evidence, including witness interviews and review of financial records.  (Supp. Br. at 7, citing Manz. Exs. 24 and 27).  None of this evidence establishes any form of illegal kickback scheme.  The only financial transaction involving Claimant that is referenced in Exhibit 24 concerns a $20,000 payment to cover medical expenses he incurred in the United States in 2004. (Manz. Ex. 24 at -319).  Exhibit 24 does not reference any form of extortion or identify any kickbacks paid to Claimant or anyone else for that matter.  The report simply states that Celotti, was at one time

bankrupt as the result of many failed corporations. However, he became friends with the President of EG and eventually became a millionaire. (Manz. Ex. 24 at - 317). The report also claims that one month prior to his death, he allegedly transferred his assets to his wife and a third person named Gimmy Ricci who allegedly opened several fraudulent corporations in Italy.

Exhibit 27 is similarly devoid of evidence supporting the existence of a kickback scheme. Although the report claims that Italian authorities "identified a network of accounts that are owned or controlled by Teodoro OBIANG," there is no evidence to support the additional claim that those accounts were "allegedly funded with government revenues stolen by the father and his son." (Manz. Ex. 27 at - 419.) Not only did the GdF fail to identify any amount of money in these accounts, but Exhibit 27 does not identify a single payment or kickback to Claimant or anyone else. Thus, there is no basis to assume that these accounts contained the proceeds of any illegal activity, let alone the proceeds of foreign corruption. Rather, Exhibit 27 simply identifies a number of companies in which Celotti owned shares, which were allegedly taken over by the "Obiang family" after his death. (Id. at 420.)

The government cites no reliable evidentiary support for this alleged takeover. Indeed, the government has never even contended that Claimant violated EG law by assuming 45% control of GW after Celottis's death. Rather, the government claimed that Celotti paid Claimant 45% of GW's revenues while he was alive. As set forth above, there is no support for that claim. To the extent that the government (now, for the first time) suggests that the alleged control of GW (in 2007, after Celotti's death) supports probable cause that the Defendant Assets were the proceeds of that allegedly illegal takeover, that claim fails as well. The newspaper report and the uncorroborated testimony of two unidentified businessmen are conclusory and provide no indication as to how this change of control allegedly occurred. Moreover, even if their claims were credible, there is no indication that any funds from the alleged control of GW in 2007 were used to purchase the

CLAIMANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant Assets.  Inasmuch as Claimant purchased the Malibu estate in 2006, while Celotti was alive, there is absolutely no basis to claim that the Malibu estate is the proceeds of that alleged takeover.  Likewise although the government claims that a nexus exists between Celotti and Claimant because Claimant sent communications relating to Sweetwater's acquisition from Celotti's office in 2006, the government must concede that those communications took place while Celotti was alive and therefore before the alleged takeover, which is the only source of alleged funds its evidence could possibly suggest Claimant may have derived through GW.  In sum, none of these exhibits provide reliable evidence of a kickback scheme, bribery, extortion or any other violation of foreign law that resulted in proceeds used in the acquisition of the Defendant Assets.

**There is no credible evidence to support alleged *attempted* misappropriation and extortion.**  Claimant's negotiation for the purchase of an airplane and a hotel construction project do not demonstrate any illegal conduct.  The Court found that "[a]t best, then, the Government has presented evidence of an attempted misuse of EG assets."  TR at 10.  The evidence the government cites, however, does not even rise to the level of an attempt.  To prove an attempt, the government must prove that Claimant "intended" to misappropriate public funds, and that he "did something that was a *substantial step* toward committing the crime."  9th Cir. Model Crim. Jury Instr. § 5.3 (Attempt).  The evidence, however, belies a conclusion that Claimant either intended to misappropriate public funds or took a substantial step toward the commission of the misappropriation.

During Claimant's negotiations to purchase the airplane, he had several conversations with Mr. Fuller who prepared a letter regarding an April 20, 2004 conversation (Graf Ex. 6A) and an email regarding a conversation that occurred on April 25, 2004.  (Graf Ex. 6B.)  According to the April 25 email, which Fuller described as containing the latest information, Claimant stated that he wanted to solve the payment issue by transferring the money through "traditional means."

1   Claimant then suggested a "back-up" proposal to expedite payment wherein "he
2   could pay [one of the American oil company that have a CFA account] and they in
3   turn could pay [Gulfstream]."  (Graf Ex. 6B at -131.)  Thus, the latest information
4   on this issue belies any intention of Claimant to misappropriate public funds—
5   Claimant allegedly suggested that he (not the E.G. government treasury) could first
6   give a company which has an account in his native currency the money for the plane
7   in such currency and have that company thereafter pay those funds to Gulfstream
8   (presumably in U.S. dollars) to expedite the payment.  Mr. Fuller does not describe
9   any intention for Claimant to misappropriate any public funds in such a suggested
10  transaction.

11      Given that this email was the latest information on the subject, the
12  government cannot demonstrate that Claimant took a substantial step toward
13  misappropriating public funds based on an earlier conversation.  (See Graf. Ex. 6A.)
14  "To constitute a substantial step, a defendant's act or actions must demonstrate that
15  the crime will take place unless interrupted by independent circumstances."  9th Cir.
16  Model Crim. Jury Instr. § 5.3 (Attempt).  Even if Claimant and Fuller had
17  previously discussed the possibility that the E.G. government would pay for the
18  plane,  Ex. 6B demonstrates that Claimant did not pursue that idea—the oil
19  company was never contacted, no efforts were made to misappropriate funds, and
20  the payment proceeded through a "transparent and legitimate process."  (Graf Ex. 5
21  at -125-126.)   Indeed, the Court too observed that the oil company was never
22  contacted or used to purchase the jet, and that the Gulfstream executive "'concluded
23  the transfer was a legitimate transaction and nothing in the transaction has given him
24  any cause for alarm.'"  TR at 10.

25      Likewise, the evidence the government relies on for the suggestion that
26  Claimant attempted to extort a British company that wanted to build a hotel in EG
27  does not establish any attempted crime.  The government claims that in or around
28  2003, a British company sought permission to build a Sheraton hotel in EG's capital

-8-

and that Claimant refused to permit the British company to build the hotel unless its executives agreed to provide him with 55 percent of the hotel's equity. (EX. A #32.)  However, the government has again, misconstrued the actual report of investigation.  Exhibit 7 to the Graf declaration states,

> [Claimant] was the point person from the EG government in the dealings with the British company. In 2003, Kareri went with a delegation from the British company to Obiang's home in Los Angeles, California.  Obiang said the British company could not build the hotel as the **EG government was not getting enough of the share**. Obiang demanded a fifty-five percent share of the hotel, and the company declined to build the hotel. Kareri does not remember the name of the British company that wanted to build the hotel.
> (Graf Ex. 7 at 83-84 (emphasis added).)

Contrary to the government's assertion that Claimant attempted to extort money for himself from the hotel, the report clearly states that Claimant was negotiating on behalf of the government and that the 55% share he allegedly demanded was for the government's required interest in the project because the government was not getting enough of the share.  Thus, this evidence does not even amount to an attempt.  Even if it did, as the Court's tentative makes clear, such conduct would not support probable cause.

**Probable cause cannot be based on uncorroborated rumors of alleged extortion of timber businesses.**  As the Court stated in its tentative ruling, "the Government's reliance on a news article, written by an individual who has not submitted an affidavit before the court and claiming some anonymous timber executives stated that Claimant 'would call meetings of other timber company managers and collect extortion money from them,' is insufficient.  It is unclear what the Government, or even the reporter, did to confirm this anonymous informant's information."  TR at 11 n.9 (citation omitted).  The government still has not pointed to any efforts it made to corroborate and demonstrate the reliability of the allegations made by unknown sources in articles for NGO publications.

Indeed, the only evidence that has been proffered so far demonstrates that these NGOs are "extremely tendentious," and "may be working from a position of

bias and with poor information," "with often-exaggerated claims," "which [are] at odds" with "local nuances and 'ground truth.'"  (Graf Ex. 14 at -591, Ex. 15 at -584, -588-589.)

The government cannot rely on these organizations to support probable cause without first demonstrating that it addressed the State Department's concerns about their reliability.  The only plausible conclusion that can be drawn from the government's continued failure to demonstrate it corroborated and assured the reliability of these unknown sources is that it did not.  And as the Court stated, "An unknown informant's information cannot be corroborated by unknown means.  *See* Gates, 462 U.S. at 242 (holding that an informant's information may help establish probable cause 'so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge.')."  TR at 11.

**The "French" investigation does not support probable cause.**      The government attempts to mislead this court by suggesting that Claimant was the subject of a French criminal investigation and that "France confirmed most of [these] allegations."  (Supp. Br. at 9, citing Manz. Ex. 2 at -124611.)  However, the PSI reveals no such thing.  The PSI simply notes that three NGOs filed a lawsuit (in France) claiming that the ruling families of several African states had allegedly amassed millions of dollars worth of properties in France "that could not be the fruits of their official salaries . . . but would have likely required the use of stolen public assets."  (Manz. Ex. 2 at -124611.)  Later, the NGOs filed a legal memorandum in which *the NGOs claimed* that the French police had corroborated most of the allegations and uncovered additional luxury assets.  (Manz. Ex. 2 at -124611, n.78.)  Thus, contrary to the government's suggestion, there is no evidence that the French police confirmed any of the NGOs' claims.  Rather, the NGOs filed a brief which contained that self-serving statement.  Significantly, the PSI did not identify a single document from the French police stating that they had corroborated

1  the NGOs claims or otherwise establishing that those assets were the proceeds of
2  foreign corruption.

3      **The government has not shown that Nguema's net worth is criminally
4  derived.**  The government has failed to offer any reliable evidence that Claimant
5  engaged in conduct that is illegal and which generated proceeds in the first instance.
6  The government's net worth theory presupposes that Claimant's net worth was
7  illegally derived, but without evidence of any actual illegal conduct or proceeds
8  thereof, the government's leap to the so-called net worth doctrine lacks both logical
9  and legal bases.  As this Court noted in dismissing the FAC, the government's
10  evidence fails to prove "that the funds were illegally-procured in the first instance."
11  Order, ECF No. 47, at 4.  Instead, the government's characterization of the evidence
12  "is devoted to describing Nguema's lavish lifestyle and profligate spending, which
13  the government then attempts to convert into illegal activity by stating conclusorily
14  that Nguema's only legitimate income was a 'relatively modest' government salary
15  of under $100,000 per year." Id.

16      Not only has the government stilled failed to produce evidence of *illegal*
17  conduct from which *any* proceeds were derived, but its own evidence, as the Court
18  observed in its tentative ruling, "indicates that Claimant earned substantial sums of
19  money in logging" and that such logging activities and the resulting wealth for
20  Claimant was legal when such money was derived from the business.  TR at 15.

21      It is the government's burden to prove probable cause; it is not Claimant's
22  burden to disprove it.  TR at 15.  Accordingly, it is not enough for the government to
23  merely aver without any evidentiary support that Claimant's government salary is
24  his only legitimate income and that all other wealth he may have accumulated is
25  *ipso facto* proceeds of corruption.  The government has not presented any evidence
26  to support a factual dispute on this issue that would defeat summary judgment.

27      Moreover, as the Court recognized in its tentative ruling, courts that have
28  applied the net worth doctrine have only done so where there was also significant

1  connection, or nexus, evidence.  The government has not presented such evidence of

2  a connection here.  The government's evidence "is insufficient evidence to support

3  probable cause that Claimant's assets were the product of his alleged political

4  corruption, which is the Government's burden to bear."  TR at 16-17; <u>see also</u> Reply

5  Br., ECF No. 94, at 20-23.

6       **Nguema's link to the so-called "Inner Circle."**  The Court has already ruled

7  that the government's broad-stroke allegations indicting the entire system of

8  government in E.G. of general corruption failed as a matter of law to satisfy even

9  the more liberal pleading standard and dismissed the FAC on this basis.  <u>See</u> Order,

10 ECF No. 47.  Yet the government re-hashes its ad hominem attack against President

11 Obiang and "the amorphously defined 'Inner Circle' to which [Claimant] allegedly

12 belonged."  <u>See id.</u> at 4.  Just as with the deficient FAC, however, the government's

13 allegations against President Obiang's administration "fails to disclose when the

14 extortion allegedly occurred or (crucially) Nguema's role in any of the extortionist

15 schemes. . . ."  <u>Id.</u>  Accordingly, they do not create a factual dispute that can defeat

16 summary judgment.

17       Nothing in <u>$493,850</u> changes this conclusion.  The "linking" in <u>$493,850</u> was

18 not the "guilt by association" link the government attempts to make here.  Rather,

19 that "link" was specific evidence of the claimant's involvement in drug trafficking.

20 <u>$493,850</u>, 518 F.3d at 1163, 1169.  This additional evidence included affidavits by

21 two witnesses who testified that claimant "met separately with each of them to

22 discuss the importation and sale of cocaine[, . . .] indicated to these witnesses that he

23 employs his family members in his cocaine operations, and that he personally

24 transports cocaine and currency to Mexico using different types of vehicles."  <u>Id.</u> at

25 1165.  When combined with the government's other evidence suggesting a

26 connection between claimant and his property with drug trafficking, the court found

27 that this additional "linking" evidence – i.e., the corroborating information supplied

28 by the affiants – was sufficient to rise above the "mere suspicion" provided by the

-12-

government's evidence without this further link to drug trafficking.  <u>$493,850</u>, 518 F.3d at 1169.

**The government's other evidence is unavailing**.  This Court's tentative ruling rejected the government's claims that shell companies, possession of cash, and Claimant's statements about his wealth support probable cause.  None of the government's responses compel the Court to alter that ruling.  The undisputed facts remain that Claimant made offers on the property in his own name, that he is identified in Sweetwater Malibu, LLC's publically-filed Statements of Information as "Chief Executive Officer" and the sole manager; and that Claimant holds title to the defendant Ferrari in his own name as an individual.  (See Claimant Fact Nos. A.14-15; Response to Gov't Supp. Fact No. 92.)  Likewise the government's suggestion that transportation of bulk cash is not just associated with drug trafficking, but also with "terrorism, money laundering, racketeering, tax evasion and similar crimes" proves nothing. (Gov't Br. at 16 n.15).  There is no evidence that Claimant is a terrorist or tax evader, and the government's argument simply highlights the lack of evidence it possesses regarding the source of Claimant's funds.  Finally, Claimant's statements about his wealth are not inconsistent.  As the Court explained, "there is no reason for the Court to view Claimant's explanations skeptically because there is no reason to believe the stories are inconsistent."  TR at 13-14.  Moreover, inconsistent statements would not support probable cause that the Defendant Assets are proceeds of foreign corruption as the government alleges. <u>See</u>, <u>e.g.</u>, <u>U.S. v. $49,576.00 U.S. Currency</u>, 116 F.3d 425, 428 (9th Cir. 1997) ("appellant's use of a fake driver's license, his evasive and dishonest answers to questions, and his general nervous behavior are indicative of some illegal activity, but not necessarily of drug trafficking. We therefore conclude that the government failed to produce sufficient evidence to support a finding of probable cause to believe the property was involved in a drug transaction."); <u>U.S. v. U.S. Currency, $30,060.00</u>, 39 F.3d 1039, 1044 (9th Cir. 1994) ("The government also points to

-13-

1   circumstantial evidence regarding the large amount of Alexander's money and his

2   false accounts of the money's source and his own employment record. While this

3   evidence may support a suspicion of illegal activity, a mere suspicion of illegal

4   activity is not enough to establish probable cause that the money was connected to

5   drugs."); $191,910.00, 16 F.3d at 1071 (same).

6   **II.   BECAUSE THE GOVERNMENT DID NOT INVOKE BANK FRAUD**

7   **AS A BASIS FOR FORFEITURE WHEN IT FILED THE ACTION, IT**

8   **CANNOT SUPPORT PROBABLE CAUSE TO INSTITUTE**

9   Ninth Circuit law makes clear that the government cannot defeat a summary

10   judgment motion by claiming that it possessed probable cause for a different

11   specified unlawful activity than that which formed the basis for the institution of the

12   action.  Rather, the government must possess probable cause for the violations it has

13   actually alleged.  In $191,910.00, the court stated "probable cause to believe that the

14   property is involved in some illegal activity is not enough—the government must

15   have probable cause to believe that the property is involved in the activity subject to

16   the specific forfeiture statute it invokes."  16 F.3d at 1071.  Here, the government

17   invoked the general forfeiture statute, 18 U.S.C. § 981(a)(1), by relying on the

18   specific activity of alleged violations of foreign law as the only grounds for

19   forfeiture.  Because the government did not rely on bank fraud as a basis for its

20   claims when it instituted this action, it cannot rely on that non-invoked theory to

21   support probable cause to institute the forfeiture proceeding under a different theory.

22   The probable cause requirement flows from the plain language of 19 U.S.C. §

23   1615 which "requires that probable cause shall be first shown for the institution of

24   such suit or action."  In considering this language the court in $191,910.00 noted

25   that the statute:

26   > does not simply say the government must have probable cause for its
   > action. It says the government must have probable cause for the
27   > *institution of such action*  (emphasis in original).  The clear import of
   > this language is that the government must show that it had probable
28   > cause to institute –that is, probable cause at the time it instituted—the

suit or action in which it seeks to forfeit the claimant's property.  Id. at 1067.

Thus, while evidence of some unpleaded theory may be relevant for some *other* action, it is irrelevant to establish probable cause for the action that was actually instituted.

In $191,910.00, the court noted that the government brought the action under 21 U.S.C. § 881(a)(6), which renders money subject to forfeiture if it was involved in drug trafficking.   Therefore "the government must show that, at the time it brought this action, it had probable cause to believe that the money in Claimant's bags was used or intended to be used in a drug transaction." Id. at 1071.  See also $405,089.23, 122 F.3d at 1289 (forfeiture under 21 U.S.C. § 881(a)(6) required probable cause that property was substantially connected to the sale of controlled substances); $493,850, 518 F.3d 1159 (9th Cir. 2008) (same).

The court in $191,910.00 found that while the government's evidence may have raised some suspicions of illegal activity, it failed to establish probable cause to believe that the money was connected specifically to drug activities.  The court determined that claimant could just have easily been "a distributor of 'street money' in a political campaign, an embezzler, a jewel smuggler, an art thief, or and S&L crook as a drug conspirator.  However, as we have explained, suspicions of general criminality are not enough." Id. at 1072.

Similarly here, the government's suspicions regarding bank fraud, or any other crime for that matter, are irrelevant to whether the government had probable cause for the action it actually instituted.  Unlike section 881, which only permits forfeiture of property involved in drug trafficking, section 981(a)(1) permits forfeiture of property that is involved in or which constitutes the proceeds of violations of more than 247 federal offenses, including the foreign law violations which were the only specific crimes identified by the government when it invoked that forfeiture statute in the original complaint.

Although the bank fraud statute, 18 U.S.C. § 1344, is specifically identified as a basis for forfeiture under section 981, the government deliberately bypassed that section and identified violations of foreign law as the sole basis for its original complaint.[1]   Indeed, the government has admitted that it did not invoke bank fraud in instituting this action, arguing that its bank fraud basis for forfeiture constituted "new claims and allegations that were not alleged in the original complaint" and which are "in effect the commencement of a new suit."  (Gov't Opp. Br. at 8.)[2]   As the government conceded at the most recent hearing, "a lot of the allegations in that second complaint were not in the first complaint.  They were based upon further investigation that took place. . . .   [E]ven the accusations of criminality are different." Hr'g Tr. at 8:5-10.

The government's acknowledgment that the bank fraud claims constitute a new suit belies any suggestion that on April 28, 2011, when it instituted this action, it invoked bank fraud as a basis for forfeiture.  The Court's Tentative Ruling noted that subsequent complaints can fix original pleading defects because "[w]hether probable cause exists to institute proceedings is solely a question of what

---

[1]   Section 981(a)(1)(C) lists 34 specifically-enumerated federal statutes that can give rise to forfeiture.  The last enumerated statute is Section 1344 bank fraud.  Immediately after Section 1344, the forfeiture statute incorporates, in the disjunctive, "or any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title)."  The forfeiture statutory scheme invoked by the government omitted Section 1344, relying instead solely on the disjunctive incorporation of other specified unlawful activity, specifically as "defined by 18 U.S.C. § 1956(c) (7) and include foreign offenses involving 'extortion,' 'bribery of a public official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official.'" Compl., ECF No. 1, at 6.

[2]   Similarly, in defending the FAC, the government conceded that even then it relied on "three distinct claims for forfeiture," and that each of these bases depended on the specified unlawful activity of "offenses against a foreign nation."  Opp., ECF No. 44, at 1-2, 8-9, 11, 14.  It is an undisputed fact that Section 1344 domestic bank fraud was not invoked until the government filed the SAC in June 2012.

CLAIMANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

information is in the government's possession." TR at 17-18 (quoting $191,910.00, 16 F.3d at 1068).  Here, however, the government's failure to invoke the bank fraud statute was not merely a pleading-with-particularity defect or error.  Rather, the government made a strategic decision to base this case solely on violations of foreign law when it instituted the action.  It then amended its complaint, but still omitted a bank fraud theory.  It was not until the Court dismissed the FAC and gave the government leave to amend that the government asserted bank fraud as a basis for forfeiture to try to save its unsupported action.

## III.   CLAIMANTS MOVED FOR AND ARE ENTITLED TO JUDGMENT, WHICH WOULD HAVE A PRECLUSIONARY EFFECT ON FUTURE ACTIONS FOR FORFEITURE ON THE SAME BASES

The government argues that summary judgment does not preclude it from re-filing this case and utilizing evidence it acquired **after** it initiated this action to establish probable cause.  The government suggests that a finding that it did not have probable cause to institute this action is not a determination on the merits and that the probable cause inquiry is merely a threshold issue that allows the government to get into the courthouse door.  If the government finds the door locked (because of a lack of probable cause), the government can simply go around again.

Not only is this argument wholly without merit, but it makes no practical sense.  The government's revolving door theory of probable cause would effectively eliminate the probable cause requirement because the government could always re-file a new claim with evidence it acquired after it instituted the original action.  It bears noting that once again the government's position is directly at odds with statements government's counsel has made in open court:

> Mr. Lee:   That's correct, Your Honor. So the probable cause requirement is what permits the government to either get into the courthouse door or not, and so if it doesn't have probable cause at the time it makes certain allegations, then the case will be dismissed and we would *never* be able to be allowed to enter the courthouse door." Hr'g Tr. at 7:17-22 (emphasis added).

That statement was an accurate statement of the law.  Once a determination has been made that the government lacks probable cause, the proper procedure is to enter judgment on behalf of Claimant.[3]  A review of the disposition of several cases where the claimant prevailed on a motion for summary judgment is instructive.

In U.S. v. $32,000 in U.S. Currency, 2007 WL 1297098 (D. Ariz. Apr. 30, 2007), the district court granted summary judgment for the claimant, ordered the immediate return of the currency and directed the clerk  to "terminate this action."  Id. at *7.  The court thereafter entered *judgment* for the claimant and "ORDERED AND ADJUDGED that the Court having granted [Claimant's] Motion for Summary Judgment, the United States shall return the $32,000 to Edward Leflore. This Complaint and action are hereby dismissed." (Lyons Decl., Ex. A.)

In U.S. v. $31,999.00 in U.S. Currency, 1992 WL 209542 (N.D.N.Y. June 1, 1992), the court granted summary judgment for claimants and "ORDERED, that the Clerk of the Court is directed to enter *judgment dismissing the complaint with prejudice for lack of probable cause*; and it is further ORDERED, that the Government is directed to return the res and any accrued interest over to the claimant no later than five (5) days after the time for filing an appeal of this decision has Expired. . . ."  Id. at *9 (emphasis added) (Lyons Dec. Exhibit B.)

In $186,416 in U.S. Currency, the Court reversed the District Court's denial of claimant's motion for summary judgment and ordered the District Court to enter judgment for claimant."  590 F.3d 942, 955 (9th Cir. 2010).  On remand, the district court entered *judgment* for the claimant and ordered "[t]he res, together with all

---

[3]   Inasmuch as the government vigorously argued that Claimant could not challenge the existence of probable cause by filing a motion to dismiss, the government cannot be heard to complain that entry of judgment is the appropriate order here.

accrued interest . . . returned to claimant not later than forty-five (45) days from the date of the entry of this judgment. . . ." (Lyons Dec. Exhibit C.)

Indeed, in $405,089.23, the Court noted that "Our conclusion that the Government  has failed to demonstrate probable cause for the forfeiture of the targeted assets would ordinarily end the case for the Government because probable cause is a prerequisite for the institution of civil forfeiture proceedings." Id. at 1291.  However, in that case, it was not clear until the court's intervening decision in $191,910.00 (after the court entered summary judgment), that the government could not rely on after-acquired evidence to support probable cause.  Based on the government's representation (on appeal) that it possessed evidence "it obtained prior to the institution of the forfeiture proceedings that would in its opinion establish the requisite probable cause, including the necessary nexus to narcotics activity," the court remanded this case "to allow the Government an opportunity to supplement the record for its summary judgment motion to include additional evidence that was in its possession at the time the complaint was filed." Id. at 1291-92.

Thus, an absence of probable cause entitles Claimant to Judgment and pursuant to 28 U.S.C. § 2465, the immediate return of his property.  The government's authorities do not alter that conclusion.  The government relies on United States v. 9,800, 952 F. Supp 1254 (N.D. Ill. 1996); U.S. v. One Partially Assembled Drag Racer, 899 F. Supp. 1334 (D.N.J. 1995); U.S. v. One Parcel, 705 Supp. 710 (D.R.I. 1989); and U.S. v. $38,000, 816 F.2d 1538 (11th Cir. 1987), to show that courts have dismissed forfeiture actions on probable cause grounds "without prejudice."  However, these cases involved motions to dismiss, ***not summary judgment motions.***  None of those cases involved a determination that the government actually lacked probable cause at the time of the seizure.

Likewise, the government's reliance on Costello v. United States, 365 U.S. 265, 285 (1951) is misplaced.  There, the Court held that a dismissal for failure to file an affidavit of good cause in connection with a de-naturalization proceeding was

04579.23529/5442456.6

1  not a bar to the government re-filing the action with the required affidavit.  The

2  petitioner argued that the earlier dismissal should have been construed to be with

3  prejudice because the order did not specify that it was without prejudice, and the

4  ground of dismissal was not within one of the exceptions under Rule 41(b).  The

5  Court noted that at common law, dismissal on a ground not going to the merits was

6  not ordinarily a bar to a subsequent action on the same claim.  The court noted Rule

7  41(b) was not a change to this common-law principle because the dismissals

8  enumerated in Rule 41(b)

9      primarily involve situations in which the defendant must incur the
inconvenience of preparing to meet the merits because there is no initial

10      bar to the Court's reaching them.  It is therefore logical that a dismissal
on one of these grounds should, unless the Court otherwise specifies,

11      bar a subsequent action.  Id. at 286.

12      The court noted that in contrast, the failure of the government to file the

13  affidavit of good cause did not operate as an adjudication on the merits because the

14  defendant is not put to the necessity of preparing a defense because the failure of the

15  government to file the affidavit with the complaint requires dismissal.  Id. at 287.

16      Thus, Costello does not deal with the issue of probable cause on summary

17  judgment.  However, to the extent it has any applicability, it is clear that this Court's

18  order granting summary judgment here must be with prejudice because Claimant

19  has "incur[red] the inconvenience of preparing to meet the merits. . . ."  See id. at

20  286.  The government's failure to demonstrate probable cause cannot be equated

21  with simply attaching an affidavit of good cause to a complaint.  Rather, Claimant

22  was forced to conduct discovery and file a summary judgment motion in order to

23  demonstrate that the government lacked probable cause.

## Conclusion

24

25      For the foregoing reasons, the Court should grant Claimants' motion, enter

26  judgment in favor of Claimants and order the immediate return of the Defendant

27  Assets.

28

1  DATED:  July 31, 2013         QUINN EMANUEL URQUHART &
                                 SULLIVAN, LLP

2

3

4                               By  /s/ Duane R. Lyons
                                    Duane R. Lyons
5                                   Brian M. Wheeler
                                    Attorneys for Claimants Vice President
6                                   Teodoro Nguema Obiang Mangue and
                                    Sweetwater Malibu, LLC
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28